1
2
3
4

HOLLAND & KNIGHT LLP
Samuel J. Stone (SBN 317013)
400 S. Hope Street, 8th Floor
Los Angeles, CA 90071
Telephone: (213) 896-2400
Facsimile:  (213) 895.2450
Email:  sam.stone@hklaw.com

5
6
7
8
9

HOLLAND & KNIGHT LLP
Nipun J. Patel (*pro hac vice*)
Justin M. Kadoura (*pro hac vice*)
1650 Market Street, Suite 3300
Philadelphia, Pennsylvania 19103
Phone: 215.252.9527
Fax: 215.867.6070
Email: nipun.patel@hklaw.com
          justin.kadoura@hklaw.com

10
11

Attorneys for Defendants
Defendant WSP USA, INC., WSP USA BUILDINGS INC.,
and kW MISSION CRITICAL ENGINEERING, D.P.C.,

12

13

**UNITED STATES DISTRICT COURT**

14

**NORTHERN DISTRICT OF CALIFORNIA**

15

16
17
18
19
20
21
22
23
24
25

CG ENTERPRISES HOLDINGS, LLC, a
California limited liability company; and
STEPHEN M. COON, an individual

          Plaintiffs,

      vs.

WSP USA, INC., a New York corporation;
WSP USA BUILDINGS, INC., a New
York corporation; kW MISSION
CRITICAL ENGINEERING, D.P.C., a
New York design professional corporation;
and DOES 1 through 20, inclusive,
Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No.:  3:24-CV-00292

Hon. Vince Chhabria

**DECLARATION OF KENNETH
CLAUSEN**

26

27

28

DECLARATION OF KENNETH CLAUSEN                                    Case No.:  3:24-CV-00292

I, Kenneth Clausen, hereby declare and state as follows:

1. I am the Troy, NY office managing principal and director of operations for kW Mission Critical Engineering ("kW MCE"), a national business line of Defendant WSP USA Buildings, Inc. ("WSP Buildings").

2. Defendant WSP USA, Inc. ("WSP USA"), is an indirect subsidiary of WSP Buildings.

3. I am an adult over the age of eighteen.

4. I have personal knowledge of the facts set forth in this Declaration or learned of those facts from others with personal knowledge, and am authorized by the Defendants to make this Declaration in support of Defendants' Motion to Dismiss, Transfer, or Stay Plaintiffs' Complaint.

5. In December 2020, WSP Buildings acquired by merger kW MCE, a small (then approximately 175 employee) engineering firm that focused primarily on designing data centers and other mission-critical projects.

6. kW Mission Critical Engineering, D.P.C. no longer exists as a standalone corporate entity.

7. The acquisition of kW MCE closed on December 30, 2020.

8. WSP Buildings and WSP USA are New York corporations with a New York principal place of business.

9. The operations of kW MCE, and now the kW MCE business division of WSP, have been based in Troy, New York, since long before the acquisition. As part of his job duties post-merger, Coon routinely and frequently communicated with employees in the Troy, New York office of the kw MCE division of WSP Buildings, including myself. As a result of those communications and my direct oversight of operations for the kW MCE division, I have personal knowledge of Coon's performance, work, job duties, and business activities both pre- and post-merger.

10. Stephen Coon worked for kW MCE for approximately seven years before the acquisition.

DECLARATION OF KENNETH CLAUSEN                    Case No.:  3:24-CV-00292

11. On December 30, 2020, as part of the merger, Coon was hired by WSP Buildings as a Professional Electrical Engineer and Managing Principal of the Phoenix Office.

12. As part of the acquisition, kW MCE's senior leadership team and key employees, including Coon, signed employment agreements and retention agreements containing restrictive covenants.

13. Attached hereto as Exhibit B is a true and correct copy of Coon's Employment Agreement.

14. Attached hereto as Exhibit C is a true and correct copy of Coon's Retention Bonus Agreement.

15. Coon was responsible for providing technical engineering expertise and developing successful relationships with design team partners—architects, engineers, and contractors.

16. Coon gained substantial experience and insight into kW MCE's data center business, and had key responsibilities for leadership of key client accounts and projects associated with data center program design and build out.

17. Coon also gained knowledge about all aspects of kW MCE's customers' programs, including schedule, budget, risk and desired engineering team.

18. The customer relationships, goodwill, trade secrets, client accounts and ongoing projects were part of the business kW MCE sold to WSP.

19. On November 2, 2022, Coon tendered notice that he would not renew the Employment Agreement and wanted to continue his employment with WSP as an at-will employee.

20. Attached hereto as Exhibit D is a true and correct copy of Coon's November 2, 2022 notice.

21. On October 18, 2023, Coon tendered his resignation letter.

22. Attached hereto as Exhibit E is a true and correct copy of Coon's resignation letter.

23. Coon's last day of employment with WSP was November 3, 2023.

2

24.     Prior to his resignation, Coon openly admitted to me that he was starting a competing business in Phoenix and upstate New York, near kW MCE's Troy, New York office, and had a lease ready to be executed in January of 2024.

25.     Coon also told me that he was "going to be taking anyone in Troy who had not signed a retention agreement," and acknowledged that he needed kW MCE's mechanical engineers to deliver on competitive services to the very clients Coon was responsible for servicing at kW MCE.

26.     Coon told me that by recruiting those experienced mechanical engineers, he could start a business that could compete directly with WSP.

27.     Coon also bragged to me that a member of the C-suite of another company, Bowman Engineering, already planned to acquire his business once it reached $25 million dollars in annual revenue.

28.     Coon has solicited several former kW MCE/WSP employees, including at least Jason Leone, Gary Russinko, Andrew Stercho, and Jonathan Sterling.

29.     Leone was a Principal Mechanical Engineer and is subject to restrictive covenants contained in his own Retention Bonus Agreement.

30.     Attached hereto as Exhibit F is a true and correct copy of Leone's Retention Bonus Agreement.

31.     Leone resigned from WSP on December 5, 2023.  His last day was December 22, 2023, and he has refused to disclose his new employer.

32.     Russinko was the Managing Principal of WSP's Troy Office and is subject to restrictive covenants contained in his own Retention Bonus Agreement.

33.     Attached hereto as Exhibit G is a true and correct copy of Russinko's Retention Bonus Agreement.

34.     Russinko resigned from WSP on October 30, 2023.  His last day was December 1, 2023, and he too has refused to disclose his new employer.

35.     Stercho was a Principal Fire Protection Engineer for WSP.

3

36. Stercho resigned from WSP on January 2, 2024, and he too has refused to disclose his new employer.

37. Sterling was a Plumbing Designer for WSP.

38. Sterling resigned from WSP on January 2, 2024, and he too has refused to disclose his new employer.

39. The data-center design business is extremely competitive, with each company's ability to compete largely dependent on, inter alia, (1) its ability to understand and accommodate a client's needs, and (2) the quality and reputation of its specific engineers.

40. The key accounts that Coon was responsible for servicing have the potential to generate the tens of millions of dollars for FY 2024 and beyond.

41. Coon has in-depth knowledge of customer preferences, pricing, desired team, project specifications, engineering specifications, and kW MCE's existing and past work for those key customers.

42. Competition from former kW MCE/WSP employees—and especially high-level employees like Coon—would be devastating for WSP.  Based on Coon's prior comments to me, he is likely to target other key kW MCE employees in early 2024, if he has not already done so.

43. I have also received information from design partners suggesting that Coon is soliciting competitive work from kW MCE's existing customers.

44. The kW MCE business division has virtually no connection to the state of California:  it has no facilities, office centers, or training centers in California.

45. None of WSP's employees in the kw MCE division are based in California.

46. At the time he was hired by WSP Buildings until at least the date of his termination, Coon resided in Arizona.

47. Coon's primary client accounts were located outside of California.

48. Payroll transactions for Coon's salary and bonuses were processed from kW Mission Critical Engineering (from January 2021 to April 2021) and WSP US Building Inc. (from April 2020 to October 2023).

49.     Coon communicated by telephone and email with WSP employees located in either Troy, New York or Atlanta, Georgia, including individuals who support WSP's IT, HR, benefits, marketing, and sales functions across the country.

50.     Coon would have contacted New York or Georgia-based WSP employees to resolve payroll, benefits, or other problems throughout the course of his employment.

51.     Coon's medical coverage, medical benefits, and retirement plans during his employment with WSP Buildings were administered from New York.

52.     Coon's timekeeping, customer billing and email were managed in or from New York.

53.     Coon's Employment Agreement and Retention Bonus Agreement were negotiated between individuals located in Troy, New York, and executed by WSP in New York, New York.

54.     Russinko, Leone, Stercho, and Sterling were based out of the same Troy, New York office where I am also based.

I hereby declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Dated:  February 1, 2024                    _____

                                                    Kenneth Clausen

DECLARATION OF KENNETH CLAUSEN                    Case No.:  3:24-CV-00292

# EXHIBIT A

HOLLAND & KNIGHT LLP
Samuel J. Stone (SBN 317013)
400 S. Hope Street, 8th Floor
Los Angeles, CA 90071
Telephone: (213) 896-2400
Facsimile:  (213) 895.2450
Email:  sam.stone@hklaw.com

HOLLAND & KNIGHT LLP
Nipun J. Patel (*pro hac vice*)
Justin M. Kadoura (*pro hac vice*)
1650 Market Street, Suite 3300
Philadelphia, Pennsylvania 19103
Phone: 215.252.9527
Fax: 215.867.6070
Email: nipun.patel@hklaw.com
        justin.kadoura@hklaw.com

Attorneys for Defendants
Defendant WSP USA, INC., WSP USA BUILDINGS INC.,
and kW MISSION CRITICAL ENGINEERING, D.P.C.,

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CG ENTERPRISES HOLDINGS, LLC, a California limited liability company; and STEPHEN M. COON, an individual<br><br>Plaintiffs,<br><br>vs.<br><br>WSP USA, INC., a New York corporation; WSP USA BUILDINGS, INC., a New York corporation; kW MISSION CRITICAL ENGINEERING, D.P.C., a New York design professional corporation; and DOES 1 through 20, inclusive, Defendants. | Case No.:  3:24-CV-00292<br><br>Hon. Charles R. Breyer<br><br>**DECLARATION OF KENNETH CLAUSEN** |

I, Kenneth Clausen, hereby declare and state as follows:

1. I am the Troy, NY office managing principal and director of operations for kW Mission Critical Engineering ("kW MCE"), a national business line of Defendant WSP USA Buildings, Inc. ("WSP Buildings").

2. Defendant WSP USA, Inc. ("WSP USA"), is an indirect subsidiary of WSP Buildings.

3. I am an adult over the age of eighteen.

4. I have personal knowledge of the facts set forth in this Declaration or learned of those facts from others with personal knowledge, and am authorized by the Defendants to make this Declaration in support of Defendants' Motion to Dismiss, Transfer, or Stay Plaintiffs' Complaint.

5. In December 2020, WSP Buildings acquired by merger kW MCE, a small (then approximately 175 employee) engineering firm that focused primarily on designing data centers and other mission-critical projects.

6. kW Mission Critical Engineering, D.P.C. no longer exists as a standalone corporate entity.

7. The acquisition of kW MCE closed on December 30, 2020.

8. WSP Buildings and WSP USA are New York corporations with a New York principal place of business.

9. The operations of kW MCE, and now the kW MCE business division of WSP, have been based in Troy, New York, since long before the acquisition. As part of his job duties post-merger, Coon routinely and frequently communicated with employees in the Troy, New York office of the kw MCE division of WSP Buildings, including myself. As a result of those communications and my direct oversight of operations for the kW MCE division, I have personal knowledge of Coon's performance, work, job duties, and business activities both pre- and post-merger.

10. Stephen Coon worked for kW MCE for approximately seven years before the acquisition.

DECLARATION OF KENNETH CLAUSEN                    Case No.:  3:24-CV-00292

11. On December 30, 2020, as part of the merger, Coon was hired by WSP Buildings as a Professional Electrical Engineer and Managing Principal of the Phoenix Office.

12. As part of the acquisition, kW MCE's senior leadership team and key employees, including Coon, signed employment agreements and retention agreements containing restrictive covenants.

13. Attached hereto as Exhibit B is a true and correct copy of Coon's Employment Agreement.

14. Attached hereto as Exhibit C is a true and correct copy of Coon's Retention Bonus Agreement.

15. Coon was responsible for providing technical engineering expertise and developing successful relationships with design team partners—architects, engineers, and contractors.

16. Coon gained substantial experience and insight into kW MCE's data center business, and had key responsibilities for leadership of key client accounts and projects associated with data center program design and build out.

17. Coon also gained knowledge about all aspects of kW MCE's customers' programs, including schedule, budget, risk and desired engineering team.

18. The customer relationships, goodwill, trade secrets, client accounts and ongoing projects were part of the business kW MCE sold to WSP.

19. On November 2, 2022, Coon tendered notice that he would not renew the Employment Agreement and wanted to continue his employment with WSP as an at-will employee.

20. Attached hereto as Exhibit D is a true and correct copy of Coon's November 2, 2022 notice.

21. On October 18, 2023, Coon tendered his resignation letter.

22. Attached hereto as Exhibit E is a true and correct copy of Coon's resignation letter.

23. Coon's last day of employment with WSP was November 3, 2023.

DECLARATION OF KENNETH CLAUSEN                    Case No.:  3:24-CV-00292

24.     Prior to his resignation, Coon openly admitted to me that he was starting a competing business in Phoenix and upstate New York, near kW MCE's Troy, New York office, and had a lease ready to be executed in January of 2024.

25.     Coon also told me that he was "going to be taking anyone in Troy who had not signed a retention agreement," and acknowledged that he needed kW MCE's mechanical engineers to deliver on competitive services to the very clients Coon was responsible for servicing at kW MCE.

26.     Coon told me that by recruiting those experienced mechanical engineers, he could start a business that could compete directly with WSP.

27.     Coon also bragged to me that a member of the C-suite of another company, Bowman Engineering, already planned to acquire his business once it reached $25 million dollars in annual revenue.

28.     Coon has solicited several former kW MCE/WSP employees, including at least Jason Leone, Gary Russinko, Andrew Stercho, and Jonathan Sterling.

29.     Leone was a Principal Mechanical Engineer and is subject to restrictive covenants contained in his own Retention Bonus Agreement.

30.     Attached hereto as Exhibit F is a true and correct copy of Leone's Retention Bonus Agreement.

31.     Leone resigned from WSP on December 5, 2023.  His last day was December 22, 2023, and he has refused to disclose his new employer.

32.     Russinko was the Managing Principal of WSP's Troy Office and is subject to restrictive covenants contained in his own Retention Bonus Agreement.

33.     Attached hereto as Exhibit G is a true and correct copy of Russinko's Retention Bonus Agreement.

34.     Russinko resigned from WSP on October 30, 2023.  His last day was December 1, 2023, and he too has refused to disclose his new employer.

35.     Stercho was a Principal Fire Protection Engineer for WSP.

DECLARATION OF KENNETH CLAUSEN                    Case No.:  3:24-CV-00292

36.     Stercho resigned from WSP on January 2, 2024, and he too has refused to disclose his new employer.

37.     Sterling was a Plumbing Designer for WSP.

38.     Sterling resigned from WSP on January 2, 2024, and he too has refused to disclose his new employer.

39.     The data-center design business is extremely competitive, with each company's ability to compete largely dependent on, inter alia, (1) its ability to understand and accommodate a client's needs, and (2) the quality and reputation of its specific engineers.

40.     The key accounts that Coon was responsible for servicing have the potential to generate the tens of millions of dollars for FY 2024 and beyond.

41.     Coon has in-depth knowledge of customer preferences, pricing, desired team, project specifications, engineering specifications, and kW MCE's existing and past work for those key customers.

42.     Competition from former kW MCE/WSP employees—and especially high-level employees like Coon—would be devastating for WSP.  Based on Coon's prior comments to me, he is likely to target other key kW MCE employees in early 2024, if he has not already done so.

43.     I have also received information from design partners suggesting that Coon is soliciting competitive work from kW MCE's existing customers.

44.     The kW MCE business division has virtually no connection to the state of California:  it has no facilities, office centers, or training centers in California.

45.     None of WSP's employees in the kw MCE division are based in California.

46.     At the time he was hired by WSP Buildings until at least the date of his termination, Coon resided in Arizona.

47.     Coon's primary client accounts were located outside of California.

48.     Payroll transactions for Coon's salary and bonuses were processed from kW Mission Critical Engineering (from January 2021 to April 2021) and WSP US Building Inc. (from April 2020 to October 2023).

49.     Coon communicated by telephone and email with WSP employees located in either Troy, New York or Atlanta, Georgia, including individuals who support WSP's IT, HR, benefits, marketing, and sales functions across the country.

50.     Coon would have contacted New York or Georgia-based WSP employees to resolve payroll, benefits, or other problems throughout the course of his employment.

51.     Coon's medical coverage, medical benefits, and retirement plans during his employment with WSP Buildings were administered from New York.

52.     Coon's timekeeping, customer billing and email were managed in or from New York.

53.     Coon's Employment Agreement and Retention Bonus Agreement were negotiated between individuals located in Troy, New York, and executed by WSP in New York, New York.

54.     Russinko, Leone, Stercho, and Sterling were based out of the same Troy, New York office where I am also based.

I hereby declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:  February 1, 2024                        _____

                                                Kenneth Clausen

DECLARATION OF KENNETH CLAUSEN                    Case No.:  3:24-CV-00292

# EXHIBIT B

## SENIOR LEADERSHIP EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT (this "Agreement") is made and entered into this December 30, 2020 (the "Effective Date") by and between kW Mission Critical Engineering d.p.c. or its successor in interest, (the "Company"), and Stephen Coon ("Senior Leader").

WHEREAS, the Company desires to employ Senior Leader as its Managing Principal (pre-integration) or Senior Director or a similar role (post-integration) with WSP USA, and Senior Leader desires to be employed by the Company in said capacity or a similar role post integration with WSP USA; and

WHEREAS, each party desires to set forth in writing the terms and conditions of their understandings and agreements;

NOW, THEREFORE, in consideration of the mutual covenants and obligations contained herein, the Company hereby agrees to employ Senior Leader and Senior Leader hereby accepts such employment upon the terms and conditions set forth in this Agreement:

1. **Position**

(a) Beginning December 30, 2020 (the "Effective Date"), the Company agrees to employ Senior Leader in the position of Managing Principal before integration into WSP USA or in the position of Senior Director or a similar role, after integration with WSP USA. As Managing Principal/Senior Director, Senior Leader shall serve and perform the management duties and exercise the powers which may from time to time be reasonably assigned to or vested in them by the Company.

(b) Senior Leader agrees that during the term of this Agreement, they will devote their best efforts and all of their business time and attention to all facets of the business of the Company and will faithfully and diligently carry out the duties of Managing Principal/Senior Director. Senior Leader will not, during the Term of this Agreement, directly or indirectly engage in any business, either as an employee, employer, consultant, principal, officer, director, advisor, or in any other capacity, either with or without compensation, without the prior written consent of the Company.

(c) During the performance of duties under this Agreement, Senior Leader agrees to comply with (i) all federal, state and local laws, ordinances and regulations, (ii) Company policies, procedures, and directions, as in effect from time-to-time, and (iii) the Company Code of Conduct, as amended.

(d) Subject to any restrictions imposed on the Company or any agreement between Senior Leader and the Company in light of the COVID-19 pandemic, Senior Leader shall perform their duties from the Company's offices in Phoenix, Arizona; provided, however, that Senior Leader shall travel as necessary to carry out all assigned duties.

(e) Senior Leader represents that, as of the Effective Date, they are not subject to any contract, agreement, or other legal obligation (including, without limitation, any restrictive

covenant) restricting their ability to accept employment with the Company or fully and faithfully carry out the duties and responsibilities.  Senior Leader shall immediately notify the Company upon becoming aware of any such restrictions, whether actual or alleged.  Senior Leader agrees not to disclose to the Company, or use for the Company's benefit, any confidential information or trade secrets of any person in violation of any law, contract, or other legally-enforceable restriction.

## 2.  Term

The term of this Agreement shall be two (2) years from the Effective Date, and shall be automatically extended from year to year on the same terms and conditions  (the "Term"); subject to (a) termination under Section 5 herein; or (b) or upon advance written notice from one party to the other of their intent to not renew the Agreement at least thirty (30) calendar days before the current Term is set to expire. Nothing stated in this Agreement or represented orally or in writing to either party shall create an obligation to renew this Agreement. If either party elects to terminate this Agreement at the end of the  Term, for reasons not covered under Section 5, the Senior Leader will convert to an at-will employee.

## 3.  <u>Compensation</u>

(a) <u>Base Salary.</u>  The Company shall pay the Senior Leader an annual base salary of $200,000.16 ("Annual Base Salary"), which amount may be adjusted annually at the sole discretion of the Company.

(b) <u>Performance Bonus.</u>  In addition to the Annual Base Salary and other benefits thereunder, Senior Leader shall be eligible for an annual bonus (the "Performance Bonus"), based upon the financial performance of the Company as set and determined by the Company, and the achievement of performance objectives set by the Company (the "Performance Criteria").  The actual amount, if any, of the Performance Bonus granted to Senior Leader upon the achievement of the Performance Criteria shall be in the sole discretion of the Company.  The Performance Bonus shall be paid as soon as reasonably practicable, but in no event more than ninety (90) days, following the end of the Company's fiscal year.

(c) <u>Payment.</u>  Payment of all compensation to Senior Leader hereunder shall be made in accordance with the relevant Company policies in effect from time to time, including normal payroll practices, and shall be subject to all applicable employment and withholding taxes.

## 4.  <u>Benefits</u>

(a) <u>Generally.</u>  The Company shall make available to Senior Leader, throughout the Term of this Agreement, such equipment, benefits, and perquisites as are generally provided by the Company to its Senior Leader employees, including but not limited to (i) use of a computer or similar hardware provided by the Company, and (ii) any group life, health, dental, vision, disability or accident insurance, pension plan, profit-sharing plan, retirement savings plan, 401(k) plan, or other such benefit plan or policy which may presently be in effect or which may hereafter be adopted by the Company for its Senior Leader officers and key management

personnel; provided, however, that nothing herein contained shall be deemed to require the Company to adopt or maintain any particular plan or policy.

(b) PTO.  The Senior Leader shall be entitled to paid time off, (for vacation, personal and/or sick days), during each calendar year, consistent with the policies then applicable to Senior Leader officers and key management personnel.

(c) Holidays.  The Senior Leader shall be entitled to paid holidays, consistent with the policies then applicable to Senior Leader officers and key management personnel.

(d) Reimbursement of Expenses.  The Company shall reimburse Senior Leader, upon presentation of receipts or other adequate documentation, for all reasonable business expenses incurred by Senior Leader in the course of rendering services to the Company under this Agreement, including any travel expenses for travel on behalf of the Company.  Such reimbursement shall be subject to, and must comply with, the Company's policies and procedures regarding expense reimbursement.

**5.  Termination**

(a) Termination by Senior Leader for Good Reason.  Senior Leader may terminate this Agreement for "Good Reason" after providing ninety (90) days written notice to the Company.  "Good Reason" shall consist of:

(i)    A material diminution in the nature or scope of Senior Leader's duties, responsibilities, authority, powers or functions (other than as a result of a sale or other disposition of the equity or assets of the Company and/or its affiliates);

(ii)    A non-voluntary material reduction in Senior Leader's Annual Base Salary, except for any such reduction in connection with a general proportionate reduction in the compensation of senior employees of the Company and/or its affiliates;

(iii)    Removal of the Senior Leader from their position as Managing Principal (pre-integration) or Senior Director/similar role (post-integration) with WSP USA, other than for "Cause" or by death or disability, as set forth in Section 5(b), (e) and (f), during the Term;

(iv)    Failure by the Company to make any payment to Senior Leader required to be made under the terms of this Agreement, if the breach is not cured within thirty (30) days after Senior Leader provides written notice to the Company which provides in reasonable detail the nature of the payment; or

(v)    A relocation of Senior Leader's principal place of business by more than 30 miles.

(b) Termination by the Company for Cause.  The Company may terminate Senior Leader's employment with the Company at any time for "Cause," as determined by the Company.  Upon termination by the Company for Cause, Senior Leader shall be entitled to a payment of all accrued but unpaid Annual Base Salary, vacation, and any other amounts then due

and payable to Senior Leader thereunder, as of the date of Senior Leader's termination.  Senior Leader shall not be entitled to any other payments from the Company, including severance payments stated in Section 6.  "Cause" shall consist of:

        (i)     Willful refusal or unreasonable neglect to perform the Senior Leader's duties, as reasonably determined by the Company, if the willful refusal or unreasonable neglect is not cured within thirty (30) days after the Company provides written notice to the Senior Leader which provides in reasonable detail the nature of such refusal or neglect to perform duties;

        (ii)     Commission of an act involving willful misrepresentation, deceit, dishonesty, fraud, perjury, moral turpitude, embezzlement, harassment, unlawful retaliation, or other misleading or unlawful conduct, or conduct that impairs or injures the reputation of the Company;

        (iii)     The conviction of Senior Leader of, or entry by the Senior Leader of a plea of guilty or no contest to, any (a) felony, (b) crime involving dishonesty or moral turpitude, or (c) crime or tort relating to the Company, its business, or its competitors;

        (iv)     Being under the influence of alcohol (other than in circumstances where socially acceptable and within reasonable levels) or being under the influence of drugs (other than over-the-counter or prescription medicine to the extent such medicine is taken in accordance with its directions or under the supervision of a physician) during the performance of Senior Leader's duties;

        (v)     Conduct determined by the Company to be a breach of the Senior Leader's duty of loyalty, or any acts by Senior Leader to aid, abet, or support an entity engaged in the Same or Similar Business of the Company as defined in Section 8(b);

        (vi)     Failure to provide full and complete cooperation in any investigation by the Company; or

        (vii)     A material breach of the terms of this Agreement, if the breach is not cured within thirty (30) days after the Company provides written notice to the Senior Leader which provides in reasonable detail the nature of the breach.

      (c)  <u>Termination by the Company Without Cause.</u>  The Company may terminate this Agreement at any time without Cause prior to the expiration of the Term.

      (d)  <u>Voluntary Resignation by Senior Leader.</u>  Senior Leader may terminate this Agreement prior to the expiration of the term after providing ninety (90) days written notice to the Company.  If this occurs, Senior Leader will be entitled to a payment of all accrued but unpaid Annual Base Salary, vacation, and any other amounts then due and payable to Senior Leader, as of the date of Senior Leader's resignation.

      (e)  <u>Disability.</u>  The Company may terminate this Agreement at any time if the Company determines Senior Leader has sustained a "disability."  Senior Leader shall be deemed

to have sustained a "disability" if Senior Leader is physically or mentally incapacitated so as to render Senior Leader unable to fully perform the essential functions of the position, with or without reasonable accommodation, for a consecutive period of more than ninety (90) days.

(f)  Death.  This Agreement will terminate automatically upon Senior Leader's death.

### 6.  **Payments Upon Termination; Clawback**

(a)  Upon termination of this Agreement pursuant to Section 5, Senior Leader shall be entitled to payment of:

(i)   The unpaid portion of Senior Leader's then-current Annual Base Salary which has accrued through their date of termination;

(ii)   If unpaid, the unpaid portion of the Performance Bonus for the fiscal year most recently completed that the Company has awarded, if any, to the Senior Leader prior to the Senior Leader's termination of employment with the Company, pursuant to the terms of Section 3(b); and

(iii)   To the extent required by law or Company policy in effect at the time of Senior Leader's termination, the value of any accrued, unused vacation and reimbursement of expenses, which are due, accrued, or payable.

(b)  In addition to the payments set forth in Section 6(a), upon termination of Senior Leader under Section 5(a), 5(e), or upon termination by the Company without Cause under Section 5(c), Senior Leader (their estate, or legal representatives, as the case may be) will be entitled to:

(i)   A severance payment equal to six (6) months of Senior Leader's then current Annual Base Salary;

(ii)   Payment of one half of the annual Performance Bonus for the year in which the termination occurs calculated as though all Performance Criteria have been achieved for the entire year, unless termination is made more than six (6) months after the start of the fiscal year, under which circumstances Senior Leader would receive a prorated Performance Bonus payment calculated as though all Performance Criteria have been achieved; and

(c)  Receipt of the payments set forth in Section 6(b) above are expressly conditioned on execution (without revocation) by Senior Leader of an agreement containing a general release and waiver of claims, confidentiality provisions, and other terms satisfactory to the Company that do not contradict the terms of this Agreement, within sixty (60) days following the date of such termination, or such longer period if required by law.  Any payment by the Company to Senior Leader under this Section 6 shall be paid in equal bi-weekly installments, to coincide with the Company's normal payroll period, over a one-year period, or at other intervals as mutually agreed by the Parties following termination.

5

(d) Notwithstanding any other provision of this Agreement, the Company shall not be required to make any payment set forth in Section 3(b) or 6(b) of this Agreement, or any other bonus or incentive payment previously authorized by the Company, and may seek repayment of such payments if previously made, if the Company determines:

       (i)     Senior Leader engaged in conduct that constitutes "Cause" pursuant to Section 5(b), regardless of whether Senior Leader was terminated pursuant to such provision;

       (ii)    Senior Leader engaged in conduct that would otherwise require or permit the Company to withhold or seek repayment under applicable law.

## 7.   <u>Nondisclosure</u>

(a) <u>Confidential Information.</u> The Company will give Senior Leader access to, and Senior Leader will become familiar with, various trade secrets and other confidential business information, consisting of, but not limited to: research and development information; formulas; designs; systems; codes; computer, internet, and intranet software and files; records; strategies; marketing procedures; processes; computer programs; compilations of information; client requirements; pricing techniques; contracts; lists identifying customers, budgeting and financial information; partners, or investors; employee information; methods of doing business; and other confidential information that is regularly used in the operating, technology, and business dealings of the Company ("Confidential Information"). "Confidential Information" does not include information that (i) is or becomes generally available to the public other than as a result of a disclosure, directly or indirectly, by Senior Leader, or (ii) is or becomes available to Senior Leader on a non-confidential basis from a source other than the Company, provided that such source is not known by Senior Leader to be bound by a confidentiality agreement with or other obligation of non-disclosure to any Person.

(b) <u>Non-Disclosure of Confidential Information.</u>

       (i)     The Senior Leader agrees that all Confidential Information, whether prepared by Senior Leader or otherwise coming into their possession, shall remain the exclusive property of the Company.  Senior Leader further agrees that, except as provided herein, Senior Leader shall not, without the prior written consent of the Company, use or disclose to any third party any of the Confidential Information, directly or indirectly, either during Senior Leader's employment with the Company or at any time following the termination of Senior Leader's employment with the Company.

       (ii)    Pursuant to the Defend Trade Secrets Act of 2016, Senior Leader acknowledges and agrees that an individual may not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that is made (a) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney; and (b) solely for the purpose of reporting or investigating a suspected violation of law; or is made in a complaint or other document that is filed under seal in a lawsuit or other proceeding.  An individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the employer's trade

secrets to their attorney and use the trade secret information in the court proceeding only if the individual files any document containing the trade secret under seal, and does not disclose the trade secret, except pursuant to court order.

(iii)    Nothing herein shall prevent Senior Leader from disclosing Confidential Information (a) upon the order of any court or administrative agency, (b) upon the request or demand of any regulatory agency or authority having jurisdiction over Senior Leader or the Company, (c) to the extent required by law or regulation, or (d) to the extent necessary in connection with any suit, action or proceeding relating to this Agreement or the exercise of any remedy thereunder.

(c) <u>Return of Confidential Information.</u>  Senior Leader shall promptly deliver to the Company at such time as Senior Leader's employment with the Company terminates, or at any time that the Company may request, all memoranda, notes, plans, data, drawings, manuals, letters, records, reports, electronic mail, recordings, computer tapes and software and other documents and data, constituting or relating to Confidential Information or Work Product (as defined in Section 9) which the Senior Leader may then possess or have under the Senior Leader's control.

(d) Senior Leader acknowledges that the Confidential Information and other consideration to be provided to Senior Leader pursuant to this Agreement give rise to the Company's interest in restraining Senior Leader from disclosing the Company's Confidential Information.

### 8.  **<u>Non-Competition and Non-Solicitation</u>**

As an incentive and as a specific condition for entering into this Agreement, the Parties make, give, and agree to the following covenants respecting competition and solicitation:

### B.  **Non-Compete:**

(i)    The Company is in a highly competitive business and expends a considerable amount of money in the development of business from new clients and customers and continued business from existing clients and customers. The business and clientele of the Company are national and worldwide in scope, and therefore the territorial and time limitations set forth in this Non-Compete clause are reasonable and necessary for the protection of the Company's interests.

(ii)    During Employee's employment with the Company or its successor-in-interest and for a period of 12 months following the termination of Employee's employment for any reason (voluntary or involuntary), Employee shall not directly or indirectly own, manage, operate, control, be employed by, consult with or participate in the ownership, management, operation or control of any business, in a manner that would reasonably be expected to divert business from any of the Company's "Clients" or "Prospective Clients" with whom Employee had any involvement in developing, servicing, soliciting, or maintaining during the year prior to Employee's termination.

    (iii) Clients is defined as clients who the Company provided services for at any time during the 12-month period immediately preceding Employee's termination. "Prospective Clients" includes any person or entity: (a) to whom the Company has submitted qualifications or a proposal with Employee's direct personal involvement during the 12 months prior to Employee's termination; or (b) concerning whom Employee was assisting the Company in preparing a submittal of qualifications or a proposal at the time of Employee's termination.

    **C. Non-Solicitation of Employees, Consultants, and Contractors:** During Employee's employment with the Company or its successor-in-interest, and for a period of 12 months following the termination of Employee's employment for any reason (voluntary or involuntary), Employee shall not directly or indirectly (on Employee's own or in combination or association with others, and whether for Employee's own benefit or for the benefit of other persons or entities) engage in activity which involves or could result in the actual or potential termination of the Company's relationship with or the solicitation, hiring, or engagement of any person or entity who is, at the time, or was within the last 12 months of Employee's employment within the Company, an employee, consultant, or independent contractor of the Company or any of its affiliates, including for greater certainty, any affiliate U.S. company of WSP USA ("Affiliate").

    D. **Non-Solicitation of Clients:** During Employee's employment with the Company and for a period of 12 months following the termination of Employee's employment for any reason (voluntary or involuntary), Employee shall not directly or indirectly (on Employee's own or in combination or association with others, and whether for Employee's own benefit or for the benefit of other parties or entities) contact, call upon, solicit or otherwise accept business from, render services to, market services or products to, divert business from, and/or interfere with the Company's relationship or business with any of the Company's existing Clients or Prospective Clients (as that term is defined above) that Employee interacted with on behalf of the Company, was introduced to by virtue of Employee's employment with the Company, or otherwise learned confidential information concerning during the last 12 months of Employee's employment within the Company.

    E. **Miscellaneous**: To the extent Employee's restrictive covenants obligations under Employee's Retention Bonus Agreement with the Company, or any Stock Purchase Agreement, are more restrictive than those provided hereunder, such restrictive covenants shall, in the event of a conflict, control, to the extent allowable under applicable law.

    9. <u>**Intellectual Property**</u>

    (a) <u>Works Made for Hire.</u> Senior Leader understands and agrees that all copyrights, patents, trade secrets, and other intellectual property rights in or associated with any ideas, concepts, techniques, inventions, processes, data, or works of authorship developed or created by Senior Leader during the course of the Senior Leader's employment with the Company and related to Senior Leader's performance of this Agreement ("Work Product") will

belong exclusively to the Company.  To the extent possible, any copyrightable Work Product shall be considered a "work made for hire" for the Company within the meaning of Title 17 of the United States Code, and all ownership rights to such Work Product shall belong to the Company.  Any patentable inventions conceived or reduced to practice by Senior Leader in the course of performance under this Agreement shall be the property of the Company.

(b) <u>Assignment.</u>  If any copyrightable Work Product is not "work made for hire" for the Company under Title 17 of the United States Code, or if any other intellectual property rights in any Work Product (including any patentable invention) is not otherwise owned by the Company as and when it is created, developed, conceived, or reduced to practice, then Senior Leader hereby transfers, assigns, and conveys to the Company and its successors and assigns, without any requirement of further consideration, any and all right, title, and interest Senior Leader may have in such Work Product, including but not limited to any copyright or other intellectual property rights pertaining thereto, effectively automatically as and when created, developed, conceived, or reduced to practice.  Senior Leader hereby waives any so-called "moral rights of authors" in connection with the Work Product and acknowledge and agree that the Company may use, exploit, distribute, reproduce, advertise, promote, publicize, alter, modify, or edit the Work Product, or combine the Work Product with other works, in the Company's sole discretion, in any format or medium now in existence or hereafter devised.

(c) <u>Cooperation.</u>  Upon the request of the Company, Senior Leader will take all further actions and steps necessary to effectuate the assignments set forth in this Section 9, including executing and delivering documents as requested by the Company in connection with such assignments.  Senior Leader hereby waives any and all rights to seek or obtain any injunctive or equitable relief in connection with the exercise of any right that Senior Leader could otherwise claim with respect to any Work Product.

## 10. <u>Non-Disparagement</u>

(a) Except to the extent otherwise prohibited under law, during the term of this Agreement and hereafter, Senior Leader shall not disparage the Company, its affiliates, or their respective past or present officers, directors, associated or employees.

(b) The foregoing restrictions shall not apply to (i) actions or statements taken or made by the Senior Leader while employed by the Company in good faith as fulfilling the Senior Leader's duties with the Company, or otherwise at the request of the Company, or (ii) truthful statements made in compliance with legal process or any investigation, inquiry, or other proceeding by a governmental authority.

## 11. <u>Entire Agreement; Severability and Reformation; Amendment</u>

(a) This Agreement contains the full and complete understanding of the parties hereto with respect to the subject matter contained herein, and supersedes and replaces any prior Agreement, either oral or written, which Senior Leader may have with the Company that relates to the same subject matter.

(b) If any one or more of the terms, provisions, covenants or restrictions of this Agreement shall be determined by a court of competent jurisdiction to be invalid, void or unenforceable, then the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect, and to that end the provisions shall be deemed severable.  If any one or more of the provisions contained in this Agreement shall for any reason be held to be excessively broad as to duration, geographical scope, activity or subject, it shall be reformed by limiting and reducing it to the minimum extent necessary, so as to be enforceable to the extent compatible with the applicable law.  The obligations of the parties set forth in Sections 7-10, 15, and 17 shall survive termination of this Agreement if the Agreement is terminated during the initial or subsequent term(s). However, if the Agreement is terminated at the end of a term, pursuant to Section 2 and prior to renewal, and the Senior Leader is converted to an at-will employee, the restrictive covenants contained in Section 8 will expire one (1) year from the date that Senior Leader is converted to an at-will employee provided that Senior Leader remains employed with Company one year after converting to an at-will employee.

(c) This Agreement may be amended only by a writing signed by Senior Leader and a duly authorized representative of the Company (other than Senior Leader).

## 12. Notices

(a) All notices and other communications required or permitted to be given thereunder shall be in writing and shall be deemed to have been duly given if delivered personally, mailed by certified mail (return receipt requested) or sent by overnight delivery service or facsimile transmission (with electronic confirmation of successful transmission) to the parties at the following addresses or at such other addresses as shall be specified by the parties by like notice:

> If to the Company:     Chief Human Resources Officer
>
> If to Senior Leader:     Most recently recorded home address

(b) Notice given shall, in the case of mail, be deemed to be given and received on the third calendar day after posting, in the case overnight delivery service, on the date of actual delivery and, in the case of facsimile transmission, telex or personal delivery, on the date of actual transmission or, as the case may be, personal delivery.

## 13. Assignment; Successors; Counterparts

(a) This Agreement is personal to Senior Leader and may not be assigned by Senior Leader without the prior written consent of the Company.

(b) This Agreement shall inure to the benefit of and be binding upon Senior Leader, their heirs and personal representatives, and the Company, its successors and assigns.

(c) This Agreement may be executed in counterparts, each of which will take effect as an original and all of which shall evidence one and the same Agreement.

## 14. Governing Law; Construction; Non-Waiver

(a)  This Agreement shall be governed by and construed in accordance with the law of the State of New York, without regard to principles of conflicts of law.

(b)  The headings and captions of this Agreement are provided for convenience only and are intended to have no effect in construing or interpreting this Agreement.  The language in all parts of this Agreement shall be in all cases construed in accordance to its fair meaning and not strictly for or against the Company or Senior Leader.

(c)  No failure or neglect of either party, in any instance, to exercise any right, power or privilege thereunder or under law shall constitute a waiver of any other right, power or privilege or of the same right, power or privilege in any other instance.  All waivers by either party thereto must be contained in a writing signed by the party to be charged and, in the case of the Company, by an officer of the Company other than Senior Leader, or other person duly authorized by the Company. The waiver by either party of a breach of any provision contained in this Agreement shall not be construed as or operate as a waiver of any subsequent breach.

**15. <u>Assistance in Litigation</u>**   Senior Leader shall, during and after termination of employment, upon reasonable notice, furnish such information and proper assistance to the Company as may be reasonably required by the Company in connection with any litigation in which it or any of its subsidiaries or affiliates is, or may become, a party; provided, however, that any such assistance following termination shall be furnished at mutually agreeable times and for mutually agreeable compensation.

**16. <u>Remedies</u>** The parties recognize and affirm that in the event of a breach of any provision of this Agreement, money damages would be inadequate and neither Senior Leader nor the Company would have an adequate remedy at law.  Accordingly, the parties agree that in the event of a breach or a threatened breach of any of the provisions of this Agreement either party may, in addition and supplementary to other rights and remedies existing in its favor, apply to any court of law or equity of competent jurisdiction for specific performance and/or injunctive or other relief in order to enforce or prevent any violations of the provisions thereof (without posting a bond or other security).

**17. <u>Resolution of Disputes</u>**

(a)  Any dispute arising between any of the Company and Senior Leader under this Agreement, or under any statute, regulation, or ordinance, or in connection with the Senior Leader's Employment with the Company, shall be submitted to binding arbitration before the American Arbitration Association ("AAA") for resolution (the "Arbitration"), unless otherwise prohibited by law.

(b)  The Arbitration shall be conducted in the State of New York, and the arbitrator will apply New York State law, including federal law as applied in New York courts.  The arbitration shall be conducted in accordance with AAA's Employment Arbitration Rules and Procedures, as modified herein.  The Arbitration shall be conducted by a single arbitrator who shall have experience in Senior Leader management disputes.  The arbitrator, and not any federal, state, or local court or adjudicatory authority, shall have exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability, and/or formation of this Agreement,

including but not limited to any dispute as to whether a particular claim is subject to arbitration thereunder.  The arbitral award shall be in writing, state the reasons for the award, and be final and binding on the parties.

(c)  The arbitration shall, to the extent permitted by law, be conducted on a strictly confidential basis, and none of the Parties shall disclose the existence of a claim; the nature of a claim or defense; any documents, exhibits, or information exchanged or presented in connection with a claim or defense; or the result of any action (collectively, "Arbitration Materials"), to any third party, with the sole exception of Parties' legal counsel, who the Parties shall ensure also complies with these confidentiality terms.

(d)  In the event of any court proceeding to challenge or enforce an arbitrator's award, the parties hereby consent to the exclusive jurisdiction of the state and federal courts in New York, New York, and agree to venue in that jurisdiction.  The Parties agree to take all steps necessary to protect the confidentiality of the Arbitration Materials in connection with any such proceeding, agree to file all Confidential Information (and all documents containing Confidential Information) under seal, and agree to the entry of an appropriate protective order encompassing the confidentiality terms of this Agreement.

## 18. Section 409A

(a)  Notwithstanding anything herein to the contrary, this Agreement is intended to be interpreted and applied so that the payment of the benefits set forth herein either shall either be exempt from the requirements of Section 409A of the Internal Revenue Code of 1986, as amended (the "Code"), or shall comply with the requirements of such provision.  Notwithstanding anything in this Agreement or elsewhere to the contrary, distributions upon termination of Senior Leader's employment may only be made upon a "separation from service" as determined under Section 409A of the Code.  Each payment under this Agreement or otherwise shall be treated as a separate payment for purposes of Section 409A of the Code.  In no event may Senior Leader, directly or indirectly, designate the calendar year of any payment to be made under this Agreement or otherwise which constitutes a "deferral of compensation" within the meaning of Section 409A of the Code.

(b)  All reimbursements and in-kind benefits provided under this Agreement shall be made or provided in accordance with the requirements of Section 409A of the Code.  To the extent that any reimbursements pursuant to this Agreement or otherwise are taxable to Senior Leader, any reimbursement payment due to Senior Leader shall be paid to Senior Leader on or before the last day of Senior Leader's taxable year following the taxable year in which the related expense was incurred; provided, that, Senior Leader has provided the Company written documentation of such expenses in a timely fashion and such expenses otherwise satisfy the Company' expense reimbursement policies.  Reimbursements pursuant to this Agreement or otherwise are not subject to liquidation or exchange for another benefit and the amount of such reimbursements that Senior Leader receives in one taxable year shall not affect the amount of such reimbursements that Senior Leader receives in any other taxable year.

(c)  Notwithstanding any provision in this Agreement to the contrary, if on the date of their termination from employment with the Company Senior Leader is deemed to be a

"specified employee" within the meaning of Code Section 409A and the Final Treasury Regulations using the identification methodology selected by the Company from time to time, or if none, the default methodology under Code Section 409A, any payments or benefits due upon a termination of Senior Leader's employment under any arrangement that constitutes a "deferral of compensation" within the meaning of Code Section 409A shall be delayed and paid or provided (or commence, in the case of installments) on the first payroll date on or following the earlier of (i) the date which is six (6) months and one (1) day after Senior Leader's termination of employment for any reason other than death, and (ii) the date of Senior Leader's death, and any remaining payments and benefits shall be paid or provided in accordance with the normal payment dates specified for such payment or benefit.

(d) Notwithstanding any of the foregoing to the contrary, the Company and its respective officers, directors, employees, or agents make no guarantee that the terms of this Agreement as written comply with, or are exempt from, the provisions of Code Section 409A, and none of the foregoing shall have any liability for the failure of the terms of this Agreement as written to comply with, or be exempt from, the provisions of Code Section 409A

**19. <u>Voluntary Agreement</u>**   Senior Leader and the Company represent and agree that each has reviewed all aspects of this Agreement, has carefully read and understands all provisions of this Agreement, and is voluntarily entering into this Agreement. Each party represents and agrees that such party has had the opportunity to review any and all aspects of this Agreement with legal, tax or other advisors of such party's choice before executing this Agreement.

IN WITNESS THEREOF, the parties thereto have executed this Agreement on the dates stated below.

**COMPANY**
**kW Mission Critical Engineering d.p.c.**

Dated: _12/29/2020_

By: _____
Name: James Warren
Title: Founding Principal

**SENIOR LEADER**

Dated: _12/29/2020_

By: _____
Stephen Coon

# EXHIBIT C

# RETENTION BONUS AGREEMENT

Pursuant to the terms and conditions set forth below, and in consideration of the benefits provided for herein, **kW Mission Critical Engineering, d.p.c.** (hereinafter the "**Company**") and **Steve Coon** (hereinafter "**Employee**" and, together with the Company, the "**Parties**") hereby enter into this Retention Bonus Agreement (hereinafter this "**Retention Agreement**").

## I.      Purpose of Retention Bonus

As a valued member of the organization, the purpose of the Retention Bonus is to recognize Employee's contribution to the Company, to incentivize Employee to remain with the Company for at least a period of two years (the "**Transition Period**") following the Closing Date, (defined as the effective date of the completion of the merger of the Company and WSP USA Buildings Inc. ("**WSP USA**"), in order to assist the Company with integration into WSP USA, and to protect the Company's employees and clients from being diverted away from the Company.

## II.      Consideration for Retention Agreement

Employee may be paid a Retention Bonus pursuant to the terms herein if:

(a) Employee remains employed and "in good standing" (as defined herein) by the Company (or its successor-in-interest) through the relevant dates in Section II(A)(1)(a) and/or (b) (each a "**Vesting Date**"; collectively, the "**Vesting Dates**") of this Retention Agreement; or

(b) Employee is terminated, without "**Cause**" (as defined herein), by the Company during the Transition Period. In such an event, Employee will be paid any remaining portion of the Retention Bonus within thirty (30) days of the termination date.

### A.   Retention Bonus

Employee shall be paid a total Retention Bonus of **$475,000**, less all applicable deductions required by law (the "**Retention Bonus**"), which Retention Bonus will be paid in two installments (spread out over two years), on the dates set forth under the below Schedule of Payments. In the event that Employee resigns, or is terminated for Cause, by the time either the First Payment or the Second Payment come due, the relevant portion will not be payable. For greater certainty, it is possible for Employee to have earned the First Payment, assuming the conditions for the First Payment were met, but not earn the Second Payment.

#### 1.   Schedule of Payments

a.   **First Payment**: The first payment of **$118,750**, less all deductions required by law, representing 25% of the Retention Bonus, will be paid to Employee via direct deposit or other acceptable means at the Company's discretion on the first payroll following December 30, 2021, so long as

Employee remains employed by Company or its successor-in-interest on December 30, 2021.

b. **Second Payment:** The second and final payment of **$356,250**, less all deductions required by law, representing the remaining 75% of the Retention Bonus, will be paid via direct deposit or other acceptable means at the Company's discretion on the first payroll following December 30, 2022, so long as Employee remains employed by Company or its successor-in-interest on December 30, 2022.

## III.     Non-Competition and Non-Solicitation

As an incentive and as a specific condition for entering into this Retention Agreement, the Parties make, give, and agree to the following covenants respecting competition and solicitation:

### A.  Non-Compete:

1.  The Company is in a highly competitive business and expends a considerable amount of money in the development of business from new clients and customers and continued business from existing clients and customers. The business and clientele of the Company are national and worldwide in scope, and therefore the territorial and time limitations set forth in this Non-Compete clause are reasonable and necessary for the protection of the Company's interests.

2.  During Employee's employment with the Company or its successor-in-interest and for a period of 12 months following the termination of Employee's employment for any reason (voluntary or involuntary), Employee shall not directly or indirectly own, manage, operate, control be employed by, consult with or participate in the ownership, management, operation or control of any business in a manner that would reasonably be expected to divert business from any of the Company's "**Clients**" or "**Prospective Clients**" (as defined herein) with whom Employee had any involvement in developing, servicing, soliciting, or maintaining during the year prior to Employee's termination.

3.  "Clients" is defined as clients who the Company provided services for at any time during the 12-month period immediately preceding Employee's termination. "Prospective Clients" includes any person or entity: (a) to whom the Company has submitted qualifications or a proposal with Employee's direct personal involvement during the 12 months prior to Employee's termination; or (b) concerning whom Employee was assisting the Company in preparing a submittal of qualifications or a proposal at the time of Employee's termination.

### B.  Non-Solicitation of Employees, Consultants, and Contractors:  During Employee's employment with the Company or its successor-in-interest, and for a

2

period of 12 months following the termination of Employee's employment for any reason (voluntary or involuntary), Employee shall not directly or indirectly (on Employee's own or in combination or association with others, and whether for Employee's own benefit or for the benefit of other persons or entities) engage in activity which involves or could result in the actual or potential termination of the Company's relationship with or the solicitation, hiring, or engagement of any person or entity who is, at the time, or was within the last 12 months of Employee's employment within the Company, an employee, consultant, or independent contractor of the Company or any of its affiliates, including for greater certainty, any affiliate U.S. company of WSP USA ("**Affiliate**").

**C. Non-Solicitation of Clients:** During Employee's employment with the Company and for a period of 12 months following the termination of Employee's employment for any reason (voluntary or involuntary), Employee shall not directly or indirectly (on Employee's own or in combination or association with others, and whether for Employee's own benefit or for the benefit of other parties or entities) contact, call upon, solicit or otherwise accept business from, render services to, market services or products to, divert business from, and/or interfere with the Company's relationship or business with any of the Company's existing Clients or Prospective Clients (as that term is defined above) that Employee interacted with on behalf of the Company, was introduced to by virtue of Employee's employment with the Company, or otherwise learned confidential information concerning during the last 12 months of Employee's employment within the Company.

**D. Termination of Restrictive Covenants:** The above restrictive covenants terminate either within one year of the Employee's termination date or, if the Employee remains employed by the Company, within three years of the Closing Date, whichever is sooner.

## IV.   General Terms and Conditions

**A.**   Employee's obligations and rights of the Company shall extend to any parent corporation, subsidiaries and corporate affiliate companies, and to any of their successors, assignees and transferees.

**B.**   For purposes of this Retention Agreement, "in good standing" means that the Employee does not have a written record of disciplinary action for violating the Company's Code of Conduct, or policies related to anti-harassment, non-discrimination, and non-retaliation.

**C.**   For purposes of this Retention Agreement, the term "Cause" shall mean any of the following: (i) conviction of a crime (including conviction on a nolo contendere plea) involving the commission by Employee of a felony or of a criminal act involving, in the good faith judgment of the Company, fraud, dishonesty, or moral turpitude but excluding any conviction which results solely from Employee's title or position with the Company and is not based on

Employee's personal conduct; (ii) as determined by the Company in good faith, the failure to perform reasonably requested employment duties as required by the Company, as determined by the Company in good faith, after written notice from the Company of such failure to perform; (iii) fraud or embezzlement determined in accordance with the Company's normal investigative procedures consistently applied in comparable circumstances; (iv) gross misconduct or gross negligence in connection with the business of the Company or an Affiliate which has an adverse effect on the Company or the Affiliate, as determined by the Company in good faith; or (v) violation of the Company's written policies relating to equal employment, discrimination, harassment, retaliation, business conduct or other material Company policies.

**D.**     Employee acknowledges that: (i) unless stated otherwise in a written agreement executed by a representative of the Company, Employee's employment with the Company is at-will; accordingly, Employee may be terminated by the Company for any reason and in its sole discretion and Employee may terminate the employment relationship for any reason and in Employee's sole discretion; and (ii) Employee is to consult with and rely upon Employee's own tax, legal, and financial advisors regarding the consequences and risks of the Retention Bonus.

**E.**     This Retention Agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to its conflict of laws provision. The parties being desirous of having any disputes resolved in a forum having a substantial body of law and experience with the matters contained herein, agree that any action or proceeding with respect to this Agreement shall be brought exclusively in the Supreme Court of the State of New York, New York County, or in the United States District Court for the Southern District of New York or in any other court of competent jurisdiction sitting in the State of New York, New York County and the parties agree to the personal jurisdiction thereof

**F.**     The invalidity or unenforceability of any part or subpart of this Retention Agreement shall not affect the validity or enforceability of the remainder of the Retention Agreement. If any provision of this Agreement shall be held to be excessively broad as to time, geography, activity or other obligations, it shall be construed or reformed by limiting or reducing it, so as to be enforceable.

**G.**     This Retention Agreement supersedes any prior discussions, statements, representations, communications, whether oral or in writing, about its subject matter. This Retention Agreement reflects the full agreement with respect to its subject matter and can only be modified in a writing signed by Employee and an executive of the Company or its successor-in-interest.

The Parties knowingly and voluntarily sign this Retention Agreement as of the date(s) set forth below:

**kW Mission Critical Engineering, d.p.c.**

Date: 12/29/2020

**James Warren**

**Employee**

Date: 12/28/2020

**Steve Coon**

5

# EXHIBIT D

Stephen Coon, PE
5533 E Via Caballo Blanco
Cave Creek, AZ 85331
November 2, 2022

Debbie Arendsen
Chief Human Resources Officer
WSP
3340 Peachtree Road NE
Suite 2400
Atlanta, GA 30326

Dear Debbie Arendsen:

Please acknowledge this letter as advanced written notice of my intent to not renew the Senior
Leadership Employment Agreement under section 2 at the end of the agreement term.  I would like to
remain at WSP as an at-will employee.

Please confirm receipt of this notice and please confirm the end of term to be December 30, 2022.

Sincerely,

Stephen Coon, PE
scoon@kwmce.com
518.852.6793
Enclosures: Senior Leadership Employment Agreement

# EXHIBIT E

October 18, 2023

Mr. Ken Clausen
Director of Operations
KClausen@kwmce.com


Please accept this letter as my formal resignation from kW Mission Critical Engineering member of WSP (kWMCE). My last day is flexible based upon what is best for the business sometime between two and four weeks from today.

I am extremely grateful for the mentorship and the career everyone at kWMCE provided me over the last 10+ years as I cannot imagine a better experience. The opportunities and the knowledge shared with me provided my family and I with a life I could not imagine when I started at the firm.  From the bottom of my heart, thank you.

Please let me know how I can help the transition and make it as smooth as possible. As we move forward, I will be fully transparent. I will ensure everything confidential is turned over to kWMCE. I will return all access to company information including devices (laptop) provided by kWMCE. At the end of my last day I will ensure, to the best of my knowledge, I no longer have access to anything connected to kWMCE. If I find anything after my last day, I will be sure that it is immediately turned over to kWMCE and deleted off personal devices if applicable. There are however a few items that were provided by kWMCE in one manner or anther that I would like to keep, and I have no issues with purchasing these items from the business:

- Pre-inked Professional Engineer stamps
- Digital Professional Engineer stamps
- Current list of my multi-state Professional Engineer status.  This is the list provided to me frequently by Lin McGlinchey.
- A copy of my current kWMCE professional resume (CV)
- Current professional photo
- Professional registrations and dues previously purchased that will remain active past my last day at kWMCE
- Several books including both physical and audio books inclusive of select code books.
- Mobile phone case
- Mobile phone charger and accessories
- My contact list, if kWMCE wants to review before I download, I completely understand.
- kWMCE backpack and apparel provided as it will be difficult to find all the older items. Currently known items will be return.


I wish everyone at kWMCE the very best personally and professionally. Thank you for everything.



Steve Coon, PE
518.852.6793

# EXHIBIT F

# RETENTION BONUS AGREEMENT

Pursuant to the terms and conditions set forth below, and in consideration of the benefits provided for herein, **kW Mission Critical Engineering, d.p.c.** (hereinafter the "**Company**") and **Jason Leone** (hereinafter "**Employee**" and, together with the Company, the "**Parties**") hereby enter into this Retention Bonus Agreement (hereinafter this "**Retention Agreement**").

## I.      Purpose of Retention Bonus

As a valued member of the organization, the purpose of the Retention Bonus is to recognize Employee's contribution to the Company, to incentivize Employee to remain with the Company for at least a period of two years (the "**Transition Period**") following the Closing Date, (defined as the effective date of the completion of the merger of the Company and WSP USA Buildings Inc. ("**WSP USA**"), in order to assist the Company with integration into WSP USA, and to protect the Company's employees and clients from being diverted away from the Company.

## II.      Consideration for Retention Agreement

Employee may be paid a Retention Bonus pursuant to the terms herein if:

(a) Employee remains employed and "in good standing" (as defined herein) by the Company (or its successor-in-interest) through the relevant dates in Section II(A)(1)(a) and/or (b) (each a "**Vesting Date**"; collectively, the "**Vesting Dates**") of this Retention Agreement; or

(b) Employee is terminated, without "**Cause**" (as defined herein), by the Company during the Transition Period. In such an event, Employee will be paid any remaining portion of the Retention Bonus within thirty (30) days of the termination date.

### A.   Retention Bonus

Employee shall be paid a total Retention Bonus of **$225,000**, less all applicable deductions required by law (the "**Retention Bonus**"), which Retention Bonus will be paid in two installments (spread out over two years), on the dates set forth under the below Schedule of Payments. In the event that Employee resigns, or is terminated for Cause, by the time either the First Payment or the Second Payment come due, the relevant portion will not be payable. For greater certainty, it is possible for Employee to have earned the First Payment, assuming the conditions for the First Payment were met, but not earn the Second Payment.

#### 1.   Schedule of Payments

**a.   First Payment**: The first payment of **$56,250**, less all deductions required by law, representing 25% of the Retention Bonus, will be paid to Employee via direct deposit or other acceptable means at the Company's discretion on the first payroll following December 30, 2021, so long as Employee

remains employed by Company or its successor-in-interest on December 30, 2021.

**b. Second Payment:** The second and final payment of **$168,750**, less all deductions required by law, representing the remaining 75% of the Retention Bonus, will be paid via direct deposit or other acceptable means at the Company's discretion on the first payroll following December 30, 2022, so long as Employee remains employed by Company or its successor-in-interest on December 30, 2022.

## III.   Non-Competition and Non-Solicitation

As an incentive and as a specific condition for entering into this Retention Agreement, the Parties make, give, and agree to the following covenants respecting competition and solicitation:

### A. Non-Compete:

1. The Company is in a highly competitive business and expends a considerable amount of money in the development of business from new clients and customers and continued business from existing clients and customers. The business and clientele of the Company are national and worldwide in scope, and therefore the territorial and time limitations set forth in this Non-Compete clause are reasonable and necessary for the protection of the Company's interests.

2. During Employee's employment with the Company or its successor-in-interest and for a period of 12 months following the termination of Employee's employment for any reason (voluntary or involuntary), Employee shall not directly or indirectly own, manage, operate, control be employed by, consult with or participate in the ownership, management, operation or control of any business in a manner that would reasonably be expected to divert business from any of the Company's "**Clients**" or "**Prospective Clients**" (as defined herein) with whom Employee had any involvement in developing, servicing, soliciting, or maintaining during the year prior to Employee's termination.

3. "Clients" is defined as clients who the Company provided services for at any time during the 12-month period immediately preceding Employee's termination. "Prospective Clients" includes any person or entity: (a) to whom the Company has submitted qualifications or a proposal with Employee's direct personal involvement during the 12 months prior to Employee's termination; or (b) concerning whom Employee was assisting the Company in preparing a submittal of qualifications or a proposal at the time of Employee's termination.

### B. Non-Solicitation of Employees, Consultants, and Contractors: During Employee's employment with the Company or its successor-in-interest, and for a

2

period of 12 months following the termination of Employee's employment for any reason (voluntary or involuntary), Employee shall not directly or indirectly (on Employee's own or in combination or association with others, and whether for Employee's own benefit or for the benefit of other persons or entities) engage in activity which involves or could result in the actual or potential termination of the Company's relationship with or the solicitation, hiring, or engagement of any person or entity who is, at the time, or was within the last 12 months of Employee's employment within the Company, an employee, consultant, or independent contractor of the Company or any of its affiliates, including for greater certainty, any affiliate U.S. company of WSP USA ("**Affiliate**").

C. **Non-Solicitation of Clients:** During Employee's employment with the Company and for a period of 12 months following the termination of Employee's employment for any reason (voluntary or involuntary), Employee shall not directly or indirectly (on Employee's own or in combination or association with others, and whether for Employee's own benefit or for the benefit of other parties or entities) contact, call upon, solicit or otherwise accept business from, render services to, market services or products to, divert business from, and/or interfere with the Company's relationship or business with any of the Company's existing Clients or Prospective Clients (as that term is defined above) that Employee interacted with on behalf of the Company, was introduced to by virtue of Employee's employment with the Company, or otherwise learned confidential information concerning during the last 12 months of Employee's employment within the Company.

D. **Termination of Restrictive Covenants:** The above restrictive covenants terminate either within one year of the Employee's termination date or, if the Employee remains employed by the Company, within three years of the Closing Date, whichever is sooner.

## IV.   General Terms and Conditions

A.   Employee's obligations and rights of the Company shall extend to any parent corporation, subsidiaries and corporate affiliate companies, and to any of their successors, assignees and transferees.

B.   For purposes of this Retention Agreement, "in good standing" means that the Employee does not have a written record of disciplinary action for violating the Company's Code of Conduct, or policies related to anti-harassment, non-discrimination, and non-retaliation.

C.   For purposes of this Retention Agreement, the term "Cause" shall mean any of the following: (i) conviction of a crime (including conviction on a nolo contendere plea) involving the commission by Employee of a felony or of a criminal act involving, in the good faith judgment of the Company, fraud, dishonesty, or moral turpitude but excluding any conviction which results solely from Employee's title or position with the Company and is not based on

3

Employee's personal conduct; (ii) as determined by the Company in good faith, the failure to perform reasonably requested employment duties as required by the Company, as determined by the Company in good faith, after written notice from the Company of such failure to perform; (iii) fraud or embezzlement determined in accordance with the Company's normal investigative procedures consistently applied in comparable circumstances; (iv) gross misconduct or gross negligence in connection with the business of the Company or an Affiliate which has an adverse effect on the Company or the Affiliate, as determined by the Company in good faith; or (v) violation of the Company's written policies relating to equal employment, discrimination, harassment, retaliation, business conduct or other material Company policies.

**D.**    Employee acknowledges that: (i) unless stated otherwise in a written agreement executed by a representative of the Company, Employee's employment with the Company is at-will; accordingly, Employee may be terminated by the Company for any reason and in its sole discretion and Employee may terminate the employment relationship for any reason and in Employee's sole discretion; and (ii) Employee is to consult with and rely upon Employee's own tax, legal, and financial advisors regarding the consequences and risks of the Retention Bonus.

**E.**    This Retention Agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to its conflict of laws provision. The parties being desirous of having any disputes resolved in a forum having a substantial body of law and experience with the matters contained herein, agree that any action or proceeding with respect to this Agreement shall be brought exclusively in the Supreme Court of the State of New York, New York County, or in the United States District Court for the Southern District of New York or in any other court of competent jurisdiction sitting in the State of New York, New York County and the parties agree to the personal jurisdiction thereof

**F.**    The invalidity or unenforceability of any part or subpart of this Retention Agreement shall not affect the validity or enforceability of the remainder of the Retention Agreement. If any provision of this Agreement shall be held to be excessively broad as to time, geography, activity or other obligations, it shall be construed or reformed by limiting or reducing it, so as to be enforceable.

**G.**    This Retention Agreement supersedes any prior discussions, statements, representations, communications, whether oral or in writing, about its subject matter. This Retention Agreement reflects the full agreement with respect to its subject matter and can only be modified in a writing signed by Employee and an executive of the Company or its successor-in-interest.

The Parties knowingly and voluntarily sign this Retention Agreement as of the date(s) set forth below:

**kW Mission Critical Engineering, d.p.c.**

_____                    Date:_**12/29/2020**_
**James Warren**

**Employee**

_____                    Date:_**12/28/2020**_
**Jason Leone**

# EXHIBIT G

# RETENTION BONUS AGREEMENT

Pursuant to the terms and conditions set forth below, and in consideration of the benefits provided for herein, **kW Mission Critical Engineering, d.p.c.** (hereinafter the "**Company**") and **Gary Russinko** (hereinafter "**Employee**" and, together with the Company, the "**Parties**") hereby enter into this Retention Bonus Agreement (hereinafter this "**Retention Agreement**").

## I.      Purpose of Retention Bonus

As a valued member of the organization, the purpose of the Retention Bonus is to recognize Employee's contribution to the Company, to incentivize Employee to remain with the Company for at least a period of two years (the "**Transition Period**") following the Closing Date, (defined as the effective date of the completion of the merger of the Company and WSP USA Buildings Inc. ("**WSP USA**"), in order to assist the Company with integration into WSP USA, and to protect the Company's employees and clients from being diverted away from the Company.

## II.     Consideration for Retention Agreement

Employee may be paid a Retention Bonus pursuant to the terms herein if:

(a) Employee remains employed and "in good standing" (as defined herein) by the Company (or its successor-in-interest) through the relevant dates in Section II(A)(1)(a) and/or (b) (each a "**Vesting Date**"; collectively, the "**Vesting Dates**") of this Retention Agreement; or

(b) Employee is terminated, without "**Cause**" (as defined herein), by the Company during the Transition Period. In such an event, Employee will be paid any remaining portion of the Retention Bonus within thirty (30) days of the termination date.

### A.   Retention Bonus

Employee shall be paid a total Retention Bonus of **$330,000**, less all applicable deductions required by law (the "**Retention Bonus**"), which Retention Bonus will be paid in two installments (spread out over two years), on the dates set forth under the below Schedule of Payments. In the event that Employee resigns, or is terminated for Cause, by the time either the First Payment or the Second Payment come due, the relevant portion will not be payable. For greater certainty, it is possible for Employee to have earned the First Payment, assuming the conditions for the First Payment were met, but not earn the Second Payment.

####    1.   Schedule of Payments

#####       a.   **First Payment**: The first payment of **$82,500**, less all deductions required by law, representing 25% of the Retention Bonus, will be paid to Employee via direct deposit or other acceptable means at the Company's discretion on the first payroll following December 30, 2021, so long as Employee

remains employed by Company or its successor-in-interest on December 30, 2021.

**b. Second Payment:** The second and final payment of **$247,500**, less all deductions required by law, representing the remaining 75% of the Retention Bonus, will be paid via direct deposit or other acceptable means at the Company's discretion on the first payroll following December 30, 2022, so long as Employee remains employed by Company or its successor-in-interest on December 30, 2022.

## III.   Non-Competition and Non-Solicitation

As an incentive and as a specific condition for entering into this Retention Agreement, the Parties make, give, and agree to the following covenants respecting competition and solicitation:

### A.  Non-Compete:

1. The Company is in a highly competitive business and expends a considerable amount of money in the development of business from new clients and customers and continued business from existing clients and customers. The business and clientele of the Company are national and worldwide in scope, and therefore the territorial and time limitations set forth in this Non-Compete clause are reasonable and necessary for the protection of the Company's interests.

2. During Employee's employment with the Company or its successor-in-interest and for a period of 12 months following the termination of Employee's employment for any reason (voluntary or involuntary), Employee shall not directly or indirectly own, manage, operate, control be employed by, consult with or participate in the ownership, management, operation or control of any business in a manner that would reasonably be expected to divert business from any of the Company's "**Clients**" or "**Prospective Clients**" (as defined herein) with whom Employee had any involvement in developing, servicing, soliciting, or maintaining during the year prior to Employee's termination.

3. "Clients" is defined as clients who the Company provided services for at any time during the 12-month period immediately preceding Employee's termination. "Prospective Clients" includes any person or entity: (a) to whom the Company has submitted qualifications or a proposal with Employee's direct personal involvement during the 12 months prior to Employee's termination; or (b) concerning whom Employee was assisting the Company in preparing a submittal of qualifications or a proposal at the time of Employee's termination.

### B. Non-Solicitation of Employees, Consultants, and Contractors: During Employee's employment with the Company or its successor-in-interest, and for a

2

period of 12 months following the termination of Employee's employment for any reason (voluntary or involuntary), Employee shall not directly or indirectly (on Employee's own or in combination or association with others, and whether for Employee's own benefit or for the benefit of other persons or entities) engage in activity which involves or could result in the actual or potential termination of the Company's relationship with or the solicitation, hiring, or engagement of any person or entity who is, at the time, or was within the last 12 months of Employee's employment within the Company, an employee, consultant, or independent contractor of the Company or any of its affiliates, including for greater certainty, any affiliate U.S. company of WSP USA ("**Affiliate**").

**C.** **Non-Solicitation of Clients:** During Employee's employment with the Company and for a period of 12 months following the termination of Employee's employment for any reason (voluntary or involuntary), Employee shall not directly or indirectly (on Employee's own or in combination or association with others, and whether for Employee's own benefit or for the benefit of other parties or entities) contact, call upon, solicit or otherwise accept business from, render services to, market services or products to, divert business from, and/or interfere with the Company's relationship or business with any of the Company's existing Clients or Prospective Clients (as that term is defined above) that Employee interacted with on behalf of the Company, was introduced to by virtue of Employee's employment with the Company, or otherwise learned confidential information concerning during the last 12 months of Employee's employment within the Company.

**D.** **Termination of Restrictive Covenants:** The above restrictive covenants terminate either within one year of the Employee's termination date or, if the Employee remains employed by the Company, within three years of the Closing Date, whichever is sooner.

## IV.  General Terms and Conditions

**A.**    Employee's obligations and rights of the Company shall extend to any parent corporation, subsidiaries and corporate affiliate companies, and to any of their successors, assignees and transferees.

**B.**    For purposes of this Retention Agreement, "in good standing" means that the Employee does not have a written record of disciplinary action for violating the Company's Code of Conduct, or policies related to anti-harassment, non-discrimination, and non-retaliation.

**C.**    For purposes of this Retention Agreement, the term "Cause" shall mean any of the following: (i) conviction of a crime (including conviction on a nolo contendere plea) involving the commission by Employee of a felony or of a criminal act involving, in the good faith judgment of the Company, fraud, dishonesty, or moral turpitude but excluding any conviction which results solely from Employee's title or position with the Company and is not based on

3

Employee's personal conduct; (ii) as determined by the Company in good faith, the failure to perform reasonably requested employment duties as required by the Company, as determined by the Company in good faith, after written notice from the Company of such failure to perform; (iii) fraud or embezzlement determined in accordance with the Company's normal investigative procedures consistently applied in comparable circumstances; (iv) gross misconduct or gross negligence in connection with the business of the Company or an Affiliate which has an adverse effect on the Company or the Affiliate, as determined by the Company in good faith; or (v) violation of the Company's written policies relating to equal employment, discrimination, harassment, retaliation, business conduct or other material Company policies.

**D.**     Employee acknowledges that: (i) unless stated otherwise in a written agreement executed by a representative of the Company, Employee's employment with the Company is at-will; accordingly, Employee may be terminated by the Company for any reason and in its sole discretion and Employee may terminate the employment relationship for any reason and in Employee's sole discretion; and (ii) Employee is to consult with and rely upon Employee's own tax, legal, and financial advisors regarding the consequences and risks of the Retention Bonus.

**E.**     This Retention Agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to its conflict of laws provision. The parties being desirous of having any disputes resolved in a forum having a substantial body of law and experience with the matters contained herein, agree that any action or proceeding with respect to this Agreement shall be brought exclusively in the Supreme Court of the State of New York, New York County, or in the United States District Court for the Southern District of New York or in any other court of competent jurisdiction sitting in the State of New York, New York County and the parties agree to the personal jurisdiction thereof

**F.**     The invalidity or unenforceability of any part or subpart of this Retention Agreement shall not affect the validity or enforceability of the remainder of the Retention Agreement. If any provision of this Agreement shall be held to be excessively broad as to time, geography, activity or other obligations, it shall be construed or reformed by limiting or reducing it, so as to be enforceable.

**G.**     This Retention Agreement supersedes any prior discussions, statements, representations, communications, whether oral or in writing, about its subject matter. This Retention Agreement reflects the full agreement with respect to its subject matter and can only be modified in a writing signed by Employee and an executive of the Company or its successor-in-interest.

The Parties knowingly and voluntarily sign this Retention Agreement as of the date(s) set forth below:

**kW Mission Critical Engineering, d.p.c.**


**James Warren**                                                    Date: 12/29/2020


**Employee**

Gary Russinko

Digitally signed by Gary Russinko
DN: C=US, E=grussinko@kwmce.com, O="kW
Mission Critical Engineering, dpc", CN=Gary
Russinko
Reason: I agree to the terms defined by the
placement of my signature on this document
Contact Info: 518-708-7732
Date: 2020.12.27 16:00:28-05'00'

**Gary Russinko**                                                    Date: 12/27/2020

# EXHIBIT H

# Holland & Knight

1180 West Peachtree Street, Suite 1800 | Atlanta, GA 30309 | T 404.817.8500 | F 404.881.0470
Holland & Knight LLP | www.hklaw.com

Todd D. Wozniak
+1 404-817-8431
Todd.Wozniak@hklaw.com


October 25, 2023

*Via Overnight Mail*


Stephen Coon
5533 E. Via Caballo Blanco
Cave Creek, AZ 85331

**Re:     POST-EMPLOYMENT RESTRICTIVE COVENANT REMINDER**

Dear Mr. Coon:

This law firm represents WSP USA Inc. and its subsidiaries and predecessor companies (the "Company") in connection with your Senior Leadership Employment Agreement with the Company (the "Agreement"). A copy of the Agreement is enclosed for your convenience.

It has come to our attention that you have recently resigned your employment with the Company and that your employment with the Company will end on or before November 3, 2023. We are writing to remind you of your contractual obligations under the Agreement related to non-competition, non-solicitation, confidentiality, and intellectual property. These obligations apply both during and after your employment with the Company in accordance with their terms.

Specifically, Section 7 of your Agreement contains a restriction on disclosure of confidential information. In that provision, you "agree[d] that all Confidential Information, whether prepared by [you] or otherwise coming into [your] possession, shall remain the exclusive property of the Company." Agreement § 7(b)(i). The provision further provides that you agreed not to, "without the prior written consent of the Company, use or disclose to any third party any of the Confidential Information, directly or indirectly, either during [your] employment with the Company or at any time following the termination of [your] employment with the Company." *Id.*   In the non-disclosure provision, you also must "promptly deliver at such time as [your] employment with the Company terminates, or at any time that the Company may request," "all memoranda, notes, plans, data, drawings, manuals, letters, records, reports, electronic mail, recordings, computer tapes and software and other documents and data, constituting or relating to Confidential Information or Work Product . . . which [you] may then possess or have under [your] control." *Id.* § 7(c).

Atlanta | Austin | Boston | Charlotte | Chicago | Dallas | Denver | Fort Lauderdale | Fort Worth | Houston
Jacksonville | Los Angeles | Miami | New York | Orange County | Orlando | Philadelphia | Portland
San Francisco | Stamford | Tallahassee | Tampa | Tysons | Washington, D.C. | West Palm Beach

October 25, 2023
Page 2

Section 8 of your Agreement contains a non-compete provision stating that you "shall not directly or indirectly own, manage, operate, control, be employed by, consult with or participate in the ownership, management operation or control of any business in a manner that would reasonably be expected to divert business from any of the Company's 'Clients' or 'Prospective Clients' with whom [you] had any involvement in developing, servicing, soliciting, or maintaining during the year prior to [your] termination." Agreement § 8(B)(ii). Section 8 also contains a non-solicitation provision that you shall not engage in "the solicitation, hiring, or engagement of any person or entity who is, at the time, or was within the last 12 months of [your] employment with the Company, an employee, consultant, or independent contractor of the Company or any of its affiliates." *Id.* § 8(C). These Section 8 restrictions remain in effect "for a period of 12 months following the termination of [your] employment for any reason (voluntary or involuntary)." *Id.* §§ 8(B)(ii), (C).  Please note that the provisions of Section 11(b) do not apply given that you did not remain employed by the Company for one year following your termination of the Agreement and your becoming an at-will employee of the Company.

Section 9 of your Agreement contains an intellectual property provision stating that you "understand[] and agree[] that all copyrights, patents, trade secrets, and other intellectual property rights in or associated with any ideas, concepts, techniques, inventions, processes, data, or works of authorship developed or created by [you] during the course of [your] employment with the Company" belongs "exclusively to the Company." *Id.* § 9(a); *see also id.*§ 9(b).

WSP takes these restrictive covenants very seriously and expects you to honor the Agreement.  If you were to breach one or more of these covenants, WSP would be forced to enforce the Agreement and seek all available remedies, including an injunction, damages, and its attorneys' fees and costs.

If you have any questions about your obligations under the Agreement, feel free to call me.

Also, in light of your resignation, please return all documents, property, and data belonging to WSP to WSP.  This includes all electronically stored information stored on a personal device, cloud storage accounts, or USB drive.  This also includes the following items you requested to keep from the Company in your resignation letter, including: (1) the company-generated list of your multi-state Professional Engineer status; (2) your kWMCE professional resume; (3) the professional photograph(s) provided by the Company; (4) all reference materials, including physical books or audiobooks, paid for by the Company; and (5) professional contact list(s).

The other items noted in your resignation letter you are free to take with you. That includes (1) your pre-inked professional engineer's stamp as well as your digital stamp, (2) the registrations and dues that have already been paid on your behalf (until such time as those registration expire); (3) mobile phone case and other phone accessories; and (4) your kWMCE backpack and apparel.

October 25, 2023
Page 3

If you are represented by legal counsel, please share this letter with your counsel.

Sincerely,

HOLLAND & KNIGHT LLP

Todd D. Wozniak

Enclosures

# EXHIBIT I

# Holland & Knight

1180 West Peachtree Street, Suite 1800 | Atlanta, GA 30309 | T 404.817.8500 | F 404.881.0470
Holland & Knight LLP | www.hklaw.com

Todd D. Wozniak
+1 404-817-8431
Todd.Wozniak@hklaw.com

December 29, 2023

VIA OVERNIGHT MAIL

Jason Leone
11 Ann Lee Court
Latham, NY 12110
Jason.leone@wsp.com

Re:     **POST-EMPLOYMENT RESTRICTIVE COVENANT REMINDER**

Dear Mr. Leone:

This law firm represents WSP USA Inc. and its subsidiaries and predecessor companies (the "Company") in connection with your post-employment restrictive covenants and confidentiality obligations to the Company (the "Agreement").  A copy of your Retention Agreement is enclosed for your convenience.

The agreements contain covenants related to non-competition and non-solicitation. These obligations apply both during and after your employment with the Company in accordance with their terms.  Further, you agreed and reaffirmed in 2022 as part of your receipt of the Company's handbook that

> WSP is engaged in a highly competitive business and our competitive position depends upon our ability to maintain the confidentiality of the Confidential Information and trade secrets which WSP as an organization has an obligation to protect.  Any unauthorized disclosure, release or use of any of WSP business information, Confidential Information or trade secrets, could be highly detrimental to the company. . .

You agreed that WSP's Confidential Information includes, but is not limited to:

> Financial and business information, such as information with respect to costs, commissions, fees, profits, sales, markets, mailing lists, strategies and plans for future business, new business, product or other development, potential acquisitions or divestitures, and new marketing ideas;

> Product and technical information, such as formulae, specifications, designs, drawings, component lists, databases, software (or pre-cursor documents),

December 29, 2023
Page 2

manuals, instructions and catalogues held in any form relating to the production, creation, supply or provision of the products or services for the Company or any affiliate;

Marketing information, such as information relating to the marketing or sales of any products or services of the Company and any affiliate, including without limitation, lists of customers and suppliers' names, addresses and contacts, sales targets and statistics, market share and pricing statistics, marketing surveys, research reports and advertising and promotional material;

. . .

Section III(A) of your Agreement contains a non-compete provision stating that you "shall not directly or indirectly own, manage, operate, control, be employed by, consult with or participate in the ownership, management operation or control of any business in a manner that would reasonably be expected to divert business from any of the Company's 'Clients' or 'Prospective Clients' . . . with whom [you] had any involvement in developing, servicing, soliciting, or maintaining during the year prior to [your] termination." Agreement § III(A)(2). That same Section also contains a non-solicitation provision providing that you shall not directly or indirectly engage in "the solicitation, hiring, or engagement of any person or entity who is, at the time, or was within the last 12 months of [your] employment with the Company, an employee, consultant, or independent contractor of the Company or any of its affiliates. . ." *Id.* § III(B). Further, the non-solicitation prohibition prevents you from directly or indirectly engaging in conduct that would result in you "contact[ing], call[ing] upon, solicit[ing] or otherwise accept[ing business from, render services to, market services or products to, divert business from, and/or interfere with the Company's relationship or business with any of the Company's existing Clients or Prospective Clients (as that term is defined above) . . ." *Id.*

The above covenants are in addition to obligations imposed by law, including under the Defend Trade Secrets Act and similar state statutes prohibiting the retention and misappropriation of the Company's trade secrets. WSP takes these restrictive covenants and the protection of its trade secrets very seriously and expects you to honor all applicable agreements and law. WSP will not hesitate to enforce its contractual and statutory legal rights and seek all available remedies, including an injunction, damages, and its attorneys' fees and costs.

We understand that you recently resigned your employment with the Company, and that your employment with the Company ended on December 22, 2023. We further understand that you have refused to disclose where you are going to work, but intend to start with a competitor of the Company formed by another former Company employee in violation of his own restrictive covenants.

In light of the circumstances of your resignation, please confirm immediately the return of all documents, property, and data belonging to WSP to WSP. This includes all electronically stored information stored on a personal device, cloud storage accounts, or USB drive. This also includes,

December 29, 2023
Page 3

for example, (1) company-generated list of your multi-state Professional Engineer status; (2) your kWMCE professional resume; (3) the professional photograph(s) provided by the Company; (4) all reference materials, including physical books or audiobooks, paid for by the Company; and (5) professional contact list(s).

We further demand that you send in writing by no later than January 2, 2024, a written letter or affidavit, along with a detailed description of, and production of all documents related to: (a) the name of your current employer; (b) your current title; (c) all documents related to and/or reflecting any current or prospective employment or business relationship with Stephen Coon and/or Gary Russinko and/or your prospective employer; (d) all documents reflecting your communications with any customers, consultants, suppliers, distributors, or other entities or relationships of the Company, and (e) written confirmation that you will preserve and not delete all documents and materials (including on your personal laptop and/or phone) related to your new prospective employment, solicitation of Company employees or customers, and/or plans to compete with the Company.

If you have any questions about your obligations, feel free to call me.  If you are represented by legal counsel, please share this letter with your counsel and have them contact us.

Sincerely,

HOLLAND & KNIGHT LLP

Todd D. Wozniak

Enclosures

# RETENTION BONUS AGREEMENT

Pursuant to the terms and conditions set forth below, and in consideration of the benefits provided for herein, **kW Mission Critical Engineering, d.p.c.** (hereinafter the "**Company**") and **Jason Leone** (hereinafter "**Employee**" and, together with the Company, the "**Parties**") hereby enter into this Retention Bonus Agreement (hereinafter this "**Retention Agreement**").

## I.     Purpose of Retention Bonus

As a valued member of the organization, the purpose of the Retention Bonus is to recognize Employee's contribution to the Company, to incentivize Employee to remain with the Company for at least a period of two years (the "**Transition Period**") following the Closing Date, (defined as the effective date of the completion of the merger of the Company and WSP USA Buildings Inc. ("**WSP USA**"), in order to assist the Company with integration into WSP USA, and to protect the Company's employees and clients from being diverted away from the Company.

## II.     Consideration for Retention Agreement

Employee may be paid a Retention Bonus pursuant to the terms herein if:

(a) Employee remains employed and "in good standing" (as defined herein) by the Company (or its successor-in-interest) through the relevant dates in Section II(A)(1)(a) and/or (b) (each a "**Vesting Date**"; collectively, the "**Vesting Dates**") of this Retention Agreement; or

(b) Employee is terminated, without "**Cause**" (as defined herein), by the Company during the Transition Period. In such an event, Employee will be paid any remaining portion of the Retention Bonus within thirty (30) days of the termination date.

### A.   Retention Bonus

Employee shall be paid a total Retention Bonus of **$225,000**, less all applicable deductions required by law (the "**Retention Bonus**"), which Retention Bonus will be paid in two installments (spread out over two years), on the dates set forth under the below Schedule of Payments. In the event that Employee resigns, or is terminated for Cause, by the time either the First Payment or the Second Payment come due, the relevant portion will not be payable. For greater certainty, it is possible for Employee to have earned the First Payment, assuming the conditions for the First Payment were met, but not earn the Second Payment.

### 1.   Schedule of Payments

     **a.   First Payment**: The first payment of **$56,250**, less all deductions required by law, representing 25% of the Retention Bonus, will be paid to Employee via direct deposit or other acceptable means at the Company's discretion on the first payroll following December 30, 2021, so long as Employee

remains employed by Company or its successor-in-interest on December 30, 2021.

**b. Second Payment:** The second and final payment of **$168,750**, less all deductions required by law, representing the remaining 75% of the Retention Bonus, will be paid via direct deposit or other acceptable means at the Company's discretion on the first payroll following December 30, 2022, so long as Employee remains employed by Company or its successor-in-interest on December 30, 2022.

## III.    Non-Competition and Non-Solicitation

As an incentive and as a specific condition for entering into this Retention Agreement, the Parties make, give, and agree to the following covenants respecting competition and solicitation:

### A.    Non-Compete:

1. The Company is in a highly competitive business and expends a considerable amount of money in the development of business from new clients and customers and continued business from existing clients and customers. The business and clientele of the Company are national and worldwide in scope, and therefore the territorial and time limitations set forth in this Non-Compete clause are reasonable and necessary for the protection of the Company's interests.

2. During Employee's employment with the Company or its successor-in-interest and for a period of 12 months following the termination of Employee's employment for any reason (voluntary or involuntary), Employee shall not directly or indirectly own, manage, operate, control be employed by, consult with or participate in the ownership, management, operation or control of any business in a manner that would reasonably be expected to divert business from any of the Company's "**Clients**" or "**Prospective Clients**" (as defined herein) with whom Employee had any involvement in developing, servicing, soliciting, or maintaining during the year prior to Employee's termination.

3. "Clients" is defined as clients who the Company provided services for at any time during the 12-month period immediately preceding Employee's termination. "Prospective Clients" includes any person or entity: (a) to whom the Company has submitted qualifications or a proposal with Employee's direct personal involvement during the 12 months prior to Employee's termination; or (b) concerning whom Employee was assisting the Company in preparing a submittal of qualifications or a proposal at the time of Employee's termination.

### B. Non-Solicitation of Employees, Consultants, and Contractors: During Employee's employment with the Company or its successor-in-interest, and for a

2

period of 12 months following the termination of Employee's employment for any reason (voluntary or involuntary), Employee shall not directly or indirectly (on Employee's own or in combination or association with others, and whether for Employee's own benefit or for the benefit of other persons or entities) engage in activity which involves or could result in the actual or potential termination of the Company's relationship with or the solicitation, hiring, or engagement of any person or entity who is, at the time, or was within the last 12 months of Employee's employment within the Company, an employee, consultant, or independent contractor of the Company or any of its affiliates, including for greater certainty, any affiliate U.S. company of WSP USA ("**Affiliate**").

C. **Non-Solicitation of Clients:** During Employee's employment with the Company and for a period of 12 months following the termination of Employee's employment for any reason (voluntary or involuntary), Employee shall not directly or indirectly (on Employee's own or in combination or association with others, and whether for Employee's own benefit or for the benefit of other parties or entities) contact, call upon, solicit or otherwise accept business from, render services to, market services or products to, divert business from, and/or interfere with the Company's relationship or business with any of the Company's existing Clients or Prospective Clients (as that term is defined above) that Employee interacted with on behalf of the Company, was introduced to by virtue of Employee's employment with the Company, or otherwise learned confidential information concerning during the last 12 months of Employee's employment within the Company.

D. **Termination of Restrictive Covenants:** The above restrictive covenants terminate either within one year of the Employee's termination date or, if the Employee remains employed by the Company, within three years of the Closing Date, whichever is sooner.

## IV. General Terms and Conditions

A. Employee's obligations and rights of the Company shall extend to any parent corporation, subsidiaries and corporate affiliate companies, and to any of their successors, assignees and transferees.

B. For purposes of this Retention Agreement, "in good standing" means that the Employee does not have a written record of disciplinary action for violating the Company's Code of Conduct, or policies related to anti-harassment, non-discrimination, and non-retaliation.

C. For purposes of this Retention Agreement, the term "Cause" shall mean any of the following: (i) conviction of a crime (including conviction on a nolo contendere plea) involving the commission by Employee of a felony or of a criminal act involving, in the good faith judgment of the Company, fraud, dishonesty, or moral turpitude but excluding any conviction which results solely from Employee's title or position with the Company and is not based on

Employee's personal conduct; (ii) as determined by the Company in good faith, the failure to perform reasonably requested employment duties as required by the Company, as determined by the Company in good faith, after written notice from the Company of such failure to perform; (iii) fraud or embezzlement determined in accordance with the Company's normal investigative procedures consistently applied in comparable circumstances; (iv) gross misconduct or gross negligence in connection with the business of the Company or an Affiliate which has an adverse effect on the Company or the Affiliate, as determined by the Company in good faith; or (v) violation of the Company's written policies relating to equal employment, discrimination, harassment, retaliation, business conduct or other material Company policies.

**D.**     Employee acknowledges that: (i) unless stated otherwise in a written agreement executed by a representative of the Company, Employee's employment with the Company is at-will; accordingly, Employee may be terminated by the Company for any reason and in its sole discretion and Employee may terminate the employment relationship for any reason and in Employee's sole discretion; and (ii) Employee is to consult with and rely upon Employee's own tax, legal, and financial advisors regarding the consequences and risks of the Retention Bonus.

**E.**     This Retention Agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to its conflict of laws provision. The parties being desirous of having any disputes resolved in a forum having a substantial body of law and experience with the matters contained herein, agree that any action or proceeding with respect to this Agreement shall be brought exclusively in the Supreme Court of the State of New York, New York County, or in the United States District Court for the Southern District of New York or in any other court of competent jurisdiction sitting in the State of New York, New York County and the parties agree to the personal jurisdiction thereof

**F.**     The invalidity or unenforceability of any part or subpart of this Retention Agreement shall not affect the validity or enforceability of the remainder of the Retention Agreement. If any provision of this Agreement shall be held to be excessively broad as to time, geography, activity or other obligations, it shall be construed or reformed by limiting or reducing it, so as to be enforceable.

**G.**     This Retention Agreement supersedes any prior discussions, statements, representations, communications, whether oral or in writing, about its subject matter. This Retention Agreement reflects the full agreement with respect to its subject matter and can only be modified in a writing signed by Employee and an executive of the Company or its successor-in-interest.

The Parties knowingly and voluntarily sign this Retention Agreement as of the date(s) set forth below:

**kW Mission Critical Engineering, d.p.c.**

_____     Date: 12/29/2020
**James Warren**


**Employee**

_____     Date: 12/28/2020
**Jason Leone**

**DiLudovico, Diane (PHL - X46879)**

| | |
|---|---|
| **From:** | TrackingUpdates@fedex.com |
| **Sent:** | Friday, December 29, 2023 2:10 PM |
| **To:** | DiLudovico, Diane (PHL - X46879) |
| **Subject:** | FedEx Shipment 788680498218: This shipment is scheduled to be sent |



# You're getting a package!

A label was created and your package is preparing to be shipped. We'll send the delivery date when we get your package from the shipper.

 The delivery date may be updated when FedEx receives the package.



**INITIATED**

| | |
|---|---|
| **TRACKING NUMBER** | 788680498218 |
| **FROM** | Holland & Knight |
| | 1650 Market Street |
| | STE 3300 |
| | Philadelphia, PA, US, 19103 |
| **TO** | Jason Leone |
| | Jason Leone |

1

11 ANN LEE CT
LATHAM, NY, US, 12110

| | |
|---|---|
| **PURCHASE ORDER NUMBER** | 46080 |
| **REFERENCE** | 213614.00001 |
| **SHIPPER REFERENCE** | 213614.00001 |
| **PACKAGING TYPE** | FedEx Envelope |
| **ORIGIN** | Philadelphia, PA, 19103 |
| **DESTINATION** | LATHAM, NY, US, 12110 |
| **SPECIAL HANDLING** | Residential Delivery |
| **STANDARD TRANSIT** | Sat, 12/30/2023 by 1:30pm |
| **NUMBER OF PIECES** | 1 |
| **TOTAL SHIPMENT WEIGHT** | 0.50 LB |
| **SERVICE TYPE** | FedEx Priority Overnight |



# Notifications, from start to finish

Get push notifications when you pair FedEx Delivery Manager® with the FedEx® Mobile app. You can activate alerts in the app to track your package. Then listen for the virtual doorbell chime that lets you know your package was delivered.

**DOWNLOAD THE MOBILE APP**

**FOLLOW FEDEX**

      

✉ Please do not respond to this message. This email was sent from an unattended mailbox. This report was generated at approximately 1:10 PM CST 12/29/2023.

All weights are estimated.

To track the latest status of your shipment, click on the tracking number above.

Standard transit is the date and time the package is scheduled to be delivered by, based on the selected service, destination and ship date. Limitations and exceptions may apply. Please see the FedEx Service Guide for terms and conditions of service, including the FedEx Money-Back Guarantee, or contact your FedEx Customer Support representative.

© 2023 Federal Express Corporation. The content of this message is protected by copyright and trademark laws under U.S. and international law. Review our privacy policy. All rights reserved.

Thank you for your business.

**DiLudovico, Diane (PHL - X46879)**

| | |
|---|---|
| **From:** | TrackingUpdates@fedex.com |
| **Sent:** | Saturday, December 30, 2023 9:27   M |
| **To:** | DiLudovico, Diane (PHL - X46879) |
| **Subject:** | FedEx Shipment 788680498218:   our package has been delivered |
| ttac  ment : | DeliveryPicture. peg |



# Hi. Your package was delivered Sat, 12/30/2023 at 9:20am.



Delivered to 11 ANN LEE CT, LATHAM, NY 12110

**OBTAIN PROOF OF DELIVERY**

1



Delivery picture not showing   View in browser.

# How was your delivery



| TRACKING NUMBER | 788680498218 |
| --- | --- |
| FROM | Holland & Knight |
| | 1650 Market Street |
| | STE 3300 |
| | Philadelphia, PA, US, 19103 |
| TO | Jason Leone |
| | Jason Leone |
| | 11 ANN LEE CT |
| | LATHAM, NY, US, 12110 |
| PURCHASE ORDER NUMBER | 46080 |
| REFERENCE | 213614.00001 |
| SHIPPER REFERENCE | 213614.00001 |
| SHIP DATE | Fri 12/29/2023 05:25 PM |
| DELIVERED TO | Residence |
| PACKAGING TYPE | FedEx Envelope |
| ORIGIN | Philadelphia, PA, US, 19103 |

2

| | |
|---|---|
| **DESTINATION** | LATHAM, NY, US, 12110 |
| **SPECIAL HANDLING** | Residential Delivery |
| **NUMBER OF PIECES** | 1 |
| **TOTAL SHIPMENT WEIGHT** | 0.50 LB |
| **SERVICE TYPE** | FedEx Priority Overnight |



## Notifications, from start to finish

Get push notifications when you pair FedEx Delivery Manager® with the FedEx® Mobile app. You can activate alerts in the app to track your package. Then listen for the virtual doorbell chime that lets you know your package was delivered.

**DOWNLOAD THE MOBILE APP**

**FOLLOW FEDEX**

     

✉ Please do not respond to this message. This email was sent from an unattended mailbox. This report was generated at approximately 8:27 AM CST 12/30/2023.

All weights are estimated.

To track the latest status of your shipment, click on the tracking number above.

Standard transit is the date and time the package is scheduled to be delivered by, based on the selected service, destination and ship date. Limitations and exceptions may apply. Please see

3

the FedEx Service Guide for terms and conditions of service, including the FedEx Money-Back Guarantee, or contact your FedEx Customer Support representative.

© 2023 Federal Express Corporation. The content of this message is protected by copyright and trademark laws under U.S. and international law. Review our privacy policy. All rights reserved.

Thank you for your business.

# EXHIBIT J

# Holland & Knight

1180 West Peachtree Street, Suite 1800 | Atlanta, GA 30309 | T 404.817.8500 | F 404.881.0470
Holland & Knight LLP | www.hklaw.com

Todd D. Wozniak
+1 404-817-8431
Todd.Wozniak@hklaw.com

December 29, 2023

VIA OVERNIGHT MAIL

Gary Russinko
 9  Grooms Road
Rexford, NY 1214
Gary.russinko@gmail.com

### Re:    **POST-EMPLOYMENT RESTRICTIVE COVENANT REMINDER**

Dear Mr. Russinko:

This law firm represents WSP USA Inc. and its subsidiaries and predecessor companies (the "Company") in connection with your post-employment restrictive covenants and confidentiality obligations to the Company (the "Agreement"). A copy of your Retention Agreement is enclosed for your convenience.

The agreements contain covenants related to non-competition and non-solicitation. These obligations apply both during and after your employment with the Company in accordance with their terms. Further, you agreed and reaffirmed in 2022 as part of your receipt of the Company's handbook that

> WSP is engaged in a highly competitive business and our competitive position depends upon our ability to maintain the confidentiality of the Confidential Information and trade secrets which WSP as an organization has an obligation to protect. Any unauthorized disclosure, release or use of any of WSP business information, Confidential Information or trade secrets, could be highly detrimental to the company. . .

You agreed that WSP's Confidential Information includes, but is not limited to:

> Financial and business information, such as information with respect to costs, commissions, fees, profits, sales, markets, mailing lists, strategies and plans for future business, new business, product or other development, potential acquisitions or divestitures, and new marketing ideas;

> Product and technical information, such as formulae, specifications, designs, drawings, component lists, databases, software (or pre-cursor documents),

Atlanta | Austin | Boston | Charlotte | Chicago | Dallas | Denver | Fort Lauderdale | Fort Worth | Houston
Jacksonville | Los Angeles | Miami | New York | Orange County | Orlando | Philadelphia | Portland
San Francisco | Stamford | Tallahassee | Tampa | Tysons | Washington, D.C. | West Palm Beach

December 29, 2023
Page 2

      manuals, instructions and catalogues held in any form relating to the production, creation, supply or provision of the products or services for the Company or any affiliate;

      Marketing information, such as information relating to the marketing or sales of any products or services of the Company and any affiliate, including without limitation, lists of customers and suppliers' names, addresses and contacts, sales targets and statistics, market share and pricing statistics, marketing surveys, research reports and advertising and promotional material;

      . . .

Section III(A) of your Agreement contains a non-compete provision stating that you "shall not directly or indirectly own, manage, operate, control, be employed by, consult with or participate in the ownership, management operation or control of any business in a manner that would reasonably be expected to divert business from any of the Company's 'Clients' or 'Prospective Clients' . . . with whom [you] had any involvement in developing, servicing, soliciting, or maintaining during the year prior to [your] termination." Agreement § III(A)(2). That same Section also contains a non-solicitation provision providing that you shall not directly or indirectly engage in "the solicitation, hiring, or engagement of any person or entity who is, at the time, or was within the last 12 months of [your] employment with the Company, an employee, consultant, or independent contractor of the Company or any of its affiliates. . ." *Id.* § III(B).  Further, the non-solicitation prohibition prevents you from directly or indirectly engaging in conduct that would result in you "contact[ing], call[ing] upon, solicit[ing] or otherwise accept[ing business from, render services to, market services or products to, divert business from, and/or interfere with the Company's relationship or business with any of the Company's existing Clients or Prospective Clients (as that term is defined above) . . ." *Id.*

The above covenants are in addition to obligations imposed by law, including under the Defend Trade Secrets Act and similar state statutes prohibiting the retention and misappropriation of the Company's trade secrets.  WSP takes these restrictive covenants and the protection of its trade secrets very seriously and expects you to honor all applicable agreements and law.  WSP will not hesitate to enforce its contractual and statutory legal rights and seek all available remedies, including an injunction, damages, and its attorneys' fees and costs.

We understand that you recently resigned your employment with the Company, and that your employment with the Company ended on December 1, 2023.  We further understand that you have refused to disclose where you are going to work, but intend to start with a competitor of the Company formed by another former Company employee in violation of his own restrictive covenants.

In light of the circumstances of your resignation, please confirm immediately the return of all documents, property, and data belonging to WSP to WSP.  This includes all electronically stored information stored on a personal device, cloud storage accounts, or USB drive.  This also includes,

December 29, 2023
Page 3

for example, (1) company-generated list of your multi-state Professional Engineer status; (2) your kWMCE professional resume; (3) the professional photograph(s) provided by the Company; (4) all reference materials, including physical books or audiobooks, paid for by the Company; and (5) professional contact list(s).

We further demand that you send in writing by no later than January 2, 2024, a written letter or affidavit, along with a detailed description of, and production of all documents related to: (a) the name of your current employer; (b) your current title; (c) all documents related to and/or reflecting any current or prospective employment or business relationship with Stephen Coon and/or Jason Leone and/or your prospective employer; (d) all documents reflecting your communications with any customers, consultants, suppliers, distributors, or other entities or relationships of the Company, and (e) written confirmation that you will preserve and not delete all documents and materials (including on your personal laptop and/or phone) related to your new prospective employment, solicitation of Company employees or customers, and/or plans to compete with the Company.

If you have any questions about your obligations, feel free to call me. If you are represented by legal counsel, please share this letter with your counsel and have them contact us.

Sincerely,

HOLLAND & KNIGHT LLP

Todd D. Wozniak

Enclosures

# RETENTION BONUS AGREEMENT

Pursuant to the terms and conditions set forth below, and in consideration of the benefits provided for herein, **kW Mission Critical Engineering, d.p.c.** (hereinafter the "**Company**") and **Gary Russinko** (hereinafter "**Employee**" and, together with the Company, the "**Parties**") hereby enter into this Retention Bonus Agreement (hereinafter this "**Retention Agreement**").

## I.     Purpose of Retention Bonus

As a valued member of the organization, the purpose of the Retention Bonus is to recognize Employee's contribution to the Company, to incentivize Employee to remain with the Company for at least a period of two years (the "**Transition Period**") following the Closing Date, (defined as the effective date of the completion of the merger of the Company and WSP USA Buildings Inc. ("**WSP USA**"), in order to assist the Company with integration into WSP USA, and to protect the Company's employees and clients from being diverted away from the Company.

## II.     Consideration for Retention Agreement

Employee may be paid a Retention Bonus pursuant to the terms herein if:

(a) Employee remains employed and "in good standing" (as defined herein) by the Company (or its successor-in-interest) through the relevant dates in Section II(A)(1)(a) and/or (b) (each a "**Vesting Date**"; collectively, the "**Vesting Dates**") of this Retention Agreement; or

(b) Employee is terminated, without "**Cause**" (as defined herein), by the Company during the Transition Period. In such an event, Employee will be paid any remaining portion of the Retention Bonus within thirty (30) days of the termination date.

### A.   Retention Bonus

Employee shall be paid a total Retention Bonus of **$330,000**, less all applicable deductions required by law (the "**Retention Bonus**"), which Retention Bonus will be paid in two installments (spread out over two years), on the dates set forth under the below Schedule of Payments. In the event that Employee resigns, or is terminated for Cause, by the time either the First Payment or the Second Payment come due, the relevant portion will not be payable. For greater certainty, it is possible for Employee to have earned the First Payment, assuming the conditions for the First Payment were met, but not earn the Second Payment.

#### 1.   Schedule of Payments

      a.   **First Payment**: The first payment of **$82,500**, less all deductions required by law, representing 25% of the Retention Bonus, will be paid to Employee via direct deposit or other acceptable means at the Company's discretion on the first payroll following December 30, 2021, so long as Employee

remains employed by Company or its successor-in-interest on December 30, 2021.

**b. Second Payment:** The second and final payment of **$247,500**, less all deductions required by law, representing the remaining 75% of the Retention Bonus, will be paid via direct deposit or other acceptable means at the Company's discretion on the first payroll following December 30, 2022, so long as Employee remains employed by Company or its successor-in-interest on December 30, 2022.

## III.   Non-Competition and Non-Solicitation

As an incentive and as a specific condition for entering into this Retention Agreement, the Parties make, give, and agree to the following covenants respecting competition and solicitation:

### A.   Non-Compete:

1. The Company is in a highly competitive business and expends a considerable amount of money in the development of business from new clients and customers and continued business from existing clients and customers. The business and clientele of the Company are national and worldwide in scope, and therefore the territorial and time limitations set forth in this Non-Compete clause are reasonable and necessary for the protection of the Company's interests.

2. During Employee's employment with the Company or its successor-in-interest and for a period of 12 months following the termination of Employee's employment for any reason (voluntary or involuntary), Employee shall not directly or indirectly own, manage, operate, control be employed by, consult with or participate in the ownership, management, operation or control of any business in a manner that would reasonably be expected to divert business from any of the Company's "**Clients**" or "**Prospective Clients**" (as defined herein) with whom Employee had any involvement in developing, servicing, soliciting, or maintaining during the year prior to Employee's termination.

3. "Clients" is defined as clients who the Company provided services for at any time during the 12-month period immediately preceding Employee's termination. "Prospective Clients" includes any person or entity: (a) to whom the Company has submitted qualifications or a proposal with Employee's direct personal involvement during the 12 months prior to Employee's termination; or (b) concerning whom Employee was assisting the Company in preparing a submittal of qualifications or a proposal at the time of Employee's termination.

**B.   Non-Solicitation of Employees, Consultants, and Contractors:** During Employee's employment with the Company or its successor-in-interest, and for a

2

period of 12 months following the termination of Employee's employment for any reason (voluntary or involuntary), Employee shall not directly or indirectly (on Employee's own or in combination or association with others, and whether for Employee's own benefit or for the benefit of other persons or entities) engage in activity which involves or could result in the actual or potential termination of the Company's relationship with or the solicitation, hiring, or engagement of any person or entity who is, at the time, or was within the last 12 months of Employee's employment within the Company, an employee, consultant, or independent contractor of the Company or any of its affiliates, including for greater certainty, any affiliate U.S. company of WSP USA ("**Affiliate**").

C. **Non-Solicitation of Clients:** During Employee's employment with the Company and for a period of 12 months following the termination of Employee's employment for any reason (voluntary or involuntary), Employee shall not directly or indirectly (on Employee's own or in combination or association with others, and whether for Employee's own benefit or for the benefit of other parties or entities) contact, call upon, solicit or otherwise accept business from, render services to, market services or products to, divert business from, and/or interfere with the Company's relationship or business with any of the Company's existing Clients or Prospective Clients (as that term is defined above) that Employee interacted with on behalf of the Company, was introduced to by virtue of Employee's employment with the Company, or otherwise learned confidential information concerning during the last 12 months of Employee's employment within the Company.

D. **Termination of Restrictive Covenants:** The above restrictive covenants terminate either within one year of the Employee's termination date or, if the Employee remains employed by the Company, within three years of the Closing Date, whichever is sooner.

## IV.    General Terms and Conditions

A.    Employee's obligations and rights of the Company shall extend to any parent corporation, subsidiaries and corporate affiliate companies, and to any of their successors, assignees and transferees.

B.    For purposes of this Retention Agreement, "in good standing" means that the Employee does not have a written record of disciplinary action for violating the Company's Code of Conduct, or policies related to anti-harassment, non-discrimination, and non-retaliation.

C.    For purposes of this Retention Agreement, the term "Cause" shall mean any of the following: (i) conviction of a crime (including conviction on a nolo contendere plea) involving the commission by Employee of a felony or of a criminal act involving, in the good faith judgment of the Company, fraud, dishonesty, or moral turpitude but excluding any conviction which results solely from Employee's title or position with the Company and is not based on

3

Employee's personal conduct; (ii) as determined by the Company in good faith, the failure to perform reasonably requested employment duties as required by the Company, as determined by the Company in good faith, after written notice from the Company of such failure to perform; (iii) fraud or embezzlement determined in accordance with the Company's normal investigative procedures consistently applied in comparable circumstances; (iv) gross misconduct or gross negligence in connection with the business of the Company or an Affiliate which has an adverse effect on the Company or the Affiliate, as determined by the Company in good faith; or (v) violation of the Company's written policies relating to equal employment, discrimination, harassment, retaliation, business conduct or other material Company policies.

D.   Employee acknowledges that: (i) unless stated otherwise in a written agreement executed by a representative of the Company, Employee's employment with the Company is at-will; accordingly, Employee may be terminated by the Company for any reason and in its sole discretion and Employee may terminate the employment relationship for any reason and in Employee's sole discretion; and (ii) Employee is to consult with and rely upon Employee's own tax, legal, and financial advisors regarding the consequences and risks of the Retention Bonus.

E.   This Retention Agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to its conflict of laws provision. The parties being desirous of having any disputes resolved in a forum having a substantial body of law and experience with the matters contained herein, agree that any action or proceeding with respect to this Agreement shall be brought exclusively in the Supreme Court of the State of New York, New York County, or in the United States District Court for the Southern District of New York or in any other court of competent jurisdiction sitting in the State of New York, New York County and the parties agree to the personal jurisdiction thereof

F.   The invalidity or unenforceability of any part or subpart of this Retention Agreement shall not affect the validity or enforceability of the remainder of the Retention Agreement. If any provision of this Agreement shall be held to be excessively broad as to time, geography, activity or other obligations, it shall be construed or reformed by limiting or reducing it, so as to be enforceable.

G.   This Retention Agreement supersedes any prior discussions, statements, representations, communications, whether oral or in writing, about its subject matter. This Retention Agreement reflects the full agreement with respect to its subject matter and can only be modified in a writing signed by Employee and an executive of the Company or its successor-in-interest.

4

The Parties knowingly and voluntarily sign this Retention Agreement as of the date(s) set forth below:

**kW Mission Critical Engineering, d.p.c.**

_____     Date: 12/29/2020
**James Warren**


**Employee**


_____     Date: 12/27/2020
**Gary Russinko**

5

**DiLudovico, Diane (PHL - X46879)**

| | |
|---|---|
| **From:** | TrackingUpdates@fedex.com |
| **Sent:** | Friday, December 29, 2023 2:11 PM |
| **To:** | DiLudovico, Diane (PHL - X46879) |
| **Subject:** | FedEx Shipment 788680622080: This shipment is scheduled to be sent |

*r*



# You're getting a package!

A label was created and your package is preparing to be shipped. We'll
send the delivery date when we get your package from the shipper.

 The delivery date may be updated when FedEx receives the package.



**INITIATED**

| | |
|---|---|
| **TRACKING NUMBER** | 788680622080 |
| **FROM** | Holland & Knight |
| | 1650 Market Street |
| | STE 3300 |
| | Philadelphia, PA, US, 19103 |
| **TO** | Gary Rusinko |
| | Gary Rusinko |

1

796 GROOMS RD
REXFORD, NY, US, 12148

| | |
|---|---|
| **PURCHASE ORDER NUMBER** | 46080 |
| **REFERENCE** | 213614.00001 |
| **SHIPPER REFERENCE** | 213614.00001 |
| **PACKAGING TYPE** | FedEx Envelope |
| **ORIGIN** | Philadelphia, PA, 19103 |
| **DESTINATION** | REXFORD, NY, US, 12148 |
| **SPECIAL HANDLING** | Residential Delivery |
| **STANDARD TRANSIT** | Sat, 12/30/2023 by 1:30pm |
| **NUMBER OF PIECES** | 1 |
| **TOTAL SHIPMENT WEIGHT** | 0.50 LB |
| **SERVICE TYPE** | FedEx Priority Overnight |



## Notifications, from start to finish

Get push notifications when you pair FedEx Delivery Manager® with the FedEx® Mobile app. You can activate alerts in the app to track your package. Then listen for the virtual doorbell chime that lets you know your package was delivered.

**DOWNLOAD THE MOBILE APP**

**FOLLOW FEDEX**

      

✉ Please do not respond to this message. This email was sent from an unattended mailbox. This report was generated at approximately 1:11 PM CST 12/29/2023.

All weights are estimated.

To track the latest status of your shipment, click on the tracking number above.

Standard transit is the date and time the package is scheduled to be delivered by, based on the selected service, destination and ship date. Limitations and exceptions may apply. Please see the FedEx Service Guide for terms and conditions of service, including the FedEx Money-Back Guarantee, or contact your FedEx Customer Support representative.

© 2023 Federal Express Corporation. The content of this message is protected by copyright and trademark laws under U.S. and international law. Review our privacy policy. All rights reserved.

Thank you for your business.

**DiLudovico, Diane (PHL - X46879)**

| | |
|---|---|
| **From:** | TrackingUpdates@fedex.com |
| **Sent:** | Saturday, December 30, 2023 9:46   M |
| **To:** | DiLudovico, Diane (PHL - X46879) |
| **Subject:** | FedEx Shipment 788680622080:   our package has been delivered |



# Hi. Your package was delivered Sat, 12/30/2023 at 9:38am.

Delivered to 796 GROOMS RD, REXFORD, NY 12148

**OBTAIN PROOF OF DELIVERY**

## How was your delivery



**TRACKING NUMBER**     788680622080

| | |
|---|---|
| **FROM** | Holland & Knight |
| | 1650 Market Street |
| | STE 3300 |
| | Philadelphia, PA, US, 19103 |
| **TO** | Gary Rusinko |
| | Gary Rusinko |
| | 796 GROOMS RD |
| | REXFORD, NY, US, 12148 |
| **PURCHASE ORDER NUMBER** | 46080 |
| **REFERENCE** | 213614.00001 |
| **SHIPPER REFERENCE** | 213614.00001 |
| **SHIP DATE** | Fri 12/29/2023 05:25 PM |
| **DELIVERED TO** | Residence |
| **PACKAGING TYPE** | FedEx Envelope |
| **ORIGIN** | Philadelphia, PA, US, 19103 |
| **DESTINATION** | REXFORD, NY, US, 12148 |
| **SPECIAL HANDLING** | Residential Delivery |
| **NUMBER OF PIECES** | 1 |
| **TOTAL SHIPMENT WEIGHT** | 0.50 LB |
| **SERVICE TYPE** | FedEx Priority Overnight |



# Notifications, from start to finish

Get push notifications when you pair FedEx Delivery Manager® with the FedEx® Mobile app. You can activate alerts in the app to track your package. Then listen for the virtual doorbell chime that lets you know your package was delivered.

**DOWNLOAD THE MOBILE APP**

**FOLLOW FEDEX**

     

✉ Please do not respond to this message. This email was sent from an unattended mailbox. This report was generated at approximately 8:45 AM CST 12/30/2023.

All weights are estimated.

To track the latest status of your shipment, click on the tracking number above.

Standard transit is the date and time the package is scheduled to be delivered by, based on the selected service, destination and ship date. Limitations and exceptions may apply. Please see the FedEx Service Guide for terms and conditions of service, including the FedEx Money-Back Guarantee, or contact your FedEx Customer Support representative.

© 2023 Federal Express Corporation. The content of this message is protected by copyright and trademark laws under U.S. and international law. Review our privacy policy. All rights reserved.

Thank you for your business.

# EXHIBIT K

AMERICAN ARBITRATION ASSOCIATION™

**ON RULES**
**DEMAND FOR ARBITRATION**

To ensure your demand is processed promptly, please file online at www.adr.org/support. Complete this form, provide last known email addresses and include a copy of the Arbitration Agreement, Plan or Contract.

| **Parties (Claimant)** | | |
|---|---|---|
| Name of Claimant:  WSP USA, Inc. | | |
| Address:  5170 Peachtree Road Building 100, Suite 300 | | |
| City:  Atlanta | State:  Georgia | Zip Code:  30341 |
| Phone No.:  (404) 237-2115 | Email Address:  katie.ganz@wsp.com | |
| Representative's Name (if known):  Nipun Patel, Justin Kadoura | | |
| Firm (if applicable):  Holland & Knight, LLP | | |
| Representative's Address:  1650 Market Street Suite 3300 | | |
| City:  Philadelphia | State:  Pennsylvania | Zip Code:  19103 |
| Phone No.:  (215)252-9527 | Email Address:  nipun.patel@hklaw.com | |

| **Parties (Respondent)** | | |
|---|---|---|
| Name of Respondent:  Stephen Coon | | |
| Address:  5533 E via Caballo Blanco | | |
| City:  Cave Creek | State:  Arizona | Zip Code:  85331 |
| Phone No.:  (518) 852-6793 | Email Address:  coon1986@gmail.com | |
| Representative's Name (if known): | | |
| Firm (if applicable): | | |
| Representative's Address: | | |
| City: | State:  Select... | Zip Code: |
| Phone No.: | Email Address: | |

**Mediation:** If you would like the AAA to contact the other parties and attempt to arrange mediation, please check this box ☑.

Claim: What was/is the employee/worker's annual wage range? ☐ Less than $100,000 ☑ $100,000-$250,000 ☐ Over $250,000
*Note: This question is required by California law.*

Amount of Claim:  at least $475,000 plus interest, damages for lost profits, unjust enrichment, disgorgement, and exemplary damages

Claim involves: ☑ Statutorily Protected Rights ☑ Non-Statutorily Protected Rights

In detail, please describe the nature of each claim. You may attach additional pages if necessary:

See attached request for interim relief and discovery for relevant allegations and claims.  Formal Arbitration Complaint forthcoming.

AMERICAN ARBITRATION ASSOCIATION™                                    ON RULES
                                                          DEMAND FOR ARBITRATION

| | |
|---|---|
| Other Relief Sought: ☑ Attorneys Fees  ☐ Interest  ☑ Arbitration Costs  ☐ Punitive/ Exemplary<br>☐ Other: | |
| Please describe the qualifications for arbitrator(s) to hear this dispute:<br><br>Respondent's employment agreement provides that any dispute arising between him and WSP "shall be submitted to binding arbitration before the American Arbitration Association." | |

| | | | | |
|---|---|---|---|---|
| Hearing: Estimated time needed for hearings overall: | | hours  or  3 | | days |

Hearing Locale: New York

*(check one)* ☐ Requested by Claimant  ☑ Locale provision included in the contract

Filing Fee requirement or $350 (max amount per AAA)

Filing by Company: ☑ $2,450 single arbitrator  ☐ $3,050 three arbitrator panel

Notice: To begin proceedings, **please file online at www.adr.org/fileonline.** You will need to upload a copy of this Demand and the Arbitration Agreement, and pay the appropriate fee.

| Signature (may be signed by a representative):<br>/s/ Nipun Patel | Date:<br>1/2/2024 |
|---|---|

Pursuant to Section 1284.3 of the California Code of Civil Procedure, consumers with a gross monthly income of less than 300% of the federal poverty guidelines are entitled to a waiver of arbitration fees and costs, exclusive of arbitrator fees. This law applies to all consumer agreements subject to the California Arbitration Act, and to all consumer arbitrations conducted in California. Only those disputes arising out of employer plans are included in the consumer definition. If you believe that you meet these requirements, you must submit to the AAA a declaration under oath regarding your monthly income and the number of persons in your household. Please contact the AAA's Western Case Management Center at 1-800-778-7879. If you have any questions regarding the waiver of administrative fees, AAA Customer Service can be reached at 1-800-778-7879. Please visit our website at www.adr.org/support to file this case online.

**BEFORE**
**THE AMERICAN ARBITRATION ASSOCIATION**

| | |
|---|---|
| WSP USA, Inc., | ) |
| | ) |
| Claimant, | ) |
| | ) |
| v. | ) C.A. No. |
| | ) |
| STEPHEN COON, | ) |
| | ) |
| Respondent. | ) |
| | ) |

---

### WSP USA, INC'S MOTION FOR EMERGENCY INTERIM RELIEF

---

Claimant WSP USA, Inc. ("WSP"), by and through undersigned counsel, hereby moves for interim relief in the form of the appointment of an emergency arbitrator, a temporary injunction, and expedited initial discovery, pursuant to the Optional Rules for Emergency Measures of Protection of the AAA's Employment Arbitration Rules and Mediation Procedures.

## <u>INTRODUCTION</u>

This action arises out of Stephen Coon's breach of the duty of loyalty and violations of restrictive covenants in his employment agreements with WSP. In 2020, WSP acquired kW Mission Critical Engineering ("kW MCE"), a data-center design and mission-critical engineering firm. As part of that acquisition, kW MCE's senior leadership, including Coon, signed employment agreements that prohibited them from competing with WSP or soliciting its employees or vendors until at least one year after their departure from kW MCE for any reason. Nonetheless, Coon resigned from WSP in October 2023 for the specific purpose of starting a competing business—a fact he openly admitted to colleagues. On his way out and since the time

of his resignation, it appears Coon also solicited several current WSP employees to work for him, two of which have now resigned (in violation of their own restrictive covenants) in close succession without revealing their new employer. Having siphoned off this team of former WSP employees, Coon will imminently begin competing with WSP for the very same customers that Coon was entrusted with servicing using kW MCE's proprietary, confidential, and trade secret business information and strategies. Coon also noted that he already has a buyer for his new business lined up, offering $25MM.

AAA should appoint an emergency arbitrator to enjoin Coon from improperly competing with WSP in clear violation of his employment agreement, and to prevent irreparable harm to WSP's business, impairment of its customer goodwill, and misappropriation of WSP's confidential and trade secret business information. WSP paid Coon substantial amounts of consideration in exchange for the post-employment covenants he voluntarily agreed-to, and will be irreparably harmed, both through the loss of its competitive advantage and through the lost good will that it specifically acquired as part of its purchase of kW MCE. The emergency arbitrator should also order limited expedited discovery to allow WSP to further support its requested relief.

## BACKGROUND

**I.      WSP Acquires kW Mission Critical Engineering.**

In December 2020, WSP acquired kW MCE, a small (then approximately 175 employee) engineering firm that focused primarily on designing data centers and other mission-critical projects. (Decl. of Kenneth Clausen ¶ 4, attached hereto as Ex. A.) The acquisition closed on December 30, 2020. (*Id.* ¶ 5.) As part of the acquisition, kW MCE's senior leadership team and key employees, including Coon, signed employment agreements and retention agreements containing restrictive covenants that prohibited them from competing with WSP, soliciting its

employees, customers, or vendors, or sharing its trade secrets or confidential information.  (Ex. B at 6–8.)

## II.        Coon Agreed to Be Bound by Restrictive Covenants.

Coon worked for kW MCE for approximately eight years before the acquisition and entered an Employment Agreement with WSP on December 30, 2020, as a Professional Electrical Engineer and Managing Principal of the Phoenix Office.  (Ex. A ¶¶ 6–7 .)  Coon was responsible for providing technical engineering expertise and developing successful relationships with design team partners—architects, engineers, and contractors.  (*Id.* ¶ 11.)  Coon gained substantial experience and insight into kW MCE's data center business, and had key responsibilities for leadership of key client accounts and projects associated with data center program design and build out.  (*Id.* ¶ 12.)  Coon also gained knowledge about all aspects of kW MCE's customers' programs, including schedule, budget, risk and desired engineering team.  (*Id.* ¶ 13.)

Mr. Coon's Employment Agreement provided for a $200,000 a year base salary, benefits, and potential performance bonuses.  (Ex. B at 2.)  In exchange for this compensation, Coon agreed "not directly or indirectly [to] own, manage, operate, control, be employed by, consult with or participate in the ownership, management operation or control of any business in a manner that would reasonably be expected to divert business from any of the Company's 'Clients' or 'Prospective Clients' with whom [he] had any involvement in developing, servicing, soliciting, or maintaining during the year prior to [his] termination."  (*Id.* at 7.)  The Employment Agreement also prohibits Coon from engaging in "the solicitation, hiring, or engagement of any person or entity who is, at the time, or was within the last 12 months of [his] employment with the Company, an employee, consultant, or independent contractor of the Company or any of its affiliates."  (*Id.* at 8.)  And the Employment Agreement provides that Coon "shall not . . . contact, call upon, solicit

3

or otherwise accept business from, render services to, market services or products to, divert business from, and/or interfere with the Company's relationship or business with any of the Company's existing Clients or Prospective Clients" that he learned of, did work for, or learned confidential information about through WSP. (*Id.*)

These restrictive covenants are essential to ensuring that WSP receives the benefit of the bargain from the kW MCE acquisition, including kW MCE's good will. The data-center design business is extremely competitive, with each company's ability to compete largely dependent on, *inter alia*, (1) its ability to understand and accommodate a client's needs, and (2) the quality and reputation of its specific engineers. (Ex. A ¶ 31.) Competition from former kW MCE/WSP employees—and especially high-level employees like Coon, who is equipped with recent knowledge of kW MCE and WSP customers' preferences for, *inter alia*, engineering team organization and operation patterns—would thus be devastating for WSP. (*Id.* ¶¶ 33–34.) Accordingly, the Employment Agreement provides that the restrictive covenants will remain in place not only during Coon's employment by WSP, but also for another twelve months after he leaves or is terminated by WSP. (*See* Ex. B at 6–8.) The only exception is if Coon does not renew the Employment Agreement after the first two-year Term—and thus "convert[s] to an at-will employee" at the end of the Term, (*id.* at 2)—and "remains employed with [WSP] one year after converting to an at-will employee," at which point the restrictive covenants would expire at the end of that one year period. (*Id.* at 10.) In further recognition of the importance of the restrictive covenants, the Employment Agreement also provides, and Coon agreed, that "[t]he Company is in a highly competitive business and expends considerable amounts of money in the development of business from new clients and customers and continued business from existing clients and customers. The business and clientele of the Company are national and worldwide in scope, and

therefore the territorial and time limitations set forth in th[e] Non-Compete clause are reasonable and necessary for the protection of the Company's interests." (*Id.* at 7.)

Additionally, many employees, including Coon, also signed retention bonus agreements ("RBA") that reaffirmed their restrictive covenants in exchange for substantial cash bonuses "to incentivize [them] to remain with [kW MCE] . . . in order to assist [kW MCE] with integration into WSP." (Ex. C at 1.)  Specifically, Coon executed the RBA on December 29, 2020, the day before signing his Employment Agreement.  WSP paid Coon $475,000 over the course of two years pursuant to his RBA, in addition to his compensation under the Employment Agreement. (*Id.* at 1–2.)

**III.     Coon Violates the Restrictive Covenants.**

On November 2, 2022, Coon gave notice that he would not renew the Employment Agreement, making him an at-will employee as of December 30, 2022.  (Ex. D.)  Coon did not, however, remain with WSP for a year after that date, as required by the Employment Agreement to excuse him from the 12-month tail in the restrictive covenants.  (Ex. A ¶¶ 15, 17.)  Instead, he tendered his resignation on October 18, 2023, effective "sometime between two and four weeks from today." (Ex. E.)  His actual last day was November 3, 2023.  (Ex. A ¶ 19.)  Accordingly, the non-compete and non-solicitation provisions of his Employment Agreement are still in effect until November 3, 2024.

Nonetheless, Coon has already begun forming a competing business in Arizona (where he lives) and upstate New York (where much of kW MCE was located), likely intending to take advantage of the exploding demand for data centers because of the growth of AI software and applications.  Since his resignation (and likely earlier), Coon has solicited several former kW MCE/WSP employees—including at least Principal Mechanical Engineer Jason Leone and

Managing Principal of the Troy Office Gary Russinko, who are each subject to their own restrictive covenants with WSP, (Exs. F & G)—to join him.  (Ex. A ¶¶ 24–30.)   Russinko resigned from WSP on October 30, 2023, with his last day being December 1.  (*Id.*)   Leone followed close behind, resigning on December 5, 2023, with his last day being December 22..  (*Id.*)  Prior to his resignation, Coon openly admitted to a co-worker, Mr. Ken Clausen, that he was starting a competing business in Phoenix and upstate New York, near kW MCE's Troy, New York office, and had a lease ready to be executed in January of 2024.  (*Id.* ¶ 20.)  Coon also told Clausen he was "going to be taking anyone in Troy who had not signed a retention agreement," and acknowledged that he needed kW MCE's MEP engineers to deliver on competitive services to the very clients Coon was responsible for servicing at kW MCE.  (*Id.* ¶ 21.)  By recruiting those experienced mechanical engineers, Coon openly touted he could start a business that could compete directly with WSP.  (*Id.* ¶ 22.)  He also bragged that a member of the C-suite of another company, Bowman Engineering, already planned to pay him $25 million to buy the new business.  (*Id.* ¶ 23.)  Based on Coon's prior comments to Clausen, he is likely to target at least four other key kW MCE employees in early 2024, if he has not already done so.  (*Id.* ¶ 34.)  Design partners have also suggested to Clausen that Coon is soliciting competitive work from kW MCE's existing customers.  (*Id.* ¶ 35.)

Together, Coon and the employees he has recruited to compete against kW MCE have the potential to inflict substantial harm to WSP's business.  The key accounts that Coon was responsible for servicing have the potential to generate the tens of millions of dollars for FY 2024 and beyond.  (*Id.* ¶ 32.)  Further, Coon has in-depth knowledge of customer preferences, pricing, desired team, project specifications, engineering specifications and kW MCE's existing and past work for those key customers.  (*Id.* ¶ 33.)

On October 25, 2023, WSP's counsel sent Coon a letter, reminding him of his obligations under the restrictive covenants and addressing questions Coon asked in his resignation letter regarding which items/information he could keep and what had to be returned to WSP.  (Ex. H.) On December 29, 2023, WSP's counsel sent similar letters to Messrs. Leone and Russinko.  (Exs. I & J.)  Nonetheless, Coon seems undeterred, and neither Coon, Leone, or Russinko have divulged or disclosed where they intend to work after leaving WSP/kW MCE.  Accordingly, on January 2, 2024, WSP filed its Demand for Arbitration against Coon pursuant to § 17(a) of the Employment Agreement, asserting claims for breach of fiduciary duty, breach of contract, and tortious interference with contract.  WSP now moves for interim relief and expedited initial discovery.

## LEGAL STANDARDS[1]

The AAA's Emergency Rule O-4 provides that emergency interim relief is proper where "the party seeking the emergency relief has shown that immediate and irreparable loss or damage will result in the absence of emergency relief, and that such party is entitled to such relief." Similarly, New York law allows an employer to seek a preliminary injunction to enforce restrictive covenants where the claimant "show[s] a probability of success on the merits, the danger of irreparable injury in the absence of a preliminary injunction and a balancing of the equities in its favor."  *Frank May Assocs. Inc. v. Boughton*, 281 A.D.2d 673, 674 (N.Y. S. Ct. App. Div. 2001).

---

[1]     Coon's Employment Agreement provides that "[a]ny dispute arising between any of the Company and [Coon] under this Agreement, or under any statute, regulation, or ordinance, or in connection with [Coon's] Employment with the Company, shall be submitted to binding arbitration before the American Arbitration Association ("AAA") for resolution."  (Ex. B at 11.) It further provides that the arbitration proceedings will be governed by New York law and "conducted in accordance with AAA's Employment Arbitration Rules and Procedures."  *Id.* And it provides "that in the event of a breach of any provision of this Agreement, money damages would be inadequate and neither [Mr.Coon] nor the Company would have an adequate remedy at law" and that injunctive relief is appropriate.  *Id.*

"[T]he purpose of a preliminary injunction is to preserve the status quo until a decision is reached on the merits." *NYSARC, Inc. v. Syed*, 747 N.Y.S.2d 327, 329 (N.Y. S. Ct. 2002).

## ARGUMENT

Coon violated his duty of loyalty and his restrictive covenants by planning to start a competing business while still employed at WSP and soliciting WSP's other employees to join him. If he is permitted to begin competing with WSP, he will not only further violate his restrictive covenants, but WSP will also be irreparably harmed through the loss of its competitive position, the threatened and/or actual disclosure and misuse of its confidential information and trade secrets, and the impairment of kW MCE's business and customer good will for which WSP specifically bargained. Moreover, WSP requires expedited initial discovery on specific, targeted issues to determine the extent of the violations and Coon's plans for his competing business so that it can provide additional evidentiary support for continuing injunctive relief.

**I.      WSP Is Entitled to Emergency Interim Relief.**

**A.      WSP Is Likely to Succeed on the Merits of Its Breach-of-Contract Claims.**

To establish breach of contract, a claimant must show "the existence of a contract, the [claimant's] performance pursuant to the contract, the defendant's breach of his or her contractual obligations, and damages resulting from the breach." *Tri-Star Lighting Corp. v. Goldstein*, 151 A.D.3d 112, 1105 (N.Y. App. Div. 2017). Here, Coon breached his Employment Agreement by failing to abide by the restrictive covenants.

**i.      The Restrictive Covenants Are Enforceable.**

The Employment Agreement, including the restrictive covenants, is a valid and enforceable contract. "Generally, a covenant not to compete will be enforced . . . if it is reasonably limited temporarily and geographically and, without being harmful to the public or unduly burdensome,

serves the acceptable purpose of protecting the former employer from unfair competition."
*Bollengier v. Gulati*, 233 A.D.2d 721, 722 (N.Y. App. Div. 1996).  Moreover, "[c]ourts will
enforce noncompetition clauses 'where necessary to protect, *inter alia*, an employer's confidential
customer information and the good will of . . . customer[s] generated and maintained at the
employer's expense.'"  *Gundermann & Gundermann Ins. V. Brassill*, 46 A.D.3d 82, 83 (N.Y. App.
Div. 2007) (quoting *Milbrandt & Co., Inc. v. Griffin*, 1 A.D.3d 327, 328 (N.Y. App. Div. 2003)).

As an initial matter, in his Employment Agreement, Coon agreed that "the territorial and
time limitations set forth in th[e] Non-Compete clause are reasonable and necessary for the
protection of the Company's interests."  (Ex. B at 7.)  Accordingly, he has already conceded that
they are valid.  *See* Arbitration Award, *Clopay Corp. v. Priest*, 2023 WL 5657724 (E.D. Ok. July
10, 2023) (holding that national scope of restrictive covenant was reasonable based on employee's
admission in contract).

Moreover, courts routinely hold that the Agreement's temporal scope—twelve months
after the employee leaves the company—is reasonable.  *See, e.g.*, *Artech Info. Sys., L.L.C. v. Tee*,
280 A.D.2d 117, 124 (N.Y. App. Div. 2001); *Michael I. Weintraub, M.D., P.C. v. Schwartz*, 131
A.D.2d 663, 665 (N.Y. App. Div. 1987); *J.H. Goldberg Co., Inc. v. Stern*, 53 A.D.2d 246, 250
(N.Y. App. Div. 1976).  The temporal scope is particularly reasonable here because the covenants
were connected to the acquisition of kW MCE.  "New York courts have found three to five year
restrictions reasonable in the context of the sale of a business."  *Uni-World Capital L.P. v.
Preferred Fragrance, Inc.*, 73 F. Supp. 3d 209, 235 (S.D.N.Y. 2014)).  Although the restrictive
covenants were not part of the contract for the acquisition of kW MCE itself, the acquisition
contemplated that the restrictive covenants would be in place.  Indeed, the Employment Agreement
specifically references the transition from kW MCE to WSP, (Ex. B at 1), and the RCA states that

the purpose of that agreement, including the similar restrictive covenants set forth therein, is "to incentivize [the employees] to remain with [kW MCE] . . . in order to assist [kW MCE] with integration into WSP."  (Ex. C at 1.)

The Employment Agreement's lack of a specific geographic scope is also reasonable for two reasons.  First, WSP works with clients and vendors around the world.  *See Uni-World Capital L.P.*, 73 F. Supp. 3d at 235 (upholding non-compete that applied to "the United States of America, its territories and possessions, and any country outside of the United States of America to which products of the Business are sold"); *Integra Optics, Inc. v. Nash*, 2018 WL 224460, at *10 (N.D.N.Y. Apr. 10, 2018) (applying Colorado law and enforcing worldwide scope of restrictive covenant); *GE Betz Inc. v. Moffitt-Johnson*, 301 F. Supp. 3d 668, 685 (S.D. Tex. 2014); *Bio-Imaging Techs., Inc. v. Marchant*, 584 F. Supp. 2d 322, 328 (D. Mass. 2008) (upholding non-compete agreement that extends to "any state or country where [employer] does business); *Universal Engraving, Inc. v. Duarte*, 519 F. Supp. 2d 1140, 1153 (D. Kan. 2007).  Second, the covenants are limited to conduct that is directed at WSP's existing and prospective clients—*e.g.*, soliciting them or engaging in conduct that "would reasonably be expected" to divert them away from WSP.  *See Crest Hill Capital LLC v. Gonzalez¸* 2019 WL 1557512, at *6 (NY. S. Ct. Apr. 10, 2019) ("No geographic limitation is required for a non-solicitation clause that is client-based."); *W.R. Grace & Co., Dearborn Div. v. Mouyal*, 422 S.E.2d 529, 533 (Ga. 1992) ("Where . . . the former employee is prohibited from post-employment solicitation of employer customers which the employee contacted during his tenure with the employer, there is no need for a territorial restriction expressed in geographic terms." (footnote omitted)).  Even if this were not the case (which it is), Coon intends to operate his business—and has solicited WSP employees to work on that business—in New York, where kW MCE was primarily located, and Arizona, where Coon

10

personally worked while employed at WSP.  (*See* Ex. B at 1.)  Accordingly, enforcing the restrictive covenants to prevent Coon from starting his competing business is reasonable and necessary to protect WSP's legitimate interests.

### ii.        Coon Breached the Restrictive Covenants and Will Breach Them Again.

While WSP performed its obligations under the Employment Agreement by paying Coon a substantial salary, benefits, and bonuses, Coon violated his restrictive covenants and is planning to violate them again.  The non-solicitation clause of the Employment Agreement provides that Coon shall not "engage in any activity which involves . . . the solicitation, hiring, or engagement of any person or entity who is, at the time, or was within the last 12 months of [his] employment with the Company, an employee . . . of the Company or any of its affiliates."  (Ex. B at 8.)  He has already done that by asking Messrs. Leone and Russinko to work for him at his competing business, causing them to resign.

Moreover, Coon's competing business itself will violate the non-competition and non-solicitation provisions.  The non-competition clause provides that Coon "shall not directly or indirectly own, manage, operate, [or] control . . . any business in a manner that would reasonably be expected to divert business from any of the Company's 'Clients' or 'Prospective Clients' with whom [he] had any involvement in developing, servicing, soliciting, or maintaining during the year prior to [his] termination."  (*Id.* at 7.)  Yet, as noted above, that is exactly what Coon admits that he intends to do.  Similarly, the non-solicitation clause provides that Coon "shall not . . . contact, call upon, solicit or otherwise accept business from, render services to, market services or products to, divert business from, and/or interfere with the Company's relationship or business with any of the Company's existing Clients or Prospective Clients" that he learned of, did work for, or learned confidential information about through WSP "during the year prior to [his]

termination." (*Id.*)  Coon has openly admitted he would go after the same client base given the team he is recruiting and his stated intention to start a competing business.  (Ex. A ¶¶ 20, 21, 35.)

### iii.        WSP Has Been Harmed.

WSP has already suffered damages and will suffer further damages without interim relief. Specifically, WSP has already been harmed by Coon's tortious interference with Messrs. Leone and Russinko's retention agreements in violation of his (and their) restrictive covenants—WSP lost two valuable employees.  Moreover, as explained below, WSP will suffer irreparable damage to its reputation, good will, and customer relationships if Coon is permitted to begin competing with it to solicit the same customers Coon worked with while at kW MCE/WSP.  (*See* Part I.B, *infra*.)

### B.        WSP Will Be Irreparably Harmed Without Interim Relief.

An injury is irreparable for the purpose of obtaining preliminary relief where the party would not have an adequate remedy at law.  *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 68 (2d Cir. 1999).  Here, WSP will suffer several irreparable injuries if the Arbitrator does not intervene.

As with the reasonableness of the restrictive covenants, Coon conceded that WSP will suffer irreparable harm if he is permitted to start a competing business before the covenants expire. Specifically, in the Employment Agreement, Coon agreed that "that in the event of a breach of any provision of this Agreement, money damages would be inadequate and neither [Mr.Coon] nor the Company would have an adequate remedy at law" and that injunctive relief is appropriate.  (Ex. B at 7); *see also Ticor Title Ins. Co.*, 173 F.3d at 69 (holding that contract provision that "in the event of Cohen's breach of the post-employment competition provision, Ticor shall be entitled to injunctive relief, because it would cause irreparable injury" is an admission that harm would be irreparable).

Even apart from this admission, Coon's competing business in fact will likely cause substantial irreparable harm to WSP.  "It is well established that the loss of customer relationships stemming from the violation of nonsolicitation and non-competition clauses constitutes irreparable harm sufficient to support injunctive relief."  *Crest Hill Capital LLC*, 2019 WL 1557512, at *6. "[T]he violation of a non-compete by the solicitation of employees also constitutes irreparable harm."  *Global Switching Inc. v. Kasper*, 2006 WL 1800001, at *12 (E.D.N.Y. June 28, 2006); *EASi, LLC v. Gaffar*, 2020 WL 3868394, at *3 (C.D. Ill. July 9, 2020) (finding risk of irreparable harm because "[i]f Gaffar or L&T continue to solicit and hire EASi employees during the pendency of this lawsuit, EASi risks losing significant work from CAT, a large client, and may be competitively disadvantaged on future projects because the former EASi employees likely take with them the customer goodwill they helped to create for the employer"); *cf. Newmark Partners, L.P. v. Hunt*, 200 A.D.2d 557 (N.Y. App. Div. 2021) (granting preliminary injunction "to protect [plaintiff's] client relationships, reputation, and goodwill after losing all or almost all of their multifamily property group to their primary competitor").

As explained above, the data-center design industry is highly competitive, and a business' ability to compete depends in large part on the particular engineers working for it and its knowledge of a particular client's preferences about how the engineering team will operate.  Coon knows WSP's clients' preferences and may be able to divert substantial business from it by siphoning off its valuable team of engineers.  Coon also has knowledge of WSP/kW MCE's valuable trade secrets relating to customer projects/proposals, including design elements, proposal/fee schedules, and instruments of service like field construction documents.  Any competition or solicitation by Coon and his former WSP colleagues will necessarily involve the actual or inevitable disclosure of WSP's confidential and trade secret business information.

Finally, these harms will be compounded by the fact Coon's restrictive covenants were integral to "the sale of an existing business with its goodwill." *Frank May Assoc.*, 281 A.D.2d at 674; *accord Lund v. Agmata Wash. Enterprises, Inc.*, 190 A.D.2d 577, 577 (N.Y. App. Div. 1993); *Hay Grp., Inc. v. Nadel*, 170 A.D.2d 398, 399 (N.Y. App. Div. 1991). WSP will irreparably lose part of the good will it purchased in the acquisition if Coon is permitted to compete with it and steal its employees during the term of the restrictive covenants.

In sum, WSP will be irreparably harmed if Coon is not enjoined from competing with it and continuing improperly to solicit its employees in violation of his restrictive covenants.

**C.    The Balance of Equities Favors WSP.**

The balance of the equities favors WSP. As explained above, WSP paid Coon substantial sums of money in exchange for his employment ***and*** his agreement to abide by the restrictive covenants, and WSP will suffer significant and irreparable harm to its business, reputation, good will, and customer relationships if Coon is not enjoined from violating those covenants.

Moreover, those covenants are reasonably limited to protect WSP's interests. They do not prohibit Coon from obtaining gainful employment. Rather, they prohibit him only from soliciting the specific employees, vendors, and clients that belong to WSP, and from doing work that "would reasonably be expected to divert business" away from WSP. *See Battenkill Veterinary Equine P.C. v. Cangelosi*, 1 A.D. 856, 859 (N.Y. App. Div. 2003) (holding that equities favored the plaintiff where "[d]efendant is not being deprived of her livelihood").

Accordingly, the equities favor WSP, and the Arbitrator should issue emergency interim relief to enjoin Coon from competing with WSP and soliciting its employees or vendors during the pendency of this arbitration.

**II.      WSP Is Entitled to Expedited Initial Discovery.**

An "arbitrator [has] the authority to order such discovery, by way of  deposition, interrogatory, document production, or otherwise, as the arbitrator considers necessary to a full and fair exploration of the issues in dispute,  consistent with the expedited nature of arbitration." AAA's Employ. Arb. R. & Mediation P. 9.  WSP requests that Coon be required to preserve all relevant documents, including personal communications like emails and text messages, and that WSP be permitted to serve up to fifteen document requests and ten interrogatories to understand more about the specifics of Coon's competition plans and the full extent of his breach of his post-employment covenants.  These requests and interrogatories should include, but not be limited to, the specific requests attached hereto as Exhibits K and L.

<u>**CONCLUSION**</u>

For the forgoing reasons, the AAA should appoint an emergency arbitrator to this matter, order Coon not to compete with WSP or solicit its employees or vendors, and order Coon to preserve all relevant documents and to respond to expedited initial discovery.

Dated: January 2, 2024                         Respectfully submitted,

*/s/ Nipun J. Patel*
**HOLLAND & KNIGHT LLP**
Nipun J. Patel
1650 Market Street, Suite 3300
Philadelphia, PA 19104
nipun.patel@hklaw.com
Telephone:  215.252.9600
Fax:  215.867.6070

*Counsel for WSP USA, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I, Nipun J. Patel, do hereby certify that on January 2, 2024, a true and correct copy of

the foregoing was served via email and mail to:

Stephen Coon
5533 Evia Caballo Blanco
Cave Creek, AZ 85331

9273 E Western Saddle Way
Scottsdale, AZ 85255

Coon1986@gmail.com


*/s/ Nipun J. Patel*
Nipun J. Patel

16