# Exhibit D

What are you looking for?



(https://maps.google.com/maps?ll=36.172588,-120.545434&z=6&t=m&hl=en&gl=US&mapclient=apiv3)

# OUR OFFICES

Acting locally means being present in our communities. With more than 300 offices across the country, you can connect with one close to you.

Click on the map above to view contact details for our offices near you.

### New York (1 Penn Plaza)

ONE PENN PLAZA, 4TH FLOOR, 250 W 34TH STREET
NY 10119
NEW YORK
UNITED STATES

TEL: +1 (212) 465-5000



(https://www.instagram.com/wsp.usa/)   (https://www.linkedin.com/company/wspusa)   (https://www.youtube.com/wspusa)   (https://twitter.com/wspusa)

(https://www.facebook.com/wspusa/)

**WHO WE ARE (/EN-US/WHO-WE-ARE)**

What We Stand For (/en-us/who-we-are/what-we-stand-for)

Our Story (/en-us/who-we-are/our-story)

Future Ready (/en-us/hubs/future-ready)

U.S. Leadership (/en-us/who-we-are/leadership-team)

Our Offices (/en-us/who-we-are/our-offices)

**WHAT WE DO (/EN-US/WHAT-WE-DO)**

Sectors (/en-us/sectors)

Services (/en-us/services)

Projects (/en-us/projects)

**INSIGHTS (/EN-US/INSIGHTS)**

Climate (/en-us/insights/climate)

Mobility (/en-us/insights/mobility)

Places (/en-us/insights/places)

Society (/en-us/insights/society)

Resources (/en-us/insights/resources)

Technology (/en-us/insights/technology)

**CAREERS (/EN-US/CAREERS)**

U.S. Job Opportunities (/en-us/careers/join-our-team?country=US)

Apply Here (https://www.wsp.com/en-US/careers/join-our-team/spontaneous-application)

Supplier Registration (http://plus.wsp-pb.com/supplier_registration/)

FEMA Inspection Services (https://www.wspinspectionservices.com/)

**CORPORATE ()**

Sustainability (/en-us/who-we-are/corporate-responsibility/sustainability)

Health and Safety (/en-us/who-we-are/corporate-responsibility/health-safety)

Investors (/en-us/investors)

Whistleblowing Service (http://www.wsp-pb.com/en/Who-we-are/Corporate-Governance/Whistleblowing-service/)

News (/en-us/news)

Corporate Governance (/en-us/investors/corporate-governance)

Ethics and Integrity (/en-us/who-we-are/corporate-responsibility/ethics-integrity)

The WSP Logo (/en-us/legal/the-wsp-logo)

Privacy Notice (/en-us/legal/privacy-notice)

WSP

Anti-Spam Commitment (/en-us/legal/anti-spam-commitment)

Cookie Policy (/en-us/legal/cookie-policy)

Terms of Use (/en-us/legal/terms-of-use)

©2024 WSP

# Exhibit E

in 🔍    Home   My Network   Jobs   Messaging   Notifications   Me ▾   For Business ▾   Try Premium for $0

People ▾ | California, United States 1 ▾ | WSP in the U.S. 1 ▾ | Connections ▾ | All filters | Reset

816 results

**LinkedIn Member**
Project Consultant, Climate Finance at WSP
Ventura, CA

**LinkedIn Member**
Consultant, Sustainability, Energy and Climate Change at WSP USA
San Francisco, CA

**LinkedIn Member**
OSHPD Inspector.
Los Angeles Metropolitan Area

**Patti Boekamp** ✓ • 3rd+
Area Manager/Vice President at WSP USA
San Diego County, CA    [Message]

**LinkedIn Member**
Field Archaeologist
San Diego Metropolitan Area

**LinkedIn Member**
Consultant, Environmental Specialist at WSP USA
Los Angeles Metropolitan Area

**Hannah Karlan** • 3rd+
Master of City Planning Candidate at UC Berkeley
Berkeley, CA    [Message]

**Hemamalini (Hema) Nagarajan, P.E.** ✓ • 3rd+
AVP, NorCal Traffic Lead at WSP USA
San Francisco, CA    [Message]

**Andrina Dominguez** ✓ • 3rd+
Assistant Vice President at WSP USA
Los Angeles, CA    [Message]
Provides services · Environmental Consulting, Management
Consulting, Project Management, Financial Analysis, Cybersecurity,
Program Management, Research Skills, Strategic Planning, Grant
Writing, Technical Writing

**Veronica T.** • 3rd+
Senior Coordinator
Riverside, CA    [Message]

Are these results helpful?
Your feedback helps us improve search results    👍 👎

‹ Previous   **1** 2 3 4 5 6 7 8 … 82   Next ›

Ad ···
Get the latest jobs and industry news
TD2
Hannah, explore relevant opportunities
with **TD2**
[Follow]

About    Accessibility    Talent Solutions    ❓ Questions?    Select Language
Community      Careers      Marketing      Visit our Help    English (English) ▾
Guidelines            Solutions         Center.
Privacy & Terms   Ad Choices    Advertising    ⚙ Manage your
▾                               account and
Sales Solutions   Mobile      Small Business   privacy
Safety Center                          Go to your Settings.
                                  🛡 Recommendation
                                  transparency
                                  Learn more about
                                  Recommended
                                  Content.

LinkedIn Corporation © 2024

# Exhibit H

 What are you looking for?

# SHAPING COMMUNITIES NATIONWIDE

We are immensely proud of our extensive portfolio of projects. It demonstrates our breadth of capability and depth of expertise to transform our clients' visions into realities that are sustainable in every sense - commercially, technically, socially and environmentally.

**Local (62)**    **Global (4)**

california                                                            ✕    🔍

**62 PROJECTS BY OUR WSP TEAM**

**Filter By**



**Projects  -  San Francisco, California, USA**

## 100 Van Ness

This residential project involved the adaptive re-use of the former AAA headquarters. The project was designed using the Greenpoint rating system to environmental and energy...

(HTTPS://WWW.WSP.COM/EN-US/PROJECTS/100-VAN-NESS)



**Projects  -  San Francisco, California, USA**

## 181 Fremont

A distinctive mixed-use tower in San Francisco's Transbay Transit District, 181 Fremont stands at 800 feet with approximately 683,800 square feet consisting of 54 stories. It is...

(HTTPS://WWW.WSP.COM/EN-US/PROJECTS/181-FREMONT)



**Projects  -  San Francisco, California, USA**

## 50 United Nations Plaza

Originally constructed between 1934 and 1936, the Federal Building at 50 United Nations Plaza in San Francisco is recognized on the official National Register of Historic Places as...

(HTTPS://WWW.WSP.COM/EN-US/PROJECTS/50-UNITED-NATIONS-PLAZA)



**Projects  -  San Francisco, California, USA**

## 555 Mission Street

Located in downtown San Francisco, 555 Mission Street is a 33-story Class-A office tower. WSP USA provided MEP engineering for the project, which incorporated a number of sustainable...

(HTTPS://WWW.WSP.COM/EN-US/PROJECTS/555-MISSION-STREET)



**Projects  -  San Francisco, California, USA**

## ACT Theater at the Strand

The American Conservatory Theater (ACT) redeveloped the 100-year-old Strand Theater to meet its
growing needs. This new location along San Francisco's Market Street provides the...
(HTTPS://WWW.WSP.COM/EN-US/PROJECTS/ACT-THEATER-AT-THE-
STRAND)



**Projects  -  Anaheim, California, USA**

## ARTIC Anaheim Regional Transportation Intermodal Center

The Anaheim Regional Transportation Intermodal Center (ARTIC) is a 67,000-square-foot hub that brings
together multiple modes of transportation.
(HTTPS://WWW.WSP.COM/EN-US/PROJECTS/ARTIC-ANAHEIM-
REGIONAL-TRANSPORTATION-INTERMODAL-CENTER)



**Projects  -  California, USA**

## BART Oakland Airport Connector | Oakland, CA

WSP served as the engineer-of-record for the Oakland Airport Connector, preparing drawings, specifications, and calculations for the BART superstructure.
(HTTPS://WWW.WSP.COM/EN-US/PROJECTS/BART-AIRPORT-CONNECTOR-OAKLAND-CA)



**Projects  -  Fremont, California, USA**

## BART Warm Springs Extension

The 5.4-mile extension of BART commuter rail to a new station in Fremont, California makes it more convenient for commuters traveling to Oakland and San Francisco. The extension...
(HTTPS://WWW.WSP.COM/EN-US/PROJECTS/BART-WARM-SPRINGS-EXTENSION)



**Projects  -  San Francisco, California, USA**

## Bay Area Vision Zero Action Plan and BAYVIZ System

The data system will improve access to safety-related data and analysis tools, with the goal of reducing traffic fatalities in the nine-county region.

(HTTPS://WWW.WSP.COM/EN-US/PROJECTS/BAY-AREA-VISION-ZERO-ACTION-PLAN-AND-BAYVIZ-SYSTEM)



**Projects  -  California, USA**

## Beacon Park

Working with landscape architects Valley Crest Design Group and architects Ware Malcomb, WSP's lighting design team has brought magical energy to the first of multiple parks...

(HTTPS://WWW.WSP.COM/EN-US/PROJECTS/BEACON-PARK)





(https://www.instagram.com/wsp.usa/)    (https://www.linkedin.com/company/wspusa/)

(https://www.youtube.com/wspusa)    (https://twitter.com/wspusa)    (https://www.facebook.com/wspusa/)

**WHO WE ARE (/EN-US/WHO-WE-ARE)**

**What We Stand For (/en-us/who-we-are/what-we-stand-for)**

**Our Story (/en-us/who-we-are/our-story)**

**Future Ready (/en-us/hubs/future-ready)**

**U.S. Leadership (/en-us/who-we-are/leadership-team)**

**Our Offices (/en-us/who-we-are/our-offices)**

**WHAT WE DO (/EN-US/WHAT-WE-DO)**

**Sectors (/en-us/sectors)**

**Services (/en-us/services)**

**Projects (/en-us/projects)**

**INSIGHTS (/EN-US/INSIGHTS)**

**Climate (/en-us/insights/climate)**

**Mobility (/en-us/insights/mobility)**

**Places (/en-us/insights/places)**

**Society (/en-us/insights/society)**

**Resources (/en-us/insights/resources)**

**Technology (/en-us/insights/technology)**

**CAREERS (/EN-US/CAREERS)**

**U.S. Job Opportunities (/en-us/careers/join-our-team?country=US)**

**Apply Here (https://www.wsp.com/en-US/careers/join-our-team/spontaneous-application)**

**Supplier Registration (http://plus.wsp-pb.com/supplier_registration/)**

**FEMA Inspection Services (https://www.wspinspectionservices.com/)**

**CORPORATE ()**

**Sustainability (/en-us/who-we-are/corporate-responsibility/sustainability)**

**Health and Safety (/en-us/who-we-are/corporate-responsibility/health-safety)**

**Investors (/en-us/investors)**

**Whistleblowing Service (http://www.wsp-pb.com/en/Who-we-are/Corporate-Governance/Whistleblowing-service/)**

**News (/en-us/news)**

**Corporate Governance (/en-us/investors/corporate-governance)**

**Ethics and Integrity (/en-us/who-we-are/corporate-responsibility/ethics-integrity)**

The WSP Logo (/en-us/legal/the-wsp-logo)

Privacy Notice (/en-us/legal/privacy-notice)

Anti-Spam Commitment (/en-us/legal/anti-spam-commitment)

Cookie Policy (/en-us/legal/cookie-policy)

Terms of Use (/en-us/legal/terms-of-use)                    ©2024 WSP

# Exhibit I

**BEFORE**
**THE AMERICAN ARBITRATION ASSOCIATION**

| | | |
|---|---|---|
| WSP USA, Inc., | ) | |
| | ) | |
| Claimant, | ) | |
| | ) | |
| v. | ) | C.A. No. |
| | ) | |
| STEPHEN COON, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

---

## WSP USA, INC'S MOTION FOR EMERGENCY INTERIM RELIEF

---

Claimant WSP USA, Inc. ("WSP"), by and through undersigned counsel, hereby moves for interim relief in the form of the appointment of an emergency arbitrator, a temporary injunction, and expedited initial discovery, pursuant to the Optional Rules for Emergency Measures of Protection of the AAA's Employment Arbitration Rules and Mediation Procedures.

### <u>INTRODUCTION</u>

This action arises out of Stephen Coon's breach of the duty of loyalty and violations of restrictive covenants in his employment agreements with WSP.  In 2020, WSP acquired kW Mission Critical Engineering ("kW MCE"), a data-center design and mission-critical engineering firm.  As part of that acquisition, kW MCE's senior leadership, including Coon, signed employment agreements that prohibited them from competing with WSP or soliciting its employees or vendors until at least one year after their departure from kW MCE for any reason. Nonetheless, Coon resigned from WSP in October 2023 for the specific purpose of starting a competing business—a fact he openly admitted to colleagues.  On his way out and since the time

of his resignation, it appears Coon followed through, soliciting several current WSP employees to work for him in recent weeks, two of which resigned in December (likely in violation of their own restrictive covenants) in close succession without revealing their new employer.  Having siphoned off this key team of former WSP employees, Coon will imminently begin competing with WSP for the very same customers that Coon was entrusted with servicing using kW MCE's proprietary, confidential, and trade secret business information and strategies.  Coon bragged that he already has a potential buyer for his new business after it is scaled up to $25MM in annual recurring revenue.  Furthermore, WSP recently received information from design partners suggesting that Coon is soliciting competitive work from kW MCE's existing customers, and is likely to solicit/target four  other key employees to execute his business plans.

AAA should appoint an emergency arbitrator to enjoin Coon from further improperly competing with WSP in clear violation of his employment agreement, and to prevent irreparable harm to WSP's business, impairment of its customer goodwill, and misappropriation of WSP's confidential and trade secret business information.  WSP paid Coon substantial amounts of consideration in exchange for the post-employment covenants he voluntarily agreed-to, and will be irreparably harmed, both through the loss of its competitive advantage and through the lost good will that it specifically acquired as part of its purchase of kW MCE.  The emergency arbitrator should also order limited expedited discovery to allow WSP to further support its requested relief.

## **BACKGROUND**

### I.      **WSP Acquires kW Mission Critical Engineering.**

In December 2020, WSP acquired kW MCE, a small (then approximately 175 employee) engineering firm that focused primarily on designing data centers and other mission-critical projects.  (Decl. of Kenneth Clausen ¶ 4, attached hereto as Ex. A.)  The acquisition closed on

2

December 30, 2020.  (*Id.* ¶ 5.)  As part of the acquisition, kW MCE's senior leadership team and key employees, including Coon, signed employment agreements and retention agreements containing restrictive covenants that prohibited them from competing with WSP, soliciting its employees, customers, or vendors, or sharing its trade secrets or confidential information.  (Ex. B at 6–8.)

## II.        Coon Agreed to Be Bound by Restrictive Covenants.

Coon worked for kW MCE for approximately eight years before the acquisition and entered an Employment Agreement with WSP on December 30, 2020, as a Professional Electrical Engineer and Managing Principal of the Phoenix Office.  (Ex. A ¶¶ 6–7 .)  Coon was responsible for providing technical engineering expertise and developing successful relationships with design team partners—architects, engineers, and contractors.  (*Id.* ¶ 11.)  Coon gained substantial experience and insight into kW MCE's data center business, and had key responsibilities for leadership of key client accounts and projects associated with data center program design and build out.  (*Id.* ¶ 12.)  Coon also gained knowledge about all aspects of kW MCE's customers' programs, including schedule, budget, risk and desired engineering team.  (*Id.* ¶ 13.)

Mr. Coon's Employment Agreement provided for a $200,000 a year base salary, benefits, and potential performance bonuses.  (Ex. B at 2.)  In exchange for this compensation, Coon agreed "not directly or indirectly [to] own, manage, operate, control, be employed by, consult with or participate in the ownership, management operation or control of any business in a manner that would reasonably be expected to divert business from any of the Company's 'Clients' or 'Prospective Clients' with whom [he] had any involvement in developing, servicing, soliciting, or maintaining during the year prior to [his] termination."  (*Id.* at 7.)  The Employment Agreement also prohibits Coon from engaging in "the solicitation, hiring, or engagement of any person or

entity who is, at the time, or was within the last 12 months of [his] employment with the Company, an employee, consultant, or independent contractor of the Company or any of its affiliates."  (*Id.* at 8.)  And the Employment Agreement provides that Coon "shall not . . . contact, call upon, solicit or otherwise accept business from, render services to, market services or products to, divert business from, and/or interfere with the Company's relationship or business with any of the Company's existing Clients or Prospective Clients" that he learned of, did work for, or learned confidential information about through WSP.  (*Id.*)

These restrictive covenants are essential to ensuring that WSP receives the benefit of the bargain from the kW MCE acquisition, including kW MCE's good will.  The data-center design business is extremely competitive, with each company's ability to compete largely dependent on, *inter alia*, (1) its ability to understand and accommodate a client's needs, and (2) the quality and reputation of its specific engineers.  (Ex. A ¶ 31.)  Competition from former kW MCE/WSP employees—and especially high-level employees like Coon, who is equipped with recent knowledge of kW MCE and WSP customers' preferences for, *inter alia*, engineering team organization and operation patterns—would thus be devastating for WSP.  (*Id.* ¶¶ 33–34.)  Accordingly, the Employment Agreement provides that the restrictive covenants will remain in place not only during Coon's employment by WSP, but also for another twelve months after he leaves or is terminated by WSP.  (*See* Ex. B at 6–8.)  The only exception is if Coon does not renew the Employment Agreement after the first two-year Term—and thus "convert[s] to an at-will employee" at the end of the Term, (*id.* at 2)—and "remains employed with [WSP] one year after converting to an at-will employee," at which point the restrictive covenants would expire at the end of that one year period.  (*Id.* at 10.)  In further recognition of the importance of the restrictive covenants, the Employment Agreement also provides, and Coon agreed, that "[t]he Company is in

4

a highly competitive business and expends considerable amounts of money in the development of business from new clients and customers and continued business from existing clients and customers. The business and clientele of the Company are national and worldwide in scope, and therefore the territorial and time limitations set forth in th[e] Non-Compete clause are reasonable and necessary for the protection of the Company's interests." (*Id.* at 7.)

Additionally, many employees, including Coon, also signed retention bonus agreements ("RBA") that reaffirmed their restrictive covenants in exchange for substantial cash bonuses "to incentivize [them] to remain with [kW MCE] . . . in order to assist [kW MCE] with integration into WSP." (Ex. C at 1.) Specifically, Coon executed the RBA on December 29, 2020, the day before signing his Employment Agreement. WSP paid Coon $475,000 over the course of two years pursuant to his RBA, in addition to his compensation under the Employment Agreement. (*Id.* at 1–2.)

## III.        Coon Violates the Restrictive Covenants.

On November 2, 2022, Coon gave notice that he would not renew the Employment Agreement, making him an at-will employee as of December 30, 2022. (Ex. D.) Coon did not, however, remain with WSP for a year after that date, as required by the Employment Agreement to excuse him from the 12-month tail in the restrictive covenants. (Ex. A ¶¶ 15, 17.) Instead, he tendered his resignation on October 18, 2023, effective "sometime between two and four weeks from today." (Ex. E.) His actual last day was November 3, 2023. (Ex. A ¶ 19.) Accordingly, the non-compete and non-solicitation provisions of his Employment Agreement are still in effect until November 3, 2024.

Nonetheless, Coon has already begun forming a competing business in Arizona (where he lives) and upstate New York (where much of kW MCE was located), likely intending to take

advantage of the exploding demand for data centers because of the growth of AI software and applications.  Since his resignation (and likely earlier), Coon has solicited several former kW MCE/WSP employees—including at least Principal Mechanical Engineer Jason Leone and Managing Principal of the Troy Office Gary Russinko, who are each subject to their own restrictive covenants with WSP, (Exs. F & G)—to join him.  (Ex. A ¶¶ 24–30.)   Russinko resigned from WSP on October 30, 2023, with his last day being December 1.  (*Id.*)   Leone followed close behind, resigning on December 5, 2023, with his last day being December 22..  (*Id.*)  Prior to his resignation, Coon openly admitted to a co-worker, Mr. Ken Clausen, that he was starting a competing business in Phoenix and upstate New York, near kW MCE's Troy, New York office, and had a lease ready to be executed in January of 2024.  (*Id. ¶ 20.*)  Coon also told Clausen he was "going to be taking anyone in Troy who had not signed a retention agreement," and acknowledged that he needed kW MCE's MEP engineers to deliver on competitive services to the very clients Coon was responsible for servicing at kW MCE.  (*Id.* ¶ 21.)  By recruiting those experienced mechanical engineers, Coon openly touted he could start a business that could compete directly with WSP.  (*Id. ¶ 22.*)  He also bragged that a member of the C-suite of another company, Bowman Engineering, already planned to pay him to buy the new business once it was scaled up to $25MM in annual revenue.  (*Id.* ¶ 23.)  Based on Coon's prior comments to Clausen, he is likely to target at least four other key kW MCE employees in early 2024, if he has not already done so.  (*Id.* ¶ 34.)  Design partners have also suggested in recent weeks to Clausen that Coon is soliciting competitive work from kW MCE's existing customers.  (*Id.* ¶ 35.)

Together, Coon and the employees he has recruited to compete against kW MCE have the potential to inflict substantial harm to WSP's business.  The key accounts that Coon was responsible for servicing have the potential to generate the tens of millions of dollars for FY 2024

and beyond.  (*Id.* ¶ 32.)  Further, Coon has in-depth knowledge of customer preferences, pricing, desired team, project specifications, engineering specifications and kW MCE's existing and past work for those key customers.  (*Id.* ¶ 33.)

On October 25, 2023, WSP's counsel sent Coon a letter, reminding him of his obligations under the restrictive covenants and addressing questions Coon asked in his resignation letter regarding which items/information he could keep and what had to be returned to WSP.  (Ex. H.) On December 29, 2023, WSP's counsel sent similar letters to Messrs. Leone and Russinko.  (Exs. I & J.)  Nonetheless, Coon seems undeterred, and neither Coon, Leone, or Russinko have divulged or disclosed where they intend to work after leaving WSP/kW MCE.  Accordingly, on January 2, 2024, WSP filed its Demand for Arbitration against Coon pursuant to § 17(a) of the Employment Agreement, asserting claims for breach of fiduciary duty, breach of contract, and tortious interference with contract.  WSP now moves for interim relief and expedited initial discovery.

## LEGAL STANDARDS[1]

The AAA's Emergency Rule O-4 provides that emergency interim relief is proper where "the party seeking the emergency relief has shown that immediate and irreparable loss or damage will result in the absence of emergency relief, and that such party is entitled to such relief." Similarly, New York law allows an employer to seek a preliminary injunction to enforce restrictive covenants where the claimant "show[s] a probability of success on the merits, the danger of

---

[1]     Coon's Employment Agreement provides that "[a]ny dispute arising between any of the Company and [Coon] under this Agreement, or under any statute, regulation, or ordinance, or in connection with [Coon's] Employment with the Company, shall be submitted to binding arbitration before the American Arbitration Association ("AAA") for resolution."  (Ex. B at 11.) It further provides that the arbitration proceedings will be governed by New York law and "conducted in accordance with AAA's Employment Arbitration Rules and Procedures."  *Id.*  And it provides "that in the event of a breach of any provision of this Agreement, money damages would be inadequate and neither [Mr.Coon] nor the Company would have an adequate remedy at law" and that injunctive relief is appropriate.  *Id.*

irreparable injury in the absence of a preliminary injunction and a balancing of the equities in its favor." *Frank May Assocs. Inc. v. Boughton*, 281 A.D.2d 673, 674 (N.Y. S. Ct. App. Div. 2001). "[T]he purpose of a preliminary injunction is to preserve the status quo until a decision is reached on the merits." *NYSARC, Inc. v. Syed*, 747 N.Y.S.2d 327, 329 (N.Y. S. Ct. 2002).

## ARGUMENT

Coon violated his duty of loyalty and his restrictive covenants by planning to start a competing business while still employed at WSP and soliciting WSP's other employees to join him. If he is permitted to begin competing with WSP, he will not only further violate his restrictive covenants, but WSP will also be irreparably harmed through the loss of its competitive position, the threatened and/or actual disclosure and misuse of its confidential information and trade secrets, and the impairment of kW MCE's business and customer good will for which WSP specifically bargained. Moreover, WSP requires expedited initial discovery on specific, targeted issues to determine the extent of the violations and Coon's plans for his competing business so that it can provide additional evidentiary support for continuing injunctive relief.

I.      **WSP Is Entitled to Emergency Interim Relief.**

A.      **WSP Is Likely to Succeed on the Merits of Its Breach-of-Contract Claims.**

To establish breach of contract, a claimant must show "the existence of a contract, the [claimant's] performance pursuant to the contract, the defendant's breach of his or her contractual obligations, and damages resulting from the breach." *Tri-Star Lighting Corp. v. Goldstein*, 151 A.D.3d 112, 1105 (N.Y. App. Div. 2017). Here, Coon breached his Employment Agreement by failing to abide by the restrictive covenants.

i.      **The Restrictive Covenants Are Enforceable.**

The Employment Agreement, including the restrictive covenants, is a valid and enforceable contract.  "Generally, a covenant not to compete will be enforced . . . if it is reasonably limited temporarily and geographically and, without being harmful to the public or unduly burdensome, serves the acceptable purpose of protecting the former employer from unfair competition." *Bollengier v. Gulati*, 233 A.D.2d 721, 722 (N.Y. App. Div. 1996).  Moreover, "[c]ourts will enforce noncompetition clauses 'where necessary to protect, *inter alia*, an employer's confidential customer information and the good will of . . . customer[s] generated and maintained at the employer's expense.'"  *Gundermann & Gundermann Ins. V. Brassill*, 46 A.D.3d 82, 83 (N.Y. App. Div. 2007) (quoting *Milbrandt & Co., Inc. v. Griffin*, 1 A.D.3d 327, 328 (N.Y. App. Div. 2003)).

As an initial matter, in his Employment Agreement, Coon agreed that "the territorial and time limitations set forth in th[e] Non-Compete clause are reasonable and necessary for the protection of the Company's interests."  (Ex. B at 7.)  Accordingly, he has already conceded that they are valid.  *See* Arbitration Award, *Clopay Corp. v. Priest*, 2023 WL 5657724 (E.D. Ok. July 10, 2023) (holding that national scope of restrictive covenant was reasonable based on employee's admission in contract).

Moreover, courts routinely hold that the Agreement's temporal scope—twelve months after the employee leaves the company—is reasonable.  *See, e.g.*, *Artech Info. Sys., L.L.C. v. Tee*, 280 A.D.2d 117, 124 (N.Y. App. Div. 2001); *Michael I. Weintraub, M.D., P.C. v. Schwartz*, 131 A.D.2d 663, 665 (N.Y. App. Div. 1987); *J.H. Goldberg Co., Inc. v. Stern*, 53 A.D.2d 246, 250 (N.Y. App. Div. 1976).  The temporal scope is particularly reasonable here because the covenants were connected to the acquisition of kW MCE.  "New York courts have found three to five year restrictions reasonable in the context of the sale of a business."  *Uni-World Capital L.P. v. Preferred Fragrance, Inc.*, 73 F. Supp. 3d 209, 235 (S.D.N.Y. 2014)).  Although the restrictive

covenants were not part of the contract for the acquisition of kW MCE itself, the acquisition contemplated that the restrictive covenants would be in place. Indeed, the Employment Agreement specifically references the transition from kW MCE to WSP, (Ex. B at 1), and the RCA states that the purpose of that agreement, including the similar restrictive covenants set forth therein, is "to incentivize [the employees] to remain with [kW MCE] . . . in order to assist [kW MCE] with integration into WSP." (Ex. C at 1.)

The Employment Agreement's lack of a specific geographic scope is also reasonable for two reasons. First, WSP works with clients and vendors around the world. *See Uni-World Capital L.P.*, 73 F. Supp. 3d at 235 (upholding non-compete that applied to "the United States of America, its territories and possessions, and any country outside of the United States of America to which products of the Business are sold"); *Integra Optics, Inc. v. Nash*, 2018 WL 224460, at *10 (N.D.N.Y. Apr. 10, 2018) (applying Colorado law and enforcing worldwide scope of restrictive covenant); *GE Betz Inc. v. Moffitt-Johnson*, 301 F. Supp. 3d 668, 685 (S.D. Tex. 2014); *Bio-Imaging Techs., Inc. v. Marchant*, 584 F. Supp. 2d 322, 328 (D. Mass. 2008) (upholding non-compete agreement that extends to "any state or country where [employer] does business); *Universal Engraving, Inc. v. Duarte*, 519 F. Supp. 2d 1140, 1153 (D. Kan. 2007). Second, the covenants are limited to conduct that is directed at WSP's existing and prospective clients—*e.g.*, soliciting them or engaging in conduct that "would reasonably be expected" to divert them away from WSP. *See Crest Hill Capital LLC v. Gonzalez¸* 2019 WL 1557512, at *6 (NY. S. Ct. Apr. 10, 2019) ("No geographic limitation is required for a non-solicitation clause that is client-based."); *W.R. Grace & Co., Dearborn Div. v. Mouyal*, 422 S.E.2d 529, 533 (Ga. 1992) ("Where . . . the former employee is prohibited from post-employment solicitation of employer customers which the employee contacted during his tenure with the employer, there is no need for a territorial

restriction expressed in geographic terms." (footnote omitted)).  Even if this were not the case (which it is), Coon intends to operate his business—and has solicited WSP employees to work on that business—in New York, where kW MCE was primarily located, and Arizona, where Coon personally worked while employed at WSP.  (*See* Ex. B at 1.)  Accordingly, enforcing the restrictive covenants to prevent Coon from starting his competing business is reasonable and necessary to protect WSP's legitimate interests.

### ii.        Coon Breached the Restrictive Covenants and Will Breach Them Again.

While WSP performed its obligations under the Employment Agreement by paying Coon a substantial salary, benefits, and bonuses, Coon violated his restrictive covenants and is planning to violate them again.  The non-solicitation clause of the Employment Agreement provides that Coon shall not "engage in any activity which involves . . . the solicitation, hiring, or engagement of any person or entity who is, at the time, or was within the last 12 months of [his] employment with the Company, an employee . . . of the Company or any of its affiliates."  (Ex. B at 8.)  He has already done that by asking Messrs. Leone and Russinko to work for him at his competing business, causing them to resign.

Moreover, Coon's competing business itself will violate the non-competition and non-solicitation provisions.  The non-competition clause provides that Coon "shall not directly or indirectly own, manage, operate, [or] control . . . any business in a manner that would reasonably be expected to divert business from any of the Company's 'Clients' or 'Prospective Clients' with whom [he] had any involvement in developing, servicing, soliciting, or maintaining during the year prior to [his] termination."  (*Id.* at 7.)  Yet, as noted above, that is exactly what Coon admits that he intends to do.  Similarly, the non-solicitation clause provides that Coon "shall not . . . contact, call upon, solicit or otherwise accept business from, render services to, market services or

products to, divert business from, and/or interfere with the Company's relationship or business with any of the Company's existing Clients or Prospective Clients" that he learned of, did work for, or learned confidential information about through WSP "during the year prior to [his] termination." (*Id.*)  Coon has openly admitted he would go after the same client base given the team he is recruiting and his stated intention to start a competing business.  (Ex. A ¶¶ 20, 21, 35.)

### iii.        WSP Has Been Harmed.

WSP has already suffered damages and will suffer further damages without interim relief. Specifically, WSP has already been harmed by Coon's tortious interference with Messrs. Leone and Russinko's retention agreements in violation of his (and their) restrictive covenants—WSP lost two valuable employees.  Moreover, as explained below, WSP will suffer irreparable damage to its reputation, good will, and customer relationships if Coon is permitted to begin competing with it to solicit the same customers Coon worked with while at kW MCE/WSP.  (*See* Part I.B, *infra*.)

### B.        WSP Will Be Irreparably Harmed Without Interim Relief.

An injury is irreparable for the purpose of obtaining preliminary relief where the party would not have an adequate remedy at law.  *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 68 (2d Cir. 1999).  Here, WSP will suffer several irreparable injuries if the Arbitrator does not intervene.

As with the reasonableness of the restrictive covenants, Coon conceded that WSP will suffer irreparable harm if he is permitted to start a competing business before the covenants expire. Specifically, in the Employment Agreement, Coon agreed that "that in the event of a breach of any provision of this Agreement, money damages would be inadequate and neither [Mr.Coon] nor the Company would have an adequate remedy at law" and that injunctive relief is appropriate.  (Ex. B at 7); *see also Ticor Title Ins. Co.*, 173 F.3d at 69 (holding that contract provision that "in the event

of Cohen's breach of the post-employment competition provision, Ticor shall be entitled to injunctive relief, because it would cause irreparable injury" is an admission that harm would be irreparable).

Even apart from this admission, Coon's competing business in fact will likely cause substantial irreparable harm to WSP. "It is well established that the loss of customer relationships stemming from the violation of nonsolicitation and non-competition clauses constitutes irreparable harm sufficient to support injunctive relief." *Crest Hill Capital LLC*, 2019 WL 1557512, at *6. "[T]he violation of a non-compete by the solicitation of employees also constitutes irreparable harm." *Global Switching Inc. v. Kasper*, 2006 WL 1800001, at *12 (E.D.N.Y. June 28, 2006); *EASi, LLC v. Gaffar*, 2020 WL 3868394, at *3 (C.D. Ill. July 9, 2020) (finding risk of irreparable harm because "[i]f Gaffar or L&T continue to solicit and hire EASi employees during the pendency of this lawsuit, EASi risks losing significant work from CAT, a large client, and may be competitively disadvantaged on future projects because the former EASi employees likely take with them the customer goodwill they helped to create for the employer"); *cf. Newmark Partners, L.P. v. Hunt*, 200 A.D.2d 557 (N.Y. App. Div. 2021) (granting preliminary injunction "to protect [plaintiff's] client relationships, reputation, and goodwill after losing all or almost all of their multifamily property group to their primary competitor").

As explained above, the data-center design industry is highly competitive, and a business' ability to compete depends in large part on the particular engineers working for it and its knowledge of a particular client's preferences about how the engineering team will operate. Coon knows WSP's clients' preferences and may be able to divert substantial business from it by siphoning off its valuable team of engineers. Coon also has knowledge of WSP/kW MCE's valuable trade secrets relating to customer projects/proposals, including design elements,

proposal/fee schedules, and instruments of service like field construction documents.   Any competition or solicitation by Coon and his former WSP colleagues will necessarily involve the actual or inevitable disclosure of WSP's confidential and trade secret business information.

Finally, these harms will be compounded by the fact Coon's restrictive covenants were integral to "the sale of an existing business with its goodwill."  *Frank May Assoc.*, 281 A.D.2d at 674; *accord Lund v. Agmata Wash. Enterprises, Inc.*, 190 A.D.2d 577, 577 (N.Y. App. Div. 1993); *Hay Grp., Inc. v. Nadel*, 170 A.D.2d 398, 399 (N.Y. App. Div. 1991).  WSP will irreparably lose part of the good will it purchased in the acquisition if Coon is permitted to compete with it and steal its employees during the term of the restrictive covenants.

In sum, WSP will be irreparably harmed if Coon is not enjoined from competing with it and continuing improperly to solicit its employees in violation of his restrictive covenants.

### C.     The Balance of Equities Favors WSP.

The balance of the equities favors WSP.  As explained above, WSP paid Coon substantial sums of money in exchange for his employment ***and*** his agreement to abide by the restrictive covenants, and WSP will suffer significant and irreparable harm to its business, reputation, good will, and customer relationships if Coon is not enjoined from violating those covenants.

Moreover, those covenants are reasonably limited to protect WSP's interests.  They do not prohibit Coon from obtaining gainful employment.  Rather, they prohibit him only from soliciting the specific employees, vendors, and clients that belong to WSP, and from doing work that "would reasonably be expected to divert business" away from WSP.  *See Battenkill Veterinary Equine P.C. v. Cangelosi*, 1 A.D. 856, 859 (N.Y. App. Div. 2003) (holding that equities favored the plaintiff where "[d]efendant is not being deprived of her livelihood").

Accordingly, the equities favor WSP, and the Arbitrator should issue emergency interim relief to enjoin Coon from competing with WSP and soliciting its employees or vendors during the pendency of this arbitration.

**II.      WSP Is Entitled to Expedited Initial Discovery.**

An "arbitrator [has] the authority to order such discovery, by way of  deposition, interrogatory, document production, or otherwise, as the arbitrator considers necessary to a full and fair exploration of the issues in dispute,  consistent with the expedited nature of arbitration." AAA'S EMPLOY. ARB. R. & MEDIATION P. 9.  WSP requests that Coon be required to preserve all relevant documents, including personal communications like emails and text messages, and that WSP be permitted to serve up to fifteen document requests and ten interrogatories to understand more about the specifics of Coon's competition plans and the full extent of his breach of his post-employment covenants.  These requests and interrogatories should include, but not be limited to, the specific requests attached hereto as Exhibits K and L.

<u>CONCLUSION</u>

For the forgoing reasons, the AAA should appoint an emergency arbitrator to this matter, order Coon not to compete with WSP or solicit its employees or vendors, and order Coon to preserve all relevant documents and to respond to expedited initial discovery.

Dated: January 2, 2024                              Respectfully submitted,

<div style="margin-left: 40%;">

*/s/ Nipun J. Patel*
**HOLLAND & KNIGHT LLP**
TODD WOZNIAK
Nipun J. Patel
Justin Kadoura
1650 Market Street, Suite 3300
Philadelphia, PA 19104
Todd.Wozniak@hklaw.com

</div>

Nipun.patel@hklaw.com
justin.kadoura@hklaw.com
Telephone:  215.252.9600
Fax:  215.867.6070

*Counsel for WSP USA, Inc.*

## CERTIFICATE OF SERVICE

I, Nipun J. Patel, do hereby certify that on January 2, 2024, a true and correct copy of the foregoing was served via email and mail to:

Stephen Coon
5533 Evia Caballo Blanco
Cave Creek, AZ 85331

9273 E Western Saddle Way
Scottsdale, AZ 85255

Coon1986@gmail.com


*/s/ Nipun J. Patel*
Nipun J. Patel

16

# Exhibit J

AMERICAN ARBITRATION ASSOCIATION

WSP USA, INC.,                                  )
                                                )
                        Claimant,               )
                                                )
        v.                                      )        Case No. 01-24-0000-0148
                                                )
STEPHEN COON,                                   )
                                                )
                        Respondent.             )
_____)


**ORDER NO. 1**

On January 8, 2024, the undersigned was appointed as an Emergency Arbitrator to rule on Claimant's motion for interim relief, in which it sought a temporary injunction and expedited discovery. The motion was brought pursuant to the Optional Rules for Emergency Measures of Protection ("Optional Rules") contained in the AAA's Employment Arbitration Rules and Mediation Procedures. The arbitration arises out of Respondent's alleged violation of restrictive covenants and confidentiality provisions in his employment agreement with WSP following his resignation from WSP in October of 2023. WSP asserts irreparable injury to its business and customer goodwill, and misappropriation of WSP's confidential and trade secret business information.

Respondent objected to the motion on the basis that the arbitrator lacked jurisdiction over the emergency application. Following an initial conference on January 10, 2024, the undersigned took the jurisdiction question under advisement. On January 12, 2024, the undersigned communicated its ruling to the parties. This order confirms that ruling.

Section 17(b) of the arbitration agreement states in relevant part as follows: "The arbitration shall be conducted in the State of New York, and the arbitrator will apply New York State law, including federal law as applied in New York courts. The arbitration shall be conducted in accordance with AAA's

Employment Arbitration Rules and Procedures, as modified herein . . ..."  The parties agree that nothing is

the arbitration agreement modifies the AAA Optional Rules for Emergency Measures of Protection,

contained in the Employment Rules ("Optional Rules").

Respondent objects to the motion for emergency relief on the basis that the parties have not

opted into those rules.  Respondent asserts that because the parties did not agree to use the optional

rules, the Arbitrator lacks authority to apply the rules, or impose any emergency measures, in these

proceedings.

The Optional Rules, as the name suggests, are optional and can only be applied in specific

situations:  where the parties have (1) entered into a "special agreement" adopting the Rules or (2)

adopted the Optional Rules in their arbitration agreement.  Optional Rule 0-1.

I agree with Respondent that neither of those circumstances applies to this case, and that

therefore the undersigned lacks jurisdiction to entertain this emergency application.

It is undisputed that the parties have not entered into a special agreement allowing the Arbitrator

to use the Optional Rules.  And the arbitration clause does not adopt the Optional Rules.  Instead, the

employment agreement allows the parties to seek injunctive relief in aid of arbitration, but that relief is

limited to "any court of law or equity of competent jurisdiction."  Employment Agreement, ¶ 16.  It is also

noteworthy that the state and federal courts in New York frequently issue orders in aid of arbitration and

have authority to do so.

WSP argues that the language in ¶ 17(b) of the arbitration agreement quoted above is broad

enough to incorporate not just the Employment Rules, but all of its other provisions, including the

Optional Rules.  However, the language in the Optional Rules suggests otherwise.  Rule 0-1 of the Optional

Rules provides in its first sentence that "where a party by special agreement or *in an arbitration clause*

*adopting these rules for emergency relief of protection*, a party in need of emergency relief . . ." (emphasis

added).  This prefatory clause requires adoption of "these rules for emergency measures or protection",

not just adoption of the Employment Rules generally.  The general clause adopting the AAA Rules does not specifically mention the optional rules or include other language from which one could infer that the parties had actually exercised their option to have those rules apply.  When that circumstance is combined with the language in Paragraph 16, it is reasonable to conclude that the parties did **not** opt into the Optional Rules

If the arbitration clause incorporated the Commercial Rules rather than the Employment Rules, the conclusion would be straightforward because the Commercial Rules *do* directly authorize emergency relief in situations such as these.  It is also possible that the parties could agree to apply the Commercial Rules in this instance, rather than the Employment Rules, thereby again obviating the jurisdiction issue. However, in the absence of agreement or some textual basis in the employment agreement to support finding that the parties *had* exercised their option to apply these Optional Rules, I cannot conclude that the parties actually opted into those rules.  And without those Rules, the arbitrator lacks jurisdiction to rule on the application for emergency relief.

I therefore conclude that this application falls outside of the parties' agreement to arbitrate, and thus that the undersigned lacks jurisdiction to entertain it.  The motion is denied.

So ordered.

Dated:  January 16, 2024

_____
Carol E. Heckman

# Exhibit K

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| WSP USA Buildings Inc., | |
| Plaintiff, | Case No.:  1:24-cv-76 (DNH/TWD) |
| v. | |
| STEPHEN COON, | **JURY DEMANDED** |
| Defendant. | |

## VERIFIED COMPLAINT

Plaintiff WSP USA Buildings Inc. ("WSP"), by and through undersigned counsel, hereby files the following Verified Complaint against Defendant Stephen Coon, and in support thereof, avers as follows:

## NATURE OF THE CASE

1.    This dispute arises out of Coon's breach of the duty of loyalty and the restrictive covenants contained in Coon's employment agreements with WSP.

2.    In 2020, WSP acquired kW Mission Critical Engineering ("kW MCE"), a data-center design and mission-critical engineering firm. As part of the acquisition, kW MCE's senior leadership, including Coon, signed employment agreements that prohibited them from competing with WSP or soliciting its employees or vendors until at least one year after their departure from kW MCE for any reason.

3.    Nonetheless, Coon resigned from WSP in October 2023 for the specific purpose of starting a competing business—a fact he openly admitted to colleagues.

4.    On his way out and since the time of his resignation, Coon has followed through, soliciting several current WSP employees to work for him in recent weeks, two of which resigned

in December (likely in violation of their own restrictive covenants) and two of which resigned in early January, all in close succession and without revealing their new employer.

5.      Having siphoned off this key team of former WSP employees, Coon will imminently begin competing with WSP for the very some customers that Coon was entrusted with servicing using kW MCE's proprietary, confidential, and trade secret business information and strategies.

6.      Coon bragged that he already has a potential buyer for his new business after it is scaled up to $25 million in annual recurring revenue.

7.      Furthermore, WSP recently received information from design partners suggesting that Coon is soliciting competitive work from kW MCE's existing customers, and is likely to solicit/target other key employees to execute his business plans.

8.      Coon should be temporarily and permanently enjoined from further improperly competing with WSP in clear violation of his employment agreement in order to prevent irreparable harm to WSP's business, impairment of its customer goodwill, and misappropriation of WSP's confidential and trade secret business information.

9.      WSP paid Coon substantial amounts of consideration in exchange for the post-employment covenants he voluntarily agreed to, and will be irreparably harmed, both through the loss of its competitive advantage and through the lost good will that it specifically acquired as part of its purchase of kW MCE.

## THE PARTIES

10.      Plaintiff WSP USA Buildings Inc. is a New York corporation with its principal place of business located at One Penn Plaza, 4th Floor, New York, NY 10119.

11.     Defendant Coon is an individual residing at 5533 E Via. Caballo Blanco, Cave Creek, AZ 85331.

## JURISDICTION AND VENUE

12.     The Court has jurisdiction pursuant to 28 U.S.C. § 1332(a) in that there is complete diversity of citizenship and the matter in controversy exceeds, exclusive of interest and costs, the sum of $75,000.

13.     Venue is proper in this district based upon the fact that a substantial part of the events or omissions giving rise to the claims occurred within the Northern District of the State of New York.  *See* 28 U.S.C. § 1391(b).

## FACTUAL ALLEGATIONS

**A.     WSP Acquires kW Mission Critical Engineering.**

14.     In December 2020, WSP acquired kW MCE, a small (then approximately 175 employee) engineering firm that focused primarily on designing data centers and other mission-critical projects.

15.     kW MCE immediately merged into WSP.

16.     As part of the acquisition, kW MCE's senior leadership team and key employees, including Coon, signed employment agreements and retention agreements containing restrictive covenants that prohibited them from competing with WSP, soliciting its employees, customers, or vendors, or sharing its trade secrets or confidential information.[1]

**B.     Coon Agreed to Be Bound by Restrictive Covenants.**

---

[1]     Attached hereto as Exhibit A is a true and correct copy of Coon's Employment Agreement. Attached hereto as Exhibit B is a true and correct copy of Coon's Retention Bonus Agreement.

17.     Coon worked for kW MCE for approximately eight years before the acquisition and entered a Senior Leadership Employment Agreement with WSP on December 30, 2020, as a Professional Electrical Engineer and Managing Principal of the Phoenix Office.

18.     Coon was responsible for providing technical engineering expertise and developing successful relationships with design team partners—architects, engineers, and contractors.

19.     Coon gained substantial experience and insight into kW MCE's data center business, and had key responsibilities for leadership of key client accounts and projects associated with data center program design and build out.

20.     Coon also gained knowledge about all aspects of kW MCE's customers' programs, including schedule, budget, risk, and desired engineering team.

21.     Coon's Employment Agreement provided for a $200,000 a year base salary, benefits, and potential performance bonuses. (*See* Exhibit A, Employment Agreement).

22.     In exchange for this compensation, Coon agreed "not to directly or indirectly [to] own, manage, operate, control, be employed by, consult with or participate in the ownership, management operation or control of any business in a manner that would reasonably be expected to divert business from any of the Company's 'Clients' or 'Prospective Clients' with whom [he] had any involvement in developing, servicing, soliciting, or maintaining during the year prior to [his] termination." (Ex. A at 7–8).

23.     The Employment Agreement also prohibits Coon from engaging in "the solicitation, hiring, or engagement of any person or entity who is, at the time, or was within the lats 12 months of [his] employment with the Company, an employee, consultant, or independent contractor of the Company or any of its affiliates." (*Id.* at 8).

4

24.     The Employment Agreement further provides that Coon "shall not . . . contact, call upon, solicit or otherwise accept business from, render services to, market services or products to, divert business from, and/or interfere with the Company's relationship or business with any of the Company's existing Clients or Prospective Clients" that he learned of, did work for, or learned confidential information about through WSP. (*Id.*).

25.     These restrictive covenants are essential to ensuring that WSP receives the benefit of the bargain from the kW MCE acquisition, including kW MCE's good will.

26.     The data-center design business is extremely competitive, with each company's ability to compete largely dependent on, *inter alia*: (1) its ability to understand and accommodate a client's needs, and (2) the quality and reputation of its specific engineers.

27.     Competition from former kW MCE/WSP employees—and especially high-level employees like Coon, who is equipped with recent knowledge of kW MCE and WSP customers' preferences for, *inter alia*, engineering team organization and operation patterns—would thus be devastating for WSP.

28.     Accordingly, the Employment Agreement provides that the restrictive covenants will remain in place not only during Coon's employment by WSP, but also for another twelve months after he leaves or is terminated by WSP.  (Ex. A at 6–8.)

29.     The only exception is if Coon does not renew the Employment Agreement after the first two-year Term—and thus "convert[s] to an at-will employee" at the end of the Term, (*id.* at 2)—and "remains employed with [WSP] one year after converting to an at-will employee," at which point the restrictive covenants would expire at the end of that one-year period. (*Id.* at 10).

30.     In further recognition of the importance of the restrictive covenants, the Employment Agreement also provides, and Coon agreed, that "[t]he Company is in a highly

competitive business and expends considerable amounts of money in the development of business from new clients and customers and continued business from existing clients and customers. The business and clientele of the Company are national and worldwide in scope, and therefore the territorial and time limitations set forth in th[e] Non-Compete clause are reasonable and necessary for the protection of the Company's interests." (*Id.* at 7).

31.    Additionally, many employees, including Coon, also signed retention bonus agreements ("RBA") that reaffirmed their restrictive covenants in exchange for substantial cash bonuses "to incentivize [them] to remain with [kW MCE] . . . in order to assist [kW MCE] with integration into WSP." (*See* Exhibit B, RBA at 1). Specifically, Coon executed the RBA on December 29, 2020, the day before signing his Employment Agreement.

32.    WSP paid Coon $475,000 over the course of two years pursuant to his RBA, in addition to his compensation under the Employment Agreement. (*Id.* at 1–2).

### C.    Coon Violates the Restrictive Covenants.

33.    On November 2, 2022, Coon gave notice that he would not renew the Employment Agreement, making him an at-will employee as of December 30, 2022.[2]

34.    Coon did not, however, remain with WSP for a year after that date, as is required by the Employment Agreement to excuse him from the 12-month tail in the restrictive covenants.

35.    Instead, Coon tendered his resignation on October 18, 2023, effective "sometime between two and four weeks from today."[3]

36.    Coon's actual last day was November 3, 2023.

37.    Accordingly, the non-compete and non-solicitation provisions of Coon's Employment Agreement are still in effect until November 3, 2024.

---

[2]    Attached hereto as Exhibit C is a true and correct copy of Coon's November 2, 2022 notice.
[3]    Attached hereto as Exhibit D is a true and correct copy of Coon's resignation letter.

38.     Nonetheless, Coon has already begun forming a competing business in Arizona (where he lives) and upstate New York (where much of kW MCE was located), likely intending to take advantage of the exploding demand for data centers because of the growth of AI software and applications.

39.     Since Coon's resignation (and likely earlier), Coon has solicited several former kW MCE/WSP employees—including at least Principal Mechanical Engineer Jason Leone and Managing Principal of the Troy Office Gary Russinko, who are each subject to their own restrictive covenants with WSP—to join him.[4]

40.     Russinko resigned from WSP on October 30, 2023, with his last day being December 1.

41.     Leone followed close behind, resigning on December 5, 2023, with his last day being December 22.

42.     Prior to his resignation, Coon openly admitted to a co-worker, Mr. Ken Clausen, that he was starting a competing business in Phoenix and upstate New York, near kW MCE's Troy, New York office, and had a lease ready to be executed in January of 2024.

43.     Coon also told Clausen he was "going to be taking anyone in Troy who had not signed a retention agreement," and acknowledged that he needed kW MCE's MEP engineers to deliver on competitive services to the very clients Coon was responsible for servicing at kW MCE.

44.     By recruiting those experienced mechanical engineers, Coon openly touted he could start a business that could compete directly with WSP.

---

[4]     Attached hereto as Exhibit E is a true and correct copy of Leone's Retention Bonus Agreement.  Attached hereto as Exhibit F is a true and correct copy of Russinko's Retention Bonus Agreement.

45.   Coon also bragged that a member of the C-suite of another company, Bowman Engineering, already planned to pay him to buy the new business once it was scaled up to $25 million in annual revenue.

46.   Based on Coon's prior comments to Clausen, he is likely to target at least four other key kW MCE employees in early 2024, if he has not already done so.

47.   Design partners have also suggested in recent weeks to Clausen that Coon is soliciting competitive work from kW MCE's existing customers.

48.   Together, Coon and the employees he has recruited to compete against kW MCE have the potential to inflict substantial harm to WSP's business.

49.   The key accounts that Coon was responsible for servicing have the potential to generate tens of millions of dollars for fiscal year 2024 and beyond.

50.   Further, Coon has in-depth knowledge of customer preferences, pricing, desired team, project specifications, engineering specifications, and kW MCE's existing and past work for those key customers.

**D.    WSP Acts Promptly to Protect Its Rights, but Coon Is Not Deterred.**

51.   On October 25, 2023, WSP's counsel sent Coon a letter, reminding him of his obligations under the restrictive covenants and addressing questions Coon asked in his resignation letter regarding which items/information he could keep and what had to be returned to WSP.[5]

52.   On December 29, 2023, WSP's counsel sent similar letters to Messrs. Leone and Russinko.[6]

---

[5]    Attached hereto as Exhibit G is a true and correct copy of the October 25, 2023 letter from WSP to Coon.
[6]    Attached hereto as Exhibits H and I are true and correct copies of the December 29 2023 letters from WSP to Russinko and Leone.

53.     Nonetheless, Coon seems undeterred, and neither Coon, Leone, nor Russinko have divulged or disclosed where they intend to work after leaving WSP/kW MCE.

54.     On January 2, 2024, WSP filed its Demand for Arbitration against Coon pursuant to § 17(a) of the Employment Agreement, asserting claims for breach of fiduciary duty, breach of contract, and tortious interference with contract.[7]

55.     Coon objected to the arbitrator's jurisdiction to decide the question of whether WSP is entitled to a temporary and preliminary injunction pending final disposition of the merits.

56.     On January 2, 2024, the same day that WSP filed its Demand for Arbitration, two other former kW/WSP employees—Principal Fire Protection Engineer Andrew Stercho and Plumbing Designer Jonathan Sterling—submitted resignation letters with the same last day, January 12, 2024.

57.     As with Coon, Leone, and Russinko, neither Stercho nor Sterling have revealed their new employer.

58.     Also on January 2, 2024, Coon filed a civil action in the Superior Court of the State of California, County of Sonoma, on behalf of himself and CG Enterprises Holdings, LLC ("CGE") against *WSP USA, Inc*.; WSP USA Buildings, Inc.; and kW Mission Critical Engineering, D.P.C., seeking an order declaring that the restrictive covenants are unenforceable under a new California statute and enjoining WSP from enforcing the rights it paid for under the Agreement.

59.     Coon does not deny in his California Complaint that he is, or immediately plans on, competing against WSP.

---

[7]     Attached hereto as Exhibit J is a true and correct copy of WSP's Arbitration Demand Form and Motion for Emergency Interim Relief in AAA Case No. 01-24-0000-0148.

60.    To the contrary, in that action, Coon asserts that WSP is trying to prevent CGE from "hiring [Coon] and other persons"—presumably, Leone, Russinko, Stercho, and Sterling.

61.    Coon appears to have chosen to file his Complaint in California solely to take advantage of California's favorable statute so he can violate the restrictive covenants with impunity.

62.    The only connection this dispute has to California is the alleged principal place of business of CGE, which is likely a sham office.

63.    CGE was created by Coon, an Arizona resident and its only member, on November 29, 2023.

64.    Upon information and belief, Coon created CGE to compete with WSP.

65.    On January 12, 2024, an emergency arbitrator decided that the AAA lacked jurisdiction to grant emergency interim relief, necessitating Plaintiff to file this action.

66.    The AAA still has jurisdiction over the arbitration on the merits, which is ongoing.

## COUNT I
## Breach of The Duty of Loyalty

67.    Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth herein.

68.    As a WSP employee and member of kW's senior leadership, Coon owed WSP a duty of loyalty during the term of his employment.

69.    The relationship between employer and employee, particularly a senior employee, here being WSP and Coon, supports the development of trust between the two, outside the four corners of a contract, amounting to a fiduciary duty.

10

70.     On information and belief, while Coon was still employed by WSP, Coon began taking steps to compete against WSP, solicit its customers and employees, and use its confidential business information and trade secrets to his own advantage, in violation of that duty.

71.     On information and belief, while Coon was still employed by WSP, Coon solicited at least four employees, including Leone, Russinko, Stercho, and Sterling, to leave kW/WSP and join him in a competing business, and those employees resigned shortly after Coon.

72.     Coon breached a fiduciary duty between himself and WSP by failing to refrain from soliciting current or former WSP employees, directly competing with WSP's business, and violating his Employment Agreement.

73.     Coon acted with actual malice to the detriment and damage of WSP, which reasonably expected that its fiduciary, Coon, would act in keeping with his duty of loyalty and to be bound under his Employment Agreement.

74.     By encouraging current or former employees to leave WSP, Coon harmed WSP's ability to perform its existing business, improperly utilized current WSP employees without compensating WSP, harmed WSP's ability to compete for additional business, caused WSP to suffer a loss in profits, and deprived WSP of the benefit of the bargain it struck when it acquired kW.

## COUNT II
### Breach of Contract

75.     Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth herein.

76.     On or around December 29, 2020, Coon signed a Senior Leadership Employment Agreement that forbid soliciting current or former kW/WSP employees or business within one year from leaving employment with kW/WSP.

77.     Coon's employment ended on November 3, 2023, meaning the solicitation restrictions would not expire until November 3, 2024.

78.     In late December 2023 and January 2024, Coon solicited at least four employees, including Leone, Russinko, Stercho, and Sterling, to leave kW/WSP and join him in a competing business, thereby breaching his Employment Agreement.

79.     Coon further created CG Enterprises Holdings, LLC and taken other steps to compete against WSP and solicit WSP's current and prospective clients.

80.     On information and belief, Coon has misappropriated or attempted to misappropriate WSP's confidential business information and trade secrets.

81.     By encouraging current or former employees to leave WSP and directly competing with WSP's business, Coon harmed WSP's ability to perform its existing business, improperly utilized current WSP employees without compensating WSP, harmed WSP's ability to compete for additional business, caused WSP to suffer a loss in profits, and deprived WSP of the benefit of the bargain it struck when it acquired kW.

<u>**COUNT III**</u>
**Tortious Interference with Contract**

82.     Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth herein.

83.     On or around December 30, 2020, Leone and Russinko signed Retention Bonus Agreements that forbid soliciting current or former kW/WSP employees or business within one year from leaving employment with kW/WSP.

84.     Coon's employment ended on November 3, 2023, meaning the solicitation restrictions would not expire until November 3, 2024.

85.     In late December 2023 and January 2024, Coon solicited at least four employees, including Leone, Russinko, Stercho, and Sterling, to leave kW/WSP and join him in a competing business, inducing them to violate their Bonus Retention Agreements.

86.     Coon's interference with the existing contracts between WSP, himself, Leone, and Russinko harmed WSP's ability to perform its existing business and allowed Coon to improperly utilize Leone and Russinko without compensating WSP.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff WSP USA Buildings Inc. prays that judgment be entered in its favor and against Defendant Stephen Coon for the following relief:

a.     Enjoining him from violating the terms of his Senior Leadership Employment Agreement.

b.     Awarding WSP's attorneys' fees and costs; and

c.     Any and all other relief as the Court deems just and proper.

Dated: January 16, 2024                    Respectfully submitted,

_____/s/ Sean C. Sheely_____
Sean C. Sheely (NY Bar No. 2604684)
**HOLLAND & KNIGHT LLP**
31 West 52nd Street
New York, NY 10019
Telephone: 212.513.3200
sean.sheely@hklaw.com

Nipun J. Patel (*pro hac vice forthcoming*)
Justin M. Kadoura (*pro hac vice forthcoming*)
**HOLLAND & KNIGHT LLP**
1650 Market Street, Suite 3300
Philadelphia, PA 19103
Telephone: 215.252.9527
nipun.patel@hklaw.com
justin.kadoura@hklaw.com

*Counsel for Plaintiff WSP USA Buildings Inc.*

13

## **VERIFICATION**

I, Ken Clausen, hereby verify, swear, and affirm that I have personal knowledge of facts alleged in the foregoing Verified Complaint, other than those allegation made on information and belief, and that such allegations are true and correct to the best of my knowledge.

Dated:  January 16, 2024

_____        _____

Ken Clausen
kW Mission Critical Engineering
Managing Principal, Director of Operations

## CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| WSP USA Buildings Inc. | Stephen Coon |

| **(b)** County of Residence of First Listed Plaintiff  New York | County of Residence of First Listed Defendant  Maricopa (Arizona) |
|---|---|
| *(EXCEPT IN U.S. PLAINTIFF CASES)* | *(IN U.S. PLAINTIFF CASES ONLY)*<br>NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF<br>THE TRACT OF LAND INVOLVED. |

| **(c)** Attorneys *(Firm Name, Address, and Telephone Number)* | Attorneys *(If Known)* |
|---|---|
| Holland & Knight LLP, 31 West 52nd Street, New York, NY 10019, 212-513-3200 ⊞ | Denton Peterson Dunn, 1930 N. Arboleda Rd., Suite 200, Mesa, AZ 85213, 480-325-9900 ⊞ |

### II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1  U.S. Government<br>Plaintiff
- ☐ 3  Federal Question<br>*(U.S. Government Not a Party)*
- ☐ 2  U.S. Government<br>Defendant
- ☒ 4  Diversity<br>*(Indicate Citizenship of Parties in Item III)*

### III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☒ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☒ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

### IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☒ 190 Other Contract<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers' Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury<br>☐ 362 Personal Injury - Medical Malpractice | **PERSONAL INJURY**<br>☐ 365 Personal Injury - Product Liability<br>☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability<br>☐ 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 690 Other | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br><br>**PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 835 Patent - Abbreviated New Drug Application<br>☐ 840 Trademark<br>☐ 880 Defend Trade Secrets Act of 2016 | ☐ 375 False Claims Act<br>☐ 376 Qui Tam (31 USC 3729(a))<br>☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and Corrupt Organizations<br>☐ 480 Consumer Credit (15 USC 1681 or 1692)<br>☐ 485 Telephone Consumer Protection Act<br>☐ 490 Cable/Sat TV<br>☐ 850 Securities/Commodities/ Exchange<br>☐ 890 Other Statutory Actions<br>☐ 891 Agricultural Acts<br>☐ 893 Environmental Matters<br>☐ 895 Freedom of Information Act<br>☐ 896 Arbitration<br>☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision<br>☐ 950 Constitutionality of State Statutes |
| **REAL PROPERTY**<br>☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | **CIVIL RIGHTS**<br>☐ 440 Other Civil Rights<br>☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/ Accommodations<br>☐ 445 Amer. w/Disabilities - Employment<br>☐ 446 Amer. w/Disabilities - Other<br>☐ 448 Education | **PRISONER PETITIONS**<br>**Habeas Corpus:**<br>☐ 463 Alien Detainee<br>☐ 510 Motions to Vacate Sentence<br>☐ 530 General<br>☐ 535 Death Penalty<br>**Other:**<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition<br>☐ 560 Civil Detainee - Conditions of Confinement | **LABOR**<br>☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Management Relations<br>☐ 740 Railway Labor Act<br>☐ 751 Family and Medical Leave Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Employee Retirement Income Security Act<br><br>**IMMIGRATION**<br>☐ 462 Naturalization Application<br>☐ 465 Other Immigration Actions | **SOCIAL SECURITY**<br>☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g))<br><br>**FEDERAL TAX SUITS**<br>☐ 870 Taxes (U.S. Plaintiff or Defendant)<br>☐ 871 IRS—Third Party 26 USC 7609 | |

### V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1  Original Proceeding
- ☐ 2  Removed from State Court
- ☐ 3  Remanded from Appellate Court
- ☐ 4  Reinstated or Reopened
- ☐ 5  Transferred from Another District *(specify)*
- ☐ 6  Multidistrict Litigation - Transfer
- ☐ 8  Multidistrict Litigation - Direct File

### VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. 1332(a)

Brief description of cause:
Breach of contract

### VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes  ☐ No

### VIII. RELATED CASE(S) IF ANY

*(See instructions):*  JUDGE _____  DOCKET NUMBER _____

| DATE | SIGNATURE OF ATTORNEY OF RECORD |
|---|---|
| January 17, 2024 | /s/ Sean C. Sheely |

**FOR OFFICE USE ONLY**

| RECEIPT # | AMOUNT  $405.00 | APPLYING IFP | JUDGE  DNH | MAG. JUDGE  TWD |
|---|---|---|---|---|

ANYNDC-6581739

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)**   **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

   **(b)**   **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

   **(c)**   **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**   **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
   United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
   United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
   Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
   Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.**   **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.**   **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.**   **Origin.** Place an "X" in one of the seven boxes.
   Original Proceedings. (1) Cases which originate in the United States district courts.
   Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
   Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
   Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
   Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
   Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
   Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket. **PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

**VI.**   **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII.**   **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
   Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
   Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.**   **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

EXHIBIT A

## SENIOR LEADERSHIP EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT (this "Agreement") is made and entered into this December 30, 2020 (the "Effective Date") by and between kW Mission Critical Engineering d.p.c. or its successor in interest, (the "Company"), and Stephen Coon ("Senior Leader").

WHEREAS, the Company desires to employ Senior Leader as its Managing Principal (pre-integration) or Senior Director or a similar role (post-integration) with WSP USA, and Senior Leader desires to be employed by the Company in said capacity or a similar role post integration with WSP USA; and

WHEREAS, each party desires to set forth in writing the terms and conditions of their understandings and agreements;

NOW, THEREFORE, in consideration of the mutual covenants and obligations contained herein, the Company hereby agrees to employ Senior Leader and Senior Leader hereby accepts such employment upon the terms and conditions set forth in this Agreement:

### 1. Position

(a) Beginning December 30, 2020 (the "Effective Date"), the Company agrees to employ Senior Leader in the position of Managing Principal before integration into WSP USA or in the position of Senior Director or a similar role, after integration with WSP USA. As Managing Principal/Senior Director, Senior Leader shall serve and perform the management duties and exercise the powers which may from time to time be reasonably assigned to or vested in them by the Company.

(b) Senior Leader agrees that during the term of this Agreement, they will devote their best efforts and all of their business time and attention to all facets of the business of the Company and will faithfully and diligently carry out the duties of Managing Principal/Senior Director. Senior Leader will not, during the Term of this Agreement, directly or indirectly engage in any business, either as an employee, employer, consultant, principal, officer, director, advisor, or in any other capacity, either with or without compensation, without the prior written consent of the Company.

(c) During the performance of duties under this Agreement, Senior Leader agrees to comply with (i) all federal, state and local laws, ordinances and regulations, (ii) Company policies, procedures, and directions, as in effect from time-to-time, and (iii) the Company Code of Conduct, as amended.

(d) Subject to any restrictions imposed on the Company or any agreement between Senior Leader and the Company in light of the COVID-19 pandemic, Senior Leader shall perform their duties from the Company's offices in Phoenix, Arizona; provided, however, that Senior Leader shall travel as necessary to carry out all assigned duties.

(e) Senior Leader represents that, as of the Effective Date, they are not subject to any contract, agreement, or other legal obligation (including, without limitation, any restrictive

covenant) restricting their ability to accept employment with the Company or fully and faithfully carry out the duties and responsibilities. Senior Leader shall immediately notify the Company upon becoming aware of any such restrictions, whether actual or alleged. Senior Leader agrees not to disclose to the Company, or use for the Company's benefit, any confidential information or trade secrets of any person in violation of any law, contract, or other legally-enforceable restriction.

## 2. Term

The term of this Agreement shall be two (2) years from the Effective Date, and shall be automatically extended from year to year on the same terms and conditions (the "Term"); subject to (a) termination under Section 5 herein; or (b) or upon advance written notice from one party to the other of their intent to not renew the Agreement at least thirty (30) calendar days before the current Term is set to expire. Nothing stated in this Agreement or represented orally or in writing to either party shall create an obligation to renew this Agreement. If either party elects to terminate this Agreement at the end of the Term, for reasons not covered under Section 5, the Senior Leader will convert to an at-will employee.

## 3. __Compensation__

(a) __Base Salary.__ The Company shall pay the Senior Leader an annual base salary of $200,000.16 ("Annual Base Salary"), which amount may be adjusted annually at the sole discretion of the Company.

(b) __Performance Bonus.__ In addition to the Annual Base Salary and other benefits thereunder, Senior Leader shall be eligible for an annual bonus (the "Performance Bonus"), based upon the financial performance of the Company as set and determined by the Company, and the achievement of performance objectives set by the Company (the "Performance Criteria"). The actual amount, if any, of the Performance Bonus granted to Senior Leader upon the achievement of the Performance Criteria shall be in the sole discretion of the Company. The Performance Bonus shall be paid as soon as reasonably practicable, but in no event more than ninety (90) days, following the end of the Company's fiscal year.

(c) __Payment.__ Payment of all compensation to Senior Leader hereunder shall be made in accordance with the relevant Company policies in effect from time to time, including normal payroll practices, and shall be subject to all applicable employment and withholding taxes.

## 4. __Benefits__

(a) __Generally.__ The Company shall make available to Senior Leader, throughout the Term of this Agreement, such equipment, benefits, and perquisites as are generally provided by the Company to its Senior Leader employees, including but not limited to (i) use of a computer or similar hardware provided by the Company, and (ii) any group life, health, dental, vision, disability or accident insurance, pension plan, profit-sharing plan, retirement savings plan, 401(k) plan, or other such benefit plan or policy which may presently be in effect or which may hereafter be adopted by the Company for its Senior Leader officers and key management

personnel; provided, however, that nothing herein contained shall be deemed to require the Company to adopt or maintain any particular plan or policy.

(b) PTO.  The Senior Leader shall be entitled to paid time off, (for vacation, personal and/or sick days), during each calendar year, consistent with the policies then applicable to Senior Leader officers and key management personnel.

(c) Holidays.  The Senior Leader shall be entitled to paid holidays, consistent with the policies then applicable to Senior Leader officers and key management personnel.

(d) Reimbursement of Expenses.  The Company shall reimburse Senior Leader, upon presentation of receipts or other adequate documentation, for all reasonable business expenses incurred by Senior Leader in the course of rendering services to the Company under this Agreement, including any travel expenses for travel on behalf of the Company.  Such reimbursement shall be subject to, and must comply with, the Company's policies and procedures regarding expense reimbursement.

**5.  Termination**

(a) Termination by Senior Leader for Good Reason.  Senior Leader may terminate this Agreement for "Good Reason" after providing ninety (90) days written notice to the Company.  "Good Reason" shall consist of:

(i)     A material diminution in the nature or scope of Senior Leader's duties, responsibilities, authority, powers or functions (other than as a result of a sale or other disposition of the equity or assets of the Company and/or its affiliates);

(ii)     A non-voluntary material reduction in Senior Leader's Annual Base Salary, except for any such reduction in connection with a general proportionate reduction in the compensation of senior employees of the Company and/or its affiliates;

(iii)     Removal of the Senior Leader from their position as Managing Principal (pre-integration) or Senior Director/similar role (post-integration) with WSP USA, other than for "Cause" or by death or disability, as set forth in Section 5(b), (e) and (f), during the Term;

(iv)     Failure by the Company to make any payment to Senior Leader required to be made under the terms of this Agreement, if the breach is not cured within thirty (30) days after Senior Leader provides written notice to the Company which provides in reasonable detail the nature of the payment; or

(v)     A relocation of Senior Leader's principal place of business by more than 30 miles.

(b) Termination by the Company for Cause.  The Company may terminate Senior Leader's employment with the Company at any time for "Cause," as determined by the Company.  Upon termination by the Company for Cause, Senior Leader shall be entitled to a payment of all accrued but unpaid Annual Base Salary, vacation, and any other amounts then due

and payable to Senior Leader thereunder, as of the date of Senior Leader's termination.  Senior Leader shall not be entitled to any other payments from the Company, including severance payments stated in Section 6.  "Cause" shall consist of:

(i)  Willful refusal or unreasonable neglect to perform the Senior Leader's duties, as reasonably determined by the Company, if the willful refusal or unreasonable neglect is not cured within thirty (30) days after the Company provides written notice to the Senior Leader which provides in reasonable detail the nature of such refusal or neglect to perform duties;

(ii)  Commission of an act involving willful misrepresentation, deceit, dishonesty, fraud, perjury, moral turpitude, embezzlement, harassment, unlawful retaliation, or other misleading or unlawful conduct, or conduct that impairs or injures the reputation of the Company;

(iii)  The conviction of Senior Leader of, or entry by the Senior Leader of a plea of guilty or no contest to, any (a) felony, (b) crime involving dishonesty or moral turpitude, or (c) crime or tort relating to the Company, its business, or its competitors;

(iv)  Being under the influence of alcohol (other than in circumstances where socially acceptable and within reasonable levels) or being under the influence of drugs (other than over-the-counter or prescription medicine to the extent such medicine is taken in accordance with its directions or under the supervision of a physician) during the performance of Senior Leader's duties;

(v)  Conduct determined by the Company to be a breach of the Senior Leader's duty of loyalty, or any acts by Senior Leader to aid, abet, or support an entity engaged in the Same or Similar Business of the Company as defined in Section 8(b);

(vi)  Failure to provide full and complete cooperation in any investigation by the Company; or

(vii)  A material breach of the terms of this Agreement, if the breach is not cured within thirty (30) days after the Company provides written notice to the Senior Leader which provides in reasonable detail the nature of the breach.

(c)  <u>Termination by the Company Without Cause.</u>  The Company may terminate this Agreement at any time without Cause prior to the expiration of the Term.

(d)  <u>Voluntary Resignation by Senior Leader.</u>  Senior Leader may terminate this Agreement prior to the expiration of the term after providing ninety (90) days written notice to the Company.  If this occurs, Senior Leader will be entitled to a payment of all accrued but unpaid Annual Base Salary, vacation, and any other amounts then due and payable to Senior Leader, as of the date of Senior Leader's resignation.

(e)  <u>Disability.</u>  The Company may terminate this Agreement at any time if the Company determines Senior Leader has sustained a "disability."  Senior Leader shall be deemed

to have sustained a "disability" if Senior Leader is physically or mentally incapacitated so as to render Senior Leader unable to fully perform the essential functions of the position, with or without reasonable accommodation, for a consecutive period of more than ninety (90) days.

(f) **Death.** This Agreement will terminate automatically upon Senior Leader's death.

## 6.  **Payments Upon Termination; Clawback**

(a)  Upon termination of this Agreement pursuant to Section 5, Senior Leader shall be entitled to payment of:

(i)  The unpaid portion of Senior Leader's then-current Annual Base Salary which has accrued through their date of termination;

(ii)  If unpaid, the unpaid portion of the Performance Bonus for the fiscal year most recently completed that the Company has awarded, if any, to the Senior Leader prior to the Senior Leader's termination of employment with the Company, pursuant to the terms of Section 3(b); and

(iii)  To the extent required by law or Company policy in effect at the time of Senior Leader's termination, the value of any accrued, unused vacation and reimbursement of expenses, which are due, accrued, or payable.

(b)  In addition to the payments set forth in Section 6(a), upon termination of Senior Leader under Section 5(a), 5(e), or upon termination by the Company without Cause under Section 5(c), Senior Leader (their estate, or legal representatives, as the case may be) will be entitled to:

(i)  A severance payment equal to six (6) months of Senior Leader's then current Annual Base Salary;

(ii)  Payment of one half of the annual Performance Bonus for the year in which the termination occurs calculated as though all Performance Criteria have been achieved for the entire year, unless termination is made more than six (6) months after the start of the fiscal year, under which circumstances Senior Leader would receive a prorated Performance Bonus payment calculated as though all Performance Criteria have been achieved; and

(c)  Receipt of the payments set forth in Section 6(b) above are expressly conditioned on execution (without revocation) by Senior Leader of an agreement containing a general release and waiver of claims, confidentiality provisions, and other terms satisfactory to the Company that do not contradict the terms of this Agreement, within sixty (60) days following the date of such termination, or such longer period if required by law.  Any payment by the Company to Senior Leader under this Section 6 shall be paid in equal bi-weekly installments, to coincide with the Company's normal payroll period, over a one-year period, or at other intervals as mutually agreed by the Parties following termination.

(d) Notwithstanding any other provision of this Agreement, the Company shall not be required to make any payment set forth in Section 3(b) or 6(b) of this Agreement, or any other bonus or incentive payment previously authorized by the Company, and may seek repayment of such payments if previously made, if the Company determines:

        (i)      Senior Leader engaged in conduct that constitutes "Cause" pursuant to Section 5(b), regardless of whether Senior Leader was terminated pursuant to such provision;

        (ii)     Senior Leader engaged in conduct that would otherwise require or permit the Company to withhold or seek repayment under applicable law.

**7. <u>Nondisclosure</u>**

(a) <u>Confidential Information.</u> The Company will give Senior Leader access to, and Senior Leader will become familiar with, various trade secrets and other confidential business information, consisting of, but not limited to: research and development information; formulas; designs; systems; codes; computer, internet, and intranet software and files; records; strategies; marketing procedures; processes; computer programs; compilations of information; client requirements; pricing techniques; contracts; lists identifying customers, budgeting and financial information; partners, or investors; employee information; methods of doing business; and other confidential information that is regularly used in the operating, technology, and business dealings of the Company ("Confidential Information"). "Confidential Information" does not include information that (i) is or becomes generally available to the public other than as a result of a disclosure, directly or indirectly, by Senior Leader, or (ii) is or becomes available to Senior Leader on a non-confidential basis from a source other than the Company, provided that such source is not known by Senior Leader to be bound by a confidentiality agreement with or other obligation of non-disclosure to any Person.

(b) <u>Non-Disclosure of Confidential Information.</u>

        (i)      The Senior Leader agrees that all Confidential Information, whether prepared by Senior Leader or otherwise coming into their possession, shall remain the exclusive property of the Company. Senior Leader further agrees that, except as provided herein, Senior Leader shall not, without the prior written consent of the Company, use or disclose to any third party any of the Confidential Information, directly or indirectly, either during Senior Leader's employment with the Company or at any time following the termination of Senior Leader's employment with the Company.

        (ii)     Pursuant to the Defend Trade Secrets Act of 2016, Senior Leader acknowledges and agrees that an individual may not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that is made (a) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney; and (b) solely for the purpose of reporting or investigating a suspected violation of law; or is made in a complaint or other document that is filed under seal in a lawsuit or other proceeding. An individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the employer's trade

secrets to their attorney and use the trade secret information in the court proceeding only if the individual files any document containing the trade secret under seal, and does not disclose the trade secret, except pursuant to court order.

(iii)     Nothing herein shall prevent Senior Leader from disclosing Confidential Information (a) upon the order of any court or administrative agency, (b) upon the request or demand of any regulatory agency or authority having jurisdiction over Senior Leader or the Company, (c) to the extent required by law or regulation, or (d) to the extent necessary in connection with any suit, action or proceeding relating to this Agreement or the exercise of any remedy thereunder.

(c) Return of Confidential Information.  Senior Leader shall promptly deliver to the Company at such time as Senior Leader's employment with the Company terminates, or at any time that the Company may request, all memoranda, notes, plans, data, drawings, manuals, letters, records, reports, electronic mail, recordings, computer tapes and software and other documents and data, constituting or relating to Confidential Information or Work Product (as defined in Section 9) which the Senior Leader may then possess or have under the Senior Leader's control.

(d) Senior Leader acknowledges that the Confidential Information and other consideration to be provided to Senior Leader pursuant to this Agreement give rise to the Company's interest in restraining Senior Leader from disclosing the Company's Confidential Information.

## 8.  Non-Competition and Non-Solicitation

As an incentive and as a specific condition for entering into this Agreement, the Parties make, give, and agree to the following covenants respecting competition and solicitation:

### B.  Non-Compete:

(i)     The Company is in a highly competitive business and expends a considerable amount of money in the development of business from new clients and customers and continued business from existing clients and customers. The business and clientele of the Company are national and worldwide in scope, and therefore the territorial and time limitations set forth in this Non-Compete clause are reasonable and necessary for the protection of the Company's interests.

(ii)     During Employee's employment with the Company or its successor-in-interest and for a period of 12 months following the termination of Employee's employment for any reason (voluntary or involuntary), Employee shall not directly or indirectly own, manage, operate, control, be employed by, consult with or participate in the ownership, management, operation or control of any business, in a manner that would reasonably be expected to divert business from any of the Company's "Clients" or "Prospective Clients" with whom Employee had any involvement in developing, servicing, soliciting, or maintaining during the year prior to Employee's termination.

7

(iii)    Clients is defined as clients who the Company provided services for at any time during the 12-month period immediately preceding Employee's termination. "Prospective Clients" includes any person or entity: (a) to whom the Company has submitted qualifications or a proposal with Employee's direct personal involvement during the 12 months prior to Employee's termination; or (b) concerning whom Employee was assisting the Company in preparing a submittal of qualifications or a proposal at the time of Employee's termination.

**C. Non-Solicitation of Employees, Consultants, and Contractors:** During Employee's employment with the Company or its successor-in-interest, and for a period of 12 months following the termination of Employee's employment for any reason (voluntary or involuntary), Employee shall not directly or indirectly (on Employee's own or in combination or association with others, and whether for Employee's own benefit or for the benefit of other persons or entities) engage in activity which involves or could result in the actual or potential termination of the Company's relationship with or the solicitation, hiring, or engagement of any person or entity who is, at the time, or was within the last 12 months of Employee's employment within the Company, an employee, consultant, or independent contractor of the Company or any of its affiliates, including for greater certainty, any affiliate U.S. company of WSP USA ("Affiliate").

D. **Non-Solicitation of Clients:** During Employee's employment with the Company and for a period of 12 months following the termination of Employee's employment for any reason (voluntary or involuntary), Employee shall not directly or indirectly (on Employee's own or in combination or association with others, and whether for Employee's own benefit or for the benefit of other parties or entities) contact, call upon, solicit or otherwise accept business from, render services to, market services or products to, divert business from, and/or interfere with the Company's relationship or business with any of the Company's existing Clients or Prospective Clients (as that term is defined above) that Employee interacted with on behalf of the Company, was introduced to by virtue of Employee's employment with the Company, or otherwise learned confidential information concerning during the last 12 months of Employee's employment within the Company.

E. **Miscellaneous**: To the extent Employee's restrictive covenants obligations under Employee's Retention Bonus Agreement with the Company, or any Stock Purchase Agreement, are more restrictive than those provided hereunder, such restrictive covenants shall, in the event of a conflict, control, to the extent allowable under applicable law.

**9.   Intellectual Property**

(a) Works Made for Hire.  Senior Leader understands and agrees that all copyrights, patents, trade secrets, and other intellectual property rights in or associated with any ideas, concepts, techniques, inventions, processes, data, or works of authorship developed or created by Senior Leader during the course of the Senior Leader's employment with the Company and related to Senior Leader's performance of this Agreement ("Work Product") will

belong exclusively to the Company.  To the extent possible, any copyrightable Work Product shall be considered a "work made for hire" for the Company within the meaning of Title 17 of the United States Code, and all ownership rights to such Work Product shall belong to the Company.  Any patentable inventions conceived or reduced to practice by Senior Leader in the course of performance under this Agreement shall be the property of the Company.

(b) <u>Assignment.</u>  If any copyrightable Work Product is not "work made for hire" for the Company under Title 17 of the United States Code, or if any other intellectual property rights in any Work Product (including any patentable invention) is not otherwise owned by the Company as and when it is created, developed, conceived, or reduced to practice, then Senior Leader hereby transfers, assigns, and conveys to the Company and its successors and assigns, without any requirement of further consideration, any and all right, title, and interest Senior Leader may have in such Work Product, including but not limited to any copyright or other intellectual property rights pertaining thereto, effectively automatically as and when created, developed, conceived, or reduced to practice.  Senior Leader hereby waives any so-called "moral rights of authors" in connection with the Work Product and acknowledge and agree that the Company may use, exploit, distribute, reproduce, advertise, promote, publicize, alter, modify, or edit the Work Product, or combine the Work Product with other works, in the Company's sole discretion, in any format or medium now in existence or hereafter devised.

(c) <u>Cooperation.</u>  Upon the request of the Company, Senior Leader will take all further actions and steps necessary to effectuate the assignments set forth in this Section 9, including executing and delivering documents as requested by the Company in connection with such assignments.  Senior Leader hereby waives any and all rights to seek or obtain any injunctive or equitable relief in connection with the exercise of any right that Senior Leader could otherwise claim with respect to any Work Product.

## 10. <u>Non-Disparagement</u>

(a) Except to the extent otherwise prohibited under law, during the term of this Agreement and hereafter, Senior Leader shall not disparage the Company, its affiliates, or their respective past or present officers, directors, associated or employees.

(b) The foregoing restrictions shall not apply to (i) actions or statements taken or made by the Senior Leader while employed by the Company in good faith as fulfilling the Senior Leader's duties with the Company, or otherwise at the request of the Company, or (ii) truthful statements made in compliance with legal process or any investigation, inquiry, or other proceeding by a governmental authority.

## 11. <u>Entire Agreement; Severability and Reformation; Amendment</u>

(a) This Agreement contains the full and complete understanding of the parties hereto with respect to the subject matter contained herein, and supersedes and replaces any prior Agreement, either oral or written, which Senior Leader may have with the Company that relates to the same subject matter.

(b) If any one or more of the terms, provisions, covenants or restrictions of this Agreement shall be determined by a court of competent jurisdiction to be invalid, void or unenforceable, then the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect, and to that end the provisions shall be deemed severable. If any one or more of the provisions contained in this Agreement shall for any reason be held to be excessively broad as to duration, geographical scope, activity or subject, it shall be reformed by limiting and reducing it to the minimum extent necessary, so as to be enforceable to the extent compatible with the applicable law. The obligations of the parties set forth in Sections 7-10, 15, and 17 shall survive termination of this Agreement if the Agreement is terminated during the initial or subsequent term(s). However, if the Agreement is terminated at the end of a term, pursuant to Section 2 and prior to renewal, and the Senior Leader is converted to an at-will employee, the restrictive covenants contained in Section 8 will expire one (1) year from the date that Senior Leader is converted to an at-will employee provided that Senior Leader remains employed with Company one year after converting to an at-will employee.

(c) This Agreement may be amended only by a writing signed by Senior Leader and a duly authorized representative of the Company (other than Senior Leader).

**12. Notices**

(a) All notices and other communications required or permitted to be given thereunder shall be in writing and shall be deemed to have been duly given if delivered personally, mailed by certified mail (return receipt requested) or sent by overnight delivery service or facsimile transmission (with electronic confirmation of successful transmission) to the parties at the following addresses or at such other addresses as shall be specified by the parties by like notice:

| | |
|---|---|
| If to the Company: | Chief Human Resources Officer |
| If to Senior Leader: | Most recently recorded home address |

(b) Notice given shall, in the case of mail, be deemed to be given and received on the third calendar day after posting, in the case overnight delivery service, on the date of actual delivery and, in the case of facsimile transmission, telex or personal delivery, on the date of actual transmission or, as the case may be, personal delivery.

**13. Assignment; Successors; Counterparts**

(a) This Agreement is personal to Senior Leader and may not be assigned by Senior Leader without the prior written consent of the Company.

(b) This Agreement shall inure to the benefit of and be binding upon Senior Leader, their heirs and personal representatives, and the Company, its successors and assigns.

(c) This Agreement may be executed in counterparts, each of which will take effect as an original and all of which shall evidence one and the same Agreement.

**14. Governing Law; Construction; Non-Waiver**

(a)  This Agreement shall be governed by and construed in accordance with the law of the State of New York, without regard to principles of conflicts of law.

(b)  The headings and captions of this Agreement are provided for convenience only and are intended to have no effect in construing or interpreting this Agreement.  The language in all parts of this Agreement shall be in all cases construed in accordance to its fair meaning and not strictly for or against the Company or Senior Leader.

(c)  No failure or neglect of either party, in any instance, to exercise any right, power or privilege thereunder or under law shall constitute a waiver of any other right, power or privilege or of the same right, power or privilege in any other instance.  All waivers by either party thereto must be contained in a writing signed by the party to be charged and, in the case of the Company, by an officer of the Company other than Senior Leader, or other person duly authorized by the Company. The waiver by either party of a breach of any provision contained in this Agreement shall not be construed as or operate as a waiver of any subsequent breach.

**15. <u>Assistance in Litigation</u>**   Senior Leader shall, during and after termination of employment, upon reasonable notice, furnish such information and proper assistance to the Company as may be reasonably required by the Company in connection with any litigation in which it or any of its subsidiaries or affiliates is, or may become, a party; provided, however, that any such assistance following termination shall be furnished at mutually agreeable times and for mutually agreeable compensation.

**16. <u>Remedies</u>** The parties recognize and affirm that in the event of a breach of any provision of this Agreement, money damages would be inadequate and neither Senior Leader nor the Company would have an adequate remedy at law.  Accordingly, the parties agree that in the event of a breach or a threatened breach of any of the provisions of this Agreement either party may, in addition and supplementary to other rights and remedies existing in its favor, apply to any court of law or equity of competent jurisdiction for specific performance and/or injunctive or other relief in order to enforce or prevent any violations of the provisions thereof (without posting a bond or other security).

**17. <u>Resolution of Disputes</u>**

(a)  Any dispute arising between any of the Company and Senior Leader under this Agreement, or under any statute, regulation, or ordinance, or in connection with the Senior Leader's Employment with the Company, shall be submitted to binding arbitration before the American Arbitration Association ("AAA") for resolution (the "Arbitration"), unless otherwise prohibited by law.

(b)  The Arbitration shall be conducted in the State of New York, and the arbitrator will apply New York State law, including federal law as applied in New York courts.  The arbitration shall be conducted in accordance with AAA's Employment Arbitration Rules and Procedures, as modified herein.  The Arbitration shall be conducted by a single arbitrator who shall have experience in Senior Leader management disputes.  The arbitrator, and not any federal, state, or local court or adjudicatory authority, shall have exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability, and/or formation of this Agreement,

11

including but not limited to any dispute as to whether a particular claim is subject to arbitration thereunder. The arbitral award shall be in writing, state the reasons for the award, and be final and binding on the parties.

(c) The arbitration shall, to the extent permitted by law, be conducted on a strictly confidential basis, and none of the Parties shall disclose the existence of a claim; the nature of a claim or defense; any documents, exhibits, or information exchanged or presented in connection with a claim or defense; or the result of any action (collectively, "Arbitration Materials"), to any third party, with the sole exception of Parties' legal counsel, who the Parties shall ensure also complies with these confidentiality terms.

(d) In the event of any court proceeding to challenge or enforce an arbitrator's award, the parties hereby consent to the exclusive jurisdiction of the state and federal courts in New York, New York, and agree to venue in that jurisdiction. The Parties agree to take all steps necessary to protect the confidentiality of the Arbitration Materials in connection with any such proceeding, agree to file all Confidential Information (and all documents containing Confidential Information) under seal, and agree to the entry of an appropriate protective order encompassing the confidentiality terms of this Agreement.

## 18. Section 409A

(a) Notwithstanding anything herein to the contrary, this Agreement is intended to be interpreted and applied so that the payment of the benefits set forth herein either shall either be exempt from the requirements of Section 409A of the Internal Revenue Code of 1986, as amended (the "Code"), or shall comply with the requirements of such provision. Notwithstanding anything in this Agreement or elsewhere to the contrary, distributions upon termination of Senior Leader's employment may only be made upon a "separation from service" as determined under Section 409A of the Code. Each payment under this Agreement or otherwise shall be treated as a separate payment for purposes of Section 409A of the Code. In no event may Senior Leader, directly or indirectly, designate the calendar year of any payment to be made under this Agreement or otherwise which constitutes a "deferral of compensation" within the meaning of Section 409A of the Code.

(b) All reimbursements and in-kind benefits provided under this Agreement shall be made or provided in accordance with the requirements of Section 409A of the Code. To the extent that any reimbursements pursuant to this Agreement or otherwise are taxable to Senior Leader, any reimbursement payment due to Senior Leader shall be paid to Senior Leader on or before the last day of Senior Leader's taxable year following the taxable year in which the related expense was incurred; provided, that, Senior Leader has provided the Company written documentation of such expenses in a timely fashion and such expenses otherwise satisfy the Company' expense reimbursement policies. Reimbursements pursuant to this Agreement or otherwise are not subject to liquidation or exchange for another benefit and the amount of such reimbursements that Senior Leader receives in one taxable year shall not affect the amount of such reimbursements that Senior Leader receives in any other taxable year.

(c) Notwithstanding any provision in this Agreement to the contrary, if on the date of their termination from employment with the Company Senior Leader is deemed to be a

"specified employee" within the meaning of Code Section 409A and the Final Treasury Regulations using the identification methodology selected by the Company from time to time, or if none, the default methodology under Code Section 409A, any payments or benefits due upon a termination of Senior Leader's employment under any arrangement that constitutes a "deferral of compensation" within the meaning of Code Section 409A shall be delayed and paid or provided (or commence, in the case of installments) on the first payroll date on or following the earlier of (i) the date which is six (6) months and one (1) day after Senior Leader's termination of employment for any reason other than death, and (ii) the date of Senior Leader's death, and any remaining payments and benefits shall be paid or provided in accordance with the normal payment dates specified for such payment or benefit.

(d) Notwithstanding any of the foregoing to the contrary, the Company and its respective officers, directors, employees, or agents make no guarantee that the terms of this Agreement as written comply with, or are exempt from, the provisions of Code Section 409A, and none of the foregoing shall have any liability for the failure of the terms of this Agreement as written to comply with, or be exempt from, the provisions of Code Section 409A

**19. <u>Voluntary Agreement</u>**  Senior Leader and the Company represent and agree that each has reviewed all aspects of this Agreement, has carefully read and understands all provisions of this Agreement, and is voluntarily entering into this Agreement.  Each party represents and agrees that such party has had the opportunity to review any and all aspects of this Agreement with legal, tax or other advisors of such party's choice before executing this Agreement.

IN WITNESS THEREOF, the parties thereto have executed this Agreement on the dates stated below.

**COMPANY**
**kW Mission Critical Engineering d.p.c.**

Dated: _____

By: _____
Name: James Warren
Title:  Founding Principal

**SENIOR LEADER**

Dated: _12/29/2020_____

By: _____
Stephen Coon

13

EXHIBIT B

# RETENTION BONUS AGREEMENT

Pursuant to the terms and conditions set forth below, and in consideration of the benefits provided for herein, **kW Mission Critical Engineering, d.p.c.** (hereinafter the "**Company**") and **Steve Coon** (hereinafter "**Employee**" and, together with the Company, the "**Parties**") hereby enter into this Retention Bonus Agreement (hereinafter this "**Retention Agreement**").

## I.      Purpose of Retention Bonus

As a valued member of the organization, the purpose of the Retention Bonus is to recognize Employee's contribution to the Company, to incentivize Employee to remain with the Company for at least a period of two years (the "**Transition Period**") following the Closing Date, (defined as the effective date of the completion of the merger of the Company and WSP USA Buildings Inc. ("**WSP USA**"), in order to assist the Company with integration into WSP USA, and to protect the Company's employees and clients from being diverted away from the Company.

## II.     Consideration for Retention Agreement

Employee may be paid a Retention Bonus pursuant to the terms herein if:

(a) Employee remains employed and "in good standing" (as defined herein) by the Company (or its successor-in-interest) through the relevant dates in Section II(A)(1)(a) and/or (b) (each a "**Vesting Date**"; collectively, the "**Vesting Dates**") of this Retention Agreement; or

(b) Employee is terminated, without "**Cause**" (as defined herein), by the Company during the Transition Period. In such an event, Employee will be paid any remaining portion of the Retention Bonus within thirty (30) days of the termination date.

### A.    Retention Bonus

Employee shall be paid a total Retention Bonus of **$475,000**, less all applicable deductions required by law (the "**Retention Bonus**"), which Retention Bonus will be paid in two installments (spread out over two years), on the dates set forth under the below Schedule of Payments. In the event that Employee resigns, or is terminated for Cause, by the time either the First Payment or the Second Payment come due, the relevant portion will not be payable. For greater certainty, it is possible for Employee to have earned the First Payment, assuming the conditions for the First Payment were met, but not earn the Second Payment.

#### 1.   Schedule of Payments

      a.  **First Payment**: The first payment of **$118,750**, less all deductions required by law, representing 25% of the Retention Bonus, will be paid to Employee via direct deposit or other acceptable means at the Company's discretion on the first payroll following December 30, 2021, so long as

Employee remains employed by Company or its successor-in-interest on December 30, 2021.

    **b. Second Payment:** The second and final payment of **$356,250**, less all deductions required by law, representing the remaining 75% of the Retention Bonus, will be paid via direct deposit or other acceptable means at the Company's discretion on the first payroll following December 30, 2022, so long as Employee remains employed by Company or its successor-in-interest on December 30, 2022.

## III.    Non-Competition and Non-Solicitation

As an incentive and as a specific condition for entering into this Retention Agreement, the Parties make, give, and agree to the following covenants respecting competition and solicitation:

    **A. Non-Compete:**

      1. The Company is in a highly competitive business and expends a considerable amount of money in the development of business from new clients and customers and continued business from existing clients and customers. The business and clientele of the Company are national and worldwide in scope, and therefore the territorial and time limitations set forth in this Non-Compete clause are reasonable and necessary for the protection of the Company's interests.

      2. During Employee's employment with the Company or its successor-in-interest and for a period of 12 months following the termination of Employee's employment for any reason (voluntary or involuntary), Employee shall not directly or indirectly own, manage, operate, control be employed by, consult with or participate in the ownership, management, operation or control of any business in a manner that would reasonably be expected to divert business from any of the Company's "**Clients**" or "**Prospective Clients**" (as defined herein) with whom Employee had any involvement in developing, servicing, soliciting, or maintaining during the year prior to Employee's termination.

      3. "Clients" is defined as clients who the Company provided services for at any time during the 12-month period immediately preceding Employee's termination. "Prospective Clients" includes any person or entity: (a) to whom the Company has submitted qualifications or a proposal with Employee's direct personal involvement during the 12 months prior to Employee's termination; or (b) concerning whom Employee was assisting the Company in preparing a submittal of qualifications or a proposal at the time of Employee's termination.

    **B. Non-Solicitation of Employees, Consultants, and Contractors:** During Employee's employment with the Company or its successor-in-interest, and for a

period of 12 months following the termination of Employee's employment for any reason (voluntary or involuntary), Employee shall not directly or indirectly (on Employee's own or in combination or association with others, and whether for Employee's own benefit or for the benefit of other persons or entities) engage in activity which involves or could result in the actual or potential termination of the Company's relationship with or the solicitation, hiring, or engagement of any person or entity who is, at the time, or was within the last 12 months of Employee's employment within the Company, an employee, consultant, or independent contractor of the Company or any of its affiliates, including for greater certainty, any affiliate U.S. company of WSP USA ("**Affiliate**").

C.  **Non-Solicitation of Clients:** During Employee's employment with the Company and for a period of 12 months following the termination of Employee's employment for any reason (voluntary or involuntary), Employee shall not directly or indirectly (on Employee's own or in combination or association with others, and whether for Employee's own benefit or for the benefit of other parties or entities) contact, call upon, solicit or otherwise accept business from, render services to, market services or products to, divert business from, and/or interfere with the Company's relationship or business with any of the Company's existing Clients or Prospective Clients (as that term is defined above) that Employee interacted with on behalf of the Company, was introduced to by virtue of Employee's employment with the Company, or otherwise learned confidential information concerning during the last 12 months of Employee's employment within the Company.

D.  **Termination of Restrictive Covenants:** The above restrictive covenants terminate either within one year of the Employee's termination date or, if the Employee remains employed by the Company, within three years of the Closing Date, whichever is sooner.

## IV.  General Terms and Conditions

A.  Employee's obligations and rights of the Company shall extend to any parent corporation, subsidiaries and corporate affiliate companies, and to any of their successors, assignees and transferees.

B.  For purposes of this Retention Agreement, "in good standing" means that the Employee does not have a written record of disciplinary action for violating the Company's Code of Conduct, or policies related to anti-harassment, non-discrimination, and non-retaliation.

C.  For purposes of this Retention Agreement, the term "Cause" shall mean any of the following: (i) conviction of a crime (including conviction on a nolo contendere plea) involving the commission by Employee of a felony or of a criminal act involving, in the good faith judgment of the Company, fraud, dishonesty, or moral turpitude but excluding any conviction which results solely from Employee's title or position with the Company and is not based on

Employee's personal conduct; (ii) as determined by the Company in good faith, the failure to perform reasonably requested employment duties as required by the Company, as determined by the Company in good faith, after written notice from the Company of such failure to perform; (iii) fraud or embezzlement determined in accordance with the Company's normal investigative procedures consistently applied in comparable circumstances; (iv) gross misconduct or gross negligence in connection with the business of the Company or an Affiliate which has an adverse effect on the Company or the Affiliate, as determined by the Company in good faith; or (v) violation of the Company's written policies relating to equal employment, discrimination, harassment, retaliation, business conduct or other material Company policies.

D.    Employee acknowledges that: (i) unless stated otherwise in a written agreement executed by a representative of the Company, Employee's employment with the Company is at-will; accordingly, Employee may be terminated by the Company for any reason and in its sole discretion and Employee may terminate the employment relationship for any reason and in Employee's sole discretion; and (ii) Employee is to consult with and rely upon Employee's own tax, legal, and financial advisors regarding the consequences and risks of the Retention Bonus.

E.    This Retention Agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to its conflict of laws provision. The parties being desirous of having any disputes resolved in a forum having a substantial body of law and experience with the matters contained herein, agree that any action or proceeding with respect to this Agreement shall be brought exclusively in the Supreme Court of the State of New York, New York County, or in the United States District Court for the Southern District of New York or in any other court of competent jurisdiction sitting in the State of New York, New York County and the parties agree to the personal jurisdiction thereof

F.    The invalidity or unenforceability of any part or subpart of this Retention Agreement shall not affect the validity or enforceability of the remainder of the Retention Agreement. If any provision of this Agreement shall be held to be excessively broad as to time, geography, activity or other obligations, it shall be construed or reformed by limiting or reducing it, so as to be enforceable.

G.    This Retention Agreement supersedes any prior discussions, statements, representations, communications, whether oral or in writing, about its subject matter. This Retention Agreement reflects the full agreement with respect to its subject matter and can only be modified in a writing signed by Employee and an executive of the Company or its successor-in-interest.

The Parties knowingly and voluntarily sign this Retention Agreement as of the date(s) set forth below:

**kW Mission Critical Engineering, d.p.c.**


Date: 12/29/2020

**James Warren**


**Employee**


Date: 12/28/2020

**Steve Coon**

EXHIBIT C

Stephen Coon, PE
5533 E Via Caballo Blanco
Cave Creek, AZ 85331
November 2, 2022

Debbie Arendsen
Chief Human Resources Officer
WSP
3340 Peachtree Road NE
Suite 2400
Atlanta, GA 30326

Dear Debbie Arendsen:

Please acknowledge this letter as advanced written notice of my intent to not renew the Senior Leadership Employment Agreement under section 2 at the end of the agreement term. I would like to remain at WSP as an at-will employee.

Please confirm receipt of this notice and please confirm the end of term to be December 30, 2022.

Sincerely,

Stephen Coon, PE
scoon@kwmce.com
518.852.6793

Enclosures: Senior Leadership Employment Agreement

EXHIBIT D

October 18, 2023

Mr. Ken Clausen
Director of Operations
KClausen@kwmce.com

Please accept this letter as my formal resignation from kW Mission Critical Engineering member of WSP (kWMCE). My last day is flexible based upon what is best for the business sometime between two and four weeks from today.

I am extremely grateful for the mentorship and the career everyone at kWMCE provided me over the last 10+ years as I cannot imagine a better experience. The opportunities and the knowledge shared with me provided my family and I with a life I could not imagine when I started at the firm.  From the bottom of my heart, thank you.

Please let me know how I can help the transition and make it as smooth as possible. As we move forward, I will be fully transparent. I will ensure everything confidential is turned over to kWMCE. I will return all access to company information including devices (laptop) provided by kWMCE. At the end of my last day I will ensure, to the best of my knowledge, I no longer have access to anything connected to kWMCE. If I find anything after my last day, I will be sure that it is immediately turned over to kWMCE and deleted off personal devices if applicable. There are however a few items that were provided by kWMCE in one manner or anther that I would like to keep, and I have no issues with purchasing these items from the business:
- Pre-inked Professional Engineer stamps
- Digital Professional Engineer stamps
- Current list of my multi-state Professional Engineer status.  This is the list provided to me frequently by Lin McGlinchey.
- A copy of my current kWMCE professional resume (CV)
- Current professional photo
- Professional registrations and dues previously purchased that will remain active past my last day at kWMCE
- Several books including both physical and audio books inclusive of select code books.
- Mobile phone case
- Mobile phone charger and accessories
- My contact list, if kWMCE wants to review before I download, I completely understand.
- kWMCE backpack and apparel provided as it will be difficult to find all the older items. Currently known items will be return.

I wish everyone at kWMCE the very best personally and professionally. Thank you for everything.

Steve Coon, PE
518.852.6793

EXHIBIT E

# RETENTION BONUS AGREEMENT

Pursuant to the terms and conditions set forth below, and in consideration of the benefits provided for herein, **kW Mission Critical Engineering, d.p.c.** (hereinafter the "**Company**") and **Jason Leone** (hereinafter "**Employee**" and, together with the Company, the "**Parties**") hereby enter into this Retention Bonus Agreement (hereinafter this "**Retention Agreement**").

## I.      Purpose of Retention Bonus

As a valued member of the organization, the purpose of the Retention Bonus is to recognize Employee's contribution to the Company, to incentivize Employee to remain with the Company for at least a period of two years (the "**Transition Period**") following the Closing Date, (defined as the effective date of the completion of the merger of the Company and WSP USA Buildings Inc. ("**WSP USA**"), in order to assist the Company with integration into WSP USA, and to protect the Company's employees and clients from being diverted away from the Company.

## II.      Consideration for Retention Agreement

Employee may be paid a Retention Bonus pursuant to the terms herein if:

(a) Employee remains employed and "in good standing" (as defined herein) by the Company (or its successor-in-interest) through the relevant dates in Section II(A)(1)(a) and/or (b) (each a "**Vesting Date**"; collectively, the "**Vesting Dates**") of this Retention Agreement; or

(b) Employee is terminated, without "**Cause**" (as defined herein), by the Company during the Transition Period. In such an event, Employee will be paid any remaining portion of the Retention Bonus within thirty (30) days of the termination date.

### A.   Retention Bonus

Employee shall be paid a total Retention Bonus of **$225,000**, less all applicable deductions required by law (the "**Retention Bonus**"), which Retention Bonus will be paid in two installments (spread out over two years), on the dates set forth under the below Schedule of Payments. In the event that Employee resigns, or is terminated for Cause, by the time either the First Payment or the Second Payment come due, the relevant portion will not be payable. For greater certainty, it is possible for Employee to have earned the First Payment, assuming the conditions for the First Payment were met, but not earn the Second Payment.

#### 1.   Schedule of Payments

##### a.   **First Payment**: The first payment of **$56,250**, less all deductions required by law, representing 25% of the Retention Bonus, will be paid to Employee via direct deposit or other acceptable means at the Company's discretion on the first payroll following December 30, 2021, so long as Employee

remains employed by Company or its successor-in-interest on December 30, 2021.

    **b. Second Payment:** The second and final payment of **$168,750**, less all deductions required by law, representing the remaining 75% of the Retention Bonus, will be paid via direct deposit or other acceptable means at the Company's discretion on the first payroll following December 30, 2022, so long as Employee remains employed by Company or its successor-in-interest on December 30, 2022.

## III.    Non-Competition and Non-Solicitation

As an incentive and as a specific condition for entering into this Retention Agreement, the Parties make, give, and agree to the following covenants respecting competition and solicitation:

### A.  Non-Compete:

1. The Company is in a highly competitive business and expends a considerable amount of money in the development of business from new clients and customers and continued business from existing clients and customers. The business and clientele of the Company are national and worldwide in scope, and therefore the territorial and time limitations set forth in this Non-Compete clause are reasonable and necessary for the protection of the Company's interests.

2. During Employee's employment with the Company or its successor-in-interest and for a period of 12 months following the termination of Employee's employment for any reason (voluntary or involuntary), Employee shall not directly or indirectly own, manage, operate, control be employed by, consult with or participate in the ownership, management, operation or control of any business in a manner that would reasonably be expected to divert business from any of the Company's "**Clients**" or "**Prospective Clients**" (as defined herein) with whom Employee had any involvement in developing, servicing, soliciting, or maintaining during the year prior to Employee's termination.

3. "Clients" is defined as clients who the Company provided services for at any time during the 12-month period immediately preceding Employee's termination. "Prospective Clients" includes any person or entity: (a) to whom the Company has submitted qualifications or a proposal with Employee's direct personal involvement during the 12 months prior to Employee's termination; or (b) concerning whom Employee was assisting the Company in preparing a submittal of qualifications or a proposal at the time of Employee's termination.

### B. Non-Solicitation of Employees, Consultants, and Contractors: During Employee's employment with the Company or its successor-in-interest, and for a

period of 12 months following the termination of Employee's employment for any reason (voluntary or involuntary), Employee shall not directly or indirectly (on Employee's own or in combination or association with others, and whether for Employee's own benefit or for the benefit of other persons or entities) engage in activity which involves or could result in the actual or potential termination of the Company's relationship with or the solicitation, hiring, or engagement of any person or entity who is, at the time, or was within the last 12 months of Employee's employment within the Company, an employee, consultant, or independent contractor of the Company or any of its affiliates, including for greater certainty, any affiliate U.S. company of WSP USA ("**Affiliate**").

C. **Non-Solicitation of Clients:** During Employee's employment with the Company and for a period of 12 months following the termination of Employee's employment for any reason (voluntary or involuntary), Employee shall not directly or indirectly (on Employee's own or in combination or association with others, and whether for Employee's own benefit or for the benefit of other parties or entities) contact, call upon, solicit or otherwise accept business from, render services to, market services or products to, divert business from, and/or interfere with the Company's relationship or business with any of the Company's existing Clients or Prospective Clients (as that term is defined above) that Employee interacted with on behalf of the Company, was introduced to by virtue of Employee's employment with the Company, or otherwise learned confidential information concerning during the last 12 months of Employee's employment within the Company.

D. **Termination of Restrictive Covenants:** The above restrictive covenants terminate either within one year of the Employee's termination date or, if the Employee remains employed by the Company, within three years of the Closing Date, whichever is sooner.

## IV. General Terms and Conditions

A. Employee's obligations and rights of the Company shall extend to any parent corporation, subsidiaries and corporate affiliate companies, and to any of their successors, assignees and transferees.

B. For purposes of this Retention Agreement, "in good standing" means that the Employee does not have a written record of disciplinary action for violating the Company's Code of Conduct, or policies related to anti-harassment, non-discrimination, and non-retaliation.

C. For purposes of this Retention Agreement, the term "Cause" shall mean any of the following: (i) conviction of a crime (including conviction on a nolo contendere plea) involving the commission by Employee of a felony or of a criminal act involving, in the good faith judgment of the Company, fraud, dishonesty, or moral turpitude but excluding any conviction which results solely from Employee's title or position with the Company and is not based on

3

Employee's personal conduct; (ii) as determined by the Company in good faith, the failure to perform reasonably requested employment duties as required by the Company, as determined by the Company in good faith, after written notice from the Company of such failure to perform; (iii) fraud or embezzlement determined in accordance with the Company's normal investigative procedures consistently applied in comparable circumstances; (iv) gross misconduct or gross negligence in connection with the business of the Company or an Affiliate which has an adverse effect on the Company or the Affiliate, as determined by the Company in good faith; or (v) violation of the Company's written policies relating to equal employment, discrimination, harassment, retaliation, business conduct or other material Company policies.

**D.** Employee acknowledges that: (i) unless stated otherwise in a written agreement executed by a representative of the Company, Employee's employment with the Company is at-will; accordingly, Employee may be terminated by the Company for any reason and in its sole discretion and Employee may terminate the employment relationship for any reason and in Employee's sole discretion; and (ii) Employee is to consult with and rely upon Employee's own tax, legal, and financial advisors regarding the consequences and risks of the Retention Bonus.

**E.** This Retention Agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to its conflict of laws provision. The parties being desirous of having any disputes resolved in a forum having a substantial body of law and experience with the matters contained herein, agree that any action or proceeding with respect to this Agreement shall be brought exclusively in the Supreme Court of the State of New York, New York County, or in the United States District Court for the Southern District of New York or in any other court of competent jurisdiction sitting in the State of New York, New York County and the parties agree to the personal jurisdiction thereof

**F.** The invalidity or unenforceability of any part or subpart of this Retention Agreement shall not affect the validity or enforceability of the remainder of the Retention Agreement. If any provision of this Agreement shall be held to be excessively broad as to time, geography, activity or other obligations, it shall be construed or reformed by limiting or reducing it, so as to be enforceable.

**G.** This Retention Agreement supersedes any prior discussions, statements, representations, communications, whether oral or in writing, about its subject matter. This Retention Agreement reflects the full agreement with respect to its subject matter and can only be modified in a writing signed by Employee and an executive of the Company or its successor-in-interest.

The Parties knowingly and voluntarily sign this Retention Agreement as of the date(s) set forth below:

**kW Mission Critical Engineering, d.p.c.**


_____                    Date:_____
**James Warren**


**Employee**

_____                    Date: 12/28/2020
**Jason Leone**

# EXHIBIT F

# RETENTION BONUS AGREEMENT

Pursuant to the terms and conditions set forth below, and in consideration of the benefits provided for herein, **kW Mission Critical Engineering, d.p.c.** (hereinafter the "**Company**") and **Gary Russinko** (hereinafter "**Employee**" and, together with the Company, the "**Parties**") hereby enter into this Retention Bonus Agreement (hereinafter this "**Retention Agreement**").

## I.      Purpose of Retention Bonus

As a valued member of the organization, the purpose of the Retention Bonus is to recognize Employee's contribution to the Company, to incentivize Employee to remain with the Company for at least a period of two years (the "**Transition Period**") following the Closing Date, (defined as the effective date of the completion of the merger of the Company and WSP USA Buildings Inc. ("**WSP USA**"), in order to assist the Company with integration into WSP USA, and to protect the Company's employees and clients from being diverted away from the Company.

## II.      Consideration for Retention Agreement

Employee may be paid a Retention Bonus pursuant to the terms herein if:

(a) Employee remains employed and "in good standing" (as defined herein) by the Company (or its successor-in-interest) through the relevant dates in Section II(A)(1)(a) and/or (b) (each a "**Vesting Date**"; collectively, the "**Vesting Dates**") of this Retention Agreement; or

(b) Employee is terminated, without "**Cause**" (as defined herein), by the Company during the Transition Period. In such an event, Employee will be paid any remaining portion of the Retention Bonus within thirty (30) days of the termination date.

### A.   Retention Bonus

Employee shall be paid a total Retention Bonus of **$330,000**, less all applicable deductions required by law (the "**Retention Bonus**"), which Retention Bonus will be paid in two installments (spread out over two years), on the dates set forth under the below Schedule of Payments. In the event that Employee resigns, or is terminated for Cause, by the time either the First Payment or the Second Payment come due, the relevant portion will not be payable. For greater certainty, it is possible for Employee to have earned the First Payment, assuming the conditions for the First Payment were met, but not earn the Second Payment.

### 1.   Schedule of Payments

a. **First Payment**: The first payment of **$82,500**, less all deductions required by law, representing 25% of the Retention Bonus, will be paid to Employee via direct deposit or other acceptable means at the Company's discretion on the first payroll following December 30, 2021, so long as Employee

remains employed by Company or its successor-in-interest on December 30, 2021.

    **b. Second Payment:** The second and final payment of **$247,500**, less all deductions required by law, representing the remaining 75% of the Retention Bonus, will be paid via direct deposit or other acceptable means at the Company's discretion on the first payroll following December 30, 2022, so long as Employee remains employed by Company or its successor-in-interest on December 30, 2022.

## III.    Non-Competition and Non-Solicitation

As an incentive and as a specific condition for entering into this Retention Agreement, the Parties make, give, and agree to the following covenants respecting competition and solicitation:

    **A. Non-Compete:**

        1.  The Company is in a highly competitive business and expends a considerable amount of money in the development of business from new clients and customers and continued business from existing clients and customers. The business and clientele of the Company are national and worldwide in scope, and therefore the territorial and time limitations set forth in this Non-Compete clause are reasonable and necessary for the protection of the Company's interests.

        2.  During Employee's employment with the Company or its successor-in-interest and for a period of 12 months following the termination of Employee's employment for any reason (voluntary or involuntary), Employee shall not directly or indirectly own, manage, operate, control be employed by, consult with or participate in the ownership, management, operation or control of any business in a manner that would reasonably be expected to divert business from any of the Company's "**Clients**" or "**Prospective Clients**" (as defined herein) with whom Employee had any involvement in developing, servicing, soliciting, or maintaining during the year prior to Employee's termination.

        3.  "Clients" is defined as clients who the Company provided services for at any time during the 12-month period immediately preceding Employee's termination. "Prospective Clients" includes any person or entity: (a) to whom the Company has submitted qualifications or a proposal with Employee's direct personal involvement during the 12 months prior to Employee's termination; or (b) concerning whom Employee was assisting the Company in preparing a submittal of qualifications or a proposal at the time of Employee's termination.

    **B. Non-Solicitation of Employees, Consultants, and Contractors:** During Employee's employment with the Company or its successor-in-interest, and for a

2

period of 12 months following the termination of Employee's employment for any reason (voluntary or involuntary), Employee shall not directly or indirectly (on Employee's own or in combination or association with others, and whether for Employee's own benefit or for the benefit of other persons or entities) engage in activity which involves or could result in the actual or potential termination of the Company's relationship with or the solicitation, hiring, or engagement of any person or entity who is, at the time, or was within the last 12 months of Employee's employment within the Company, an employee, consultant, or independent contractor of the Company or any of its affiliates, including for greater certainty, any affiliate U.S. company of WSP USA ("**Affiliate**").

C. **Non-Solicitation of Clients:** During Employee's employment with the Company and for a period of 12 months following the termination of Employee's employment for any reason (voluntary or involuntary), Employee shall not directly or indirectly (on Employee's own or in combination or association with others, and whether for Employee's own benefit or for the benefit of other parties or entities) contact, call upon, solicit or otherwise accept business from, render services to, market services or products to, divert business from, and/or interfere with the Company's relationship or business with any of the Company's existing Clients or Prospective Clients (as that term is defined above) that Employee interacted with on behalf of the Company, was introduced to by virtue of Employee's employment with the Company, or otherwise learned confidential information concerning during the last 12 months of Employee's employment within the Company.

D. **Termination of Restrictive Covenants:** The above restrictive covenants terminate either within one year of the Employee's termination date or, if the Employee remains employed by the Company, within three years of the Closing Date, whichever is sooner.

## IV. General Terms and Conditions

A. Employee's obligations and rights of the Company shall extend to any parent corporation, subsidiaries and corporate affiliate companies, and to any of their successors, assignees and transferees.

B. For purposes of this Retention Agreement, "in good standing" means that the Employee does not have a written record of disciplinary action for violating the Company's Code of Conduct, or policies related to anti-harassment, non-discrimination, and non-retaliation.

C. For purposes of this Retention Agreement, the term "Cause" shall mean any of the following: (i) conviction of a crime (including conviction on a nolo contendere plea) involving the commission by Employee of a felony or of a criminal act involving, in the good faith judgment of the Company, fraud, dishonesty, or moral turpitude but excluding any conviction which results solely from Employee's title or position with the Company and is not based on

Employee's personal conduct; (ii) as determined by the Company in good faith, the failure to perform reasonably requested employment duties as required by the Company, as determined by the Company in good faith, after written notice from the Company of such failure to perform; (iii) fraud or embezzlement determined in accordance with the Company's normal investigative procedures consistently applied in comparable circumstances; (iv) gross misconduct or gross negligence in connection with the business of the Company or an Affiliate which has an adverse effect on the Company or the Affiliate, as determined by the Company in good faith; or (v) violation of the Company's written policies relating to equal employment, discrimination, harassment, retaliation, business conduct or other material Company policies.

**D.** Employee acknowledges that: (i) unless stated otherwise in a written agreement executed by a representative of the Company, Employee's employment with the Company is at-will; accordingly, Employee may be terminated by the Company for any reason and in its sole discretion and Employee may terminate the employment relationship for any reason and in Employee's sole discretion; and (ii) Employee is to consult with and rely upon Employee's own tax, legal, and financial advisors regarding the consequences and risks of the Retention Bonus.

**E.** This Retention Agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to its conflict of laws provision. The parties being desirous of having any disputes resolved in a forum having a substantial body of law and experience with the matters contained herein, agree that any action or proceeding with respect to this Agreement shall be brought exclusively in the Supreme Court of the State of New York, New York County, or in the United States District Court for the Southern District of New York or in any other court of competent jurisdiction sitting in the State of New York, New York County and the parties agree to the personal jurisdiction thereof

**F.** The invalidity or unenforceability of any part or subpart of this Retention Agreement shall not affect the validity or enforceability of the remainder of the Retention Agreement. If any provision of this Agreement shall be held to be excessively broad as to time, geography, activity or other obligations, it shall be construed or reformed by limiting or reducing it, so as to be enforceable.

**G.** This Retention Agreement supersedes any prior discussions, statements, representations, communications, whether oral or in writing, about its subject matter. This Retention Agreement reflects the full agreement with respect to its subject matter and can only be modified in a writing signed by Employee and an executive of the Company or its successor-in-interest.

The Parties knowingly and voluntarily sign this Retention Agreement as of the date(s) set forth below:

**kW Mission Critical Engineering, d.p.c.**

_____
**James Warren**

Date: 12/29/2020

**Employee**

Gary Russinko

Digitally signed by Gary Russinko
DN: C=US, E=grussinko@kwmce.com, O="kW Mission Critical Engineering, dpc", CN=Gary Russinko
Reason: I agree to the terms defined by the placement of my signature on this document
Contact Info: 518-708-7732
Date: 2020.12.27 16:00:28-05'00'

_____
**Gary Russinko**

Date: 12/27/2020

EXHIBIT G

# Holland & Knight

1180 West Peachtree Street, Suite 1800 | Atlanta, GA 30309 | T 404.817.8500 | F 404.881.0470
Holland & Knight LLP | www.hklaw.com

Todd D. Wozniak
+1 404-817-8431
Todd.Wozniak@hklaw.com

October 25, 2023

*Via Overnight Mail*

Stephen Coon
5533 E. Via Caballo Blanco
Cave Creek, AZ 85331

Re:     POST-EMPLOYMENT RESTRICTIVE COVENANT REMINDER

Dear Mr. Coon:

This law firm represents WSP USA Inc. and its subsidiaries and predecessor companies (the "Company") in connection with your Senior Leadership Employment Agreement with the Company (the "Agreement"). A copy of the Agreement is enclosed for your convenience.

It has come to our attention that you have recently resigned your employment with the Company and that your employment with the Company will end on or before November 3, 2023. We are writing to remind you of your contractual obligations under the Agreement related to non-competition, non-solicitation, confidentiality, and intellectual property. These obligations apply both during and after your employment with the Company in accordance with their terms.

Specifically, Section 7 of your Agreement contains a restriction on disclosure of confidential information. In that provision, you "agree[d] that all Confidential Information, whether prepared by [you] or otherwise coming into [your] possession, shall remain the exclusive property of the Company." Agreement § 7(b)(i). The provision further provides that you agreed not to, "without the prior written consent of the Company, use or disclose to any third party any of the Confidential Information, directly or indirectly, either during [your] employment with the Company or at any time following the termination of [your] employment with the Company." *Id.* In the non-disclosure provision, you also must "promptly deliver at such time as [your] employment with the Company terminates, or at any time that the Company may request," "all memoranda, notes, plans, data, drawings, manuals, letters, records, reports, electronic mail, recordings, computer tapes and software and other documents and data, constituting or relating to Confidential Information or Work Product . . . which [you] may then possess or have under [your] control." *Id.* § 7(c).

Atlanta | Austin | Boston | Charlotte | Chicago | Dallas | Denver | Fort Lauderdale | Fort Worth | Houston
Jacksonville | Los Angeles | Miami | New York | Orange County | Orlando | Philadelphia | Portland
San Francisco | Stamford | Tallahassee | Tampa | Tysons | Washington, D.C. | West Palm Beach

October 25, 2023
Page 2

Section 8 of your Agreement contains a non-compete provision stating that you "shall not directly or indirectly own, manage, operate, control, be employed by, consult with or participate in the ownership, management operation or control of any business in a manner that would reasonably be expected to divert business from any of the Company's 'Clients' or 'Prospective Clients' with whom [you] had any involvement in developing, servicing, soliciting, or maintaining during the year prior to [your] termination." Agreement § 8(B)(ii). Section 8 also contains a non-solicitation provision that you shall not engage in "the solicitation, hiring, or engagement of any person or entity who is, at the time, or was within the last 12 months of [your] employment with the Company, an employee, consultant, or independent contractor of the Company or any of its affiliates." *Id.* § 8(C). These Section 8 restrictions remain in effect "for a period of 12 months following the termination of [your] employment for any reason (voluntary or involuntary)." *Id.* §§ 8(B)(ii), (C). Please note that the provisions of Section 11(b) do not apply given that you did not remain employed by the Company for one year following your termination of the Agreement and your becoming an at-will employee of the Company.

Section 9 of your Agreement contains an intellectual property provision stating that you "understand[] and agree[] that all copyrights, patents, trade secrets, and other intellectual property rights in or associated with any ideas, concepts, techniques, inventions, processes, data, or works of authorship developed or created by [you] during the course of [your] employment with the Company" belongs "exclusively to the Company." *Id.* § 9(a); *see also id.* § 9(b).

WSP takes these restrictive covenants very seriously and expects you to honor the Agreement. If you were to breach one or more of these covenants, WSP would be forced to enforce the Agreement and seek all available remedies, including an injunction, damages, and its attorneys' fees and costs.

If you have any questions about your obligations under the Agreement, feel free to call me.

Also, in light of your resignation, please return all documents, property, and data belonging to WSP to WSP. This includes all electronically stored information stored on a personal device, cloud storage accounts, or USB drive. This also includes the following items you requested to keep from the Company in your resignation letter, including: (1) the company-generated list of your multi-state Professional Engineer status; (2) your kWMCE professional resume; (3) the professional photograph(s) provided by the Company; (4) all reference materials, including physical books or audiobooks, paid for by the Company; and (5) professional contact list(s).

The other items noted in your resignation letter you are free to take with you. That includes (1) your pre-inked professional engineer's stamp as well as your digital stamp, (2) the registrations and dues that have already been paid on your behalf (until such time as those registration expire); (3) mobile phone case and other phone accessories; and (4) your kWMCE backpack and apparel.

October 25, 2023
Page 3

If you are represented by legal counsel, please share this letter with your counsel.

Sincerely,

HOLLAND & KNIGHT LLP

Todd D. Wozniak

Enclosures

EXHIBIT H

# Holland & Knight

1180 West Peachtree Street, Suite 1800 | Atlanta, GA 30309 | T 404.817.8500 | F 404.881.0470
Holland & Knight LLP | www.hklaw.com

Todd D. Wozniak
+1 404-817-8431
Todd.Wozniak@hklaw.com

December 29, 2023

VIA OVERNIGHT MAIL

Jason Leone

███████████████

Jason.leone@wsp.com

**Re:    POST-EMPLOYMENT RESTRICTIVE COVENANT REMINDER**

Dear Mr. Leone:

This law firm represents WSP USA Inc. and its subsidiaries and predecessor companies (the "Company") in connection with your post-employment restrictive covenants and confidentiality obligations to the Company (the "Agreement"). A copy of your Retention Agreement is enclosed for your convenience.

The agreements contain covenants related to non-competition and non-solicitation. These obligations apply both during and after your employment with the Company in accordance with their terms. Further, you agreed and reaffirmed in 2022 as part of your receipt of the Company's handbook that

> WSP is engaged in a highly competitive business and our competitive position depends upon our ability to maintain the confidentiality of the Confidential Information and trade secrets which WSP as an organization has an obligation to protect. Any unauthorized disclosure, release or use of any of WSP business information, Confidential Information or trade secrets, could be highly detrimental to the company. . .

You agreed that WSP's Confidential Information includes, but is not limited to:

> Financial and business information, such as information with respect to costs, commissions, fees, profits, sales, markets, mailing lists, strategies and plans for future business, new business, product or other development, potential acquisitions or divestitures, and new marketing ideas;

> Product and technical information, such as formulae, specifications, designs, drawings, component lists, databases, software (or pre-cursor documents),

Atlanta | Austin | Boston | Charlotte | Chicago | Dallas | Denver | Fort Lauderdale | Fort Worth | Houston
Jacksonville | Los Angeles | Miami | New York | Orange County | Orlando | Philadelphia | Portland
San Francisco | Stamford | Tallahassee | Tampa | Tysons | Washington, D.C. | West Palm Beach

December 29, 2023
Page 2

manuals, instructions and catalogues held in any form relating to the production, creation, supply or provision of the products or services for the Company or any affiliate;

Marketing information, such as information relating to the marketing or sales of any products or services of the Company and any affiliate, including without limitation, lists of customers and suppliers' names, addresses and contacts, sales targets and statistics, market share and pricing statistics, marketing surveys, research reports and advertising and promotional material;

. . .

Section III(A) of your Agreement contains a non-compete provision stating that you "shall not directly or indirectly own, manage, operate, control, be employed by, consult with or participate in the ownership, management operation or control of any business in a manner that would reasonably be expected to divert business from any of the Company's 'Clients' or 'Prospective Clients' . . . with whom [you] had any involvement in developing, servicing, soliciting, or maintaining during the year prior to [your] termination." Agreement § III(A)(2). That same Section also contains a non-solicitation provision providing that you shall not directly or indirectly engage in "the solicitation, hiring, or engagement of any person or entity who is, at the time, or was within the last 12 months of [your] employment with the Company, an employee, consultant, or independent contractor of the Company or any of its affiliates. . ." *Id.* § III(B). Further, the non-solicitation prohibition prevents you from directly or indirectly engaging in conduct that would result in you "contact[ing], call[ing] upon, solicit[ing] or otherwise accept[ing business from, render services to, market services or products to, divert business from, and/or interfere with the Company's relationship or business with any of the Company's existing Clients or Prospective Clients (as that term is defined above) . . ." *Id.*

The above covenants are in addition to obligations imposed by law, including under the Defend Trade Secrets Act and similar state statutes prohibiting the retention and misappropriation of the Company's trade secrets. WSP takes these restrictive covenants and the protection of its trade secrets very seriously and expects you to honor all applicable agreements and law. WSP will not hesitate to enforce its contractual and statutory legal rights and seek all available remedies, including an injunction, damages, and its attorneys' fees and costs.

We understand that you recently resigned your employment with the Company, and that your employment with the Company ended on December 22, 2023. We further understand that you have refused to disclose where you are going to work, but intend to start with a competitor of the Company formed by another former Company employee in violation of his own restrictive covenants.

In light of the circumstances of your resignation, please confirm immediately the return of all documents, property, and data belonging to WSP to WSP. This includes all electronically stored information stored on a personal device, cloud storage accounts, or USB drive. This also includes,

December 29, 2023
Page 3

for example, (1) company-generated list of your multi-state Professional Engineer status; (2) your kWMCE professional resume; (3) the professional photograph(s) provided by the Company; (4) all reference materials, including physical books or audiobooks, paid for by the Company; and (5) professional contact list(s).

We further demand that you send in writing by no later than January 2, 2024, a written letter or affidavit, along with a detailed description of, and production of all documents related to: (a) the name of your current employer; (b) your current title; (c) all documents related to and/or reflecting any current or prospective employment or business relationship with Stephen Coon and/or Gary Russinko and/or your prospective employer; (d) all documents reflecting your communications with any customers, consultants, suppliers, distributors, or other entities or relationships of the Company, and (e) written confirmation that you will preserve and not delete all documents and materials (including on your personal laptop and/or phone) related to your new prospective employment, solicitation of Company employees or customers, and/or plans to compete with the Company.

If you have any questions about your obligations, feel free to call me. If you are represented by legal counsel, please share this letter with your counsel and have them contact us.

Sincerely,

HOLLAND & KNIGHT LLP

Todd D. Wozniak

Enclosures

# RETENTION BONUS AGREEMENT

Pursuant to the terms and conditions set forth below, and in consideration of the benefits provided for herein, **kW Mission Critical Engineering, d.p.c.** (hereinafter the "**Company**") and **Jason Leone** (hereinafter "**Employee**" and, together with the Company, the "**Parties**") hereby enter into this Retention Bonus Agreement (hereinafter this "**Retention Agreement**").

## I.      Purpose of Retention Bonus

As a valued member of the organization, the purpose of the Retention Bonus is to recognize Employee's contribution to the Company, to incentivize Employee to remain with the Company for at least a period of two years (the "**Transition Period**") following the Closing Date, (defined as the effective date of the completion of the merger of the Company and WSP USA Buildings Inc. ("**WSP USA**"), in order to assist the Company with integration into WSP USA, and to protect the Company's employees and clients from being diverted away from the Company.

## II.      Consideration for Retention Agreement

Employee may be paid a Retention Bonus pursuant to the terms herein if:

(a) Employee remains employed and "in good standing" (as defined herein) by the Company (or its successor-in-interest) through the relevant dates in Section II(A)(1)(a) and/or (b) (each a "**Vesting Date**"; collectively, the "**Vesting Dates**") of this Retention Agreement; or

(b) Employee is terminated, without "**Cause**" (as defined herein), by the Company during the Transition Period. In such an event, Employee will be paid any remaining portion of the Retention Bonus within thirty (30) days of the termination date.

### A.   Retention Bonus

Employee shall be paid a total Retention Bonus of **$225,000**, less all applicable deductions required by law (the "**Retention Bonus**"), which Retention Bonus will be paid in two installments (spread out over two years), on the dates set forth under the below Schedule of Payments. In the event that Employee resigns, or is terminated for Cause, by the time either the First Payment or the Second Payment come due, the relevant portion will not be payable. For greater certainty, it is possible for Employee to have earned the First Payment, assuming the conditions for the First Payment were met, but not earn the Second Payment.

#### 1.   Schedule of Payments

##### a.   **First Payment**: The first payment of **$56,250**, less all deductions required by law, representing 25% of the Retention Bonus, will be paid to Employee via direct deposit or other acceptable means at the Company's discretion on the first payroll following December 30, 2021, so long as Employee

remains employed by Company or its successor-in-interest on December 30, 2021.

    **b. Second Payment:** The second and final payment of **$168,750**, less all deductions required by law, representing the remaining 75% of the Retention Bonus, will be paid via direct deposit or other acceptable means at the Company's discretion on the first payroll following December 30, 2022, so long as Employee remains employed by Company or its successor-in-interest on December 30, 2022.

## III.    Non-Competition and Non-Solicitation

As an incentive and as a specific condition for entering into this Retention Agreement, the Parties make, give, and agree to the following covenants respecting competition and solicitation:

    **A. Non-Compete:**

        1.    The Company is in a highly competitive business and expends a considerable amount of money in the development of business from new clients and customers and continued business from existing clients and customers. The business and clientele of the Company are national and worldwide in scope, and therefore the territorial and time limitations set forth in this Non-Compete clause are reasonable and necessary for the protection of the Company's interests.

        2.    During Employee's employment with the Company or its successor-in-interest and for a period of 12 months following the termination of Employee's employment for any reason (voluntary or involuntary), Employee shall not directly or indirectly own, manage, operate, control be employed by, consult with or participate in the ownership, management, operation or control of any business in a manner that would reasonably be expected to divert business from any of the Company's "**Clients**" or "**Prospective Clients**" (as defined herein) with whom Employee had any involvement in developing, servicing, soliciting, or maintaining during the year prior to Employee's termination.

        3.    "Clients" is defined as clients who the Company provided services for at any time during the 12-month period immediately preceding Employee's termination. "Prospective Clients" includes any person or entity: (a) to whom the Company has submitted qualifications or a proposal with Employee's direct personal involvement during the 12 months prior to Employee's termination; or (b) concerning whom Employee was assisting the Company in preparing a submittal of qualifications or a proposal at the time of Employee's termination.

    **B. Non-Solicitation of Employees, Consultants, and Contractors:** During Employee's employment with the Company or its successor-in-interest, and for a

period of 12 months following the termination of Employee's employment for any reason (voluntary or involuntary), Employee shall not directly or indirectly (on Employee's own or in combination or association with others, and whether for Employee's own benefit or for the benefit of other persons or entities) engage in activity which involves or could result in the actual or potential termination of the Company's relationship with or the solicitation, hiring, or engagement of any person or entity who is, at the time, or was within the last 12 months of Employee's employment within the Company, an employee, consultant, or independent contractor of the Company or any of its affiliates, including for greater certainty, any affiliate U.S. company of WSP USA ("**Affiliate**").

**C.** **Non-Solicitation of Clients:** During Employee's employment with the Company and for a period of 12 months following the termination of Employee's employment for any reason (voluntary or involuntary), Employee shall not directly or indirectly (on Employee's own or in combination or association with others, and whether for Employee's own benefit or for the benefit of other parties or entities) contact, call upon, solicit or otherwise accept business from, render services to, market services or products to, divert business from, and/or interfere with the Company's relationship or business with any of the Company's existing Clients or Prospective Clients (as that term is defined above) that Employee interacted with on behalf of the Company, was introduced to by virtue of Employee's employment with the Company, or otherwise learned confidential information concerning during the last 12 months of Employee's employment within the Company.

**D.** **Termination of Restrictive Covenants:** The above restrictive covenants terminate either within one year of the Employee's termination date or, if the Employee remains employed by the Company, within three years of the Closing Date, whichever is sooner.

## IV. General Terms and Conditions

**A.** Employee's obligations and rights of the Company shall extend to any parent corporation, subsidiaries and corporate affiliate companies, and to any of their successors, assignees and transferees.

**B.** For purposes of this Retention Agreement, "in good standing" means that the Employee does not have a written record of disciplinary action for violating the Company's Code of Conduct, or policies related to anti-harassment, non-discrimination, and non-retaliation.

**C.** For purposes of this Retention Agreement, the term "Cause" shall mean any of the following: (i) conviction of a crime (including conviction on a nolo contendere plea) involving the commission by Employee of a felony or of a criminal act involving, in the good faith judgment of the Company, fraud, dishonesty, or moral turpitude but excluding any conviction which results solely from Employee's title or position with the Company and is not based on

Employee's personal conduct; (ii) as determined by the Company in good faith, the failure to perform reasonably requested employment duties as required by the Company, as determined by the Company in good faith, after written notice from the Company of such failure to perform; (iii) fraud or embezzlement determined in accordance with the Company's normal investigative procedures consistently applied in comparable circumstances; (iv) gross misconduct or gross negligence in connection with the business of the Company or an Affiliate which has an adverse effect on the Company or the Affiliate, as determined by the Company in good faith; or (v) violation of the Company's written policies relating to equal employment, discrimination, harassment, retaliation, business conduct or other material Company policies.

**D.**  Employee acknowledges that: (i) unless stated otherwise in a written agreement executed by a representative of the Company, Employee's employment with the Company is at-will; accordingly, Employee may be terminated by the Company for any reason and in its sole discretion and Employee may terminate the employment relationship for any reason and in Employee's sole discretion; and (ii) Employee is to consult with and rely upon Employee's own tax, legal, and financial advisors regarding the consequences and risks of the Retention Bonus.

**E.**  This Retention Agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to its conflict of laws provision. The parties being desirous of having any disputes resolved in a forum having a substantial body of law and experience with the matters contained herein, agree that any action or proceeding with respect to this Agreement shall be brought exclusively in the Supreme Court of the State of New York, New York County, or in the United States District Court for the Southern District of New York or in any other court of competent jurisdiction sitting in the State of New York, New York County and the parties agree to the personal jurisdiction thereof

**F.**  The invalidity or unenforceability of any part or subpart of this Retention Agreement shall not affect the validity or enforceability of the remainder of the Retention Agreement. If any provision of this Agreement shall be held to be excessively broad as to time, geography, activity or other obligations, it shall be construed or reformed by limiting or reducing it, so as to be enforceable.

**G.**  This Retention Agreement supersedes any prior discussions, statements, representations, communications, whether oral or in writing, about its subject matter. This Retention Agreement reflects the full agreement with respect to its subject matter and can only be modified in a writing signed by Employee and an executive of the Company or its successor-in-interest.

The Parties knowingly and voluntarily sign this Retention Agreement as of the date(s) set forth below:

**kW Mission Critical Engineering, d.p.c.**

_____     Date:_____

**James Warren**

**Employee**

_____     Date: 12/28/2020

**Jason Leone**

**DiLudovico, Diane (PHL - X46879)**

| | |
|---|---|
| **From:** | TrackingUpdates@fedex.com |
| **Sent:** | Friday, December 29, 2023 2:10 PM |
| **To:** | DiLudovico, Diane (PHL - X46879) |
| **Subject:** | FedEx Shipment 788680498218: This shipment is scheduled to be sent |

*[External email]*



# You're getting a package!

A label was created and your package is preparing to be shipped. We'll
send the delivery date when we get your package from the shipper.

 The delivery date may be updated when FedEx receives the package.



**INITIATED**

**TRACKING NUMBER**    788680498218

**FROM**    Holland & Knight
1650 Market Street
STE 3300
Philadelphia, PA, US, 19103

**TO**    Jason Leone
Jason Leone

1

| | |
|---|---|
| **PURCHASE ORDER NUMBER** | 46080 |
| **REFERENCE** | 213614.00001 |
| **SHIPPER REFERENCE** | 213614.00001 |
| **PACKAGING TYPE** | FedEx Envelope |
| **ORIGIN** | Philadelphia, PA, 19103 |
| **DESTINATION** | LATHAM, NY, US, 12110 |
| **SPECIAL HANDLING** | Residential Delivery |
| **STANDARD TRANSIT** | Sat, 12/30/2023 by 1:30pm |
| **NUMBER OF PIECES** | 1 |
| **TOTAL SHIPMENT WEIGHT** | 0.50 LB |
| **SERVICE TYPE** | FedEx Priority Overnight |



# Notifications, from start to finish

Get push notifications when you pair FedEx Delivery Manager® with the FedEx® Mobile app. You can activate alerts in the app to track your package. Then listen for the virtual doorbell chime that lets you know your package was delivered.

**DOWNLOAD THE MOBILE APP**

**FOLLOW FEDEX**

      

✉ Please do not respond to this message. This email was sent from an unattended mailbox. This report was generated at approximately 1:10 PM CST 12/29/2023.

All weights are estimated.

To track the latest status of your shipment, click on the tracking number above.

Standard transit is the date and time the package is scheduled to be delivered by, based on the selected service, destination and ship date. Limitations and exceptions may apply. Please see the FedEx Service Guide for terms and conditions of service, including the FedEx Money-Back Guarantee, or contact your FedEx Customer Support representative.

© 2023 Federal Express Corporation. The content of this message is protected by copyright and trademark laws under U.S. and international law. Review our privacy policy. All rights reserved.

Thank you for your business.

**DiLudovico, Diane (PHL - X46879)**

| | |
|---|---|
| **From:** | TrackingUpdates@fedex.com |
| **Sent:** | Saturday, December 30, 2023 9:27 AM |
| **To:** | DiLudovico, Diane (PHL - X46879) |
| **Subject:** | FedEx Shipment 788680498218: Your package has been delivered |
| **Attachments:** | DeliveryPicture.jpeg |

*[External email]*



# Hi. Your package was delivered Sat, 12/30/2023 at 9:20am.



Delivered to ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

**OBTAIN PROOF OF DELIVERY**

1



Delivery picture not showing? <u>View</u> in browser.

# How was your delivery ?

   

| | |
|---|---|
| **TRACKING NUMBER** | <u>788680498218</u> |
| **FROM** | Holland & Knight |
| | 1650 Market Street |
| | STE 3300 |
| | Philadelphia, PA, US, 19103 |
| **TO** | Jason Leone |
| | Jason Leone |
| | ███████████████ |
| **PURCHASE ORDER NUMBER** | 46080 |
| **REFERENCE** | 213614.00001 |
| **SHIPPER REFERENCE** | 213614.00001 |
| **SHIP DATE** | Fri 12/29/2023 05:25 PM |
| **DELIVERED TO** | Residence |
| **PACKAGING TYPE** | FedEx Envelope |
| **ORIGIN** | Philadelphia, PA, US, 19103 |

| | |
|---|---|
| **DESTINATION** | LATHAM, NY, US, 12110 |
| **SPECIAL HANDLING** | Residential Delivery |
| **NUMBER OF PIECES** | 1 |
| **TOTAL SHIPMENT WEIGHT** | 0.50 LB |
| **SERVICE TYPE** | FedEx Priority Overnight |



# Notifications, from start to finish

Get push notifications when you pair FedEx Delivery Manager® with the FedEx® Mobile app. You can activate alerts in the app to track your package. Then listen for the virtual doorbell chime that lets you know your package was delivered.

**DOWNLOAD THE MOBILE APP**

**FOLLOW FEDEX**

      

✉ Please do not respond to this message. This email was sent from an unattended mailbox. This report was generated at approximately 8:27 AM CST 12/30/2023.

All weights are estimated.

To track the latest status of your shipment, click on the tracking number above.

Standard transit is the date and time the package is scheduled to be delivered by, based on the selected service, destination and ship date. Limitations and exceptions may apply. Please see

3

the FedEx Service Guide for terms and conditions of service, including the FedEx Money-Back Guarantee, or contact your FedEx Customer Support representative.

© 2023 Federal Express Corporation. The content of this message is protected by copyright and trademark laws under U.S. and international law. Review our [privacy policy](). All rights reserved.

Thank you for your business.

EXHIBIT I

# Holland & Knight

1180 West Peachtree Street, Suite 1800 | Atlanta, GA 30309 | T 404.817.8500 | F 404.881.0470
Holland & Knight LLP | www.hklaw.com

Todd D. Wozniak
+1 404-817-8431
Todd.Wozniak@hklaw.com

December 29, 2023

VIA OVERNIGHT MAIL

Gary Russinko

███████████████████

Gary.russinko@gmail.com

### Re:    POST-EMPLOYMENT RESTRICTIVE COVENANT REMINDER

Dear Mr. Russinko:

This law firm represents WSP USA Inc. and its subsidiaries and predecessor companies (the "Company") in connection with your post-employment restrictive covenants and confidentiality obligations to the Company (the "Agreement"). A copy of your Retention Agreement is enclosed for your convenience.

The agreements contain covenants related to non-competition and non-solicitation. These obligations apply both during and after your employment with the Company in accordance with their terms. Further, you agreed and reaffirmed in 2022 as part of your receipt of the Company's handbook that

> WSP is engaged in a highly competitive business and our competitive position depends upon our ability to maintain the confidentiality of the Confidential Information and trade secrets which WSP as an organization has an obligation to protect. Any unauthorized disclosure, release or use of any of WSP business information, Confidential Information or trade secrets, could be highly detrimental to the company. . .

You agreed that WSP's Confidential Information includes, but is not limited to:

> Financial and business information, such as information with respect to costs, commissions, fees, profits, sales, markets, mailing lists, strategies and plans for future business, new business, product or other development, potential acquisitions or divestitures, and new marketing ideas;

> Product and technical information, such as formulae, specifications, designs, drawings, component lists, databases, software (or pre-cursor documents),

Atlanta | Austin | Boston | Charlotte | Chicago | Dallas | Denver | Fort Lauderdale | Fort Worth | Houston
Jacksonville | Los Angeles | Miami | New York | Orange County | Orlando | Philadelphia | Portland
San Francisco | Stamford | Tallahassee | Tampa | Tysons | Washington, D.C. | West Palm Beach

December 29, 2023
Page 2

> manuals, instructions and catalogues held in any form relating to the production, creation, supply or provision of the products or services for the Company or any affiliate;
>
> Marketing information, such as information relating to the marketing or sales of any products or services of the Company and any affiliate, including without limitation, lists of customers and suppliers' names, addresses and contacts, sales targets and statistics, market share and pricing statistics, marketing surveys, research reports and advertising and promotional material;
>
> . . .

Section III(A) of your Agreement contains a non-compete provision stating that you "shall not directly or indirectly own, manage, operate, control, be employed by, consult with or participate in the ownership, management operation or control of any business in a manner that would reasonably be expected to divert business from any of the Company's 'Clients' or 'Prospective Clients' . . . with whom [you] had any involvement in developing, servicing, soliciting, or maintaining during the year prior to [your] termination." Agreement § III(A)(2). That same Section also contains a non-solicitation provision providing that you shall not directly or indirectly engage in "the solicitation, hiring, or engagement of any person or entity who is, at the time, or was within the last 12 months of [your] employment with the Company, an employee, consultant, or independent contractor of the Company or any of its affiliates. . ." *Id.* § III(B). Further, the non-solicitation prohibition prevents you from directly or indirectly engaging in conduct that would result in you "contact[ing], call[ing] upon, solicit[ing] or otherwise accept[ing business from, render services to, market services or products to, divert business from, and/or interfere with the Company's relationship or business with any of the Company's existing Clients or Prospective Clients (as that term is defined above) . . ." *Id.*

The above covenants are in addition to obligations imposed by law, including under the Defend Trade Secrets Act and similar state statutes prohibiting the retention and misappropriation of the Company's trade secrets. WSP takes these restrictive covenants and the protection of its trade secrets very seriously and expects you to honor all applicable agreements and law. WSP will not hesitate to enforce its contractual and statutory legal rights and seek all available remedies, including an injunction, damages, and its attorneys' fees and costs.

We understand that you recently resigned your employment with the Company, and that your employment with the Company ended on December 1, 2023. We further understand that you have refused to disclose where you are going to work, but intend to start with a competitor of the Company formed by another former Company employee in violation of his own restrictive covenants.

In light of the circumstances of your resignation, please confirm immediately the return of all documents, property, and data belonging to WSP to WSP. This includes all electronically stored information stored on a personal device, cloud storage accounts, or USB drive. This also includes,

December 29, 2023
Page 3

for example, (1) company-generated list of your multi-state Professional Engineer status; (2) your kWMCE professional resume; (3) the professional photograph(s) provided by the Company; (4) all reference materials, including physical books or audiobooks, paid for by the Company; and (5) professional contact list(s).

We further demand that you send in writing by no later than January 2, 2024, a written letter or affidavit, along with a detailed description of, and production of all documents related to: (a) the name of your current employer; (b) your current title; (c) all documents related to and/or reflecting any current or prospective employment or business relationship with Stephen Coon and/or Jason Leone and/or your prospective employer; (d) all documents reflecting your communications with any customers, consultants, suppliers, distributors, or other entities or relationships of the Company, and (e) written confirmation that you will preserve and not delete all documents and materials (including on your personal laptop and/or phone) related to your new prospective employment, solicitation of Company employees or customers, and/or plans to compete with the Company.

If you have any questions about your obligations, feel free to call me. If you are represented by legal counsel, please share this letter with your counsel and have them contact us.

Sincerely,

HOLLAND & KNIGHT LLP

Todd Wgn

Todd D. Wozniak

Enclosures

# RETENTION BONUS AGREEMENT

Pursuant to the terms and conditions set forth below, and in consideration of the benefits provided for herein, **kW Mission Critical Engineering, d.p.c.** (hereinafter the "**Company**") and **Gary Russinko** (hereinafter "**Employee**" and, together with the Company, the "**Parties**") hereby enter into this Retention Bonus Agreement (hereinafter this "**Retention Agreement**").

## I.      Purpose of Retention Bonus

As a valued member of the organization, the purpose of the Retention Bonus is to recognize Employee's contribution to the Company, to incentivize Employee to remain with the Company for at least a period of two years (the "**Transition Period**") following the Closing Date, (defined as the effective date of the completion of the merger of the Company and WSP USA Buildings Inc. ("**WSP USA**"), in order to assist the Company with integration into WSP USA, and to protect the Company's employees and clients from being diverted away from the Company.

## II.      Consideration for Retention Agreement

Employee may be paid a Retention Bonus pursuant to the terms herein if:

(a) Employee remains employed and "in good standing" (as defined herein) by the Company (or its successor-in-interest) through the relevant dates in Section II(A)(1)(a) and/or (b) (each a "**Vesting Date**"; collectively, the "**Vesting Dates**") of this Retention Agreement; or

(b) Employee is terminated, without "**Cause**" (as defined herein), by the Company during the Transition Period. In such an event, Employee will be paid any remaining portion of the Retention Bonus within thirty (30) days of the termination date.

### A.   Retention Bonus

Employee shall be paid a total Retention Bonus of **$330,000**, less all applicable deductions required by law (the "**Retention Bonus**"), which Retention Bonus will be paid in two installments (spread out over two years), on the dates set forth under the below Schedule of Payments. In the event that Employee resigns, or is terminated for Cause, by the time either the First Payment or the Second Payment come due, the relevant portion will not be payable. For greater certainty, it is possible for Employee to have earned the First Payment, assuming the conditions for the First Payment were met, but not earn the Second Payment.

#### 1.   Schedule of Payments

##### a.   **First Payment**: The first payment of **$82,500**, less all deductions required by law, representing 25% of the Retention Bonus, will be paid to Employee via direct deposit or other acceptable means at the Company's discretion on the first payroll following December 30, 2021, so long as Employee

remains employed by Company or its successor-in-interest on December 30, 2021.

    **b. Second Payment:** The second and final payment of **$247,500**, less all deductions required by law, representing the remaining 75% of the Retention Bonus, will be paid via direct deposit or other acceptable means at the Company's discretion on the first payroll following December 30, 2022, so long as Employee remains employed by Company or its successor-in-interest on December 30, 2022.

## III.    Non-Competition and Non-Solicitation

As an incentive and as a specific condition for entering into this Retention Agreement, the Parties make, give, and agree to the following covenants respecting competition and solicitation:

    **A. Non-Compete:**

      1. The Company is in a highly competitive business and expends a considerable amount of money in the development of business from new clients and customers and continued business from existing clients and customers. The business and clientele of the Company are national and worldwide in scope, and therefore the territorial and time limitations set forth in this Non-Compete clause are reasonable and necessary for the protection of the Company's interests.

      2. During Employee's employment with the Company or its successor-in-interest and for a period of 12 months following the termination of Employee's employment for any reason (voluntary or involuntary), Employee shall not directly or indirectly own, manage, operate, control be employed by, consult with or participate in the ownership, management, operation or control of any business in a manner that would reasonably be expected to divert business from any of the Company's "**Clients**" or "**Prospective Clients**" (as defined herein) with whom Employee had any involvement in developing, servicing, soliciting, or maintaining during the year prior to Employee's termination.

      3. "Clients" is defined as clients who the Company provided services for at any time during the 12-month period immediately preceding Employee's termination. "Prospective Clients" includes any person or entity: (a) to whom the Company has submitted qualifications or a proposal with Employee's direct personal involvement during the 12 months prior to Employee's termination; or (b) concerning whom Employee was assisting the Company in preparing a submittal of qualifications or a proposal at the time of Employee's termination.

    **B. Non-Solicitation of Employees, Consultants, and Contractors:** During Employee's employment with the Company or its successor-in-interest, and for a

2

period of 12 months following the termination of Employee's employment for any reason (voluntary or involuntary), Employee shall not directly or indirectly (on Employee's own or in combination or association with others, and whether for Employee's own benefit or for the benefit of other persons or entities) engage in activity which involves or could result in the actual or potential termination of the Company's relationship with or the solicitation, hiring, or engagement of any person or entity who is, at the time, or was within the last 12 months of Employee's employment within the Company, an employee, consultant, or independent contractor of the Company or any of its affiliates, including for greater certainty, any affiliate U.S. company of WSP USA ("**Affiliate**").

C. **Non-Solicitation of Clients:** During Employee's employment with the Company and for a period of 12 months following the termination of Employee's employment for any reason (voluntary or involuntary), Employee shall not directly or indirectly (on Employee's own or in combination or association with others, and whether for Employee's own benefit or for the benefit of other parties or entities) contact, call upon, solicit or otherwise accept business from, render services to, market services or products to, divert business from, and/or interfere with the Company's relationship or business with any of the Company's existing Clients or Prospective Clients (as that term is defined above) that Employee interacted with on behalf of the Company, was introduced to by virtue of Employee's employment with the Company, or otherwise learned confidential information concerning during the last 12 months of Employee's employment within the Company.

D. **Termination of Restrictive Covenants:** The above restrictive covenants terminate either within one year of the Employee's termination date or, if the Employee remains employed by the Company, within three years of the Closing Date, whichever is sooner.

## IV.  General Terms and Conditions

A. Employee's obligations and rights of the Company shall extend to any parent corporation, subsidiaries and corporate affiliate companies, and to any of their successors, assignees and transferees.

B. For purposes of this Retention Agreement, "in good standing" means that the Employee does not have a written record of disciplinary action for violating the Company's Code of Conduct, or policies related to anti-harassment, non-discrimination, and non-retaliation.

C. For purposes of this Retention Agreement, the term "Cause" shall mean any of the following: (i) conviction of a crime (including conviction on a nolo contendere plea) involving the commission by Employee of a felony or of a criminal act involving, in the good faith judgment of the Company, fraud, dishonesty, or moral turpitude but excluding any conviction which results solely from Employee's title or position with the Company and is not based on

3

Employee's personal conduct; (ii) as determined by the Company in good faith, the failure to perform reasonably requested employment duties as required by the Company, as determined by the Company in good faith, after written notice from the Company of such failure to perform; (iii) fraud or embezzlement determined in accordance with the Company's normal investigative procedures consistently applied in comparable circumstances; (iv) gross misconduct or gross negligence in connection with the business of the Company or an Affiliate which has an adverse effect on the Company or the Affiliate, as determined by the Company in good faith; or (v) violation of the Company's written policies relating to equal employment, discrimination, harassment, retaliation, business conduct or other material Company policies.

**D.** Employee acknowledges that: (i) unless stated otherwise in a written agreement executed by a representative of the Company, Employee's employment with the Company is at-will; accordingly, Employee may be terminated by the Company for any reason and in its sole discretion and Employee may terminate the employment relationship for any reason and in Employee's sole discretion; and (ii) Employee is to consult with and rely upon Employee's own tax, legal, and financial advisors regarding the consequences and risks of the Retention Bonus.

**E.** This Retention Agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to its conflict of laws provision. The parties being desirous of having any disputes resolved in a forum having a substantial body of law and experience with the matters contained herein, agree that any action or proceeding with respect to this Agreement shall be brought exclusively in the Supreme Court of the State of New York, New York County, or in the United States District Court for the Southern District of New York or in any other court of competent jurisdiction sitting in the State of New York, New York County and the parties agree to the personal jurisdiction thereof

**F.** The invalidity or unenforceability of any part or subpart of this Retention Agreement shall not affect the validity or enforceability of the remainder of the Retention Agreement. If any provision of this Agreement shall be held to be excessively broad as to time, geography, activity or other obligations, it shall be construed or reformed by limiting or reducing it, so as to be enforceable.

**G.** This Retention Agreement supersedes any prior discussions, statements, representations, communications, whether oral or in writing, about its subject matter. This Retention Agreement reflects the full agreement with respect to its subject matter and can only be modified in a writing signed by Employee and an executive of the Company or its successor-in-interest.

The Parties knowingly and voluntarily sign this Retention Agreement as of the date(s) set forth below:

**kW Mission Critical Engineering, d.p.c.**

_____        Date:_____
**James Warren**


**Employee**


_____        Date:_____
**Gary Russinko**

**DiLudovico, Diane (PHL - X46879)**

| | |
|---|---|
| **From:** | TrackingUpdates@fedex.com |
| **Sent:** | Friday, December 29, 2023 2:11 PM |
| **To:** | DiLudovico, Diane (PHL - X46879) |
| **Subject:** | FedEx Shipment 788680622080: This shipment is scheduled to be sent |

*[External email]*



# You're getting a package!

A label was created and your package is preparing to be shipped. We'll
send the delivery date when we get your package from the shipper.

 The delivery date may be updated when FedEx receives the package.



**INITIATED**

| | |
|---|---|
| **TRACKING NUMBER** | 788680622080 |
| **FROM** | Holland & Knight |
| | 1650 Market Street |
| | STE 3300 |
| | Philadelphia, PA, US, 19103 |
| **TO** | Gary Rusinko |
| | Gary Rusinko |

1

| | |
|---|---|
| **PURCHASE ORDER NUMBER** | 46080 |
| **REFERENCE** | 213614.00001 |
| **SHIPPER REFERENCE** | 213614.00001 |
| **PACKAGING TYPE** | FedEx Envelope |
| **ORIGIN** | Philadelphia, PA, 19103 |
| **DESTINATION** | REXFORD, NY, US, 12148 |
| **SPECIAL HANDLING** | Residential Delivery |
| **STANDARD TRANSIT** | Sat, 12/30/2023 by 1:30pm |
| **NUMBER OF PIECES** | 1 |
| **TOTAL SHIPMENT WEIGHT** | 0.50 LB |
| **SERVICE TYPE** | FedEx Priority Overnight |



# Notifications, from start to finish

Get push notifications when you pair FedEx Delivery Manager® with the FedEx® Mobile app. You can activate alerts in the app to track your package. Then listen for the virtual doorbell chime that lets you know your package was delivered.

**DOWNLOAD THE MOBILE APP**

FOLLOW FEDEX

      

✉ Please do not respond to this message. This email was sent from an unattended mailbox. This report was generated at approximately 1:11 PM CST 12/29/2023.

All weights are estimated.

To track the latest status of your shipment, click on the tracking number above.

Standard transit is the date and time the package is scheduled to be delivered by, based on the selected service, destination and ship date. Limitations and exceptions may apply. Please see the FedEx Service Guide for terms and conditions of service, including the FedEx Money-Back Guarantee, or contact your FedEx Customer Support representative.

© 2023 Federal Express Corporation. The content of this message is protected by copyright and trademark laws under U.S. and international law. Review our privacy policy. All rights reserved.

Thank you for your business.

**DiLudovico, Diane (PHL - X46879)**

| | |
|---|---|
| **From:** | TrackingUpdates@fedex.com |
| **Sent:** | Saturday, December 30, 2023 9:46 AM |
| **To:** | DiLudovico, Diane (PHL - X46879) |
| **Subject:** | FedEx Shipment 788680622080: Your package has been delivered |

*[External email]*



# Hi. Your package was delivered Sat, 12/30/2023 at 9:38am.



Delivered to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**OBTAIN PROOF OF DELIVERY**

## How was your delivery ?



**TRACKING NUMBER**     788680622080

1

|         |                          |
|---------|--------------------------|
| **FROM** | Holland & Knight        |
|         | 1650 Market Street       |
|         | STE 3300                 |
|         | Philadelphia, PA, US, 19103 |
| **TO**  | Gary Rusinko             |
|         | Gary Rusinko             |

| | |
|---|---|
| **PURCHASE ORDER NUMBER** | 46080 |
| **REFERENCE** | 213614.00001 |
| **SHIPPER REFERENCE** | 213614.00001 |
| **SHIP DATE** | Fri 12/29/2023 05:25 PM |
| **DELIVERED TO** | Residence |
| **PACKAGING TYPE** | FedEx Envelope |
| **ORIGIN** | Philadelphia, PA, US, 19103 |
| **DESTINATION** | REXFORD, NY, US, 12148 |
| **SPECIAL HANDLING** | Residential Delivery |
| **NUMBER OF PIECES** | 1 |
| **TOTAL SHIPMENT WEIGHT** | 0.50 LB |
| **SERVICE TYPE** | FedEx Priority Overnight |



# Notifications, from start to finish

Get push notifications when you pair FedEx Delivery Manager® with the FedEx® Mobile app. You can activate alerts in the app to track your package. Then listen for the virtual doorbell chime that lets you know your package was delivered.

**DOWNLOAD THE MOBILE APP**

**FOLLOW FEDEX**



✉ Please do not respond to this message. This email was sent from an unattended mailbox. This report was generated at approximately 8:45 AM CST 12/30/2023.

All weights are estimated.

To track the latest status of your shipment, click on the tracking number above.

Standard transit is the date and time the package is scheduled to be delivered by, based on the selected service, destination and ship date. Limitations and exceptions may apply. Please see the FedEx Service Guide for terms and conditions of service, including the FedEx Money-Back Guarantee, or contact your FedEx Customer Support representative.

© 2023 Federal Express Corporation. The content of this message is protected by copyright and trademark laws under U.S. and international law. Review our privacy policy. All rights reserved.

Thank you for your business.

EXHIBIT J

To ensure your demand is processed promptly, please file online at www.adr.org/support. Complete this form, provide last known email addresses and include a copy of the Arbitration Agreement, Plan or Contract.

## Parties (Claimant)

Name of Claimant:  WSP USA, Inc.

Address:  5170 Peachtree Road Building 100, Suite 300

| City:  Atlanta | State:  Georgia | Zip Code:  30341 |
|---|---|---|

| Phone No.:  (404) 237-2115 | Email Address:  katie.ganz@wsp.com |
|---|---|

Representative's Name (if known):  Nipun Patel, Justin Kadoura

Firm (if applicable):  Holland & Knight, LLP

Representative's Address:  1650 Market Street Suite 3300

| City:  Philadelphia | State:  Pennsylvania | Zip Code:  19103 |
|---|---|---|

| Phone No.:  (215)252-9527 | Email Address:  nipun.patel@hklaw.com |
|---|---|

## Parties (Respondent)

Name of Respondent:  Stephen Coon

Address:  5533 E via Caballo Blanco

| City:  Cave Creek | State:  Arizona | Zip Code:  85331 |
|---|---|---|

| Phone No.:  (518) 852-6793 | Email Address:  coon1986@gmail.com |
|---|---|

Representative's Name (if known):

Firm (if applicable):

Representative's Address:

| City: | State: Select... | Zip Code: |
|---|---|---|
| Phone No.: | Email Address: | |

**Mediation:** If you would like the AAA to contact the other parties and attempt to arrange mediation, please check this box ☑.

Claim: What was/is the employee/worker's annual wage range? ☐ Less than $100,000  ☑ $100,000-$250,000  ☐ Over $250,000
*Note: This question is required by California law.*

Amount of Claim:  at least $475,000 plus interest, damages for lost profits, unjust enrichment, disgorgement, and exemplary damages

Claim involves:  ☑ Statutorily Protected Rights  ☑ Non-Statutorily Protected Rights

In detail, please describe the nature of each claim. You may attach additional pages if necessary:

See attached request for interim relief and discovery for relevant allegations and claims. Formal Arbitration Complaint forthcoming.



| Other Relief Sought: ☑ Attorneys Fees  ☐ Interest  ☑ Arbitration Costs  ☐ Punitive/ Exemplary |
|---|
| ☐ Other: |

| Please describe the qualifications for arbitrator(s) to hear this dispute: |
|---|
| Respondent's employment agreement provides that any dispute arising between him and WSP "shall be submitted to binding arbitration before the American Arbitration Association." |

| Hearing: Estimated time needed for hearings overall: | hours or 3 | days |
|---|---|---|

| Hearing Locale: New York |
|---|
| *(check one)* ☐ Requested by Claimant  ☑ Locale provision included in the contract |

| Filing Fee requirement or $350 (max amount per AAA) |
|---|
| Filing by Company: ☑ $2,450 single arbitrator  ☐ $3,050 three arbitrator panel |

| Notice: To begin proceedings, **please file online at www.adr.org/fileonline.** You will need to upload a copy of this Demand and the Arbitration Agreement, and pay the appropriate fee. |
|---|

| Signature (may be signed by a representative): | Date: |
|---|---|
| /s/ Nipun Patel | 1/2/2024 |

Pursuant to Section 1284.3 of the California Code of Civil Procedure, consumers with a gross monthly income of less than 300% of the federal poverty guidelines are entitled to a waiver of arbitration fees and costs, exclusive of arbitrator fees. This law applies to all consumer agreements subject to the California Arbitration Act, and to all consumer arbitrations conducted in California. Only those disputes arising out of employer plans are included in the consumer definition. If you believe that you meet these requirements, you must submit to the AAA a declaration under oath regarding your monthly income and the number of persons in your household. Please contact the AAA's Western Case Management Center at 1-800-778-7879. If you have any questions regarding the waiver of administrative fees, AAA Customer Service can be reached at 1-800-778-7879. Please visit our website at www.adr.org/support to file this case online.

**BEFORE
THE AMERICAN ARBITRATION ASSOCIATION**

| | | |
|---|---|---|
| WSP USA, Inc., | ) | |
| | ) | |
| Claimant, | ) | |
| | ) | |
| v. | ) | C.A. No. |
| | ) | |
| STEPHEN COON, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

---

## WSP USA, INC'S MOTION FOR EMERGENCY INTERIM RELIEF

---

Claimant WSP USA, Inc. ("WSP"), by and through undersigned counsel, hereby moves for interim relief in the form of the appointment of an emergency arbitrator, a temporary injunction, and expedited initial discovery, pursuant to the Optional Rules for Emergency Measures of Protection of the AAA's Employment Arbitration Rules and Mediation Procedures.

## <u>INTRODUCTION</u>

This action arises out of Stephen Coon's breach of the duty of loyalty and violations of restrictive covenants in his employment agreements with WSP. In 2020, WSP acquired kW Mission Critical Engineering ("kW MCE"), a data-center design and mission-critical engineering firm. As part of that acquisition, kW MCE's senior leadership, including Coon, signed employment agreements that prohibited them from competing with WSP or soliciting its employees or vendors until at least one year after their departure from kW MCE for any reason. Nonetheless, Coon resigned from WSP in October 2023 for the specific purpose of starting a competing business—a fact he openly admitted to colleagues. On his way out and since the time

of his resignation, it appears Coon followed through, soliciting several current WSP employees to work for him in recent weeks, two of which resigned in December (likely in violation of their own restrictive covenants) in close succession without revealing their new employer. Having siphoned off this key team of former WSP employees, Coon will imminently begin competing with WSP for the very same customers that Coon was entrusted with servicing using kW MCE's proprietary, confidential, and trade secret business information and strategies. Coon bragged that he already has a potential buyer for his new business after it is scaled up to $25MM in annual recurring revenue. Furthermore, WSP recently received information from design partners suggesting that Coon is soliciting competitive work from kW MCE's existing customers, and is likely to solicit/target four other key employees to execute his business plans.

AAA should appoint an emergency arbitrator to enjoin Coon from further improperly competing with WSP in clear violation of his employment agreement, and to prevent irreparable harm to WSP's business, impairment of its customer goodwill, and misappropriation of WSP's confidential and trade secret business information. WSP paid Coon substantial amounts of consideration in exchange for the post-employment covenants he voluntarily agreed-to, and will be irreparably harmed, both through the loss of its competitive advantage and through the lost good will that it specifically acquired as part of its purchase of kW MCE. The emergency arbitrator should also order limited expedited discovery to allow WSP to further support its requested relief.

## **BACKGROUND**

### I.      **WSP Acquires kW Mission Critical Engineering.**

In December 2020, WSP acquired kW MCE, a small (then approximately 175 employee) engineering firm that focused primarily on designing data centers and other mission-critical projects. (Decl. of Kenneth Clausen ¶ 4, attached hereto as Ex. A.) The acquisition closed on

December 30, 2020.  (*Id.* ¶ 5.)  As part of the acquisition, kW MCE's senior leadership team and key employees, including Coon, signed employment agreements and retention agreements containing restrictive covenants that prohibited them from competing with WSP, soliciting its employees, customers, or vendors, or sharing its trade secrets or confidential information.  (Ex. B at 6–8.)

## II.        Coon Agreed to Be Bound by Restrictive Covenants.

Coon worked for kW MCE for approximately eight years before the acquisition and entered an Employment Agreement with WSP on December 30, 2020, as a Professional Electrical Engineer and Managing Principal of the Phoenix Office.  (Ex. A ¶¶ 6–7 .)  Coon was responsible for providing technical engineering expertise and developing successful relationships with design team partners—architects, engineers, and contractors.  (*Id.* ¶ 11.)  Coon gained substantial experience and insight into kW MCE's data center business, and had key responsibilities for leadership of key client accounts and projects associated with data center program design and build out.  (*Id.* ¶ 12.)  Coon also gained knowledge about all aspects of kW MCE's customers' programs, including schedule, budget, risk and desired engineering team.  (*Id.* ¶ 13.)

Mr. Coon's Employment Agreement provided for a $200,000 a year base salary, benefits, and potential performance bonuses.  (Ex. B at 2.)  In exchange for this compensation, Coon agreed "not directly or indirectly [to] own, manage, operate, control, be employed by, consult with or participate in the ownership, management operation or control of any business in a manner that would reasonably be expected to divert business from any of the Company's 'Clients' or 'Prospective Clients' with whom [he] had any involvement in developing, servicing, soliciting, or maintaining during the year prior to [his] termination."  (*Id.* at 7.)  The Employment Agreement also prohibits Coon from engaging in "the solicitation, hiring, or engagement of any person or

entity who is, at the time, or was within the last 12 months of [his] employment with the Company, an employee, consultant, or independent contractor of the Company or any of its affiliates." (*Id.* at 8.) And the Employment Agreement provides that Coon "shall not . . . contact, call upon, solicit or otherwise accept business from, render services to, market services or products to, divert business from, and/or interfere with the Company's relationship or business with any of the Company's existing Clients or Prospective Clients" that he learned of, did work for, or learned confidential information about through WSP. (*Id.*)

These restrictive covenants are essential to ensuring that WSP receives the benefit of the bargain from the kW MCE acquisition, including kW MCE's good will. The data-center design business is extremely competitive, with each company's ability to compete largely dependent on, *inter alia*, (1) its ability to understand and accommodate a client's needs, and (2) the quality and reputation of its specific engineers. (Ex. A ¶ 31.) Competition from former kW MCE/WSP employees—and especially high-level employees like Coon, who is equipped with recent knowledge of kW MCE and WSP customers' preferences for, *inter alia*, engineering team organization and operation patterns—would thus be devastating for WSP. (*Id.* ¶¶ 33–34.) Accordingly, the Employment Agreement provides that the restrictive covenants will remain in place not only during Coon's employment by WSP, but also for another twelve months after he leaves or is terminated by WSP. (*See* Ex. B at 6–8.) The only exception is if Coon does not renew the Employment Agreement after the first two-year Term—and thus "convert[s] to an at-will employee" at the end of the Term, (*id.* at 2)—and "remains employed with [WSP] one year after converting to an at-will employee," at which point the restrictive covenants would expire at the end of that one year period. (*Id.* at 10.) In further recognition of the importance of the restrictive covenants, the Employment Agreement also provides, and Coon agreed, that "[t]he Company is in

4

a highly competitive business and expends considerable amounts of money in the development of business from new clients and customers and continued business from existing clients and customers. The business and clientele of the Company are national and worldwide in scope, and therefore the territorial and time limitations set forth in th[e] Non-Compete clause are reasonable and necessary for the protection of the Company's interests." (*Id.* at 7.)

Additionally, many employees, including Coon, also signed retention bonus agreements ("RBA") that reaffirmed their restrictive covenants in exchange for substantial cash bonuses "to incentivize [them] to remain with [kW MCE] . . . in order to assist [kW MCE] with integration into WSP." (Ex. C at 1.) Specifically, Coon executed the RBA on December 29, 2020, the day before signing his Employment Agreement. WSP paid Coon $475,000 over the course of two years pursuant to his RBA, in addition to his compensation under the Employment Agreement. (*Id.* at 1–2.)

## III.        Coon Violates the Restrictive Covenants.

On November 2, 2022, Coon gave notice that he would not renew the Employment Agreement, making him an at-will employee as of December 30, 2022. (Ex. D.) Coon did not, however, remain with WSP for a year after that date, as required by the Employment Agreement to excuse him from the 12-month tail in the restrictive covenants. (Ex. A ¶¶ 15, 17.) Instead, he tendered his resignation on October 18, 2023, effective "sometime between two and four weeks from today." (Ex. E.) His actual last day was November 3, 2023. (Ex. A ¶ 19.) Accordingly, the non-compete and non-solicitation provisions of his Employment Agreement are still in effect until November 3, 2024.

Nonetheless, Coon has already begun forming a competing business in Arizona (where he lives) and upstate New York (where much of kW MCE was located), likely intending to take

advantage of the exploding demand for data centers because of the growth of AI software and applications.  Since his resignation (and likely earlier), Coon has solicited several former kW MCE/WSP employees—including at least Principal Mechanical Engineer Jason Leone and Managing Principal of the Troy Office Gary Russinko, who are each subject to their own restrictive covenants with WSP, (Exs. F & G)—to join him.  (Ex. A ¶¶ 24–30.)   Russinko resigned from WSP on October 30, 2023, with his last day being December 1.  (*Id.*)   Leone followed close behind, resigning on December 5, 2023, with his last day being December 22..  (*Id.*)  Prior to his resignation, Coon openly admitted to a co-worker, Mr. Ken Clausen, that he was starting a competing business in Phoenix and upstate New York, near kW MCE's Troy, New York office, and had a lease ready to be executed in January of 2024.  (*Id.* ¶ 20.)  Coon also told Clausen he was "going to be taking anyone in Troy who had not signed a retention agreement," and acknowledged that he needed kW MCE's MEP engineers to deliver on competitive services to the very clients Coon was responsible for servicing at kW MCE.  (*Id.* ¶ 21.)  By recruiting those experienced mechanical engineers, Coon openly touted he could start a business that could compete directly with WSP.  (*Id.* ¶ 22.)  He also bragged that a member of the C-suite of another company, Bowman Engineering, already planned to pay him to buy the new business once it was scaled up to $25MM in annual revenue.  (*Id.* ¶ 23.)  Based on Coon's prior comments to Clausen, he is likely to target at least four other key kW MCE employees in early 2024, if he has not already done so.  (*Id.* ¶ 34.)  Design partners have also suggested in recent weeks to Clausen that Coon is soliciting competitive work from kW MCE's existing customers.  (*Id.* ¶ 35.)

Together, Coon and the employees he has recruited to compete against kW MCE have the potential to inflict substantial harm to WSP's business.  The key accounts that Coon was responsible for servicing have the potential to generate the tens of millions of dollars for FY 2024

and beyond.  (*Id.* ¶ 32.)  Further, Coon has in-depth knowledge of customer preferences, pricing, desired team, project specifications, engineering specifications and kW MCE's existing and past work for those key customers.  (*Id.* ¶ 33.)

On October 25, 2023, WSP's counsel sent Coon a letter, reminding him of his obligations under the restrictive covenants and addressing questions Coon asked in his resignation letter regarding which items/information he could keep and what had to be returned to WSP.  (Ex. H.) On December 29, 2023, WSP's counsel sent similar letters to Messrs. Leone and Russinko.  (Exs. I & J.)  Nonetheless, Coon seems undeterred, and neither Coon, Leone, or Russinko have divulged or disclosed where they intend to work after leaving WSP/kW MCE.  Accordingly, on January 2, 2024, WSP filed its Demand for Arbitration against Coon pursuant to § 17(a) of the Employment Agreement, asserting claims for breach of fiduciary duty, breach of contract, and tortious interference with contract.  WSP now moves for interim relief and expedited initial discovery.

## **LEGAL STANDARDS**[1]

The AAA's Emergency Rule O-4 provides that emergency interim relief is proper where "the party seeking the emergency relief has shown that immediate and irreparable loss or damage will result in the absence of emergency relief, and that such party is entitled to such relief." Similarly, New York law allows an employer to seek a preliminary injunction to enforce restrictive covenants where the claimant "show[s] a probability of success on the merits, the danger of

---

[1]     Coon's Employment Agreement provides that "[a]ny dispute arising between any of the Company and [Coon] under this Agreement, or under any statute, regulation, or ordinance, or in connection with [Coon's] Employment with the Company, shall be submitted to binding arbitration before the American Arbitration Association ("AAA") for resolution."  (Ex. B at 11.) It further provides that the arbitration proceedings will be governed by New York law and "conducted in accordance with AAA's Employment Arbitration Rules and Procedures."  *Id.*  And it provides "that in the event of a breach of any provision of this Agreement, money damages would be inadequate and neither [Mr.Coon] nor the Company would have an adequate remedy at law" and that injunctive relief is appropriate.  *Id.*

irreparable injury in the absence of a preliminary injunction and a balancing of the equities in its favor." *Frank May Assocs. Inc. v. Boughton*, 281 A.D.2d 673, 674 (N.Y. S. Ct. App. Div. 2001). "[T]he purpose of a preliminary injunction is to preserve the status quo until a decision is reached on the merits." *NYSARC, Inc. v. Syed*, 747 N.Y.S.2d 327, 329 (N.Y. S. Ct. 2002).

## ARGUMENT

Coon violated his duty of loyalty and his restrictive covenants by planning to start a competing business while still employed at WSP and soliciting WSP's other employees to join him. If he is permitted to begin competing with WSP, he will not only further violate his restrictive covenants, but WSP will also be irreparably harmed through the loss of its competitive position, the threatened and/or actual disclosure and misuse of its confidential information and trade secrets, and the impairment of kW MCE's business and customer good will for which WSP specifically bargained. Moreover, WSP requires expedited initial discovery on specific, targeted issues to determine the extent of the violations and Coon's plans for his competing business so that it can provide additional evidentiary support for continuing injunctive relief.

**I.      WSP Is Entitled to Emergency Interim Relief.**

**A.      WSP Is Likely to Succeed on the Merits of Its Breach-of-Contract Claims.**

To establish breach of contract, a claimant must show "the existence of a contract, the [claimant's] performance pursuant to the contract, the defendant's breach of his or her contractual obligations, and damages resulting from the breach." *Tri-Star Lighting Corp. v. Goldstein*, 151 A.D.3d 112, 1105 (N.Y. App. Div. 2017). Here, Coon breached his Employment Agreement by failing to abide by the restrictive covenants.

**i.      The Restrictive Covenants Are Enforceable.**

8

The Employment Agreement, including the restrictive covenants, is a valid and enforceable contract. "Generally, a covenant not to compete will be enforced . . . if it is reasonably limited temporarily and geographically and, without being harmful to the public or unduly burdensome, serves the acceptable purpose of protecting the former employer from unfair competition." *Bollengier v. Gulati*, 233 A.D.2d 721, 722 (N.Y. App. Div. 1996). Moreover, "[c]ourts will enforce noncompetition clauses 'where necessary to protect, *inter alia*, an employer's confidential customer information and the good will of . . . customer[s] generated and maintained at the employer's expense.'" *Gundermann & Gundermann Ins. V. Brassill*, 46 A.D.3d 82, 83 (N.Y. App. Div. 2007) (quoting *Milbrandt & Co., Inc. v. Griffin*, 1 A.D.3d 327, 328 (N.Y. App. Div. 2003)).

As an initial matter, in his Employment Agreement, Coon agreed that "the territorial and time limitations set forth in th[e] Non-Compete clause are reasonable and necessary for the protection of the Company's interests." (Ex. B at 7.) Accordingly, he has already conceded that they are valid. *See* Arbitration Award, *Clopay Corp. v. Priest*, 2023 WL 5657724 (E.D. Ok. July 10, 2023) (holding that national scope of restrictive covenant was reasonable based on employee's admission in contract).

Moreover, courts routinely hold that the Agreement's temporal scope—twelve months after the employee leaves the company—is reasonable. *See, e.g.*, *Artech Info. Sys., L.L.C. v. Tee*, 280 A.D.2d 117, 124 (N.Y. App. Div. 2001); *Michael I. Weintraub, M.D., P.C. v. Schwartz*, 131 A.D.2d 663, 665 (N.Y. App. Div. 1987); *J.H. Goldberg Co., Inc. v. Stern*, 53 A.D.2d 246, 250 (N.Y. App. Div. 1976). The temporal scope is particularly reasonable here because the covenants were connected to the acquisition of kW MCE. "New York courts have found three to five year restrictions reasonable in the context of the sale of a business." *Uni-World Capital L.P. v. Preferred Fragrance, Inc.*, 73 F. Supp. 3d 209, 235 (S.D.N.Y. 2014)). Although the restrictive

9

covenants were not part of the contract for the acquisition of kW MCE itself, the acquisition contemplated that the restrictive covenants would be in place. Indeed, the Employment Agreement specifically references the transition from kW MCE to WSP, (Ex. B at 1), and the RCA states that the purpose of that agreement, including the similar restrictive covenants set forth therein, is "to incentivize [the employees] to remain with [kW MCE] . . . in order to assist [kW MCE] with integration into WSP." (Ex. C at 1.)

The Employment Agreement's lack of a specific geographic scope is also reasonable for two reasons. First, WSP works with clients and vendors around the world. *See Uni-World Capital L.P.*, 73 F. Supp. 3d at 235 (upholding non-compete that applied to "the United States of America, its territories and possessions, and any country outside of the United States of America to which products of the Business are sold"); *Integra Optics, Inc. v. Nash*, 2018 WL 224460, at *10 (N.D.N.Y. Apr. 10, 2018) (applying Colorado law and enforcing worldwide scope of restrictive covenant); *GE Betz Inc. v. Moffitt-Johnson*, 301 F. Supp. 3d 668, 685 (S.D. Tex. 2014); *Bio-Imaging Techs., Inc. v. Marchant*, 584 F. Supp. 2d 322, 328 (D. Mass. 2008) (upholding non-compete agreement that extends to "any state or country where [employer] does business); *Universal Engraving, Inc. v. Duarte*, 519 F. Supp. 2d 1140, 1153 (D. Kan. 2007). Second, the covenants are limited to conduct that is directed at WSP's existing and prospective clients—*e.g.*, soliciting them or engaging in conduct that "would reasonably be expected" to divert them away from WSP. *See Crest Hill Capital LLC v. Gonzalez¸* 2019 WL 1557512, at *6 (NY. S. Ct. Apr. 10, 2019) ("No geographic limitation is required for a non-solicitation clause that is client-based."); *W.R. Grace & Co., Dearborn Div. v. Mouyal*, 422 S.E.2d 529, 533 (Ga. 1992) ("Where . . . the former employee is prohibited from post-employment solicitation of employer customers which the employee contacted during his tenure with the employer, there is no need for a territorial

restriction expressed in geographic terms." (footnote omitted)). Even if this were not the case (which it is), Coon intends to operate his business—and has solicited WSP employees to work on that business—in New York, where kW MCE was primarily located, and Arizona, where Coon personally worked while employed at WSP. (*See* Ex. B at 1.) Accordingly, enforcing the restrictive covenants to prevent Coon from starting his competing business is reasonable and necessary to protect WSP's legitimate interests.

### ii. Coon Breached the Restrictive Covenants and Will Breach Them Again.

While WSP performed its obligations under the Employment Agreement by paying Coon a substantial salary, benefits, and bonuses, Coon violated his restrictive covenants and is planning to violate them again. The non-solicitation clause of the Employment Agreement provides that Coon shall not "engage in any activity which involves . . . the solicitation, hiring, or engagement of any person or entity who is, at the time, or was within the last 12 months of [his] employment with the Company, an employee . . . of the Company or any of its affiliates." (Ex. B at 8.) He has already done that by asking Messrs. Leone and Russinko to work for him at his competing business, causing them to resign.

Moreover, Coon's competing business itself will violate the non-competition and non-solicitation provisions. The non-competition clause provides that Coon "shall not directly or indirectly own, manage, operate, [or] control . . . any business in a manner that would reasonably be expected to divert business from any of the Company's 'Clients' or 'Prospective Clients' with whom [he] had any involvement in developing, servicing, soliciting, or maintaining during the year prior to [his] termination." (*Id.* at 7.) Yet, as noted above, that is exactly what Coon admits that he intends to do. Similarly, the non-solicitation clause provides that Coon "shall not . . . contact, call upon, solicit or otherwise accept business from, render services to, market services or

products to, divert business from, and/or interfere with the Company's relationship or business with any of the Company's existing Clients or Prospective Clients" that he learned of, did work for, or learned confidential information about through WSP "during the year prior to [his] termination." (*Id.*)  Coon has openly admitted he would go after the same client base given the team he is recruiting and his stated intention to start a competing business.  (Ex. A ¶¶ 20, 21, 35.)

**iii.      WSP Has Been Harmed.**

WSP has already suffered damages and will suffer further damages without interim relief. Specifically, WSP has already been harmed by Coon's tortious interference with Messrs. Leone and Russinko's retention agreements in violation of his (and their) restrictive covenants—WSP lost two valuable employees.  Moreover, as explained below, WSP will suffer irreparable damage to its reputation, good will, and customer relationships if Coon is permitted to begin competing with it to solicit the same customers Coon worked with while at kW MCE/WSP.  (*See* Part I.B, *infra*.)

**B.      WSP Will Be Irreparably Harmed Without Interim Relief.**

An injury is irreparable for the purpose of obtaining preliminary relief where the party would not have an adequate remedy at law.  *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 68 (2d Cir. 1999).  Here, WSP will suffer several irreparable injuries if the Arbitrator does not intervene.

As with the reasonableness of the restrictive covenants, Coon conceded that WSP will suffer irreparable harm if he is permitted to start a competing business before the covenants expire. Specifically, in the Employment Agreement, Coon agreed that "that in the event of a breach of any provision of this Agreement, money damages would be inadequate and neither [Mr.Coon] nor the Company would have an adequate remedy at law" and that injunctive relief is appropriate.  (Ex. B at 7); *see also Ticor Title Ins. Co.*, 173 F.3d at 69 (holding that contract provision that "in the event

of Cohen's breach of the post-employment competition provision, Ticor shall be entitled to injunctive relief, because it would cause irreparable injury" is an admission that harm would be irreparable).

Even apart from this admission, Coon's competing business in fact will likely cause substantial irreparable harm to WSP. "It is well established that the loss of customer relationships stemming from the violation of nonsolicitation and non-competition clauses constitutes irreparable harm sufficient to support injunctive relief." *Crest Hill Capital LLC*, 2019 WL 1557512, at *6. "[T]he violation of a non-compete by the solicitation of employees also constitutes irreparable harm." *Global Switching Inc. v. Kasper*, 2006 WL 1800001, at *12 (E.D.N.Y. June 28, 2006); *EASi, LLC v. Gaffar*, 2020 WL 3868394, at *3 (C.D. Ill. July 9, 2020) (finding risk of irreparable harm because "[i]f Gaffar or L&T continue to solicit and hire EASi employees during the pendency of this lawsuit, EASi risks losing significant work from CAT, a large client, and may be competitively disadvantaged on future projects because the former EASi employees likely take with them the customer goodwill they helped to create for the employer"); *cf. Newmark Partners, L.P. v. Hunt*, 200 A.D.2d 557 (N.Y. App. Div. 2021) (granting preliminary injunction "to protect [plaintiff's] client relationships, reputation, and goodwill after losing all or almost all of their multifamily property group to their primary competitor").

As explained above, the data-center design industry is highly competitive, and a business' ability to compete depends in large part on the particular engineers working for it and its knowledge of a particular client's preferences about how the engineering team will operate. Coon knows WSP's clients' preferences and may be able to divert substantial business from it by siphoning off its valuable team of engineers. Coon also has knowledge of WSP/kW MCE's valuable trade secrets relating to customer projects/proposals, including design elements,

proposal/fee schedules, and instruments of service like field construction documents. Any competition or solicitation by Coon and his former WSP colleagues will necessarily involve the actual or inevitable disclosure of WSP's confidential and trade secret business information.

Finally, these harms will be compounded by the fact Coon's restrictive covenants were integral to "the sale of an existing business with its goodwill." *Frank May Assoc.*, 281 A.D.2d at 674; *accord Lund v. Agmata Wash. Enterprises, Inc.*, 190 A.D.2d 577, 577 (N.Y. App. Div. 1993); *Hay Grp., Inc. v. Nadel*, 170 A.D.2d 398, 399 (N.Y. App. Div. 1991). WSP will irreparably lose part of the good will it purchased in the acquisition if Coon is permitted to compete with it and steal its employees during the term of the restrictive covenants.

In sum, WSP will be irreparably harmed if Coon is not enjoined from competing with it and continuing improperly to solicit its employees in violation of his restrictive covenants.

### C.  The Balance of Equities Favors WSP.

The balance of the equities favors WSP. As explained above, WSP paid Coon substantial sums of money in exchange for his employment ***and*** his agreement to abide by the restrictive covenants, and WSP will suffer significant and irreparable harm to its business, reputation, good will, and customer relationships if Coon is not enjoined from violating those covenants.

Moreover, those covenants are reasonably limited to protect WSP's interests. They do not prohibit Coon from obtaining gainful employment. Rather, they prohibit him only from soliciting the specific employees, vendors, and clients that belong to WSP, and from doing work that "would reasonably be expected to divert business" away from WSP. *See Battenkill Veterinary Equine P.C. v. Cangelosi*, 1 A.D. 856, 859 (N.Y. App. Div. 2003) (holding that equities favored the plaintiff where "[d]efendant is not being deprived of her livelihood").

Accordingly, the equities favor WSP, and the Arbitrator should issue emergency interim relief to enjoin Coon from competing with WSP and soliciting its employees or vendors during the pendency of this arbitration.

**II.      WSP Is Entitled to Expedited Initial Discovery.**

An "arbitrator [has] the authority to order such discovery, by way of  deposition, interrogatory, document production, or otherwise, as the arbitrator considers necessary to a full and fair exploration of the issues in dispute,  consistent with the expedited nature of arbitration." AAA'S EMPLOY. ARB. R. & MEDIATION P. 9.  WSP requests that Coon be required to preserve all relevant documents, including personal communications like emails and text messages, and that WSP be permitted to serve up to fifteen document requests and ten interrogatories to understand more about the specifics of Coon's competition plans and the full extent of his breach of his post-employment covenants.  These requests and interrogatories should include, but not be limited to, the specific requests attached hereto as Exhibits K and L.

<div align="center">

**CONCLUSION**

</div>

For the forgoing reasons, the AAA should appoint an emergency arbitrator to this matter, order Coon not to compete with WSP or solicit its employees or vendors, and order Coon to preserve all relevant documents and to respond to expedited initial discovery.

Dated: January 2, 2024                              Respectfully submitted,

_/s/ Nipun J. Patel_
**HOLLAND & KNIGHT LLP**
TODD WOZNIAK
Nipun J. Patel
Justin Kadoura
1650 Market Street, Suite 3300
Philadelphia, PA 19104
Todd.Wozniak@hklaw.com

Nipun.patel@hklaw.com
justin.kadoura@hklaw.com
Telephone:  215.252.9600
Fax:  215.867.6070

*Counsel for WSP USA, Inc.*

## CERTIFICATE OF SERVICE

I, Nipun J. Patel, do hereby certify that on January 2, 2024, a true and correct copy of

the foregoing was served via email and mail to:

Stephen Coon
5533 Evia Caballo Blanco
Cave Creek, AZ 85331

9273 E Western Saddle Way
Scottsdale, AZ 85255

Coon1986@gmail.com

*/s/ Nipun J. Patel*
Nipun J. Patel

EXHIBIT K

1  Scott F. Gibson, Arizona State Bar No. #010884
2  (Pro Hac Vice Pending)
   SGibson@DentonPeterson.com
3  Jay Parmelee, SBN 274676
   Jay@DentonPeterson.com

DPD  DENTON PETERSON DUNN
     ATTORNEYS & COUNSELORS AT LAW

   1930 N. ARBOLEDA ROAD, SUITE 200
   MESA, ARIZONA 85213
   TELEPHONE: (480) 325-9900
   FACSIMILE: (480) 325-9901
   HTTPS://ARIZONABUSINESSLAWYERAZ.COM
   *Attorneys for Plaintiffs*

ELECTRONICALLY FILED
Superior Court of California
County of Sonoma
1/2/2024 8:00 AM
By: Melisa Kennedy Galindo, Deputy Clerk

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

# COUNTY OF SONOMA – UNLIMITED CIVIL JURISDICTION

CG ENTERPRISES HOLDINGS, LLC, a California limited liability company; and STEPHEN M. COON, an individual;

    Plaintiffs,

vs.

WSP USA, INC., a New York corporation; WSP USA BUILDINGS, INC., a New York corporation; kW MISSION CRITICAL ENGINEERING, D.P.C., a New York design professional corporation; and DOES 1 through 20, inclusive,

    Defendants.

Case No.: 24CV00024

**COMPLAINT FOR:**

1. **DECLARATORY RELIEF**

2. **VIOLATION OF CALIFORNIA BUSINESS AND PROFESSIONS CODE 16600** *et seq.*

3. **VIOLATION OF CALIFORNIA BUSINESS AND PROFESSIONS CODE 17200** *et seq.*

4. **INJUNCTIVE RELIEF**

Plaintiffs CG Enterprises Holdings, LLC ("CG"), a California limited liability company, and Stephen M. Coon ("Steve"), an individual, assert the following causes of action against Defendants WSP USA, Inc., a New York corporation ("WSP USA"); WSP USA Buildings, Inc. ("Buildings"), a New York corporation; kW Mission Critical Engineering, d.p.c. ("kW"), a New York design professional corporation; and Does 1 through 20, inclusive, alleges as follows:

---

1

**COMPLAINT FOR (1) DECLARATORY RELIEF; (2) VIOLATION OF CALIFORNIA BUSINESS AND PROFESSIONS CODE 16600** *et seq.***; (3) VIOLATION OF CALIFORNIA BUSINESS AND PROFESSIONS CODE 17200** *et seq.***; (4) INJUNCTIVE RELIEF**

## **STATEMENT OF THE CASE**

1.     Since 1872, California has had a settled public policy in favor of open competition and has rejected the common law "rule of reasonableness" related to noncompete agreements and other restrictive covenants. That public policy is codified in section 16600 of the California Business and Professions Code, which notes that with certain limited exceptions not applicable to this case, "every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void."

2.     In 2023, the Legislature passed two bills – Assembly Bill 1076 and Senate Bill 699 – that "codify existing case law" and reinforce California's commitment to open competition. Those statutes became effective January 1, 2024.

3.     The statutes and the accompanying statements of legislative intent clarify a number of aspects of California law:

a.   California Business and Professions Code Section 16600 "shall be read broadly in accordance with *Edwards v. Arthur Andersen LLP* (2008) 44 Cal.4th 937, to void the application of any noncompete agreement in an employment context or any noncompete clause in an employment contract, no matter how narrowly tailored, that does not satisfy an exception in this chapter."

b.   It is unlawful for an employer to include a noncompete clause in an employment contract, unless the agreement meets a statutory exception. Use of an unlawful noncompete agreement constitutes "an act of unfair competition" under California Business and Professions Code § 17200 *et seq*.

c.   Any contract that is void under California law is unenforceable regardless of where and when the contract was signed.

d.   California's public policy against restraint of trade law trumps other state laws when an employee seeks employment in California, even if the

1930 N. ARBOLEDA ROAD, SUITE 200
MESA, AZ 85213
DENTON PETERSON DUNN
ATTORNEYS & COUNSELORS AT LAW
DPD

2

1    employee had signed the contractual restraint while living outside of
2    California and working for a non-California employer.

    e.  California has a "strong interest in protecting the freedom of movement of
3    
4    persons whom California-based employers wish to employe to provide
5    services in California, regardless of the person's state of residence."

    f.  The "freedom of employment is paramount to competitive business
6    
7    interests."

8        4.     Defendants seek to restrict Plaintiff CG from hiring Steve and other persons by
9    threatening to enforce certain noncompete clauses and other restrictive covenants that are
10   unlawful under California's fundamental public policy in favor of open competition.
11   Specifically, Defendants have threatened to sue Plaintiffs for doing precisely what they have
12   a fundamental right to do under California law.

13       5.     This case seeks declaratory and injunctive relief preventing Defendants from
14   doing so. Plaintiffs also seek damages and other monetary relief.

15   

16                            **PARTIES**

17       6.     CG is, and at all times herein mentioned was, a corporation organized and
18   existing under the laws of the State of California, with its primary place of business in Santa
19   Rosa, California.

20       7.     Steve is, and at all times herein mentioned was, an individual residing in the
21   State of Arizona.

22       8.     WSP USA is a corporation organized and existing under the laws of the State of
23   New York, with its principal place of business in New York.

24       9.     WSP USA has been qualified to do business in California since 1978.

25       10.    WSP USA has employees in California.

26       11.    Buildings is a corporation organized and existing under the laws of the State of
27   New York, with its principal place of business in New York.

28   

1930 N. ARBOLEDA ROAD, SUITE 200
MESA, AZ 85213
DENTON PETERSON DUNN
ATTORNEYS & COUNSELORS AT LAW
DPD

3
**COMPLAINT FOR (1) DECLARATORY RELIEF; (2) VIOLATION OF CALIFORNIA BUSINESS AND
PROFESSIONS CODE 16600 *et seq.*; (3) VIOLATION OF CALIFORNIA BUSINESS AND PROFESSIONS
CODE 17200 *et seq.*; (4) INJUNCTIVE RELIEF**

12. Buildings has been qualified to do business in California since 2012.

13. Buildings has employees in California.

14. kW is, and at all times herein mentioned was, a design professional corporation organized and existing under the laws of the State of New York, with its primary place of business in the State of New York, with significant business contacts throughout California such as to satisfy California's long arm statutes.

15. Plaintiffs are ignorant of the true names and capacities of defendants sued herein as Does 1 through 20, inclusive, and therefore sue these defendants by such fictitious names. Plaintiffs will amend this complaint to allege their true names and capacities when ascertained.

16. Plaintiffs are informed and believe, and based thereon allege, that at all times herein mentioned each of the defendants sued herein was the agent and employee of each of the remaining defendants and at all times was acting within the purpose and scope of such agency and employment. Specifically, Plaintiffs are informed and believe, and based thereon allege, that Defendants all acted in concert, such that the actions of one entity were known to, approved by, and performed at the direction of the others.

## VENUE, JURISDICTION, AND CHOICE OF LAW

17. The Defendants in this matter conduct significant business in the County of Sonoma, State of California, and throughout the State of California, such that venue is appropriate in this Court.

18. The obligations sued upon are commercial in nature and are not subject to the provisions of Civil Code § 1812.10 or § 2984.4.

19. By agreement of the contracting parties, New York law applies to the interpretation or enforcement of the contracts at issue in this lawsuit. However, the sections at issue in this lawsuit are void under California Business and Professions Code §§ 16600.1 and 16600.5.

4

**COMPLAINT FOR (1) DECLARATORY RELIEF; (2) VIOLATION OF CALIFORNIA BUSINESS AND PROFESSIONS CODE 16600 *et seq.*; (3) VIOLATION OF CALIFORNIA BUSINESS AND PROFESSIONS CODE 17200 *et seq.*; (4) INJUNCTIVE RELIEF**

DPD
DENTON PETERSON DUNN
ATTORNEYS · COUNSELORS AT LAW
1930 N. ARBOLEDA ROAD, SUITE 200
MESA, AZ 85213

## FACTS COMMON TO ALL CAUSES OF ACTION

20.    kW operates in the area of mission critical engineering.

21.    On or about December 30, 2020, kW merged its business with WSP USA.

22.    As part of that merger, Steve entered into a Retention Bonus Agreement (the "Retention Agreement") with kW. **Exhibit A** is a copy of the Retention Agreement.

23.    The Retention Agreement contains provisions that restricted Steve's ability to work for a time. By the terms of the Retention Agreement, Steve no longer has any obligations to kW or WSP USA under the Retention Agreement.

24.    On or about December 29, 2020, Steve and kW "or its successors in interest" entered into a Senior Leadership Employment Agreement (the "Agreement") whereby Steve would perform services for kW and kW would compensate Steve for services rendered. **Exhibit B** is a copy of the Agreement.

25.    Under Paragraph 2, the Agreement had a two-year term that automatically would be extended from year to year unless either party gave advance written notice of their intent not to renew at least 30 days before the end of the current term.

26.    On or about November 2, 2022, Steve gave notice of his intent not to renew more than 30 days before the end of the term.

27.    Effective January 1, 2023, the Agreement between Steve and kW terminated. Steve's employment with kW converted to an at will employment

28.    On or about October 18, 2023, Steve gave written notice terminating his at will employment with kW effective November 3, 2023.

29.    The Agreement contains a non-competition clause purporting to restrict Steve from performing services for another similar employer for a period of twelve months anywhere in the world.

COMPLAINT FOR (1) DECLARATORY RELIEF; (2) VIOLATION OF CALIFORNIA BUSINESS AND PROFESSIONS CODE 16600 *et seq.*; (3) VIOLATION OF CALIFORNIA BUSINESS AND PROFESSIONS CODE 17200 *et seq.*; (4) INJUNCTIVE RELIEF

30.     The Agreement contains a non-solicitation clause purporting to restrict Steve, for a period of twelve months, from soliciting, hiring, or engaging any person or entity that has performed services for kW in the last twelve months.

31.     The Agreement contains a second non-solicitation clause purporting to restrict Steve, for a period of twelve months, from soliciting, contacting, or calling upon any person or entity for which kW has performed services, or has submitted a proposal to, or has considered submitting a proposal to.

32.     The restrictive covenants in the Agreement are void under California Business and Professions Code §§ 16600.1 and 16600.5.

33.     CG is a California employer.

34.     CG wishes to engage Steve as an employee.

## FIRST CAUSE OF ACTION

### Declaratory Relief

35.     Plaintiffs reallege and incorporate by reference the above paragraphs as if set forth fully herein.

36.     An actual controversy arisen and now exists between Plaintiffs and Defendants, and each of them, concerning their respective rights, obligations, and duties as they relate to the Agreement.

37.     A judicial determination is necessary so that the parties may ascertain their rights, duties, and obligations with respect to the Agreement.

38.     Plaintiffs desire a judicial determination and declaration that the non-competition and non-solicitation clauses of the Agreement are void.

## SECOND CAUSE OF ACTION

### Violation of California Business and Professions Code § 16600 *et seq.*

39.     Plaintiffs reallege and incorporate the allegations stated above.

**COMPLAINT FOR (1) DECLARATORY RELIEF; (2) VIOLATION OF CALIFORNIA BUSINESS AND PROFESSIONS CODE 16600 *et seq.*; (3) VIOLATION OF CALIFORNIA BUSINESS AND PROFESSIONS CODE 17200 *et seq.*; (4) INJUNCTIVE RELIEF**

DENTON PETERSON DUNN
ATTORNEYS & COUNSELORS AT LAW
1930 N. ARBOLEDA ROAD, SUITE 200
MESA, AZ 85213

40.     The restrictive covenants in the Agreement are void and unlawful pursuant to the provisions of California Business and Professions Code § 16600 *et seq.*

41.     Plaintiffs have been damaged as a result of Defendants' unlawful acts.

42.     Plaintiffs are entitled to recover their actual damages, plus their attorneys' fees and costs of suit.

## THIRD CAUSE OF ACTION

### Violation of California Business and Professions Code 17200

43.     Plaintiffs reallege and incorporate the allegations stated above.

44.     Defendants threaten to, and unless restrained, will institute lawsuits upon Steve to prevent Steve from working for CG.

45.     Any such action would result in irreparable harm to Plaintiffs and violate California law and policy, and will cause damages for which pecuniary compensation will not afford adequate relief because Steve's knowledge, talents, and abilities are unique.

46.     Injunctive relief is necessary to enjoin Defendants from further action which would violate California law and policy.

47.     Can't enforce restrictive covenants against others

## FOURTH CAUSE OF ACTION

### For Injunctive Relief

48.     Plaintiffs reallege and incorporate the allegations stated above.

49.     Defendants threaten to, and unless restrained, will institute lawsuits upon Steve to prevent Steve from working for CG.

50.     Any such action would result in irreparable harm to Plaintiffs and violate California law and policy, and will cause damages for which pecuniary compensation will not afford adequate relief because Steve's knowledge, talents, and abilities are unique.

**COMPLAINT FOR (1) DECLARATORY RELIEF; (2) VIOLATION OF CALIFORNIA BUSINESS AND PROFESSIONS CODE 16600 *et seq.*; (3) VIOLATION OF CALIFORNIA BUSINESS AND PROFESSIONS CODE 17200 *et seq.*; (4) INJUNCTIVE RELIEF**

DENTON PETERSON DUNN
ATTORNEYS & COUNSELORS AT LAW
1930 N. ARBOLEDA ROAD, SUITE 200
MESA, AZ 85213

51.     CG and Steve require the Court to enter injunctive relief enjoining Defendants from further action which would violate California law and policy.

**WHEREFORE**, Plaintiffs pray for judgment against Defendants, and each of them, as follows:

1.      For an Order declaring the non-competition and non-solicitation clauses of the Agreement void, and/or a restraining order preventing Defendants and their agents, employees, officers, attorneys, and representative from attempting to enforce the non-competition and non-solicitation clauses of the Agreement;

2.      For attorneys' fees as permitted by law or contract;

3.      For costs of suit incurred herein; and

4.      For such other and further relief as the Court may deem just and proper.

DATED: January 1, 2024.

                        **DENTON PETERSON DUNN, PLLC**


                        /s/ Jay Parmelee
                        Jay Parmelee
                        1930 N. Arboleda Road, Suite 200
                        Mesa, AZ  85213
                        *Attorneys for Plaintiffs*

**COMPLAINT FOR (1) DECLARATORY RELIEF; (2) VIOLATION OF CALIFORNIA BUSINESS AND PROFESSIONS CODE 16600 *et seq.*; (3) VIOLATION OF CALIFORNIA BUSINESS AND PROFESSIONS CODE 17200 *et seq.*; (4) INJUNCTIVE RELIEF**

EXHIBIT L

Scott F. Gibson, Arizona State Bar No. #010884
(Pro Hac Vice Pending)
SGibson@DentonPeterson.com

Jay Parmelee, SBN 274676
Jay@DentonPeterson.com

**DPD** DENTON PETERSON DUNN
ATTORNEYS & COUNSELORS AT LAW

1930 N. ARBOLEDA ROAD, SUITE 200
MESA, ARIZONA 85213
TELEPHONE: (480) 325-9900
FACSIMILE: (480) 325-9901
HTTPS://ARIZONABUSINESSLAWYERAZ.COM

*Attorneys for Plaintiffs*

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF SONOMA – UNLIMITED CIVIL JURISDICTION

| | |
|---|---|
| CG ENTERPRISES HOLDINGS, LLC, a California limited liability company; and STEPHEN M. COON, an individual;<br><br>Plaintiffs,<br><br>vs.<br><br>WSP USA, INC., a New York corporation; WSP USA BUILDINGS, INC., a New York corporation; kW MISSION CRITICAL ENGINEERING, D.P.C., a New York design professional corporation; and DOES 1 through 20, inclusive,<br><br>Defendants. | Case No.: 24CV00024<br><br>**Assigned to the Honorable Christopher Honigsberg – Dept. 18**<br><br>**PLAINTIFFS' EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION ENJOINING DEFENDANTS FROM PROCEEDING WITH ENFORCEMENT OF RESTRICTIVE COVENANTS AND OTHER RELIEF; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>[Filed concurrently with Declarations of Stephen M. Coon and Jay Parmelee; and [Proposed] Order hereon]<br><br>Complaint Filed: January 2, 2024<br>Trial Date: None Set |

1

**TO ALL INTERESTED PARTIES AND TO THEIR RESPECTIVE ATTORNEYS:**

**PLEASE TAKE NOTICE** that Plaintiffs CG Enterprises Holdings, LLC ("CG") and Stephen M. Coon ("Steve") hereby apply to this Court *ex parte* for a temporary restraining order and order to show cause why a preliminary injunction should not issue restraining and enjoining Defendants WSP USA Inc., WSP USA Buildings INC., and kW Mission Critical Engineering, d.p.c. from enforcing or attempting to enforce any restrictive covenants contained in any employment or independent contractor agreements between any Defendant and Steve. The court will set a hearing upon filing of this application. Plaintiffs request a hearing as soon as the Court is available.

This Application is made on the grounds that non-compete and non-solicitation clauses affecting California business enterprises are void under Business and Professions Code § 16600, and any attempt by Defendants to enforce such a provision will cause irreparable harm to Plaintiffs. Plaintiffs are likely to succeed on the merits of the accompanying declaratory relief lawsuit, brought under Business and Professions Code § 16600.5.

This Application is based on the Complaint on file, the exhibits thereto, the Declarations of Jay Parmelee and Stephen M. Coon filed concurrently herewith, the attached memorandum of points and authorities, and on such other and further oral and/or documentary evidence as may be presented at the hearing of this *ex parte* application.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

**PLAINTIFFS' EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION ENJOINING DEFENDANTS FROM PROCEEDING WITH ENFORCEMENT OF RESTRICTIVE COVENANTS AND OTHER RELIEF; MEMORANDUM OF POINTS AND AUTHORITIES**

DENTON PETERSON DUNN
ATTORNEYS & COUNSELORS AT LAW
1930 N. ARBOLEDA ROAD, SUITE 200
MESA, AZ 85213

Counsel for Plaintiffs notified the presumed counsel for Defendants on January 16, 2024, via email and phone call, of this application.  The presumed counsel for Defendants is Todd D. Wozniak, Nipun J. Patel, and Justin Kadoura of Holland & Knight LLP, 1650 Market Street, Suite 3300, Philadelphia, PA 19104, todd.wozniak@hklaw.com, nipun.patel@hklaw.com, justin.kadoura@hklaw.com (215) 252-9600. *See* Declaration of Jay Parmelee.

Dated: January 16, 2024                **DENTON PETERSON DUNN, PLLC**


/s/ Jay Parmelee_____
Jay Parmelee
*Attorneys for Plaintiffs*

**PLAINTIFFS' EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION ENJOINING DEFENDANTS FROM PROCEEDING WITH ENFORCEMENT OF RESTRICTIVE COVENANTS AND OTHER RELIEF; MEMORANDUM OF POINTS AND AUTHORITIES**

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.  Relief Requested

Plaintiffs petition this Court ex parte to issue a temporary restraining order to enjoin Defendants from enforcing or attempting to enforce any restrictive covenants contained in any employment or independent contractor agreements between any Defendant and Steve. Such relief is appropriate in view of the conduct of Defendants, which filed for arbitration on the same day as Plaintiff filed this lawsuit to obtain injunctive relief.  The contract between the parties allows either party to ask a court of competent jurisdiction for injunctive relief. Given that the restrictive covenants violate California law and policy, and given that CG is a California limited liability company seeking to employ Steve, the fundamental rights of Plaintiffs will be violated by any other enforcement of the restrictive covenants and irreparable harm will occur.  Therefore, the Court should issue a temporary restraining order to prevent a multiplicity of actions and irreparable harm from occurring.

### II.  Factual Background

Steve is a Professional Electrical Engineer with more than  fifteen years of experience in the strategic design of electrical topologies. Declaration of Stephen M. Coon ("Coon Decl.") at ¶ 4.  Steve also has in-depth knowledge of cross discipline engineering in mission critical infrastructure design. *Id*., at ¶ 5. Steve has experience managing over fifty employees and growing a company from the ground up. *Id*., at ¶ 6. Steve is highly reputable in his particular field of professional electrical engineering. *Id*., at ¶ 7. CG Enterprises Holdings, LLC ("CG") is a start-up California limited liability company that Steve founded in late 2023. *Id*., at ¶ 8. Steve wishes to continue his work in mission critical engineering through CG. *Id*., at ¶ 9.

Defendants WSP USA, Inc. and WSP USA Buildings Inc. (collectively and interchangeably, "WSP"), and kW Mission Critical Engineering, d.p.c. ("kW Engineering") seek to prevent Steve from working through CG. *Id*., at ¶ 10 and Exhibit A thereto. WSP owns kW. *Id*., at ¶ 11 and Exhibit A thereto. WSP is a large publicly traded New York corporation

**PLAINTIFFS' EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION ENJOINING DEFENDANTS FROM PROCEEDING WITH ENFORCEMENT OF RESTRICTIVE COVENANTS AND OTHER RELIEF; MEMORANDUM OF POINTS AND AUTHORITIES**

DENTON PETERSON DUNN
ATTORNEYS & COUNSELORS AT LAW
1930 N. ARBOLEDA ROAD, SUITE 200
MESA, AZ 85213
DPD

which, in 2022, employed 66,200 individuals and earned $11.93 billion in revenues. *Id*., at ¶ 12 and Exhibit B thereto. WSP has acquired nearly 194 companies around the world, including 17 in the United States. *Id*., at ¶ 13 and Exhibit C thereto. WSP USA, Inc. has been authorized to do business in California since 1978; WSP USA Buildings, Inc has been so authorized since 2012. *Id*., at ¶¶ 14-15 and Exhibits D and E thereto.

WSP seeks to prevent Steve from working on any mission critical engineering projects anywhere in the United States until November 2024 pursuant to non-competition and non-solicitation clauses in his employment agreement with Defendants. *Id*., at ¶ 16 and Exhibit A thereto. Those restrictions are void under well-established California public policy.

Steve formerly was a part owner of kW Engineering. *Id*., at ¶ 17. He and the other owners sold their interest in kW Engineering to WSP in December 2020. *Id*., at ¶ 18. kW Engineering merged its business with WSP. *Id*., at ¶ 19. As part of that merger, Steve entered into a Retention Bonus Agreement (the "Retention Agreement") with kW Engineering. *Id*., at ¶ 20 and Exhibit F thereto. The Retention Agreement contains provisions that restricted Steve's ability to work for no more than three years from the closing date (i.e., until December 28, 2023). *Id*., at ¶ 21 and Exhibit F thereto. Steve no longer has any obligations to kW Engineering or WSP USA under the Retention Agreement. *Id*., at ¶ 22 and Exhibit F thereto.

As part of the merger, Steve also entered into a Senior Leadership Employment Agreement (the "Agreement") with kW Engineering "or its successors in interest" whereby Steve would perform services for kW Engineering, and kW Engineering would compensate Steve for the services rendered. *Id*., at ¶ 23 and Exhibit G thereto. Those provisions violate fundamental California public policy. The Agreement contains a "Non-Competition and Non-Solicitation" section. *Id*., at ¶ 24 and Exhibit G thereto. The Agreement states that:

> During the Employee's employment with the Company or its successor-in-interest and for a period of 12 months following the termination of Employee's employment for any reason (voluntary or involuntary), Employee shall not directly or indirectly own, manage, operate, control, be

**PLAINTIFFS' EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION ENJOINING DEFENDANTS FROM PROCEEDING WITH ENFORCEMENT OF RESTRICTIVE COVENANTS AND OTHER RELIEF; MEMORANDUM OF POINTS AND AUTHORITIES**

employed by, consult with or participate in the ownership, management, operation, or control of any business, in a manner that would reasonably be expected to divert business from any of the Company's "Clients" or "Prospective Clients" with whom Employee had any involvement in developing, servicing, soliciting, or maintaining during the year prior to Employee's termination.

*Id.*, at ¶ 25 and Exhibit G thereto.

The Agreement clarifies that:

Clients is defined as clients who the Company provided services for at any time during the 12-month period immediately preceding Employee's termination. "Prospective Clients" includes any person or entity: (a) to whom the Company has submitted qualifications or a proposal with Employee's direct personal involvement during the 12 months prior to Employee's termination; or (b) concerning whom Employee was assisting the Company in preparing a submittal of qualifications or a proposal at the time of Employee's termination.

*Id.*, at ¶ 26 and Exhibit G thereto.

The Agreement also includes two "Non-Solicitation" clauses which similarly purport to limit Steve's ability to communicate with or interact with current, historical, or prospective clients of kW Engineering and any person or entity who was an employee, consultant, or contractor of kW Engineering or any of WSP's 17 USA Affiliates:

During the Employee's employment with Company or its successor-in-interest, and for a period of 12 months following the termination of Employee's employment for any reason (voluntary or involuntary), Employee shall not directly or indirectly (on Employee's own or in combination or association with others, and whether for Employee's own benefit or for the benefit of other persons or entities) engage in activity which involves or could result in the actual or potential termination of the Company's relationship with or the solicitation, hiring, or engagement of any person or entity who is, at the time, or was within the last 12 months of Employee's employment within the Company, an employee, consultant, or independent contractor of the Company or any of its affiliates, including for greater certainty, any affiliate U.S. Company of WSP USA ("Affiliate").

*Id.*, at ¶ 27 and Exhibit G thereto.

**PLAINTIFFS' EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION ENJOINING DEFENDANTS FROM PROCEEDING WITH ENFORCEMENT OF RESTRICTIVE COVENANTS AND OTHER RELIEF; MEMORANDUM OF POINTS AND AUTHORITIES**

1    The Agreement further states that:

2    During Employer's employment with the Company and for a period of 12
months following the termination of Employee's employment for any reason
3    (voluntary or involuntary), Employee shall not directly or indirectly (on
Employee's own or in combination or association with others, and whether
4    for Employee's own benefit or for the benefit of other parties or entities)
contract, call upon, solicit or otherwise accept business from, render services
5    to, market services or products to, divert business from, and/or interfere with
6    the Company's relationship or business with any of the Company's existing
Clients or Prospective Clients (as that term is defined above) that Employee
7    interacted with on behalf of the Company, was introduced to by virtue of
Employee's employment with the Company, or otherwise learned
8    confidential information concerning during the last 12 months of Employee's
9    employment within the Company.

10

11    *Id.*, at ¶ 28 and Exhibit G thereto.

12        The Agreement had a two-year term. *Id.*, at ¶ 29 and Exhibit G thereto. Under Paragraph

13    2, the term of the Agreement would automatically be extended from year to year unless either

14    party gave advance written notice of their intent not to renew at least 30 days before the end of

15    the current term. *Id.*, at ¶ 30 and Exhibit G thereto. On or about November 2, 2022, Steve gave

16    notice of his intent not to renew more than 30 days before the end of the term. *Id.*, at ¶ 31.

17    Effective January 1, 2023, the Agreement between Steve and kW Engineering terminated, and

18    Steve's employment with kW Engineering converted to an at will employment. *Id.*, at ¶ 32. On

19    or about October 18, 2023, Steve gave written notice terminating his at-will employment with

20    kW Engineering effective November 3, 2023. *Id.*, at ¶ 33.

21        Ironically, if Steve had remained employed with kW Engineering until December 31,

22    2023, Defendants would have no grounds for restricting his employment under the Agreement.

23    *See* Exhibit G to Coon Decl., ¶ 11 (when Steve became an at-will employee on January 1, 2023,

24    the restrictive covenants expired "one (1) year from the date that Senior Leader is converted to

25    an at-will employee provided that Senior Leader remains employment with Company one year

26    after converting to an at-will employee"). *Id.*, at ¶ 34. In other words, Defendants not only seek

27

28

**PLAINTIFFS' EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO
SHOW CAUSE RE PRELIMINARY INJUNCTION ENJOINING DEFENDANTS FROM PROCEEDING WITH
ENFORCEMENT OF RESTRICTIVE COVENANTS AND OTHER RELIEF; MEMORANDUM OF POINTS
AND AUTHORITIES**

DENTON PETERSON DUNN
ATTORNEYS & COUNSELORS AT LAW
1930 N. ARBOLEDA ROAD, SUITE 200
MESA, AZ 85213
DPD

to restrict Steve contrary to fundamental California public policy, but also seek a one-year restriction because he terminated his employment 58 days "early."

The Agreement requires the parties to resolve their disputes by binding arbitration with the American Arbitration Association ("AAA") in New York pursuant to AAA's Employment Arbitration Rules and Procedures. *Id*., at ¶ 35 and Exhibit G thereto. But the Agreement also allows either party to seek "apply to any court of law or equity of competent jurisdiction for specific performance and/or injunctive or other relief in order to enforce or prevent any violations of the provisions" of the Agreement. *Id*., at ¶ 36 and Exhibit G thereto.

On January 2, 2024, the same day this action was filed, WSP commenced arbitration proceedings with the AAA, filing a Motion for Emergency Interim Relief and requesting that the arbitrator enjoin Steve from competing with WSP and soliciting its employees or vendors during the pendency of the arbitration. *Id*., at ¶ 37 and Exhibit A thereto. On January 12, 2024, the arbitrator ruled that because the parties had not adopted the Optional Rules for Emergency Measures of Protection, WSP could not seek emergency interim relief in any arbitration proceedings. *Id*., at ¶ 38. Consequently, any issues related to injunctive relief must be resolved by a "court of competent jurisdiction." This Court meets that contractual requirement.

Plaintiffs filed this case with the Court on January 2, 2024. *Id*., at ¶ 39. Plaintiffs seek injunctive relief related to the rights and obligations of the parties under the Agreement. Id., at ¶ 40.

## III.  Argument

### A.  *Legal Standard*

When considering whether to grant a temporary restraining order, trial courts evaluate the likelihood that the moving party will succeed on the merits at trial and the balance of harms that would be suffered by plaintiff if relief is not granted, as compared to the harms that would be incurred by the opposing party if relief is granted. *Church of Christ in Hollywood v. Superior Court*, 99 Cal.App.4th 1244, 1251 (2002) (*Hollywood*) citing *IT Corp. v. County of Imperial*,

**PLAINTIFFS' EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION ENJOINING DEFENDANTS FROM PROCEEDING WITH ENFORCEMENT OF RESTRICTIVE COVENANTS AND OTHER RELIEF; MEMORANDUM OF POINTS AND AUTHORITIES**

DENTON PETERSON DUNN
1930 N. ARBOLEDA ROAD, SUITE 200
MESA, AZ 85213

35 Cal.3d 63, 69-70 (1983). Trial courts have discretion to balance the relative weight of each consideration: "the greater the plaintiff's showing on one, the less [that] must be shown on the other…" *Hollywood*, *supra*, at pp. 1251-52, citing *Butt v. State of California*, 4 Cal.4th 668, 678 (1992).

This case involves Defendants' attempts to enforce illegal restrictive covenants against Steve and CG. The unenforceability of the covenants is unassailable. Beginning in 1872, "California settled public policy in favor of open competition, and rejected the common law 'rule of reasonableness' when the Legislature enacted the Civil Code." *Edwards v. Arthur Andersen LLP*, 44 Cal.4th 937, 945, 189 P.3d 285, 290 (Cal. 2008). That statutory prohibition is codified in no uncertain terms: "Except as provided in this chapter, *every contract* by which anyone is *restrained from engaging in a lawful profession, trade, or business of any kind* is to that extent void." CAL. BUS. & PROF. CODE § 16600(a) (emphasis added). "Today in California, covenants not to compete are void, subject to several [statutory] exceptions," none of which apply to our case.[1] *Edwards*, 189 P.3d at 290. Since the original enactment of the prohibition in 1872, California courts "have consistently affirmed that section 16600 evinces a settled legislative policy in favor of open competition and employee mobility." *Id.*, 189 P.3d at 291. The Legislature has directed the courts to read § 16600 "broadly" to "void the application of any noncompete agreement in an employment context, or any other noncompete clause in an employment contract, no matter how narrowly tailored, that does not satisfy an exception to this chapter." CAL. BUS. & PROF. CODE § 16600(b). A void restrictive covenant is "unenforceable regardless of where and when the contract was signed" and regardless of whether "the employment was maintained outside of California." CAL. BUS. & PROF. CODE § 16600.5(a),(b).

---

[1]    Those exceptions involve the sale of a business (§ 16601), dissolution of a partnership (§ 16602), and termination of a limited liability company (§ 16602.5).

**PLAINTIFFS' EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION ENJOINING DEFENDANTS FROM PROCEEDING WITH ENFORCEMENT OF RESTRICTIVE COVENANTS AND OTHER RELIEF; MEMORANDUM OF POINTS AND AUTHORITIES**

DENTON PETERSON DUNN
ATTORNEYS & COUNSELORS AT LAW
1930 N. ARBOLEDA ROAD, SUITE 200
MESA, AZ 85213
DPD

Defendants are threatening to enforce these void restrictive covenants against Steve, in violation of well-established California law. Indeed, California law grants him the right to file a private action for injunctive relief and to recover damages arising from violations of § 16600 *et seq. See* CAL. BUS. & PROF. CODE § 16600.5(e). Moreover, the Court has the authority to prevent Defendants from seeking to enforce the restrictive covenants in another venue.

In *Robinson v. Jardine Ins. Brokers Int'l Ltd.*, 856 F. Supp. 554, 561 (N.D. Cal. 1994), the plaintiff sought to prevent the defendant from enforcing a temporary restraining order the defendant obtained from an English Court which required plaintiff to comply with a noncompete provision in an employment agreement plaintiff allegedly entered into with defendant (the "English Court's TRO"). The Northern District Court of California issued a preliminary injunction preventing the defendant from enforcing the English Court's TRO in the United States. The court reasoned that the non-compete provision in the alleged employment agreement was void under CAL. BUS. & PROF. CODE § 16600. 856 F. Supp. 554, 559. The court also reasoned that plaintiff would suffer immediate and irreparable harm if the preliminary injunction was not issued because plaintiff would be prevented from serving clients who chose to transfer business to plaintiff, which would cause loss or damage to those client relationships. *Id.* Further, the court reasoned that, given the defendant's size as company, defendant's possible loss of a few clients and employees did not outweigh the hardship to an individual employee in plaintiff's position. *Id.*

**B.      *Plaintiffs will Suffer Irreparable Harm if Injunction is Not Granted***

The right of an individual to engage in his profession, trade, or business is a fundamental right in California, and violation of that right necessarily causes irreparable harm to the individual. Every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void, unless it falls within a few specific exceptions which are inapplicable to this case. CAL. BUS. & PROF. CODE § 16600 (a). The interests of an employee in his own mobility and betterment are deemed paramount to the

DENTON PETERSON DUNN
ATTORNEYS & COUNSELORS AT LAW
1930 N. ARBOLEDA ROAD, SUITE 200
MESA, AZ 85213

competitive business interests of the employers, where neither the employee nor his new employer has committed any illegal act accompanying the employment change. *Dowell v. Biosense Webster, Inc.*, 179 Cal. App. 4th 564, 575, 102 Cal. Rptr. 3d 1, 8 (2009) citing *Application Group, Inc. v. Hunter Group, Inc.* (1998) 61 Cal.App.4th 881, 906–908, 72 Cal.Rptr.2d 73. If Defendants are able to enforce the restrictive covenants in the Agreement, which restrain Steve from engaging in his lawful profession, both Steve and CG will suffer irreparable harm. Coon Decl. at ¶¶ 41-49.

Steve is a Professional Electrical Engineer with over fifteen years of experience in the strategic design of electrical topologies. Steve also has in-depth knowledge of cross discipline engineering in mission critical infrastructure design. If the non-compete in the Agreement is enforced, Steve will not be able to get a job in his particular field of engineering until November 2024. The non-compete in the Agreement restrains Steve from directly, or indirectly, acting in a manner that would reasonably be expected to divert business from any of the Company's "Clients" or "Prospective Clients" with whom Steve had any involvement during the year prior to Steve's termination. The "Company" includes both kW Engineering and its successor in interest, WSP. WSP certainly thinks that Steve has the ability to redirect business, which is why WSP commenced arbitration proceedings in New York to keep Steve from working.

Likewise, if the non-solicitation clauses are enforced, Steve will be prevented from obtaining a job in an area of his expertise until November 2024. The non-solicitation clauses prohibit Steve from, among other things: (1) indirectly engaging in activity which could result in potential termination of the Company's relationship with any person or entity who was an employee, consultant, independent contractor of WSP for the last twelve months of Steve's employment, or (2) indirectly rendering services to any of WSP's existing or prospective clients. If Steve is employed by any company that does any of the same business as WSP or any of its 17 US affiliates, Steve is arguably indirectly engaging in activity which could result in potential termination of the Company's relationship with any person or entity who was an

**PLAINTIFFS' EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION ENJOINING DEFENDANTS FROM PROCEEDING WITH ENFORCEMENT OF RESTRICTIVE COVENANTS AND OTHER RELIEF; MEMORANDUM OF POINTS AND AUTHORITIES**

employee, consultant, independent contractor of WSP for the last twelve months of Steve's employment. Similarly, if Steve is employed by any company that serves any of the same clients or prospective clients as WSP or its 17 US affiliates, Steve is arguably indirectly rendering services to any of WSP's exiting or prospective clients. Steve cannot accept a position in his career field without arguably violating one of the non-solicitation clauses.

If Defendants are allowed to enforce the restrictive covenants, Steve will not only be restricted in his ability to be mobile and better himself, but will be in a position where it will be difficult for him to obtain employment. If Steve is forced to change careers for the next year, particularly with his amount of experience, it will be difficult for Steve to find a job in any field because Steve is underqualified for high level positions in an area outside of his area of expertise, but overeducated for low level positions. If Steve is able to obtain a job, it is highly unlikely he will able to receive the amount of income he can earn in a field where he has over fifteen years of expertise in a field where he has no experience. Furthermore, Steve's ability to obtain a job in his field of expertise after the restrictive covenants expire will be reduced because he missed out on the opportunity to refine his craft and build relationships in 2024. If Defendants are allowed to enforce the restrictive covenants in the Agreement, Steve will be immediately and irreparably harmed.

Likewise, CG will be immediately and irreparably harmed if Defendants are allowed to prevent CG from hiring Steve. Steve has been licensed as a Professional Electrical Engineer in California since 2018, which on its own makes him a valuable employee with specialized skills. He also has significant management experience and the ability to scale a business. If CG cannot hire Steve, CG will miss out on the work Steve would have done for CG, the relationships Steve would have built for CG, and the growth CG could have experienced under Steve's leadership. While CG could, and would have to, hire an engineer that is not Steve if Defendants are allowed to enforce the restrictive covenants, CG is unlikely to be able to find someone with the combination of expertise, skills, and reputation that Steve has. CG will be immediately and

DENTON PETERSON DUNN
ATTORNEYS & COUNSELORS AT LAW
1930 N. ARBOLEDA ROAD, SUITE 200
MESA, AZ 85213
DPD

1    irreparably harmed if Defendants are allowed to enforce the restrictive covenants in the

2    Agreement.

3         Steve and CG will be immediately and irreparably harmed if Defendants are allowed to

4    enforce the restrictive covenants in the Agreement because Steve will be denied his

5    fundamental right to be employed by any California employer that is interested in hiring Steve,

6    and CG will be denied its fundamental right to hire anyone who is interested in being hired by

7    CG. The Court should enjoin WSP from enforcing the restrictive covenants in the Agreement

8    anywhere in the United States.

9         **C.    *The Potential Harm to Plaintiffs Outweighs the Potential Harm to Defendants*

10        Like the defendant in *Robinson*, WSP is a large company. According to its 2022 Annual

11   Report, WSP employed 66,200 individuals in 2022 and earned $11.93 billion in revenues.

12   Because of the size of Defendants, to the extent Defendants lose any clients or employees

13   because the restrictive covenants are not enforced, the harm, if any, Defendants suffer will be

14   nowhere near the harm Steve will suffer as an individual unable to get a job in any area in

15   which he has expertise, or the harm a small company like CG will suffer if it is unable to obtain

16   a valuable employee with high level skills and a good reputation. The balance of harms in this

17   case, like in *Robinson*, weighs in favor of granting a preliminary injunction and temporary

18   restraining order preventing the Defendants from enforcing the restrictive covenants in the

19   Agreement.

20        **D.    *Plaintiffs are Likely to Succeed on the Merits of their Declaratory Relief***

21             ***Claim***

22        With a few limited exceptions, every contract by which anyone is restrained from

23   engaging in a lawful profession, trade, or business of any kind is to that extent void in the

24   State of California. Cal. Bus. & Prof. Code § 16600 (a). Cal. Bus. & Prof. Code § 16600 *et al*.

25   shall be read broadly to void the application of any noncompete agreement in an employment

26   context, or any noncompete clause in an employment contract, no matter how narrowly

27

28

**PLAINTIFFS' EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION ENJOINING DEFENDANTS FROM PROCEEDING WITH ENFORCEMENT OF RESTRICTIVE COVENANTS AND OTHER RELIEF; MEMORANDUM OF POINTS AND AUTHORITIES**

DENTON PETERSON DUNN
ATTORNEYS & COUNSELORS AT LAW
1930 N. ARBOLEDA ROAD, SUITE 200
MESA, AZ 85213
DPD

tailored, that does not satisfy an exception. Cal. Bus. & Prof. Code § 16600 (b). Any contract that is void under Cal. Bus. & Prof. Code § 16600 et. al. is unenforceable regardless of where and when the contract was signed. Cal. Bus. & Prof. Code § 16600.5 (a). An employer or former employer shall not attempt to enforce a contract that is void regardless of whether the contract was signed and the employment was maintained outside of California. Cal. Bus. & Prof. Code § 16600.5 (b). There are exceptions to Cal. Bus. & Prof. Code § 16600 (a) for:

- An owner of a business who is selling its interest, Cal. Bus. & Prof. Code § 16601;
- A partner whose partnership is being dissolved or is being dissociated, Cal. Bus. & Prof. Code § 16602;
- A member of a limited liability company where the limited liability company is being dissolved or sold, Cal. Bus. & Prof. Code § 16602.5;
- A former employee of a telephone answering service who had access to the customer list, Cal. Bus. & Prof. Code § 16606; and
- A former employee of an employment agency who had access to their customer list, Cal. Bus. & Prof. Code § 16607.

None of those exceptions apply in this case.

The court in *Fillpoint, LLC v. Maas* held that the non-competition and non-solicitation clauses in Maas's employment agreement with Fillpoint were unenforceable, notwithstanding the fact that Maas entered into the employment agreement at the same time he sold his ownership interest to Fillpoint. *Fillpoint, LLC v. Maas* (2012) 208 Cal.App.4th 1170, 1183. The court reasoned that the purchase agreement contained its own non-competition clause, with a term of three years from the closing date, which had already expired. *Id.* at 1182. The court also reasoned that the clause in the purchase agreement was designed to protect the goodwill that Fillpoint acquired, while the clause in the employment agreement targeted Maas's fundamental right to pursue his profession. *Id.* at 1183. The court pointed out that the non-solicitation clauses in the employment agreement were not limited to clients and employees of

DPD DENTON PETERSON DUNN
ATTORNEYS & COUNSELORS AT LAW
1930 N. ARBOLEDA ROAD, SUITE 200
MESA, AZ 85213

the business when it was sold, but also included clients and employees which were acquired by the business after it sold. *Id.* The court reasoned that the non-solicitation clauses could not serve the purpose of protecting the goodwill Fillpoint purchased when the clauses extended to clients and employees who had no connection to the business when it was purchased by Fillpoint. *Id.*

Like Maas, Steve entered into multiple agreements with kW Engineering and WSP when he sold his interest in kW Engineering to WSP. Steve entered into the Retention Agreement and the Agreement. The non-competition clause in the Retention Agreement, like the non-competition clause in the purchase agreement in *Fillpoint*, was specifically designed to protect the goodwill which WSP purchased. The term of the non-competition clause in the Retention Agreement was based on the closing date, and was set to expire no more than three years from the closing date regardless of whether Steve remained employed by kW Engineering.

Meanwhile, the non-competition and non-solicitation clauses in the Agreement target Steve's fundamental right to pursue his profession. The term of the restrictive covenants of the Agreement are specifically tied to Steve's employment, not the closing date. Likewise, the non-solicitation clauses in the Agreement, much like the non-solicitation clauses in the employment agreement in *Fillpoint*, purport to restrict Steve from soliciting clients and employees who did not become clients and employees of Defendants until long after the completion of the sale. Furthermore, in the Agreement itself, Defendants admit that the purpose of the non-competition clause is to protect the "considerable amount of money" Defendants expend obtaining new clients and maintaining existing clients. The restrictive covenants in the Agreement, like the restrictive covenants in the employment agreement in *Fillpoint*, target the employee's fundamental right to pursue his profession, and thus are void under Cal. Bus. & Prof. Code § 16600 et. al. As the noncompetition provision at issue is not tied to the sale of business, it is likely that it is void under California law, and Steve will prevail on the merits of his declaratory relief action.

---

15

**PLAINTIFFS' EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION ENJOINING DEFENDANTS FROM PROCEEDING WITH ENFORCEMENT OF RESTRICTIVE COVENANTS AND OTHER RELIEF; MEMORANDUM OF POINTS AND AUTHORITIES**

1    The Court should enjoin Defendants from enforcing the restrictive covenants in the

2    Agreement anywhere in the United States, because Plaintiffs are likely to succeed on the

3    merits of their claims.

4    **IV.**    **Conclusion**

5    The Court should grant the temporary restraining order and preliminary injunction

6    enjoining Defendants from enforcing the restrictive covenants in the Agreement anywhere in

7    the United States because otherwise Plaintiffs shall suffer irreparable harm during the course

8    of this litigation, in which they are likely to prevail.

9

10   DATED: January 16, 2024            **DENTON PETERSON DUNN, PLLC**

11

12                                      /s/ Jay Parmelee
                                        Jay Parmelee
13                                      *Attorneys for Plaintiffs*

DENTON PETERSON DUNN
ATTORNEYS & COUNSELORS AT LAW
1930 N. ARBOLEDA ROAD, SUITE 200
MESA, AZ 85213

1  Scott F. Gibson, Arizona State Bar No. #010884
   (Pro Hac Vice Pending)
2  SGibson@DentonPeterson.com
   Jay Parmelee, SBN 274676
3  Jay@DentonPeterson.com

4  DPD DENTON PETERSON DUNN
         ATTORNEYS & COUNSELORS AT LAW

5      1930 N. ARBOLEDA ROAD, SUITE 200
           MESA, ARIZONA 85213
6        TELEPHONE: (480) 325-9900
         FACSIMILE: (480) 325-9901
7      HTTPS://ARIZONABUSINESSLAWYERAZ.COM
       *Attorneys for Plaintiffs*

8           SUPERIOR COURT OF THE STATE OF CALIFORNIA

9        COUNTY OF SONOMA – UNLIMITED CIVIL JURISDICTION

10

11 | CG ENTERPRISES HOLDINGS, LLC, a | Case No.:24CV00024
12 | California limited liability company; and
     STEPHEN M. COON, an individual; | **Assigned to the Honorable Christopher**
13 | | **Honigsberg – Dept. 18**
14 | Plaintiffs, |
15 | vs. | **DECLARATION OF STEPHEN M. COON IN SUPPORT OF PLAINTIFFS' EX PARTE APPLICATION FOR**
16 | | **TEMPORARY RESTRAINING ORDER**
17 | WSP USA, INC., a New York corporation; | **AND ORDER TO SHOW CAUSE RE**
     WSP USA BUILDINGS, INC., a New York | **PRELIMINARY INJUNCTION**
18 | corporation; kW MISSION CRITICAL | **ENJOINING DEFENDANTS FROM**
     ENGINEERING, D.P.C., a New York design | **PROCEEDING WITH ENFORCEMENT**
19 | professional corporation; and DOES 1 through | **OF RESTRICTIVE COVENANTS AND**
     20, inclusive, | **OTHER RELIEF**
20 | Defendants. |

21 | | [Filed concurrently with Plaintiffs' Ex Parte
22 | | Application for Temporary Restraining Order
     | and Order to Show Cause re Preliminary
23 | | Injunction Enjoining Defendants from
     | Proceeding with Enforcement of Restrictive
24 | | Covenants and Other Relief; Memorandum of
     | Points and Authorities; Declaration of Jay
25 | | Parmelee; and [Proposed] Order thereon]
26 | | Complaint Filed:        January 2, 2024
     | Trial Date:             None Set
27

1
28  **DECLARATION OF STEPHEN M. COON IN SUPPORT OF PLAINTIFFS' EX PARTE APPLICATION FOR
    TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION
    ENJOINING DEFENDANTS FROM PROCEEDING WITH ENFORCEMENT OF RESTRICTIVE
    COVENANTS AND OTHER RELIEF**

I, Stephen M. Coon, hereby declare:

1.     I am one of the Plaintiffs in this lawsuit, and the owner of Plaintiff CG Enterprises Holdings, LLC.

2.     The facts set forth herein are of my own personal knowledge, and if called upon to testify as a witness, I could and would competently testify thereto.

3.     I make this declaration in support of Plaintiffs' Ex Parte Application for Temporary Restraining Order and Order to Show Cause re Preliminary Injunction Enjoining Defendants from Proceeding with Enforcement of Restrictive Covenants and Other Relief.

4.     I am a licensed Professional Electrical Engineer with more than fifteen years of experience in the strategic design of electrical topologies. I have been licensed in California as a Professional Electrical Engineer since 2018.

5.     I have in-depth knowledge of cross discipline engineering in mission critical infrastructure design.

6.     I have experience managing over fifty employees and growing a company from the ground up.

7.     I am highly reputable in my particular field of professional electrical engineering.

8.     CG Enterprises Holdings, LLC ("CG") is a start-up California limited liability company that I founded in late 2023.

9.     I wish to continue my work in mission critical engineering through CG.

10.    Defendants WSP USA, Inc. and WSP USA Buildings Inc. (collectively and interchangeably, "WSP"), and kW Mission Critical Engineering, d.p.c. ("kW Engineering") seek to prevent me from working through CG.  A true and correct copy of Defendants' Motion for Emergency Interim Relief in AAA arbitration is attached hereto, marked as Exhibit "A."

11.    WSP owns kW. Exhibit A, p. 1.

2

**DECLARATION OF STEPHEN M. COON IN SUPPORT OF PLAINTIFFS' EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION ENJOINING DEFENDANTS FROM PROCEEDING WITH ENFORCEMENT OF RESTRICTIVE COVENANTS AND OTHER RELIEF**

DENTON PETERSON DUNN
ATTORNEYS & COUNSELORS AT LAW
1930 N. ARBOLEDA ROAD, SUITE 200
MESA, AZ 85213
DPD

12. WSP is a large New York corporation which, in 2022, employed 66,200 individuals and earned $11.93 billion in revenues. WSP 2022 Annual Report at p. 1-2. A true and correct copy of the WSP 2022 Annual Report is attached hereto, marked as Exhibit "B."

13. WSP has acquired nearly 194 companies around the world, including 17 in the United States. Screenshot of WSP's Acquisitions Page. A true and correct copy of the WSP Acquisitions Page screenshot is attached hereto, marked as Exhibit "C."

14. WSP USA, Inc. has been authorized to do business in California since 1978. Screenshot of California Secretary of State's Entity Search. A true and correct copy of the California Secretary of State's Entity Search results screenshot is attached hereto, marked as Exhibit "D."

15. WSP USA Buildings, Inc. has been authorized to do business in California since 2012. Screenshot of California Secretary of State's Entity Search. A true and correct copy of the California Secretary of State's Entity Search results screenshot is attached hereto, marked as Exhibit "E."

16. WSP seeks to prevent me from working on any mission critical engineering projects anywhere in the United States until November 2024 pursuant to non-competition and non-solicitation clauses in my employment agreement with Defendants. Exhibit A, p. 15.

17. I formerly was a part owner of kW Engineering.

18. I, along with the other owners, sold my interest in kW Engineering to WSP in December 2020.

19. kW Engineering merged its business with WSP.

20. As part of that merger, I entered into a Retention Bonus Agreement (the "Retention Agreement") with kW Engineering. A true and correct copy of the Retention Bonus Agreement is attached hereto, marked as Exhibit "F."

DENTON PETERSON DUNN
ATTORNEYS & COUNSELORS AT LAW
1930 N. ARBOLEDA ROAD, SUITE 200
MESA, AZ 85213

3

21.     The Retention Agreement contains provisions that restricted my ability to work for no more than three years from the closing date (i.e., until December 28, 2023). Exhibit F, p. 2, ¶ III.

22.     I no longer have any obligations to kW Engineering or WSP USA under the Retention Agreement. Exhibit F, p. 3, ¶ III (D).

23.     As part of the merger, I also entered into a Senior Leadership Employment Agreement (the "Agreement") with kW Engineering "or its successors in interest" whereby I would perform services for kW Engineering, and kW Engineering would compensate me for the services rendered. A true and correct copy of the Agreement is attached hereto, marked as Exhibit "G."

24.     The Agreement contains a "Non-Competition and Non-Solicitation" section. Exhibit G, ¶ 8.

25.     The Agreement states that:

During the Employee's employment with the Company or its successor-in-interest and for a period of 12 months following the termination of Employee's employment for any reason (voluntary or involuntary), Employee shall not directly or indirectly own, manage, operate, control, be employed by, consult with or participate in the ownership, management, operation, or control of any business, in a manner that would reasonably be expected to divert business from any of the Company's "Clients" or "Prospective Clients" with whom Employee had any involvement in developing, servicing, soliciting, or maintaining during the year prior to Employee's termination.

Exhibit G, ¶ 8(B)(ii).

26.     The Agreement clarifies that:

"Clients" is defined as clients who the Company provided services for at any time during the 12-month period immediately preceding Employee's termination. "Prospective Clients" includes any person or entity: (a) to whom the Company has submitted qualifications or a proposal with Employee's direct personal involvement during the 12 months prior to Employee's

**DECLARATION OF STEPHEN M. COON IN SUPPORT OF PLAINTIFFS' EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION ENJOINING DEFENDANTS FROM PROCEEDING WITH ENFORCEMENT OF RESTRICTIVE COVENANTS AND OTHER RELIEF**

DENTON PETERSON DUNN
ATTORNEYS | COUNSELORS AT LAW
1930 N. ARBOLEDA ROAD, SUITE 200
MESA, AZ 85213

termination; or (b) concerning whom Employee was assisting the Company in preparing a submittal of qualifications or a proposal at the time of Employee's termination.

Exhibit G, ¶ 8(B)(iii).

27. The Agreement also includes two "Non-Solicitation" clauses which similarly purport to limit my ability to communicate with or interact with current, historical, or prospective clients of kW Engineering and any person or entity who was an employee, consultant, or contractor of kW Engineering or any of WSP's 17 USA Affiliates:

> During the Employee's employment with Company or its successor-in-interest, and for a period of 12 months following the termination of Employee's employment for any reason (voluntary or involuntary), Employee shall not directly or indirectly (on Employee's own or in combination or association with others, and whether for Employee's own benefit or for the benefit of other persons or entities) engage in activity which involves or could result in the actual or potential termination of the Company's relationship with or the solicitation, hiring, or engagement of any person or entity who is, at the time, or was within the last 12 months of Employee's employment within the Company, an employee, consultant, or independent contractor of the Company or any of its affiliates, including for greater certainty, any affiliate U.S. Company of WSP USA ("Affiliate").

Exhibit G, ¶ 8(C-D).

28. The Agreement further states that:

> During Employer's employment with the Company and for a period of 12 months following the termination of Employee's employment for any reason (voluntary or involuntary), Employee shall not directly or indirectly (on Employee's own or in combination or association with others, and whether for Employee's own benefit or for the benefit of other parties or entities) contract, call upon, solicit or otherwise accept business from, render services to, market services or products to, divert business from, and/or interfere with the Company's relationship or business with any of the Company's existing Clients or Prospective Clients (as that term is defined above) that Employee interacted with on behalf of the Company, was introduced to by virtue of Employee's employment with the Company, or otherwise learned confidential information concerning during the last 12 months of Employee's employment within the Company.

DECLARATION OF STEPHEN M. COON IN SUPPORT OF PLAINTIFFS' EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION ENJOINING DEFENDANTS FROM PROCEEDING WITH ENFORCEMENT OF RESTRICTIVE COVENANTS AND OTHER RELIEF

DENTON PETERSON DUNN
1930 N. ARBOLEDA ROAD, SUITE 200
MESA, AZ 85213

Exhibit G, ¶ 8(D).

29.     The Agreement had a two-year term. Exhibit G, ¶ 2.

30.     Under Paragraph 2, the term of the Agreement would automatically be extended from year to year unless either party gave advance written notice of their intent not to renew at least 30 days before the end of the current term. Exhibit G, ¶ 2.

31.     On or about November 2, 2022, I gave notice of my intent not to renew the Agreement more than 30 days before the end of the term.

32.     Effective January 1, 2023, the Agreement between kW Engineering and I terminated, and my employment with kW Engineering converted to an at will employment.

33.     On or about October 18, 2023, I gave written notice terminating my at-will employment with kW Engineering effective November 3, 2023.

34.     If I had remained employed with kW Engineering until December 31, 2023, Defendants would have no grounds for restricting my employment under the Agreement. *See* Exhibit G, ¶ 11 (when I became an at-will employee on January 1, 2023, the restrictive covenants expired "one (1) year from the date that Senior Leader is converted to an at-will employee provided that Senior Leader remains employment with Company one year after converting to an at-will employee").

35.     The Agreement requires the parties to resolve their disputes by binding arbitration with the American Arbitration Association ("AAA") in New York pursuant to AAA's Employment Arbitration Rules and Procedures. Exhibit G, ¶ 14.

36.     The Agreement also allows either party to "apply to any court of law or equity of competent jurisdiction for specific performance and/or injunctive or other relief in order to enforce or prevent any violations of the provisions" of the Agreement. Exhibit G, ¶ 16.

37.     On January 2, 2024, the same day I filed this suit, WSP commenced arbitration proceedings with the AAA, filing a Motion for Emergency Interim Relief and requesting that

DECLARATION OF STEPHEN M. COON IN SUPPORT OF PLAINTIFFS' EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION ENJOINING DEFENDANTS FROM PROCEEDING WITH ENFORCEMENT OF RESTRICTIVE COVENANTS AND OTHER RELIEF

DENTON PETERSON DUNN
ATTORNEYS & COUNSELORS AT LAW
1930 N. ARBOLEDA ROAD, SUITE 200
MESA, AZ 85213
DPD

the arbitrator enjoin me from competing with WSP and soliciting its employees or vendors during the pendency of the arbitration. Exhibit A.

38. On January 12, 2024, the arbitrator ruled that because the parties had not adopted the Optional Rules for Emergency Measures of Protection, WSP could not seek emergency interim relief in any arbitration proceedings.

39. Plaintiffs filed this case with the Court on January 2, 2024.

40. We seek injunctive relief related to the rights and obligations of the parties under the Agreement.

41. If I accepted a job in my particular field of electrical engineering anywhere in the world, I would be employed by a company which is arguably a competitor of WSP.

42. Because of my reputation and expertise, I am concerned that simply accepting employment from a competitor of WSP could arguably be reasonably expected to divert business from Company from Clients or Prospective Clients.

43. If I am employed by any company that does any of the same business as WSP or any of its 17 US affiliates, I am arguably indirectly engaging in activity which could result in potential termination of the Company's relationship with any person or entity who was an employee, consultant, independent contractor of WSP for the last twelve months of my employment.

44. If I am employed by any company that serves any of the same clients or prospective clients as WSP or its 17 US affiliates, I am arguably indirectly rendering services to any of WSP's existing or prospective clients.

45. I cannot accept a position in my career field without arguably violating one of the non-solicitation clauses.

46. If I am forced to change careers for the next year, particularly with my amount of experience, it will be difficult for me to find a job in any field because I am underqualified

DENTON PETERSON DUNN
ATTORNEYS & COUNSELORS AT LAW
1930 N. ARBOLEDA ROAD, SUITE 200
MESA, AZ 85213

for high level positions in an area outside of my area of expertise, but overeducated for low level positions.

47.     If I am able to obtain a job in an unrelated field, it is highly unlikely I will able to receive the amount of income I can earn in a field where I have over fifteen years of expertise.

48.     My ability to obtain a job in my field of expertise after the restrictive covenants expire will be reduced if I miss out on the opportunity to refine my craft and build relationships in 2024.

49.     If Defendants are allowed to enforce the restrictive covenants in the Agreement, I will be immediately and irreparably harmed.

Executed this 16th day of January, 2024, in Scottsdale, Arizona.

Stephen M. Coon, Declarant

**DECLARATION OF STEPHEN M. COON IN SUPPORT OF PLAINTIFFS' EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION ENJOINING DEFENDANTS FROM PROCEEDING WITH ENFORCEMENT OF RESTRICTIVE COVENANTS AND OTHER RELIEF**

# Exhibit A

**BEFORE**
**THE AMERICAN ARBITRATION ASSOCIATION**

| | | |
|---|---|---|
| WSP USA, Inc., | ) | |
| | ) | |
| Claimant, | ) | |
| | ) | |
| v. | ) | C.A. No. |
| | ) | |
| STEPHEN COON, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

---

### WSP USA, INC'S MOTION FOR EMERGENCY INTERIM RELIEF

---

Claimant WSP USA, Inc. ("WSP"), by and through undersigned counsel, hereby moves for interim relief in the form of the appointment of an emergency arbitrator, a temporary injunction, and expedited initial discovery, pursuant to the Optional Rules for Emergency Measures of Protection of the AAA's Employment Arbitration Rules and Mediation Procedures.

### <u>INTRODUCTION</u>

This action arises out of Stephen Coon's breach of the duty of loyalty and violations of restrictive covenants in his employment agreements with WSP. In 2020, WSP acquired kW Mission Critical Engineering ("kW MCE"), a data-center design and mission-critical engineering firm. As part of that acquisition, kW MCE's senior leadership, including Coon, signed employment agreements that prohibited them from competing with WSP or soliciting its employees or vendors until at least one year after their departure from kW MCE for any reason. Nonetheless, Coon resigned from WSP in October 2023 for the specific purpose of starting a competing business—a fact he openly admitted to colleagues. On his way out and since the time

of his resignation, it appears Coon followed through, soliciting several current WSP employees to work for him in recent weeks, two of which resigned in December (likely in violation of their own restrictive covenants) in close succession without revealing their new employer.  Having siphoned off this key team of former WSP employees, Coon will imminently begin competing with WSP for the very same customers that Coon was entrusted with servicing using kW MCE's proprietary, confidential, and trade secret business information and strategies.  Coon bragged that he already has a potential buyer for his new business after it is scaled up to $25MM in annual recurring revenue.  Furthermore, WSP recently received information from design partners suggesting that Coon is soliciting competitive work from kW MCE's existing customers, and is likely to solicit/target four  other key employees to execute his business plans.

AAA should appoint an emergency arbitrator to enjoin Coon from further improperly competing with WSP in clear violation of his employment agreement, and to prevent irreparable harm to WSP's business, impairment of its customer goodwill, and misappropriation of WSP's confidential and trade secret business information.  WSP paid Coon substantial amounts of consideration in exchange for the post-employment covenants he voluntarily agreed-to, and will be irreparably harmed, both through the loss of its competitive advantage and through the lost good will that it specifically acquired as part of its purchase of kW MCE.  The emergency arbitrator should also order limited expedited discovery to allow WSP to further support its requested relief.

## **BACKGROUND**

### I.       **WSP Acquires kW Mission Critical Engineering.**

In December 2020, WSP acquired kW MCE, a small (then approximately 175 employee) engineering firm that focused primarily on designing data centers and other mission-critical projects.  (Decl. of Kenneth Clausen ¶ 4, attached hereto as Ex. A.)  The acquisition closed on

December 30, 2020.  (*Id.* ¶ 5.)  As part of the acquisition, kW MCE's senior leadership team and key employees, including Coon, signed employment agreements and retention agreements containing restrictive covenants that prohibited them from competing with WSP, soliciting its employees, customers, or vendors, or sharing its trade secrets or confidential information.  (Ex. B at 6–8.)

## II.      Coon Agreed to Be Bound by Restrictive Covenants.

Coon worked for kW MCE for approximately eight years before the acquisition and entered an Employment Agreement with WSP on December 30, 2020, as a Professional Electrical Engineer and Managing Principal of the Phoenix Office.  (Ex. A ¶¶ 6–7 .)  Coon was responsible for providing technical engineering expertise and developing successful relationships with design team partners—architects, engineers, and contractors.  (*Id.* ¶ 11.)  Coon gained substantial experience and insight into kW MCE's data center business, and had key responsibilities for leadership of key client accounts and projects associated with data center program design and build out.  (*Id.* ¶ 12.)  Coon also gained knowledge about all aspects of kW MCE's customers' programs, including schedule, budget, risk and desired engineering team.  (*Id.* ¶ 13.)

Mr. Coon's Employment Agreement provided for a $200,000 a year base salary, benefits, and potential performance bonuses.  (Ex. B at 2.)  In exchange for this compensation, Coon agreed "not directly or indirectly [to] own, manage, operate, control, be employed by, consult with or participate in the ownership, management operation or control of any business in a manner that would reasonably be expected to divert business from any of the Company's 'Clients' or 'Prospective Clients' with whom [he] had any involvement in developing, servicing, soliciting, or maintaining during the year prior to [his] termination."  (*Id.* at 7.)  The Employment Agreement also prohibits Coon from engaging in "the solicitation, hiring, or engagement of any person or

entity who is, at the time, or was within the last 12 months of [his] employment with the Company, an employee, consultant, or independent contractor of the Company or any of its affiliates." (*Id.* at 8.) And the Employment Agreement provides that Coon "shall not . . . contact, call upon, solicit or otherwise accept business from, render services to, market services or products to, divert business from, and/or interfere with the Company's relationship or business with any of the Company's existing Clients or Prospective Clients" that he learned of, did work for, or learned confidential information about through WSP. (*Id.*)

These restrictive covenants are essential to ensuring that WSP receives the benefit of the bargain from the kW MCE acquisition, including kW MCE's good will. The data-center design business is extremely competitive, with each company's ability to compete largely dependent on, *inter alia*, (1) its ability to understand and accommodate a client's needs, and (2) the quality and reputation of its specific engineers. (Ex. A ¶ 31.) Competition from former kW MCE/WSP employees—and especially high-level employees like Coon, who is equipped with recent knowledge of kW MCE and WSP customers' preferences for, *inter alia*, engineering team organization and operation patterns—would thus be devastating for WSP. (*Id.* ¶¶ 33–34.) Accordingly, the Employment Agreement provides that the restrictive covenants will remain in place not only during Coon's employment by WSP, but also for another twelve months after he leaves or is terminated by WSP. (*See* Ex. B at 6–8.) The only exception is if Coon does not renew the Employment Agreement after the first two-year Term—and thus "convert[s] to an at-will employee" at the end of the Term, (*id.* at 2)—and "remains employed with [WSP] one year after converting to an at-will employee," at which point the restrictive covenants would expire at the end of that one year period. (*Id.* at 10.) In further recognition of the importance of the restrictive covenants, the Employment Agreement also provides, and Coon agreed, that "[t]he Company is in

4

a highly competitive business and expends considerable amounts of money in the development of business from new clients and customers and continued business from existing clients and customers. The business and clientele of the Company are national and worldwide in scope, and therefore the territorial and time limitations set forth in th[e] Non-Compete clause are reasonable and necessary for the protection of the Company's interests." (*Id.* at 7.)

Additionally, many employees, including Coon, also signed retention bonus agreements ("RBA") that reaffirmed their restrictive covenants in exchange for substantial cash bonuses "to incentivize [them] to remain with [kW MCE] . . . in order to assist [kW MCE] with integration into WSP." (Ex. C at 1.) Specifically, Coon executed the RBA on December 29, 2020, the day before signing his Employment Agreement. WSP paid Coon $475,000 over the course of two years pursuant to his RBA, in addition to his compensation under the Employment Agreement. (*Id.* at 1–2.)

## III.     Coon Violates the Restrictive Covenants.

On November 2, 2022, Coon gave notice that he would not renew the Employment Agreement, making him an at-will employee as of December 30, 2022. (Ex. D.) Coon did not, however, remain with WSP for a year after that date, as required by the Employment Agreement to excuse him from the 12-month tail in the restrictive covenants. (Ex. A ¶¶ 15, 17.) Instead, he tendered his resignation on October 18, 2023, effective "sometime between two and four weeks from today." (Ex. E.) His actual last day was November 3, 2023. (Ex. A ¶ 19.) Accordingly, the non-compete and non-solicitation provisions of his Employment Agreement are still in effect until November 3, 2024.

Nonetheless, Coon has already begun forming a competing business in Arizona (where he lives) and upstate New York (where much of kW MCE was located), likely intending to take

advantage of the exploding demand for data centers because of the growth of AI software and applications. Since his resignation (and likely earlier), Coon has solicited several former kW MCE/WSP employees—including at least Principal Mechanical Engineer Jason Leone and Managing Principal of the Troy Office Gary Russinko, who are each subject to their own restrictive covenants with WSP, (Exs. F & G)—to join him. (Ex. A ¶¶ 24–30.) Russinko resigned from WSP on October 30, 2023, with his last day being December 1. (*Id.*) Leone followed close behind, resigning on December 5, 2023, with his last day being December 22.. (*Id.*) Prior to his resignation, Coon openly admitted to a co-worker, Mr. Ken Clausen, that he was starting a competing business in Phoenix and upstate New York, near kW MCE's Troy, New York office, and had a lease ready to be executed in January of 2024. (*Id.* ¶ 20.) Coon also told Clausen he was "going to be taking anyone in Troy who had not signed a retention agreement," and acknowledged that he needed kW MCE's MEP engineers to deliver on competitive services to the very clients Coon was responsible for servicing at kW MCE. (*Id.* ¶ 21.) By recruiting those experienced mechanical engineers, Coon openly touted he could start a business that could compete directly with WSP. (*Id.* ¶ 22.) He also bragged that a member of the C-suite of another company, Bowman Engineering, already planned to pay him to buy the new business once it was scaled up to $25MM in annual revenue. (*Id.* ¶ 23.) Based on Coon's prior comments to Clausen, he is likely to target at least four other key kW MCE employees in early 2024, if he has not already done so. (*Id.* ¶ 34.) Design partners have also suggested in recent weeks to Clausen that Coon is soliciting competitive work from kW MCE's existing customers. (*Id.* ¶ 35.)

Together, Coon and the employees he has recruited to compete against kW MCE have the potential to inflict substantial harm to WSP's business. The key accounts that Coon was responsible for servicing have the potential to generate the tens of millions of dollars for FY 2024

and beyond.  (*Id.* ¶ 32.)  Further, Coon has in-depth knowledge of customer preferences, pricing, desired team, project specifications, engineering specifications and kW MCE's existing and past work for those key customers.  (*Id.* ¶ 33.)

On October 25, 2023, WSP's counsel sent Coon a letter, reminding him of his obligations under the restrictive covenants and addressing questions Coon asked in his resignation letter regarding which items/information he could keep and what had to be returned to WSP.  (Ex. H.) On December 29, 2023, WSP's counsel sent similar letters to Messrs. Leone and Russinko.  (Exs. I & J.)  Nonetheless, Coon seems undeterred, and neither Coon, Leone, or Russinko have divulged or disclosed where they intend to work after leaving WSP/kW MCE.  Accordingly, on January 2, 2024, WSP filed its Demand for Arbitration against Coon pursuant to § 17(a) of the Employment Agreement, asserting claims for breach of fiduciary duty, breach of contract, and tortious interference with contract.  WSP now moves for interim relief and expedited initial discovery.

## LEGAL STANDARDS[1]

The AAA's Emergency Rule O-4 provides that emergency interim relief is proper where "the party seeking the emergency relief has shown that immediate and irreparable loss or damage will result in the absence of emergency relief, and that such party is entitled to such relief." Similarly, New York law allows an employer to seek a preliminary injunction to enforce restrictive covenants where the claimant "show[s] a probability of success on the merits, the danger of

---

[1]    Coon's Employment Agreement provides that "[a]ny dispute arising between any of the Company and [Coon] under this Agreement, or under any statute, regulation, or ordinance, or in connection with [Coon's] Employment with the Company, shall be submitted to binding arbitration before the American Arbitration Association ("AAA") for resolution."  (Ex. B at 11.) It further provides that the arbitration proceedings will be governed by New York law and "conducted in accordance with AAA's Employment Arbitration Rules and Procedures."  *Id.*  And it provides "that in the event of a breach of any provision of this Agreement, money damages would be inadequate and neither [Mr.Coon] nor the Company would have an adequate remedy at law" and that injunctive relief is appropriate.  *Id.*

irreparable injury in the absence of a preliminary injunction and a balancing of the equities in its favor." *Frank May Assocs. Inc. v. Boughton*, 281 A.D.2d 673, 674 (N.Y. S. Ct. App. Div. 2001). "[T]he purpose of a preliminary injunction is to preserve the status quo until a decision is reached on the merits." *NYSARC, Inc. v. Syed*, 747 N.Y.S.2d 327, 329 (N.Y. S. Ct. 2002).

## ARGUMENT

Coon violated his duty of loyalty and his restrictive covenants by planning to start a competing business while still employed at WSP and soliciting WSP's other employees to join him. If he is permitted to begin competing with WSP, he will not only further violate his restrictive covenants, but WSP will also be irreparably harmed through the loss of its competitive position, the threatened and/or actual disclosure and misuse of its confidential information and trade secrets, and the impairment of kW MCE's business and customer good will for which WSP specifically bargained. Moreover, WSP requires expedited initial discovery on specific, targeted issues to determine the extent of the violations and Coon's plans for his competing business so that it can provide additional evidentiary support for continuing injunctive relief.

## I.    WSP Is Entitled to Emergency Interim Relief.

### A.    WSP Is Likely to Succeed on the Merits of Its Breach-of-Contract Claims.

To establish breach of contract, a claimant must show "the existence of a contract, the [claimant's] performance pursuant to the contract, the defendant's breach of his or her contractual obligations, and damages resulting from the breach." *Tri-Star Lighting Corp. v. Goldstein*, 151 A.D.3d 112, 1105 (N.Y. App. Div. 2017). Here, Coon breached his Employment Agreement by failing to abide by the restrictive covenants.

#### i.    The Restrictive Covenants Are Enforceable.

The Employment Agreement, including the restrictive covenants, is a valid and enforceable contract. "Generally, a covenant not to compete will be enforced . . . if it is reasonably limited temporarily and geographically and, without being harmful to the public or unduly burdensome, serves the acceptable purpose of protecting the former employer from unfair competition." *Bollengier v. Gulati*, 233 A.D.2d 721, 722 (N.Y. App. Div. 1996). Moreover, "[c]ourts will enforce noncompetition clauses 'where necessary to protect, *inter alia*, an employer's confidential customer information and the good will of . . . customer[s] generated and maintained at the employer's expense.'" *Gundermann & Gundermann Ins. V. Brassill*, 46 A.D.3d 82, 83 (N.Y. App. Div. 2007) (quoting *Milbrandt & Co., Inc. v. Griffin*, 1 A.D.3d 327, 328 (N.Y. App. Div. 2003)).

As an initial matter, in his Employment Agreement, Coon agreed that "the territorial and time limitations set forth in th[e] Non-Compete clause are reasonable and necessary for the protection of the Company's interests." (Ex. B at 7.) Accordingly, he has already conceded that they are valid. *See* Arbitration Award, *Clopay Corp. v. Priest*, 2023 WL 5657724 (E.D. Ok. July 10, 2023) (holding that national scope of restrictive covenant was reasonable based on employee's admission in contract).

Moreover, courts routinely hold that the Agreement's temporal scope—twelve months after the employee leaves the company—is reasonable. *See, e.g.*, *Artech Info. Sys., L.L.C. v. Tee*, 280 A.D.2d 117, 124 (N.Y. App. Div. 2001); *Michael I. Weintraub, M.D., P.C. v. Schwartz*, 131 A.D.2d 663, 665 (N.Y. App. Div. 1987); *J.H. Goldberg Co., Inc. v. Stern*, 53 A.D.2d 246, 250 (N.Y. App. Div. 1976). The temporal scope is particularly reasonable here because the covenants were connected to the acquisition of kW MCE. "New York courts have found three to five year restrictions reasonable in the context of the sale of a business." *Uni-World Capital L.P. v. Preferred Fragrance, Inc.*, 73 F. Supp. 3d 209, 235 (S.D.N.Y. 2014)). Although the restrictive

9

covenants were not part of the contract for the acquisition of kW MCE itself, the acquisition contemplated that the restrictive covenants would be in place.  Indeed, the Employment Agreement specifically references the transition from kW MCE to WSP, (Ex. B at 1), and the RCA states that the purpose of that agreement, including the similar restrictive covenants set forth therein, is "to incentivize [the employees] to remain with [kW MCE] . . . in order to assist [kW MCE] with integration into WSP."  (Ex. C at 1.)

The Employment Agreement's lack of a specific geographic scope is also reasonable for two reasons.  First, WSP works with clients and vendors around the world.  *See Uni-World Capital L.P.*, 73 F. Supp. 3d at 235 (upholding non-compete that applied to "the United States of America, its territories and possessions, and any country outside of the United States of America to which products of the Business are sold"); *Integra Optics, Inc. v. Nash*, 2018 WL 224460, at *10 (N.D.N.Y. Apr. 10, 2018) (applying Colorado law and enforcing worldwide scope of restrictive covenant); *GE Betz Inc. v. Moffitt-Johnson*, 301 F. Supp. 3d 668, 685 (S.D. Tex. 2014); *Bio-Imaging Techs., Inc. v. Marchant*, 584 F. Supp. 2d 322, 328 (D. Mass. 2008) (upholding non-compete agreement that extends to "any state or country where [employer] does business); *Universal Engraving, Inc. v. Duarte*, 519 F. Supp. 2d 1140, 1153 (D. Kan. 2007).  Second, the covenants are limited to conduct that is directed at WSP's existing and prospective clients—*e.g.*, soliciting them or engaging in conduct that "would reasonably be expected" to divert them away from WSP.  *See Crest Hill Capital LLC v. Gonzalez*¸ 2019 WL 1557512, at *6 (NY. S. Ct. Apr. 10, 2019) ("No geographic limitation is required for a non-solicitation clause that is client-based."); *W.R. Grace & Co., Dearborn Div. v. Mouyal*, 422 S.E.2d 529, 533 (Ga. 1992) ("Where . . . the former employee is prohibited from post-employment solicitation of employer customers which the employee contacted during his tenure with the employer, there is no need for a territorial

restriction expressed in geographic terms." (footnote omitted)). Even if this were not the case (which it is), Coon intends to operate his business—and has solicited WSP employees to work on that business—in New York, where kW MCE was primarily located, and Arizona, where Coon personally worked while employed at WSP. (*See* Ex. B at 1.) Accordingly, enforcing the restrictive covenants to prevent Coon from starting his competing business is reasonable and necessary to protect WSP's legitimate interests.

### ii. Coon Breached the Restrictive Covenants and Will Breach Them Again.

While WSP performed its obligations under the Employment Agreement by paying Coon a substantial salary, benefits, and bonuses, Coon violated his restrictive covenants and is planning to violate them again. The non-solicitation clause of the Employment Agreement provides that Coon shall not "engage in any activity which involves . . . the solicitation, hiring, or engagement of any person or entity who is, at the time, or was within the last 12 months of [his] employment with the Company, an employee . . . of the Company or any of its affiliates." (Ex. B at 8.) He has already done that by asking Messrs. Leone and Russinko to work for him at his competing business, causing them to resign.

Moreover, Coon's competing business itself will violate the non-competition and non-solicitation provisions. The non-competition clause provides that Coon "shall not directly or indirectly own, manage, operate, [or] control . . . any business in a manner that would reasonably be expected to divert business from any of the Company's 'Clients' or 'Prospective Clients' with whom [he] had any involvement in developing, servicing, soliciting, or maintaining during the year prior to [his] termination." (*Id.* at 7.) Yet, as noted above, that is exactly what Coon admits that he intends to do. Similarly, the non-solicitation clause provides that Coon "shall not . . . contact, call upon, solicit or otherwise accept business from, render services to, market services or

11

products to, divert business from, and/or interfere with the Company's relationship or business with any of the Company's existing Clients or Prospective Clients" that he learned of, did work for, or learned confidential information about through WSP "during the year prior to [his] termination." (*Id.*)  Coon has openly admitted he would go after the same client base given the team he is recruiting and his stated intention to start a competing business.  (Ex. A ¶¶ 20, 21, 35.)

    **iii.**        **WSP Has Been Harmed.**

WSP has already suffered damages and will suffer further damages without interim relief. Specifically, WSP has already been harmed by Coon's tortious interference with Messrs. Leone and Russinko's retention agreements in violation of his (and their) restrictive covenants—WSP lost two valuable employees.  Moreover, as explained below, WSP will suffer irreparable damage to its reputation, good will, and customer relationships if Coon is permitted to begin competing with it to solicit the same customers Coon worked with while at kW MCE/WSP.  (*See* Part I.B, *infra*.)

    **B.**        **WSP Will Be Irreparably Harmed Without Interim Relief.**

An injury is irreparable for the purpose of obtaining preliminary relief where the party would not have an adequate remedy at law.  *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 68 (2d Cir. 1999).  Here, WSP will suffer several irreparable injuries if the Arbitrator does not intervene.

As with the reasonableness of the restrictive covenants, Coon conceded that WSP will suffer irreparable harm if he is permitted to start a competing business before the covenants expire. Specifically, in the Employment Agreement, Coon agreed that "that in the event of a breach of any provision of this Agreement, money damages would be inadequate and neither [Mr.Coon] nor the Company would have an adequate remedy at law" and that injunctive relief is appropriate.  (Ex. B at 7); *see also Ticor Title Ins. Co.*, 173 F.3d at 69 (holding that contract provision that "in the event

of Cohen's breach of the post-employment competition provision, Ticor shall be entitled to injunctive relief, because it would cause irreparable injury" is an admission that harm would be irreparable).

Even apart from this admission, Coon's competing business in fact will likely cause substantial irreparable harm to WSP.  "It is well established that the loss of customer relationships stemming from the violation of nonsolicitation and non-competition clauses constitutes irreparable harm sufficient to support injunctive relief."  *Crest Hill Capital LLC*, 2019 WL 1557512, at *6. "[T]he violation of a non-compete by the solicitation of employees also constitutes irreparable harm."  *Global Switching Inc. v. Kasper*, 2006 WL 1800001, at *12 (E.D.N.Y. June 28, 2006); *EASi, LLC v. Gaffar*, 2020 WL 3868394, at *3 (C.D. Ill. July 9, 2020) (finding risk of irreparable harm because "[i]f Gaffar or L&T continue to solicit and hire EASi employees during the pendency of this lawsuit, EASi risks losing significant work from CAT, a large client, and may be competitively disadvantaged on future projects because the former EASi employees likely take with them the customer goodwill they helped to create for the employer"); *cf. Newmark Partners, L.P. v. Hunt*, 200 A.D.2d 557 (N.Y. App. Div. 2021) (granting preliminary injunction "to protect [plaintiff's] client relationships, reputation, and goodwill after losing all or almost all of their multifamily property group to their primary competitor").

As explained above, the data-center design industry is highly competitive, and a business' ability to compete depends in large part on the particular engineers working for it and its knowledge of a particular client's preferences about how the engineering team will operate.  Coon knows WSP's clients' preferences and may be able to divert substantial business from it by siphoning off its valuable team of engineers.  Coon also has knowledge of WSP/kW MCE's valuable trade secrets relating to customer projects/proposals, including design elements,

proposal/fee schedules, and instruments of service like field construction documents. Any competition or solicitation by Coon and his former WSP colleagues will necessarily involve the actual or inevitable disclosure of WSP's confidential and trade secret business information.

Finally, these harms will be compounded by the fact Coon's restrictive covenants were integral to "the sale of an existing business with its goodwill." *Frank May Assoc.*, 281 A.D.2d at 674; *accord Lund v. Agmata Wash. Enterprises, Inc.*, 190 A.D.2d 577, 577 (N.Y. App. Div. 1993); *Hay Grp., Inc. v. Nadel*, 170 A.D.2d 398, 399 (N.Y. App. Div. 1991). WSP will irreparably lose part of the good will it purchased in the acquisition if Coon is permitted to compete with it and steal its employees during the term of the restrictive covenants.

In sum, WSP will be irreparably harmed if Coon is not enjoined from competing with it and continuing improperly to solicit its employees in violation of his restrictive covenants.

## C. The Balance of Equities Favors WSP.

The balance of the equities favors WSP. As explained above, WSP paid Coon substantial sums of money in exchange for his employment *and* his agreement to abide by the restrictive covenants, and WSP will suffer significant and irreparable harm to its business, reputation, good will, and customer relationships if Coon is not enjoined from violating those covenants.

Moreover, those covenants are reasonably limited to protect WSP's interests. They do not prohibit Coon from obtaining gainful employment. Rather, they prohibit him only from soliciting the specific employees, vendors, and clients that belong to WSP, and from doing work that "would reasonably be expected to divert business" away from WSP. *See Battenkill Veterinary Equine P.C. v. Cangelosi*, 1 A.D. 856, 859 (N.Y. App. Div. 2003) (holding that equities favored the plaintiff where "[d]efendant is not being deprived of her livelihood").

14

Accordingly, the equities favor WSP, and the Arbitrator should issue emergency interim relief to enjoin Coon from competing with WSP and soliciting its employees or vendors during the pendency of this arbitration.

**II.      WSP Is Entitled to Expedited Initial Discovery.**

An "arbitrator [has] the authority to order such discovery, by way of  deposition, interrogatory, document production, or otherwise, as the arbitrator considers necessary to a full and fair exploration of the issues in dispute,  consistent with the expedited nature of arbitration." AAA'S EMPLOY. ARB. R. & MEDIATION P. 9.  WSP requests that Coon be required to preserve all relevant documents, including personal communications like emails and text messages, and that WSP be permitted to serve up to fifteen document requests and ten interrogatories to understand more about the specifics of Coon's competition plans and the full extent of his breach of his post-employment covenants.  These requests and interrogatories should include, but not be limited to, the specific requests attached hereto as Exhibits K and L.

<div align="center"><u>CONCLUSION</u></div>

For the forgoing reasons, the AAA should appoint an emergency arbitrator to this matter, order Coon not to compete with WSP or solicit its employees or vendors, and order Coon to preserve all relevant documents and to respond to expedited initial discovery.

Dated: January 2, 2024                         Respectfully submitted,

                                                          _/s/ Nipun J. Patel_____
                                                          **HOLLAND & KNIGHT LLP**
                                                          TODD WOZNIAK
                                                          Nipun J. Patel
                                                          Justin Kadoura
                                                          1650 Market Street, Suite 3300
                                                          Philadelphia, PA 19104
                                                          Todd.Wozniak@hklaw.com

Nipun.patel@hklaw.com
justin.kadoura@hklaw.com
Telephone:  215.252.9600
Fax:  215.867.6070

*Counsel for WSP USA, Inc.*

<u>**CERTIFICATE OF SERVICE**</u>

I, Nipun J. Patel, do hereby certify that on January 2, 2024, a true and correct copy of

the foregoing was served via email and mail to:

Stephen Coon
5533 Evia Caballo Blanco
Cave Creek, AZ 85331

9273 E Western Saddle Way
Scottsdale, AZ 85255

Coon1986@gmail.com

*/s/ Nipun J. Patel*
Nipun J. Patel

# Exhibit B



# Purposeful Growth

In the first year of our 2022-2024 strategic cycle, we continued to grow with purpose, delivered a strong performance, and made significant progress toward our ambitions.

Download our 2022 Annual Report



"Looking back on 2022, I take pride in our collective achievements, as we reinforced the solid foundation of our
diversified and resilient platform."

**Alexandre L'Heureux**
President and CEO, WSP Global

Read Alexandre's message

## Our Projects

Shaping the communities of tomorrow through our innovative projects, we view each one as an opportunity to contribute to a low-carbon world and to accelerate the green transition.

NEW YORK, USA

### Champlain Hudson Power Express Transmission Line

High-voltage transmission line bringing hydropower-generated electricity from Canada to New York City is the largest underground project of its kind ever attempted in...

HELSINKI, FINLAND

### Atlantinsilta, Helsinki: 2022 Bridge of the Year

The project brought together our expertise in bridge, foundation and lighting design, as well as landscape architecture.

IQALUIT, NUNAVUT, CANADA

### Safeguarding the Water Supply in the City of Iqaluit

When a foreign chemical appears in a municipal water supply, making it unsafe for human consumption, immediate action to locate and resolve the issue must tak...

## WSP Today

Our 66,200 talented professionals are united by a common purpose: working with clients to design, plan and create a more sustainable world.

**Employees**

| 11,800 | 20,500 | 22,500 | 11,400 |
|---|---|---|---|
| Canada | Americas (US, Latin America and the Caribbean) | EMEIA (Europe, Middle East, India and Africa) | APAC (Asia, Australia and New Zealand) |

Revenues by Market Sector                    Net Revenues by Region



45%
Transportation &
Infrastructure

28%
Earth &
Environment

19%
Property &
Buildings

8%
Power, Energy
and Industry

## 2022 Financial Highlights

We are pleased to report solid financial results, including record organic growth in our net revenues.

| 11.93 B | 8.96 B | 7.3% | 1.53 B |
|---|---|---|---|
| Revenues (CAD) | Net Revenues (CAD)[1] | Organic growth in Net Revenues | Adjusted EBITDA (CAD)[2] |
| 749.1 M | 17.1% | 73 | 13.0 B |
| Earnings before net financing expense and income taxes (CAD) | Adjusted EBITDA Margin[2] | Days Sales Outstanding (DSO)[3] | Backlog (CAD)[3] |



## 2022 in Review

In the first year of our 2022-2024 strategic cycle, we forged ahead with our disciplined acquisition approach, welcomed thousands of new professionals and made solid progress on our ESG commitments.

**FEBRUARY 1**
WSP recognized as **Industry Mover in sustainability** by S&P Global

**FEBRUARY 14**
WSP acquires **Climate Finance Advisors** in the US

**MARCH 9**
WSP sets out bold ambitions in its **2022-2024 Global Strategic Action Plan**

**MARCH 23**
WSP publishes its inaugural report on the **Task Force on Climate-related Financial Disclosures (TCFD)**

**JUNE 2**
WSP acquires **BOD Arquitectura e Ingeniería** in Spain

**JUNE 16**
WSP publishes **ESG Report** and **Climate Transition Plan**

**JUNE 29**
WSP is included in **Corporate Knights' Best 50 Corporate Citizens in Canada** for a second consecutive year

**AUGUST 1**
WSP acquires **Greencap Holdings** in Australia

**AUGUST 18**
WSP takes the **#1** spot in **ENR Magazine's List of Top 225 International Design Firms** for the second year in a row.

**SEPTEMBER 21**
WSP acquires the **Environment & Infrastructure Business of John Wood Group PLC**

**SEPTEMBER 23**
WSP acquires **Capita REI and GL Hearn from Capita plc** in the UK

**OCTOBER 3**
WSP acquires **Odeh Engineers** in the US

**OCTOBER 26**

Targets initiative's new Net-Zero Standard

**DECEMBER 6**

WSP Signs agreement to acquire Swiss-based **BG Consulting Engineers**[4]

**DECEMBER 7**

WSP unveils its Biodiversity Statement and **donates $700,000 to Nature Conservancy of Canada**

**DECEMBER 8**

WSP signs agreement to acquire Australia-Based **enstruct**[4]

**DECEMBER 16**

WSP scores an **"A" for transparency on Climate Change** on global environmental non-profit CDP's list

[Download our 2022 Annual Report]   [Read the press release]

1 Total of segments measure. Refer to section 8.1, "Net revenues" of WSP's Management's Discussion and Analysis for the quarter and year ended December 31, 2022 ("MD&A") for a reconciliation to revenues.

2 Non-IFRS financial measure or non-IFRS ratio without a standardized definition under IFRS, which may not be comparable to similar measures or ratios used by other issuers. Refer to section 22. "Glossary of segment reporting, non-IFRS and other financial measures", of WSP's MD&A for explanations of the composition and usefulness of this non-IFRS financial measure and non-IFRS ratio. Quantitative reconciliations of the non-IFRS financial measure to the most directly comparable IFRS measure are incorporated by reference to sections 8.3, "Adjusted EBITDA" of WSP's MD&A. Adjusted EBITDA margin is defined as adjusted EBITDA expressed as a percentage of net revenues.

3 Supplemental financial measure. Backlog represents future revenues stemming from existing signed contracts to be completed. DSO represents the average number of days to convert the Corporation's trade receivables (net of sales taxes) and costs and anticipated profits in excess of billings into cash, net of billings in excess of costs and anticipated profits.

4 The acquisitions of BG Consulting and enstruct were completed on January 31.



| WHO WE ARE | WHAT WE DO | INSIGHTS | CAREERS | CORPORATE |
|---|---|---|---|---|
| What We Stand For | Sectors | Climate | U.S. Job Opportunities | Sustainability |
| Our Story | Services | Mobility | Apply Here | Health and Safety |
| Future-Ready | Projects | Places | Supplier Registration | Investors |
| U.S. Leadership | | Society | FEMA Inspection Services | Whistleblowing Service |
| Our Offices | | Resources | | News |
| | | Technology | | Corporate Governance |
| | | | | Ethics and Integrity |

©2024 WSP    The WSP Logo    Privacy Policy    Anti-Spam Commitment    Cookie Policy    Terms of Use

# Exhibit C



What are you looking for?

Investors (/en-us/investors) / SHAREHOLDER INFORMATION (/en-us/investors/shareholder-information) / Acquisitions (/en-us/investors/shareholder-information/ac...

# ACQUISITIONS

We bring the latest technologies and a culture of innovation to our work to meet community needs for mobility, connectivity, sustainability, and resilience.

## Our Approach

In addition to supporting our employees in their charitable activities, we make an impact through our everyday work as we "plan, design, manage and engineer our communities to thrive." Having strong roots locally means there is pride and responsibility in delivering high quality projects for our communities.

All Years ⌄

| NAME | AREA OF EXPERTISE | LOCATION |
| --- | --- | --- |
| lgt | Buildings | Canada |
| Calibre | Mining Engineering, Sustainability & Environment | Australia |
| enstruct | Buildings | Australia |
| BG Bonnard & Gardel Holding SA | Multi-disciplinary professional services | Switzerland, France |
| Odeh Engineers | Multi-disciplinary professional services | United States |
| GL Hearn | Multi-disciplinary professional services | United Kingdom |
| Capita REI | Multi-disciplinary professional services | United Kingdom |
| Greencap Holdings | Environment | Australia |
| BOD Arquitectura e Ingeniería | Buildings | Spain |
| Environment & Infrastructure business ("E&I") of John Wood Group PLC | Environment | Across 10 OECD countries |
| Climate Finance Advisors, Benefit LLC | Climate, Resilience and Sustainability services | United States |
| Englekirk Structural Engineers | Buildings | United States |
| Knight Partners, LLC | Multi-disciplinary professional services | United States |
| b+p baurealisation | Multi-disciplinary professional services | Switzerland |
| Golder | Environment | United States, Canada, Europe, Africa, Asia Pacific, Latin America |
| EarthCon Consulting Group | Multi-disciplinary professional services | United States |
| tk1sc | Mechanical, electrical and plumbing engineering design services | United States |
| kW Mission Critical Engineering | Mechanical, electrical and plumbing engineering design services | United States |
| Smart Navigation | Bathymetry | Canada |
| LT Environmental Inc. | Multi-disciplinary professional services | United States |
| Ecology and Environment Inc. | Multi-disciplinary professional services | United States & Latin America |
| Elton Consulting Group PTY Ltd | Multi-disciplinary professional services | Australia |



| Lievense | AREA OF EXPERTISE | Netherlands LOCATION |
| --- | --- | --- |
| Buildings, Environment, Energy, Infrastructure and Water | | |

| | | |
| --- | --- | --- |
| Orbicon | Environment | Denmark, Sweden & Arctic region |
| Leach Wallace Associates, Inc. | Mechanical, electrical and plumbing engineering design services | United States |
| Indigo Planning Limited | Planning | United Kingdom |
| Todt, Gmür + Partner AG | Buildings | Switzerland |
| Sepia | Civil and geotechnics engineering services | France |
| Louis Berger | Transportation & Infrastructure and Environmental & Water sectors, as well as Master Planning | United States, Continental Europe, the Middle East, Africa, Asia (mainly India) and Latin America |
| Irwinconsult | Property & Buildings | Australia |
| Kontigo | Advisory services and social sustainability | Sweden |
| UnionConsult Gruppen AS and its affiliated entities (UnionConsult) | Buildings | Norway |
| Opus International Consultants Limited ("Opus") | Infrastructure (transportation and water), buildings and asset management | New Zealand, Australia, Canada, USA and the United Kingdom |
| Trafix Oy | Traffic and transport planning and management. | Finland |
| Consultoría Colombiana S.A. ("ConCol") | Power, transport, oil & gas, environment, project management | Colombia, Peru, Chile, Panama, Mexico |
| Leggette, Brashears and Graham, Inc. ("LBG") | Groundwater and environmental engineering services | USA |
| Willoughby Engineering | MEP, Building Performance | USA |
| Poch | Engineering, environmental services and project/construction management | Peru, Colombia and Mexico |
| Wirthensohn | Buildings | Switzerland |
| Yarmuth Radoff Green LLC (YR&G) | Sustainability | United States |
| ISS Proko Oy and ISS Suunnittelupalvelut Oy ("ISS Proko") | Construction and project management, supervision, appraisals and inspection | Finland |
| ProVab Invest AB | Water, Waste water cleaning processes | Sweden |
| AWT Consulting Engineers Pty Ltd | Structural engineering | Australia |
| Høyer Finseth | Project management and related advisory services | Norway |
| Mouchel Consulting | Public transportation and infrastructure | United Kingdom |
| CRC Engineering P.C. | Cogeneration (power & steam) | United States |
| Schlumberger's industrial water consultancy business | Industrial water consultancy | Chile, Peru, United States, United Kingdom, Colombia, Mexico |
| DITEC | Structural Engineering | Mexico |
| PRD Konsult AB | Power and Energy | Sweden |
| PTS Kiinteistotekniika Oy | Project Management, Buildings | Finland |
| MMM Group Limited | Transportation, Infrastructure & Environment, Buildings | Canada |
| Halvorson and Partners | Structural engineering services | U.S.A |
| Vicicom AB | Broadband and telecommunications networks for municipalities and operators | Sweden |
| FLK Sverige AB | Mechanical engineering | Sweden |
| Levelton Consultants Ltd. and Caravel Investments Ltd. | Environment, geotechnical, building science and materials engineering and testing | Canada |
| Faveo Group | Infrastructure and energy | Norway and Sweden |
| SPL Consultants Limited | Environment, Geotechnical and Buildings Science | Canada |
| Dessau CEI S.A.S | Transportation and Oil & Gas | Colombia |
| ccrd | Buildings, Healthcare, Science and Technology | USA |
| Parsons Brinckerhoff | | Worldwide |
| Winward Group | Structural Engineering | Australia |
| Technip TPS | Building and infrastructure engineering | France |



| Focus | Engineering and Geomatics | Alberta, Canada |
|---|---|---|
| | AREA OF EXPERTISE | LOCATION |

| | | |
|---|---|---|
| TECNOAmbiental S.A.S | Environmental services | Meta, Colombia |
| De Curtis Engineering Limited | Coastal and marine facilities | Ontario, Canada |
| Design Food Systems | Food services and hospitality design consulting | Ontario, Canada |
| Consultores Regionales Asociados S.A.S. (CRA) | Civil engineering, environment, energy and telecommunications | Bogotá, Colombia |
| Rodrigue Julien Expert-Conseil | Mechanical and electrical engineering | Quebec, Canada |
| GRB Engineering Ltd. | Oil and Gas | Calgary, Canada |
| Smith Carter Architects and Engineers Inc. (now part of Architecture 49, our strategic business partner) | Architecture and engineering | Winnipeg, Canada |
| North 46 Architecture Inc. (now part of Architecture 49, our strategic business partner) | Buildings | Charlottetown, Canada |
| WSP Group PLC | Multi-disciplinary professional services | United Kingdom |
| Decibel Consultants Inc. | Architectural Acoustics, Industrial/Environmental Noise Measurement and Control, Field of Vibration | Quebec, Canada |
| WHW Architects (now part of Architecture 49, our strategic business partner) | Buildings | Nova Scotia, Canada |
| JMH | Environment | Quebec, Canada |
| OptiVert | Environment | Quebec, Canada |
| Dakins | Municipal Infrastructure | Ontario, Canada |
| ARCOP (now part of Architecture 49, our strategic business partner) | Buildings (Architecture) | Quebec, Canada |
| ISACTION inc. | Automated System Integration | Quebec, Canada |
| Le Groupe GIROUX | Geomatics and Surveying | Quebec, Canada |
| Delcom Engineering Ltd. | Consulting Engineering and Land Surveying | Prince Edward Island, Canada |
| AE Consultants (now part of Architecture 49, our strategic business partner) | Architecture | Newfoundland and Labrador, Canada |
| Thompson Rosemount Group | Municipal Infrastructure, Buildings | Ontario, Canada |
| Bearden Engineering Consultants Ltd. | Buildings, Structure, Architecture | Alberta, Canada |
| Beaubien Glover Maskell Engineering North Inc. | Buildings, Electrical, Energy Efficiency | Alberta, Canada |
| Terrain Group Inc. | Municipal Infrastructure, Transportation, Environment | Nova Scotia, New Brunswick, Alberta, Canada |
| ANO Architects (strategic partner) | Buildings | Ontario, Canada |
| Pryde Schropp McComb Inc. | Aviation Engineering Consulting | Ontario and Alberta, Canada |
| Aquapraxis Inc. | Urban hydrology and Water Resource Management | Quebec, Canada |
| Tundra Engineering Associates Ltd. | Oil and Gas Industry | Alberta, Canada |
| V.B. Cook Co. Limited | Mining Engineering, Energy, Transportation, Building and Environment | Ontario, Canada |
| Hirschfield Williams Timmins Ltd | Mechanical Engineering | British Columbia, Canada |
| Design Collaborative Associates Ltd. | Architecture | Port of Spain, Trinidad and Tobago |
| Énergie et Analyses ENAQ du Québec Ltée | Energy | Québec, Canada |
| Algal & Associates Ltd. | Energy | Ontario, Canada |
| Jagger Hims Ltd. | Environment | Ontario, Canada |
| WM. R. Walker Engineering Inc. | Municipal Infrastructure, Transportation, Buildings, Energy | Ontario, Canada |
| Magnate Engineering & Associates Inc. | Telecommunications | Ontario, Canada |
| Progemes Consultants | Buildings | Quebec, Canada |
| Harp Engineering & D | Mechanical & Electrical | Ontario, Canada |
| Envirotel 3000 Inc. | Environment | Quebec, Canada |
| WSA Trenchless Consultants Inc. | Municipal Infrastructure | Quebec, Canada |

| | AREA OF EXPERTISE | LOCATION |
|---|---|---|
| Consultants Inc. | Transportation | Ontario, Canada |
| Wiebe Environmental Services Inc. | Environment | Alberta, Canada |
| Gilles Taché & Associés Inc | Municipal Infrastructure | Quebec, Canada |
| Bullock Baur Associates Ltd. | Municipal Infrastructure | British Columbia, Canada |
| Peterson Galloway Ltd. | Building Engineering | British Columbia, Canada |
| Zenix Engineering Ltd. | Building Engineering | Ontario, Canada |
| Solmers Inc. | Environment | Quebec, Canada |
| Henderson Paddon & Associates Ltd. | Municipal Infrastructure, Transportation, Buildings and Environment | Ontario, Canada |
| Les Consultants GÉNIPLUS Inc./ Nageco Inc. | Buildings, Municipal Infrastructure and Transportation | Quebec, Canada |
| Consumaj Estrie Inc. | Municipal Infrastructure and Environment | Quebec, Canada |
| DDH Environnement Ltd. | Environment | Quebec, Canada |
| Mountain Enterprises | Structural Modelling and Design | USA |
| Charterhouse Building Services Limited | Building Services Consultancy | UK |
| Transenco Limited | Transportation and Municipal Infrastructure | Ontario, Canada |
| Phoenix Engineering | Wind Energy | Alberta, Canada, and Texas, USA |
| RFA Consulting Electrical Engineers Inc. | Building, Municipal Infrastructure and Transportation | British Columbia, Canada |
| EXH Engineering Services Ltd. | Transportation and Municipal Infrastructure | Alberta, Canada |
| Doucet & Associés Conseils ltée | Telecommunications and Utilities Infrastructure | Quebec, Canada |
| Pomeroy Consulting Engineers Ltd. | Buildings | British Columbia, Canada |
| GLD Experts-Conseils | Municipal Infrastructure, Transportation, Building, Environment | Quebec, Canada |
| Nove Environnement inc. | Environment and land use planning | Quebec, Canada |
| NCE Ltd. | Transportation | Ontario, Canada |
| SEG Engineering | Municipal Infrastructure | Manitoba, Canada |
| Harmer Podolak Engineering Consultants Inc. | Bridge and Municipal Infrastructure | Ontario, Canada |
| TERRA experts conseils | Municipal Infrastructure | Quebec, Canada |
| André Simard et associés | Environment and Municipal Infrastructure | Quebec, Canada |
| B.H. Martin Consultants Ltd. | Building and Civil Engineering, Mining and Environment | Ontario, Canada |
| Entec | Marine Engineering Consultant | South Africa |
| CEL International | Industrial Processes | UK |
| SEi Design Engineers | Building Services | USA |
| CBP Consulting Engineers AG | Building Services Design & Project Management | Germany |
| Chas. H. Sells, Inc. | Transport & Infrastructure Consultant | USA |
| Worthington-Smith & Brouwer (GTG) (PTY) Limited | Refrigeration Consultant | South Africa |
| LC Consulting | Structural Engineering Consultant | South Africa |
| Fitzwalter | Environmental Remediation | Australia |
| Lincolne Scott | Buildings Services Consultants | Australia |
| Kazmar Associates, Ltd. | Building Engineering | Ontario, Canada |
| VizStudio | 3D Visual Simulation | Quebec, Canada |
| Talone OÜ | Structural Engineering | Estonia |
| Environmental Strategies Consulting, LLC | Environmental and Remediation | USA |
| LC Consultants | Structural Engineering Consultants | Dubai |
| Ark Consulting Pty Ltd, Responsive Environmental Solutions Pty Ltd and ESH Connect Australasia Pty Ltd | Environmental Consultants | Australia |
| Transek AB | Transportation/Traffic Management | Sweden |

WSP

| | AREA OF EXPERTISE | LOCATION |
|---|---|---|
| Labelle-Ryan Génipro inc. | Municipal Infrastructure, Mechanical & Electrical, Structure, Environment | Quebec, Canada |
| MacViro Holdings Inc. | Water & Waste Water Treatment, Solid Waste Management, Environment, Power | Ontario, Canada |
| Martoni, Cyr and Associates Inc. | Building Engineering, Telecommunications | Quebec, Canada |
| Cochrane Design Group | Buildings, Municipal Infrastructure, Transportation, Power, Industrial, Processing | British Columbia, Saskatchewan, Manitoba and Ontario, Canada |
| PHB Group | Building Services Engineering Consultant | United Arabs Emirates |
| AMEC | Pulp and paper, Pharmaceutical and Biotechnology, Power | Quebec, Canada |
| Sokkia | Mechanical, Electrical | Quebec, Canada |
| AdeB Consultants Ltd. | Mechanical, Electrical and Civil Engineering | Port of Spain, Trinidad & Tobago |
| Consultants Génium Inc. | Building & Maritime Engineering, Municipal Infrastructure, Transportation | Quebec, Canada |
| Léandre Gervais & Associés Inc. | Mining & Forestry Engineering, Mechanical & Electrical, Structure, Municipal Infrastructure, Industrial | Quebec, Canada |
| Groupe-Conseil Aiguebelle Inc. | Environment, Civil Engineering, Industrial | Quebec, Canada |
| Day & Behn Engineering Inc. | Mechanical & Electrical, Lighting design | Ontario, Canada |
| Integrated Building Services Design Partnership Plc | Building services with focus on Healthcare | UK |
| Promine Consultants Inc. | Mining Engineering, Geology | Quebec, Canada |
| Consulting KORTES OY | Bridge designer/Structural Design | Finland |
| Inregia AB | Regional planning and performance analysis (public sector) | Sweden |
| Savoie & Associés, Experts-Conseils Inc. | Mechanical and Electrical (food services) | Quebec, Canada |
| Les Consultants de l'Outaouais Inc. | Municipal Infrastructure | Quebec, Canada |
| Clemann Large Patterson & Associates Inc. | Mechanical and Electrical | Ontario, Canada |
| ICI Côte-Nord Inc. | Industrial | Quebec, Canada |
| Hydro-Terra Inc. | Industrial | Quebec, Canada |
| Consultants industriels C.E.M. Inc. | Industrial | Quebec, Canada |
| STRON Consultants Inc. | Mechanical and Electrical, Pharmaceutical | Quebec, Canada |
| Walmsley | Environmental consultant | South Africa |
| EMP Projects OY | Energy Project Management | Finland |
| LT Consultants OY | Transport and infrastructure consultant | Finland |
| Jacobson & Widmark | Multidisciplinary Engineering Consultants | Sweden |
| Ingeos G.E.M. inc. | Environment | Montreal, Canada |
| Sauvé Boucher Associates Inc. | Building engineering, Structures Engineering, Industrial | Quebec, Canada |
| Kostuch Engineering Limited | Municipal Infrastructure and Transportation | Quebec, Canada |
| BMST Roumon Experts Conseils inc. | Municipal Infrastructure and Transportation | Quebec, Canada |
| Le Groupe Icogec (1991) Inc. | Municipal Infrastructure | Quebec, Canada |
| Mitchell, McFarlane, Brentnall & Partners International Ltd (MMBP) | Structural Engineers | Hong Kong |
| Flack + Kurtz Inc. | Building Services Engineering Consultant | USA |
| Cantor Seinuk Group | High-rise structural engineering consultant | USA |
| Naturam Environment Inc. | Environment, Vegetation control | Quebec, Canada |
| Groupe conseil Gesco Inc. | Mechanical Engineering, Municipal Infrastructure and Transportation, Industrial, Railway Engineering, Environment | Quebec, Canada |
| MBS | Infrastructure services | South Africa |
| WEVS Group | Building services and process engineer | South Africa |
| HJT | Structural consulting engineer | UK |



| | AREA OF EXPERTISE | LOCATION | | |
|---|---|---|---|---|
| Brissette Samson & Associates | Building Engineering, Petroleum Engineering | Quebec, Canada | | |
| Raymond Desmarais & Associates | Building engineering | Quebec, Canada | | |
| Graham Consulting Group | Civil Engineering Consultant (Highways/Transportation/Infrastructure) | UK | | |
| RT James Ltd | Structural Engineering Consultant | UK | | |
| A B Consulting plc | Multidisciplinary consultant | UK | | |
| Parsons Brown | Building Services Consultancy | UK | | |
| Donald Rudd & Partners | Building Services Consultancy | UK | | |
| Cairns & Byles | Building Services and motorway communications | UK | | |

**wsp** (/en-us/)

 (https://www.instagram.com/wsp.usa/)

 (https://www.linkedin.com/company/wspusa/)

(https://www.youtube.com/wspusa)

 (https://twitter.com/wspusa)

f (https://www.facebook.com/wspusa/)

**WHO WE ARE (/EN-US/WHO-WE-ARE)**

What We Stand For (/en-us/who-we-are/what-we-stand-for)

Our Story (/en-us/who-we-are/our-story)

Future Ready (/en-us/hubs/future-ready)

U.S. Leadership (/en-us/who-we-are/leadership-team)

Our Offices (/en-us/who-we-are/our-offices)

**WHAT WE DO (/EN-US/WHAT-WE-DO)**

Sectors (/en-us/sectors)

Services (/en-us/services)

Projects (/en-us/projects)

**INSIGHTS (/EN-US/INSIGHTS)**

Climate (/en-us/insights/climate)

Mobility (/en-us/insights/mobility)

Places (/en-us/insights/places)

Society (/en-us/insights/society)

Resources (/en-us/insights/resources)

Technology (/en-us/insights/technology)

**CAREERS (/EN-US/CAREERS)**

U.S. Job Opportunities (/en-us/careers/join-our-team?country=US)

Apply Here (https://www.wsp.com/en-US/careers/join-our-team/spontaneous-application)

Supplier Registration (http://plus.wsp-pb.com/supplier_registration/)

FEMA Inspection Services (https://www.wspinspectionservices.com/)

**CORPORATE ()**

Sustainability (/en-us/who-we-are/corporate-responsibility/sustainability)

Health and Safety (/en-us/who-we-are/corporate-responsibility/health-safety)

Investors (/en-us/investors)

Whistleblowing Service (http://www.wsp-pb.com/en/Who-we-are/Corporate-Governance/Whistleblowing-service/)

News (/en-us/news)

Corporate Governance (/en-us/investors/corporate-governance)

Ethics and Integrity (/en-us/who-we-are/corporate-responsibility/ethics-integrity)

©2024 WSP

The WSP Logo (/en-us/legal/the-wsp-logo)   Privacy Policy (/en-us/legal/privacy-policy)   Anti-Spam Commitment (/en-us/legal/anti-spam-commitment)   Cookie Policy (/en-us/legal/cookie-policy)
Terms of Use (/en-us/legal/terms-of-use)

Case 3:24-cv-00762-NJR-TWD Document 34-21 Filed 02/06/24 Page 206 of 487

# Exhibit D



California
Secretary of State

Business    UCC

⌂ Home

🔍 Search

📁 Forms

? Help

## Business Search

The California Business Search provides access to available information for **corporations, limited liability companies** and **limited partnerships** of record with the California Secretary of State, with **free PDF copies** of over 17 million imaged business entity documents, including the most recent imaged Statements of Information filed for Corporations and Limited Liability Companies.

Currently, information for Limited Liability Partnerships (e.g. law firms, architecture firms, engineering firms, public accountancy firms, and land survey firms), General Partnerships, and other entity types or **not contained** in the California Business Search. If you wish to obtain information about LLPs and GPs, submit a Business Entities Order paper form to request copies of filings for these entity types. Note: This search is not intended to serve as a name reservation search. To reserve an entity name, select Forms on the left panel and select Entity Name Reservation ? Corporation, LLC, LP.

### Basic Search

* A Basic search can be performed using an entity name or entity number. When conducting a search by an entity name, where applicable **remove "C"** from the entity number. Note **a basic search** will search **only ACTIVE entities** (Corporations, Limited Liability Companies, Limited Partnerships, Cooperatives, Name Reservations, Foreign Name Reservations, Unincorporated Common Interest Developments, and Out of State Associations). The basic search performs a contains ?keyword? search. An Advanced search allows for a ?starts with? filter. To search entities that have a status other than active or to refine search criteria, use the **Advanced** search feature.

### Advanced Search

* An Advanced search is required when searching for publicly traded disclosure information or a status other than active.

* An Advanced search allows for searching by specific entity types (e.g., Nonprofit Mutual Benefit Corporation) or by entity groups (e.g., All Corporations) as well as searching by ?begins with? specific search criteria.

**Disclaimer:** Search results are limited to the 500 entities closest matching the entered search criteria. If your desired search result is not found within the 500 entities provided, please refine the search criteria using the Advanced search function for additional results/entities. The California Business Search is updated as documents are approved. The data provided is not a complete or certified record.

Although every attempt has been made to ensure that the information contained in the database is accurate, the Secretary of State's office is not responsible for any loss, consequence, or damage resulting directly or indirectly from reliance on the accuracy, reliability, or timeliness of the information that is provided. All such information is provided "as is." To order certified copies or certificates of status, (1) locate an entity using the search; (2) select Request Certificate in the right-hand detail drawer; and (3) complete your request online.

| WSP usa, inc | 🔍 |
|---|---|

Advanced ⌄

Results: 9

| Entity Information | | Initial Filing Date | Status | Entity Type | Formed In | Agent |
|---|---|---|---|---|---|---|
| WSP USA ADMINISTRATION INC. (1994092) | › | 11/19/1996 | Active | Stock Corporation - Out of State - Stock | DELAWARE | C T CORPORATION SYSTEM |
| WSP USA BUILDINGS INC. (3524006) | › | 12/03/2012 | Active | Stock Corporation - Out of State - Stock | NEW YORK | C T CORPORATION SYSTEM |
| WSP USA DESIGN INC. (3617423) | › | 11/05/2013 | Active | Stock Corporation - Out of State - Stock | DELAWARE | C T CORPORATION SYSTEM |
| WSP USA ENERGY STORAGE SERVICES INC. (5773658) | › | 06/15/2023 | Active | Stock Corporation - Out of State - Stock | DELAWARE | C T CORPORATION SYSTEM |
| WSP USA ENVIRONMENT & INFRASTRUCTURE INC. (1890237) | › | 06/06/1994 | Active | Stock Corporation - Out of State - Stock | NEVADA | C T CORPORATION SYSTEM |
| WSP USA INC. (900655) | › | 10/19/1978 | Active | Stock Corporation - Out of State - Stock | NEW YORK | C T CORPORATION SYSTEM |
| WSP USA SERVICES INC. (2119493) | › | 09/04/1998 | Active | Stock Corporation - Out of State - Stock | DELAWARE | THE CORPORATION COMPANY |
| WSP USA SOLUTIONS INC. (3897716) | › | 04/22/2016 | Active | Stock Corporation - Out of State - Stock | NEW YORK | C T CORPORATION SYSTEM |

### WSP USA INC. (900655)    ✕


Request Certificate

| | |
|---|---|
| Initial Filing Date | 10/19/1978 |
| Status | Active |
| Standing - SOS | Good |
| Standing - FTB | Good |
| Standing - Agent | Good |
| Standing - VCFCF | Good |
| Formed In | NEW YORK |
| Entity Type | Stock Corporation - Out of State - Stock |
| Principal Address | ONE PENN PLAZA 4TH FLOOR NEW YORK, NY 10119 |
| Mailing Address | 4139 OREGON PIKE EPHRATA, PA17522 |
| Statement of Info Due Date | 10/31/2024 |
| Agent | 1505 Corporation C T CORPORATION SYSTEM |
| CA Registered Corporate (15O5) Agent Authorized Employee(s) | AMANDA GARCIA 330 N BRAND BLVD, GLENDALE, CA |
| | GABRIELA SANCHEZ 330 N BRAND BLVD, GLENDALE, CA |
| | DAISY MONTENEGRO 330 N BRAND BLVD, GLENDALE, CA |
| | BEATRICE CASAREZ-BARRIENTEZ 330 N BRAND BLVD, GLENDALE, CA |
| | JESSIE GASTELUM 330 N BRAND BLVD, GLENDALE, CA |
| | JOHN MONTICO 330 N BRAND BLVD, GLENDALE, CA |
| | DIANA RUIZ 330 N BRAND BLVD, GLENDALE, CA |
| | SARAI MARIN 330 N BRAND BLVD, GLENDALE, CA |
| | EMANUEL JACOBO 330 N BRAND BLVD, GLENDALE, CA |
| | GLADYS AGUILERA 330 N BRAND BLVD, GLENDALE, CA |
| | VIVIAN IMPERIAL 330 N BRAND BLVD, GLENDALE, CA |
| | CARLOS PAZ 330 N BRAND BLVD, GLENDALE, CA |
| | ALBERTO DAMONTE 330 N BRAND BLVD, GLENDALE, CA |
| | PETER CAYETANO 330 N BRAND BLVD, GLENDALE, CA |
| | ELSA MONTANEZ 330 N BRAND BLVD, GLENDALE, CA |
| | XENIA PEREZ 330 N BRAND BLVD, GLENDALE, CA |
| | YESENIA CARPENTER 330 N BRAND BLVD, GLENDALE, CA |
| | JAQUELINE MEJIA 330 N BRAND BLVD, GLENDALE, CA |

View History        Request Access

© 2024 CA Secretary of State

# Exhibit E

1/16/24, 2:32 PM

Search | California Secretary of State

California Secretary of State

Business    UCC




Login

# Business Search

The California Business Search provides access to available information for *corporations*, *limited liability companies* and *limited partnerships* of record with the California Secretary of State, with *free PDF copies* of over 17 million imaged business entity documents, including the most recent imaged Statements of Information for Corporations and Limited Liability Companies.

Currently, information for Limited Liability Partnerships (e.g. law firms, architecture firms, accountancy firms, engineering firms, and land survey firms, public accountancy firms, and other entity types are *not contained* in the California Business Search. If you wish to obtain information about LLPs and GPs, submit a Business Entities Order (paper) form to request copies of filings for these entity types. Note: This search is not intended to serve as a name reservation search. To reserve an entity name, select Forms on the left-hand and select Entity Name Reservation ? Corporations, LLC, LP.

## Basic Search

A basic search can be performed using an entity name or entity number. When conducting a search by an entity number, where applicable, remove 10 in the entity number. Note: *a basic search* will search *only ACTIVE entities* (Corporations, Limited Liability Companies, Limited Partnerships, Cooperatives, Name Reservations, Unincorporated Common Interest Developments, and Out of State Associations). The basic search performs a *contains "keyword" search*. The Advanced search allows for a "starts with" to search entities that have a status other than active or to refine search criteria, use the *Advanced search* feature.

## Advanced Search

An Advanced search is required when searching for publicly traded disclosure information or a status other than active.

An Advanced search allows for searching by specific entity types (e.g. Nonprofit Mutual Benefit Corporation) or by entity groups (e.g. All Corporations) as well as searching by begins with (spell).

*Disclaimer: Search results are not limited to the 500 entities closest matching the entered search criteria. If your desired search result is not found within the 500 entities provided, please refine the search criteria using the Advanced search function for additional search results/entities. The California Business Search is updated as documents are approved. The data provided is not a complete or certified record.*

Although every attempt has been made to ensure that the information contained in the database is accurate, the Secretary of State is not responsible for any loss, consequence, or damage resulting directly or indirectly from reliance on the accuracy, reliability, or timeliness of the information that is provided. All such information is provided "as is." To order copies of filings or certificates of status, (1) locate an entity using the search; (2) select Request Certificate in the right-hand detail drawer; and (3) complete your request online.

wsp usa buildings, inc                      🔍

Advanced ⌄

Result: 1

| Entity Information ⇅ | Initial Filing Date | Status ⇅ | Entity Type ⇅ | Formed In ⇅ | Agent ⇅ |
|---|---|---|---|---|---|
| WSP USA BUILDINGS INC | 12/03/2012 | Active | Stock Corporation - Out of State - Stock | NEW YORK | C T CORPORATION SYSTEM |

---

WSP USA BUILDINGS INC (5324888)

| | |
|---|---|
| Record Filing Date | 12/03/2012 |
| Status | Active |
| Standing - SOS | Good |
| Standing - FTB | Good |
| Standing - Agent | Good |
| Standing - VCFCF | Good |
| Formed in | NEW YORK |
| Entity Type | Stock Corporation - Out of State - Stock |
| Principal Address | ONE PENN PLAZA, NEW YORK, NY 10119 |
| Mailing Address | ONE PENN PLAZA, NEW YORK, NY10119 |
| Statement of Info Due Date | 12/31/2024 |
| Agent | 1505 Corporation, C T CORPORATION SYSTEM |
| CA Registered Corporate (1505) Agent Individual Employee(s) | AMANDA GARCIA, 330 N BRAND BLVD, GLENDALE, CA |
| | GABRIELA SANCHEZ, 330 N BRAND BLVD, GLENDALE, CA |
| | DAISY MONTENEGRO, 330 N BRAND BLVD, GLENDALE, CA |
| | BEATRICE CRAMEZ-BARROSTO, 330 N BRAND BLVD, GLENDALE, CA |
| | JESSIE CASTELLON, 330 N BRAND BLVD, GLENDALE, CA |
| | JOHN MONTO, 330 N BRAND BLVD, GLENDALE, CA |
| | DIANA RUIZ, 330 N BRAND BLVD, GLENDALE, CA |
| | SARA MARIN, 330 N BRAND BLVD, GLENDALE, CA |
| | EMANUEL JACOBO, 330 N BRAND BLVD, GLENDALE, CA |
| | GLADYS AGUILERA, 330 N BRAND BLVD, GLENDALE, CA |
| | VIVIAN IMPERIAL, 330 N BRAND BLVD, GLENDALE, CA |
| | CARLOS PAZ, 330 N BRAND BLVD, GLENDALE, CA |
| | ALBERTO DAMONTE, 330 N BRAND BLVD, GLENDALE, CA |
| | PETER CAYETANO, 330 N BRAND BLVD, GLENDALE, CA |
| | ELSA MONTANEZ, 330 N BRAND BLVD, GLENDALE, CA |
| | KENIA PEREZ, 330 N BRAND BLVD, GLENDALE, CA |
| | YESENIA CARPENTER, 330 N BRAND BLVD, GLENDALE, CA |
| | JACQUELINE MARIN, 330 N BRAND BLVD, GLENDALE, CA |

Request Access

View History

# Exhibit F

# RETENTION BONUS AGREEMENT

Pursuant to the terms and conditions set forth below, and in consideration of the benefits provided for herein, **kW Mission Critical Engineering, d.p.c.** (hereinafter the "**Company**") and **Steve Coon** (hereinafter "**Employee**" and, together with the Company, the "**Parties**") hereby enter into this Retention Bonus Agreement (hereinafter this "**Retention Agreement**").

## I.      Purpose of Retention Bonus

As a valued member of the organization, the purpose of the Retention Bonus is to recognize Employee's contribution to the Company, to incentivize Employee to remain with the Company for at least a period of two years (the "**Transition Period**") following the Closing Date, (defined as the effective date of the completion of the merger of the Company and WSP USA Buildings Inc. ("**WSP USA**"), in order to assist the Company with integration into WSP USA, and to protect the Company's employees and clients from being diverted away from the Company.

## II.      Consideration for Retention Agreement

Employee may be paid a Retention Bonus pursuant to the terms herein if:

(a) Employee remains employed and "in good standing" (as defined herein) by the Company (or its successor-in-interest) through the relevant dates in Section II(A)(1)(a) and/or (b) (each a "**Vesting Date**"; collectively, the "**Vesting Dates**") of this Retention Agreement; or

(b) Employee is terminated, without "**Cause**" (as defined herein), by the Company during the Transition Period. In such an event, Employee will be paid any remaining portion of the Retention Bonus within thirty (30) days of the termination date.

### A.   Retention Bonus

Employee shall be paid a total Retention Bonus of **$475,000**, less all applicable deductions required by law (the "**Retention Bonus**"), which Retention Bonus will be paid in two installments (spread out over two years), on the dates set forth under the below Schedule of Payments. In the event that Employee resigns, or is terminated for Cause, by the time either the First Payment or the Second Payment come due, the relevant portion will not be payable. For greater certainty, it is possible for Employee to have earned the First Payment, assuming the conditions for the First Payment were met, but not earn the Second Payment.

### 1.   Schedule of Payments

**a.  First Payment**: The first payment of **$118,750**, less all deductions required by law, representing 25% of the Retention Bonus, will be paid to Employee via direct deposit or other acceptable means at the Company's discretion on the first payroll following December 30, 2021, so long as

Employee remains employed by Company or its successor-in-interest on December 30, 2021.

    **b. Second Payment:** The second and final payment of **$356,250**, less all deductions required by law, representing the remaining 75% of the Retention Bonus, will be paid via direct deposit or other acceptable means at the Company's discretion on the first payroll following December 30, 2022, so long as Employee remains employed by Company or its successor-in-interest on December 30, 2022.

## III.    Non-Competition and Non-Solicitation

As an incentive and as a specific condition for entering into this Retention Agreement, the Parties make, give, and agree to the following covenants respecting competition and solicitation:

    **A. Non-Compete:**

       1. The Company is in a highly competitive business and expends a considerable amount of money in the development of business from new clients and customers and continued business from existing clients and customers. The business and clientele of the Company are national and worldwide in scope, and therefore the territorial and time limitations set forth in this Non-Compete clause are reasonable and necessary for the protection of the Company's interests.

       2. During Employee's employment with the Company or its successor-in-interest and for a period of 12 months following the termination of Employee's employment for any reason (voluntary or involuntary), Employee shall not directly or indirectly own, manage, operate, control be employed by, consult with or participate in the ownership, management, operation or control of any business in a manner that would reasonably be expected to divert business from any of the Company's "**Clients**" or "**Prospective Clients**" (as defined herein) with whom Employee had any involvement in developing, servicing, soliciting, or maintaining during the year prior to Employee's termination.

       3. "Clients" is defined as clients who the Company provided services for at any time during the 12-month period immediately preceding Employee's termination. "Prospective Clients" includes any person or entity: (a) to whom the Company has submitted qualifications or a proposal with Employee's direct personal involvement during the 12 months prior to Employee's termination; or (b) concerning whom Employee was assisting the Company in preparing a submittal of qualifications or a proposal at the time of Employee's termination.

    **B. Non-Solicitation of Employees, Consultants, and Contractors:** During Employee's employment with the Company or its successor-in-interest, and for a

2

period of 12 months following the termination of Employee's employment for any reason (voluntary or involuntary), Employee shall not directly or indirectly (on Employee's own or in combination or association with others, and whether for Employee's own benefit or for the benefit of other persons or entities) engage in activity which involves or could result in the actual or potential termination of the Company's relationship with or the solicitation, hiring, or engagement of any person or entity who is, at the time, or was within the last 12 months of Employee's employment within the Company, an employee, consultant, or independent contractor of the Company or any of its affiliates, including for greater certainty, any affiliate U.S. company of WSP USA ("**Affiliate**").

C. **Non-Solicitation of Clients:** During Employee's employment with the Company and for a period of 12 months following the termination of Employee's employment for any reason (voluntary or involuntary), Employee shall not directly or indirectly (on Employee's own or in combination or association with others, and whether for Employee's own benefit or for the benefit of other parties or entities) contact, call upon, solicit or otherwise accept business from, render services to, market services or products to, divert business from, and/or interfere with the Company's relationship or business with any of the Company's existing Clients or Prospective Clients (as that term is defined above) that Employee interacted with on behalf of the Company, was introduced to by virtue of Employee's employment with the Company, or otherwise learned confidential information concerning during the last 12 months of Employee's employment within the Company.

D. **Termination of Restrictive Covenants:** The above restrictive covenants terminate either within one year of the Employee's termination date or, if the Employee remains employed by the Company, within three years of the Closing Date, whichever is sooner.

## IV. General Terms and Conditions

A. Employee's obligations and rights of the Company shall extend to any parent corporation, subsidiaries and corporate affiliate companies, and to any of their successors, assignees and transferees.

B. For purposes of this Retention Agreement, "in good standing" means that the Employee does not have a written record of disciplinary action for violating the Company's Code of Conduct, or policies related to anti-harassment, non-discrimination, and non-retaliation.

C. For purposes of this Retention Agreement, the term "Cause" shall mean any of the following: (i) conviction of a crime (including conviction on a nolo contendere plea) involving the commission by Employee of a felony or of a criminal act involving, in the good faith judgment of the Company, fraud, dishonesty, or moral turpitude but excluding any conviction which results solely from Employee's title or position with the Company and is not based on

Employee's personal conduct; (ii) as determined by the Company in good faith, the failure to perform reasonably requested employment duties as required by the Company, as determined by the Company in good faith, after written notice from the Company of such failure to perform; (iii) fraud or embezzlement determined in accordance with the Company's normal investigative procedures consistently applied in comparable circumstances; (iv) gross misconduct or gross negligence in connection with the business of the Company or an Affiliate which has an adverse effect on the Company or the Affiliate, as determined by the Company in good faith; or (v) violation of the Company's written policies relating to equal employment, discrimination, harassment, retaliation, business conduct or other material Company policies.

**D.**     Employee acknowledges that: (i) unless stated otherwise in a written agreement executed by a representative of the Company, Employee's employment with the Company is at-will; accordingly, Employee may be terminated by the Company for any reason and in its sole discretion and Employee may terminate the employment relationship for any reason and in Employee's sole discretion; and (ii) Employee is to consult with and rely upon Employee's own tax, legal, and financial advisors regarding the consequences and risks of the Retention Bonus.

**E.**     This Retention Agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to its conflict of laws provision. The parties being desirous of having any disputes resolved in a forum having a substantial body of law and experience with the matters contained herein, agree that any action or proceeding with respect to this Agreement shall be brought exclusively in the Supreme Court of the State of New York, New York County, or in the United States District Court for the Southern District of New York or in any other court of competent jurisdiction sitting in the State of New York, New York County and the parties agree to the personal jurisdiction thereof

**F.**     The invalidity or unenforceability of any part or subpart of this Retention Agreement shall not affect the validity or enforceability of the remainder of the Retention Agreement. If any provision of this Agreement shall be held to be excessively broad as to time, geography, activity or other obligations, it shall be construed or reformed by limiting or reducing it, so as to be enforceable.

**G.**     This Retention Agreement supersedes any prior discussions, statements, representations, communications, whether oral or in writing, about its subject matter. This Retention Agreement reflects the full agreement with respect to its subject matter and can only be modified in a writing signed by Employee and an executive of the Company or its successor-in-interest.

The Parties knowingly and voluntarily sign this Retention Agreement as of the date(s) set forth below:

**kW Mission Critical Engineering, d.p.c.**


_____          Date:_____
**James Warren**



**Employee**

_____          Date:_____
**Steve Coon**                                          12/28/2020

# Exhibit G

# SENIOR LEADERSHIP EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT (this "Agreement") is made and entered into this December [30], 2020 (the "Effective Date") by and between kW Mission Critical Engineering d.p.c. or its successor in interest, (the "Company"), and Stephen Coon ("Senior Leader").

WHEREAS, the Company desires to employ Senior Leader as its Managing Principal (pre-integration) or Senior Director or a similar role (post-integration) with WSP USA, and Senior Leader desires to be employed by the Company in said capacity or a similar role post integration with WSP USA; and

WHEREAS, each party desires to set forth in writing the terms and conditions of their understandings and agreements;

NOW, THEREFORE, in consideration of the mutual covenants and obligations contained herein, the Company hereby agrees to employ Senior Leader and Senior Leader hereby accepts such employment upon the terms and conditions set forth in this Agreement:

## 1. <u>Position</u>

(a) Beginning December [30], 2020 (the "Effective Date"), the Company agrees to employ Senior Leader in the position of Managing Principal before integration into WSP USA or in the position of Senior Director or a similar role, after integration with WSP USA. As Managing Principal/Senior Director, Senior Leader shall serve and perform the management duties and exercise the powers which may from time to time be reasonably assigned to or vested in them by the Company.

(b) Senior Leader agrees that during the term of this Agreement, they will devote their best efforts and all of their business time and attention to all facets of the business of the Company and will faithfully and diligently carry out the duties of Managing Principal/Senior Director. Senior Leader will not, during the Term of this Agreement, directly or indirectly engage in any business, either as an employee, employer, consultant, principal, officer, director, advisor, or in any other capacity, either with or without compensation, without the prior written consent of the Company.

(c) During the performance of duties under this Agreement, Senior Leader agrees to comply with (i) all federal, state and local laws, ordinances and regulations, (ii) Company policies, procedures, and directions, as in effect from time-to-time, and (iii) the Company Code of Conduct, as amended.

(d) Subject to any restrictions imposed on the Company or any agreement between Senior Leader and the Company in light of the COVID-19 pandemic, Senior Leader shall perform their duties from the Company's offices in Phoenix, Arizona; provided, however, that Senior Leader shall travel as necessary to carry out all assigned duties.

(e) Senior Leader represents that, as of the Effective Date, they are not subject to any contract, agreement, or other legal obligation (including, without limitation, any restrictive

covenant) restricting their ability to accept employment with the Company or fully and faithfully carry out the duties and responsibilities.  Senior Leader shall immediately notify the Company upon becoming aware of any such restrictions, whether actual or alleged.  Senior Leader agrees not to disclose to the Company, or use for the Company's benefit, any confidential information or trade secrets of any person in violation of any law, contract, or other legally-enforceable restriction.

**2.  Term**

The term of this Agreement shall be two (2) years from the Effective Date, and shall be automatically extended from year to year on the same terms and conditions  (the "Term"); subject to (a) termination under Section 5 herein; or (b) or upon advance written notice from one party to the other of their intent to not renew the Agreement at least thirty (30) calendar days before the current Term is set to expire. Nothing stated in this Agreement or represented orally or in writing to either party shall create an obligation to renew this Agreement. If either party elects to terminate this Agreement at the end of the  Term, for reasons not covered under Section 5, the Senior Leader will convert to an at-will employee.

**3.  <u>Compensation</u>**

(a)  <u>Base Salary.</u>  The Company shall pay the Senior Leader an annual base salary of $200,000.16 ("Annual Base Salary"), which amount may be adjusted annually at the sole discretion of the Company.

(b)  <u>Performance Bonus.</u>  In addition to the Annual Base Salary and other benefits thereunder, Senior Leader shall be eligible for an annual bonus (the "Performance Bonus"), based upon the financial performance of the Company as set and determined by the Company, and the achievement of performance objectives set by the Company (the "Performance Criteria").  The actual amount, if any, of the Performance Bonus granted to Senior Leader upon the achievement of the Performance Criteria shall be in the sole discretion of the Company.  The Performance Bonus shall be paid as soon as reasonably practicable, but in no event more than ninety (90) days, following the end of the Company's fiscal year.

(c)  <u>Payment.</u>  Payment of all compensation to Senior Leader hereunder shall be made in accordance with the relevant Company policies in effect from time to time, including normal payroll practices, and shall be subject to all applicable employment and withholding taxes.

**4.  <u>Benefits</u>**

(a) <u>Generally.</u>  The Company shall make available to Senior Leader, throughout the Term of this Agreement, such equipment, benefits, and perquisites as are generally provided by the Company to its Senior Leader employees, including but not limited to (i) use of a computer or similar hardware provided by the Company, and (ii) any group life, health, dental, vision, disability or accident insurance, pension plan, profit-sharing plan, retirement savings plan, 401(k) plan, or other such benefit plan or policy which may presently be in effect or which may hereafter be adopted by the Company for its Senior Leader officers and key management

personnel; provided, however, that nothing herein contained shall be deemed to require the Company to adopt or maintain any particular plan or policy.

(b) PTO.  The Senior Leader shall be entitled to paid time off, (for vacation, personal and/or sick days), during each calendar year, consistent with the policies then applicable to Senior Leader officers and key management personnel.

(c) Holidays.  The Senior Leader shall be entitled to paid holidays, consistent with the policies then applicable to Senior Leader officers and key management personnel.

(d) Reimbursement of Expenses.  The Company shall reimburse Senior Leader, upon presentation of receipts or other adequate documentation, for all reasonable business expenses incurred by Senior Leader in the course of rendering services to the Company under this Agreement, including any travel expenses for travel on behalf of the Company.  Such reimbursement shall be subject to, and must comply with, the Company's policies and procedures regarding expense reimbursement.

**5.  Termination**

(a) Termination by Senior Leader for Good Reason.  Senior Leader may terminate this Agreement for "Good Reason" after providing ninety (90) days written notice to the Company.  "Good Reason" shall consist of:

(i) A material diminution in the nature or scope of Senior Leader's duties, responsibilities, authority, powers or functions (other than as a result of a sale or other disposition of the equity or assets of the Company and/or its affiliates);

(ii) A non-voluntary material reduction in Senior Leader's Annual Base Salary, except for any such reduction in connection with a general proportionate reduction in the compensation of senior employees of the Company and/or its affiliates;

(iii) Removal of the Senior Leader from their position as Managing Principal (pre-integration) or Senior Director/similar role (post-integration) with WSP USA, other than for "Cause" or by death or disability, as set forth in Section 5(b), (e) and (f), during the Term;

(iv) Failure by the Company to make any payment to Senior Leader required to be made under the terms of this Agreement, if the breach is not cured within thirty (30) days after Senior Leader provides written notice to the Company which provides in reasonable detail the nature of the payment; or

(v) A relocation of Senior Leader's principal place of business by more than 30 miles.

(b) Termination by the Company for Cause.  The Company may terminate Senior Leader's employment with the Company at any time for "Cause," as determined by the Company.  Upon termination by the Company for Cause, Senior Leader shall be entitled to a payment of all accrued but unpaid Annual Base Salary, vacation, and any other amounts then due

and payable to Senior Leader thereunder, as of the date of Senior Leader's termination.  Senior Leader shall not be entitled to any other payments from the Company, including severance payments stated in Section 6.  "Cause" shall consist of:

        (i)      Willful refusal or unreasonable neglect to perform the Senior Leader's duties, as reasonably determined by the Company, if the willful refusal or unreasonable neglect is not cured within thirty (30) days after the Company provides written notice to the Senior Leader which provides in reasonable detail the nature of such refusal or neglect to perform duties;

        (ii)     Commission of an act involving willful misrepresentation, deceit, dishonesty, fraud, perjury, moral turpitude, embezzlement, harassment, unlawful retaliation, or other misleading or unlawful conduct, or conduct that impairs or injures the reputation of the Company;

        (iii)    The conviction of Senior Leader of, or entry by the Senior Leader of a plea of guilty or no contest to, any (a) felony, (b) crime involving dishonesty or moral turpitude, or (c) crime or tort relating to the Company, its business, or its competitors;

        (iv)    Being under the influence of alcohol (other than in circumstances where socially acceptable and within reasonable levels) or being under the influence of drugs (other than over-the-counter or prescription medicine to the extent such medicine is taken in accordance with its directions or under the supervision of a physician) during the performance of Senior Leader's duties;

        (v)      Conduct determined by the Company to be a breach of the Senior Leader's duty of loyalty, or any acts by Senior Leader to aid, abet, or support an entity engaged in the Same or Similar Business of the Company as defined in Section 8(b);

        (vi)    Failure to provide full and complete cooperation in any investigation by the Company; or

        (vii)   A material breach of the terms of this Agreement, if the breach is not cured within thirty (30) days after the Company provides written notice to the Senior Leader which provides in reasonable detail the nature of the breach.

        (c)  <u>Termination by the Company Without Cause.</u>  The Company may terminate this Agreement at any time without Cause prior to the expiration of the Term.

        (d)  <u>Voluntary Resignation by Senior Leader.</u>  Senior Leader may terminate this Agreement prior to the expiration of the term after providing ninety (90) days written notice to the Company.  If this occurs, Senior Leader will be entitled to a payment of all accrued but unpaid Annual Base Salary, vacation, and any other amounts then due and payable to Senior Leader, as of the date of Senior Leader's resignation.

        (e)  <u>Disability.</u>  The Company may terminate this Agreement at any time if the Company determines Senior Leader has sustained a "disability."  Senior Leader shall be deemed

to have sustained a "disability" if Senior Leader is physically or mentally incapacitated so as to render Senior Leader unable to fully perform the essential functions of the position, with or without reasonable accommodation, for a consecutive period of more than ninety (90) days.

(f)  <u>Death.</u>  This Agreement will terminate automatically upon Senior Leader's death.

**6.  <u>Payments Upon Termination; Clawback</u>**

(a)  Upon termination of this Agreement pursuant to Section 5, Senior Leader shall be entitled to payment of:

(i)  The unpaid portion of Senior Leader's then-current Annual Base Salary which has accrued through their date of termination;

(ii)  If unpaid, the unpaid portion of the Performance Bonus for the fiscal year most recently completed that the Company has awarded, if any, to the Senior Leader prior to the Senior Leader's termination of employment with the Company, pursuant to the terms of Section 3(b); and

(iii)  To the extent required by law or Company policy in effect at the time of Senior Leader's termination, the value of any accrued, unused vacation and reimbursement of expenses, which are due, accrued, or payable.

(b)  In addition to the payments set forth in Section 6(a), upon termination of Senior Leader under Section 5(a), 5(e), or upon termination by the Company without Cause under Section 5(c), Senior Leader (their estate, or legal representatives, as the case may be) will be entitled to:

(i)  A severance payment equal to six (6) months of Senior Leader's then current Annual Base Salary;

(ii)  Payment of one half of the annual Performance Bonus for the year in which the termination occurs calculated as though all Performance Criteria have been achieved for the entire year, unless termination is made more than six (6) months after the start of the fiscal year, under which circumstances Senior Leader would receive a prorated Performance Bonus payment calculated as though all Performance Criteria have been achieved; and

(c)  Receipt of the payments set forth in Section 6(b) above are expressly conditioned on execution (without revocation) by Senior Leader of an agreement containing a general release and waiver of claims, confidentiality provisions, and other terms satisfactory to the Company that do not contradict the terms of this Agreement, within sixty (60) days following the date of such termination, or such longer period if required by law.  Any payment by the Company to Senior Leader under this Section 6 shall be paid in equal bi-weekly installments, to coincide with the Company's normal payroll period, over a one-year period, or at other intervals as mutually agreed by the Parties following termination.

(d) Notwithstanding any other provision of this Agreement, the Company shall not be required to make any payment set forth in Section 3(b) or 6(b) of this Agreement, or any other bonus or incentive payment previously authorized by the Company, and may seek repayment of such payments if previously made, if the Company determines:

(i)     Senior Leader engaged in conduct that constitutes "Cause" pursuant to Section 5(b), regardless of whether Senior Leader was terminated pursuant to such provision;

(ii)     Senior Leader engaged in conduct that would otherwise require or permit the Company to withhold or seek repayment under applicable law.

## 7.   **Nondisclosure**

(a) <u>Confidential Information.</u> The Company will give Senior Leader access to, and Senior Leader will become familiar with, various trade secrets and other confidential business information, consisting of, but not limited to: research and development information; formulas; designs; systems; codes; computer, internet, and intranet software and files; records; strategies; marketing procedures; processes; computer programs; compilations of information; client requirements; pricing techniques; contracts; lists identifying customers, budgeting and financial information; partners, or investors; employee information; methods of doing business; and other confidential information that is regularly used in the operating, technology, and business dealings of the Company ("Confidential Information"). "Confidential Information" does not include information that (i) is or becomes generally available to the public other than as a result of a disclosure, directly or indirectly, by Senior Leader, or (ii) is or becomes available to Senior Leader on a non-confidential basis from a source other than the Company, provided that such source is not known by Senior Leader to be bound by a confidentiality agreement with or other obligation of non-disclosure to any Person.

(b) <u>Non-Disclosure of Confidential Information.</u>

(i)     The Senior Leader agrees that all Confidential Information, whether prepared by Senior Leader or otherwise coming into their possession, shall remain the exclusive property of the Company.  Senior Leader further agrees that, except as provided herein, Senior Leader shall not, without the prior written consent of the Company, use or disclose to any third party any of the Confidential Information, directly or indirectly, either during Senior Leader's employment with the Company or at any time following the termination of Senior Leader's employment with the Company.

(ii)     Pursuant to the Defend Trade Secrets Act of 2016, Senior Leader acknowledges and agrees that an individual may not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that is made (a) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney; and (b) solely for the purpose of reporting or investigating a suspected violation of law; or is made in a complaint or other document that is filed under seal in a lawsuit or other proceeding.  An individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the employer's trade

secrets to their attorney and use the trade secret information in the court proceeding only if the individual files any document containing the trade secret under seal, and does not disclose the trade secret, except pursuant to court order.

(iii)     Nothing herein shall prevent Senior Leader from disclosing Confidential Information (a) upon the order of any court or administrative agency, (b) upon the request or demand of any regulatory agency or authority having jurisdiction over Senior Leader or the Company, (c) to the extent required by law or regulation, or (d) to the extent necessary in connection with any suit, action or proceeding relating to this Agreement or the exercise of any remedy thereunder.

(c) <u>Return of Confidential Information.</u>  Senior Leader shall promptly deliver to the Company at such time as Senior Leader's employment with the Company terminates, or at any time that the Company may request, all memoranda, notes, plans, data, drawings, manuals, letters, records, reports, electronic mail, recordings, computer tapes and software and other documents and data, constituting or relating to Confidential Information or Work Product (as defined in Section 9) which the Senior Leader may then possess or have under the Senior Leader's control.

(d) Senior Leader acknowledges that the Confidential Information and other consideration to be provided to Senior Leader pursuant to this Agreement give rise to the Company's interest in restraining Senior Leader from disclosing the Company's Confidential Information.

## 8.  <u>Non-Competition and Non-Solicitation</u>

As an incentive and as a specific condition for entering into this Agreement, the Parties make, give, and agree to the following covenants respecting competition and solicitation:

### B.  Non-Compete:

(i)     The Company is in a highly competitive business and expends a considerable amount of money in the development of business from new clients and customers and continued business from existing clients and customers. The business and clientele of the Company are national and worldwide in scope, and therefore the territorial and time limitations set forth in this Non-Compete clause are reasonable and necessary for the protection of the Company's interests.

(ii)     During Employee's employment with the Company or its successor-in-interest and for a period of 12 months following the termination of Employee's employment for any reason (voluntary or involuntary), Employee shall not directly or indirectly own, manage, operate, control, be employed by, consult with or participate in the ownership, management, operation or control of any business, in a manner that would reasonably be expected to divert business from any of the Company's "Clients" or "Prospective Clients" with whom Employee had any involvement in developing, servicing, soliciting, or maintaining during the year prior to Employee's termination.

(iii)     Clients is defined as clients who the Company provided services for at any time during the 12-month period immediately preceding Employee's termination. "Prospective Clients" includes any person or entity: (a) to whom the Company has submitted qualifications or a proposal with Employee's direct personal involvement during the 12 months prior to Employee's termination; or (b) concerning whom Employee was assisting the Company in preparing a submittal of qualifications or a proposal at the time of Employee's termination.

**C. Non-Solicitation of Employees, Consultants, and Contractors:** During Employee's employment with the Company or its successor-in-interest, and for a period of 12 months following the termination of Employee's employment for any reason (voluntary or involuntary), Employee shall not directly or indirectly (on Employee's own or in combination or association with others, and whether for Employee's own benefit or for the benefit of other persons or entities) engage in activity which involves or could result in the actual or potential termination of the Company's relationship with or the solicitation, hiring, or engagement of any person or entity who is, at the time, or was within the last 12 months of Employee's employment within the Company, an employee, consultant, or independent contractor of the Company or any of its affiliates, including for greater certainty, any affiliate U.S. company of WSP USA ("Affiliate").

D. **Non-Solicitation of Clients:** During Employee's employment with the Company and for a period of 12 months following the termination of Employee's employment for any reason (voluntary or involuntary), Employee shall not directly or indirectly (on Employee's own or in combination or association with others, and whether for Employee's own benefit or for the benefit of other parties or entities) contact, call upon, solicit or otherwise accept business from, render services to, market services or products to, divert business from, and/or interfere with the Company's relationship or business with any of the Company's existing Clients or Prospective Clients (as that term is defined above) that Employee interacted with on behalf of the Company, was introduced to by virtue of Employee's employment with the Company, or otherwise learned confidential information concerning during the last 12 months of Employee's employment within the Company.

E. **Miscellaneous**: To the extent Employee's restrictive covenants obligations under Employee's Retention Bonus Agreement with the Company, or any Stock Purchase Agreement, are more restrictive than those provided hereunder, such restrictive covenants shall, in the event of a conflict, control, to the extent allowable under applicable law.

9. **Intellectual Property**

(a) <u>Works Made for Hire.</u>  Senior Leader understands and agrees that all copyrights, patents, trade secrets, and other intellectual property rights in or associated with any ideas, concepts, techniques, inventions, processes, data, or works of authorship developed or created by Senior Leader during the course of the Senior Leader's employment with the Company and related to Senior Leader's performance of this Agreement ("Work Product") will

belong exclusively to the Company. To the extent possible, any copyrightable Work Product shall be considered a "work made for hire" for the Company within the meaning of Title 17 of the United States Code, and all ownership rights to such Work Product shall belong to the Company. Any patentable inventions conceived or reduced to practice by Senior Leader in the course of performance under this Agreement shall be the property of the Company.

(b) <u>Assignment.</u> If any copyrightable Work Product is not "work made for hire" for the Company under Title 17 of the United States Code, or if any other intellectual property rights in any Work Product (including any patentable invention) is not otherwise owned by the Company as and when it is created, developed, conceived, or reduced to practice, then Senior Leader hereby transfers, assigns, and conveys to the Company and its successors and assigns, without any requirement of further consideration, any and all right, title, and interest Senior Leader may have in such Work Product, including but not limited to any copyright or other intellectual property rights pertaining thereto, effectively automatically as and when created, developed, conceived, or reduced to practice. Senior Leader hereby waives any so-called "moral rights of authors" in connection with the Work Product and acknowledge and agree that the Company may use, exploit, distribute, reproduce, advertise, promote, publicize, alter, modify, or edit the Work Product, or combine the Work Product with other works, in the Company's sole discretion, in any format or medium now in existence or hereafter devised.

(c) <u>Cooperation.</u> Upon the request of the Company, Senior Leader will take all further actions and steps necessary to effectuate the assignments set forth in this Section 9, including executing and delivering documents as requested by the Company in connection with such assignments. Senior Leader hereby waives any and all rights to seek or obtain any injunctive or equitable relief in connection with the exercise of any right that Senior Leader could otherwise claim with respect to any Work Product.

## 10. <u>Non-Disparagement</u>

(a) Except to the extent otherwise prohibited under law, during the term of this Agreement and hereafter, Senior Leader shall not disparage the Company, its affiliates, or their respective past or present officers, directors, associated or employees.

(b) The foregoing restrictions shall not apply to (i) actions or statements taken or made by the Senior Leader while employed by the Company in good faith as fulfilling the Senior Leader's duties with the Company, or otherwise at the request of the Company, or (ii) truthful statements made in compliance with legal process or any investigation, inquiry, or other proceeding by a governmental authority.

## 11. <u>Entire Agreement; Severability and Reformation; Amendment</u>

(a) This Agreement contains the full and complete understanding of the parties hereto with respect to the subject matter contained herein, and supersedes and replaces any prior Agreement, either oral or written, which Senior Leader may have with the Company that relates to the same subject matter.

(b) If any one or more of the terms, provisions, covenants or restrictions of this Agreement shall be determined by a court of competent jurisdiction to be invalid, void or unenforceable, then the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect, and to that end the provisions shall be deemed severable. If any one or more of the provisions contained in this Agreement shall for any reason be held to be excessively broad as to duration, geographical scope, activity or subject, it shall be reformed by limiting and reducing it to the minimum extent necessary, so as to be enforceable to the extent compatible with the applicable law. The obligations of the parties set forth in Sections 7-10, 15, and 17 shall survive termination of this Agreement if the Agreement is terminated during the initial or subsequent term(s). However, if the Agreement is terminated at the end of a term, pursuant to Section 2 and prior to renewal, and the Senior Leader is converted to an at-will employee, the restrictive covenants contained in Section 8 will expire one (1) year from the date that Senior Leader is converted to an at-will employee provided that Senior Leader remains employed with Company one year after converting to an at-will employee.

(c) This Agreement may be amended only by a writing signed by Senior Leader and a duly authorized representative of the Company (other than Senior Leader).

## 12. Notices

(a) All notices and other communications required or permitted to be given thereunder shall be in writing and shall be deemed to have been duly given if delivered personally, mailed by certified mail (return receipt requested) or sent by overnight delivery service or facsimile transmission (with electronic confirmation of successful transmission) to the parties at the following addresses or at such other addresses as shall be specified by the parties by like notice:

If to the Company:    Chief Human Resources Officer

If to Senior Leader:    Most recently recorded home address

(b) Notice given shall, in the case of mail, be deemed to be given and received on the third calendar day after posting, in the case overnight delivery service, on the date of actual delivery and, in the case of facsimile transmission, telex or personal delivery, on the date of actual transmission or, as the case may be, personal delivery.

## 13. Assignment; Successors; Counterparts

(a) This Agreement is personal to Senior Leader and may not be assigned by Senior Leader without the prior written consent of the Company.

(b) This Agreement shall inure to the benefit of and be binding upon Senior Leader, their heirs and personal representatives, and the Company, its successors and assigns.

(c) This Agreement may be executed in counterparts, each of which will take effect as an original and all of which shall evidence one and the same Agreement.

## 14. Governing Law; Construction; Non-Waiver

(a)  This Agreement shall be governed by and construed in accordance with the law of the State of New York, without regard to principles of conflicts of law.

(b)  The headings and captions of this Agreement are provided for convenience only and are intended to have no effect in construing or interpreting this Agreement.  The language in all parts of this Agreement shall be in all cases construed in accordance to its fair meaning and not strictly for or against the Company or Senior Leader.

(c)  No failure or neglect of either party, in any instance, to exercise any right, power or privilege thereunder or under law shall constitute a waiver of any other right, power or privilege or of the same right, power or privilege in any other instance.  All waivers by either party thereto must be contained in a writing signed by the party to be charged and, in the case of the Company, by an officer of the Company other than Senior Leader, or other person duly authorized by the Company. The waiver by either party of a breach of any provision contained in this Agreement shall not be construed as or operate as a waiver of any subsequent breach.

**15. <u>Assistance in Litigation</u>**   Senior Leader shall, during and after termination of employment, upon reasonable notice, furnish such information and proper assistance to the Company as may be reasonably required by the Company in connection with any litigation in which it or any of its subsidiaries or affiliates is, or may become, a party; provided, however, that any such assistance following termination shall be furnished at mutually agreeable times and for mutually agreeable compensation.

**16. <u>Remedies</u>** The parties recognize and affirm that in the event of a breach of any provision of this Agreement, money damages would be inadequate and neither Senior Leader nor the Company would have an adequate remedy at law.  Accordingly, the parties agree that in the event of a breach or a threatened breach of any of the provisions of this Agreement either party may, in addition and supplementary to other rights and remedies existing in its favor, apply to any court of law or equity of competent jurisdiction for specific performance and/or injunctive or other relief in order to enforce or prevent any violations of the provisions thereof (without posting a bond or other security).

**17. <u>Resolution of Disputes</u>**

(a)  Any dispute arising between any of the Company and Senior Leader under this Agreement, or under any statute, regulation, or ordinance, or in connection with the Senior Leader's Employment with the Company, shall be submitted to binding arbitration before the American Arbitration Association ("AAA") for resolution (the "Arbitration"), unless otherwise prohibited by law.

(b)  The Arbitration shall be conducted in the State of New York, and the arbitrator will apply New York State law, including federal law as applied in New York courts.  The arbitration shall be conducted in accordance with AAA's Employment Arbitration Rules and Procedures, as modified herein.  The Arbitration shall be conducted by a single arbitrator who shall have experience in Senior Leader management disputes.  The arbitrator, and not any federal, state, or local court or adjudicatory authority, shall have exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability, and/or formation of this Agreement,

including but not limited to any dispute as to whether a particular claim is subject to arbitration thereunder. The arbitral award shall be in writing, state the reasons for the award, and be final and binding on the parties.

(c) The arbitration shall, to the extent permitted by law, be conducted on a strictly confidential basis, and none of the Parties shall disclose the existence of a claim; the nature of a claim or defense; any documents, exhibits, or information exchanged or presented in connection with a claim or defense; or the result of any action (collectively, "Arbitration Materials"), to any third party, with the sole exception of Parties' legal counsel, who the Parties shall ensure also complies with these confidentiality terms.

(d) In the event of any court proceeding to challenge or enforce an arbitrator's award, the parties hereby consent to the exclusive jurisdiction of the state and federal courts in New York, New York, and agree to venue in that jurisdiction. The Parties agree to take all steps necessary to protect the confidentiality of the Arbitration Materials in connection with any such proceeding, agree to file all Confidential Information (and all documents containing Confidential Information) under seal, and agree to the entry of an appropriate protective order encompassing the confidentiality terms of this Agreement.

## 18. **Section 409A**

(a) Notwithstanding anything herein to the contrary, this Agreement is intended to be interpreted and applied so that the payment of the benefits set forth herein either shall either be exempt from the requirements of Section 409A of the Internal Revenue Code of 1986, as amended (the "Code"), or shall comply with the requirements of such provision. Notwithstanding anything in this Agreement or elsewhere to the contrary, distributions upon termination of Senior Leader's employment may only be made upon a "separation from service" as determined under Section 409A of the Code. Each payment under this Agreement or otherwise shall be treated as a separate payment for purposes of Section 409A of the Code. In no event may Senior Leader, directly or indirectly, designate the calendar year of any payment to be made under this Agreement or otherwise which constitutes a "deferral of compensation" within the meaning of Section 409A of the Code.

(b) All reimbursements and in-kind benefits provided under this Agreement shall be made or provided in accordance with the requirements of Section 409A of the Code. To the extent that any reimbursements pursuant to this Agreement or otherwise are taxable to Senior Leader, any reimbursement payment due to Senior Leader shall be paid to Senior Leader on or before the last day of Senior Leader's taxable year following the taxable year in which the related expense was incurred; provided, that, Senior Leader has provided the Company written documentation of such expenses in a timely fashion and such expenses otherwise satisfy the Company' expense reimbursement policies. Reimbursements pursuant to this Agreement or otherwise are not subject to liquidation or exchange for another benefit and the amount of such reimbursements that Senior Leader receives in one taxable year shall not affect the amount of such reimbursements that Senior Leader receives in any other taxable year.

(c) Notwithstanding any provision in this Agreement to the contrary, if on the date of their termination from employment with the Company Senior Leader is deemed to be a

"specified employee" within the meaning of Code Section 409A and the Final Treasury Regulations using the identification methodology selected by the Company from time to time, or if none, the default methodology under Code Section 409A, any payments or benefits due upon a termination of Senior Leader's employment under any arrangement that constitutes a "deferral of compensation" within the meaning of Code Section 409A shall be delayed and paid or provided (or commence, in the case of installments) on the first payroll date on or following the earlier of (i) the date which is six (6) months and one (1) day after Senior Leader's termination of employment for any reason other than death, and (ii) the date of Senior Leader's death, and any remaining payments and benefits shall be paid or provided in accordance with the normal payment dates specified for such payment or benefit.

(d) Notwithstanding any of the foregoing to the contrary, the Company and its respective officers, directors, employees, or agents make no guarantee that the terms of this Agreement as written comply with, or are exempt from, the provisions of Code Section 409A, and none of the foregoing shall have any liability for the failure of the terms of this Agreement as written to comply with, or be exempt from, the provisions of Code Section 409A

**19. Voluntary Agreement**  Senior Leader and the Company represent and agree that each has reviewed all aspects of this Agreement, has carefully read and understands all provisions of this Agreement, and is voluntarily entering into this Agreement.  Each party represents and agrees that such party has had the opportunity to review any and all aspects of this Agreement with legal, tax or other advisors of such party's choice before executing this Agreement.

IN WITNESS THEREOF, the parties thereto have executed this Agreement on the dates stated below.

**COMPANY**
**kW Mission Critical Engineering d.p.c.**

Dated: _____     By: _____
Name: James Warren
Title:  Founding Principal

**SENIOR LEADER**

Dated: _12/29/2020_____     By: _____
Stephen Coon

1  Scott F. Gibson, Arizona State Bar No. #010884
   (Pro Hac Vice Pending)
2  SGibson@DentonPeterson.com
   Jay Parmelee, SBN 274676
3  Jay@DentonPeterson.com

   **DPD** DENTON PETERSON DUNN
4        ATTORNEYS & COUNSELORS AT LAW
5  1930 N. ARBOLEDA ROAD, SUITE 200
   MESA, ARIZONA 85213
6  TELEPHONE: (480) 325-9900
   FACSIMILE: (480) 325-9901
7  HTTPS://ARIZONABUSINESSLAWYERAZ.COM

   *Attorneys for Plaintiffs*

8         SUPERIOR COURT OF THE STATE OF CALIFORNIA

9        COUNTY OF SONOMA – UNLIMITED CIVIL JURISDICTION

10

11  CG ENTERPRISES HOLDINGS, LLC, a          Case No.:24CV00024
    California limited liability company; and
12  STEPHEN M. COON, an individual;          **Assigned to the Honorable Christopher**
                                             **Honigsberg – Dept. 18**
13
                  Plaintiffs,
14                                           **DECLARATION OF JAY PARMELEE IN**
15  vs.                                      **SUPPORT OF PLAINTIFFS' EX PARTE**
                                             **APPLICATION FOR TEMPORARY**
16  WSP USA, INC., a New York corporation;   **RESTRAINING ORDER AND ORDER**
    WSP USA BUILDINGS, INC., a New York      **TO SHOW CAUSE RE PRELIMINARY**
17  corporation; kW MISSION CRITICAL         **INJUNCTION ENJOINING**
    ENGINEERING, D.P.C., a New York design   **DEFENDANTS FROM PROCEEDING**
18  professional corporation; and DOES 1 through **WITH ENFORCEMENT OF**
    20, inclusive,                           **RESTRICTIVE COVENANTS AND**
19                                           **OTHER RELIEF**
20                Defendants.
21                                           [Filed concurrently with Plaintiffs' Ex Parte
22                                           Application for Temporary Restraining Order
                                             and Order to Show Cause re Preliminary
23                                           Injunction Enjoining Defendants from
                                             Proceeding with Enforcement of Restrictive
24                                           Covenants and Other Relief; Memorandum of
                                             Points and Authorities;  Declaration of
25                                           Stephen M. Coon; and [Proposed] Order
26                                           thereon]
27                                    1
28  **DECLARATION OF JAY PARMELEE IN SUPPORT OF PLAINTIFFS' EX PARTE APPLICATION FOR
    TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION
    ENJOINING DEFENDANTS FROM PROCEEDING WITH ENFORCEMENT OF RESTRICTIVE
    COVENANTS AND OTHER RELIEF**

| | |
|---|---|
| | Complaint Filed: January 2, 2024 |
| | Trial Date: None Set |

I, Jay Parmelee, hereby declare:

1.      I am an attorney licensed to practice before all courts located within the State of California.  My State Bar Identification Number is 274676.

2.      I am an attorney of record for Plaintiffs in this action.

3.      The facts set forth herein are of my own personal knowledge, and if called upon to testify as a witness, I could and would competently testify thereto.

4.      I make this declaration in support of Plaintiff's Ex Parte Application for Temporary Restraining Order and Order to Show Cause re Preliminary Injunction Enjoining Defendants from Proceeding with Enforcement of Restrictive Covenants and Other Relief.

5.      The presumed counsel for Defendants WSP USA Inc., WSP USA Buildings INC., and kW Mission Critical Engineering, d.p.c. is Todd D. Wozniak, Nipun J. Patel, and Justin Kadoura of Holland & Knight LLP, 1650 Market Street, Suite 3300, Philadelphia, PA 19104, todd.wozniak@hklaw.com, nipun.patel@hklaw.com, justin.kadoura@hklaw.com (215) 252-9600.

6.      I contacted the presumed counsel for Defendants on January 16, 2024 via email and phone call to notify them of Plaintiff's Ex Parte Application.

7.      I expect that Defendants will object to the temporary restraining order and preliminary injunction which Plaintiffs are seeking, because Plaintiffs are seeking from restraining Defendants from continuing to engage in conduct they are already engaging in.

I swear under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Executed this 16th day of January, 2024, in Mesa Arizona.


/s/ Jay Parmelee
Jay Parmelee, Declarant

2

**DECLARATION OF JAY PARMELEE IN SUPPORT OF PLAINTIFFS' EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION ENJOINING DEFENDANTS FROM PROCEEDING WITH ENFORCEMENT OF RESTRICTIVE COVENANTS AND OTHER RELIEF**

EXHIBIT M

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| WSP USA Buildings Inc., | ) |
| | ) |
| | ) |
|    Plaintiff | ) |
| | )   C.A. No. |
|  , v. | ) |
| | ) |
| STEPHEN COON, | ) |
|     Defendant. | ) |
| | ) |

---

## WSP USA BUILDINGS INC'S FIRST SET OF INTERROGATORIES

---

Pursuant to Rule 9 of the Employment Arbitration Rules and Mediation Procedures of the American Arbitration Association and this Emergency Arbitrator's Order granting expedited initial discovery, Claimant WSP USA Buildings Inc. hereby serves the First Set of Interrogatories ("Interrogatories") on Stephen Coon in connection with the above-captioned case. Respond to each Interrogatory separately and fully in writing and provide those responses to undersigned counsel no later than January 31, 2024.

In responding to these Interrogatories, you (as hereinafter defined) shall utilize the following Definitions and Instructions, each of which shall be deemed a material part of each Interrogatory.

### <u>DEFINITIONS AND INSTRUCTIONS</u>

1. "<u>Plaintiff</u>" or "<u>WSP</u>" shall mean WSP USA Buildings Inc. and its agents, employees or other representatives.

2. "<u>Defendant</u>," "<u>you</u>," "<u>your</u>," or "<u>yourself</u>" shall mean the named Stephen Coon as

well as his agents or any other individual or entity acting or purporting to act on Defendant's behalf with respect to the subject matter of each Interrogatory.

3. "kW" shall mean kW Mission Critical Engineering d.c.p. as well as its affiliates, agents, attorneys, employees, or other representatives, or its successors in interest as well as their affiliates, agents, attorneys, employees, or other representatives.

4. "Document" or "documents" as used herein shall be interpreted in the broadest sense permitted under Federal Rule of Civil Procedure 34(a)(1)(A). A document is a tangible record of letters, words, numbers, or illustrations, including electronically stored information. "Document" and "documents" include without limitation the original and any non-identical copies.

5. "Person" or "persons" shall mean each and every individual or entity, whether real or judicial or incorporated or unincorporated, encompassed within the usual and customary meaning of "person" or "persons" or otherwise encompassed within the definition.

6. "Relating," "relate," or "relate to" shall mean anything connected, associated, related to, or in any manner whatsoever having to do with the substance or subject matter of the information or document requested herein.

7. "Communication" shall mean the transmittal of information, in any form.

8. "Statement" shall mean, without limitation, any written and/or verbal communications, whether formal or informal.

9. "Restrictive Covenant" shall mean any agreement not to compete with, share information belonging to, or solicit the business or employment of any person or entity affiliated with WSP and/or kW.

10. The term "possession, custody, or control" includes without limitation, the

possession, custody, or control of Defendant, any third person to whom Defendant has surrendered possession, custody, or control, and all other persons acting on behalf of any persons subject to this Paragraph.

11. The singular of any word used herein shall be deemed to include the plural of such word and the plural shall include the singular.

12. The conjunctions "and" and "or" shall be interpreted to mean "and/or," and shall not be interpreted to exclude any information otherwise within the scope of the Interrogatory.

13. To the extent you decline to answer any Interrogatory in whole or in part based on a claim of privilege, please so state in your written response and state your basis for invoking any such privilege.

14. These Interrogatories seek all information that is known or available to you and your agents, representatives, investigators, and, unless privileged, your attorneys and your attorneys' agents, employees, representatives, or investigators.

15. All Interrogatory responses and documents shall be separated in accordance with the numbered and lettered paragraphs and subparagraphs herein.

16. These Interrogatories are to be deemed continuing in nature and any subsequently discovered information responsive to these Interrogatories shall be produced immediately upon your learning of such information.

17. If you cannot for any reason answer any Interrogatory fully and completely after exercising due diligence to secure the information requested, you must so state and describe in full detail the efforts made to obtain the information and set forth the most complete answer possible given the limited information.

18. Applicable Time Period: Unless otherwise specified herein, the Interrogatories

relate to a time period extending from December 30, 2020, to the present. Accordingly, the Interrogatories shall be deemed to be continuing so as to require further and supplemental production by you of documents which originate or fall within the scope of the Interrogatories at any time prior to the conclusion of this litigation.

## INTERROGATORIES

1.    Identify and describe the circumstances, plans, and reasons that caused You to submit Your notice of resignation on October 18, 2023, including the dates on which You became aware of or developed those circumstances, plans, and reasons.

2.    Identify and describe any plan, intention, or expectation of Yours to start a business in any form, including a corporation or similar entity, partnership, or sole proprietorship, that is or will be in the business of providing engineering services of any kind.

3.    Identify and describe any plan, intention, or expectation for You to seek, obtain, or commence employment by any person or entity, including Yourself, that is or will be in the business of providing engineering services of any kind.

4.    Identify and describe any plan, intention, or expectation for You to engage in the business of providing engineering services of any kind.

5.    Identify and describe any plan, intention, or expectation for You to do business of any kind with any customer or prospective customer of WSP and/or kW.

6.    Describe any communications by or to You regarding any plan, intention, expectation, circumstance, or reason identified and/or described in response to Interrogatories 1 through 5.

7.    Describe any communications between You and any other person or entity regarding Confidential Information, as defined in Section 7 of the December 30, 2020 Senior

Leadership Employment Agreement between You and kW, other than communications made or received in the scope of Your employment for WSP and/or kW.

8. Since October 18, 2023, describe in detail Your communications, directly or indirectly, with any current or former employee, contractor, agent, vendor, or customer of kW and/or WSP regarding any actual or prospective engineering services to be performed by or through any person or entity, including Yourself, other than WSP and/or kW.

Dated: January 17, 2024                  Respectfully submitted,

*/s/ Nipun J. Patel*
**HOLLAND & KNIGHT LLP**
Nipun J. Patel
1650 Market Street, Suite 3300
Philadelphia, PA 19104
nipun.patel@hklaw.com
Telephone:  215.252.9600
Fax:  215.867.6070

EXHIBIT N

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| WSP USA Buildings Inc., | ) | |
| | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | C.A. No. |
| , v. | ) | |
| | ) | |
| STEPHEN COON, | ) | |
| Defendant. | ) | |
| | ) | |

---

**WSP USA BUILDINGS INC'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS**

---

Pursuant to Rule 9 of the Employment Arbitration Rules and Mediation Procedures of the American Arbitration Association and this Emergency Arbitrator's Order granting expedited initial discovery, Plaintiff WSP USA Buildings Inc. hereby serves the First Requests for Production of Documents ("Requests") on Stephen Coon in connection with the above-captioned case. Provide the requested documents to undersigned counsel no later than January 31, 2024In responding to these Requests, you (as hereinafter defined) shall utilize the following Definitions and Instructions, each of which shall be deemed a material part of each Request.

## DEFINITIONS AND INSTRUCTIONS

1.   "Plaintiff" or "WSP" shall mean WSP USA Buildings Inc. and its agents, employees or other representatives.

2.   "Defendant," "you," "your," or "yourself" shall mean the named Stephen Coon as well as his agents or any other individual or entity acting or purporting to act on Defendant's behalf with respect to the subject matter of each Request.

3.    "kW" shall mean kW Mission Critical Engineering d.c.p. as well as its affiliates, agents, attorneys, employees, or other representatives, or its successors in interest as well as their affiliates, agents, attorneys, employees, or other representatives.

4.    "Document" or "documents" as used herein shall be interpreted in the broadest sense permitted under the AAA's applicable rules of procedure. A document is a tangible record of letters, words, numbers, or illustrations, including electronically stored information. "Document" and "documents" include without limitation the original and any non-identical copies.

5.    "Person" or "persons" shall mean each and every individual or entity, whether real or judicial or incorporated or unincorporated, encompassed within the usual and customary meaning of "person" or "persons" or otherwise encompassed within the definition.

6.    "Relating," "relate," or "relate to" shall mean anything connected, associated, related to, or in any manner whatsoever having to do with the substance or subject matter of the information or document requested herein.

7.    "Communication" shall mean the transmittal of information, in any form.

8.    "Statement" shall mean, without limitation, any written and/or verbal communications, whether formal or informal.

9.    "Restrictive Covenant" shall mean any agreement not to compete with, share information belonging to, or solicit the business or employment of any person or entity affiliated with WSP and/or kW.

10.   The term "possession, custody, or control" includes without limitation, the possession, custody, or control of Defendant, any third person to whom Defendant has surrendered possession, custody, or control, and all other persons acting on behalf of any persons

subject to this Paragraph.

11.    The singular of any word used herein shall be deemed to include the plural of such word and the plural shall include the singular.

12.    The conjunctions "and" and "or" shall be interpreted to mean "and/or," and shall not be interpreted to exclude any information otherwise within the scope of the Request.

13.    If any document requested is no longer in your possession, custody, or control, or is unobtainable by you, then you must provide an explanation of why the document is no longer in your possession, custody, or control and identify its current location; the date the document was last in your possession, custody, or control; the current custodian of the document; the title, length, and type of document (e.g., notes, report, etc.) and the subject matter and contents of the document; and an explanation of your attempts to obtain the document.

14.    These Requests are to be deemed continuing in nature and any subsequently discovered information or documents responsive to these Requests shall be produced immediately upon your learning of such information or documents.

15.    To the extent you withhold any document requested on a claim of privilege, please so state in your written response and produce a privilege log that includes your basis for invoking any such privilege and a specific description of the documents withheld from production.

16.    Applicable Time Period: Unless otherwise specified herein, the following Requests relate to a time period extending from December 30, 2020, to the present. Accordingly, the following Requests shall be deemed to be continuing so as to require further and supplemental production by you of documents which originate or fall within the scope of the following Requests at any time prior to the conclusion of this litigation.

## DOCUMENT REQUESTS

1.      All communications regarding Your intention or decision to resign from kW and/or WSP.

2.      All communications regarding any plan, intention, or expectation that, while You were employed or after Your employment by kW and/or WSP, You will form any business in any form, including a corporation or similar entity, partnership, or sole proprietorship, that is or will be in the business of providing engineering services of any kind.

3.      All communications regarding any plan, intention, or expectation for You to seek, obtain, or commence employment by any person or entity, including Yourself, that is or will be in the business of providing engineering services of any kind.

4.      All communications by You encouraging, discussing, or assisting any current or former employee, contractor, agent, vendor, or customer of kW and/or WSP to either: (a) cease, diminish, or change their business relationship with kW and/or WSP in any way or (b) start, enhance, or consider a business relationship with any other entity or person, including Yourself.

5.      All documents and communications reflecting or relating to attempts by You to solicit a business relationship with any person or entity that has done business with and/or worked with or for kW and/or WSP between December 30, 2022, and the present.

6.      All documents and communications reflecting or relating to the existence of any Restrictive Covenant to which any current or former employee, contractor, agent, vendor, or customer of kW and/or WSP is bound or their obligations thereunder.

7.      All documents and communications in Your possession, custody, or control reflecting Confidential Information, as defined in Section 7 of the December 30, 2020 Senior Leadership Employment Agreement between You and kW.

8.      All communications between You and Gary Russinko and/or Jason Leone following your drafting of your notice of intent to resign from kW and/or WSP.

9.      All communications between You and any person or entity affiliated with the following kW customers: Databank, Aligned Data Centers, Cyrus One and/or Yondr.

Dated: January 17, 2024                    Respectfully submitted,

                                    */s/ Nipun J. Patel*
                                    **HOLLAND & KNIGHT LLP**
                                    Nipun J. Patel
                                    1650 Market Street, Suite 3300
                                    Philadelphia, PA 19104
                                    nipun.patel@hklaw.com
                                    Telephone:  215.252.9600
                                    Fax:  215.867.6070

# Exhibit L

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| WSP USA Buildings Inc., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:24-cv-76 (DNH/TWD) |
| | ) | |
| STEPHEN COON, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

---

## WSP USA BUILDINGS INC'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION IN AID OF ARBITRATION

---

Plaintiff WSP USA Buildings Inc. ("WSP"), by and through undersigned counsel, hereby moves for an order temporarily restraining and enjoining Defendant Stephen Coon from violating the restrictive covenants in his Senior Leadership Employment Agreement ("Employment Agreement") with WSP during the pendency of the Parties' contractually-mandated arbitration that is currently pending in front of the American Arbitration Association.

## INTRODUCTION

This action arises out of Stephen Coon's breach of the duty of loyalty and violations of restrictive covenants in his employment agreements with WSP. In 2020, WSP acquired kW Mission Critical Engineering ("kW MCE"), a data-center design and mission-critical engineering firm. As part of that acquisition, kW MCE's senior leadership, including Coon, signed employment agreements that prohibited them from competing with WSP or soliciting its employees or vendors until at least one year after their departure from kW MCE for any reason.

Nonetheless, Coon resigned from WSP in October 2023 for the specific purpose of starting a competing business—a fact he openly admitted to colleagues. On his way out and since the time of his resignation, it appears Coon followed through, soliciting several current WSP employees to work for him in recent weeks, four of which resigned between December and January (likely in violation of their own restrictive covenants) in close succession without revealing their new employer. Having siphoned off this key team of former WSP employees, Coon will imminently begin competing with WSP for the very same customers that Coon was entrusted with servicing using kW MCE's proprietary, confidential, and trade secret business information and strategies. Coon bragged that he already has a potential buyer for his new business after it is scaled up to $25MM in annual recurring revenue. Furthermore, WSP recently received information from design partners suggesting that Coon is soliciting competitive work from kW MCE's existing customers, and is likely to solicit/target four other key employees to execute his business plans.

Pursuant to Coon's Employment Agreement, WSP initiated an arbitration action against Coon in the American Arbitration Association ("AAA"), seeking damages and injunctive relief. WSP paid Coon substantial amounts of consideration in exchange for the post-employment covenants he voluntarily agreed to, and if he is permitted to continue violating those covenants, WSP will be irreparably harmed, both through the loss of its competitive advantage and through the lost good will that it specifically acquired as part of its purchase of kW MCE. Accordingly, at the suggestion of the emergency arbitrator appointed by the AAA, WSP asks the Court to enjoin Coon from further improperly competing with WSP and prevent irreparable harm to WSP's business, impairment of its customer goodwill, and misappropriation of WSP's confidential information and trade secrets and order limited, expedited initial discovery to enable WSP to show that the injunction should extend for the entire duration of the arbitration. WSP further requests

2

that the Court schedule a hearing for forty-five days after its order disposing of this Motion, and that the initial injunction remain in place until the Court has ruled on whether the preliminary injunction should be extended.

## BACKGROUND AND PROCEDURAL HISTORY

### I.     WSP Acquires kW Mission Critical Engineering.

In December 2020, WSP acquired kW MCE, a small (then approximately 175 employee) engineering firm that focused primarily on designing data centers and other mission-critical projects. (Compl. ¶ 14.) As part of the acquisition, kW MCE's senior leadership team and key employees, including Coon, signed employment agreements and retention agreements containing restrictive covenants that prohibited them from competing with WSP, soliciting its employees, customers, or vendors, or sharing its trade secrets or confidential information. (Ex. A at 6–8.)

### II.     Coon Agreed to Be Bound by Restrictive Covenants.

Coon worked for kW MCE for approximately eight years before the acquisition and entered an Employment Agreement with WSP on December 30, 2020, as a Professional Electrical Engineer and Managing Principal of the Phoenix Office. (Compl. ¶ 17.) Coon was responsible for providing technical engineering expertise and developing successful relationships with design team partners—architects, engineers, and contractors. (*Id.* ¶ 18.) Coon gained substantial experience and insight into kW MCE's data center business, and had key responsibilities for leadership of key client accounts and projects associated with data center program design and build out. (*Id.* ¶ 19.) Coon also gained knowledge about all aspects of kW MCE's customers' programs, including schedule, budget, risk and desired engineering team. (*Id.* ¶ 20.)

Mr. Coon's Employment Agreement provided for a $200,000 a year base salary, benefits, and potential performance bonuses. (Ex. A at 2.) In exchange for this compensation, Coon agreed

"not directly or indirectly [to] own, manage, operate, control, be employed by, consult with or participate in the ownership, management operation or control of any business in a manner that would reasonably be expected to divert business from any of the Company's 'Clients' or 'Prospective Clients' with whom [he] had any involvement in developing, servicing, soliciting, or maintaining during the year prior to [his] termination." (*Id.* at 7.) The Employment Agreement also prohibits Coon from engaging in "the solicitation, hiring, or engagement of any person or entity who is, at the time, or was within the last 12 months of [his] employment with the Company, an employee, consultant, or independent contractor of the Company or any of its affiliates." (*Id.* at 8.) And the Employment Agreement provides that Coon "shall not . . . contact, call upon, solicit or otherwise accept business from, render services to, market services or products to, divert business from, and/or interfere with the Company's relationship or business with any of the Company's existing Clients or Prospective Clients" that he learned of, did work for, or learned confidential information about through WSP. (*Id.*)

These restrictive covenants are essential to ensuring that WSP receives the benefit of the bargain from the kW MCE acquisition, including kW MCE's good will. The data-center design business is extremely competitive, with each company's ability to compete largely dependent on, *inter alia*, (1) its ability to understand and accommodate a client's needs, and (2) the quality and reputation of its specific engineers. (Compl. ¶ 26.) Competition from former kW MCE/WSP employees—and especially high-level employees like Coon, who is equipped with recent knowledge of kW MCE and WSP customers' preferences for, *inter alia*, engineering team organization and operation patterns—would thus be devastating for WSP. (*Id.* ¶ 27.) Accordingly, the Employment Agreement provides that the restrictive covenants will remain in place not only during Coon's employment by WSP, but also for another twelve months after he leaves or is

terminated by WSP.  (*See* Ex. A at 6–8.)  The only exception is if Coon does not renew the Employment Agreement after the first two-year Term—and thus "convert[s] to an at-will employee" at the end of the Term, (*id.* at 2)—and "remains employed with [WSP] one year after converting to an at-will employee," at which point the restrictive covenants would expire at the end of that one year period.  (*Id.* at 10.)  In further recognition of the importance of the restrictive covenants, the Employment Agreement also provides, and Coon agreed, that "[t]he Company is in a highly competitive business and expends considerable amounts of money in the development of business from new clients and customers and continued business from existing clients and customers.  The business and clientele of the Company are national and worldwide in scope, and therefore the territorial and time limitations set forth in th[e] Non-Compete clause are reasonable and necessary for the protection of the Company's interests."  (*Id.* at 7.)

Additionally, many employees, including Coon, also signed retention bonus agreements ("RBA") that reaffirmed their restrictive covenants in exchange for substantial cash bonuses "to incentivize [them] to remain with [kW MCE] . . . in order to assist [kW MCE] with integration into WSP."  (Ex. B at 1.)  Specifically, Coon executed the RBA on December 29, 2020, the day before signing his Employment Agreement.  WSP paid Coon $475,000 over the course of two years pursuant to his RBA, in addition to his compensation under the Employment Agreement.  (*Id.* at 1–2.)

## III.        Coon Violates the Restrictive Covenants.

On November 2, 2022, Coon gave notice that he would not renew the Employment Agreement, making him an at-will employee as of December 30, 2022.  (Ex. C.)  Coon did not, however, remain with WSP for a year after that date, as required by the Employment Agreement to excuse him from the 12-month tail in the restrictive covenants.  (Compl. ¶ 34.)  Instead, he

tendered his resignation on October 18, 2023, effective "sometime between two and four weeks from today." (Ex. D.) His actual last day was November 3, 2023. (Compl. ¶ 36.) Accordingly, the non-compete and non-solicitation provisions of his Employment Agreement are still in effect until November 3, 2024.

Nonetheless, Coon has already begun forming a competing business in Arizona (where he lives) and upstate New York (where much of kW MCE was located), likely intending to take advantage of the exploding demand for data centers because of the growth of AI software and applications. Since his resignation (and likely earlier), Coon has solicited several former kW MCE/WSP employees to join him, including at least four from kW MCE's New York office— Principal Mechanical Engineer Jason Leone and Managing Principal of the Troy Office Gary Russinko, who are each subject to their own restrictive covenants with WSP, (Exs. E & F), as well as Andrew Stercho and Darren Keyser. (Compl. ¶¶ 39, 56.) Russinko resigned from WSP on October 30, 2023, with his last day being December 1. (*Id.* ¶ 40.) Leone followed close behind, resigning on December 5, 2023, with his last day being December 22. (*Id.* ¶ 41.) Stercho and Sterling both resigned on January 2, 2024. (*Id.* ¶ 56.) Russinko, Leone, Stercho, and Sterling each refuse to disclose their new employers. Prior to his resignation, Coon openly admitted to a co-worker, Mr. Ken Clausen, that he was starting a competing business in Phoenix and upstate New York, near kW MCE's Troy, New York office (where Clausen works), and had a lease ready to be executed in January of 2024. (*Id.* ¶ 42.) Coon also told Clausen he was "going to be taking anyone in Troy who had not signed a retention agreement," and acknowledged that he needed kW MCE's MEP engineers to deliver on competitive services to the very clients Coon was responsible for servicing at kW MCE. (*Id.* ¶ 43.) By recruiting those experienced mechanical engineers, Coon openly touted he could start a business that could compete directly with WSP. (*Id.* ¶ 44.) He also

bragged that a member of the C-suite of another company, Bowman Engineering, already planned to pay him to buy the new business once it was scaled up to $25MM in annual revenue. (*Id.* ¶ 45.) Based on Coon's prior comments to Clausen, he is likely to target at least four other key kW MCE employees in early 2024, if he has not already done so. (*Id.* ¶ 46.) Design partners have also suggested in recent weeks to Clausen that Coon is soliciting competitive work from kW MCE's existing customers. (*Id.* ¶ 47.)

Together, Coon and the employees he has recruited to compete against kW MCE have the potential to inflict substantial harm to WSP's business. (*Id.* ¶ 48.) The key accounts that Coon was responsible for servicing have the potential to generate the tens of millions of dollars for FY 2024 and beyond. (*Id.* ¶ 49.) Further, Coon has in-depth knowledge of customer preferences, pricing, desired teams, project specifications, engineering specifications, and kW MCE's existing and past work for those key customers. (*Id.* ¶ 50.)

## IV. WSP Acts Promptly to Protect Its Rights.

On October 25, 2023, WSP's counsel sent Coon a letter, reminding him of his obligations under the restrictive covenants and addressing questions Coon asked in his resignation letter regarding which items/information he could keep and what had to be returned to WSP. (Ex. G.) On December 29, 2023, WSP's counsel sent similar letters to Messrs. Leone and Russinko. (Exs. H & I.) Nonetheless, Coon seems undeterred, and neither Coon, Leone, or Russinko have divulged or disclosed where they intend to work after leaving WSP/kW MCE.

On January 2, 2024, WSP filed a Demand for Arbitration against Coon pursuant to § 17(a) of the Employment Agreement,[1] asserting claims for breach of fiduciary duty, breach of contract,

---

[1] "Any dispute arising between any of the Company and [Coon] under this Agreement, or under any statute, regulation, or ordinance, or in connection with the [Coon]'s Employment with the Company, shall be submitted to binding arbitration before the American Arbitration

and tortious interference with contract. WSP simultaneously moved for emergency interim relief, including the appointment of an emergency arbitrator, a temporary order enjoining Coon from violating the restrictive covenants during the pendency of the arbitration, and limited expedited discovery in support of that relief. (Ex. J.)[2] The same day, Coon and his new employer, CG Enterprises Holdings, LLC ("CGE"), improperly filed an action in the Superior Court of Sonoma County, California—which is not a proper forum pursuant to the Employment Agreement and, in any event, lacks personal jurisdiction over WSP—seeking an order declaring that the restrictive covenants are unenforceable under a new California statute and enjoining WSP from enforcing the rights it paid for under the Agreement. (Ex. K.) Notably, Coon does not deny in his California Complaint that he is, or immediately plans on, competing against WSP, and he appears to have chosen to file in California solely to take advantage of California's favorable statute. Indeed, the only connection that action has to California is the alleged principal place of business of CGE, which is likely a sham office. Coon admits that he (an Arizona resident) created CGE in November 29, 2023, presumably to compete with WSP, a New York corporation based in New York City, vis-à-vis kW MCE, a New York corporation based in Troy, New York.

---

Association ("AAA") for resolution (the "Arbitration"), unless otherwise prohibited by law. . . . The Arbitration shall be conducted in the State of New York, and the arbitrator will apply New York State law, including federal law as applied in New York courts. The arbitration shall be conducted in accordance with AAA's Employment Arbitration Rules and Procedures, as modified herein, . . . by a single arbitrator who shall have experience in Senior Leader management disputes. The arbitrator, and not any federal, state, or local court or adjudicatory authority, shall have exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability, and/or formation of this Agreement, including but not limited to any dispute as to whether a particular claim is subject to arbitration thereunder. The arbitral award shall be in writing, state the reasons for the award, and be final and binding on the parties." (Ex. A at 11–12.)

[2]     Exhibit K includes WSP's Arbitration Demand Form and Motion for Emergency Interim Relief, but omits the exhibits attached to filings because each of those exhibits is included in the exhibits attached to this Motion for Temporary Restraining Order and Preliminary Injunction.

On January 4, 2024, the AAA acknowledged receipt of WSP's Demand and Motion and ordered Coon to respond by close of business on January 5, 2024.  In Coon's response, he ***again*** did not deny competing or planning to compete with WSP.  Instead, Coon objected only that any emergency injunctive relief must be sought from a court pursuant to § 16 of the Agreement,[3] not from the AAA, because, according to Coon, although the Employment Agreement provides that the arbitration will be governed by the AAA's Employment Rules, without limitation, the Parties had not explicitly adopted the AAA's Optional Rules providing for emergency relief.  On January 6, 2024, WSP opposed that objection and also reasserted its request that an arbitrator be appointed on an emergency basis to protect WSP's rights.

On January 8, 2024, the AAA appointed retired federal Magistrate Judge Caren E. Heckman as the emergency arbitrator.  On January 10, 2012, Judge Heckman held a conference call with the Parties to set a schedule and hear arguments on Coon's objection.  On January 12, 2024, Judge Heckman held another conference call, during which she acknowledged that the jurisdictional issue was "close" and agreed with WSP that Coon's approach of requiring WSP to seek emergency relief in court while litigating the merits in the AAA—was piecemeal and inefficient.  Nonetheless, Judge Heckman "reluctantly" declined jurisdiction and suggested to

---

[3]    "[I]n the event of a breach of any provision of this Agreement, money damages would be inadequate and neither [Coon] nor the Company would have an adequate remedy at law. Accordingly, the parties agree that in the event of a breach or a threatened breach of any of the provisions of this Agreement either party may, in addition and supplementary to other rights and remedies existing in its favor, apply to any court of law or equity of competent jurisdiction for specific performance and/or injunctive or other relief in order to enforce or prevent any violations of the provisions thereof (without posting a bond or other security)."  (Ex. A at 11.)

9

WSP that it could ask this Court to grant emergency injunctive relief in aid of arbitration or appoint the AAA to decide that issue. WSP then promptly prepared and filed this action.[4]

## LEGAL STANDARDS

"Where the parties have agreed to arbitrate a dispute, a district court has jurisdiction to issue a preliminary injunction [or temporary restraining order] to preserve the status quo pending arbitration." *General Mills, Inc. v. Champion Petfoods USA, Inc.*, 2020 WL 915824, at *3 (S.D.N.Y. Feb. 26, 2020); *accord Citizens Secs., Inc. v. Bender*, 2019 WL 3494397, at *2 (N.D.N.Y. Aug. 1, 2019). "In the Second Circuit, the standard for entry of a temporary restraining order is the same as for a preliminary injunction." *Citizens Secs., Inc.*, 2019 WL 3494397, at *2 n.1. An employer is entitled to a temporary restraining order to enforce restrictive covenants in aid of arbitration where the employer shows "(1) a likelihood of success on the merits or ... sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the plaintiff's favor; (2) a likelihood of irreparable injury in the absence of an injunction; (3) that the balance of hardships tips in the plaintiff's favor; and (4) that the public interest would not be disserved by the issuance of an injunction." *Id.* at *2.

## ARGUMENT

Coon violated his duty of loyalty and his restrictive covenants by planning to start a competing business while still employed at WSP and soliciting WSP's other employees to join him. If he is permitted to compete with WSP during the pendency of the arbitration, he will not only further violate his restrictive covenants, but WSP will also be irreparably harmed through the loss of its competitive position, the threatened and/or actual disclosure and misuse of its

---

[4]    Yesterday, January 16, 2024, Coon improperly filed his own preemptive Motion for an *ex parte* TRO in the California action to invalidate the restrictive covenants. Ex. L. On information and belief, WSP still has not been served in that action.

confidential information and trade secrets, and the impairment of kW MCE's business and customer good will for which WSP specifically bargained.  Accordingly, WSP requests that the Court preliminary enjoin Coon from violating his restrictive covenants.  WSP also requests that the Court order limited, expedited initial discovery and schedule a hearing for forty-five days after its order disposing of this Motion to decide whether preliminary injunction should be extended for the duration of the arbitration.

I.      **WSP Is Entitled to Preliminary Injunctive Relief.**

   A.      **WSP Is Likely to Succeed on the Merits of Its Breach-of-Contract Claims.**

   To establish breach of contract, a claimant must show "the existence of a contract, the [claimant's] performance pursuant to the contract, the defendant's breach of his or her contractual obligations, and damages resulting from the breach."  *Tri-Star Lighting Corp. v. Goldstein*, 151 A.D.3d 112, 1105 (N.Y. App. Div. 2017).  Here, Coon breached his Employment Agreement by failing to abide by the restrictive covenants.

   i.      **The Restrictive Covenants Are Enforceable.**

   The Employment Agreement, including the restrictive covenants, is a valid and enforceable contract.  "Generally, a covenant not to compete will be enforced . . . if it is reasonably limited temporarily and geographically and, without being harmful to the public or unduly burdensome, serves the acceptable purpose of protecting the former employer from unfair competition." *Bollengier v. Gulati*, 233 A.D.2d 721, 722 (N.Y. App. Div. 1996).  Moreover, "[c]ourts will enforce noncompetition clauses 'where necessary to protect, *inter alia*, an employer's confidential customer information and the good will of . . . customer[s] generated and maintained at the employer's expense.'" *Gundermann & Gundermann Ins. V. Brassill*, 46 A.D.3d 82, 83 (N.Y. App. Div. 2007) (quoting *Milbrandt & Co., Inc. v. Griffin*, 1 A.D.3d 327, 328 (N.Y. App. Div. 2003)).

As an initial matter, in his Employment Agreement, Coon agreed that "the territorial and time limitations set forth in th[e] Non-Compete clause are reasonable and necessary for the protection of the Company's interests."  (Ex. A at 7.)  Accordingly, he has already conceded that they are valid.  *See* Arbitration Award, *Clopay Corp. v. Priest*, 2023 WL 5657724 (E.D. Ok. July 10, 2023) (holding that national scope of restrictive covenant was reasonable based on employee's admission in contract).

Moreover, courts routinely hold that the Agreement's temporal scope—twelve months after the employee leaves the company—is reasonable.  *See, e.g.*, *Artech Info. Sys., L.L.C. v. Tee*, 280 A.D.2d 117, 124 (N.Y. App. Div. 2001); *Michael I. Weintraub, M.D., P.C. v. Schwartz*, 131 A.D.2d 663, 665 (N.Y. App. Div. 1987); *J.H. Goldberg Co., Inc. v. Stern*, 53 A.D.2d 246, 250 (N.Y. App. Div. 1976).  The temporal scope is particularly reasonable here because the covenants were connected to the acquisition of kW MCE.  "New York courts have found three to five year restrictions reasonable in the context of the sale of a business."  *Uni-World Capital L.P. v. Preferred Fragrance, Inc.*, 73 F. Supp. 3d 209, 235 (S.D.N.Y. 2014)).  Although the restrictive covenants were not part of the contract for the acquisition of kW MCE itself, the acquisition contemplated that the restrictive covenants would be in place.  Indeed, the Employment Agreement specifically references the transition from kW MCE to WSP, (Ex. A at 1), and the RCA states that the purpose of that agreement, including the similar restrictive covenants set forth therein, is "to incentivize [the employees] to remain with [kW MCE] . . . in order to assist [kW MCE] with integration into WSP."  (Ex. B at 1.)

The Employment Agreement's lack of a specific geographic scope is also reasonable for two reasons.  First, WSP works with clients and vendors around the world.  *See Uni-World Capital L.P.*, 73 F. Supp. 3d at 235 (upholding non-compete that applied to "the United States of America,

its territories and possessions, and any country outside of the United States of America to which products of the Business are sold"); *Integra Optics, Inc. v. Nash*, 2018 WL 224460, at *10 (N.D.N.Y. Apr. 10, 2018) (applying Colorado law and enforcing worldwide scope of restrictive covenant); *GE Betz Inc. v. Moffitt-Johnson*, 301 F. Supp. 3d 668, 685 (S.D. Tex. 2014); *Bio-Imaging Techs., Inc. v. Marchant*, 584 F. Supp. 2d 322, 328 (D. Mass. 2008) (upholding non-compete agreement that extends to "any state or country where [employer] does business); *Universal Engraving, Inc. v. Duarte*, 519 F. Supp. 2d 1140, 1153 (D. Kan. 2007). Second, the covenants are limited to conduct that is directed at WSP's existing and prospective clients—*e.g.*, soliciting them or engaging in conduct that "would reasonably be expected" to divert them away from WSP. *See Crest Hill Capital LLC v. Gonzalez*¸ 2019 WL 1557512, at *6 (NY. S. Ct. Apr. 10, 2019) ("No geographic limitation is required for a non-solicitation clause that is client-based."); *W.R. Grace & Co., Dearborn Div. v. Mouyal*, 422 S.E.2d 529, 533 (Ga. 1992) ("Where . . . the former employee is prohibited from post-employment solicitation of employer customers which the employee contacted during his tenure with the employer, there is no need for a territorial restriction expressed in geographic terms." (footnote omitted)). Even if this were not the case (which it is), Coon intends to operate his business—and has solicited WSP employees to work on that business—in New York, where kW MCE was primarily located, and Arizona, where Coon personally worked while employed at WSP. (*See* Ex. A at 1.) Accordingly, enforcing the restrictive covenants to prevent Coon from starting his competing business is reasonable and necessary to protect WSP's legitimate interests.

### ii. Coon Breached the Restrictive Covenants and Will Breach Them Again.

While WSP performed its obligations under the Employment Agreement by paying Coon a substantial salary, benefits, and bonuses, Coon violated his restrictive covenants and is planning

to violate them again. The non-solicitation clause of the Employment Agreement provides that Coon shall not "engage in any activity which involves . . . the solicitation, hiring, or engagement of any person or entity who is, at the time, or was within the last 12 months of [his] employment with the Company, an employee . . . of the Company or any of its affiliates." (Ex. A at 8.) He has already done that by asking Messrs. Leone, Russinko, Stercho, and Sterling to work for him at his competing business, causing them to resign.

Moreover, Coon's competing business itself will violate the non-competition and non-solicitation provisions. The non-competition clause provides that Coon "shall not directly or indirectly own, manage, operate, [or] control . . . any business in a manner that would reasonably be expected to divert business from any of the Company's 'Clients' or 'Prospective Clients' with whom [he] had any involvement in developing, servicing, soliciting, or maintaining during the year prior to [his] termination." (*Id.* at 7.) Yet, as noted above, that is exactly what Coon admits that he intends to do. Similarly, the non-solicitation clause provides that Coon "shall not . . . contact, call upon, solicit or otherwise accept business from, render services to, market services or products to, divert business from, and/or interfere with the Company's relationship or business with any of the Company's existing Clients or Prospective Clients" that he learned of, did work for, or learned confidential information about through WSP "during the year prior to [his] termination." (*Id.*) Coon has openly admitted he would go after the same client base given the team he is recruiting and his stated intention to start a competing business. (Compl. ¶¶ 42–47.)

### iii.     WSP Has Been Harmed.

WSP has already suffered damages and will suffer further damages without interim relief. Specifically, WSP has already been harmed by Coon's solicitation of Messrs. Leone, Russinko, Stercho, and Sterling—WSP lost four valuable employees. This solicitation also constitutes

tortious interference with Messrs. Leone and Russink's retention agreements, denying WSP the benefit of the bargain vis-à-vis their restrictive covenants. And, as explained below, WSP will suffer irreparable damage to its reputation, good will, and customer relationships if Coon is permitted to begin competing with it to solicit the same customers Coon worked with while at kW MCE/WSP. (*See* Part I.B, *infra*.)

### B.  WSP Will Be Irreparably Harmed Without Injunctive Relief.

An injury is irreparable for the purpose of obtaining preliminary relief where the party would not have an adequate remedy at law. *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 68 (2d Cir. 1999). Here, WSP will suffer several irreparable injuries if the Court does not intervene.

As with the reasonableness of the restrictive covenants, Coon conceded that WSP will suffer irreparable harm if he is permitted to start a competing business before the covenants expire. Specifically, in the Employment Agreement, Coon agreed "that in the event of a breach of any provision of this Agreement, money damages would be inadequate and neither [Coon] nor the Company would have an adequate remedy at law" and that injunctive relief is appropriate. (Ex. A at 7); *see also Ticor Title Ins. Co.*, 173 F.3d at 69 (holding that contract provision that "in the event of Cohen's breach of the post-employment competition provision, Ticor shall be entitled to injunctive relief, because it would cause irreparable injury" is an admission that harm would be irreparable).

Even apart from this admission, Coon's competing business in fact will likely cause substantial irreparable harm to WSP. "It is well established that the loss of customer relationships stemming from the violation of nonsolicitation and non-competition clauses constitutes irreparable harm sufficient to support injunctive relief." *Crest Hill Capital LLC*, 2019 WL 1557512, at *6; *accord Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir. 1999). "[T]he violation of a non-

compete by the solicitation of employees also constitutes irreparable harm." *Global Switching Inc. v. Kasper*, 2006 WL 1800001, at *12 (E.D.N.Y. June 28, 2006); *EASi, LLC v. Gaffar*, 2020 WL 3868394, at *3 (C.D. Ill. July 9, 2020) (finding risk of irreparable harm because "[i]f Gaffar or L&T continue to solicit and hire EASi employees during the pendency of this lawsuit, EASi risks losing significant work from CAT, a large client, and may be competitively disadvantaged on future projects because the former EASi employees likely take with them the customer goodwill they helped to create for the employer"); *cf. Newmark Partners, L.P. v. Hunt*, 200 A.D.2d 557 (N.Y. App. Div. 2021) (granting preliminary injunction "to protect [plaintiff's] client relationships, reputation, and goodwill after losing all or almost all of their multifamily property group to their primary competitor").

As explained above, the data-center design industry is highly competitive, and a business' ability to compete depends in large part on the particular engineers working for it and its knowledge of a particular client's preferences about how the engineering team will operate. Coon knows WSP's clients' preferences and may be able to divert substantial business from it by siphoning off its valuable team of engineers. Coon also has knowledge of WSP/kW MCE's valuable trade secrets relating to customer projects/proposals, including design elements, proposal/fee schedules, and instruments of service like field construction documents. Any competition or solicitation by Coon and his former WSP colleagues will necessarily involve the actual or inevitable disclosure of WSP's confidential and trade secret business information.

Finally, these harms will be compounded by the fact Coon's restrictive covenants were integral to "the sale of an existing business with its goodwill." *Frank May Assoc.*, 281 A.D.2d at 674; *accord Lund v. Agmata Wash. Enterprises, Inc.*, 190 A.D.2d 577, 577 (N.Y. App. Div. 1993); *Hay Grp., Inc. v. Nadel*, 170 A.D.2d 398, 399 (N.Y. App. Div. 1991). WSP will irreparably lose

part of the good will it purchased in the acquisition if Coon is permitted to compete with it and steal its employees during the term of the restrictive covenants.

In sum, WSP will be irreparably harmed if Coon is not enjoined from competing with it and continuing improperly to solicit its employees in violation of his restrictive covenants.

### C.     The Balance of Equities Favors WSP.

The balance of the equities favors WSP.  As explained above, WSP paid Coon substantial sums of money in exchange for his employment ***and*** his agreement to abide by the restrictive covenants, and WSP will suffer significant and irreparable harm to its business, reputation, good will, and customer relationships if Coon is not enjoined from violating those covenants.

Moreover, those covenants are reasonably limited to protect WSP's interests.  They do not prohibit Coon from obtaining gainful employment.  Rather, they prohibit him only from soliciting the specific employees, vendors, and clients that belong to WSP, and from doing work that "would reasonably be expected to divert business" away from WSP.  *See Battenkill Veterinary Equine P.C. v. Cangelosi*, 1 A.D. 856, 859 (N.Y. App. Div. 2003) (holding that equities favored the plaintiff where "[d]efendant is not being deprived of her livelihood").

Accordingly, the equities favor WSP, and the Court should issue a temporary restraining order and/or preliminary injunction, prohibiting Coon from competing with WSP and soliciting its employees or vendors during the pendency of the arbitration.

### II.       WSP Is Entitled to Expedited Initial Discovery.

WSP further requests that the Court order expedited initial discovery to enable WSP to obtain evidence to support a preliminary injunction for the entire duration of the arbitration, and hold the a hearing for that purpose forty-five days after ruling on this Motion.  Specifically the Court should order Coon to preserve all relevant documents, including personal communications

like emails and text messages, and allow WSP to serve up to fifteen document requests and ten interrogatories to understand more about the specifics of Coon's competition plans and the full extent of his breach of his post-employment covenants. These requests and interrogatories should include, but not be limited to, the specific requests attached hereto as Exhibits M and N.

## **CONCLUSION**

For the forgoing reasons, the Court should order Coon not to compete with WSP or solicit its employees or vendors, and order Coon to preserve all relevant documents and to respond to expedited initial discovery.

Dated: January 17, 2024                    Respectfully submitted,


                                           _____*/s/ Sean C. Sheely*_____
                                           Sean C. Sheely (NY Bar No. 2604684)
                                           **HOLLAND & KNIGHT LLP**
                                           31 West 52nd Street
                                           New York, NY 10019
                                           Telephone: 212.513.3200
                                           sean.sheely@hklaw.com

                                           Todd Wozniak (*pro hac vice forthcoming*)
                                           Nipun J. Patel (*pro hac vice forthcoming*)
                                           Justin M. Kadoura (*pro hac vice forthcoming*)
                                           **HOLLAND & KNIGHT LLP**
                                           1650 Market Street, Suite 3300
                                           Philadelphia, PA 19103
                                           Telephone: 215.252.9527
                                           todd.wozniak@hklaw.com
                                           nipun.patel@hklaw.com
                                           justin.kadoura@hklaw.com

                                           *Counsel for Plaintiff WSP USA Buildings Inc.*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF NEW YORK

WSP USA Buildings Inc.,

               Plaintiff,

    v.

STEPHEN COON,

               Defendant.

Case No.:  1:24-cv-76 (DNH/TWD)

## ORDER

**AND NOW,** this ___ day of _____, 2024, upon consideration of Plaintiff WSP USA Buildings Inc.'s ("Plaintiff") Motion for Temporary Restraining Order and Preliminary Injunction, it is hereby **ORDERED** that Plaintiff's Motion is **GRANTED**. It is **FURTHER ORDERED** that Defendant Stephen Coon show cause before the Hon. _____, United States District Court for the Northern District of New York, on the ___ day of _____, 2024 at _____ in the _____ of that day or soon thereafter as counsel can be heard, why an Order should not be entered in this matter:

(1)     Temporarily enjoining Defendant Coon from:

    a)  using or disclosing to any third party any of the Confidential Information, directly or indirectly, either during Defendant's employment with Plaintiff or at any time following the termination of Defendant's employment with Plaintiff;

    b)  directly or indirectly owning, managing, operating, controlling, being employed by, consulting with or participating in the ownership, management, operation or control of any business, in a manner that would reasonably be expected to divert business from any of the Plaintiff's "Clients" or "Prospective Clients" with whom Defendant

had any involvement in developing, servicing, soliciting, or maintaining during the year prior to Defendant's termination, as those terms are defined in Defendant's Senior Leadership Employment Agreement;

c) directly or indirectly (on Defendant's own or in combination or association with others, and whether for Defendant's own benefit or for the benefit of other parties or entities) contacting, calling upon, soliciting or otherwise accepting business from, rendering services to, marketing services or products to, diverting business from, and/or interfering with the Plaintiff's relationship or business with any of the Plaintiff's existing Clients or Prospective Clients that Defendant interacted with on behalf of the Plaintiff, was introduced to by virtue of Defendant's employment with the Plaintiff, or otherwise learned confidential information concerning during the last 12 months of Defendant's employment with the Plaintiff; and

d) directly or indirectly (on Defendant's own or in combination or association with others, and whether for Defendant's own benefit or for the benefit of other persons or entities) engaging in activity which involves or could result in the actual or potential termination of the Plaintiff's relationship with or the solicitation, hiring, or engagement of any person or entity who is, at the time, or was within the last 12 months of Defendant's employment with the Plaintiff, an employee, consultant, or independent contractor of the Plaintiff or any of its affiliates, including for greater certainty, any affiliate of Plaintiff or kW MCE or WSP USA, Inc.

(2)   Permitting expedited discovery commencing immediately upon receipt of this Order, with leave for Plaintiff to serve 15 Requests for Production and 15 Interrogatories upon Defendant, with answers due 14 days from receipt, and take the deposition of Defendant.

**ORDERED** that security in the amount of $5,000 be posted by Plaintiff prior to

_____ _____, 2024 at _____ o'clock in the _____ of that day; and it is further

**ORDERED** that service of a copy of this Order to Show Cause and annexed Memorandum

of Law, and Declarations, together with the Complaint, shall be served on counsel for Defendant,

on or before _____, 2024, and shall be deemed good and sufficient service; and it is

further

**ORDERED**, that answering papers, if any, shall be served upon counsel for Plaintiff, to

be received on or before _____, 2024.

**AND IT IS SO ORDERED.**

_____

# Exhibit M

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

WSP USA BUILDINGS INC.,

                 Plaintiff,

         -v-                       1:24-CV-076

STEPHEN COON,

                 Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                 OF COUNSEL:

Holland & Knight LLP        SEAN C. SHEELY, ESQ.
Attorneys for Plaintiff
31 West 52 Street
New York, NY 10019

DAVID N. HURD
United States District Judge

## **DECISION and ORDER**

## I. **INTRODUCTION**

On January 17, 2024, plaintiff WSP USA Buildings Inc. ("WSP" or "plaintiff"), a national engineering firm, filed this action against one of its former employees, defendant Stephen Coon ("Mr. Coon" or "defendant"). That same day, plaintiff filed an emergency motion seeking a temporary restraining order ("TRO") and preliminary injunction that would prevent

defendant from allegedly violating certain restrictive covenants contained in his employment agreement ("the Agreement").[1]

Mr. Coon worked as a professional electrical engineer and managing principal of kW Mission Critical Engineering's ("KW") Phoenix, Arizona office for eight years prior to WSP's acquisition of KW in 2020. Dkt. No. 1. When KW was acquired by plaintiff, defendant and other senior leadership signed the Agreement as part of plaintiff's acquisition of KW and its employees. *Id.*

Mr. Coon later resigned in late 2023. Dkt. No. 1. What began as the ordinary departure of a key employee has since turned sour. Both parties have initiated parallel lawsuits contesting the validity of the Agreement. According to plaintiff, the Agreement—which contains both non-compete and non-solicitation language—prevents defendant from competing with plaintiff's engineering business anywhere in the country. Dkt. No. 1-1.

But Mr. Coon acted first. On January 2, 2024, defendant filed a lawsuit in the California Superior Court in Sonoma County against WSP seeking declaratory relief. Dkt. No. 1. That case was removed by plaintiff to the Northern District of California on January 17, 2024—the same day that it sought relief in this district. *See CG Enter. Holdings, LLC v. WSP USA, Inc.*, No. 24-CV-0292 (CRB).

---

[1] WSP's request for a TRO and preliminary injunction was filed *ex parte*. To date, Mr. Coon has yet to appear in this action, and it remains unclear whether he has even been served with either the complaint or plaintiff's motion papers. Dkt. No. 7-2.

Resolution of this case, however, does not require a discussion of the merits. This is because there are several procedural hurdles, discussed below, that plaintiff has not cleared which permit dismissal of this case.

## II. **DISCUSSION**

First, dismissal of WSP's case is proper under the so-called "first-to-file" rule. *Adam v. Jacobs*, 950 F.2d 89, 92 (2d Cir. 1991) (quoting *First City Nat'l Bank & Trust Co. v. Simmons*, 878 F.2d 76, 79 (2d Cir. 1989) ("Where there are two competing lawsuits, the first suit should have priority, absent the showing of balance of convenience or special circumstances giving priority to the second."). While ordinarily the district court hearing the original suit will enjoin the second suit, the court being posed the second lawsuit must also exercise its "judicial self-restraint" to decline to hear the second suit while the first remains pending elsewhere. *Id.* (citing *Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197, 1202–03 (2d Cir. 1970)). Thus, it is not only within a district judge's discretion, but his duty to conserve judicial resources which permits dismissing or staying the second action when an earlier, identical case remains pending elsewhere. *Id.* at 92.

This rule permits dismissal of WSP's case here on account of Mr. Coon's earlier lawsuit pending before the Northern District of California. Compl. ¶

58; Pl.'s Mem. at 8.[2]  Like this lawsuit, Mr. Coon's lawsuit also contests the enforceability of, and alleged violation of, the Agreement.  Critically, as noted, defendant was the first to file.  As a result, his case takes priority over this case.

There are, of course, exceptions to the first-to-file rule.  *Emps. Ins. of Wausau v. Fox Ent. Grp., Inc.*, 522 F.3d 271, 275 (2d Cir. 2008) (citations omitted) ("We have recognized only two exceptions to the first-filed rule: (1) where the "balance of convenience" favors the second-filed action . . . and (2) where "special circumstances" warrant giving priority to the second suit[.]").  Upon review, however, neither exception applies in this case.[3]

Therefore, dismissal of WSP's suit is proper to give way to Mr. Coon's earlier action in the Northern District of California.  Yet, even assuming that the first-to-file rule is somehow inapplicable, there are more procedural hurdles that remain.

Second, in addition to losing the race to the courthouse, WSP appears to have mislaid venue.  Applying the federal venue statute correctly, venue

---

[2] Pagination corresponds to CM/ECF.

[3] To the extent that the "special circumstances" exception may apply in this case given the timeline between plaintiff's demand for arbitration and defendant's filing of the California lawsuit, the Second Circuit has not outlined factual scenarios in which a declaratory lawsuit will be deemed "improper anticipatory litigation" when it is filed close in time to a demand for arbitration as opposed to a formal demand letter referencing imminent federal litigation.  *See Fit & Fun Playscapes, LLC v. Sensory Path, Inc.*, 2022 WL 118257, at * 7–8 (S.D.N.Y. Jan 12, 2022) (citing *Buddy USA, Inc. v. Recording Indus. Ass'n of America, Inc.*, 21 F. App'x 52, 55 (2d Cir. 2001) (summary order)).

appears to be proper in the following locations: in the District of Arizona, where defendant is domiciled and subject to general personal jurisdiction pursuant to §§ 1391(b)(1) and (3); in the Northern District of California where plaintiff has established a competing business entity as an alleged violation of the Employment Agreement pursuant to §§ 1391(b)(2)–(3); or perhaps in the Southern District of New York, the forum explicitly contemplated in the Agreement itself. *See* Ex. A to Mot. for TRO at 13. Not found in this list, however, is the Northern District of New York.

In filing this case, WSP claims that venue is proper pursuant to § 1391(b)(2) on account that "a substantial part of the events of omissions giving rise to the claims occurred within the Northern District[.]" Compl. ¶ 13. Yet, the only fact WSP has alleged that might support venue in the Northern District is that Mr. Coon solicited one of its employees who happens to work in its Troy, New York office. Compl. ¶¶ 39, 43. Plaintiff does not allege that defendant has ever traveled to, or is currently operating a competing business in this district.[4] Plaintiff makes only speculative claims that that defendant plans to do so. *Id.* ¶ 38.

---

[4] For the same reasons, it is doubtful that plaintiff has met its burden of establishing that this Court has *personal jurisdiction* over defendant, whose contacts with New York appear attenuated at best.

In sum, it is not clear how this dispute should or will be resolved. However, it is clear that it must be resolved elsewhere.[5]

Therefore, it is

ORDERED that

1. Plaintiff's complaint is DISMISSED, without prejudice; and

2. Plaintiff's motion for a TRO and a preliminary injunction is DENIED without prejudice as moot.

The Clerk of the Court is directed to terminate the pending motion, enter a judgment accordingly, and close the file.

    IT IS SO ORDERED.



David N. Hurd
U.S. District Judge

Dated:  January 25, 2024
        Utica, New York.

---

[5] While arguably the more prudent course in this case might be to deny plaintiff's TRO and to schedule a hearing on the preliminary injunction, that would further waste the Court's valuable resources and time.  Given the obvious procedural defects in plaintiff's case, we need not wait for defendant, who will likely raise the same issues presented here, to reach the same conclusion we reach today.

# Exhibit N

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| WSP USA BUILDINGS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:24-cv-00076-DNH-TWD |
| | ) | |
| STEPHEN COON, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## NOTICE OF MOTION

**PLEASE TAKE NOTICE** that upon the accompanying Memorandum of Law and Declaration of Sean C. Sheely, dated February 8, 2024, and the exhibits annexed thereto, Plaintiff WSP USA Buildings Inc. ("WSP") hereby moves this Court before the Honorable David N. Hurd, District Judge of the United States District Court, Northern District of New York, for an order, pursuant to Local Rule 60.1: (i) reconsidering the Decision and Order dated January 25, 2024 (ECF 9); (ii) vacating the January 25, 2024 Judgment and reinstating the case (ECF 10); (iii) permitting Defendant Stephen Coon to be served and immediately joined to this matter; and (iv) granting WSP's previously-filed motion for a temporary restraining order and preliminary injunction (ECF 3, 7).

WSP moves for reconsideration of the January 25, 2024 Decision and Order on the basis that the Court respectfully overlooked material facts and authority and the resulting injustice that WSP reasonably believes will alter the Court's conclusions on the applicability of the first-filed rule and venue.

Dated: February 8, 2024                    Respectfully submitted,

HOLLAND & KNIGHT LLP
*Attorneys for Plaintiff*

By:    */s/ Sean C. Sheely*
        Sean C. Sheely

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WSP USA BUILDINGS, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Case No. 1:24-cv-00076-DNH-TWD |
| | ) |
| STEPHEN COON, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## DECLARATION OF SEAN C. SHEELY

I, Sean C. Sheely, hereby declare as follows:

1.      I am a partner at the law firm of Holland & Knight LLP, attorneys for Plaintiff WSP USA Buildings Inc.'s ("WSP"). I make this declaration in support of WSP's Motion for Reconsideration to provide the Court with relevant corporate filings and court filings.

2.      Annexed hereto as **Exhibit 1** is a true and correct copy of the Articles of Incorporation for CG Enterprises Holdings, LLC.

3.      Annexed as **Exhibit 2** is the docket report for *DraftKings Inc. v. Hermalyn*, No. 24-cv-10299-JEK (D.Mass.), which sets outs the Court's Order and Decision at ECF 29, as well as (A) plaintiff's memorandum of law in support of its motion for a temporary restraining order (ECF 4); and (B) defendant's memorandum in support of its emergency motion to stay pursuant to the first-filed rule (ECF 26).

4.      Annexed hereto as **Exhibit 3** is a true and correct copy of WSP's Motion to Dismiss filed on February 2, 2024 in the California action, *CG Enter. Holdings, LLC v. WSP USA, Inc.*, No. 24-CV-0292 (CRB), and the exhibits thereto.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on the date set forth below.

Sworn to in New York, New York on February 8, 2024.

/s/ Sean C. Sheely

Sean C. Sheely

2

# EXHIBIT 1



202359914969



**STATE OF CALIFORNIA**
*Office of the Secretary of State*
**ARTICLES OF ORGANIZATION**
**CA LIMITED LIABILITY COMPANY**
California Secretary of State
1500 11th Street
Sacramento, California 95814
(916) 653-3516

For Office Use Only

**-FILED-**

File No.: 202359914969

Date Filed: 11/29/2023

| Limited Liability Company Name | |
| --- | --- |
| Limited Liability Company Name | CG Enterprises Holdings, LLC |

| Initial Street Address of Principal Office of LLC | |
| --- | --- |
| Principal Address | 3558 ROUND BARN BLVD<br>SUITE 200<br>SANTA ROSA, CA 95403 |

| Initial Mailing Address of LLC | |
| --- | --- |
| Mailing Address | 3558 ROUND BARN BLVD<br>SUITE 200<br>SANTA ROSA, CA 95403 |
| Attention | |

| Agent for Service of Process | |
| --- | --- |
| California Registered Corporate Agent (1505) | C T CORPORATION SYSTEM<br>Registered Corporate 1505 Agent |

**Purpose Statement**

The purpose of the limited liability company is to engage in any lawful act or activity for which a limited liability company may be organized under the California Revised Uniform Limited Liability Company Act.

| Management Structure | |
| --- | --- |
| The LLC will be managed by | One Manager |

Additional information and signatures set forth on attached pages, if any, are incorporated herein by reference and made part of this filing.

**Electronic Signature**

☒ By signing, I affirm under penalty of perjury that the information herein is true and correct and that I am authorized by California law to sign.

*Hubert Dampt*                                    11/29/2023

Organizer Signature                          Date

B2293-9118  11/29/2023  3:40 PM Received by California Secretary of State

# EXHIBIT 2

# United States District Court
## District of Massachusetts (Boston)
## CIVIL DOCKET FOR CASE #: 1:24-cv-10299-JEK

DraftKings Inc. v. Hermalyn
Assigned to: District Judge Julia E. Kobick
Cause: 18:1836(a) Injunction against Misappropriation of Trade
Secrets

Date Filed: 02/05/2024
Jury Demand: Plaintiff
Nature of Suit: 880 Defend Trade Secrets
Act (of 2016)
Jurisdiction: Federal Question

**Plaintiff**

**DraftKings Inc.**                    represented by    **Jason C. Schwartz**
Gibson Dunn & Crutcher LLP
1050 Connecticut Avenue N.W.
Suite 300
Washington, DC 20036
202-955-8500
Fax: 202-530-9522
Email: jschwartz@gibsondunn.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Orin Snyder**
Gibson Dunn & Crutcher
200 Park Avenue
New York, NY 10166
212-351-4000
Email: osnyder@gibsondunn.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Andrew S. Dulberg**
Wilmer Cutler Pickering Hale and Dorr LLP
(Bos)
60 State Street
Boston, MA 02109
617-526-6352
Fax: 617-526-5000
Email: andrew.dulberg@wilmerhale.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Michael Hermalyn**                    represented by    **Russell Beck**
Beck Reed Riden LLP
155 Federal Street, Suite 1302

Boston, MA 02110
617-500-8670
Fax: 617-500-8665
Email: rbeck@beckreed.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stephen D. Riden**
Beck Reed Riden LLP
155 Federal Street, Suite 1302
Suite 1302
Boston, MA 02110
617-500-8672
Email: sriden@beckreed.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Email All Attorneys

Email All Attorneys and Additional Recipients

| Date Filed | # | Docket Text |
|------------|---|-------------|
| 02/05/2024 | 1 | COMPLAINT against Michael Hermalyn Filing fee: $ 405, receipt number AMADC-10255503 (Fee Status: Filing Fee paid), filed by DraftKings Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Civil Cover Sheet, # 4 Category Form, # 5 Summons) (Dulberg, Andrew) (Entered: 02/05/2024) |
| 02/05/2024 | 2 | CORPORATE DISCLOSURE STATEMENT by DraftKings Inc. identifying Corporate Parent No Corporate Parent for DraftKings Inc... (Dulberg, Andrew) (Entered: 02/05/2024) |
| 02/05/2024 | 3 | MOTION for Temporary Restraining Order by DraftKings Inc.. (Attachments: # 1 Text of Proposed Order)(Dulberg, Andrew) (Entered: 02/05/2024) |
| 02/05/2024 | 4 | MEMORANDUM in Support re 3 MOTION for Temporary Restraining Order filed by DraftKings Inc.. (Dulberg, Andrew) (Entered: 02/05/2024) |
| 02/05/2024 | 5 | AFFIDAVIT of Gregory Karamitis in Support re 3 MOTION for Temporary Restraining Order filed by DraftKings Inc.. (Dulberg, Andrew) (Entered: 02/05/2024) |
| 02/05/2024 | 6 | AFFIDAVIT of Brian Harris in Support re 3 MOTION for Temporary Restraining Order filed by DraftKings Inc.. (Dulberg, Andrew) (Entered: 02/05/2024) |
| 02/06/2024 | 7 | MOTION for Expedited Discovery by DraftKings Inc.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Dulberg, Andrew) (Entered: 02/06/2024) |
| 02/06/2024 | 8 | MEMORANDUM in Support re 7 MOTION for Expedited Discovery filed by DraftKings Inc.. (Dulberg, Andrew) (Entered: 02/06/2024) |
| 02/06/2024 | 9 | MOTION for Short Order of Notice re 7 MOTION for Expedited Discovery , 3 MOTION for Temporary Restraining Order by DraftKings Inc..(Dulberg, Andrew) (Entered: 02/06/2024) |
| 02/06/2024 | 10 | MOTION for Leave to Appear Pro Hac Vice for admission of Orin Snyder Filing fee: $ 125, receipt number AMADC-10255522 by DraftKings Inc.. (Attachments: # 1 Certification of Orin Snyder)(Dulberg, Andrew) Modified on 2/6/2024 to add receipt number (Cook, Savannah). (Entered: 02/06/2024) |

| 02/06/2024 | [11](#) | MOTION for Leave to Appear Pro Hac Vice for admission of Jason C. Schwartz Filing fee: $ 125, receipt number AMADC-10255520 by DraftKings Inc.. (Attachments: # [1](#) Certification of Jason C. Schwartz)(Dulberg, Andrew) (Entered: 02/06/2024) |
|---|---|---|
| 02/06/2024 | [12](#) | MOTION for Leave to Appear Pro Hac Vice for admission of Harris M. Mufson Filing fee: $ 125, receipt number AMADC-10255521 by DraftKings Inc.. (Attachments: # [1](#) Certification of Harris M. Mufson)(Dulberg, Andrew) (Entered: 02/06/2024) |
| 02/06/2024 | [13](#) | MOTION for Leave to Appear Pro Hac Vice for admission of Justin M. DiGennaro Filing fee: $ 125, receipt number AMADC-10255523 by DraftKings Inc.. (Attachments: # [1](#) Certification of Justin M. DiGennaro)(Dulberg, Andrew) (Entered: 02/06/2024) |
| 02/06/2024 | 14 | ELECTRONIC NOTICE of Case Assignment. District Judge Julia E. Kobick assigned to case. If the trial Judge issues an Order of Reference of any matter in this case to a Magistrate Judge, the matter will be transmitted to Magistrate Judge Jennifer C. Boal. (Cowan, Nicole) (Entered: 02/06/2024) |
| 02/06/2024 | [15](#) | NOTICE of Appearance by Russell Beck on behalf of Michael Hermalyn (Beck, Russell) (Entered: 02/06/2024) |
| 02/06/2024 | [16](#) | NOTICE of Appearance by Stephen D. Riden on behalf of Michael Hermalyn (Riden, Stephen) (Entered: 02/06/2024) |
| 02/06/2024 | [17](#) | Summons Issued as to All Defendants. **Counsel receiving this notice electronically should download this summons, complete one for each defendant and serve it in accordance with Fed.R.Civ.P. 4 and LR 4.1. Summons will be mailed to plaintiff(s) not receiving notice electronically for completion of service.** (Barbosa, Nilsa) (Entered: 02/06/2024) |
| 02/06/2024 | 18 | District Judge Julia E. Kobick: ELECTRONIC ORDER entered granting [11](#) Motion for Leave to Appear Pro Hac Vice Added Jason C. Schwartz. **Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account.** Instructions on how to link CM/ECF accounts to upgraded pacer account can be found at https://www.mad.uscourts.gov/caseinfo/nextgen-current-pacer-accounts.htm#link-account. (Cook, Savannah) (Entered: 02/06/2024) |
| 02/06/2024 | 19 | District Judge Julia E. Kobick: ELECTRONIC ORDER entered granting [12](#) Motion for Leave to Appear Pro Hac Vice Added Harris M. Mufson. **Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.** Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm. A Notice of Appearance must be entered on the docket by the newly admitted attorney. (Cook, Savannah) (Entered: 02/06/2024) |

| 02/06/2024 | 20 | District Judge Julia E. Kobick: ELECTRONIC ORDER entered granting 13 Motion for Leave to Appear Pro Hac Vice Added Justin M. DiGennaro. |
| | | **Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.** |
| | | Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm. |
| | | A Notice of Appearance must be entered on the docket by the newly admitted attorney. |
| | | (Cook, Savannah) (Entered: 02/06/2024) |
| 02/06/2024 | 21 | District Judge Julia E. Kobick: ELECTRONIC ORDER entered granting 10 Motion for Leave to Appear Pro Hac Vice Added Orin Snyder. |
| | | **Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.** |
| | | Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm. |
| | | A Notice of Appearance must be entered on the docket by the newly admitted attorney. |
| | | (Cook, Savannah) (Entered: 02/06/2024) |
| 02/06/2024 | 22 | District Judge Julia E. Kobick: ELECTRONIC ORDER entered denying 9 MOTION for Short Order of Notice re 7 MOTION for Expedited Discovery, 3 MOTION for Temporary Restraining Order. (Currie, Haley) (Entered: 02/06/2024) |
| 02/06/2024 | 23 | ELECTRONIC NOTICE Setting Hearing on Motion 7 MOTION for Expedited Discovery , 3 MOTION for Temporary Restraining Order - Motion Hearing set for 2/8/2024 01:00 PM in Courtroom 3 (In person only) before District Judge Julia E. Kobick. (Currie, Haley) (Entered: 02/06/2024) |
| 02/06/2024 | 24 | District Judge Julia E. Kobick: ELECTRONIC ORDER entered - The defendant is ORDERED to file a response, if any, to the plaintiff's motion for a temporary restraining order 3 and motion for expedited discovery 7 by **4pm on Wednesday, February 7.** (Currie, Haley) (Entered: 02/06/2024) |
| 02/06/2024 | 25 | Emergency MOTION to Stay *Pursuant to the First-Filed Rule* by Michael Hermalyn. (Beck, Russell) (Entered: 02/06/2024) |
| 02/06/2024 | 26 | MEMORANDUM in Support re 25 Emergency MOTION to Stay *Pursuant to the First-Filed Rule* filed by Michael Hermalyn. (Beck, Russell) (Entered: 02/06/2024) |
| 02/06/2024 | 27 | DECLARATION re 25 Emergency MOTION to Stay *Pursuant to the First-Filed Rule of Russell Beck* by Michael Hermalyn. (Attachments: # 1 Exhibit A - California Complaint, # 2 Exhibit B - California TRO / PI Application, # 3 Exhibit C - California Remand Order, # 4 Exhibit D - California TRO / PI Application)(Beck, Russell) (Entered: 02/06/2024) |

| 02/06/2024 | [28] | DECLARATION re [25] Emergency MOTION to Stay *Pursuant to the First-Filed Rule of Michael Hermalyn* by Michael Hermalyn. (Beck, Russell) (Entered: 02/06/2024) |
|---|---|---|
| 02/06/2024 | 29 | District Judge Julia E. Kobick: ELECTRONIC ORDER entered. |

Defendant Michael Hermalyn's Emergency Motion to Stay [25] is **DENIED.** Invoking the first-to-file rule, also known as the prior pending action doctrine, Hermalyn asks this Court to stay this matter, because he filed two similar, but not entirely overlapping, lawsuits against DraftKings Inc. in California state court. Both California lawsuits were removed by DraftKings to federal court; one has since been remanded for lack of jurisdiction, *see* ECF 27-3 (Beck Decl., Ex. C), (In Chambers) Remand Order, *Hermalyn v. DraftKings, Inc.*, No. 2:24-cv-00918 (C.D. Cal. Feb. 5, 2024), and Hermalyn has argued that the other should likewise be immediately remanded for lack of jurisdiction, *see* ECF 6, Plaintiff's Notice of Related Case, *Hermalyn and FVP, LLC v. DraftKings, Inc.*, No. 2:24-cv-00997 (C.D. Cal. Feb. 6, 2024).

The prior pending action doctrine "covers scenarios in which 'actions involving the same parties and similar subject matter are pending in different federal district courts'" and "the overlap between the two suits is nearly complete.'" *Maldonado-Cabrera v. Anglero-Alfaro*, 26 F.4th 523, 526 (1st Cir. 2022) (quoting *TPM Holdings, Inc. v. Intra-Gold Indus., Inc.*, 91 F.3d 1, 4 (1st Cir. 1996)). But that "general principle... to avoid duplicative litigation holds water only within the federal system." *Id.* at 527 (internal quotation marks omitted). Where there exists substantial overlap between parties and issues in federal and state court actions, "'the pendency of an action in the state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction.'" *Id.* "Except when warranted by a doctrine of abstention or comity recognized by the Supreme Court,... a federal court is not free to surrender jurisdiction-whether by outright dismissal or by a stay-to a parallel state-court action without a sufficient showing of the required exceptional circumstances." *Id.* (citations omitted).

Hermalyn makes no argument that any abstention doctrine warrants a stay of this litigation in light of the pending California cases. And Hermalyn has taken the position that the federal court lacks subject matter jurisdiction in the case pending in the U.S. District Court for the Central District of California, because, he says, it is "exactly the same case" as the case already remanded to state court. ECF 6, at 2, Plaintiff's Notice of Related Case, *Hermalyn and FVP, LLC v. DraftKings, Inc.*, No. 2:24-cv-00997 (C.D. Cal. Feb. 6, 2024). Under the circumstances, the first-to-file rule does not apply. The Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331, at a minimum, and it has a "virtually unflagging obligation" to exercise its jurisdiction in this case. *Maldonado-Cabrera*, 26 F.4th at 527 (internal quotation marks omitted).

But even if the first-to-file rule were to apply, the Court would decline to exercise its discretion to stay this case. "When deciding whether to apply the rule, courts must consider: (1) which action was filed first; (2) the similarity of the parties; and (3) the similarity of the issues." *Waithaka v. Amazon.com, Inc.*, 404 F. Supp. 3d 335, 350 (D. Mass. 2019), aff'd, 966 F.3d 10 (1st Cir. 2020). However, "the first-to-file rule is not to be applied in a mechanical way," and "[e]xceptions to the rule are not rare." *EMC Corp. v. Parallel Iron, LLC*, 914 F. Supp. 2d 125, 127 (D. Mass. 2012). While the California case was filed before this action and includes both Hermalyn and DraftKings as parties, the Courts exercise of jurisdiction here would "better serve the interests involved." *Id.*

Hermalyn signed a confidentiality agreement and a noncompetition covenant with DraftKings expressly stating that he "submit[s] to the personal jurisdiction of" "the United States District Court for the District of Massachusetts for any dispute arising hereunder" and "waive[s] any other requirement (whether imposed by statute, rule of court, or

otherwise) with respect to personal jurisdiction or service of process." ECF 1-1, at 6 (§ 9); ECF 1-2, at 15 (§ f). Hermalyn has thus "submit[ted]" to the Court's exercise of personal jurisdiction in this case. *See Inso Corp. v. Dekotec Handelsges, mbH*, 999 F. Supp. 165, 166 (D. Mass. 1998) ("A party to a contract may waive its right to challenge personal jurisdiction by consenting to personal jurisdiction in a forum selection clause.'" (citing *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 11 (1972), and *Jacobson v. Mailboxes Etc. U.S.A., Inc.*, 419 Mass. 572, 575 (1995)). The parties also agreed, in those same contractual provisions, that their agreements "shall be governed by the internal substantive laws of Massachusetts, without regard to the doctrine of conflicts of law." ECF 1-1, at 6 (§ 9); ECF 1-2, at 15 (§ f). Moreover, this case, unlike the California cases, involves a claim for misappropriation of trade secrets in violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836. *See* ECF 1, ¶¶ 130-143. The Court thus declines to exercise its discretion to stay this matter. (Currie, Haley) Modified on 2/6/2024 (Kelly, Danielle). (Entered: 02/06/2024)

| | | |
|---|---|---|
| 02/07/2024 | 30 | Assented to MOTION for Leave to Appear Pro Hac Vice for admission of Justine Goeke Filing fee: $ 125, receipt number AMADC-10258376 by DraftKings Inc.. (Attachments: # 1 Certification of Justine Goeke)(Dulberg, Andrew) (Entered: 02/07/2024) |
| 02/07/2024 | 31 | District Judge Julia E. Kobick: ELECTRONIC ORDER entered granting 30 Motion for Leave to Appear Pro Hac Vice Added Justine Goeke.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney.<br><br>(Cook, Savannah) (Entered: 02/07/2024) |
| 02/07/2024 | 32 | AFFIDAVIT OF SERVICE Executed by DraftKings Inc.. Michael Hermalyn served on 2/6/2024, answer due 2/27/2024. Acknowledgement filed by DraftKings Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Dulberg, Andrew) (Entered: 02/07/2024) |
| 02/07/2024 | 33 | Opposition re 3 MOTION for Temporary Restraining Order filed by Michael Hermalyn. (Beck, Russell) (Entered: 02/07/2024) |
| 02/07/2024 | 34 | DECLARATION re 33 Opposition to Motion *of Russell Beck* by Michael Hermalyn. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Beck, Russell) (Entered: 02/07/2024) |
| 02/07/2024 | 35 | Opposition re 7 MOTION for Expedited Discovery filed by Michael Hermalyn. (Beck, Russell) (Entered: 02/07/2024) |
| 02/07/2024 | 36 | DECLARATION re 33 Opposition to Motion *of Michael Hermalyn* by Michael Hermalyn. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Beck, Russell) (Entered: 02/07/2024) |
| 02/07/2024 | 37 | DECLARATION re 33 Opposition to Motion *of Robert Ferrara* by Michael Hermalyn. (Beck, Russell) (Entered: 02/07/2024) |
| 02/07/2024 | 38 | Emergency MOTION to Continue hearing on Plaintiff DraftKings' Motion for a Temporary Restraining Order to February 9, 2024 by Michael Hermalyn.(Riden, Stephen) (Entered: 02/07/2024) |

| 02/07/2024 | [39](#) | Opposition re [38](#) Emergency MOTION to Continue hearing on Plaintiff DraftKings' Motion for a Temporary Restraining Order to February 9, 2024 filed by DraftKings Inc.. (Dulberg, Andrew) (Entered: 02/07/2024) |
| 02/08/2024 | 40 | District Judge Julia E. Kobick: ELECTRONIC ORDER entered re [38](#) Emergency MOTION to Continue hearing on Plaintiff DraftKings' Motion for a Temporary Restraining Order - The motion to continue is denied as moot. (Currie, Haley) (Entered: 02/08/2024) |

| **PACER Service Center** | | |
| --- | --- | --- |
| **Transaction Receipt** | | |
| 02/08/2024 15:04:54 | | |
| **PACER Login:** | kellymcneill | **Client Code:** | 888040.00001 |
| **Description:** | Docket Report | **Search Criteria:** | 1:24-cv-10299-JEK |
| **Billable Pages:** | 6 | **Cost:** | 0.60 |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

DRAFTKINGS INC.,

       Plaintiff,

   v.

MICHAEL HERMALYN,

      Defendant.

Civil Action No. 1:24-cv-10299

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

STATEMENT OF FACTS ................................................................................. 4

ARGUMENT ....................................................................................................... 6

    I.    DRAFTKINGS IS LIKELY TO SUCCEED ON THE MERITS ........................... 7

        A.    Trade Secrets Misappropriation ..................................................... 7

            1.    The Documents Hermalyn Accessed And Downloaded Contain Protectable Trade Secrets .............................................. 7

            2.    DraftKings' Trade Secrets Derive Independent Economic Value from Their Secrecy ...................................................... 8

            3.    DraftKings Took Reasonable Efforts To Protect Its Trade Secrets . 9

            4.    Hermalyn Misappropriated DraftKings' Trade Secrets ................ 10

        B.    Breach Of Contract ..................................................................... 11

            1.    Hermalyn Has Breached and Will Continue to Breach His Nondisclosure Agreement ............................................... 11

            2.    Hermalyn Has Breached and Will Continue to Breach His Nonsolicitation Agreements ............................................. 12

            3.    Hermalyn Has Breached and Will Continue To Breach His Noncompetition Obligations ............................................. 13

            4.    Hermalyn Cannot Avoid His Contractual Obligations By Purporting to Move to California ..................................... 15

        C.    Hermalyn Is Violating His Duty of Loyalty .............................. 16

        D.    Hermalyn Is Committing the Tort of Conversion ...................... 17

    II.    DRAFTKINGS WILL BE IMMEDIATELY AND IRREPARABLY INJURED ABSENT EMERGENCY RELIEF ............................................................. 18

    III.    THE BALANCE OF EQUITIES FAVORS GRANTING A TEMPORARY RESTRAINING ORDER ................................................................. 19

    IV.    A TEMPORARY RESTRAINING ORDER IS IN THE PUBLIC INTEREST ......... 19

CONCLUSION ................................................................................................ 20

i

# TABLE OF AUTHORITIES

## Cases

*Acordia Ne., Inc. v. Acad. Risk Res. & Ins., LLC*,
   2005 WL 704870 (Mass. Super. Ct. Jan. 5, 2005)............................................................17

*Albert's Organics, Inc. v. Holzman*,
   445 F. Supp. 3d 463 (N.D. Cal. 2020) ......................................................................................8

*Allstate Ins. Co. v. Fougere*,
   2019 WL 4776986 (D. Mass. Sept. 30, 2019) ..........................................................................9

*Aspect Software, Inc. v. Barnett*,
   787 F. Supp. 2d 118 (D. Mass 2011) ........................................................................12, 16, 18

*Augat, Inc. v. Aegis, Inc.*,
   409 Mass. 165 (1991) ..............................................................................................................16

*Bio-Imaging Techs., Inc. v. Marchant*,
   584 F. Supp. 2d 322 (D. Mass. 2008) .......................................................................18, 19, 20

*Blades of Green, Inc. v. Go Green Lawn & Pest, LLC*,
   598 F. Supp. 3d 348 (D. Md. 2022) ..........................................................................................7

*Bruno Int'l Ltd. v. Vicor Corp.*,
   2015 WL 5447652 (D. Mass. Sept. 16, 2015) ........................................................................11

*Builder Servs. Grp., Inc. v. Harkins*,
   2023 WL 4685943 (D. Mass. July 21, 2023)....................................................................10, 18

*Corp. Techs., Inc. v. Harnett ("Harnett I")*,
   943 F. Supp. 2d 233 (D. Mass. 2013) .............................................................12, 13, 18, 20

*Corp. Techs., Inc. v. Harnett ("Harnett II")*,
   731 F.3d 6 (1st Cir. 2013)..................................................................................................11, 12

*CVS Pharmacy, Inc. v. Lavin*,
   951 F.3d 50 (1st Cir. 2020)........................................................................................................7

*Diomed, Inc. v. Vascular Sols., Inc.*,
   417 F. Supp. 2d 137 (D. Mass. 2006) .......................................................................................8

*EMC Corp. v. Donatelli*,
   2009 WL 1663651 (Mass. Super. Ct. May 5, 2009)................................................................16

*EMC Corp. v. Pure Storage, Inc.*,
   2016 WL 7826662 (D. Mass. Aug. 19, 2016) ..........................................................................8

*FrontRunner HC, Inc., v. Waveland RCM, LLC*,
   2020 WL 7321161 (D. Mass. Dec. 11, 2020)..........................................................................11

*G&L Plumbing, Inc. v. Kibbe*,
  2023 WL 6881597 (D. Mass. Oct. 18, 2023)...........................................................7, 10, 17

*Genzyme Corp. v. Melvin*,
  2023 WL 3173131 (Mass. Super. Ct. Apr. 4, 2023) ............................................................14

*Goldstein v. Batista Contracting LLC*,
  2023 WL 3113275, at *2 (D. Mass. Apr. 27, 2023) ..............................................................7

*KPM Analytics N. Am. Corp. v. Blue Sun Sci., LLC*,
  2021 WL 2982866 (D. Mass. July 15, 2021)........................................................................16

*Lombard Med. Techs., Inc. v. Johannessen*,
  729 F. Supp. 2d 432 (D. Mass. 2010) ....................................................................14, 18, 20

*Marcam Corp. v. Orchard*,
  885 F. Supp. 294 (D. Mass. 1995) ......................................................................................18

*McCormick v. Lischynsky*,
  539 F. Supp. 3d 225 (D. Mass. 2021) ..................................................................................17

*Nat'l Med. Care, Inc. v. Sharif*,
  2020 WL 6318922 (D. Mass. Sept. 2, 2020) .......................................................................14

*Netcracker Tech. Corp. v. Laliberte*,
  2020 WL 6384312 (D. Mass. Oct. 30, 2020) .........................................................................9

*New England Cir. Sale v. Randall*,
  1996 WL 1171929 (D. Mass. June 4, 1996) ...................................................................19, 20

*Nuance Commc'ns, Inc. v. Kovalenko*,
  2022 WL 2347112 (D. Mass. June 29, 2022) ................................................................14, 20

*Organ Recovery Sys., Inc. v. Pres. Sols.*,
  2012 WL 116041, at *9 (N.D. Ill. Jan. 16, 2012) .................................................................8

*Oxford Glob. Res., Inc. v. Guerriero*,
  2003 WL 23112398 (D. Mass. Dec. 30, 2003) ....................................................................16

*Shipley Co., Inc. v. Clark*,
  728 F. Supp. 818 (D. Mass. 1990) ......................................................................................18

*SimpliVity Corp. v. Bondranko*,
  204 F. Supp. 3d 340 (D. Mass. 2016) ............................................................................18, 19

*Thermal Eng'g Int'l (USA) Inc. v. Lanaville*,
  646 F. Supp. 3d 202 (D. Mass. 2022) ..................................................................................12

*TouchPoint Sols., Inc. v. Eastman Kodak Co.*,
  345 F. Supp. 2d 23 (D. Mass. 2004) .....................................................................................9

**Statutes**

18 U.S.C. § 1836(b)(1) ...................................................................................................7

18 U.S.C. § 1839(3) .......................................................................................................8

M.G.L. c. 93 § 42(4) .......................................................................................................8

M.G.L. c. 149 § 24L(b) .................................................................................................14

M.G.L. c. 149 § 24L(b)(iii) ...........................................................................................14

M.G.L. c. 149 § 24L(b)(iv) ...........................................................................................14

M.G.L. c. 149 § 24L(b)(v) ............................................................................................15

M.G.L. c. 149 § 24L(b)(vi) ......................................................................................14, 15

## INTRODUCTION

Defendant Michael Hermalyn, a senior executive who Plaintiff DraftKings Inc. ("DraftKings") paid millions of dollars to oversee VIP customer acquisition and retention, hatched a secret plan over the past year to steal and use DraftKings' confidential information, solicit DraftKings' customers and employees, and, ultimately, to join a direct DraftKings competitor, Fanatics, Inc. ("Fanatics") in brazen violation of his contracts with and duties to DraftKings, his employer. As early as the February 2023 Super Bowl, Hermalyn was clandestinely meeting with Fanatics' CEO and leadership team to discuss employment. Then, over the summer, he encouraged other employees on his VIP customer team to meet with Fanatics' CEO, even as he convinced DraftKings to pay himself and those same team members millions of dollars in retention bonuses. Hermalyn's scheme culminated on the eve of this year's Super Bowl, one of the most important days on the sports gaming calendar. On February 1, 2024, he quit his job without warning to take a position performing the same functions, and soliciting the same customers, for Fanatics as President of Fanatics' VIP program. Hermalyn had told DraftKings just days before that "a friend passed" and he would need to be out of the office to "deal[] with that." Compl. ¶ 6. But geolocation information from his company-issued cellphone and email shows Hermalyn secretly flew to Fanatics' offices in California. While in California, Hermalyn viewed and downloaded multiple documents from DraftKings' systems containing highly confidential DraftKings trade secrets and confidential and proprietary information—including highly confidential information regarding DraftKings' plans for entertaining key partners at the Super Bowl. These business partners are athletes, executives, celebrities, influencers, and the representatives of major DraftKings business partners; DraftKings invites them to special events (like the Super Bowl) and they are critical to DraftKings' business development efforts to recruit

1

and retain VIP customers. The downloaded information also included the identities of DraftKings employees with key partner relationships, as well as the planned locations for VIP customer events and the number of VIP attendees at those events over Super Bowl weekend. Disclosure of this information to a competitor, like Fanatics, could result in an extraordinary unfair competitive advantage to Fanatics and risks irreparable harm to DraftKings by threatening the possibility that Fanatics could interfere with and commandeer DraftKings' ongoing relationships. DraftKings believes Hermalyn has already disclosed this information to Fanatics—he downloaded it while in California and visiting Fanatics' offices. Injunctive relief is necessary to halt any further harm.

Hermalyn downloaded other confidential DraftKings documents as well in the final days before he resigned to join Fanatics. For example, he downloaded a document that detailed the activity of DraftKings' business development team on a weekly basis from May 2022 through November 2023, identifying the teams and leagues, marketplaces, media companies, influencers, and content-distribution platforms with which DraftKings was negotiating or had executed partnerships, including its priorities for future partnership deals. Disclosure of this document would allow a competitor to identify DraftKings' business priorities and strategy and interfere with DraftKings' ongoing or planned negotiations with existing or potential business partners.

The information that Hermalyn viewed and downloaded is vital to DraftKings' ability to maintain and grow its business with essential constituencies—both the relatively small number of high-net worth customers who wager significant sums on sporting events and the important business partners who help DraftKings engage and retain those VIP customers. That is especially the case for a marquee event like the Super Bowl—this Sunday—where players in the gaming industry compete for these relationships. Hermalyn's possession of DraftKings' trade secrets irreparably injures DraftKings' ability to compete at the Super Bowl and beyond. Injunctive relief

2

is urgently necessary to prevent Hermalyn from using and disclosing DraftKings' confidential information and trade secrets any more than he already has.

The same day Hermalyn abruptly resigned from DraftKings, on February 1, he also filed a California lawsuit against DraftKings, claiming he plans to become a California resident—a hastily constructed effort to evade enforcement of his contracts with DraftKings on the purported basis that they are unenforceable in California. But Hermalyn has lived for years in New Jersey, where his wife still works and his kids go to school. On this record, Hermalyn's purported move is categorically insufficient to invalidate his contractual promise not to compete with DraftKings or solicit its customers and employees—contracts that comport with every aspect of Massachusetts law on non-competition covenants.

The "move" from New Jersey to California was not the only made-for-litigation gambit Hermalyn and his counsel manufactured in connection with the California litigation. Fanatics established a new LLC in the days before Hermalyn's resignation, ostensibly for the sole purpose of attempting to defeat diversity jurisdiction in California federal court, hoping that a state court would be more willing to permit Hermalyn to flee his otherwise enforceable obligations.

DraftKings' preliminary investigation since Hermalyn resigned has revealed that Hermalyn's misappropriation of DraftKings trade secrets and confidential information is not an isolated incident of theft, disloyalty, and misconduct. DraftKings has learned that last year Hermalyn covertly encouraged his subordinates on the DraftKings VIP team to leave DraftKings and join Fanatics, successfully inducing one subordinate to do so. Hermalyn also persuaded DraftKings to award him millions of dollars in new DraftKings equity under the false pretenses that he remained loyal to DraftKings. In light of Hermalyn's theft of DraftKings' trade secrets and confidential information while at Fanatics' office, his abrupt resignation and breach of his non-

3

competition agreement, and the evidence of misconduct DraftKings continues to uncover, DraftKings has no choice but to file this action to halt immediate and irreparable harm, in the crucial days leading up to and during the Super Bowl, caused by Hermalyn's exploitation of its trade secrets and other highly confidential information on behalf of Fanatics, a direct competitor.

For the reasons below, and supported by the Verified Complaint and Affidavits of Gregory Karamitis and Brian Harris, this Court should grant DraftKings' Emergency Motion and enjoin Hermalyn from using, reviewing, and disclosing DraftKings' information in any way, requiring him to return information he stole, and from working as president of Fanatics' VIP program.

## STATEMENT OF FACTS

DraftKings is a leader in the fiercely competitive digital sports entertainment and gaming industry, best known for fantasy sports and mobile sports betting and iGaming products. Affidavit of Gregory Karamitis ("Karamitis Aff.") ¶¶ 3, 18. In DraftKings' industry, online gaming businesses compete for a small number of key partners—including athletes, celebrities, influencers, and representatives of corporate partners like professional sports leagues and teams— as well as VIP customers who regularly wager significant sums online. *Id.* ¶¶ 9, 18. Until his abrupt resignation on February 1 to start a new position with Fanatics, one of DraftKings' direct competitors, Hermalyn was a senior executive at DraftKings, managing DraftKings' industry-leading VIP team to engage DraftKings' most loyal customers. *Id.* ¶¶ 6, 10–13.

The VIP team is critical to the success of DraftKings' business: it is dedicated to fostering personal relationships with DraftKings' most loyal and influential customers, responsible for a significant share of DraftKings' revenue and business development prospects. *Id.* ¶¶ 8–13. As the leader of the VIP team, Hermalyn regularly accessed and used DraftKings' most valuable and sensitive trade secrets and other highly confidential information, including, but not limited to: (i)

4

comprehensive VIP customer lists containing a wide range of customer information; (ii) research and analytics regarding development of VIP and loyalty programs; and (iii) points of contact with critical partners essential to the advancement of DraftKings' marketing strategy. *Id.* ¶¶ 14–16.

To protect its business interests, and conforming with Massachusetts law, DraftKings required Hermalyn to enter into a Nonsolicitation, Nondisclosure & Assignment of Inventions Agreement before his employment, in which he promised not to misuse or disclose DraftKings' trade secret and confidential information or, for twelve months following his employment, solicit DraftKings' employees or clients. Compl. ¶¶ 38–39, 46 & Ex. A. In exchange for millions of dollars in compensation, Hermalyn also entered into Noncompetition Covenants that prohibited him, for a limited period of time after the termination of his employment, from competing against DraftKings in the sports betting and online gaming business. *Id.* ¶¶ 50–51 & Ex. B.

Hermalyn has brazenly violated and continues to violate these agreements, as well as his obligations under common law. Specifically, on February 1, 2024, Hermalyn suddenly informed DraftKings that he was resigning to join Fanatics as President of its VIP team—a role identical to his position at DraftKings. Karamitis Aff. ¶¶ 6, 30. DraftKings subsequently discovered that, in the week before he resigned, Hermalyn viewed and downloaded multiple documents detailing DraftKings' business strategies and confidential information, including the blueprint for a VIP player recruiting program and a 181-page chart detailing DraftKings' business contracts and prospects. *Id.* ¶¶ 24–27 (the "VIP Founders Club" Presentation and the "BD Team Tracker Weekly Report' "); Affidavit of Brian Harris ("Harris Aff.") ¶¶ 17–18, 25.

On January 30, after telling DraftKings he needed to take time off following the death of a friend, Hermalyn traveled to California; went to Fanatics' Los Angeles headquarters; and, while inside or in close proximity to Fanatics' offices, accessed the DraftKings corporate Google

5

Workspace from a non-DraftKings device and downloaded a sensitive document, the "(MASTER) SB 2024" spreadsheet, containing detailed information about key partners—athletes, celebrities, influencers, and corporate representatives like professional sports leagues and teams—attending the Super Bowl.  Karamitis Aff. ¶¶ 21–23; Harris Aff. ¶¶ 19–24.  It includes information about each partner's employment or other affiliation, their travel itinerary for the Super Bowl, and what events they will attend.  Karamits Aff.  ¶ 22.  And it also reflects the number of VIP customers attending various DraftKings events during Super Bowl weekend.  *Id.* ¶ 22–23.

Also on January 30, and again on January 31, Hermalyn downloaded DraftKings' document "BD_Gaming 101"—a pitch deck DraftKings uses to present on the online gaming industry to potential business partners (who must sign non-disclosure agreements in order to view the presentation).  *Id.* ¶ 28; Harris Aff. ¶¶ 19–24.  The deck includes DraftKings' confidential strategies for building such partnerships .  Karamits Aff.  ¶ 28.

Hermalyn is now undertaking the same job responsibilities at Fanatics as he did at DraftKings.  He will be competing directly *against* DraftKings for the same VIP players he worked to engage and retain for DraftKings only days ago—players who drive a significant percentage of the industry's overall revenue.  Hermalyn's covert theft of DraftKings' documents shows he intends to use and disclose DraftKings' trade secret information for Fanatics' benefit.  This peril is urgent:  Hermalyn could deploy stolen information to interfere with DraftKings' precious long-term relationships with its most important partners and loyal customers in the vital days leading up to and during the Super Bowl this weekend, February 11.  *Id.* ¶¶ 29–30.

## ARGUMENT

A court evaluating a motion for a temporary restraining order considers four factors: (1) the likelihood the movant will succeed on the merits; (2) whether the movant is likely to suffer

irreparable harm in the absence of preliminary relief; (3) the balance of hardships; and (4) whether an injunction is in the public interest. *CVS Pharmacy, Inc. v. Lavin*, 951 F.3d 50, 55 (1st Cir. 2020); *see Goldstein v. Batista Contracting LLC, 2023 WL 3113275, at \*2* (D. Mass. Apr. 27, 2023) (same factors apply to a temporary restraining order as to a preliminary injunction).

## I.     DraftKings Is Likely To Succeed On The Merits

DraftKings is likely to succeed on the merits of its claims for trade secrets misappropriation, breach of contract, breach of duty of loyalty, and conversion.

### A.     Trade Secrets Misappropriation

To prevail on its trade secrets claim under both the federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §§ 1836 *et seq.*, and the Massachusetts Uniform Trade Secret Act ("MUTSA"), M.G.L. c. 93 §§ 42–42G, a plaintiff must show that (1) the information at issue constitutes a trade secret, (2) the trade secret derives independent economic value from its secrecy, (3) the plaintiff took reasonable steps to keep the information secret, and (4) the defendant misappropriated the trade secret. *See* 18 U.S.C. §§ 1836(b)(1), 1839(3); *G&L Plumbing, Inc. v. Kibbe*, 2023 WL 6881597, at \*3 (D. Mass. Oct. 18, 2023).[1] DraftKings satisfies these elements.

#### 1.     The Documents Hermalyn Accessed And Downloaded Contain Protectable Trade Secrets

The documents Hermalyn reviewed and downloaded immediately before he joined DraftKings' direct competitor contain paradigmatic protectable trade secrets: (i) DraftKings' compilation of key business contacts, their points of contact at DraftKings, and the Super Bowl

---

[1] To prevail on its DTSA claim, DraftKings must also show that the alleged trade secrets are "related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1). DraftKings indisputably satisfies this requirement: these trade secrets pertain to its gaming services which are offered in states across the country, and even internationally. Compl. ¶¶ 18–19; Karamitis Aff. ¶ 3; *see Blades of Green, Inc. v. Go Green Lawn & Pest, LLC*, 598 F. Supp. 3d 348, 355 (D. Md. 2022) ("[C]ourts routinely conclude that a plaintiff satisfies its pleading burden [under the DTSA] by alleging that it is engaged in national or international sales.").

events they plan to attend, in the "(MASTER) SB 2024" spreadsheet; (ii) confidential information regarding DraftKings' executed contracts and contracts under negotiation, as well as marketing strategies (such as identification of target markets, media, and platforms), in DraftKings' BD Team Tracker Weekly Report; and (iii) DraftKings' confidential and proprietary strategy for developing a top-tier VIP program, in the VIP Founders Club PowerPoint document.

Courts routinely recognize this as textbook trade secrets under both the DTSA and the MUTSA.  *See* 18 U.S.C. § 1839(3) (trade secrets include "all forms and types of financial [and] business[] information"); M.G.L. c. 93, § 42(4) (protecting compilations of information including customer lists, business strategies, financial and customer data); *EMC Corp. v. Pure Storage, Inc.*, 2016 WL 7826662, at *6 (D. Mass. Aug. 19, 2016) (noting compilations of business contact information are "routinely granted trade secret protection," because "[t]he fact that individual aspects of the 'lists' may be public does not prevent the entire compilation from being a trade secret"); *Organ Recovery Sys., Inc. v. Pres. Sols.*, 2012 WL 116041, at *9 (N.D. Ill. Jan. 16, 2012) (recognizing business partner lists are protectable trade secrets); *Albert's Organics, Inc. v. Holzman*, 445 F. Supp. 3d 463, 473 (N.D. Cal. 2020)  (same); *Diomed, Inc. v. Vascular Sols., Inc.*, 417 F. Supp. 2d 137, 144–45 (D. Mass. 2006) (same as to business and marketing strategies).

## 2. DraftKings' Trade Secrets Derive Independent Economic Value from Their Secrecy

The trade secrets Hermalyn accessed and downloaded derive independent economic value from their secrecy.  DraftKings operates in the fiercely competitive digital sports entertainment and gaming industry in which its strong VIP relationships are the lifeblood of its business. Karamitis Aff. ¶¶ 9, 17, 18.  DraftKings' success in the gaming space is owed in large part to the secrecy of its confidential VIP program, the body of knowledge DraftKings has accumulated about

its VIP players, its marketing strategies for fostering new customer relationships, and the pricing and other deal terms reached with its VIP players and other customers. *Id.* ¶¶ 15–18.

In a competitor's hands—particularly days before the Super Bowl—this information positions Hermalyn and Fanatics to damage DraftKings' position in the market by interfering with and commandeering DraftKings' relationships and partnerships based on DraftKings' trade secrets. *Id.* ¶¶ 13, 22–23, 29. DraftKings' trade secrets meet the independent economic value requirement. *See, e.g.*, *Allstate Ins. Co. v. Fougere*, 2019 WL 4776986, at *21 (D. Mass. Sept. 30, 2019) (independent economic value in confidentiality of compilations of customer information).

### 3. DraftKings Took Reasonable Efforts To Protect Its Trade Secrets

DraftKings took reasonable steps to maintain the secrecy of its trade secrets. "[C]ourts do not require the possessor of a trade secret to take heroic measures to preserve its secrecy, only all proper and reasonable steps." *Netcracker Tech. Corp. v. Laliberte*, 2020 WL 6384312, at *4 (D. Mass. Oct. 30, 2020) (citations omitted). Courts assess reasonableness by considering the existence of confidentiality agreements, the manner in which the confidential information was stored, the extent to which it was disclosed, and the degree to which it is publicly available. *TouchPoint Sols., Inc. v. Eastman Kodak Co.*, 345 F. Supp. 2d 23, 29 (D. Mass. 2004).

DraftKings' robust measures to protect its trade secrets are significantly more than merely "reasonable." DraftKings requires all employees to execute confidentiality agreements upon commencing employment and annually refreshes them on their obligations to protect DraftKings' trade secrets and confidential information. Harris Aff. ¶ 9. In addition to implementing standard corporate security measures—i.e., password protecting company laptops, requiring password changes every 90 days, using firewalls, and requiring two-factor authentication—DraftKings significantly limits those employees who can access the very documents Hermalyn stole. *Id.* ¶¶

9

10–15, 18.  DraftKings employs specialized tools to monitor unusual download activity, and to immediately investigate any activity those systems identify as suspicious.  *Id.* at ¶¶ 15–16.

Courts routinely find these efforts more than qualify as reasonable measures to protect trade secrets.  *See G&L Plumbing, Inc.*, 2023 WL 6881597, at *5 (likelihood of success on proving reasonable measures even where trade secrets were *not* subject to confidentiality agreement but were password-protected with restricted access); *Builder Servs. Grp., Inc. v. Harkins*, 2023 WL 4685943, at *6 (D. Mass. July 21, 2023) (similar).

### 4.     Hermalyn Misappropriated DraftKings' Trade Secrets

There is no question Hermalyn misappropriated DraftKings' trade secrets.  To prove misappropriation, DraftKings need only show that Hermalyn acquired one of its trade secrets through improper means, or disclosed or used without consent a trade secret that was acquired by improper means.  *See Builder Servs. Grp., Inc.*, 2023 WL 4685943, at *4.  Improper means includes theft or inducement of a breach of duty to maintain secrecy.  *Id.* at *6.

At minimum, Hermalyn misappropriated DraftKings' trade secret "(MASTER) SB 2024" spreadsheet and "BD_Gaming101" presentation, downloading those documents at Fanatics' offices and using a non-DraftKings device.  Harris Aff. ¶ 24.  This was a knowing and malicious breach of Hermalyn's contractual obligation not to use DraftKings confidential information for unauthorized purposes, or to remove such information from the company's systems without authorization.  Compl. Ex. A § 5.  And it was a transparent attempt to assist his new employer in unlawfully competing against DraftKings at the Super Bowl this weekend.  Compl. ¶ 88.

In the First Circuit, these straightforward facts are axiomatic misappropriation.  *See G&L Plumbing, Inc.*, 2023 WL 6881597, at * 5 (granting TRO on trade secrets claim where employee sent data from his company cell phone to his personal phone, in violation of company policy);

*FrontRunner HC, Inc., v. Waveland RCM, LLC*, 2020 WL 7321161, at *11 (D. Mass. Dec. 11, 2020) (granting injunction where former employee downloaded company data to personal email).[2]

## B.    Breach Of Contract

DraftKings is also likely to succeed on its claims for breach of contract.  There can be no meaningful dispute that Hermalyn and DraftKings agreed—and Hermalyn received significant consideration for agreeing—that Hermalyn would not disclose DraftKings' confidential information, or compete with DraftKings or solicit DraftKings' employees or customers within reasonable limits.  DraftKings performed by hiring and paying him.  Hermalyn has breached those promises.  And DraftKings faces irreparable harm as a result.

### 1.    Hermalyn Has Breached and Will Continue to Breach His Nondisclosure Agreement

In August 2020, as part of accepting his offer to work at DraftKings, Hermalyn executed a "Nonsolicitation, Nondisclosure & Assignment of Inventions Agreement" promising that he would not remove or use the company's confidential information for any unauthorized purpose. *See* Compl. Ex. A.  Hermalyn broke his promise.  He used confidential information without authorization to compete with DraftKings, and removed confidential information from DraftKings' systems by downloading it to a non-DraftKings device without authorization.  And if he has not already disclosed the information he took to Fanatics, he will soon.  Evidence a departing employee "took with him . . . notes that contained confidential information" is sufficient to "support [a] preliminary injunction" enforcing a non-disclosure agreement.  *Corp. Techs., Inc.*

---

[2]  For the same reasons that DraftKings is likely to succeed on the merits of its statutory claims for trade secret misappropriation, it is also likely to succeed in proving that Hermalyn misappropriated confidential business information in violation of common law. *See* Compl. Counts IV and V; *Bruno Int'l Ltd. v. Vicor Corp.*, 2015 WL 5447652, at *11 (D. Mass. Sept. 16, 2015) (statutory and common law claims "receive effectively the same liability analysis").

*v. Harnett ("Harnett II")*, 731 F.3d 6, 14 (1st Cir. 2013). These facts far exceed that standard.

Nor is there any doubt that the information Hermalyn stole was confidential. It was not known outside of DraftKings; its access was limited to a small number of employees, protected with security measures; it is enormously valuable to DraftKings and DraftKings' competitors; and duplicating that information would take a competitor like Fanatics significant time and resources. Harris Aff. ¶¶ 10–15, 18 ; Karamitis Aff. ¶¶ 29–30; *Corp. Techs. v. Harnett ("Harnett I")*, 943 F. Supp. 2d 233, 240 (D. Mass. 2013), *aff'd*, 731 F.3d 6 (1st Cir. 2013).

Injunctive relief is also warranted under the "inevitable disclosure" doctrine, finding "trade secret misappropriation" where, as here, a "former employee's new employment will inevitably lead him to rely on his knowledge of the plaintiff's trade secrets." *Harnett II*, 731 F.3d at 14; *see also Aspect Software, Inc. v. Barnett*, 787 F. Supp. 2d 118, 129, 130 n.11 (D. Mass 2011). .

### 2. Hermalyn Has Breached and Will Continue to Breach His Nonsolicitation Agreements

Hermalyn's August 2020 agreement also restricts him, during his employment and for a period of twelve months thereafter, from soliciting DraftKings employees to "leave [their] relationship with the Company." Compl. Ex. A at ¶ 3. But Hermalyn has already breached this term of his agreement—most egregiously when he emailed his subordinates on the VIP team while employed by DraftKings and actively encouraged them to meet with Fanatics' Chief Executive Officer. Compl. ¶ 93. "Courts in Massachusetts . . . routinely uph[o]ld" similar non-solicitation provisions, because "employers have an interest in preserving the talent and goodwill of their employees." *Thermal Eng'g Int'l (USA) Inc. v. Lanaville*, 646 F. Supp. 3d 202, 206 (D. Mass. 2022) (citation omitted). DraftKings is likely to succeed on its claim that the applicable anti-raiding provision binds Hermalyn here. Similarly, the agreement's provision restricting Hermalyn,

for a limited, twelve-month period, from soliciting customers that he was involved with or learned about while working for DraftKings, Compl. Ex. A at ¶ 2, is valid under Massachusetts law, and Hermalyn should be required to comply with it. *E.g.*, *Harnett I*, 943 F. Supp. 2d at 238–39.

### 3. Hermalyn Has Breached and Will Continue To Breach His Noncompetition Obligations

During his time working for DraftKings, Hermalyn agreed to noncompetition covenants in exchange for millions of dollars in compensation, most recently on August 16, 2023 (the "Noncompetition Covenant"). Compl. Ex. B. The Noncompetition Covenant bars Hermalyn, for twelve months following the termination of his employment, from providing services to DraftKings' competitors "that relate to any aspect of the Business of the Company . . . for which [Hermalyn] performed services or received Confidential Information . . . at any time during the six (6) month period prior to [his] termination." Compl. Ex. B, Att. III ¶ (a). Hermalyn's work for Fanatics, in which he is undertaking the *same* responsibilities he had at DraftKings and competing for the *same* VIP players he once recruited to DraftKings, plainly violates this provision.

DraftKings will also be able to prove that the Noncompetition Covenant is lawful and enforceable: it complies with each of the requirements of the Massachusetts Noncompetition Agreement Act ("MNAA"). *See* M.G.L. c. 149 § 24L(b). The agreement is supported by reasonable, "mutually-agreed upon consideration," and meets the MNAA's requirements that it be in writing, advise Hermalyn of his right to seek counsel, and provide Hermalyn at least a ten-day consideration period. *Id.* at § 24L(b)(ii), (vii); Compl. Ex. B §§ (a), (*l*), (m). In addition, the agreement is consistent with public policy because it is reasonable in scope and no broader than necessary to protect DraftKings' legitimate interests. *See id.* at § 24L(b)(iii)–(viii); *infra* at 20.

<u>*Reasonable Duration.*</u> Consistent with the MNAA, the period during which Hermalyn is

restricted from competing with DraftKings does not "exceed 12 months from the date of cessation of employment." M.G.L. c. 149 § 24L(b)(iv); *see also Nuance Commc'ns, Inc. v. Kovalenko*, 2022 WL 2347112, at *6 (D. Mass. June 29, 2022).

*Reasonable Scope.* The agreement is also "reasonable in the scope of proscribed activities in relation to the interests protected." M.G.L. c. 149 § 24L(b)(vi). It restricts Hermalyn only from competing with aspects of DraftKings' business that he worked in, or for which he received confidential information in the six months before his termination. Compl. Ex. B. Att. III ¶ (a); *cf. Genzyme Corp. v. Melvin*, 2023 WL 3173131, at *3 (Mass. Super. Ct. Apr. 4, 2023) (broader agreement found "reasonable with respect to the scope of activities it restricts").

The agreement is "no broader than necessary" to protect DraftKings' trade secrets, confidential information, and/or goodwill. M.G.L. c. 149 § 24L(b)(iii). Hermalyn's job focused on soliciting and maintaining relationships with a relatively small population of VIP players that DraftKings competes to attract. Courts have found this type of goodwill interest can be adequately protected only by noncompetition restrictions, *see Nat'l Med. Care, Inc. v. Sharif*, 2020 WL 6318922, at *12 (D. Mass. Sept. 2, 2020); *Nuance Commc'ns, Inc.*, 2022 WL 2347112, at *6, making the Noncompetition Covenant "presumptively reasonable." M.G.L. c. 149 § 24L(b)(vi).

*Reasonable Geographic Reach.* Finally, the global scope of the Noncompetition Covenant is reasonable because DraftKings maintains offices around the world and competes internationally with other companies in the digital sports entertainment and gaming sectors. *See* Karamits Aff. ¶¶ 3, 18; *Lombard Med. Techs., Inc. v. Johannessen*, 729 F. Supp. 2d 432, 439 (D. Mass. 2010). Even if Hermalyn could show a global restriction is overbroad, he is still subject to earlier noncompetition agreements that restrict his ability to compete in the U.S., a "presumptively reasonable" geographic limitation given that Hermalyn provided services nationwide. Karamits

14

Aff. ¶¶ 10–13; , M.G.L. c. 149 § 24L(b)(v).  In any event, the appropriate remedy for an overbroad covenant is not to invalidate the agreement but to reform it "to render it valid and enforceable," *id.* § 24L(d), something the parties' agreement also requires.  Compl. Ex. B, Att. III ¶ (i).

A restriction prohibiting Hermalyn from performing the *same* functions, soliciting the *same* VIP players, in the *same* geographic regions as his job for DraftKings (all of which Hermalyn is now doing) is plainly valid, legal, and enforceable.

### 4. Hermalyn Cannot Avoid His Contractual Obligations By Purporting to Move to California

Hermalyn's own course of conduct shows he believes the Noncompetition Covenant would be enforced if analyzed under Massachusetts law—as the contract itself says it must be.  Compl. Ex. B, Att. III ¶ (f).  On the same three-day trip (spanning January 29 to 31, 2024) to Fanatics' California headquarters that saw him downloading DraftKings' confidential information, Hermalyn also (1) signed a lease of an apartment in Los Angeles (location, size, duration of lease unknown), (2) obtained a California driver's license, (3) purchased a car registered in California, (4) registered to vote in California, (5) obtained an appointment with a physician in California, and (6) contacted summer camps and "joined waitlists."  Compl. ¶ 83.  Then on February 1, 2024, he filed suit in California state court claiming to be a California resident who could not possibly be held to his contractual non-competition obligations and Massachusetts forum-selection clauses. *Id.* ¶ 75.  What's more, Fanatics formed a Nevada LLC to employ Hermalyn on January 31, 2024 —a clear sham to evade federal court diversity jurisdiction over Hermalyn's action. *Id.* ¶ 9.

Hermalyn has resided with his family for years in a multi-million dollar home in New Jersey.  Compl. ¶ 79.  His children attend schools in New Jersey, and his wife is employed in New York City.  *Id.* ¶ 81.  He is not a California resident simply because he spent a weekend in the state

last month.  And, even if he were, Massachusetts courts have refused to apply foreign law, in breach of an otherwise valid choice of law provision, in similar contexts—even where no fraud was involved.  This is because employees should not be "allow[ed] . . . to escape the obligations of the[ir] contract by, in essence, fleeing the jurisdiction."  *Oxford Glob. Res., Inc. v. Guerriero*, 2003 WL 23112398, at *6 (D. Mass. Dec. 30, 2003); *see also EMC Corp. v. Donatelli*, 2009 WL 1663651, at *4 (Mass. Super. May 5, 2009) (employee cannot "choose for his new residence . . . the one state where the likelihood of his defeating his non-competition covenant may be the greatest"); *Aspect Software, Inc.*, 787 F. Supp. 2d at 127 (Massachusetts choice-of-law provision enforceable even though employee had become California resident and was working in California).

## C.  Hermalyn Is Violating His Duty of Loyalty

Employees "who occupy positions of trust and confidence," including "executives [and] . . . employees who are given access to confidential information," have a fiduciary duty of loyalty to their employers.  *KPM Analytics N. Am. Corp. v. Blue Sun Sci., LLC*, 2021 WL 2982866, at *19 (D. Mass. July 15, 2021).  Hermalyn was subject to this duty of loyalty.  *Id.*; Harris Aff. ¶ 9.  His obligations did not terminate with his employment:  he still has a duty not to misappropriate DraftKings' confidential information.  *Augat, Inc. v. Aegis, Inc.*, 409 Mass. 165, 173 (1991).

DraftKings has shown that Hermalyn has violated and is continuing to violate this duty of loyalty.  Among other things, he solicited his subordinates on the VIP team in July 2023 to work for Fanatics, Compl. ¶¶ 93–94; lied to DraftKings about his intentions to remain employed at the company, *id.* ¶¶ 95–96; used the company's corporate credit for unauthorized, personal expenses (e.g., thousands of dollars on wine for friends) *id.* ¶¶ 100–101, 103; and engaged in self-dealing by arranging for DraftKings to purchase approximately $150,000 worth of dinners at three New York City restaurants in which he had an interest, without disclosing that interest. *Id.*  Most

16

critically, DraftKings has evidence showing Hermalyn violated his duty of loyalty by bringing DraftKings' confidential and proprietary information into the Fanatics Headquarters, so that Fanatics could benefit. *Id.* ¶ 167; Harris Aff. ¶¶ 17–25. Hermalyn is now working for Fanatics to solicit the same VIP players who DraftKings employed him to keep loyal to their organization— a job that will inevitably require him to misappropriate additional of DraftKings' highly sensitive and confidential business information. *Supra* at 12. Based on the record that DraftKings has developed at this preliminary stage, DraftKings has demonstrated a likelihood of success on its breach of fiduciary duty claim. *See, e.g.*, *Acordia Ne., Inc. v. Acad. Risk Res. & Ins., LLC*, 2005 WL 704870, at *1 (Mass. Super. Ct. Jan. 5, 2005) (granting TRO based on similar record).

### D.      Hermalyn Is Committing the Tort of Conversion

Finally, DraftKings is likely to succeed on the merits of its conversion claim because the evidence suggests that Hermalyn has and is "intentionally and wrongfully exercis[ing] acts of ownership, control or dominion" over DraftKings' property, with the intention of depriving DraftKings of its use, and that this misappropriation of DraftKings' property has and will caused the company harm. *See McCormick v. Lischynsky*, 539 F. Supp. 3d 225, 235 (D. Mass. 2021) (elements of conversion claim). As set forth in detail above, Hermalyn accessed highly sensitive, trade secret information that he had no legitimate business reason to access. There can be no reasonable dispute that DraftKings has an ownership interest in this confidential business information. *E.g.*, *G&L Plumbing, Inc.* 2023 WL 6881597, at *6–7 (granting preliminary injunction for conversion claim). And, as detailed in the following section, the harm that DraftKings has and will suffer if this information is shared with Fanatics or any of DraftKings' other competitors is evident, particularly given the intense competition across the online gaming industry to secure the participation of the VIP players that the documents concerned. *See id.* at *7.

17

## II.    DraftKings Will Be Immediately And Irreparably Injured Absent Emergency Relief

DraftKings faces immediate, irreparable harm if injunctive relief is not granted.  Otherwise Hermalyn and Fanatics will be free to unlawfully compete against DraftKings—using misappropriated DraftKings trade secrets and other confidential information and poaching DraftKings' customers, partners, and employees during the most important days of the year.

Where, as here, a former employee misappropriated trade secrets, irreparable harm is presumed where the plaintiff establishes a likelihood of success on the merits.  *Builder Servs. Grp., Inc.*, 2023 WL 4685943, at *6.  And where a former employee uses confidential information to benefit a direct competitor, the former employer is gravely harmed.  *See Marcam Corp. v. Orchard*, 885 F. Supp. 294, 296–97 (D. Mass. 1995) (enjoining former manager involved in top-level discussions regarding product development and sales from working for, and providing confidential information to, a competitor).  "As a general rule, a breach of non-compete agreements tied to trade secrets concerns triggers a finding of irreparable harm." *Aspect Software, Inc.*, 787 F. Supp. 2d at 130. That is because the injury from violation of a non-competition agreement is "so hard to quantify" and because an employee working for a direct competitor "often cannot avoid the inevitable disclosure of confidential information,"  *SimpliVity Corp. v. Bondranko*, 204 F. Supp. 3d 340, 350 (D. Mass. 2016).  Courts in this district regularly grant injunctive relief in these circumstances.  *E.g.*, *Aspect Software, Inc.*, 787 F. Supp. 2d at 130–32*; Lombard Med. Techs.*, 729 F. Supp. 2d at 442; *Bio-Imaging Techs., Inc. v. Marchant*, 584 F. Supp. 2d 322, 330–31 (D. Mass. 2008); *Shipley Co., Inc. v. Clark*, 728 F. Supp. 818, 827–28  (D. Mass. 1990); *Harnett I*, 943 F. Supp. 2d at 242–43, 248.

Irreparable harm to DraftKings is certain in the absence of injunctive relief "[g]iven the value of the confidential information retained by [Hermalyn], the similarities of his new and old

positions, and the overlap between [DraftKings'] and [Fanatics'] products and customers." *SimpliVity Corp.*, 204 F. Supp. 3d at 351. DraftKings is one of only a few prominent companies competing for the patronage of the relatively small number of high-net worth customers who wager significant sums on sporting events. Hermalyn is one of the only individuals at DraftKings who knows the identity or contact information of some of DraftKings' most loyal and significant customers. And on his way out the door Hermalyn downloaded a trove of DraftKings documents containing confidential business strategy, partner information, and confidential business terms and projects. Injunctive relief is necessary to protect the confidential information, customer relationships, and competitive advantages DraftKings invested time and resources to develop.

## III.    The Balance of Equities Favors Granting A Temporary Restraining Order

The immediate and irreparable harm DraftKings will suffer if emergency relief is not granted outweighs any harm to Hermalyn. The parties agreed at the outset that any violation of the Noncompetition Covenant would cause DraftKings irreparable harm, Compl. Ex. B, Att. III ¶ (e), which "is a factor properly added to the scale in weighing the equities," *Alexander & Alexander, Inc. v. Danahy*, 21 Mass. App. Ct. 488, 501 (1986). The only "harm" to Hermalyn would be honoring the terms of the employment agreement he freely accepted in exchange for millions of dollars of compensation. *See* Compl. Ex. B. This Court has explained that "the balance of hardships weigh[] in [the employer's] favor" where, as here, the employee "has voluntarily chosen to leave [the employer] after freely entering into a non-compete agreement" and enjoying the benefits of that bargain. *Bio-Imaging Techs.*, 584 F. Supp. 2d at 330.

## IV.    A Temporary Restraining Order Is In The Public Interest

"It is in society's best interest to recognize and enforce agreements which were voluntarily issued into and accepted." *New England Cir. Sale v. Randall*, 1996 WL 1171929, at *3 (D. Mass.

June 4, 1996).  Accordingly, injunctive relief enforcing restrictive covenants "serve[] the public interest in enforcing contractual arrangements," *Bio-Imaging Techs., Inc.*, 584 F. Supp. 2d at 330, and this Court has regularly granted them on facts analogous to those presented here.  *E.g.*, *Nuance Commc'ns*, 2022 WL 2347112, at *11; *New England Cir. Sale*, 1996 WL 1171929, at *3.

Because "[t]he time-bound non-solicitation and non-disclosure obligations in this case" would last for no more than twelve months, they are "less restrictive than other covenants that Massachusetts courts frequently uphold," *Harnett I*, 943 F. Supp. 2d at 245, and their enforcement would not offending the public's interest in "the free alienability of employees," *Bio-Imaging Techs.*, 584 F. Supp. 2d at 330.  Where, as here, the obligation is "designed to protect [the plaintiff's] confidential information and good will, the agreements should be enforced." *Lombard Med. Techs.*, 729 F. Supp. 2d at 443 (D. Mass. 2010).

## CONCLUSION

For the foregoing reasons, DraftKings respectfully requests the Court issue a temporary restraining order consistent with the Proposed Temporary Restraining Order filed herewith.

Dated: February 5, 2024

Respectfully submitted,

*/s/ Andrew S. Dulberg*
William F. Lee (BBO #291960)
Andrew S. Dulberg (BBO #675405)
**WILMER CUTLER PICKERING
HALE AND DORR LLP**
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000
william.lee@wilmerhale.com
andrew.dulberg@wilmerhale.com

**GIBSON, DUNN & CRUTCHER LLP**
Orin Snyder (*pro hac vice pending*)
Harris M. Mufson (*pro hac vice pending*)
Justin M. DiGennaro (*pro hac vice pending*)
200 Park Avenue
New York, NY 10166-0193
Tel: 212.351.4000
Fax: 212.351.4035
OSnyder@gibsondunn.com
HMufson@gibsondunn.com
JDiGennaro@gibsondunn.com

Jason C. Schwartz (*pro hac vice pending*)
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Tel: 202.955.8500
JSchwartz@gibsondunn.com

*Attorneys for Plaintiff DraftKings Inc.*

## CERTIFICATE OF SERVICE

I, Andrew S. Dulberg, counsel for Plaintiff, hereby certify that this document has been filed through the Court's ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF). This document is being sent by email to counsel for Defendant and will also be sent by courier to the addresses below.

Brad D. Brian
Bethany W. Kristovich
Anne K. Conley
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071-9100
Brad.Brian@mto.com
Bethany.Kristovich@mto.com
Anne.Conley@mto.com

/s/ Andrew S. Dulberg
Andrew S. Dulberg

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

DRAFTKINGS, INC.,

*Plaintiff*,

v.

MICHAEL Z. HERMALYN,

*Defendant.*

Civil Action No. 1:24-cv-10299-JEK

**Oral Argument Requested**

## MEMORANDUM IN SUPPORT OF DEFENDANT'S EMERGENCY MOTION TO STAY
## <u>PURSUANT TO THE FIRST-FILED RULE</u>

This case should be immediately stayed as duplicative of a parallel case seeking emergency injunctive relief, among other things, that was first filed by Defendant Michael Z. Hermalyn in the Los Angeles, California Superior Court last week (the "First-Filed Action"). In recent days, Plaintiff DraftKings, Inc. ("DraftKings") has twice improperly removed the First-Filed Action to the U.S. District Court for the Central District of California, *see* Case Nos. 2:24-cv-00918 and 2:24-cv-00997, in order to avoid the Los Angeles Superior Court's jurisdiction over the parties' dispute and buy time to file its own lawsuit seeking emergency injunctive relief in this Court against Hermalyn. DraftKings' jurisdictional gamesmanship should not be countenanced.

Last week, on February 1, 2024, Hermalyn—a California resident who has <u>***never***</u> lived or worked in the Commonwealth of Massachusetts—and his current employer, Los Angeles-based FVP, LLC ("Fanatics VIP"), filed a complaint in the Superior Court of the State of California in the County of Los Angeles seeking a declaratory judgment and injunctive relief to enjoin DraftKings from prohibiting Hermalyn from working for Fanatics VIP through the enforcement of illegal post-employment restrictive covenants, including 12-month, ***worldwide*** non-compete

and non-solicitation covenants contained in Hermalyn's agreements with DraftKings.[1]  Also on February 1, 2024, Hermalyn gave notice to DraftKings of his intention to seek an *ex parte* application for a temporary restraining order in the First-Filed Action, seeking a prohibition on DraftKings attempting to enforce the illegal restrictive covenants.  This relief is based on California statutes that not only invalidate the restrictive covenants at issue, but give Hermalyn a private right of action for injunctive relief against DraftKings to prohibit their enforcement.  *See* Cal. Bus. & Prof. Code §§ 16600(a), 16600.5.

Overnight on February 1, 2024, in a transparent attempt to avoid an adverse ruling from the California state court, DraftKings removed the case to California federal court—without any basis in law or fact.  The next day, on February 2, 2024, Hermalyn and Fanatics VIP moved to remand for lack of federal jurisdiction.  Yesterday, on February 5, 2024, the federal court—on its own—remanded the case to the California Superior Court, as no diversity jurisdiction exists.  Later on February 5, 2024, Hermalyn submitted a renewed request for a temporary restraining order, and he requested a hearing on the application on Wednesday, February 7, 2024.

Last night, February 5, 2024, DraftKings once again improperly removed the First-Filed Action to federal court, despite the lack of diversity and despite the California federal court's *sua sponte* order unequivocally remanding the case.  *See* Case No. 2:24-cv-00997 (C.D. Cal. Feb. 5, 2024).  Then, just before midnight and continuing into the early morning on February 6, 2024,

---

[1]    Beck Decl., <u>Ex. A</u> (Compl., *Hermalyn et al. v. DraftKings, Inc.*, No. 24STCV02694 (Feb. 1, 2024)).  Citations to "Beck Decl." are to the Declaration of Russell Beck in Support of Defendant's Motion to Stay, filed concurrently with this Memorandum.

DraftKings filed this action.[2]  DraftKings is clearly doing so in order to divest the Los Angeles Superior Court of jurisdiction and prevent Hermalyn's state court *ex parte* request for a temporary restraining order from going forward there, long enough for DraftKings to get relief from this Court first.

Because the First-Filed Action involves the enforceability of the ***same*** post-employment restrictive covenants, relating to the ***same*** parties and arising from the ***same*** underlying facts and legal issues, well-established principles of judicial economy, interstate comity, and avoidance of waste and conflicting rulings strongly favor staying this litigation in its entirety pending resolution of the First-Filed Action in California.

## BACKGROUND

Defendant Hermalyn, a California resident, recently accepted an offer of employment from non-party Fanatics VIP, a California-based affiliate of the digital sports platform Fanatics Holdings, Inc. (together with its subsidiaries and affiliates, including Fanatics VIP, "Fanatics"). Hermalyn Decl.[3] ¶¶ 2, 4, 6.  Hermalyn serves as the President of Fanatics VIP and the Head of Fanatics' Los Angeles, California office.  *Id.* ¶ 4.  This position requires Hermalyn to live and work in Los Angeles, California, where Fanatics currently employs approximately 80 people.  *Id.* ¶ 5.

Prior to joining Fanatics VIP, Hermalyn worked for DraftKings for fewer than 3.5 years, from approximately September 2020 to February 1, 2024.  During this time, Hermalyn worked

---

[2]  Hermalyn denies all allegations of misconduct alleged by Plaintiff in their incendiary filings.  He intends to correct the misstatements following an opportunity to prepare his opposition to the midnight filings.

[3]  Citations to "Hermalyn Decl." are to the Declaration of Michael Z. Hermalyn in Support of Defendant's Motion to Stay, filed concurrently with this Memorandum.

from DraftKings' New York City office or his then-home office in Bay Head, New Jersey. *Id.* ¶¶ 2, 8-9. Hermalyn never lived or worked in the Commonwealth of Massachusetts, nor was he based out of or affiliated with DraftKings' Massachusetts office. *Id.* ¶ 9. DraftKings' employment-related agreements with Hermalyn contained overbroad and illegal post-employment restrictive covenants, including ***global***, 12-month non-compete and non-solicitation covenants. *See* Beck Decl., <u>Ex. A</u>.

      As a resident of the State of California, Hermalyn seeks to continue his employment with Fanatics VIP as President and as the Head of Fanatics' Los Angeles office, without the burden of the unenforceable prohibitions and restraints his agreements with DraftKings impose. Accordingly, on February 1, 2024, Hermalyn and Fanatics VIP filed a complaint in the Superior Court of the State of California in the County of Los Angeles, Central District, seeking declaratory relief and injunctive relief and asserting violations of California Business & Professions Code Sections 16600, 16600.1, 16600.5, and 17200. Beck Decl., <u>Ex. A</u>. The First-Filed Action alleges that DraftKings, Hermalyn's former employer, has sought to improperly restrain Hermalyn, a California resident and employee, from pursuing a lawful profession of his choosing with Fanatics VIP in California, and restrict California-based Fanatics VIP from employing him, by enforcing sweeping post-employment restrictive covenants and Massachusetts forum selection and choice of law provisions, all of which are ***illegal and void*** under California law. *Id.*

      Additionally, also on February 1, 2024, Hermalyn promptly submitted and gave notice of his intention to seek a Temporary Restraining Order and Preliminary Injunction seeking to enjoin

DraftKings from enforcing the illegal contracts.[4]  He did so pursuant to California's recently enacted law (effective January 1, 2024) that grants California residents a private right of action to enjoin enforcement of restrictive covenants, even if signed outside of California while working for a non-California employer.  The legislative history of this new law demonstrates that it was intended to give California workers the right to sue both: (a) to invalidate unlawful restrictive covenants; and (b) to enjoin their former employers from suing outside California to enforce such covenants.  *See* Beck Decl., Exs. A, D.

On February 1, 2024, DraftKings improperly removed the action, purportedly based on diversity jurisdiction, to the U.S. District Court for the Central District of California.  No. 2:24-cv-00918-MCS-E (C.D. Cal.).  On February 2, 2024, Hermalyn and Fanatics VIP immediately filed an expedited motion to remand, explaining that there was no diversity.  On February 5, 2024, without even waiting for DraftKings to respond, the district court *sua sponte* remanded the case.[5]  Later that same day, with the case back in the California Superior Court, Hermalyn submitted a renewed application for a Temporary Restraining Order and Order to Show Cause Regarding a Preliminary Injunction.[6]  Hermalyn requested a hearing on his application at the earliest opportunity available, on February 7, 2024, at 8:30 a.m. Pacific Time.

---

[4]  *See* Beck Decl., Ex. B (Pl.'s *Ex Parte* App. for (1) a Temp. Restraining Order and (2) an Order to Show Cause Regarding Preliminary Injunction, *Hermalyn et al. v. DraftKings, Inc.*, No. 24STCV02694 (Feb. 1, 2024)).

[5]  *See* Beck Decl., Ex. C ((In Chambers) Remand Order, No. 2:24-cv-00918-MCS-E, ECF No. 14 (C.D. Cal. Feb. 5, 2024)).

[6]  *See* Beck Decl., Ex. D (Pl.'s *Ex Parte* App. for (1) a Temp. Restraining Order and (2) an Order to Show Cause Regarding Preliminary Injunction, *Hermalyn et al. v. DraftKings, Inc.*, No. 24STCV02694 (Feb. 1, 2024)).

Late on February 5, 2024, DraftKings contacted Hermalyn's counsel in the First-Filed Action and informed them that it would be filing this action and associated motions, and requested Hermalyn's consent. Instead of providing the papers to Hermalyn's counsel, however, DraftKings filed this action near midnight on February 5, 2024. DraftKings also once again removed the First-Filed Action to federal court on the night of February 5, 2024. *See* Case No. 2:24-cv-00997 (C.D. Cal. Feb. 5, 2024)). DraftKings intent is clear: to avoid the application of California law and public policy that invalidate the restrictive covenants at issue, and to stall the First-Filed Action long enough to get a ruling in this Court first.

Boiled down, in this duplicative lawsuit, DraftKings seeks to enforce the exact same restrictive covenants whose validity Hermalyn is already challenging in the First-Filed Action. *See, e.g.*, Compl. (ECF No. 1) ¶¶ 1 (alleging "brazen violation of his agreements with and duties to DraftKings"), 4 ("Hermalyn repeatedly executed contractual agreements with DraftKings"); Counts I-III. That is also the basis of DraftKings' motion for a temporary restraining order. *See* [Proposed] Temporary Restraining Order (ECF No. 3-1) (referring repeatedly to Hermalyn's Agreements with DraftKings). Hermalyn and his fellow California plaintiff, Fanatics VIP, have filed a notice in the Central District of California that the case is the same as DraftKings' previous attempt to remove the action, which was rejected by the court, and intend to move for remand expeditiously. *Id.* ECF No. 6. This action should be stayed in its entirety pending resolution of the First-Filed Action in California.

## **ARGUMENT**

This Court should apply its "broad discretion" and "inherent" power to stay this case in its entirety in favor of the "economy of time and effort for itself, for counsel, and for litigants." *Thakkar v. United States*, 389 F. Supp. 3d 160, 171 (D. Mass. 2019) (quoting *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936); *Klein v. MHM Corr. Servs.*, 2010 WL 3245291, at *9 (D. Mass.

Aug. 16, 2010)). The First Circuit has long held that "[o]bvious concerns" exist where, as here, multiple actions involving overlapping parties and subject matter are pending in different courts. *See TPM Holdings v. Intra-Gold Indus.*, 91 F.3d 1, 4 (1st Cir. 1996). These concerns include "wasted resources because of piecemeal litigation, the possibility of conflicting judgments, and a general concern that the courts may unduly interfere with each other's affairs." *Id.* To avoid waste of resources, undue burden and inconvenience, and the possibility of conflicting judgments, "where identical actions are proceeding concurrently in two federal courts, entailing duplicative litigation and a waste of judicial resources, the first filed action is generally preferred . . . ." *Sophos, Inc. v. RPost Holdings, Inc.*, 2014 WL 2434637, at *1 (D. Mass. May 30, 2014) (quoting *Cianbro Corp. v. Curran-Lavoie, Inc.*, 814 F.2d 7, 11 (1st Cir. 1987)).

"Under the first-to-file rule, . . . 'the usual practice is for the court where the case was first filed to resolve the issues, and the other court to defer by either staying, transferring, or dismissing the action.'" *Jimenez v. Kohl's Dep't Stores, Inc.*, 480 F. Supp. 3d 305, 306 (D. Mass. 2020) (quoting *Thakkar*, 389 F. Supp. 3d at 170). "When deciding whether to apply the rule, courts must consider: (1) which action was filed first; (2) the similarity of the parties; and (3) the similarity of the issues." *Waithaka v. Amazon.com, Inc.*, 404 F. Supp. 3d 335, 350 (D. Mass. 2019), *aff'd*, 966 F.3d 10 (1st Cir. 2020). Here, all three factors weigh heavily in favor of this Court issuing a stay until there is a resolution in the First-Filed Action in California.

A. **The California Action Was the First Filed Case.**

*First*, it is undisputed that the case in California was the first-filed action between overlapping parties. Defendant Hermalyn and his employer Fanatics VIP filed the First-Filed

Action, seeking declaratory judgment and injunctive relief in California on February 1, 2024.[7]
Beck Decl., Ex. A.  DraftKings did not file this action against Hermalyn until near midnight on
February 5, 2024.  ECF No. 1.  Therefore, the first factor weighs strongly in favor of this Court
issuing a stay to allow "the case [where the dispute] was first filed to resolve the issues."  *See
Jimenez*, 480 F. Supp. 3d at 306 (quoting *Thakkar*, 389 F. Supp. 3d at 170); *see also Sophos, Inc.*,
2014 WL 2434637, at *3 ("[T]he mere passage of a single day is enough to trigger the first-filed
rule.") (citing *Veryfine Prod., Inc. v. Phlo Corp.*, 124 F. Supp. 2d 16, 26 (D. Mass. 2000)).

**B.  The Parties Completely Overlap.**

**Second**, the parties in the First-Filed Action and this action entirely overlap—Hermalyn
and DraftKings.  The second factor is therefore easily satisfied as well.[8]

**C.  The Overlap in the Factual and Legal Issues Also Weighs in Favor of a Stay.**

**Third**, the First-Filed Action and this subsequent action involve overlapping factual and
legal issues.  DraftKings' contract claims in this case turn on the enforceability of Hermalyn's
post-employment covenants; they are thus merely the mirror image of the claims Hermalyn and
Fanatics VIP already have brought in the First-Filed Action in California, challenging those exact
same covenants as illegal and seeking to enjoin their enforcement.  *See* Beck Decl., Exs. A, D.

---

[7]    Although, as noted above, DraftKings improperly removed the case to federal court
(from which it has since been remanded), and has now done so again, for removed actions the
relevant filing date is the date the underlying complaint was filed, not the date of removal.  *See
OneBeacon Am. Ins. Co. v. Celanese Corp.*, 2015 WL 1962168, at *7 n.3 (D. Mass. May 1, 2015).

[8]    It does not matter that Fanatics VIP is also a plaintiff in the First-Filed Action and not a
party here.  *See Waithaka*, 404 F. Supp. 3d at 351 (noting that "[t]he first-to-file rule only requires
similar parties, not identical ones"); *see also Thakkar*, 389 F. Supp. 3d at 172 (holding that first-
filed rule "does not require strict identity of the parties, but rather substantial similarity") (citation
omitted).  Indeed, Fanatics VIP will be directly affected by any decision in this Court without
being a party to this action, whereas in California, all issues can be resolved among all interested
parties.

Accordingly, this action should be stayed.  *See Holmes Grp., Inc. v. Hamilton Beach/Proctor Silex, Inc.*, 249 F. Supp. 2d 12, 15 (D. Mass. 2002) (explaining that the first-filed action is favored "even if it is a request for a declaratory judgment").  DraftKings' claims here are necessarily and wholly dependent on the enforceability (or not) of the restrictive covenants at issue.  *See* Compl. (ECF No. 1) Counts I-III.  A stay here will permit those issues to be appropriately decided in the First-Filed Action in California, while avoiding waste of judicial resources and a risk of inconsistent rulings that would result if both courts simultaneously heard and addressed the same issues.  *See Thakkar*, 389 F. Supp. 3d at 174 ("Courts also examine whether [the first and second-filed actions] turn on similar determinations of fact and seek to resolve similar legal issues.").

Although DraftKings has brought additional claims in this case regarding purported trade secret theft, these claims all involve the same common and overlapping nucleus of facts that indisputably underlies the claims already filed in California.  Both cases concern Hermalyn's employment and departure from DraftKings and his subsequent employment at Fanatics VIP.  The complete overlap in the factual and legal issues between both cases make the efficiency and comity concerns underlying the "first-to-file" rule even more acute.  Further, DraftKings' claims against Hermalyn here are between the same parties as in the First-Filed Action, and thus should be pled against him and decided there as compulsory counterclaims.  This further justifies a stay.  *See, e.g.*, *Hostway Corp. v. JPMorgan Chase Bank, N.A.*, 2009 WL 2601359, at *2 (N.D. Ill. Aug. 24, 2009) (granting motion to stay second-filed action involving claims that could be pled as counterclaims in first-filed action); *Donkenny, Inc. v. Nadler*, 544 F. Supp. 166, 170 (S.D.N.Y. 1982) (same).[9]

---

[9]     There are no factors favoring litigating these issues in Massachusetts, as the relevant witnesses are in California and relevant events allegedly took place there, and *none* of the underlying events took place in Massachusetts.  As the Complaint concedes, even when he worked for DraftKings, Hermalyn worked from New York and New Jersey.  Compl. (ECF No. 1) ¶ 13.

In addition, while DraftKings may point to a Massachusetts forum selection clause in certain contracts with Hermalyn, Hermalyn is already challenging the enforceability of that provision against him, a California resident, in the California First-Filed Action. *See* Beck Decl., Ex. A, ¶¶ 58, 70-72.

### D. No Compelling Factors Warrant Litigating This Action In Massachusetts.

There are no factors favoring litigating the parties' dispute in Massachusetts, as the key witnesses are in California (including Hermalyn and Fanatics VIP), the relevant events allegedly took place there, and *none* of the underlying events took place in Massachusetts. As the Complaint concedes, even when he worked for DraftKings, Hermalyn worked from New York and New Jersey. Compl. (ECF No. 1) ¶ 13. For these and other reasons, even if not stayed, Defendant anticipates promptly moving to dismiss this action in favor of the First-Filed Action in California.

Finally, while DraftKings may point to a Massachusetts forum selection clause in certain contracts with Hermalyn, Hermalyn is already challenging the enforceability of that provision against him, a California resident, in the California First-Filed Action. *See* Beck Decl., Ex. A, ¶¶ 58, 70-72. California has a substantial interest in resolving that issue, particularly in light of the new California statute that Hermalyn is relying on for his injunctive relief application. *See* Cal. Bus. & Prof. Code §§ 16600(a), 16600.5.[10]

---

For these and other reasons, even if not stayed, Defendant anticipates promptly moving to dismiss this action in favor of the First-Filed Action in California.

[10]   The right to freely pursue one's chosen profession embodied in California Business & Professions Code section 16600 is an "unwaivable statutory right" under California law. *Brown v. TSG Mgmt. Co., LLC*, 57 Cal. App. 5th 303, 313-16 (2020). Under well-settled precedent, California renders void any "mandatory forum selection clause" that "diminishes" its resident's unwaivable statutory rights, as such clauses otherwise "could be used to circumvent" those "unwaivable statutory rights." *Verdugo v. Alliantgroup, L.P.*, 237 Cal. App, 4th 141, 149, 154 (2015) (voiding forum selection clause where defendant failed to show its enforcement would not diminish plaintiff's California Labor Code rights); *see also G Cos. Mgmt., LLC v. LREP Ariz.,*

## CONCLUSION

For the foregoing reasons, this Court should stay this case in its entirety pending the outcome of the First-Filed Action in California.

Dated: February 6, 2024                    Respectfully submitted,

                                           *Attorneys for Defendant Michael Z. Hermalyn*

                                           /s/  *Russell Beck*
                                           Russell Beck (BBO# 561031)
                                           Stephen Riden (BBO# 644451)
                                           Beck Reed Riden LLP
                                           155 Federal Street, Suite 1302
                                           Boston, MA 02110
                                           Tel.: (617) 500-8660
                                           Fax: (617) 500-8665
                                           rbeck@beckreed.com
                                           sriden@beckreed.com

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was filed on February 6, 2024 through the ECF System and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

Dated:  February 6, 2024                    /s/  *Russell Beck*

---

*LLC*, 88 Cal. App. 5th 342, 350-51 (2023) (refusing to enforce forum selection clause that diminished plaintiff's unwaivable rights under California's usury laws); *Am. Online, Inc. v. Super. Ct.*, 90 Cal. App. 4th 1, 13 (2001) (refusing to enforce forum selection clause that diminished plaintiffs' unwaivable rights under California's Consumers Legal Remedies Act); *Hall v. Super. Ct.*, 150 Cal. App. 3d 411, 416-17 (1983) (refusing to enforce forum selection clause that diminished plaintiffs' unwaivable statutory rights under the California Corporations Code).

# EXHIBIT 3

1  HOLLAND & KNIGHT LLP
   Samuel J. Stone (SBN 317013)
2  400 S. Hope Street, 8th Floor
   Los Angeles, CA 90071
3  Telephone: (213) 896-2400
   Facsimile: (213) 895.2450
4  Email: sam.stone@hklaw.com

5  HOLLAND & KNIGHT LLP
   Nipun J. Patel (*pro hac vice*)
6  Justin M. Kadoura (*pro hac vice*)
   1650 Market Street, Suite 3300
7  Philadelphia, Pennsylvania 19103
   Phone: 215.252.9527
8  Fax: 215.867.6070
   Email: nipun.patel@hklaw.com
9        justin.kadoura@hklaw.com

10

11             **UNITED STATES DISTRICT COURT**

12            **NORTHERN DISTRICT OF CALIFORNIA**

13

14  CG ENTERPRISES HOLDINGS, LLC, a    ) Case No. 3:24-cv-00292-CRB
    California limited liability company; and  )
15  STEPHEN M. COON, an individual;    ) [Removed from Sonoma County Superior Court
                                       ) Case No.: 24CV00024]
16              Plaintiff,             )
                                       ) **DEFENDANTS' MOTION TO DISMISS**
17         vs.                         ) **PURSUANT TO FEDERAL RULES OF**
                                       ) **CIVIL PROCEDURE 12(B)(2), (3), AND (6)**
18  WSP USA, INC., a New York corporation;  ) **OR, IN THE ALTERNATIVE, TO STAY**
    WSP USA BUILDINGS, INC., a New York  ) **THIS ACTION PURSUANT TO 9 U.S.C. §**
19  corporation; kW MISSION CRITICAL   ) **3, OR TRANSFER PURSUANT TO 28**
    ENGINEERING, D.P.C., a New York design  ) **U.S.C. § 1404(a)**
20  professional corporation; and DOES 1  )
    through 20, inclusive,             ) [Fed. R. Civ. P. 12(b); Civ.L.R. 7]
21                                     )
               Defendants.            )
22                                     ) Hearing Date:   March 8, 2024
                                       ) Hearing Time:   10:00 a.m.
23                                     ) Location:       450 Golden Gate Avenue,
                                       ) Courtroom 6, 17th Floor, San Francisco,
24                                     ) California 94102
                                       )
25                                     )
                                       )
26  _____ )

27

28

Holland & Knight LLP
400 South Hope Street, 8th Floor
Los Angeles, California 90071
Tel.: 213.896.2400 Fax: 213.896.2450

Holland & Knight LLP
400 South Hope Street, 8th Floor
Los Angeles, California 90071
Tel.: 213.896.2400 Fax: 213.896.2450

**PLEASE TAKE NOTICE THAT**, on March 8, 2024 at 10:00 a.m. or as soon thereafter as the matter may be heard, Defendants WSP USA, INC., WSP USA BUILDINGS, INC., and kW MISSION CRITICAL ENGINEERING, D.P.C. ("Defendants") hereby move the above-captioned Court, located at 450 Golden Gate Avenue, Courtroom 6, 17th Floor, San Francisco, California 94102, for an order dismiss all claims alleged against them in the Complaint filed by Plaintiffs Stephen Coon and CG Enterprise Holdings, LLC, or in the alternative, staying this Action or transferring it.  This Motion is based on this Notice of Motion and Motion, Memorandum of Points and Authorities, Declaration of Kenneth Clausen in Support Thereof, any papers filed in Reply, argument of counsel, the Court's file, and any and all other matters the Court deems appropriate and proper.

MOTION TO DISMISS, STAY,  OR TRANSFER                    Case No.: 3:24-cv-00292-CR

1

## **TABLE OF CONTENTS**

2
**Page**

3 INTRODUCTION AND SUMMARY OF ARGUMENT ....................................................1

4 BACKGROUND ............................................................................................................3

5   I.   WSP Acquires kW Mission Critical Engineering. .................................................3

6   II.  Coon Agreed to Be Bound by Restrictive Covenants Governed By New York Law
         and Subject to Binding Arbitration.......................................................................3

7   III. Coon Openly Violates the Restrictive Covenants. ..............................................5

8   IV.  WSP Acts Promptly to Protect Its Rights and Initiates Arbitration.......................6

9 ARGUMENT..................................................................................................................7

10  I.   The Court Should Dismiss or Stay This Action Pursuant to the Arbitration
         Provisions in the Employment Agreement. ...........................................................7

11  II.  This Court Lacks Personal Jurisdiction over WSP.................................................9

12  III. Venue Is Improper in this District. .....................................................................11

13  IV.  Plaintiffs Fail to State a Claim for Relief. ..........................................................11

        A.   CGE Lacks Standing to Pursue Its § 16600 Claim..............................12

14      B.   The Restrictive Covenants Are Enforceable Under New York Law, Which
             Governs Plaintiffs' Claim. ...................................................................12

15

16      C.   Plaintiffs' Claims Impermissibly Apply California Law Extraterritorially.....14

        D.   The Restrictive Covenants Do Not Violate Sections 16600..................16

17      E.   Plaintiffs Fail to State a § 17200 Claim. .............................................18

18  V.   The Court Should Transfer This Action to the Southern District of New York.........18

19 CONCLUSION.............................................................................................................20

20

21

22

23

24

25

26

27

28

Holland & Knight LLP
400 South Hope Street, 8th Floor
Los Angeles, California 90071
Tel.: 213.896.2400 Fax: 213.896.2450

1

## TABLE OF AUTHORITIES

2                                                                    **Page(s)**

**Cases**

3  *Alliant Ins. Servs., Inc. et al. v. Gaddy*,
       159 Cal. App. 4th 1292 (2008) ...................................................................16
4
5  *Apple Inc. v. Allan & Assocs. Ltd.*,
       445 F. Supp. 3d 42 (N.D. Cal. 2020) ......................................................9, 10
6
7  *Application Grp., Inc. v. Hunter Grp., Inc.*,
       61 Cal. App. 4th 881 (Cal. Ct. App. 1998) .............................................13
8  *Arthur J. Gallagher & Co. v. Lang*,
       2014 WL 2195062 (N.D. Cal. May 23, 2014) ........................................17
9
10 *Arthur J. Gallagher & Co. v. Petree*,
       2022 WL 1241232 (E.D. Cal. Apr. 27, 2022) .........................................17
11 *Atl. Marine Const. Co. v. U. S. Dist. Ct. for W. Dist. of Texas*,
       571 U.S. 49 (2013)...................................................................................19
12
13 *Bernal v. Kohl's Corp.*,
       2023 WL 80088977 (C.D. Cal. Nov. 17, 2023) ......................................19
14
15 *Bollengier v. Gulati*,
       233 A.D.2d 721 (N.Y. App. Div. 1996) ..................................................12
16 *Boorstein v. CBS Interactive, Inc.*,
       222 Cal. App. 4th 456 (Cal. Ct. App. 2013) ...........................................12
17
18 *Build Grp., Inc. v. N.R. Windows, Inc.*,
       2022 WL 3697355 (C.D. Cal. Feb. 17, 2022) ...........................................8
19
20 *Cabrera v. Ford Motor Co.*,
       2023 WL 6307946 (N.D. Cal. Sept. 26, 2023) ........................................18
21 *Chun Ping Turng v. Guaranteed Rate, Inc.*,
       371 F. Supp. 3d 610 (N.D. Cal. 2019).......................................................7
22
23 *Continental Appliances, Inc. v. Thomas*,
       2012 WL 3646887 (N.D. Cal. Aug. 23, 2012) .........................................11
24 *Daimler AG v. Bauman*,
       571 U.S. 117 (2014).................................................................................10
25
26 *Dexcom, Inc. v. Medtronic, Inc.*,
       2021 WL 5908930 (S.D. Cal. Dec. 14, 2021) ...........................................8
27
28 *Fillpoint, LLC v. Maas*,
       208 Cal. App. 4th 1170 (Cal. App. Ct. 2012)....................................16, 17

Holland & Knight LLP
400 South Hope Street, 8th Floor
Los Angeles, California 90071
Tel.: 213.896.2400 Fax: 213.896.2450

ii

*Genasys Inc. v. Vector Acoustics, LLC*,
    2023 4414222 (S.D. Cal. July 7, 2023) ................................................................. 7

*Golden State Orthopaedics, Inc. v. Howmedica Osteonics Corp.*,
    2016 WL 4698931 (N.D. Cal. Sept. 8, 2016) ..................................................... 12

*Herbert v. Los Angeles Raiders, Ltd.*,
    23 Cal. App. 4th 414 (Cal. Ct. App. 1991) ...................................................... 15

*Howard v. Octagon, Inc.*,
    2013 WL 5122191 (N.D. Cal. Sept. 13, 2013) ................................................ 18

*Huynh v. Walmart, Inc.*,
    2022 WL 3109562 (N.D. Cal. Aug. 4, 2022) ............................................ 11, 12

*Inmar Rx Solutions, Inc. v. Devos, Ltd.*,
    786 F. App'x 445 (5th Cir. 2019) ..................................................................... 11

*Laver v. Credit Suisse Secs. (USA), LLC*,
    2018 WL 3068109 (N.D. Cal. June 1, 2018) ...................................................... 7

*LNS Enterprises LLC v. Continental Motors, Inc.*,
    22 F.4th 852 (9th Cir. 2022) ............................................................................. 10

*Loughlin v. Ventraq, Inc.*,
    2011 WL 1303641 (S.D. Cal. Apr. 5, 2011) ...................................................... 7

*Marcotte v. Micros Sys., Inc.*,
    2014 WL 4477349 (N.D. Cal. Sept. 11, 2014) .................................................. 8

*Medcor, Inc. v. Garcia*,
    2022 WL 124163, at *5 (N.D. Ill. Jan. 13, 2022) .......................................... 14

*Momot v. Mastro*,
    652 F.3d 982 (9th Cir. 2011) ............................................................................. 8

*Motorola Credit Corp. v. Uzan*,
    388 F.3d 39 (2d Cir. 2004) ............................................................................... 12

*Norwest Mortg., Inc. v. Super. Ct.*,
    72 Cal. App. 4th 214 (Cal. Ct. App. 1999) ...................................................... 16

*Oren Enterprises, Inc. v. Stefanie Cove & Co.*,
    2017 WL 8220230 (C.D. Cal. June 2, 2017) ...................................................... 7

*Rent-A-Center, West, Inc. v. Jackson*,
    561 U.S. 63 (2010) ......................................................................................... 8, 9

*Ridenhour v. UMG Recordings, Inc.*,
    2012 WL 463960 (N.D. Cal. Feb. 13, 2012) .................................................... 13

iii

*Sam Francis Found. v. Christies, Inc.*,
   784 F.3d 1320 (9th Cir. 2015) .............................................................................14

*Schwarzenegger v. Fred Martin Motor Co.*,
   374 F.3d 797 (9th Cir. 2004) ...............................................................................9

*VCA Animal Hosps., Inc. v. Hampel*,
   2023 WL 8857757 (Cal. Ct. App. Dec. 22, 2023)..........................................16, 17

*Willis Re Inc. v. Herriott*,
   550 F. Supp. 3d 68 (S.D.N.Y. 2021) ...................................................................14

**Statutes**

9 U.S.C. § 2 ..............................................................................................................9

9 U.S.C. § 3 ..................................................................................................7, 9, 19

9 U.S.C. § 4 ................................................................................................18, 19

28 U.S.C. § 1391(b) .................................................................................................11

28 U.S.C. § 1391(b)(1) .............................................................................................18

28 U.S.C. § 1404(a) ....................................................................................2, 18, 20

Cal. Bus. & Prof. Code § 16600 .....................................................................*passim*

Cal. Bus. & Prof. Code § 16600.5 ...........................................................................12

Cal. Bus. & Prof. Code § 16601 ..............................................................................16

Cal. Bus. & Prof. Code § 17200 ......................................................14, 15, 16, 18

Cal. Lab. Code § 925(a)(2) .......................................................................................14

Cal. Lab. Code § 16600.5(b) ....................................................................................14

**Other Authorities**

N.Y. Veto No. 113 (2023), http://public.leginfo.state.ny.us/navigate.cgi?NVDTO: ...................13

U.S. Dist. Cts.—Nat'l Jud. Caseload Profile (Sept. 2023),
   https://www.uscourts.gov/file/76945/download................................................20

Holland & Knight LLP
400 South Hope Street, 8th Floor
Los Angeles, California 90071
Tel.: 213.896.2400 Fax: 213.896.2450

Holland & Knight LLP
400 South Hope Street, 8th Floor
Los Angeles, California 90071
Tel.: 213.896.2400 Fax: 213.896.2450

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION AND SUMMARY OF ARGUMENT

Plaintiff Stephen Coon ("Coon") has embarked on an aggressive campaign to unlawfully divert clients and employees from his former employer, WSP USA, Inc. ("WSP"), in flagrant violation of the restrictive covenants in his Employment Agreement ("Agreement"). Those violations are the subject of an ongoing arbitration between WSP and Coon in New York pursuant to the valid forum-selection Clause in the Agreement that vests the American Arbitration Association ("AAA") with exclusive jurisdiction to address disputes about the Agreement. In a quintessential example of improper forum shopping, however, Coon filed this action asserting arbitrable claims in an improper state court forum for the sole purpose of attempting to take advantage of California law to rewrite the Agreement, avoid his duty to arbitrate, and escape the consequences of his misconduct. Specifically, Plaintiffs argue that this Court, located in California, should apply California law to invalidate restrictive covenants in a contract that has absolutely nothing to do with California: The Agreement is between Coon, an Arizona resident, and WSP, a New York company with its principal place of business in New York; the Agreement was not negotiated or signed in California; the Agreement was executed in connection with WSP's purchase of kW Mission Critical Engineering ("kW"), Coon's former business, also based in New York; the Agreement specifically requires Coon to arbitrate claims against WSP in New York under New York law; and part of WSP's claims against Coon in the underlying arbitration relates to his tortious poaching of employees that worked in kW's Troy, New York office.

Coon artificially manufactured and contrived the only connection between this action and California. Specifically, within weeks of resigning from WSP, Coon formed his competing business, Plaintiff CG Enterprises Holdings LLC ("CGE"), in California. CGE's connection to California, however, is a fiction. Coon is CGE's sole member and Plaintiffs do not allege that CGE has any operations or employees (including Coon himself) in California. In fact, Coon likely chose to form CGE under California law solely so he could file this action and try to take advantage of California's statute banning certain noncompete agreements. *See* Cal. Bus. & Prof. Code § 16600, *et seq* ("Section 16600"). Indeed, Plaintiffs filed their Complaint shortly after: (1) WSP informed

1

Coon that it would enforce his restrictive covenants, which, pursuant to the Agreement, would have to be done through arbitration in New York under New York law; and (2) New York's Governor vetoed that state's similar legislation seeking effectively to ban non-competition agreements (which she did less than one month after CGE was formed and two weeks before Plaintiffs filed their Complaint).

This Court should stay or dismiss this case. First, Plaintiffs' claims are subject to the arbitration clause in the Agreement and thus must be dismissed or stayed pending resolution of the New York arbitration, pursuant to the Federal Arbitration Act. Second, because this case lacks any connection to California, , the Court should dismiss for lack of personal jurisdiction over WSP and/or improper venue. Plaintiffs do not and could not allege that WSP has sufficient contacts with this State to establish jurisdiction or that any of the venue requirements are met. .

Third even if Plaintiffs could sue here (and they cannot), Plaintiffs are not entitled relief under Section 16600. As an initial matter, CGE lacks standing to bring its claim because Section 16600 creates a cause of action only for employees, not employers like CGE. Moroever, applying Section 16600 would violate the choice-of-law provision in Coon's Agreement, which requires the application of New York law. With Coon's claim having no connection to California, there is no basis to disregard his agreement that New York law will govern this dispute. Additionally, the Dormant Commerce Clause prohibits Plaintiffs' attempts to apply Section 16600 extraterritorially. Finally, Plaintiffs have failed to state a claim for relief because the statute on which they rely, § 16600, does not apply to the restrictive covenants at issue here.

Accordingly, this Court should either dismiss Plaintiffs' claims or stay them pending resolution of the Parties' ongoing arbitration. Alternatively, this court should transfer this action to the Southern District of New York under 28 USC 1404(a).

MOTION TO DISMISS, STAY OR TRANSFER        Case No.: 3:24-cv-00292-CRB

## BACKGROUND

### I.    WSP Acquires kW Mission Critical Engineering.

In December 2020, WSP acquired kW, a small (then approximately 175 employee) engineering firm that focused primarily on designing data centers and other mission-critical projects.  (Ex. A, Decl. of Ken Clausen ¶ 5.)  As part of the acquisition, kW's senior leadership team and key employees, including Coon, signed employment agreements and retention agreements containing restrictive covenants that prohibited them from competing with WSP, soliciting its employees, customers, or vendors, or sharing its trade secrets or confidential information.  (Ex. B at 6–8.).  Coon's Agreements were not negotiated in California nor did they have anything to do with California.  (Clausen Decl. ¶ 53.)  Each pertinent agreement designated New York law as controlling.  (Ex. B at 11.)

### II.    Coon Agreed to Be Bound by Restrictive Covenants Governed By New York Law and Subject to Binding Arbitration.

Coon worked for kW for approximately eight years before the acquisition.  (Clausen Decl. ¶ 10.)  On December 30, 2020, Coon entered into the Agreement with WSP providing for him to work as WSP's Managing Principal of the Phoenix Office and as a Professional Electrical Engineer.  (*Id.* ¶ 11)  Coon was responsible for providing technical engineering expertise and developing successful relationships with design team partners—architects, engineers, and contractors.  (*Id.* ¶ 15.)  Coon gained substantial experience and insight into kW's data center business and had key responsibilities for leadership of key client accounts and projects associated with data center program design and build out.  (*Id.* ¶ 16.)  Coon also gained knowledge about all aspects of kW's customers' programs, including highly confidential items like schedule, budget, risk and desired engineering team.  (*Id.* ¶ 17.)

Coon's Agreement provided for a $200,000 a year base salary, benefits, and potential performance bonuses.  (*Id.*, Ex. B at 2.)  In exchange for this compensation, Coon agreed not to compete with WSP "in a manner that would reasonably be expected to divert business from any of the Company's 'Clients' or 'Prospective Clients' with whom [he] had any involvement in

developing, servicing, soliciting, or maintaining during the year prior to [his] termination." (*Id.* at 7.) The Agreement also prohibits Coon from engaging in soliciting or hiring anyone who is or "was within the last 12 months of [his] employment with the Company, an employee, consultant, or independent contractor of the Company or any of its affiliates." (*Id.* at 8.) And the Agreement provides that Coon shall not "solicit or otherwise accept business from . . . and/or interfere with the Company's relationship or business with any of the Company's existing Clients or Prospective Clients" that he learned of, did work for, or gained access to confidential information about through WSP. (*Id.*)

These restrictive covenants are essential to ensuring that WSP receives the benefit of the bargain from the kW acquisition, including kW's good will. The data-center design business is extremely competitive, with each company's ability to compete largely dependent on, *inter alia*, (1) its ability to understand and accommodate a client's needs, and (2) the quality and reputation of its specific engineers. (Clausen Decl. ¶ 39.) Competition from senior-level former kW/WSP employees like Coon would thus be devastating for WSP. (*Id.* ¶ 42.) Accordingly, the Agreement provides that the restrictive covenants will remain in place for twelve months after he leaves or is terminated by WSP. (*See* Ex. B at 6–8.) The only exception is if Coon does not renew the Agreement after the first two-year Term—and thus "convert[s] to an at-will employee" at the end of the Term (*id.* at 2)—and "remains employed with [WSP] one year after converting to an at-will employee," at which point the restrictive covenants would expire. (*Id.* at 10.) In further recognition of the importance of the restrictive covenants, the Agreement also provides, and Coon agreed, that:

> The Company is in a highly competitive business and expends considerable amounts of money in the development of business from new clients and customers and continued business from existing clients and customers. The business and clientele of the Company are national and worldwide in scope, and therefore the territorial and time limitations set forth in th[e] Non-Compete clause are reasonable and necessary for the protection of the Company's interests.

(*Id.* at 7.)

The Agreement further provides that it is governed by New York law; that all disputes arising from the Agreement, any statute, regulation or ordinance, or Coon's employment relationship with WSP must be decided exclusively in binding arbitration by the AAA in New York; and that any arbitration award can be enforced only in a court in New York County. (*Id.* at 11–12.)

4

Additionally, Coon also signed a retention bonus agreement ("RBA") with WSP reaffirming his restrictive covenants in exchange for substantial cash bonuses "to incentivize [him] to remain with [kW] . . . in order to assist [kW] with integration into WSP." (Ex. C at 1.) On December 29, 2020, Coon executed the RBA, the day before signing his Agreement. WSP paid Coon $475,000 over the course of two years pursuant to his RBA in addition to his compensation under the Agreement. (*Id.* at 1–2.) Like the Agreement, the RBA also designates New York law as governing its terms and has no connection to California. (*Id.* at 11.)

**III.  Coon Openly Violates the Restrictive Covenants.**

On November 2, 2022, Coon gave notice that he would not renew the Employment Agreement, making him an at-will employee as of December 30, 2022. (Ex. D.) Coon did not, however, remain with WSP for a year after that date, as required by the Employment Agreement to excuse him from the 12-month tail in the restrictive covenants. (Clausen Decl. ¶¶ 19–21.) Instead, he tendered his resignation on October 18, 2023. (Ex. E.) His actual last day was November 3, 2023. (Clausen Decl. ¶ 23.) Accordingly, the non-compete and non-solicitation provisions of his Agreement are still in effect until November 3, 2024.

Nonetheless, Coon began forming a competing business operating in Arizona (where he lives) intending to take advantage of the exploding demand for data centers because of the growth of AI software and applications. Since his resignation (and likely earlier), Coon has solicited several former kW/WSP employees to join him, including at least four from kW's New York office— Principal Mechanical Engineer Jason Leone and Managing Principal of the Troy Office Gary Russinko, who are each subject to their own restrictive covenants with WSP, (*see id.* Exs. F & G), as well as Andrew Stercho and Darren Keyser. Russinko, Leone, Stercho, and Sterling resigned between October 30, 2023, and January 2, 2024, and each refuses to disclose their new employers. (Clausen Decl. ¶¶ 28–38.) Prior to his resignation, Coon openly admitted to a co-worker, Mr. Ken Clausen ("Clausen"), that he was starting a competing business in Phoenix and upstate New York, near kW's Troy, New York office (where Clausen works), and had a lease ready to be executed in January of 2024. (*Id.* ¶ 24.) Coon also told Clausen he was "going to be taking anyone in Troy who had not signed a retention agreement," and acknowledged that he needed kW's MEP engineers

5

to deliver on competitive services to the very clients Coon was responsible for servicing at kW. (*Id.* ¶ 25.) By recruiting those experienced mechanical engineers, Coon openly touted he could start a business that could compete directly with WSP. (*Id.* ¶ 26.) He also bragged that a member of the C-suite of another company, Bowman Engineering, already planned to pay him to buy the new business once it was scaled up to $25 million in annual revenue. (*Id.* ¶ 27.) Based on Coon's comments to Clausen, WSP has reason to believe Coon has targeted at least four other key kW MCE employees in early 2024, if he has not already done so. WSP's partners have also informed Clausen that Coon is soliciting competitive work from kW's existing customers. (*Id.* ¶ 43.)

Together, Coon and the employees he has recruited to compete against kW/WSP have the potential to inflict substantial harm to WSP's business. (*Id.* ¶ 42.) The key accounts that Coon was responsible for servicing have the potential to generate the tens of millions of dollars for FY 2024 and beyond. (*Id.* ¶ 40.) Further, Coon has in-depth knowledge of WSP's trade secrets including customer preferences, pricing, desired teams, project specifications, engineering specifications, and kW MCE's existing and past work for those key customers. (*Id.* ¶ 41.)

**IV.   WSP Acts Promptly to Protect Its Rights and Initiates Arbitration**

On October 25, 2023, WSP's counsel sent Coon a letter reminding him of his obligations under the restrictive covenants. (Ex. H.) On December 29, 2023, WSP's counsel sent similar letters to Messrs. Leone and Russinko. (Exs. I & J.) Nonetheless, Coon seems undeterred.

On January 2, 2024, WSP filed a Demand for Arbitration with the American Arbitration Association ("AAA") against Coon pursuant to § 17(a) of the Agreement, asserting claims for breach of fiduciary duty, breach of contract, and tortious interference with contract. (Ex. K.) That arbitration is proceeding, with the Parties' choices of arbitrators due on February 6, 2024. Also on January 2, 2024, Coon and CGE improperly filed this action in state court, seeking an order declaring that the restrictive covenants are unenforceable under a new California statute and enjoining WSP from enforcing the rights it paid for under the Agreement. Notably, Coon does not deny that he is, or immediately plans on, competing against WSP, (*see* Compl. ¶ 4), and chose to file in California solely to take advantage of California's favorable statutes. Indeed, the only connection this action has to California is the ***alleged*** principal place of business of CGE. (*Id.* ¶ 6.)

6

<u>**ARGUMENT**</u>

**I.      The Court Should Dismiss or Stay This Action Pursuant to the Arbitration Provisions in the Employment Agreement.**

       Plaintiffs' claims are subject to mandatory arbitration.  Under the Federal Arbitration Act, "[a]rbitration agreements are 'valid, irrevocable, and enforceable.'"  *Chun Ping Turng v. Guaranteed Rate, Inc.*, 371 F. Supp. 3d 610, 618 (N.D. Cal. 2019) (quoting 9 U.S.C. § 2).  "When considering a party's request [to enforce an arbitration agreement], the court is limited to determining (1) whether a valid arbitration agreement exists, and if so (2) whether the arbitration agreement encompasses the dispute at issue."  *Chun Ping Turng*, 371 F. Supp. 3d at 618.  If "a valid agreement exists to arbitrate the claims at issue . . . [t]he party opposing arbitration then bears the burden of proving by a preponderance of the evidence any defense to enforcing the agreement."  *Genasys Inc. v. Vector Acoustics, LLC*, 2023 4414222, at *6 (S.D. Cal. July 7, 2023) (quotation marks omitted).  If that party fails to meet its burden, the FAA "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall" enforce the agreement, *Oren Enterprises, Inc. v. Stefanie Cove & Co.*, 2017 WL 8220230, at *4 (C.D. Cal. June 2, 2017), by either "stay[ing] or dismiss[ing] the claims subject to arbitration."  *Loughlin v. Ventraq, Inc.*, 2011 WL 1303641, at *2 (S.D. Cal. Apr. 5, 2011); *accord Laver v. Credit Suisse Secs. (USA), LLC*, 2018 WL 3068109, at *4 (N.D. Cal. June 1, 2018) (dismissing action because of valid arbitration clause); 9 U.S.C. § 3 (requiring courts to stay arbitrable issues pending arbitration).

       In Coon's Agreement, he agreed that "[a]ny dispute arising between any of the Company and Senior Leader under this Agreement, or under any statute, regulation, or ordinance, or in connection with the Senior Leader's Employment with the Company, shall be submitted to binding arbitration."  (Ex. B at 11.)  He further agreed that "[t]he arbitrator, and not any federal, state, or local court or adjudicatory authority, shall have exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability, and/or formation of this Agreement, including but not limited to any dispute as to whether a particular claim is subject to arbitration thereunder."  (*Id.* at 11–12 (the "Delegation Clause").)

MOTION TO DISMISS, STAY OR TRANSFER       Case No.: 3:24-cv-00292-CRB

1    Plaintiffs readily concede that the arbitration agreement is enforceable.  Instead, they argue

2    that the non-compete and non-solicitation provisions of the Employment Agreement violate

3    California's public policy embodied in Section 16600.  Courts have repeatedly upheld arbitration

4    clauses that select forums outside California, even though those forums might choose not to apply

5    Section 16600.  *See Build Grp., Inc. v. N.R. Windows, Inc.*, 2022 WL 3697355, at *4 (C.D. Cal.

6    Feb. 17, 2022) (rejecting argument that Section 16600 voided forum-selection clause "because the

7    only relevant consideration is whether the forum [ ] selection clause itself violates California public

8    policy, not the agreement in which it appears" (quotation mark omitted) (alteration in original));

9    *Dexcom, Inc. v. Medtronic, Inc.*, 2021 WL 5908930, at *3 (S.D. Cal. Dec. 14, 2021) ("Nothing in

10   section 16600 prevents setting non-Californian tribunals as designated for a . . . for disputes

11   involving employment agreements containing non-compete clauses." (quotation marks omitted));

12   *Marcotte v. Micros Sys., Inc.*, 2014 WL 4477349, at *8 (N.D. Cal. Sept. 11, 2014) (same).

13   Nor do Plaintiffs argue that their claims are not arbitrable.   To the contrary, Plaintiffs

14   concede that "[t]he Agreement requires the parties to resolve their disputes by binding arbitration

15   with the American Arbitration Association ('AAA') in New York."  (Pls.' Mot. for TRO at 8.)

16   Indeed, their claims are a "dispute arising between any of the Company and Senior Leader under

17   this Agreement, or under any statute, regulation, or ordinance, or in connection with the Senior

18   Leader's Employment with the Company," and/or relating to the "interpretation" and

19   "enforceability" of the Employment Agreement.  What's more, Plaintiffs' claims are ***defenses to***

20   ***the specific claims brought by WSP in the pending arbitration in New York***.

21   Moreover, the issue of arbitrability is itself subject to arbitration.  The Delegation Clause

22   specifically provides that the AAA shall have the ***exclusive*** authority to decide "any dispute as to

23   whether a particular claim is subject to arbitration thereunder."  "Although gateway issues of

24   arbitrability presumptively are reserved for the court, the parties may agree to delegate them to the

25   arbitrator."  *Momot v. Mastro*, 652 F.3d 982, 987 (9th Cir. 2011).  Indeed, the United States Supreme

26   Court has upheld a delegation provision that is identical to the Delegation Provision in Coon's

27   Employment Agreement.  In *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63 (2010), the parties,

28   like Coon here, agreed that "[t]he Arbitrator, and not any federal, state, or local court or agency,

8

1 shall have exclusive authority to resolve any dispute relating to the interpretation, applicability,

2 enforceability or formation of this Agreement including, but not limited to any claim that all or any

3 part of this Agreement is void or voidable." *Rent A Center*, 561 U.S. at 66. The Supreme Court

4 held that because the employee did not "challenge[] the delegation provision specifically, [the

5 Court] must treat it as valid under § 2 [of the FAA], and must [either stay the judicial proceedings

6 or compel arbitration,] leaving any challenge to the validity of the Agreement as a whole for the

7 arbitrator." *Id.* at 72. Accordingly, even if Plaintiffs do dispute the arbitrability of their claims,

8 they must do so in the arbitration proceeding, not here.

9 Rather than argue that the arbitration provisions are invalid or not applicable, Plaintiffs

10 argue only that a different provision of the Agreement allows them to "apply to any court of law or

11 equity of competent jurisdiction for specific performance and/or injunctive or other relief in order

12 to enforce or prevent any violations of the provisions" of the Agreement." (Pls.' Mot. for TRO at

13 8.) Plaintiffs are incorrect. That provision applies *only* "in the event of a breach or a threatened

14 breach of any of the provisions of this Agreement" and *only* "to enforce or prevent any violations

15 of the provisions thereof." (Ex. B at 11.) Yet, Plaintiffs do not allege any "breach" or "threatened

16 breach" of the Agreement and Plaintiffs are not trying to "enforce" that Agreement. To the contrary,

17 Plaintiffs argue that the Agreement is void. Accordingly, this narrow exception to the arbitration

18 provisions do not apply.

19 Because the arbitration provisions are enforceable and apply to Plaintiffs' claims, the Court

20 should dismiss this case. At a minimum, however, the Court must stay this action during the

21 pendency of the arbitration. *See* 9 U.S.C. § 3.

22 **II.    This Court Lacks Personal Jurisdiction over WSP.**

23 Plaintiffs' improper attempt to avoid litigating in the contractually-mandated forum are

24 compounded by the fact that they filed this action in a Court that does not have jurisdiction. "Where

25 a defendant moves to dismiss a complaint for lack of personal jurisdiction, the plaintiff bears the

26 burden of demonstrating that jurisdiction is appropriate." *Schwarzenegger v. Fred Martin Motor

27 Co.*, 374 F.3d 797, 800 (9th Cir. 2004). "The Court may consider evidence presented in affidavits

28 and declarations in determining personal jurisdiction." *Apple Inc. v. Allan & Assocs. Ltd.*, 445 F.

9

Supp. 3d 42, 50 (N.D. Cal. 2020). Although "uncontroverted allegations in the complaint must be taken as true . . . [t]he Court may not assume the truth of allegations [in the Complaint] that are contradicted by affidavit." *Id.* "If both sides submit affidavits, [however,] then [c]onflicts between the parties over statements contained in affidavits must be resolved in the plaintiff's favor." *LNS Enterprises LLC v. Continental Motors, Inc.*, 22 F.4th 852, 858 (9th Cir. 2022) (alteration in original) (quotation mark omitted).

Plaintiffs allege that personal jurisdiction is proper in California because WSP supposedly has "significant business contacts throughout California." (Compl. ¶ 14.) Even setting aside that Plaintiffs offer no factual support for this assertion, "[a] corporation's continuous activity of some sorts within a state . . . is not enough to support the demand that the corporation be amenable to suits unrelated to that activity." *Bristrol-Myers Squibb Co. v. Super. Ct. of Cal.*, 582 U.S. 255, 264 (2017). Rather, to subject WSP to jurisdiction in California, Plaintiffs must meet the demanding standards for either general or specific jurisdiction.

To establish either type of jurisdiction, "the defendant [must have] certain minimum contacts with [the State] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Daimler AG v. Bauman*, 571 U.S. 117, 126 (2014). General jurisdiction exists only if WSP's "affiliations with the State are so 'continuous and systematic' as to render [it] essentially at home in the forum State." *Id.* at 128. "[O]nly a limited set of affiliations with a forum"—generally, the defendant's state of incorporation and the state containing its principal place of business—"will render a defendant amenable to general jurisdiction in that State. *Bristol-Myers Squibb Co.*, 582 U.S. at 262. By contrast, "[f]or a state court to exercise specific jurisdiction, 'the suit' must 'aris[e] out of or relat[e] to the defendant's contacts with the forum.'" *Id.* (all but first alteration in original).

WSP is not "essentially at home" in California. WSP USA, Inc. and WSP USA Buildings Inc. are New York corporations with their principal places of business in New York City, and kW does not exist as a separate entity anymore. (Clausen Decl. ¶ 8.) Accordingly, Defendants are not subject to general jurisdiction in California.

MOTION TO DISMISS, STAY OR TRANSFER          Case No.: 3:24-cv-00292-CRB

Nor is WSP subject to specific jurisdiction in California. Plaintiffs do not describe any of the "business" WSP allegedly does in California, let alone explain how Plaintiffs' claims arise out of that in-state conduct. (Clausen Decl. ¶¶ 44–54.) Indeed, the only connection between this case and California is that CGE was organized under California law *after* Coon's employment with WSP ended. Yet, "the plaintiff's residence [in the forum] alone is not enough to establish" personal jurisdiction. *Continental Appliances, Inc. v. Thomas*, 2012 WL 3646887, at *5 (N.D. Cal. Aug. 23, 2012). Coon resided in Arizona during and after his employment with WSP. His Agreement was not negotiated or signed in California. WSP sent cease-and-desist letters to Coon in Arizona, not to CGE in California. And the arbitration and injunction proceedings are both in New York. Accordingly, Plaintiffs' claims do not arise out of WSP's forum contacts. *See Inmar Rx Solutions, Inc. v. Devos, Ltd.*, 786 F. App'x 445 (5th Cir. 2019) (dismissing employee's challenge to noncompete for lack of personal jurisdiction in Texas even though employee's new business was incorporated there and the defendants sent cease-and-desist letters to the new employer there).

Because this Court lacks both general and specific jurisdiction over WSP, it must dismiss this Action.

## III. Venue Is Improper in this District.

For essentially the same reasons that the Court lacks personal jurisdiction, none of the requirements for venue in this District are met. WSP does not reside in this District, "a substantial part of the events or omissions giving rise to the claim" did not occur in this District, and this District is not a district "in which any defendant is subject to the court's personal jurisdiction with respect to [this] action." 28 U.S.C. § 1391(b). Accordingly, this action must be dismissed or, in the alternative, transferred to a proper venue. *See* Part VI, *infra*.

## IV. Plaintiffs Fail to State a Claim for Relief.

On a Rule 12(b)(6) motion, a court must dismiss the complaint unless the plaintiff pleads "enough facts to state a claim to relief that is plausible on its face." *Huynh v. Walmart, Inc.*, 2022 WL 3109562, at *7 (N.D. Cal. Aug. 4, 2022). To do so, the plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "[T]he Court need not accept as true allegations contradicted by judicially noticeable

11

facts" or "assume the truth of legal conclusions merely because they are cast in the form of factual allegations." *Id.*

Even if this Court could hear Plaintiffs' claim (it cannot), Plaintiffs fail to state a claim for relief because (1) Plaintiffs lack standing to bring several of their claims; (2) Plaintiffs' claim would require the Court impermissibly to apply California law extraterritorially; (3) their claim ignores the choice-of-law provision in the Employment Agreement; and (4) the restrictive covenants do not violate California law.

## A.    CGE Lacks Standing to Pursue Its § 16600 Claim.

CGE lacks standing to bring a claim under § 16600. "The prerequisites for standing to assert statutorily-based causes of action are determined from the statutory language, as well as the underlying legislative intent and the purpose of the statute." *Boorstein v. CBS Interactive, Inc.*, 222 Cal. App. 4th 456, 466 (Cal. Ct. App. 2013). Here, the statute provides that "[a]n employee, former employee, or prospective employee may bring a private action to enforce this chapter." CAL. BUS. & PROF. CODE § 16600.5. CGE is a prospective ***employer***, not an employee, former employee, or prospective employee, and thus lacks standing. *See Golden State Orthopaedics, Inc. v. Howmedica Osteonics Corp.*, 2016 WL 4698931, at *3 (N.D. Cal. Sept. 8, 2016) (holding that former employee's new employer lacked standing under § 16600). Accordingly, CGE's claim must be dismissed.

## B.    The Restrictive Covenants Are Enforceable Under New York Law, Which Governs Plaintiffs' Claim.

Plaintiffs acknowledge that the Agreement provides that it "shall be governed by and construed in accordance with the law of the State of New York, without regard to principles of conflicts of law." (Ex. B at 11.) "[A] choice-of-law clause in a contract will apply to disputes about the existence or validity of that contract." *Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 50 (2d Cir. 2004). Under New York law, the restrictive covenants in Coon's Agreement are enforceable absent certain circumstances that Plaintiffs do not (and could not) allege in their Complaint. *See Bollengier v. Gulati*, 233 A.D.2d 721, 722 (N.Y. App. Div. 1996).

| MOTION TO DISMISS, STAY OR TRANSFER | Case No.: 3:24-cv-00292-CRB |

Nonetheless, Plaintiffs assert that California law, specifically Section 16600, applies to their claims and invalidates the noncompete and non-solicitation provisions of Coon's Employment Agreement. They are incorrect. Courts will enforce a non-California choice-of-law provision that has some connection to the contract at issue unless (1) doing so will impair California's fundamental public policy and (2) California has a materially greater interest in the dispute. *Ridenhour v. UMG Recordings, Inc.*, 2012 WL 463960, at *2 (N.D. Cal. Feb. 13, 2012). Here, New York's connection with the contract and this dispute is much stronger than California's. Coon worked for kW, which is based in New York. (Clausen Decl. ¶¶ 8–9.) Coon frequently worked with staff located in New York. (*Id.* ¶ 49.) Coon sent his resignation letter to Mr. Clausen in New York. (N.Y. Comp. Ex. D.) Additionally, the arbitration and injunction action to enforce the Agreement are pending in New York, and the Parties agreed in Agreement that any arbitration award can be enforced only in a New York court.

Moreover, if every former employee of a New York company can evade their contractual obligations by simply filing the forms to establish an LLC in California, New York's interests in protecting New York businesses generally, and in enforcing their contracts specifically, will be severely impaired. Indeed, New York's Governor Kathy Hochul recently vetoed a bill that, similar to Section 16600, "would broadly prohibit all non-compete agreements in New York," explaining that New York businesses "have legitimate interests [in non-competition agreements] that cannot be met with the Legislation's one-size-fits-all approach."[1]

By contrast, California has almost no connection to this case, and its "interest in protecting the freedom of movement of persons whom California-based employers . . . wish to employ to provide services in California," *Application Grp., Inc. v. Hunter Grp., Inc.*, 61 Cal. App. 4th 881, 901 (Cal. Ct. App. 1998), will not be materially impaired by applying New York law. CGE is not a "California-based employer" except for only in loosest possible sense. Plaintiffs have not shown that CGE has any operations or employees in California. Nor have they shown that Coon himself will "provide services" here. In short, the ***only*** event underlying this action that occurred in

---

[1]     N.Y. Veto No. 113 (2023), http://public.leginfo.state.ny.us/navigate.cgi?NVDTO:.

MOTION TO DISMISS, STAY OR TRANSFER          Case No.: 3:24-cv-00292-CRB

California appears to be that Coon filed CGE's Articles of Organization in California. Moreover, at least part of Coon's conduct which WSP alleges violates his restrictive covenants happened before CGE even existed.[2] Accordingly, New York law applies to Plaintiffs' claim. *See Medcor, Inc. v. Garcia*, 2022 WL 124163, at *5 (N.D. Ill. Jan. 13, 2022) (upholding Illinois choice-of-law provision and refusing to apply Section 16600 to a noncompete agreement under the same conflict-of-laws test used in California); *see also Willis Re Inc. v. Herriott*, 550 F. Supp. 3d 68, 98 (S.D.N.Y. 2021) (holding that Section 16600 had no application in New York's conflict-of-laws analysis).

Because New York law applies and permits enforcement of the restrictive covenants, Plaintiffs are not entitled to the relief they seek and their claim must be dismissed.

## C. Plaintiffs' Claims Impermissibly Apply California Law Extraterritorially.

The extraterritorial application of Sections 16600 and 17200 of the Business & Professions Code violates the Dormant Commerce Clause. The Dormant Commerce Clause "precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State." *Sam Francis Found. v. Christies, Inc.*, 784 F.3d 1320, 1323 (9th Cir. 2015). Where a "state statute facially regulates a commercial transaction that takes place wholly outside of the State's borders . . . it violates the dormant Commerce Clause." *Id.* (quotation marks and citation omitted).

Section 16600, as amended effective January 1, 2024, facially violates the Dormant Commerce Clause because it regulates extraterritorial commercial transactions, specifically providing that it applies "regardless of whether the contract was signed and the employment was maintained outside of California." Cal. Lab. Code 16600.5(b). And in this case, Plaintiffs are impermissibly attempting to apply Section 16600 to an employment relationship outside California.

---

[2] Additionally, California law specifically provides the circumstances under which California policy requires an out-of-state choice-of-law provision in an employment agreement to be invalidated. Specifically, California's Labor Code provides that "[a]n employer shall not require an employee who primarily resides and works in California, as a condition of employment, to agree to a provision that would . . . [d]eprive the employee of the substantive protection of California law with respect to a controversy arising in California." CAL. LABOR CODE § 925(a)(2). Coon is not entitled to this protection because he is not a California resident and does not work here, and the controversy did not arise here.

Again, the Employment Agreement was not negotiated or signed in California, and neither Coon, WSP, nor kW reside here. (Clausen Decl. ¶¶ 8–9, 11, 46, 53.) Accordingly, Section 16600, facially and as applied to this case, violates the Dormant Commerce Clause and cannot be enforced. Plaintiffs' Section 17200 claim is based on the alleged Section 16600 issue and attempts to regulate the same conduct, and is thus subject to the same fate.

Moreover, the California Court of Appeals has held that an earlier, *less restrictive* version of Section 16600 violated the Dormant Commerce Clause. *Herbert v. Los Angeles Raiders, Ltd.*, 23 Cal. App. 4th 414, 423 (Cal. Ct. App. 1991). In *Herbert*, a football player argued that a provision of the NFL's contract with the NFL Players Association, restricting the terms on which "free agents" (players whose contract with their current team has expired) could switch to a new team, violated Section 16600 and the California Constitution. The court explained that "[w]here the nature of an enterprise is such that differing state regulation, although not conflicting, requires the enterprise to comply with the strictest standard of several states in order to continue an interstate business extending over many states, the extra-territorial effect which the application of a particular state law would exact constitutes, absent a strong state interest, an impermissible burden on interstate commerce." *Id.* at 422 (quoting *Flood v. Kuhn*, 443 F.2d 264 (2d Cir. 1971)). The court held that the player's alleged "right to work as a professional football player . . . may not be enforced because of its impermissible burden on interstate commerce." *Herbert*, 23 Cal. App. 4th at 424.

As in *Herbert*, protecting Coon's alleged "right to work"—*i.e.*, his purported right to start a California shell company for the sole purposing of hiring himself and stealing WSP's clients and employees using inside information—would effectively require WSP "to comply with the strictest standard of several states." Specifically, it would require WSP to account for California's near-complete ban on noncompete and non-solicitation agreements—in all its employment relationships, regardless of where the employee, clients, or co-employees at issue are located. It would also substantially burden states like New York that want to protect employers' legitimate interests.

Because Plaintiffs' Section 16600 and 17200 claims would require an extraterritorial application of those sections that would violate the Dormant Commerce Clause, they must be dismissed. Additionally, courts routinely hold that Section 17200 does not apply extraterritorially

<div align="center">15</div>

to claims by non-residents based on out-of-state conduct.  *See Norwest Mortg., Inc. v. Super. Ct.*, 72 Cal. App. 4th 214, 223 (Cal. Ct. App. 1999).  Accordingly, at a minimum, Coon's Section 17200 claim must be dismissed.

### D.   The Restrictive Covenants Do Not Violate Sections 16600.

The restrictive covenants in Coon's Employment Agreement do not violate Section 16600. The statute has an explicit carve out allowing enforcement of restrictive covenants agreed to in connection with the sale of a business.  CAL. BUS. & PROFS. CODE § 16601.  Coon's restrictive covenants were signed in connection with the sale of his interest in kW and are essential to protecting the goodwill associated with WSP's purchase.  (Clausen Decl. ¶ 11.)  The data-center-design business is employee and team focused, such that part of the goodwill associated with kW was tied to its teams.  *See VCA Animal Hosps., Inc. v. Hampel*, 2023 WL 8857757, at *9 (Cal. Ct. App. Dec. 22, 2023) ("Where, as here, the goodwill of a business is built largely on relationships and reputation, it follows that the goodwill built by such an individual does not terminate upon the sale of the business when she continues to work there."); *Alliant Ins. Servs., Inc. et al. v. Gaddy,* 159 Cal. App. 4th 1292,  (2008) (upholding non-compete agreement).  Accordingly, the covenants are enforceable.

Plaintiffs' reliance on *Fillpoint, LLC v. Maas*, 208 Cal. App. 4th 1170 (Cal. App. Ct. 2012), is misplaced.  In that case, the plaintiff entered into an employment contract and a purchase agreement in connection with the sale of plaintiff's stock in a business acquired by the defendant, with each agreement containing a separate noncompete clause.  The court held that various differences between the two noncompete provisions indicated that the noncompete in the purchase agreement was meant to protect the goodwill that the defendant purchased in the transaction, but the noncompete in the employment agreement was not.  "[T]he two covenants not to compete were intended 'to deal with the different damage Maas might do wearing the separate hats of major shareholder and key employee.'"  *Fillpoint, LLC*, 208 Cal. App. 4th at 1183.

Plaintiffs assert that the purchase agreement is akin to Coon's RBA, and the differences between the covenants in the RBA and Employment Agreement demonstrate that Coon's Agreement was not intended to protect kW's goodwill.  Not so.  First, Coon did not wear "separate

16

hats" after WSP acquired kW:  He was a senior executive employee and team member, from which part of the purchased goodwill derived.  Thus, differences between the covenants in each agreement do not indicate anything.  Second, unlike the two agreements in *Fillpoint*, the covenants in Coon's Employment Agreement are not "much broader" than those in the RBA.  *Id.* at 1182.  To the contrary, many of the covenants are virtually identical.  *See Arthur J. Gallagher & Co. v. Petree*, 2022 WL 1241232, at *3 (E.D. Cal. Apr. 27, 2022) (holding that *Fillpoint* did not apply where, *inter alia*, "the noncompete provisions in [two agreements] are identical").  Third, unlike the purchase agreement in *Fillpoint*, which lasted for "thirty-six months after the Closing Date," the duration of the covenants in the RBA are not tied solely to the closing date:  They expired on the earlier of three years after closing *or* twelve months after Coon is terminated.  The California Court of Appeals has held that agreements with two alternative end dates can be included in covenants made in connection with the sale of a business.  *See VCA Animal Hosps., Inc.*, 2023 WL 8857757, at *9.  In short, the existence of the RBA does not suggest that the covenants in the Employment Agreement were not also intended to protect the goodwill WSP acquired when it purchased kW MCE.

Finally, Section 16600 does not apply to every type of restrictive covenant.  Specifically, Section 16600 does not apply to the provisions in Coon's Agreement prohibiting him from using or disclosing WSP's confidential information and trade secrets.  CAL. BUS. & PROFS. CODE § 16600.  Nor does Section 16600 apply to the provision prohibiting Coon from solicitating WSP's employees.  *See Arthur J. Gallagher & Co. v. Lang*, 2014 WL 2195062, at *4 (N.D. Cal. May 23, 2014).  Accordingly, even if Section 16600 applies to parts of Coon's Agreement (it does not), WSP would still be entitled to enforce several of the restrictive covenants in the New York arbitration.  Significantly, WSP has in fact alleged that Coon solicited kW employees, four of whom have already resigned from the Troy, New York office.  (Clausen Decl. ¶¶ 28–38.)  WSP also has reason to believe that Coon is using its confidential information and trade secrets to solicit WSP's clients and build his business, and WSP is entitled to seek discovery on that issue in the arbitration.

Because Section 16600 does not apply to the restrictive covenants in the Agreement, Plaintiffs have failed to state a claim.

MOTION TO DISMISS, STAY OR TRANSFER           Case No.: 3:24-cv-00292-CRB

**E.     Plaintiffs Fail to State a § 17200 Claim.**

Plaintiffs also fail to state a claim for unfair competition under Section 17200.  "A private action for violation of California Business & Professions Code § 17200 may only be brought 'by a person who has suffered injury in fact and has lost money or property as a result of the unfair competition.'"  *Howard v. Octagon, Inc.*, 2013 WL 5122191, at *7 (N.D. Cal. Sept. 13, 2013).  Neither Coon nor CGE has alleged that they have lost any property as a result of the WSP's alleged conduct.  Instead, they allege only that WSP has or will sue Coon to stop him from violating his restrictive covenants.  (Compl. ¶ 44.)  Because they have not alleged any lost of "money or property," they lack statutory standing and their claims must be dismissed.

**V.     The Court Should Transfer This Action to the Southern District of New York.**

Alternatively, the Court should transfer this case to the Southern District of New York, which has the power to order Coon to arbitrate his claims directly.  *See* 9 U.S.C. § 4.  "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented."  28 U.S.C. § 1404(a).

This action could have been brought in the Southern District of New York.  WSP is undoubtedly subject to personal jurisdiction in New York because it is incorporated and has its principal place of business there.  For the same reason, venue is proper in the Southern District of New York.  *See* 28 U.S.C 1391(b)(1).

Transfer is also convenient for the parties and witnesses and in the interest of justice.  "Courts in this District have regularly considered the following factors when deciding whether to transfer a case under § 1404(a): '(1) plaintiff's choice of forum, (2) convenience of the parties, (3) convenience of the witnesses, (4) ease of access to the evidence, (5) familiarity of each forum with the applicable law, (6) feasibility of consolidation with other claims, (7) any local interest in the controversy, and (8) the relative court congestion and time of trial in each forum.'"  *Cabrera v. Ford Motor Co.*, 2023 WL 6307946, at *2 (N.D. Cal. Sept. 26, 2023) (quoting *Doe v. Epic Games, Inc.*, 435 F. Supp. 3d 1024, 1040 (N.D. Cal. 2020)).  Because the Parties have a forum-selection clause that requires arbitration in New York, however, the analysis changes:  (1) Plaintiffs' "choice

18

of forum merits no weight" and Plaintiffs "bear[] the burden of establishing that transfer . . . is unwarranted"; and (2) the Court "should not consider arguments about the parties' private interests." *Bernal v. Kohl's Corp.*, 2023 WL 80088977, at *2 (C.D. Cal. Nov. 17, 2023). Thus, the Court "should transfer the case unless extraordinary circumstances unrelated to the convenience of the parties clearly disfavor a transfer." *Atl. Marine Const. Co. v. U. S. Dist. Ct. for W. Dist. of Texas*, 571 U.S. 49, 52 (2013).

Each of the factors favors transfer to New York. First, most of the witnesses and evidence is in New York. WSP and many of its representatives who will have to testify, such as Mr. Ken Clausen, reside in New York. All four employees who have resigned since Coon's departure reside in New York. (Clausen Decl. ¶ 54.) And, to the extent necessary, all the evidence regarding the Employment Agreement and purchase of kW will likely be in New York. By contrast, none of Plaintiffs' claims arose in California. No physical person involved in this case is located in California. And although CGE resides here, it likely has little to no evidence in connection with this case that it actually stores in California, and Coon, an Arizona resident, is likely the only CGE representative who will be involved in this case.

Second, there is already a pending arbitration in New York. If this litigation proceeds in California while the New York arbitration continues, witnesses will have to appear in both states. Additionally, because the arbitration is pending in New York, New York courts are capable of directly compelling Plaintiffs to arbitrate their claims, rather than merely staying the action until they decide to do so, as this Court must do. *See* 9 U.S.C. §§ 3 & 4.

Third, New York courts are more familiar with New York law which, as explained above, governs Plaintiffs' claims pursuant to the choice-of-law clause in the Employment Agreement.

Fourth, as also explained above, California has virtually no interest in this litigation, while New York has a strong interest in protecting New York businesses and enforcing their contracts.

Finally, the Southern District of New York is less congested than this Court. This Court had 568 weighted filings and 1,001 pending cases per judge in the last reported twelve-month

MOTION TO DISMISS, STAY OR TRANSFER                    Case No.: 3:24-cv-00292-CRB

period, September 2022 to September 2023.[3]  By contrast the Southern District of New York had 534 weighted filings and 631 pending cases per judge in that period.

Because the Parties' have a valid forum selection clause and each of the § 1404 factors favors transfer, if this Court does not dismiss or stay this action, the Court should transfer it to the Southern District of New York.

## **CONCLUSION**

For the forgoing reasons, this Court should dismiss this case.  Alternatively, the Court should stay the case pending resolution of the ongoing arbitration in New York.


Dated: February 2, 2024                    HOLLAND & KNIGHT LLP


                                           By:   /s/ *Samuel J. Stone*

                                           Attorney for Defendants

                                           WSP USA, INC., WSP USA BUILDINGS INC., and
                                           kW MISSION CRITICAL ENGINEERING, D.P.C.

---

[3] U.S. Dist. Cts.—Nat'l Jud. Caseload Profile (Sept. 2023),
https://www.uscourts.gov/file/76945/download

MOTION TO DISMISS, STAY OR TRANSFER                    Case No.: 3:24-cv-00292-CRB

**CERTIFICATE OF SERVICE**

I, Sam Stone, hereby certify that on February 2, 2024, I caused the foregoing Motion to Dismiss to be served on all Parties in this action by filing it on this Court's CM/ECF system.

<div align="center">

*/s/ Sam Stone*
Sam Stone

</div>

Holland & Knight LLP
400 South Hope Street, 8th Floor
Los Angeles, California 90071
Tel.: 213.896.2400 Fax: 213.896.2450

HOLLAND & KNIGHT LLP
Samuel J. Stone (SBN 317013)
400 S. Hope Street, 8th Floor
Los Angeles, CA 90071
Telephone: (213) 896-2400
Facsimile:  (213) 895-2450
Email:  sam.stone@hklaw.com

HOLLAND & KNIGHT LLP
Nipun J. Patel (*pro hac vice*)
Justin M. Kadoura (*pro hac vice*)
1650 Market Street, Suite 3300
Philadelphia, Pennsylvania 19103
Phone: 215.252.9527
Fax: 215.867.6070
Email: nipun.patel@hklaw.com
　　　justin.kadoura@hklaw.com

Attorneys for Defendants
Defendant WSP USA, INC., WSP USA BUILDINGS INC.,
and kW MISSION CRITICAL ENGINEERING, D.P.C.,

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CG ENTERPRISES HOLDINGS, LLC, a California limited liability company; and STEPHEN M. COON, an individual )<br><br>Plaintiffs, )<br><br>vs. )<br><br>WSP USA, INC., a New York corporation; WSP USA BUILDINGS, INC., a New York corporation; kW MISSION CRITICAL ENGINEERING, D.P.C., a New York design professional corporation; and DOES 1 through 20, inclusive, Defendants. ) | Case No.:  3:24-CV-00292<br><br>Hon. Charles R. Breyer<br><br>**DECLARATION OF KENNETH CLAUSEN** |

I, Kenneth Clausen, hereby declare and state as follows:

1. I am the Troy, NY office managing principal and director of operations for kW Mission Critical Engineering ("kW MCE"), a national business line of Defendant WSP USA Buildings, Inc. ("WSP Buildings").

2. Defendant WSP USA, Inc. ("WSP USA"), is an indirect subsidiary of WSP Buildings.

3. I am an adult over the age of eighteen.

4. I have personal knowledge of the facts set forth in this Declaration or learned of those facts from others with personal knowledge, and am authorized by the Defendants to make this Declaration in support of Defendants' Motion to Dismiss, Transfer, or Stay Plaintiffs' Complaint.

5. In December 2020, WSP Buildings acquired by merger kW MCE, a small (then approximately 175 employee) engineering firm that focused primarily on designing data centers and other mission-critical projects.

6. kW Mission Critical Engineering, D.P.C. no longer exists as a standalone corporate entity.

7. The acquisition of kW MCE closed on December 30, 2020.

8. WSP Buildings and WSP USA are New York corporations with a New York principal place of business.

9. The operations of kW MCE, and now the kW MCE business division of WSP, have been based in Troy, New York, since long before the acquisition. As part of his job duties post-merger, Coon routinely and frequently communicated with employees in the Troy, New York office of the kw MCE division of WSP Buildings, including myself. As a result of those communications and my direct oversight of operations for the kW MCE division, I have personal knowledge of Coon's performance, work, job duties, and business activities both pre- and post-merger.

10. Stephen Coon worked for kW MCE for approximately seven years before the acquisition.

DECLARATION OF KENNETH CLAUSEN                    Case No.: 3:24-CV-00292

11.     On December 30, 2020, as part of the merger, Coon was hired by WSP Buildings as a Professional Electrical Engineer and Managing Principal of the Phoenix Office.

12.     As part of the acquisition, kW MCE's senior leadership team and key employees, including Coon, signed employment agreements and retention agreements containing restrictive covenants.

13.     Attached hereto as Exhibit B is a true and correct copy of Coon's Employment Agreement.

14.     Attached hereto as Exhibit C is a true and correct copy of Coon's Retention Bonus Agreement.

15.     Coon was responsible for providing technical engineering expertise and developing successful relationships with design team partners—architects, engineers, and contractors.

16.     Coon gained substantial experience and insight into kW MCE's data center business, and had key responsibilities for leadership of key client accounts and projects associated with data center program design and build out.

17.     Coon also gained knowledge about all aspects of kW MCE's customers' programs, including schedule, budget, risk and desired engineering team.

18.     The customer relationships, goodwill, trade secrets, client accounts and ongoing projects were part of the business kW MCE sold to WSP.

19.     On November 2, 2022, Coon tendered notice that he would not renew the Employment Agreement and wanted to continue his employment with WSP as an at-will employee.

20.     Attached hereto as Exhibit D is a true and correct copy of Coon's November 2, 2022 notice.

21.     On October 18, 2023, Coon tendered his resignation letter.

22.     Attached hereto as Exhibit E is a true and correct copy of Coon's resignation letter.

23.     Coon's last day of employment with WSP was November 3, 2023.

2

DECLARATION OF KENNETH CLAUSEN                    Case No.: 3:24-CV-00292

1      24.    Prior to his resignation, Coon openly admitted to me that he was starting a

2  competing business in Phoenix and upstate New York, near kW MCE's Troy, New York office,

3  and had a lease ready to be executed in January of 2024.

4      25.    Coon also told me that he was "going to be taking anyone in Troy who had not

5  signed a retention agreement," and acknowledged that he needed kW MCE's mechanical

6  engineers to deliver on competitive services to the very clients Coon was responsible for

7  servicing at kW MCE.

8      26.    Coon told me that by recruiting those experienced mechanical engineers, he could

9  start a business that could compete directly with WSP.

10      27.    Coon also bragged to me that a member of the C-suite of another company,

11  Bowman Engineering, already planned to acquire his business once it reached $25 million

12  dollars in annual revenue.

13      28.    Coon has solicited several former kW MCE/WSP employees, including at least

14  Jason Leone, Gary Russinko, Andrew Stercho, and Jonathan Sterling.

15      29.    Leone was a Principal Mechanical Engineer and is subject to restrictive covenants

16  contained in his own Retention Bonus Agreement.

17      30.    Attached hereto as Exhibit F is a true and correct copy of Leone's Retention

18  Bonus Agreement.

19      31.    Leone resigned from WSP on December 5, 2023. His last day was December 22,

20  2023, and he has refused to disclose his new employer.

21      32.    Russinko was the Managing Principal of WSP's Troy Office and is subject to

22  restrictive covenants contained in his own Retention Bonus Agreement.

23      33.    Attached hereto as Exhibit G is a true and correct copy of Russinko's Retention

24  Bonus Agreement.

25      34.    Russinko resigned from WSP on October 30, 2023. His last day was December 1,

26  2023, and he too has refused to disclose his new employer.

27      35.    Stercho was a Principal Fire Protection Engineer for WSP.

28

3

36.     Stercho resigned from WSP on January 2, 2024, and he too has refused to disclose his new employer.

37.     Sterling was a Plumbing Designer for WSP.

38.     Sterling resigned from WSP on January 2, 2024, and he too has refused to disclose his new employer.

39.     The data-center design business is extremely competitive, with each company's ability to compete largely dependent on, inter alia, (1) its ability to understand and accommodate a client's needs, and (2) the quality and reputation of its specific engineers.

40.     The key accounts that Coon was responsible for servicing have the potential to generate the tens of millions of dollars for FY 2024 and beyond.

41.     Coon has in-depth knowledge of customer preferences, pricing, desired team, project specifications, engineering specifications, and kW MCE's existing and past work for those key customers.

42.     Competition from former kW MCE/WSP employees—and especially high-level employees like Coon—would be devastating for WSP.  Based on Coon's prior comments to me, he is likely to target other key kW MCE employees in early 2024, if he has not already done so.

43.     I have also received information from design partners suggesting that Coon is soliciting competitive work from kW MCE's existing customers.

44.     The kW MCE business division has virtually no connection to the state of California:  it has no facilities, office centers, or training centers in California.

45.     None of WSP's employees in the kw MCE division are based in California.

46.     At the time he was hired by WSP Buildings until at least the date of his termination, Coon resided in Arizona.

47.     Coon's primary client accounts were located outside of California.

48.     Payroll transactions for Coon's salary and bonuses were processed from kW Mission Critical Engineering (from January 2021 to April 2021) and WSP US Building Inc. (from April 2020 to October 2023).

4

DECLARATION OF KENNETH CLAUSEN                    Case No.:  3:24-CV-00292

49. Coon communicated by telephone and email with WSP employees located in either Troy, New York or Atlanta, Georgia, including individuals who support WSP's IT, HR, benefits, marketing, and sales functions across the country.

50. Coon would have contacted New York or Georgia-based WSP employees to resolve payroll, benefits, or other problems throughout the course of his employment.

51. Coon's medical coverage, medical benefits, and retirement plans during his employment with WSP Buildings were administered from New York.

52. Coon's timekeeping, customer billing and email were managed in or from New York.

53. Coon's Employment Agreement and Retention Bonus Agreement were negotiated between individuals located in Troy, New York, and executed by WSP in New York, New York.

54. Russinko, Leone, Stercho, and Sterling were based out of the same Troy, New York office where I am also based.

I hereby declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Dated: February 1, 2024 
_____
Kenneth Clausen

DECLARATION OF KENNETH CLAUSEN                    Case No.: 3:24-CV-00292

# EXHIBIT A

1  HOLLAND & KNIGHT LLP
   Samuel J. Stone (SBN 317013)
2  400 S. Hope Street, 8th Floor
   Los Angeles, CA 90071
3  Telephone: (213) 896-2400
   Facsimile:  (213) 895-2450
4  Email:  sam.stone@hklaw.com

5  HOLLAND & KNIGHT LLP
   Nipun J. Patel (*pro hac vice*)
6  Justin M. Kadoura (*pro hac vice*)
   1650 Market Street, Suite 3300
7  Philadelphia, Pennsylvania 19103
   Phone: 215.252.9527
8  Fax: 215.867.6070
   Email: nipun.patel@hklaw.com
9        justin.kadoura@hklaw.com

10 Attorneys for Defendants
   Defendant WSP USA, INC., WSP USA BUILDINGS INC.,
11 and kW MISSION CRITICAL ENGINEERING, D.P.C.,

12

13                UNITED STATES DISTRICT COURT

14               NORTHERN DISTRICT OF CALIFORNIA

15

16 CG ENTERPRISES HOLDINGS, LLC, a        )  Case No.:  3:24-CV-00292
   California limited liability company; and )
17 STEPHEN M. COON, an individual          )
                                           )  Hon. Charles R. Breyer
18              Plaintiffs,                  )
                                           )  **DECLARATION OF KENNETH**
19         vs.                              )  **CLAUSEN**
                                           )
20 WSP USA, INC., a New York corporation;  )
21 WSP USA BUILDINGS, INC., a New          )
   York corporation; kW MISSION           )
22 CRITICAL ENGINEERING, D.P.C., a         )
   New York design professional corporation; )
23 and DOES 1 through 20, inclusive,        )
   Defendants.                             )
24                                          )
                                           )
25 _____ )

26

27

28

DECLARATION OF KENNETH CLAUSEN                    Case No.:  3:24-CV-00292

1       I, Kenneth Clausen, hereby declare and state as follows:

2       1.     I am the Troy, NY office managing principal and director of operations for kW

3 Mission Critical Engineering ("kW MCE"), a national business line of Defendant WSP USA

4 Buildings, Inc. ("WSP Buildings").

5       2.     Defendant WSP USA, Inc. ("WSP USA"), is an indirect subsidiary of WSP

6 Buildings.

7       3.     I am an adult over the age of eighteen.

8       4.     I have personal knowledge of the facts set forth in this Declaration or learned of

9 those facts from others with personal knowledge, and am authorized by the Defendants to make

10 this Declaration in support of Defendants' Motion to Dismiss, Transfer, or Stay Plaintiffs'

11 Complaint.

12       5.     In December 2020, WSP Buildings acquired by merger kW MCE, a small (then

13 approximately 175 employee) engineering firm that focused primarily on designing data centers

14 and other mission-critical projects.

15       6.     kW Mission Critical Engineering, D.P.C. no longer exists as a standalone

16 corporate entity.

17       7.     The acquisition of kW MCE closed on December 30, 2020.

18       8.     WSP Buildings and WSP USA are New York corporations with a New York

19 principal place of business.

20       9.     The operations of kW MCE, and now the kW MCE business division of WSP,

21 have been based in Troy, New York, since long before the acquisition.  As part of his job duties

22 post-merger, Coon routinely and frequently communicated with employees in the Troy, New

23 York office of the kw MCE division of WSP Buildings, including myself.  As a result of those

24 communications and my direct oversight of operations for the kW MCE division, I have personal

25 knowledge of Coon's performance, work, job duties, and business activities both pre- and post-

26 merger.

27       10.    Stephen Coon worked for kW MCE for approximately seven years before the

28 acquisition.

DECLARATION OF KENNETH CLAUSEN         Case No.:  3:24-CV-00292

11.     On December 30, 2020, as part of the merger, Coon was hired by WSP Buildings as a Professional Electrical Engineer and Managing Principal of the Phoenix Office.

12.     As part of the acquisition, kW MCE's senior leadership team and key employees, including Coon, signed employment agreements and retention agreements containing restrictive covenants.

13.     Attached hereto as Exhibit B is a true and correct copy of Coon's Employment Agreement.

14.     Attached hereto as Exhibit C is a true and correct copy of Coon's Retention Bonus Agreement.

15.     Coon was responsible for providing technical engineering expertise and developing successful relationships with design team partners—architects, engineers, and contractors.

16.     Coon gained substantial experience and insight into kW MCE's data center business, and had key responsibilities for leadership of key client accounts and projects associated with data center program design and build out.

17.     Coon also gained knowledge about all aspects of kW MCE's customers' programs, including schedule, budget, risk and desired engineering team.

18.     The customer relationships, goodwill, trade secrets, client accounts and ongoing projects were part of the business kW MCE sold to WSP.

19.     On November 2, 2022, Coon tendered notice that he would not renew the Employment Agreement and wanted to continue his employment with WSP as an at-will employee.

20.     Attached hereto as Exhibit D is a true and correct copy of Coon's November 2, 2022 notice.

21.     On October 18, 2023, Coon tendered his resignation letter.

22.     Attached hereto as Exhibit E is a true and correct copy of Coon's resignation letter.

23.     Coon's last day of employment with WSP was November 3, 2023.

2

24.     Prior to his resignation, Coon openly admitted to me that he was starting a competing business in Phoenix and upstate New York, near kW MCE's Troy, New York office, and had a lease ready to be executed in January of 2024.

25.     Coon also told me that he was "going to be taking anyone in Troy who had not signed a retention agreement," and acknowledged that he needed kW MCE's mechanical engineers to deliver on competitive services to the very clients Coon was responsible for servicing at kW MCE.

26.     Coon told me that by recruiting those experienced mechanical engineers, he could start a business that could compete directly with WSP.

27.     Coon also bragged to me that a member of the C-suite of another company, Bowman Engineering, already planned to acquire his business once it reached $25 million dollars in annual revenue.

28.     Coon has solicited several former kW MCE/WSP employees, including at least Jason Leone, Gary Russinko, Andrew Stercho, and Jonathan Sterling.

29.     Leone was a Principal Mechanical Engineer and is subject to restrictive covenants contained in his own Retention Bonus Agreement.

30.     Attached hereto as Exhibit F is a true and correct copy of Leone's Retention Bonus Agreement.

31.     Leone resigned from WSP on December 5, 2023. His last day was December 22, 2023, and he has refused to disclose his new employer.

32.     Russinko was the Managing Principal of WSP's Troy Office and is subject to restrictive covenants contained in his own Retention Bonus Agreement.

33.     Attached hereto as Exhibit G is a true and correct copy of Russinko's Retention Bonus Agreement.

34.     Russinko resigned from WSP on October 30, 2023. His last day was December 1, 2023, and he too has refused to disclose his new employer.

35.     Stercho was a Principal Fire Protection Engineer for WSP.

3

DECLARATION OF KENNETH CLAUSEN                    Case No.: 3:24-CV-00292

36.     Stercho resigned from WSP on January 2, 2024, and he too has refused to disclose his new employer.

37.     Sterling was a Plumbing Designer for WSP.

38.     Sterling resigned from WSP on January 2, 2024, and he too has refused to disclose his new employer.

39.     The data-center design business is extremely competitive, with each company's ability to compete largely dependent on, inter alia, (1) its ability to understand and accommodate a client's needs, and (2) the quality and reputation of its specific engineers.

40.     The key accounts that Coon was responsible for servicing have the potential to generate the tens of millions of dollars for FY 2024 and beyond.

41.     Coon has in-depth knowledge of customer preferences, pricing, desired team, project specifications, engineering specifications, and kW MCE's existing and past work for those key customers.

42.     Competition from former kW MCE/WSP employees—and especially high-level employees like Coon—would be devastating for WSP.  Based on Coon's prior comments to me, he is likely to target other key kW MCE employees in early 2024, if he has not already done so.

43.     I have also received information from design partners suggesting that Coon is soliciting competitive work from kW MCE's existing customers.

44.     The kW MCE business division has virtually no connection to the state of California:  it has no facilities, office centers, or training centers in California.

45.     None of WSP's employees in the kw MCE division are based in California.

46.     At the time he was hired by WSP Buildings until at least the date of his termination, Coon resided in Arizona.

47.     Coon's primary client accounts were located outside of California.

48.     Payroll transactions for Coon's salary and bonuses were processed from kW Mission Critical Engineering (from January 2021 to April 2021) and WSP US Building Inc. (from April 2020 to October 2023)**.**

DECLARATION OF KENNETH CLAUSEN                    Case No.:  3:24-CV-00292

49. Coon communicated by telephone and email with WSP employees located in either Troy, New York or Atlanta, Georgia, including individuals who support WSP's IT, HR, benefits, marketing, and sales functions across the country.

50. Coon would have contacted New York or Georgia-based WSP employees to resolve payroll, benefits, or other problems throughout the course of his employment.

51. Coon's medical coverage, medical benefits, and retirement plans during his employment with WSP Buildings were administered from New York.

52. Coon's timekeeping, customer billing and email were managed in or from New York.

53. Coon's Employment Agreement and Retention Bonus Agreement were negotiated between individuals located in Troy, New York, and executed by WSP in New York, New York.

54. Russinko, Leone, Stercho, and Sterling were based out of the same Troy, New York office where I am also based.

I hereby declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Dated: February 1, 2024          _____

                                         Kenneth Clausen

---

DECLARATION OF KENNETH CLAUSEN

5

Case No.: 3:24-CV-00292

# EXHIBIT B

## SENIOR LEADERSHIP EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT (this "Agreement") is made and entered into this December 30, 2020 (the "Effective Date") by and between kW Mission Critical Engineering d.p.c. or its successor in interest, (the "Company"), and Stephen Coon ("Senior Leader").

WHEREAS, the Company desires to employ Senior Leader as its Managing Principal (pre-integration) or Senior Director or a similar role (post-integration) with WSP USA, and Senior Leader desires to be employed by the Company in said capacity or a similar role post integration with WSP USA; and

WHEREAS, each party desires to set forth in writing the terms and conditions of their understandings and agreements;

NOW, THEREFORE, in consideration of the mutual covenants and obligations contained herein, the Company hereby agrees to employ Senior Leader and Senior Leader hereby accepts such employment upon the terms and conditions set forth in this Agreement:

1. **Position**

   (a)  Beginning December 30, 2020 (the "Effective Date"), the Company agrees to employ Senior Leader in the position of Managing Principal before integration into WSP USA or in the position of Senior Director or a similar role, after integration with WSP USA. As Managing Principal/Senior Director, Senior Leader shall serve and perform the management duties and exercise the powers which may from time to time be reasonably assigned to or vested in them by the Company.

   (b)  Senior Leader agrees that during the term of this Agreement, they will devote their best efforts and all of their business time and attention to all facets of the business of the Company and will faithfully and diligently carry out the duties of Managing Principal/Senior Director.  Senior Leader will not, during the Term of this Agreement, directly or indirectly engage in any business, either as an employee, employer, consultant, principal, officer, director, advisor, or in any other capacity, either with or without compensation, without the prior written consent of the Company.

   (c)  During the performance of duties under this Agreement, Senior Leader agrees to comply with (i) all federal, state and local laws, ordinances and regulations, (ii) Company policies, procedures, and directions, as in effect from time-to-time, and (iii) the Company Code of Conduct, as amended.

   (d)  Subject to any restrictions imposed on the Company or any agreement between Senior Leader and the Company in light of the COVID-19 pandemic, Senior Leader shall perform their duties from the Company's offices in Phoenix, Arizona; provided, however, that Senior Leader shall travel as necessary to carry out all assigned duties.

   (e)  Senior Leader represents that, as of the Effective Date, they are not subject to any contract, agreement, or other legal obligation (including, without limitation, any restrictive

covenant) restricting their ability to accept employment with the Company or fully and faithfully carry out the duties and responsibilities. Senior Leader shall immediately notify the Company upon becoming aware of any such restrictions, whether actual or alleged. Senior Leader agrees not to disclose to the Company, or use for the Company's benefit, any confidential information or trade secrets of any person in violation of any law, contract, or other legally-enforceable restriction.

## 2. Term

The term of this Agreement shall be two (2) years from the Effective Date, and shall be automatically extended from year to year on the same terms and conditions (the "Term"); subject to (a) termination under Section 5 herein; or (b) or upon advance written notice from one party to the other of their intent to not renew the Agreement at least thirty (30) calendar days before the current Term is set to expire. Nothing stated in this Agreement or represented orally or in writing to either party shall create an obligation to renew this Agreement. If either party elects to terminate this Agreement at the end of the Term, for reasons not covered under Section 5, the Senior Leader will convert to an at-will employee.

## 3. **Compensation**

(a) Base Salary. The Company shall pay the Senior Leader an annual base salary of $200,000.16 ("Annual Base Salary"), which amount may be adjusted annually at the sole discretion of the Company.

(b) Performance Bonus. In addition to the Annual Base Salary and other benefits thereunder, Senior Leader shall be eligible for an annual bonus (the "Performance Bonus"), based upon the financial performance of the Company as set and determined by the Company, and the achievement of performance objectives set by the Company (the "Performance Criteria"). The actual amount, if any, of the Performance Bonus granted to Senior Leader upon the achievement of the Performance Criteria shall be in the sole discretion of the Company. The Performance Bonus shall be paid as soon as reasonably practicable, but in no event more than ninety (90) days, following the end of the Company's fiscal year.

(c) Payment. Payment of all compensation to Senior Leader hereunder shall be made in accordance with the relevant Company policies in effect from time to time, including normal payroll practices, and shall be subject to all applicable employment and withholding taxes.

## 4. **Benefits**

(a) Generally. The Company shall make available to Senior Leader, throughout the Term of this Agreement, such equipment, benefits, and perquisites as are generally provided by the Company to its Senior Leader employees, including but not limited to (i) use of a computer or similar hardware provided by the Company, and (ii) any group life, health, dental, vision, disability or accident insurance, pension plan, profit-sharing plan, retirement savings plan, 401(k) plan, or other such benefit plan or policy which may presently be in effect or which may hereafter be adopted by the Company for its Senior Leader officers and key management

personnel; provided, however, that nothing herein contained shall be deemed to require the Company to adopt or maintain any particular plan or policy.

(b) <u>PTO.</u>  The Senior Leader shall be entitled to paid time off, (for vacation, personal and/or sick days), during each calendar year, consistent with the policies then applicable to Senior Leader officers and key management personnel.

(c) <u>Holidays.</u>  The Senior Leader shall be entitled to paid holidays, consistent with the policies then applicable to Senior Leader officers and key management personnel.

(d) <u>Reimbursement of Expenses.</u>  The Company shall reimburse Senior Leader, upon presentation of receipts or other adequate documentation, for all reasonable business expenses incurred by Senior Leader in the course of rendering services to the Company under this Agreement, including any travel expenses for travel on behalf of the Company.  Such reimbursement shall be subject to, and must comply with, the Company's policies and procedures regarding expense reimbursement.

**5. <u>Termination</u>**

(a) <u>Termination by Senior Leader for Good Reason.</u>  Senior Leader may terminate this Agreement for "Good Reason" after providing ninety (90) days written notice to the Company.  "Good Reason" shall consist of:

(i) A material diminution in the nature or scope of Senior Leader's duties, responsibilities, authority, powers or functions (other than as a result of a sale or other disposition of the equity or assets of the Company and/or its affiliates);

(ii) A non-voluntary material reduction in Senior Leader's Annual Base Salary, except for any such reduction in connection with a general proportionate reduction in the compensation of senior employees of the Company and/or its affiliates;

(iii) Removal of the Senior Leader from their position as Managing Principal (pre-integration) or Senior Director/similar role (post-integration) with WSP USA, other than for "Cause" or by death or disability, as set forth in Section 5(b), (e) and (f), during the Term;

(iv) Failure by the Company to make any payment to Senior Leader required to be made under the terms of this Agreement, if the breach is not cured within thirty (30) days after Senior Leader provides written notice to the Company which provides in reasonable detail the nature of the payment; or

(v) A relocation of Senior Leader's principal place of business by more than 30 miles.

(b) <u>Termination by the Company for Cause.</u>  The Company may terminate Senior Leader's employment with the Company at any time for "Cause," as determined by the Company.  Upon termination by the Company for Cause, Senior Leader shall be entitled to a payment of all accrued but unpaid Annual Base Salary, vacation, and any other amounts then due

3

and payable to Senior Leader thereunder, as of the date of Senior Leader's termination. Senior Leader shall not be entitled to any other payments from the Company, including severance payments stated in Section 6. "Cause" shall consist of:

      (i)     Willful refusal or unreasonable neglect to perform the Senior Leader's duties, as reasonably determined by the Company, if the willful refusal or unreasonable neglect is not cured within thirty (30) days after the Company provides written notice to the Senior Leader which provides in reasonable detail the nature of such refusal or neglect to perform duties;

      (ii)     Commission of an act involving willful misrepresentation, deceit, dishonesty, fraud, perjury, moral turpitude, embezzlement, harassment, unlawful retaliation, or other misleading or unlawful conduct, or conduct that impairs or injures the reputation of the Company;

      (iii)     The conviction of Senior Leader of, or entry by the Senior Leader of a plea of guilty or no contest to, any (a) felony, (b) crime involving dishonesty or moral turpitude, or (c) crime or tort relating to the Company, its business, or its competitors;

      (iv)     Being under the influence of alcohol (other than in circumstances where socially acceptable and within reasonable levels) or being under the influence of drugs (other than over-the-counter or prescription medicine to the extent such medicine is taken in accordance with its directions or under the supervision of a physician) during the performance of Senior Leader's duties;

      (v)     Conduct determined by the Company to be a breach of the Senior Leader's duty of loyalty, or any acts by Senior Leader to aid, abet, or support an entity engaged in the Same or Similar Business of the Company as defined in Section 8(b);

      (vi)     Failure to provide full and complete cooperation in any investigation by the Company; or

      (vii)     A material breach of the terms of this Agreement, if the breach is not cured within thirty (30) days after the Company provides written notice to the Senior Leader which provides in reasonable detail the nature of the breach.

      (c)  <u>Termination by the Company Without Cause.</u>  The Company may terminate this Agreement at any time without Cause prior to the expiration of the Term.

      (d)  <u>Voluntary Resignation by Senior Leader.</u>  Senior Leader may terminate this Agreement prior to the expiration of the term after providing ninety (90) days written notice to the Company. If this occurs, Senior Leader will be entitled to a payment of all accrued but unpaid Annual Base Salary, vacation, and any other amounts then due and payable to Senior Leader, as of the date of Senior Leader's resignation.

      (e)  <u>Disability.</u>  The Company may terminate this Agreement at any time if the Company determines Senior Leader has sustained a "disability." Senior Leader shall be deemed

to have sustained a "disability" if Senior Leader is physically or mentally incapacitated so as to render Senior Leader unable to fully perform the essential functions of the position, with or without reasonable accommodation, for a consecutive period of more than ninety (90) days.

(f) <u>Death.</u>  This Agreement will terminate automatically upon Senior Leader's death.

**6.  <u>Payments Upon Termination; Clawback</u>**

(a)  Upon termination of this Agreement pursuant to Section 5, Senior Leader shall be entitled to payment of:

(i)  The unpaid portion of Senior Leader's then-current Annual Base Salary which has accrued through their date of termination;

(ii)  If unpaid, the unpaid portion of the Performance Bonus for the fiscal year most recently completed that the Company has awarded, if any, to the Senior Leader prior to the Senior Leader's termination of employment with the Company, pursuant to the terms of Section 3(b); and

(iii)  To the extent required by law or Company policy in effect at the time of Senior Leader's termination, the value of any accrued, unused vacation and reimbursement of expenses, which are due, accrued, or payable.

(b)  In addition to the payments set forth in Section 6(a), upon termination of Senior Leader under Section 5(a), 5(e), or upon termination by the Company without Cause under Section 5(c), Senior Leader (their estate, or legal representatives, as the case may be) will be entitled to:

(i)  A severance payment equal to six (6) months of Senior Leader's then current Annual Base Salary;

(ii)  Payment of one half of the annual Performance Bonus for the year in which the termination occurs calculated as though all Performance Criteria have been achieved for the entire year, unless termination is made more than six (6) months after the start of the fiscal year, under which circumstances Senior Leader would receive a prorated Performance Bonus payment calculated as though all Performance Criteria have been achieved; and

(c)  Receipt of the payments set forth in Section 6(b) above are expressly conditioned on execution (without revocation) by Senior Leader of an agreement containing a general release and waiver of claims, confidentiality provisions, and other terms satisfactory to the Company that do not contradict the terms of this Agreement, within sixty (60) days following the date of such termination, or such longer period if required by law.  Any payment by the Company to Senior Leader under this Section 6 shall be paid in equal bi-weekly installments, to coincide with the Company's normal payroll period, over a one-year period, or at other intervals as mutually agreed by the Parties following termination.

(d) Notwithstanding any other provision of this Agreement, the Company shall not be required to make any payment set forth in Section 3(b) or 6(b) of this Agreement, or any other bonus or incentive payment previously authorized by the Company, and may seek repayment of such payments if previously made, if the Company determines:

(i)     Senior Leader engaged in conduct that constitutes "Cause" pursuant to Section 5(b), regardless of whether Senior Leader was terminated pursuant to such provision;

(ii)     Senior Leader engaged in conduct that would otherwise require or permit the Company to withhold or seek repayment under applicable law.

**7.     Nondisclosure**

(a) Confidential Information. The Company will give Senior Leader access to, and Senior Leader will become familiar with, various trade secrets and other confidential business information, consisting of, but not limited to: research and development information; formulas; designs; systems; codes; computer, internet, and intranet software and files; records; strategies; marketing procedures; processes; computer programs; compilations of information; client requirements; pricing techniques; contracts; lists identifying customers, budgeting and financial information; partners, or investors; employee information; methods of doing business; and other confidential information that is regularly used in the operating, technology, and business dealings of the Company ("Confidential Information"). "Confidential Information" does not include information that (i) is or becomes generally available to the public other than as a result of a disclosure, directly or indirectly, by Senior Leader, or (ii) is or becomes available to Senior Leader on a non-confidential basis from a source other than the Company, provided that such source is not known by Senior Leader to be bound by a confidentiality agreement with or other obligation of non-disclosure to any Person.

(b) Non-Disclosure of Confidential Information.

(i)     The Senior Leader agrees that all Confidential Information, whether prepared by Senior Leader or otherwise coming into their possession, shall remain the exclusive property of the Company.  Senior Leader further agrees that, except as provided herein, Senior Leader shall not, without the prior written consent of the Company, use or disclose to any third party any of the Confidential Information, directly or indirectly, either during Senior Leader's employment with the Company or at any time following the termination of Senior Leader's employment with the Company.

(ii)     Pursuant to the Defend Trade Secrets Act of 2016, Senior Leader acknowledges and agrees that an individual may not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that is made (a) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney; and (b) solely for the purpose of reporting or investigating a suspected violation of law; or is made in a complaint or other document that is filed under seal in a lawsuit or other proceeding.  An individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the employer's trade

6

secrets to their attorney and use the trade secret information in the court proceeding only if the individual files any document containing the trade secret under seal, and does not disclose the trade secret, except pursuant to court order.

        (iii)    Nothing herein shall prevent Senior Leader from disclosing Confidential Information (a) upon the order of any court or administrative agency, (b) upon the request or demand of any regulatory agency or authority having jurisdiction over Senior Leader or the Company, (c) to the extent required by law or regulation, or (d) to the extent necessary in connection with any suit, action or proceeding relating to this Agreement or the exercise of any remedy thereunder.

        (c) <u>Return of Confidential Information.</u>  Senior Leader shall promptly deliver to the Company at such time as Senior Leader's employment with the Company terminates, or at any time that the Company may request, all memoranda, notes, plans, data, drawings, manuals, letters, records, reports, electronic mail, recordings, computer tapes and software and other documents and data, constituting or relating to Confidential Information or Work Product (as defined in Section 9) which the Senior Leader may then possess or have under the Senior Leader's control.

        (d) Senior Leader acknowledges that the Confidential Information and other consideration to be provided to Senior Leader pursuant to this Agreement give rise to the Company's interest in restraining Senior Leader from disclosing the Company's Confidential Information.

    **8.  <u>Non-Competition and Non-Solicitation</u>**

As an incentive and as a specific condition for entering into this Agreement, the Parties make, give, and agree to the following covenants respecting competition and solicitation:

    **B.  Non-Compete:**

        (i)    The Company is in a highly competitive business and expends a considerable amount of money in the development of business from new clients and customers and continued business from existing clients and customers. The business and clientele of the Company are national and worldwide in scope, and therefore the territorial and time limitations set forth in this Non-Compete clause are reasonable and necessary for the protection of the Company's interests.

        (ii)    During Employee's employment with the Company or its successor-in-interest and for a period of 12 months following the termination of Employee's employment for any reason (voluntary or involuntary), Employee shall not directly or indirectly own, manage, operate, control, be employed by, consult with or participate in the ownership, management, operation or control of any business, in a manner that would reasonably be expected to divert business from any of the Company's "Clients" or "Prospective Clients" with whom Employee had any involvement in developing, servicing, soliciting, or maintaining during the year prior to Employee's termination.

(iii)    Clients is defined as clients who the Company provided services for at any time during the 12-month period immediately preceding Employee's termination. "Prospective Clients" includes any person or entity: (a) to whom the Company has submitted qualifications or a proposal with Employee's direct personal involvement during the 12 months prior to Employee's termination; or (b) concerning whom Employee was assisting the Company in preparing a submittal of qualifications or a proposal at the time of Employee's termination.

**C. Non-Solicitation of Employees, Consultants, and Contractors:** During Employee's employment with the Company or its successor-in-interest, and for a period of 12 months following the termination of Employee's employment for any reason (voluntary or involuntary), Employee shall not directly or indirectly (on Employee's own or in combination or association with others, and whether for Employee's own benefit or for the benefit of other persons or entities) engage in activity which involves or could result in the actual or potential termination of the Company's relationship with or the solicitation, hiring, or engagement of any person or entity who is, at the time, or was within the last 12 months of Employee's employment within the Company, an employee, consultant, or independent contractor of the Company or any of its affiliates, including for greater certainty, any affiliate U.S. company of WSP USA ("Affiliate").

D.  **Non-Solicitation of Clients:** During Employee's employment with the Company and for a period of 12 months following the termination of Employee's employment for any reason (voluntary or involuntary), Employee shall not directly or indirectly (on Employee's own or in combination or association with others, and whether for Employee's own benefit or for the benefit of other parties or entities) contact, call upon, solicit or otherwise accept business from, render services to, market services or products to, divert business from, and/or interfere with the Company's relationship or business with any of the Company's existing Clients or Prospective Clients (as that term is defined above) that Employee interacted with on behalf of the Company, was introduced to by virtue of Employee's employment with the Company, or otherwise learned confidential information concerning during the last 12 months of Employee's employment within the Company.

E.  **Miscellaneous**: To the extent Employee's restrictive covenants obligations under Employee's Retention Bonus Agreement with the Company, or any Stock Purchase Agreement, are more restrictive than those provided hereunder, such restrictive covenants shall, in the event of a conflict, control, to the extent allowable under applicable law.

**9.  Intellectual Property**

(a)  Works Made for Hire.  Senior Leader understands and agrees that all copyrights, patents, trade secrets, and other intellectual property rights in or associated with any ideas, concepts, techniques, inventions, processes, data, or works of authorship developed or created by Senior Leader during the course of the Senior Leader's employment with the Company and related to Senior Leader's performance of this Agreement ("Work Product") will

belong exclusively to the Company. To the extent possible, any copyrightable Work Product shall be considered a "work made for hire" for the Company within the meaning of Title 17 of the United States Code, and all ownership rights to such Work Product shall belong to the Company. Any patentable inventions conceived or reduced to practice by Senior Leader in the course of performance under this Agreement shall be the property of the Company.

(b) <u>Assignment.</u> If any copyrightable Work Product is not "work made for hire" for the Company under Title 17 of the United States Code, or if any other intellectual property rights in any Work Product (including any patentable invention) is not otherwise owned by the Company as and when it is created, developed, conceived, or reduced to practice, then Senior Leader hereby transfers, assigns, and conveys to the Company and its successors and assigns, without any requirement of further consideration, any and all right, title, and interest Senior Leader may have in such Work Product, including but not limited to any copyright or other intellectual property rights pertaining thereto, effectively automatically as and when created, developed, conceived, or reduced to practice. Senior Leader hereby waives any so-called "moral rights of authors" in connection with the Work Product and acknowledge and agree that the Company may use, exploit, distribute, reproduce, advertise, promote, publicize, alter, modify, or edit the Work Product, or combine the Work Product with other works, in the Company's sole discretion, in any format or medium now in existence or hereafter devised.

(c) <u>Cooperation.</u> Upon the request of the Company, Senior Leader will take all further actions and steps necessary to effectuate the assignments set forth in this Section 9, including executing and delivering documents as requested by the Company in connection with such assignments. Senior Leader hereby waives any and all rights to seek or obtain any injunctive or equitable relief in connection with the exercise of any right that Senior Leader could otherwise claim with respect to any Work Product.

## 10. <u>Non-Disparagement</u>

(a) Except to the extent otherwise prohibited under law, during the term of this Agreement and hereafter, Senior Leader shall not disparage the Company, its affiliates, or their respective past or present officers, directors, associated or employees.

(b) The foregoing restrictions shall not apply to (i) actions or statements taken or made by the Senior Leader while employed by the Company in good faith as fulfilling the Senior Leader's duties with the Company, or otherwise at the request of the Company, or (ii) truthful statements made in compliance with legal process or any investigation, inquiry, or other proceeding by a governmental authority.

## 11. <u>Entire Agreement; Severability and Reformation; Amendment</u>

(a) This Agreement contains the full and complete understanding of the parties hereto with respect to the subject matter contained herein, and supersedes and replaces any prior Agreement, either oral or written, which Senior Leader may have with the Company that relates to the same subject matter.

(b) If any one or more of the terms, provisions, covenants or restrictions of this Agreement shall be determined by a court of competent jurisdiction to be invalid, void or unenforceable, then the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect, and to that end the provisions shall be deemed severable. If any one or more of the provisions contained in this Agreement shall for any reason be held to be excessively broad as to duration, geographical scope, activity or subject, it shall be reformed by limiting and reducing it to the minimum extent necessary, so as to be enforceable to the extent compatible with the applicable law. The obligations of the parties set forth in Sections 7-10, 15, and 17 shall survive termination of this Agreement if the Agreement is terminated during the initial or subsequent term(s). However, if the Agreement is terminated at the end of a term, pursuant to Section 2 and prior to renewal, and the Senior Leader is converted to an at-will employee, the restrictive covenants contained in Section 8 will expire one (1) year from the date that Senior Leader is converted to an at-will employee provided that Senior Leader remains employed with Company one year after converting to an at-will employee.

(c) This Agreement may be amended only by a writing signed by Senior Leader and a duly authorized representative of the Company (other than Senior Leader).

## 12. Notices

(a) All notices and other communications required or permitted to be given thereunder shall be in writing and shall be deemed to have been duly given if delivered personally, mailed by certified mail (return receipt requested) or sent by overnight delivery service or facsimile transmission (with electronic confirmation of successful transmission) to the parties at the following addresses or at such other addresses as shall be specified by the parties by like notice:

> If to the Company:  Chief Human Resources Officer
>
> If to Senior Leader:  Most recently recorded home address

(b) Notice given shall, in the case of mail, be deemed to be given and received on the third calendar day after posting, in the case overnight delivery service, on the date of actual delivery and, in the case of facsimile transmission, telex or personal delivery, on the date of actual transmission or, as the case may be, personal delivery.

## 13. Assignment; Successors; Counterparts

(a) This Agreement is personal to Senior Leader and may not be assigned by Senior Leader without the prior written consent of the Company.

(b) This Agreement shall inure to the benefit of and be binding upon Senior Leader, their heirs and personal representatives, and the Company, its successors and assigns.

(c) This Agreement may be executed in counterparts, each of which will take effect as an original and all of which shall evidence one and the same Agreement.

## 14. Governing Law; Construction; Non-Waiver

(a)  This Agreement shall be governed by and construed in accordance with the law of the State of New York, without regard to principles of conflicts of law.

(b)  The headings and captions of this Agreement are provided for convenience only and are intended to have no effect in construing or interpreting this Agreement.  The language in all parts of this Agreement shall be in all cases construed in accordance to its fair meaning and not strictly for or against the Company or Senior Leader.

(c)  No failure or neglect of either party, in any instance, to exercise any right, power or privilege thereunder or under law shall constitute a waiver of any other right, power or privilege or of the same right, power or privilege in any other instance.  All waivers by either party thereto must be contained in a writing signed by the party to be charged and, in the case of the Company, by an officer of the Company other than Senior Leader, or other person duly authorized by the Company. The waiver by either party of a breach of any provision contained in this Agreement shall not be construed as or operate as a waiver of any subsequent breach.

**15.**  **Assistance in Litigation**   Senior Leader shall, during and after termination of employment, upon reasonable notice, furnish such information and proper assistance to the Company as may be reasonably required by the Company in connection with any litigation in which it or any of its subsidiaries or affiliates is, or may become, a party; provided, however, that any such assistance following termination shall be furnished at mutually agreeable times and for mutually agreeable compensation.

**16.**  **Remedies**  The parties recognize and affirm that in the event of a breach of any provision of this Agreement, money damages would be inadequate and neither Senior Leader nor the Company would have an adequate remedy at law.  Accordingly, the parties agree that in the event of a breach or a threatened breach of any of the provisions of this Agreement either party may, in addition and supplementary to other rights and remedies existing in its favor, apply to any court of law or equity of competent jurisdiction for specific performance and/or injunctive or other relief in order to enforce or prevent any violations of the provisions thereof (without posting a bond or other security).

**17. Resolution of Disputes**

(a)  Any dispute arising between any of the Company and Senior Leader under this Agreement, or under any statute, regulation, or ordinance, or in connection with the Senior Leader's Employment with the Company, shall be submitted to binding arbitration before the American Arbitration Association ("AAA") for resolution (the "Arbitration"), unless otherwise prohibited by law.

(b)  The Arbitration shall be conducted in the State of New York, and the arbitrator will apply New York State law, including federal law as applied in New York courts.  The arbitration shall be conducted in accordance with AAA's Employment Arbitration Rules and Procedures, as modified herein.  The Arbitration shall be conducted by a single arbitrator who shall have experience in Senior Leader management disputes.  The arbitrator, and not any federal, state, or local court or adjudicatory authority, shall have exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability, and/or formation of this Agreement,

including but not limited to any dispute as to whether a particular claim is subject to arbitration thereunder. The arbitral award shall be in writing, state the reasons for the award, and be final and binding on the parties.

(c) The arbitration shall, to the extent permitted by law, be conducted on a strictly confidential basis, and none of the Parties shall disclose the existence of a claim; the nature of a claim or defense; any documents, exhibits, or information exchanged or presented in connection with a claim or defense; or the result of any action (collectively, "Arbitration Materials"), to any third party, with the sole exception of Parties' legal counsel, who the Parties shall ensure also complies with these confidentiality terms.

(d) In the event of any court proceeding to challenge or enforce an arbitrator's award, the parties hereby consent to the exclusive jurisdiction of the state and federal courts in New York, New York, and agree to venue in that jurisdiction. The Parties agree to take all steps necessary to protect the confidentiality of the Arbitration Materials in connection with any such proceeding, agree to file all Confidential Information (and all documents containing Confidential Information) under seal, and agree to the entry of an appropriate protective order encompassing the confidentiality terms of this Agreement.

## 18. <u>Section 409A</u>

(a) Notwithstanding anything herein to the contrary, this Agreement is intended to be interpreted and applied so that the payment of the benefits set forth herein either shall either be exempt from the requirements of Section 409A of the Internal Revenue Code of 1986, as amended (the "Code"), or shall comply with the requirements of such provision. Notwithstanding anything in this Agreement or elsewhere to the contrary, distributions upon termination of Senior Leader's employment may only be made upon a "separation from service" as determined under Section 409A of the Code. Each payment under this Agreement or otherwise shall be treated as a separate payment for purposes of Section 409A of the Code. In no event may Senior Leader, directly or indirectly, designate the calendar year of any payment to be made under this Agreement or otherwise which constitutes a "deferral of compensation" within the meaning of Section 409A of the Code.

(b) All reimbursements and in-kind benefits provided under this Agreement shall be made or provided in accordance with the requirements of Section 409A of the Code. To the extent that any reimbursements pursuant to this Agreement or otherwise are taxable to Senior Leader, any reimbursement payment due to Senior Leader shall be paid to Senior Leader on or before the last day of Senior Leader's taxable year following the taxable year in which the related expense was incurred; provided, that, Senior Leader has provided the Company written documentation of such expenses in a timely fashion and such expenses otherwise satisfy the Company' expense reimbursement policies. Reimbursements pursuant to this Agreement or otherwise are not subject to liquidation or exchange for another benefit and the amount of such reimbursements that Senior Leader receives in one taxable year shall not affect the amount of such reimbursements that Senior Leader receives in any other taxable year.

(c) Notwithstanding any provision in this Agreement to the contrary, if on the date of their termination from employment with the Company Senior Leader is deemed to be a

"specified employee" within the meaning of Code Section 409A and the Final Treasury Regulations using the identification methodology selected by the Company from time to time, or if none, the default methodology under Code Section 409A, any payments or benefits due upon a termination of Senior Leader's employment under any arrangement that constitutes a "deferral of compensation" within the meaning of Code Section 409A shall be delayed and paid or provided (or commence, in the case of installments) on the first payroll date on or following the earlier of (i) the date which is six (6) months and one (1) day after Senior Leader's termination of employment for any reason other than death, and (ii) the date of Senior Leader's death, and any remaining payments and benefits shall be paid or provided in accordance with the normal payment dates specified for such payment or benefit.

(d) Notwithstanding any of the foregoing to the contrary, the Company and its respective officers, directors, employees, or agents make no guarantee that the terms of this Agreement as written comply with, or are exempt from, the provisions of Code Section 409A, and none of the foregoing shall have any liability for the failure of the terms of this Agreement as written to comply with, or be exempt from, the provisions of Code Section 409A

**19. <u>Voluntary Agreement</u>** Senior Leader and the Company represent and agree that each has reviewed all aspects of this Agreement, has carefully read and understands all provisions of this Agreement, and is voluntarily entering into this Agreement. Each party represents and agrees that such party has had the opportunity to review any and all aspects of this Agreement with legal, tax or other advisors of such party's choice before executing this Agreement.

IN WITNESS THEREOF, the parties thereto have executed this Agreement on the dates stated below.

COMPANY
**kW Mission Critical Engineering d.p.c.**

Dated: 12/29/2020

By: _____
Name: James Warren
Title: Founding Principal

**SENIOR LEADER**

Dated: 12/29/2020

By: _____
Stephen Coon

13

# EXHIBIT C

# RETENTION BONUS AGREEMENT

Pursuant to the terms and conditions set forth below, and in consideration of the benefits provided for herein, **kW Mission Critical Engineering, d.p.c.** (hereinafter the "**Company**") and **Steve Coon** (hereinafter "**Employee**" and, together with the Company, the "**Parties**") hereby enter into this Retention Bonus Agreement (hereinafter this "**Retention Agreement**").

## I.      Purpose of Retention Bonus

As a valued member of the organization, the purpose of the Retention Bonus is to recognize Employee's contribution to the Company, to incentivize Employee to remain with the Company for at least a period of two years (the "**Transition Period**") following the Closing Date, (defined as the effective date of the completion of the merger of the Company and WSP USA Buildings Inc. ("**WSP USA**"), in order to assist the Company with integration into WSP USA, and to protect the Company's employees and clients from being diverted away from the Company.

## II.      Consideration for Retention Agreement

Employee may be paid a Retention Bonus pursuant to the terms herein if:

(a) Employee remains employed and "in good standing" (as defined herein) by the Company (or its successor-in-interest) through the relevant dates in Section II(A)(1)(a) and/or (b) (each a "**Vesting Date**"; collectively, the "**Vesting Dates**") of this Retention Agreement; or

(b) Employee is terminated, without "**Cause**" (as defined herein), by the Company during the Transition Period. In such an event, Employee will be paid any remaining portion of the Retention Bonus within thirty (30) days of the termination date.

### A.   Retention Bonus

Employee shall be paid a total Retention Bonus of **$475,000**, less all applicable deductions required by law (the "**Retention Bonus**"), which Retention Bonus will be paid in two installments (spread out over two years), on the dates set forth under the below Schedule of Payments. In the event that Employee resigns, or is terminated for Cause, by the time either the First Payment or the Second Payment come due, the relevant portion will not be payable. For greater certainty, it is possible for Employee to have earned the First Payment, assuming the conditions for the First Payment were met, but not earn the Second Payment.

#### 1.   Schedule of Payments

      a.   **First Payment**: The first payment of **$118,750**, less all deductions required by law, representing 25% of the Retention Bonus, will be paid to Employee via direct deposit or other acceptable means at the Company's discretion on the first payroll following December 30, 2021, so long as

Employee remains employed by Company or its successor-in-interest on December 30, 2021.

b. **Second Payment:** The second and final payment of **$356,250**, less all deductions required by law, representing the remaining 75% of the Retention Bonus, will be paid via direct deposit or other acceptable means at the Company's discretion on the first payroll following December 30, 2022, so long as Employee remains employed by Company or its successor-in-interest on December 30, 2022.

## III. Non-Competition and Non-Solicitation

As an incentive and as a specific condition for entering into this Retention Agreement, the Parties make, give, and agree to the following covenants respecting competition and solicitation:

### A. Non-Compete:

1. The Company is in a highly competitive business and expends a considerable amount of money in the development of business from new clients and customers and continued business from existing clients and customers. The business and clientele of the Company are national and worldwide in scope, and therefore the territorial and time limitations set forth in this Non-Compete clause are reasonable and necessary for the protection of the Company's interests.

2. During Employee's employment with the Company or its successor-in-interest and for a period of 12 months following the termination of Employee's employment for any reason (voluntary or involuntary), Employee shall not directly or indirectly own, manage, operate, control be employed by, consult with or participate in the ownership, management, operation or control of any business in a manner that would reasonably be expected to divert business from any of the Company's "**Clients**" or "**Prospective Clients**" (as defined herein) with whom Employee had any involvement in developing, servicing, soliciting, or maintaining during the year prior to Employee's termination.

3. "Clients" is defined as clients who the Company provided services for at any time during the 12-month period immediately preceding Employee's termination. "Prospective Clients" includes any person or entity: (a) to whom the Company has submitted qualifications or a proposal with Employee's direct personal involvement during the 12 months prior to Employee's termination; or (b) concerning whom Employee was assisting the Company in preparing a submittal of qualifications or a proposal at the time of Employee's termination.

### B. Non-Solicitation of Employees, Consultants, and Contractors: During Employee's employment with the Company or its successor-in-interest, and for a

2

period of 12 months following the termination of Employee's employment for any reason (voluntary or involuntary), Employee shall not directly or indirectly (on Employee's own or in combination or association with others, and whether for Employee's own benefit or for the benefit of other persons or entities) engage in activity which involves or could result in the actual or potential termination of the Company's relationship with or the solicitation, hiring, or engagement of any person or entity who is, at the time, or was within the last 12 months of Employee's employment within the Company, an employee, consultant, or independent contractor of the Company or any of its affiliates, including for greater certainty, any affiliate U.S. company of WSP USA ("**Affiliate**").

    **C.** **Non-Solicitation of Clients:** During Employee's employment with the Company and for a period of 12 months following the termination of Employee's employment for any reason (voluntary or involuntary), Employee shall not directly or indirectly (on Employee's own or in combination or association with others, and whether for Employee's own benefit or for the benefit of other parties or entities) contact, call upon, solicit or otherwise accept business from, render services to, market services or products to, divert business from, and/or interfere with the Company's relationship or business with any of the Company's existing Clients or Prospective Clients (as that term is defined above) that Employee interacted with on behalf of the Company, was introduced to by virtue of Employee's employment with the Company, or otherwise learned confidential information concerning during the last 12 months of Employee's employment within the Company.

    **D.** **Termination of Restrictive Covenants:** The above restrictive covenants terminate either within one year of the Employee's termination date or, if the Employee remains employed by the Company, within three years of the Closing Date, whichever is sooner.

**IV.** **General Terms and Conditions**

    **A.** Employee's obligations and rights of the Company shall extend to any parent corporation, subsidiaries and corporate affiliate companies, and to any of their successors, assignees and transferees.

    **B.** For purposes of this Retention Agreement, "in good standing" means that the Employee does not have a written record of disciplinary action for violating the Company's Code of Conduct, or policies related to anti-harassment, non-discrimination, and non-retaliation.

    **C.** For purposes of this Retention Agreement, the term "Cause" shall mean any of the following: (i) conviction of a crime (including conviction on a nolo contendere plea) involving the commission by Employee of a felony or of a criminal act involving, in the good faith judgment of the Company, fraud, dishonesty, or moral turpitude but excluding any conviction which results solely from Employee's title or position with the Company and is not based on

3

Employee's personal conduct; (ii) as determined by the Company in good faith, the failure to perform reasonably requested employment duties as required by the Company, as determined by the Company in good faith, after written notice from the Company of such failure to perform; (iii) fraud or embezzlement determined in accordance with the Company's normal investigative procedures consistently applied in comparable circumstances; (iv) gross misconduct or gross negligence in connection with the business of the Company or an Affiliate which has an adverse effect on the Company or the Affiliate, as determined by the Company in good faith; or (v) violation of the Company's written policies relating to equal employment, discrimination, harassment, retaliation, business conduct or other material Company policies.

**D.**     Employee acknowledges that: (i) unless stated otherwise in a written agreement executed by a representative of the Company, Employee's employment with the Company is at-will; accordingly, Employee may be terminated by the Company for any reason and in its sole discretion and Employee may terminate the employment relationship for any reason and in Employee's sole discretion; and (ii) Employee is to consult with and rely upon Employee's own tax, legal, and financial advisors regarding the consequences and risks of the Retention Bonus.

**E.**     This Retention Agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to its conflict of laws provision. The parties being desirous of having any disputes resolved in a forum having a substantial body of law and experience with the matters contained herein, agree that any action or proceeding with respect to this Agreement shall be brought exclusively in the Supreme Court of the State of New York, New York County, or in the United States District Court for the Southern District of New York or in any other court of competent jurisdiction sitting in the State of New York, New York County and the parties agree to the personal jurisdiction thereof

**F.**     The invalidity or unenforceability of any part or subpart of this Retention Agreement shall not affect the validity or enforceability of the remainder of the Retention Agreement. If any provision of this Agreement shall be held to be excessively broad as to time, geography, activity or other obligations, it shall be construed or reformed by limiting or reducing it, so as to be enforceable.

**G.**     This Retention Agreement supersedes any prior discussions, statements, representations, communications, whether oral or in writing, about its subject matter. This Retention Agreement reflects the full agreement with respect to its subject matter and can only be modified in a writing signed by Employee and an executive of the Company or its successor-in-interest.

The Parties knowingly and voluntarily sign this Retention Agreement as of the date(s) set forth below:

**kW Mission Critical Engineering, d.p.c.**

_____     Date: 12/29/2020
**James Warren**

**Employee**

_____     Date: 12/28/2020
**Steve Coon**

5

# EXHIBIT D

Stephen Coon, PE
5533 E Via Caballo Blanco
Cave Creek, AZ 85331
November 2, 2022

Debbie Arendsen
Chief Human Resources Officer
WSP
3340 Peachtree Road NE
Suite 2400
Atlanta, GA 30326

Dear Debbie Arendsen:

Please acknowledge this letter as advanced written notice of my intent to not renew the Senior
Leadership Employment Agreement under section 2 at the end of the agreement term.  I would like to
remain at WSP as an at-will employee.

Please confirm receipt of this notice and please confirm the end of term to be December 30, 2022.

Sincerely,

Stephen Coon, PE
scoon@kwmce.com
518.852.6793
Enclosures: Senior Leadership Employment Agreement

# EXHIBIT E

October 18, 2023

Mr. Ken Clausen
Director of Operations
KClausen@kwmce.com

Please accept this letter as my formal resignation from kW Mission Critical Engineering member of WSP (kWMCE). My last day is flexible based upon what is best for the business sometime between two and four weeks from today.

I am extremely grateful for the mentorship and the career everyone at kWMCE provided me over the last 10+ years as I cannot imagine a better experience. The opportunities and the knowledge shared with me provided my family and I with a life I could not imagine when I started at the firm.  From the bottom of my heart, thank you.

Please let me know how I can help the transition and make it as smooth as possible. As we move forward, I will be fully transparent. I will ensure everything confidential is turned over to kWMCE. I will return all access to company information including devices (laptop) provided by kWMCE. At the end of my last day I will ensure, to the best of my knowledge, I no longer have access to anything connected to kWMCE. If I find anything after my last day, I will be sure that it is immediately turned over to kWMCE and deleted off personal devices if applicable. There are however a few items that were provided by kWMCE in one manner or anther that I would like to keep, and I have no issues with purchasing these items from the business:
- Pre-inked Professional Engineer stamps
- Digital Professional Engineer stamps
- Current list of my multi-state Professional Engineer status.  This is the list provided to me frequently by Lin McGlinchey.
- A copy of my current kWMCE professional resume (CV)
- Current professional photo
- Professional registrations and dues previously purchased that will remain active past my last day at kWMCE
- Several books including both physical and audio books inclusive of select code books.
- Mobile phone case
- Mobile phone charger and accessories
- My contact list, if kWMCE wants to review before I download, I completely understand.
- kWMCE backpack and apparel provided as it will be difficult to find all the older items. Currently known items will be return.

I wish everyone at kWMCE the very best personally and professionally. Thank you for everything.

Steve Coon, PE
518.852.6793

# EXHIBIT F

# RETENTION BONUS AGREEMENT

Pursuant to the terms and conditions set forth below, and in consideration of the benefits provided for herein, **kW Mission Critical Engineering, d.p.c.** (hereinafter the "**Company**") and **Jason Leone** (hereinafter "**Employee**" and, together with the Company, the "**Parties**") hereby enter into this Retention Bonus Agreement (hereinafter this "**Retention Agreement**").

## I. Purpose of Retention Bonus

As a valued member of the organization, the purpose of the Retention Bonus is to recognize Employee's contribution to the Company, to incentivize Employee to remain with the Company for at least a period of two years (the "**Transition Period**") following the Closing Date, (defined as the effective date of the completion of the merger of the Company and WSP USA Buildings Inc. ("**WSP USA**"), in order to assist the Company with integration into WSP USA, and to protect the Company's employees and clients from being diverted away from the Company.

## II. Consideration for Retention Agreement

Employee may be paid a Retention Bonus pursuant to the terms herein if:

(a) Employee remains employed and "in good standing" (as defined herein) by the Company (or its successor-in-interest) through the relevant dates in Section II(A)(1)(a) and/or (b) (each a "**Vesting Date**"; collectively, the "**Vesting Dates**") of this Retention Agreement; or

(b) Employee is terminated, without "**Cause**" (as defined herein), by the Company during the Transition Period. In such an event, Employee will be paid any remaining portion of the Retention Bonus within thirty (30) days of the termination date.

### A. Retention Bonus

Employee shall be paid a total Retention Bonus of **$225,000**, less all applicable deductions required by law (the "**Retention Bonus**"), which Retention Bonus will be paid in two installments (spread out over two years), on the dates set forth under the below Schedule of Payments. In the event that Employee resigns, or is terminated for Cause, by the time either the First Payment or the Second Payment come due, the relevant portion will not be payable. For greater certainty, it is possible for Employee to have earned the First Payment, assuming the conditions for the First Payment were met, but not earn the Second Payment.

#### 1. Schedule of Payments

    a. **First Payment**: The first payment of **$56,250**, less all deductions required by law, representing 25% of the Retention Bonus, will be paid to Employee via direct deposit or other acceptable means at the Company's discretion on the first payroll following December 30, 2021, so long as Employee

remains employed by Company or its successor-in-interest on December 30, 2021.

    **b. Second Payment:** The second and final payment of **$168,750**, less all deductions required by law, representing the remaining 75% of the Retention Bonus, will be paid via direct deposit or other acceptable means at the Company's discretion on the first payroll following December 30, 2022, so long as Employee remains employed by Company or its successor-in-interest on December 30, 2022.

## III.    Non-Competition and Non-Solicitation

As an incentive and as a specific condition for entering into this Retention Agreement, the Parties make, give, and agree to the following covenants respecting competition and solicitation:

    **A. Non-Compete:**

      1.  The Company is in a highly competitive business and expends a considerable amount of money in the development of business from new clients and customers and continued business from existing clients and customers. The business and clientele of the Company are national and worldwide in scope, and therefore the territorial and time limitations set forth in this Non-Compete clause are reasonable and necessary for the protection of the Company's interests.

      2.  During Employee's employment with the Company or its successor-in-interest and for a period of 12 months following the termination of Employee's employment for any reason (voluntary or involuntary), Employee shall not directly or indirectly own, manage, operate, control be employed by, consult with or participate in the ownership, management, operation or control of any business in a manner that would reasonably be expected to divert business from any of the Company's "**Clients**" or "**Prospective Clients**" (as defined herein) with whom Employee had any involvement in developing, servicing, soliciting, or maintaining during the year prior to Employee's termination.

      3.  "Clients" is defined as clients who the Company provided services for at any time during the 12-month period immediately preceding Employee's termination. "Prospective Clients" includes any person or entity: (a) to whom the Company has submitted qualifications or a proposal with Employee's direct personal involvement during the 12 months prior to Employee's termination; or (b) concerning whom Employee was assisting the Company in preparing a submittal of qualifications or a proposal at the time of Employee's termination.

    **B. Non-Solicitation of Employees, Consultants, and Contractors:** During Employee's employment with the Company or its successor-in-interest, and for a

2

period of 12 months following the termination of Employee's employment for any reason (voluntary or involuntary), Employee shall not directly or indirectly (on Employee's own or in combination or association with others, and whether for Employee's own benefit or for the benefit of other persons or entities) engage in activity which involves or could result in the actual or potential termination of the Company's relationship with or the solicitation, hiring, or engagement of any person or entity who is, at the time, or was within the last 12 months of Employee's employment within the Company, an employee, consultant, or independent contractor of the Company or any of its affiliates, including for greater certainty, any affiliate U.S. company of WSP USA ("**Affiliate**").

C. **Non-Solicitation of Clients:** During Employee's employment with the Company and for a period of 12 months following the termination of Employee's employment for any reason (voluntary or involuntary), Employee shall not directly or indirectly (on Employee's own or in combination or association with others, and whether for Employee's own benefit or for the benefit of other parties or entities) contact, call upon, solicit or otherwise accept business from, render services to, market services or products to, divert business from, and/or interfere with the Company's relationship or business with any of the Company's existing Clients or Prospective Clients (as that term is defined above) that Employee interacted with on behalf of the Company, was introduced to by virtue of Employee's employment with the Company, or otherwise learned confidential information concerning during the last 12 months of Employee's employment within the Company.

D. **Termination of Restrictive Covenants:** The above restrictive covenants terminate either within one year of the Employee's termination date or, if the Employee remains employed by the Company, within three years of the Closing Date, whichever is sooner.

## IV. General Terms and Conditions

A. Employee's obligations and rights of the Company shall extend to any parent corporation, subsidiaries and corporate affiliate companies, and to any of their successors, assignees and transferees.

B. For purposes of this Retention Agreement, "in good standing" means that the Employee does not have a written record of disciplinary action for violating the Company's Code of Conduct, or policies related to anti-harassment, non-discrimination, and non-retaliation.

C. For purposes of this Retention Agreement, the term "Cause" shall mean any of the following: (i) conviction of a crime (including conviction on a nolo contendere plea) involving the commission by Employee of a felony or of a criminal act involving, in the good faith judgment of the Company, fraud, dishonesty, or moral turpitude but excluding any conviction which results solely from Employee's title or position with the Company and is not based on

3

Employee's personal conduct; (ii) as determined by the Company in good faith, the failure to perform reasonably requested employment duties as required by the Company, as determined by the Company in good faith, after written notice from the Company of such failure to perform; (iii) fraud or embezzlement determined in accordance with the Company's normal investigative procedures consistently applied in comparable circumstances; (iv) gross misconduct or gross negligence in connection with the business of the Company or an Affiliate which has an adverse effect on the Company or the Affiliate, as determined by the Company in good faith; or (v) violation of the Company's written policies relating to equal employment, discrimination, harassment, retaliation, business conduct or other material Company policies.

**D.**  Employee acknowledges that: (i) unless stated otherwise in a written agreement executed by a representative of the Company, Employee's employment with the Company is at-will; accordingly, Employee may be terminated by the Company for any reason and in its sole discretion and Employee may terminate the employment relationship for any reason and in Employee's sole discretion; and (ii) Employee is to consult with and rely upon Employee's own tax, legal, and financial advisors regarding the consequences and risks of the Retention Bonus.

**E.**  This Retention Agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to its conflict of laws provision. The parties being desirous of having any disputes resolved in a forum having a substantial body of law and experience with the matters contained herein, agree that any action or proceeding with respect to this Agreement shall be brought exclusively in the Supreme Court of the State of New York, New York County, or in the United States District Court for the Southern District of New York or in any other court of competent jurisdiction sitting in the State of New York, New York County and the parties agree to the personal jurisdiction thereof

**F.**  The invalidity or unenforceability of any part or subpart of this Retention Agreement shall not affect the validity or enforceability of the remainder of the Retention Agreement. If any provision of this Agreement shall be held to be excessively broad as to time, geography, activity or other obligations, it shall be construed or reformed by limiting or reducing it, so as to be enforceable.

**G.**  This Retention Agreement supersedes any prior discussions, statements, representations, communications, whether oral or in writing, about its subject matter. This Retention Agreement reflects the full agreement with respect to its subject matter and can only be modified in a writing signed by Employee and an executive of the Company or its successor-in-interest.

4

The Parties knowingly and voluntarily sign this Retention Agreement as of the date(s) set forth below:

**kW Mission Critical Engineering, d.p.c.**

_____       Date: _12/29/2020_
**James Warren**



**Employee**

_____       Date: _12/28/2020_
**Jason Leone**

5

# EXHIBIT G

# RETENTION BONUS AGREEMENT

Pursuant to the terms and conditions set forth below, and in consideration of the benefits provided for herein, **kW Mission Critical Engineering, d.p.c.** (hereinafter the "**Company**") and **Gary Russinko** (hereinafter "**Employee**" and, together with the Company, the "**Parties**") hereby enter into this Retention Bonus Agreement (hereinafter this "**Retention Agreement**").

## I.     Purpose of Retention Bonus

As a valued member of the organization, the purpose of the Retention Bonus is to recognize Employee's contribution to the Company, to incentivize Employee to remain with the Company for at least a period of two years (the "**Transition Period**") following the Closing Date, (defined as the effective date of the completion of the merger of the Company and WSP USA Buildings Inc. ("**WSP USA**"), in order to assist the Company with integration into WSP USA, and to protect the Company's employees and clients from being diverted away from the Company.

## II.     Consideration for Retention Agreement

Employee may be paid a Retention Bonus pursuant to the terms herein if:

(a) Employee remains employed and "in good standing" (as defined herein) by the Company (or its successor-in-interest) through the relevant dates in Section II(A)(1)(a) and/or (b) (each a "**Vesting Date**"; collectively, the "**Vesting Dates**") of this Retention Agreement; or

(b) Employee is terminated, without "**Cause**" (as defined herein), by the Company during the Transition Period. In such an event, Employee will be paid any remaining portion of the Retention Bonus within thirty (30) days of the termination date.

### A.     Retention Bonus

Employee shall be paid a total Retention Bonus of **$330,000**, less all applicable deductions required by law (the "**Retention Bonus**"), which Retention Bonus will be paid in two installments (spread out over two years), on the dates set forth under the below Schedule of Payments. In the event that Employee resigns, or is terminated for Cause, by the time either the First Payment or the Second Payment come due, the relevant portion will not be payable. For greater certainty, it is possible for Employee to have earned the First Payment, assuming the conditions for the First Payment were met, but not earn the Second Payment.

#### 1.     Schedule of Payments

a. **First Payment**: The first payment of **$82,500**, less all deductions required by law, representing 25% of the Retention Bonus, will be paid to Employee via direct deposit or other acceptable means at the Company's discretion on the first payroll following December 30, 2021, so long as Employee

remains employed by Company or its successor-in-interest on December 30, 2021.

    **b. Second Payment:** The second and final payment of **$247,500**, less all deductions required by law, representing the remaining 75% of the Retention Bonus, will be paid via direct deposit or other acceptable means at the Company's discretion on the first payroll following December 30, 2022, so long as Employee remains employed by Company or its successor-in-interest on December 30, 2022.

## III.    Non-Competition and Non-Solicitation

As an incentive and as a specific condition for entering into this Retention Agreement, the Parties make, give, and agree to the following covenants respecting competition and solicitation:

    **A. Non-Compete:**

        1. The Company is in a highly competitive business and expends a considerable amount of money in the development of business from new clients and customers and continued business from existing clients and customers. The business and clientele of the Company are national and worldwide in scope, and therefore the territorial and time limitations set forth in this Non-Compete clause are reasonable and necessary for the protection of the Company's interests.

        2. During Employee's employment with the Company or its successor-in-interest and for a period of 12 months following the termination of Employee's employment for any reason (voluntary or involuntary), Employee shall not directly or indirectly own, manage, operate, control be employed by, consult with or participate in the ownership, management, operation or control of any business in a manner that would reasonably be expected to divert business from any of the Company's "**Clients**" or "**Prospective Clients**" (as defined herein) with whom Employee had any involvement in developing, servicing, soliciting, or maintaining during the year prior to Employee's termination.

        3. "Clients" is defined as clients who the Company provided services for at any time during the 12-month period immediately preceding Employee's termination. "Prospective Clients" includes any person or entity: (a) to whom the Company has submitted qualifications or a proposal with Employee's direct personal involvement during the 12 months prior to Employee's termination; or (b) concerning whom Employee was assisting the Company in preparing a submittal of qualifications or a proposal at the time of Employee's termination.

    **B. Non-Solicitation of Employees, Consultants, and Contractors:** During Employee's employment with the Company or its successor-in-interest, and for a

2

period of 12 months following the termination of Employee's employment for any reason (voluntary or involuntary), Employee shall not directly or indirectly (on Employee's own or in combination or association with others, and whether for Employee's own benefit or for the benefit of other persons or entities) engage in activity which involves or could result in the actual or potential termination of the Company's relationship with or the solicitation, hiring, or engagement of any person or entity who is, at the time, or was within the last 12 months of Employee's employment within the Company, an employee, consultant, or independent contractor of the Company or any of its affiliates, including for greater certainty, any affiliate U.S. company of WSP USA ("**Affiliate**").

C.  **Non-Solicitation of Clients:** During Employee's employment with the Company and for a period of 12 months following the termination of Employee's employment for any reason (voluntary or involuntary), Employee shall not directly or indirectly (on Employee's own or in combination or association with others, and whether for Employee's own benefit or for the benefit of other parties or entities) contact, call upon, solicit or otherwise accept business from, render services to, market services or products to, divert business from, and/or interfere with the Company's relationship or business with any of the Company's existing Clients or Prospective Clients (as that term is defined above) that Employee interacted with on behalf of the Company, was introduced to by virtue of Employee's employment with the Company, or otherwise learned confidential information concerning during the last 12 months of Employee's employment within the Company.

D.  **Termination of Restrictive Covenants:** The above restrictive covenants terminate either within one year of the Employee's termination date or, if the Employee remains employed by the Company, within three years of the Closing Date, whichever is sooner.

## IV.  General Terms and Conditions

A.  Employee's obligations and rights of the Company shall extend to any parent corporation, subsidiaries and corporate affiliate companies, and to any of their successors, assignees and transferees.

B.  For purposes of this Retention Agreement, "in good standing" means that the Employee does not have a written record of disciplinary action for violating the Company's Code of Conduct, or policies related to anti-harassment, non-discrimination, and non-retaliation.

C.  For purposes of this Retention Agreement, the term "Cause" shall mean any of the following: (i) conviction of a crime (including conviction on a nolo contendere plea) involving the commission by Employee of a felony or of a criminal act involving, in the good faith judgment of the Company, fraud, dishonesty, or moral turpitude but excluding any conviction which results solely from Employee's title or position with the Company and is not based on

3

Employee's personal conduct; (ii) as determined by the Company in good faith, the failure to perform reasonably requested employment duties as required by the Company, as determined by the Company in good faith, after written notice from the Company of such failure to perform; (iii) fraud or embezzlement determined in accordance with the Company's normal investigative procedures consistently applied in comparable circumstances; (iv) gross misconduct or gross negligence in connection with the business of the Company or an Affiliate which has an adverse effect on the Company or the Affiliate, as determined by the Company in good faith; or (v) violation of the Company's written policies relating to equal employment, discrimination, harassment, retaliation, business conduct or other material Company policies.

**D.**     Employee acknowledges that: (i) unless stated otherwise in a written agreement executed by a representative of the Company, Employee's employment with the Company is at-will; accordingly, Employee may be terminated by the Company for any reason and in its sole discretion and Employee may terminate the employment relationship for any reason and in Employee's sole discretion; and (ii) Employee is to consult with and rely upon Employee's own tax, legal, and financial advisors regarding the consequences and risks of the Retention Bonus.

**E.**     This Retention Agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to its conflict of laws provision. The parties being desirous of having any disputes resolved in a forum having a substantial body of law and experience with the matters contained herein, agree that any action or proceeding with respect to this Agreement shall be brought exclusively in the Supreme Court of the State of New York, New York County, or in the United States District Court for the Southern District of New York or in any other court of competent jurisdiction sitting in the State of New York, New York County and the parties agree to the personal jurisdiction thereof

**F.**     The invalidity or unenforceability of any part or subpart of this Retention Agreement shall not affect the validity or enforceability of the remainder of the Retention Agreement. If any provision of this Agreement shall be held to be excessively broad as to time, geography, activity or other obligations, it shall be construed or reformed by limiting or reducing it, so as to be enforceable.

**G.**     This Retention Agreement supersedes any prior discussions, statements, representations, communications, whether oral or in writing, about its subject matter. This Retention Agreement reflects the full agreement with respect to its subject matter and can only be modified in a writing signed by Employee and an executive of the Company or its successor-in-interest.

The Parties knowingly and voluntarily sign this Retention Agreement as of the date(s) set forth below:

**kW Mission Critical Engineering, d.p.c.**


_____                    Date:___12/29/2020___
**James Warren**



**Employee**


Gary Russinko
Digitally signed by Gary Russinko
DN: C=US, E=grussinko@kwmce.com, O="kW
Mission Critical Engineering, dpc", CN=Gary
Russinko
Reason: I agree to the terms defined by the
placement of my signature on this document
Contact Info: 518-708-7732
Date: 2020.12.27 16:00:28-05'00'

_____                    Date:___12/27/2020___
**Gary Russinko**

# EXHIBIT H

# Holland & Knight

1180 West Peachtree Street, Suite 1800 | Atlanta, GA 30309 | T 404.817.8500 | F 404.881.0470
Holland & Knight LLP | www.hklaw.com

Todd D. Wozniak
+1 404-817-8431
Todd.Wozniak@hklaw.com

October 25, 2023

*Via Overnight Mail*

Stephen Coon
5533 E. Via Caballo Blanco
Cave Creek, AZ 85331

**Re:   POST-EMPLOYMENT RESTRICTIVE COVENANT REMINDER**

Dear Mr. Coon:

This law firm represents WSP USA Inc. and its subsidiaries and predecessor companies (the "Company") in connection with your Senior Leadership Employment Agreement with the Company (the "Agreement"). A copy of the Agreement is enclosed for your convenience.

It has come to our attention that you have recently resigned your employment with the Company and that your employment with the Company will end on or before November 3, 2023. We are writing to remind you of your contractual obligations under the Agreement related to non-competition, non-solicitation, confidentiality, and intellectual property. These obligations apply both during and after your employment with the Company in accordance with their terms.

Specifically, Section 7 of your Agreement contains a restriction on disclosure of confidential information. In that provision, you "agree[d] that all Confidential Information, whether prepared by [you] or otherwise coming into [your] possession, shall remain the exclusive property of the Company." Agreement § 7(b)(i). The provision further provides that you agreed not to, "without the prior written consent of the Company, use or disclose to any third party any of the Confidential Information, directly or indirectly, either during [your] employment with the Company or at any time following the termination of [your] employment with the Company." *Id.*   In the non-disclosure provision, you also must "promptly deliver at such time as [your] employment with the Company terminates, or at any time that the Company may request," "all memoranda, notes, plans, data, drawings, manuals, letters, records, reports, electronic mail, recordings, computer tapes and software and other documents and data, constituting or relating to Confidential Information or Work Product . . . which [you] may then possess or have under [your] control." *Id.* § 7(c).

Atlanta | Austin | Boston | Charlotte | Chicago | Dallas | Denver | Fort Lauderdale | Fort Worth | Houston
Jacksonville | Los Angeles | Miami | New York | Orange County | Orlando | Philadelphia | Portland
San Francisco | Stamford | Tallahassee | Tampa | Tysons | Washington, D.C. | West Palm Beach

October 25, 2023
Page 2

Section 8 of your Agreement contains a non-compete provision stating that you "shall not directly or indirectly own, manage, operate, control, be employed by, consult with or participate in the ownership, management operation or control of any business in a manner that would reasonably be expected to divert business from any of the Company's 'Clients' or 'Prospective Clients' with whom [you] had any involvement in developing, servicing, soliciting, or maintaining during the year prior to [your] termination." Agreement § 8(B)(ii). Section 8 also contains a non-solicitation provision that you shall not engage in "the solicitation, hiring, or engagement of any person or entity who is, at the time, or was within the last 12 months of [your] employment with the Company, an employee, consultant, or independent contractor of the Company or any of its affiliates." *Id.* § 8(C). These Section 8 restrictions remain in effect "for a period of 12 months following the termination of [your] employment for any reason (voluntary or involuntary)." *Id.* §§ 8(B)(ii), (C). Please note that the provisions of Section 11(b) do not apply given that you did not remain employed by the Company for one year following your termination of the Agreement and your becoming an at-will employee of the Company.

Section 9 of your Agreement contains an intellectual property provision stating that you "understand[] and agree[] that all copyrights, patents, trade secrets, and other intellectual property rights in or associated with any ideas, concepts, techniques, inventions, processes, data, or works of authorship developed or created by [you] during the course of [your] employment with the Company" belongs "exclusively to the Company." *Id.* § 9(a); *see also id.* § 9(b).

WSP takes these restrictive covenants very seriously and expects you to honor the Agreement. If you were to breach one or more of these covenants, WSP would be forced to enforce the Agreement and seek all available remedies, including an injunction, damages, and its attorneys' fees and costs.

If you have any questions about your obligations under the Agreement, feel free to call me.

Also, in light of your resignation, please return all documents, property, and data belonging to WSP to WSP. This includes all electronically stored information stored on a personal device, cloud storage accounts, or USB drive. This also includes the following items you requested to keep from the Company in your resignation letter, including: (1) the company-generated list of your multi-state Professional Engineer status; (2) your kWMCE professional resume; (3) the professional photograph(s) provided by the Company; (4) all reference materials, including physical books or audiobooks, paid for by the Company; and (5) professional contact list(s).

The other items noted in your resignation letter you are free to take with you. That includes (1) your pre-inked professional engineer's stamp as well as your digital stamp, (2) the registrations and dues that have already been paid on your behalf (until such time as those registration expire); (3) mobile phone case and other phone accessories; and (4) your kWMCE backpack and apparel.

October 25, 2023
Page 3

If you are represented by legal counsel, please share this letter with your counsel.

Sincerely,

HOLLAND & KNIGHT LLP

Todd D. Wozniak

Enclosures

# EXHIBIT I

# Holland & Knight

1180 West Peachtree Street, Suite 1800 | Atlanta, GA 30309 | T 404.817.8500 | F 404.881.0470
Holland & Knight LLP | www.hklaw.com

Todd D. Wozniak
+1 404-817-8431
Todd.Wozniak@hklaw.com

December 29, 2023

VIA OVERNIGHT MAIL

Jason Leone
11 Ann Lee Court
Latham, NY 12110
Jason.leone@wsp.com

**Re:    POST-EMPLOYMENT RESTRICTIVE COVENANT REMINDER**

Dear Mr. Leone:

This law firm represents WSP USA Inc. and its subsidiaries and predecessor companies (the "Company") in connection with your post-employment restrictive covenants and confidentiality obligations to the Company (the "Agreement"). A copy of your Retention Agreement is enclosed for your convenience.

The agreements contain covenants related to non-competition and non-solicitation. These obligations apply both during and after your employment with the Company in accordance with their terms. Further, you agreed and reaffirmed in 2022 as part of your receipt of the Company's handbook that

> WSP is engaged in a highly competitive business and our competitive position depends upon our ability to maintain the confidentiality of the Confidential Information and trade secrets which WSP as an organization has an obligation to protect. Any unauthorized disclosure, release or use of any of WSP business information, Confidential Information or trade secrets, could be highly detrimental to the company. . .

You agreed that WSP's Confidential Information includes, but is not limited to:

> Financial and business information, such as information with respect to costs, commissions, fees, profits, sales, markets, mailing lists, strategies and plans for future business, new business, product or other development, potential acquisitions or divestitures, and new marketing ideas;

> Product and technical information, such as formulae, specifications, designs, drawings, component lists, databases, software (or pre-cursor documents),

Atlanta | Austin | Boston | Charlotte | Chicago | Dallas | Denver | Fort Lauderdale | Fort Worth | Houston
Jacksonville | Los Angeles | Miami | New York | Orange County | Orlando | Philadelphia | Portland
San Francisco | Stamford | Tallahassee | Tampa | Tysons | Washington, D.C. | West Palm Beach

December 29, 2023
Page 2

      manuals, instructions and catalogues held in any form relating to the production, creation, supply or provision of the products or services for the Company or any affiliate;

      Marketing information, such as information relating to the marketing or sales of any products or services of the Company and any affiliate, including without limitation, lists of customers and suppliers' names, addresses and contacts, sales targets and statistics, market share and pricing statistics, marketing surveys, research reports and advertising and promotional material;

      . . .

Section III(A) of your Agreement contains a non-compete provision stating that you "shall not directly or indirectly own, manage, operate, control, be employed by, consult with or participate in the ownership, management operation or control of any business in a manner that would reasonably be expected to divert business from any of the Company's 'Clients' or 'Prospective Clients' . . . with whom [you] had any involvement in developing, servicing, soliciting, or maintaining during the year prior to [your] termination." Agreement § III(A)(2). That same Section also contains a non-solicitation provision providing that you shall not directly or indirectly engage in "the solicitation, hiring, or engagement of any person or entity who is, at the time, or was within the last 12 months of [your] employment with the Company, an employee, consultant, or independent contractor of the Company or any of its affiliates. . ." *Id.* § III(B). Further, the non-solicitation prohibition prevents you from directly or indirectly engaging in conduct that would result in you "contact[ing], call[ing] upon, solicit[ing] or otherwise accept[ing business from, render services to, market services or products to, divert business from, and/or interfere with the Company's relationship or business with any of the Company's existing Clients or Prospective Clients (as that term is defined above) . . ." *Id.*

The above covenants are in addition to obligations imposed by law, including under the Defend Trade Secrets Act and similar state statutes prohibiting the retention and misappropriation of the Company's trade secrets. WSP takes these restrictive covenants and the protection of its trade secrets very seriously and expects you to honor all applicable agreements and law. WSP will not hesitate to enforce its contractual and statutory legal rights and seek all available remedies, including an injunction, damages, and its attorneys' fees and costs.

We understand that you recently resigned your employment with the Company, and that your employment with the Company ended on December 22, 2023. We further understand that you have refused to disclose where you are going to work, but intend to start with a competitor of the Company formed by another former Company employee in violation of his own restrictive covenants.

In light of the circumstances of your resignation, please confirm immediately the return of all documents, property, and data belonging to WSP to WSP. This includes all electronically stored information stored on a personal device, cloud storage accounts, or USB drive. This also includes,

December 29, 2023
Page 3

for example, (1) company-generated list of your multi-state Professional Engineer status; (2) your kWMCE professional resume; (3) the professional photograph(s) provided by the Company; (4) all reference materials, including physical books or audiobooks, paid for by the Company; and (5) professional contact list(s).

We further demand that you send in writing by no later than January 2, 2024, a written letter or affidavit, along with a detailed description of, and production of all documents related to: (a) the name of your current employer; (b) your current title; (c) all documents related to and/or reflecting any current or prospective employment or business relationship with Stephen Coon and/or Gary Russinko and/or your prospective employer; (d) all documents reflecting your communications with any customers, consultants, suppliers, distributors, or other entities or relationships of the Company, and (e) written confirmation that you will preserve and not delete all documents and materials (including on your personal laptop and/or phone) related to your new prospective employment, solicitation of Company employees or customers, and/or plans to compete with the Company.

If you have any questions about your obligations, feel free to call me.  If you are represented by legal counsel, please share this letter with your counsel and have them contact us.

Sincerely,

HOLLAND & KNIGHT LLP

Todd D. Wozniak

Enclosures

# RETENTION BONUS AGREEMENT

Pursuant to the terms and conditions set forth below, and in consideration of the benefits provided for herein, **kW Mission Critical Engineering, d.p.c.** (hereinafter the "**Company**") and **Jason Leone** (hereinafter "**Employee**" and, together with the Company, the "**Parties**") hereby enter into this Retention Bonus Agreement (hereinafter this "**Retention Agreement**").

## I.      Purpose of Retention Bonus

As a valued member of the organization, the purpose of the Retention Bonus is to recognize Employee's contribution to the Company, to incentivize Employee to remain with the Company for at least a period of two years (the "**Transition Period**") following the Closing Date, (defined as the effective date of the completion of the merger of the Company and WSP USA Buildings Inc. ("**WSP USA**"), in order to assist the Company with integration into WSP USA, and to protect the Company's employees and clients from being diverted away from the Company.

## II.      Consideration for Retention Agreement

Employee may be paid a Retention Bonus pursuant to the terms herein if:

(a) Employee remains employed and "in good standing" (as defined herein) by the Company (or its successor-in-interest) through the relevant dates in Section II(A)(1)(a) and/or (b) (each a "**Vesting Date**"; collectively, the "**Vesting Dates**") of this Retention Agreement; or

(b) Employee is terminated, without "**Cause**" (as defined herein), by the Company during the Transition Period. In such an event, Employee will be paid any remaining portion of the Retention Bonus within thirty (30) days of the termination date.

### A.   Retention Bonus

Employee shall be paid a total Retention Bonus of **$225,000**, less all applicable deductions required by law (the "**Retention Bonus**"), which Retention Bonus will be paid in two installments (spread out over two years), on the dates set forth under the below Schedule of Payments. In the event that Employee resigns, or is terminated for Cause, by the time either the First Payment or the Second Payment come due, the relevant portion will not be payable. For greater certainty, it is possible for Employee to have earned the First Payment, assuming the conditions for the First Payment were met, but not earn the Second Payment.

#### 1.   Schedule of Payments

      a.  **First Payment**: The first payment of **$56,250**, less all deductions required by law, representing 25% of the Retention Bonus, will be paid to Employee via direct deposit or other acceptable means at the Company's discretion on the first payroll following December 30, 2021, so long as Employee

remains employed by Company or its successor-in-interest on December 30, 2021.

   **b. Second Payment:** The second and final payment of **$168,750**, less all deductions required by law, representing the remaining 75% of the Retention Bonus, will be paid via direct deposit or other acceptable means at the Company's discretion on the first payroll following December 30, 2022, so long as Employee remains employed by Company or its successor-in-interest on December 30, 2022.

## III.   Non-Competition and Non-Solicitation

As an incentive and as a specific condition for entering into this Retention Agreement, the Parties make, give, and agree to the following covenants respecting competition and solicitation:

   **A. Non-Compete:**

     1. The Company is in a highly competitive business and expends a considerable amount of money in the development of business from new clients and customers and continued business from existing clients and customers. The business and clientele of the Company are national and worldwide in scope, and therefore the territorial and time limitations set forth in this Non-Compete clause are reasonable and necessary for the protection of the Company's interests.

     2. During Employee's employment with the Company or its successor-in-interest and for a period of 12 months following the termination of Employee's employment for any reason (voluntary or involuntary), Employee shall not directly or indirectly own, manage, operate, control be employed by, consult with or participate in the ownership, management, operation or control of any business in a manner that would reasonably be expected to divert business from any of the Company's "**Clients**" or "**Prospective Clients**" (as defined herein) with whom Employee had any involvement in developing, servicing, soliciting, or maintaining during the year prior to Employee's termination.

     3. "Clients" is defined as clients who the Company provided services for at any time during the 12-month period immediately preceding Employee's termination. "Prospective Clients" includes any person or entity: (a) to whom the Company has submitted qualifications or a proposal with Employee's direct personal involvement during the 12 months prior to Employee's termination; or (b) concerning whom Employee was assisting the Company in preparing a submittal of qualifications or a proposal at the time of Employee's termination.

   **B. Non-Solicitation of Employees, Consultants, and Contractors:** During Employee's employment with the Company or its successor-in-interest, and for a

2

period of 12 months following the termination of Employee's employment for any reason (voluntary or involuntary), Employee shall not directly or indirectly (on Employee's own or in combination or association with others, and whether for Employee's own benefit or for the benefit of other persons or entities) engage in activity which involves or could result in the actual or potential termination of the Company's relationship with or the solicitation, hiring, or engagement of any person or entity who is, at the time, or was within the last 12 months of Employee's employment within the Company, an employee, consultant, or independent contractor of the Company or any of its affiliates, including for greater certainty, any affiliate U.S. company of WSP USA ("**Affiliate**").

C. **Non-Solicitation of Clients:** During Employee's employment with the Company and for a period of 12 months following the termination of Employee's employment for any reason (voluntary or involuntary), Employee shall not directly or indirectly (on Employee's own or in combination or association with others, and whether for Employee's own benefit or for the benefit of other parties or entities) contact, call upon, solicit or otherwise accept business from, render services to, market services or products to, divert business from, and/or interfere with the Company's relationship or business with any of the Company's existing Clients or Prospective Clients (as that term is defined above) that Employee interacted with on behalf of the Company, was introduced to by virtue of Employee's employment with the Company, or otherwise learned confidential information concerning during the last 12 months of Employee's employment within the Company.

D. **Termination of Restrictive Covenants:** The above restrictive covenants terminate either within one year of the Employee's termination date or, if the Employee remains employed by the Company, within three years of the Closing Date, whichever is sooner.

## IV.  General Terms and Conditions

A.  Employee's obligations and rights of the Company shall extend to any parent corporation, subsidiaries and corporate affiliate companies, and to any of their successors, assignees and transferees.

B.  For purposes of this Retention Agreement, "in good standing" means that the Employee does not have a written record of disciplinary action for violating the Company's Code of Conduct, or policies related to anti-harassment, non-discrimination, and non-retaliation.

C.  For purposes of this Retention Agreement, the term "Cause" shall mean any of the following: (i) conviction of a crime (including conviction on a nolo contendere plea) involving the commission by Employee of a felony or of a criminal act involving, in the good faith judgment of the Company, fraud, dishonesty, or moral turpitude but excluding any conviction which results solely from Employee's title or position with the Company and is not based on

3

Employee's personal conduct; (ii) as determined by the Company in good faith, the failure to perform reasonably requested employment duties as required by the Company, as determined by the Company in good faith, after written notice from the Company of such failure to perform; (iii) fraud or embezzlement determined in accordance with the Company's normal investigative procedures consistently applied in comparable circumstances; (iv) gross misconduct or gross negligence in connection with the business of the Company or an Affiliate which has an adverse effect on the Company or the Affiliate, as determined by the Company in good faith; or (v) violation of the Company's written policies relating to equal employment, discrimination, harassment, retaliation, business conduct or other material Company policies.

**D.**     Employee acknowledges that: (i) unless stated otherwise in a written agreement executed by a representative of the Company, Employee's employment with the Company is at-will; accordingly, Employee may be terminated by the Company for any reason and in its sole discretion and Employee may terminate the employment relationship for any reason and in Employee's sole discretion; and (ii) Employee is to consult with and rely upon Employee's own tax, legal, and financial advisors regarding the consequences and risks of the Retention Bonus.

**E.**     This Retention Agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to its conflict of laws provision. The parties being desirous of having any disputes resolved in a forum having a substantial body of law and experience with the matters contained herein, agree that any action or proceeding with respect to this Agreement shall be brought exclusively in the Supreme Court of the State of New York, New York County, or in the United States District Court for the Southern District of New York or in any other court of competent jurisdiction sitting in the State of New York, New York County and the parties agree to the personal jurisdiction thereof

**F.**     The invalidity or unenforceability of any part or subpart of this Retention Agreement shall not affect the validity or enforceability of the remainder of the Retention Agreement. If any provision of this Agreement shall be held to be excessively broad as to time, geography, activity or other obligations, it shall be construed or reformed by limiting or reducing it, so as to be enforceable.

**G.**     This Retention Agreement supersedes any prior discussions, statements, representations, communications, whether oral or in writing, about its subject matter. This Retention Agreement reflects the full agreement with respect to its subject matter and can only be modified in a writing signed by Employee and an executive of the Company or its successor-in-interest.

The Parties knowingly and voluntarily sign this Retention Agreement as of the date(s) set forth below:

**kW Mission Critical Engineering, d.p.c.**

_____     Date: __12/29/2020__
**James Warren**

**Employee**

_____     Date: __12/28/2020__
**Jason Leone**

**DiLudovico, Diane (PHL - X46879)**

| | |
|---|---|
| **From:** | TrackingUpdates@fedex.com |
| **Sent:** | Friday, December 29, 2023 2:10 PM |
| **To:** | DiLudovico, Diane (PHL - X46879) |
| **Subject:** | FedEx Shipment 788680498218: This shipment is scheduled to be sent |

*r*



# You're getting a package!

A label was created and your package is preparing to be shipped. We'll
send the delivery date when we get your package from the shipper.

 The delivery date may be updated when FedEx receives the package.



**INITIATED**

**TRACKING NUMBER**     788680498218

**FROM**     Holland & Knight
1650 Market Street
STE 3300
Philadelphia, PA, US, 19103

**TO**     Jason Leone
Jason Leone

1

|  | 11 ANN LEE CT |
|  | LATHAM, NY, US, 12110 |
| **PURCHASE ORDER NUMBER** | 46080 |
| **REFERENCE** | 213614.00001 |
| **SHIPPER REFERENCE** | 213614.00001 |
| **PACKAGING TYPE** | FedEx Envelope |
| **ORIGIN** | Philadelphia, PA, 19103 |
| **DESTINATION** | LATHAM, NY, US, 12110 |
| **SPECIAL HANDLING** | Residential Delivery |
| **STANDARD TRANSIT** | Sat, 12/30/2023 by 1:30pm |
| **NUMBER OF PIECES** | 1 |
| **TOTAL SHIPMENT WEIGHT** | 0.50 LB |
| **SERVICE TYPE** | FedEx Priority Overnight |



# Notifications, from start to finish

Get push notifications when you pair FedEx Delivery Manager® with the FedEx® Mobile app. You can activate alerts in the app to track your package. Then listen for the virtual doorbell chime that lets you know your package was delivered.

**DOWNLOAD THE MOBILE APP**

---

**FOLLOW FEDEX**

      

✉ Please do not respond to this message. This email was sent from an unattended mailbox. This report was generated at approximately 1:10 PM CST 12/29/2023.

All weights are estimated.

To track the latest status of your shipment, click on the tracking number above.

Standard transit is the date and time the package is scheduled to be delivered by, based on the selected service, destination and ship date. Limitations and exceptions may apply. Please see the FedEx Service Guide for terms and conditions of service, including the FedEx Money-Back Guarantee, or contact your FedEx Customer Support representative.

© 2023 Federal Express Corporation. The content of this message is protected by copyright and trademark laws under U.S. and international law. Review our privacy policy. All rights reserved.

Thank you for your business.

**DiLudovico, Diane (PHL - X46879)**

| | |
|---|---|
| **From:** | TrackingUpdates@fedex.com |
| **Sent:** | Saturday, December 30, 2023 9:27   M |
| **To:** | DiLudovico, Diane (PHL - X46879) |
| **Subject:** | FedEx Shipment 788680498218:   our package has been delivered |
| **ttac   ment :** | DeliveryPicture. peg |

*r*



# Hi. Your package was delivered Sat, 12/30/2023 at 9:20am.



Delivered to 11 ANN LEE CT, LATHAM, NY 12110

**OBTAIN PROOF OF DELIVERY**



Delivery picture not showing   View in browser.

# How was your delivery



| TRACKING NUMBER | 788680498218 |
| --- | --- |
| FROM | Holland & Knight |
| | 1650 Market Street |
| | STE 3300 |
| | Philadelphia, PA, US, 19103 |
| TO | Jason Leone |
| | Jason Leone |
| | 11 ANN LEE CT |
| | LATHAM, NY, US, 12110 |
| PURCHASE ORDER NUMBER | 46080 |
| REFERENCE | 213614.00001 |
| SHIPPER REFERENCE | 213614.00001 |
| SHIP DATE | Fri 12/29/2023 05:25 PM |
| DELIVERED TO | Residence |
| PACKAGING TYPE | FedEx Envelope |
| ORIGIN | Philadelphia, PA, US, 19103 |

| | |
|---|---|
| **DESTINATION** | LATHAM, NY, US, 12110 |
| **SPECIAL HANDLING** | Residential Delivery |
| **NUMBER OF PIECES** | 1 |
| **TOTAL SHIPMENT WEIGHT** | 0.50 LB |
| **SERVICE TYPE** | FedEx Priority Overnight |



## Notifications, from start to finish

Get push notifications when you pair FedEx Delivery Manager® with the FedEx® Mobile app. You can activate alerts in the app to track your package. Then listen for the virtual doorbell chime that lets you know your package was delivered.

**DOWNLOAD THE MOBILE APP**

---

**FOLLOW FEDEX**

      

✉ Please do not respond to this message. This email was sent from an unattended mailbox. This report was generated at approximately 8:27 AM CST 12/30/2023.

All weights are estimated.

To track the latest status of your shipment, click on the tracking number above.

Standard transit is the date and time the package is scheduled to be delivered by, based on the selected service, destination and ship date. Limitations and exceptions may apply. Please see

the FedEx Service Guide for terms and conditions of service, including the FedEx Money-Back Guarantee, or contact your FedEx Customer Support representative.

© 2023 Federal Express Corporation. The content of this message is protected by copyright and trademark laws under U.S. and international law. Review our privacy policy. All rights reserved.

Thank you for your business.

# EXHIBIT J

# Holland & Knight

1180 West Peachtree Street, Suite 1800 | Atlanta, GA 30309 | T 404.817.8500 | F 404.881.0470
Holland & Knight LLP | www.hklaw.com

Todd D. Wozniak
+1 404-817-8431
Todd.Wozniak@hklaw.com

December 29, 2023

VIA OVERNIGHT MAIL

Gary Russinko
 9   Grooms Road
Rexford, NY 1214
Gary.russinko@gmail.com

**Re:     POST-EMPLOYMENT RESTRICTIVE COVENANT REMINDER**

Dear Mr. Russinko:

This law firm represents WSP USA Inc. and its subsidiaries and predecessor companies (the "Company") in connection with your post-employment restrictive covenants and confidentiality obligations to the Company (the "Agreement").  A copy of your Retention Agreement is enclosed for your convenience.

The agreements contain covenants related to non-competition and non-solicitation. These obligations apply both during and after your employment with the Company in accordance with their terms.  Further, you agreed and reaffirmed in 2022 as part of your receipt of the Company's handbook that

> WSP is engaged in a highly competitive business and our competitive position depends upon our ability to maintain the confidentiality of the Confidential Information and trade secrets which WSP as an organization has an obligation to protect.  Any unauthorized disclosure, release or use of any of WSP business information, Confidential Information or trade secrets, could be highly detrimental to the company.  . .

You agreed that WSP's Confidential Information includes, but is not limited to:

> Financial and business information, such as information with respect to costs, commissions, fees, profits, sales, markets, mailing lists, strategies and plans for future business, new business, product or other development, potential acquisitions or divestitures, and new marketing ideas;

> Product and technical information, such as formulae, specifications, designs, drawings, component lists, databases, software (or pre-cursor documents),

Atlanta | Austin | Boston | Charlotte | Chicago | Dallas | Denver | Fort Lauderdale | Fort Worth | Houston
Jacksonville | Los Angeles | Miami | New York | Orange County | Orlando | Philadelphia | Portland
San Francisco | Stamford | Tallahassee | Tampa | Tysons | Washington, D.C. | West Palm Beach

December 29, 2023
Page 2

> manuals, instructions and catalogues held in any form relating to the production, creation, supply or provision of the products or services for the Company or any affiliate;
>
> Marketing information, such as information relating to the marketing or sales of any products or services of the Company and any affiliate, including without limitation, lists of customers and suppliers' names, addresses and contacts, sales targets and statistics, market share and pricing statistics, marketing surveys, research reports and advertising and promotional material;
>
> . . .

Section III(A) of your Agreement contains a non-compete provision stating that you "shall not directly or indirectly own, manage, operate, control, be employed by, consult with or participate in the ownership, management operation or control of any business in a manner that would reasonably be expected to divert business from any of the Company's 'Clients' or 'Prospective Clients' . . . with whom [you] had any involvement in developing, servicing, soliciting, or maintaining during the year prior to [your] termination." Agreement § III(A)(2). That same Section also contains a non-solicitation provision providing that you shall not directly or indirectly engage in "the solicitation, hiring, or engagement of any person or entity who is, at the time, or was within the last 12 months of [your] employment with the Company, an employee, consultant, or independent contractor of the Company or any of its affiliates. . ." *Id.* § III(B). Further, the non-solicitation prohibition prevents you from directly or indirectly engaging in conduct that would result in you "contact[ing], call[ing] upon, solicit[ing] or otherwise accept[ing business from, render services to, market services or products to, divert business from, and/or interfere with the Company's relationship or business with any of the Company's existing Clients or Prospective Clients (as that term is defined above) . . ." *Id.*

The above covenants are in addition to obligations imposed by law, including under the Defend Trade Secrets Act and similar state statutes prohibiting the retention and misappropriation of the Company's trade secrets. WSP takes these restrictive covenants and the protection of its trade secrets very seriously and expects you to honor all applicable agreements and law. WSP will not hesitate to enforce its contractual and statutory legal rights and seek all available remedies, including an injunction, damages, and its attorneys' fees and costs.

We understand that you recently resigned your employment with the Company, and that your employment with the Company ended on December 1, 2023. We further understand that you have refused to disclose where you are going to work, but intend to start with a competitor of the Company formed by another former Company employee in violation of his own restrictive covenants.

In light of the circumstances of your resignation, please confirm immediately the return of all documents, property, and data belonging to WSP to WSP. This includes all electronically stored information stored on a personal device, cloud storage accounts, or USB drive. This also includes,

December 29, 2023
Page 3

for example, (1) company-generated list of your multi-state Professional Engineer status; (2) your kWMCE professional resume; (3) the professional photograph(s) provided by the Company; (4) all reference materials, including physical books or audiobooks, paid for by the Company; and (5) professional contact list(s).

We further demand that you send in writing by no later than January 2, 2024, a written letter or affidavit, along with a detailed description of, and production of all documents related to: (a) the name of your current employer; (b) your current title; (c) all documents related to and/or reflecting any current or prospective employment or business relationship with Stephen Coon and/or Jason Leone and/or your prospective employer; (d) all documents reflecting your communications with any customers, consultants, suppliers, distributors, or other entities or relationships of the Company, and (e) written confirmation that you will preserve and not delete all documents and materials (including on your personal laptop and/or phone) related to your new prospective employment, solicitation of Company employees or customers, and/or plans to compete with the Company.

If you have any questions about your obligations, feel free to call me. If you are represented by legal counsel, please share this letter with your counsel and have them contact us.

Sincerely,

HOLLAND & KNIGHT LLP

Todd D. Wozniak

Enclosures

# RETENTION BONUS AGREEMENT

Pursuant to the terms and conditions set forth below, and in consideration of the benefits provided for herein, **kW Mission Critical Engineering, d.p.c.** (hereinafter the "**Company**") and **Gary Russinko** (hereinafter "**Employee**" and, together with the Company, the "**Parties**") hereby enter into this Retention Bonus Agreement (hereinafter this "**Retention Agreement**").

## I.      Purpose of Retention Bonus

As a valued member of the organization, the purpose of the Retention Bonus is to recognize Employee's contribution to the Company, to incentivize Employee to remain with the Company for at least a period of two years (the "**Transition Period**") following the Closing Date, (defined as the effective date of the completion of the merger of the Company and WSP USA Buildings Inc. ("**WSP USA**"), in order to assist the Company with integration into WSP USA, and to protect the Company's employees and clients from being diverted away from the Company.

## II.      Consideration for Retention Agreement

Employee may be paid a Retention Bonus pursuant to the terms herein if:

(a) Employee remains employed and "in good standing" (as defined herein) by the Company (or its successor-in-interest) through the relevant dates in Section II(A)(1)(a) and/or (b) (each a "**Vesting Date**"; collectively, the "**Vesting Dates**") of this Retention Agreement; or

(b) Employee is terminated, without "**Cause**" (as defined herein), by the Company during the Transition Period. In such an event, Employee will be paid any remaining portion of the Retention Bonus within thirty (30) days of the termination date.

### A.    Retention Bonus

Employee shall be paid a total Retention Bonus of **$330,000**, less all applicable deductions required by law (the "**Retention Bonus**"), which Retention Bonus will be paid in two installments (spread out over two years), on the dates set forth under the below Schedule of Payments. In the event that Employee resigns, or is terminated for Cause, by the time either the First Payment or the Second Payment come due, the relevant portion will not be payable. For greater certainty, it is possible for Employee to have earned the First Payment, assuming the conditions for the First Payment were met, but not earn the Second Payment.

#### 1.    Schedule of Payments

      a.  **First Payment**: The first payment of **$82,500**, less all deductions required by law, representing 25% of the Retention Bonus, will be paid to Employee via direct deposit or other acceptable means at the Company's discretion on the first payroll following December 30, 2021, so long as Employee

remains employed by Company or its successor-in-interest on December 30, 2021.

    **b. Second Payment:** The second and final payment of **$247,500**, less all deductions required by law, representing the remaining 75% of the Retention Bonus, will be paid via direct deposit or other acceptable means at the Company's discretion on the first payroll following December 30, 2022, so long as Employee remains employed by Company or its successor-in-interest on December 30, 2022.

## III.    Non-Competition and Non-Solicitation

As an incentive and as a specific condition for entering into this Retention Agreement, the Parties make, give, and agree to the following covenants respecting competition and solicitation:

    **A. Non-Compete:**

    1. The Company is in a highly competitive business and expends a considerable amount of money in the development of business from new clients and customers and continued business from existing clients and customers. The business and clientele of the Company are national and worldwide in scope, and therefore the territorial and time limitations set forth in this Non-Compete clause are reasonable and necessary for the protection of the Company's interests.

    2. During Employee's employment with the Company or its successor-in-interest and for a period of 12 months following the termination of Employee's employment for any reason (voluntary or involuntary), Employee shall not directly or indirectly own, manage, operate, control be employed by, consult with or participate in the ownership, management, operation or control of any business in a manner that would reasonably be expected to divert business from any of the Company's "**Clients**" or "**Prospective Clients**" (as defined herein) with whom Employee had any involvement in developing, servicing, soliciting, or maintaining during the year prior to Employee's termination.

    3. "Clients" is defined as clients who the Company provided services for at any time during the 12-month period immediately preceding Employee's termination. "Prospective Clients" includes any person or entity: (a) to whom the Company has submitted qualifications or a proposal with Employee's direct personal involvement during the 12 months prior to Employee's termination; or (b) concerning whom Employee was assisting the Company in preparing a submittal of qualifications or a proposal at the time of Employee's termination.

    **B. Non-Solicitation of Employees, Consultants, and Contractors:** During Employee's employment with the Company or its successor-in-interest, and for a

period of 12 months following the termination of Employee's employment for any reason (voluntary or involuntary), Employee shall not directly or indirectly (on Employee's own or in combination or association with others, and whether for Employee's own benefit or for the benefit of other persons or entities) engage in activity which involves or could result in the actual or potential termination of the Company's relationship with or the solicitation, hiring, or engagement of any person or entity who is, at the time, or was within the last 12 months of Employee's employment within the Company, an employee, consultant, or independent contractor of the Company or any of its affiliates, including for greater certainty, any affiliate U.S. company of WSP USA ("**Affiliate**").

C. **Non-Solicitation of Clients:** During Employee's employment with the Company and for a period of 12 months following the termination of Employee's employment for any reason (voluntary or involuntary), Employee shall not directly or indirectly (on Employee's own or in combination or association with others, and whether for Employee's own benefit or for the benefit of other parties or entities) contact, call upon, solicit or otherwise accept business from, render services to, market services or products to, divert business from, and/or interfere with the Company's relationship or business with any of the Company's existing Clients or Prospective Clients (as that term is defined above) that Employee interacted with on behalf of the Company, was introduced to by virtue of Employee's employment with the Company, or otherwise learned confidential information concerning during the last 12 months of Employee's employment within the Company.

D. **Termination of Restrictive Covenants:** The above restrictive covenants terminate either within one year of the Employee's termination date or, if the Employee remains employed by the Company, within three years of the Closing Date, whichever is sooner.

## IV. General Terms and Conditions

A. Employee's obligations and rights of the Company shall extend to any parent corporation, subsidiaries and corporate affiliate companies, and to any of their successors, assignees and transferees.

B. For purposes of this Retention Agreement, "in good standing" means that the Employee does not have a written record of disciplinary action for violating the Company's Code of Conduct, or policies related to anti-harassment, non-discrimination, and non-retaliation.

C. For purposes of this Retention Agreement, the term "Cause" shall mean any of the following: (i) conviction of a crime (including conviction on a nolo contendere plea) involving the commission by Employee of a felony or of a criminal act involving, in the good faith judgment of the Company, fraud, dishonesty, or moral turpitude but excluding any conviction which results solely from Employee's title or position with the Company and is not based on

Employee's personal conduct; (ii) as determined by the Company in good faith, the failure to perform reasonably requested employment duties as required by the Company, as determined by the Company in good faith, after written notice from the Company of such failure to perform; (iii) fraud or embezzlement determined in accordance with the Company's normal investigative procedures consistently applied in comparable circumstances; (iv) gross misconduct or gross negligence in connection with the business of the Company or an Affiliate which has an adverse effect on the Company or the Affiliate, as determined by the Company in good faith; or (v) violation of the Company's written policies relating to equal employment, discrimination, harassment, retaliation, business conduct or other material Company policies.

D.     Employee acknowledges that: (i) unless stated otherwise in a written agreement executed by a representative of the Company, Employee's employment with the Company is at-will; accordingly, Employee may be terminated by the Company for any reason and in its sole discretion and Employee may terminate the employment relationship for any reason and in Employee's sole discretion; and (ii) Employee is to consult with and rely upon Employee's own tax, legal, and financial advisors regarding the consequences and risks of the Retention Bonus.

E.     This Retention Agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to its conflict of laws provision. The parties being desirous of having any disputes resolved in a forum having a substantial body of law and experience with the matters contained herein, agree that any action or proceeding with respect to this Agreement shall be brought exclusively in the Supreme Court of the State of New York, New York County, or in the United States District Court for the Southern District of New York or in any other court of competent jurisdiction sitting in the State of New York, New York County and the parties agree to the personal jurisdiction thereof

F.     The invalidity or unenforceability of any part or subpart of this Retention Agreement shall not affect the validity or enforceability of the remainder of the Retention Agreement. If any provision of this Agreement shall be held to be excessively broad as to time, geography, activity or other obligations, it shall be construed or reformed by limiting or reducing it, so as to be enforceable.

G.     This Retention Agreement supersedes any prior discussions, statements, representations, communications, whether oral or in writing, about its subject matter. This Retention Agreement reflects the full agreement with respect to its subject matter and can only be modified in a writing signed by Employee and an executive of the Company or its successor-in-interest.

The Parties knowingly and voluntarily sign this Retention Agreement as of the date(s) set forth below:

**kW Mission Critical Engineering, d.p.c.**


_____      Date:___12/29/2020_____
**James Warren**


**Employee**


_____      Date:_____
**Gary Russinko**

**DiLudovico, Diane (PHL - X46879)**

| | |
|---|---|
| **From:** | TrackingUpdates@fedex.com |
| **Sent:** | Friday, December 29, 2023 2:11 PM |
| **To:** | DiLudovico, Diane (PHL - X46879) |
| **Subject:** | FedEx Shipment 788680622080: This shipment is scheduled to be sent |

*r*



# You're getting a package!

A label was created and your package is preparing to be shipped. We'll
send the delivery date when we get your package from the shipper.

 The delivery date may be updated when FedEx receives the package.



**INITIATED**

| | |
|---|---|
| **TRACKING NUMBER** | 788680622080 |
| **FROM** | Holland & Knight |
| | 1650 Market Street |
| | STE 3300 |
| | Philadelphia, PA, US, 19103 |
| **TO** | Gary Rusinko |
| | Gary Rusinko |

1

796 GROOMS RD
REXFORD, NY, US, 12148

| | |
|---|---|
| **PURCHASE ORDER NUMBER** | 46080 |
| **REFERENCE** | 213614.00001 |
| **SHIPPER REFERENCE** | 213614.00001 |
| **PACKAGING TYPE** | FedEx Envelope |
| **ORIGIN** | Philadelphia, PA, 19103 |
| **DESTINATION** | REXFORD, NY, US, 12148 |
| **SPECIAL HANDLING** | Residential Delivery |
| **STANDARD TRANSIT** | Sat, 12/30/2023 by 1:30pm |
| **NUMBER OF PIECES** | 1 |
| **TOTAL SHIPMENT WEIGHT** | 0.50 LB |
| **SERVICE TYPE** | FedEx Priority Overnight |



## Notifications, from start to finish

Get push notifications when you pair FedEx Delivery Manager® with the FedEx® Mobile app. You can activate alerts in the app to track your package. Then listen for the virtual doorbell chime that lets you know your package was delivered.

**DOWNLOAD THE MOBILE APP**

**FOLLOW FEDEX**

      

✉ Please do not respond to this message. This email was sent from an unattended mailbox. This report was generated at approximately 1:11 PM CST 12/29/2023.

All weights are estimated.

To track the latest status of your shipment, click on the tracking number above.

Standard transit is the date and time the package is scheduled to be delivered by, based on the selected service, destination and ship date. Limitations and exceptions may apply. Please see the FedEx Service Guide for terms and conditions of service, including the FedEx Money-Back Guarantee, or contact your FedEx Customer Support representative.

© 2023 Federal Express Corporation. The content of this message is protected by copyright and trademark laws under U.S. and international law. Review our privacy policy. All rights reserved.

Thank you for your business.

**DiLudovico, Diane (PHL - X46879)**

| | |
|---|---|
| **From:** | TrackingUpdates@fedex.com |
| **Sent:** | Saturday, December 30, 2023 9:46   M |
| **To:** | DiLudovico, Diane (PHL - X46879) |
| **Subject:** | FedEx Shipment 788680622080:   our package has been delivered |



# Hi. Your package was delivered Sat, 12/30/2023 at 9:38am.



Delivered to 796 GROOMS RD, REXFORD, NY 12148

**OBTAIN PROOF OF DELIVERY**

## How was your delivery

    

**TRACKING NUMBER**       788680622080

1

| | |
|---|---|
| **FROM** | Holland & Knight |
| | 1650 Market Street |
| | STE 3300 |
| | Philadelphia, PA, US, 19103 |
| | |
| **TO** | Gary Rusinko |
| | Gary Rusinko |
| | 796 GROOMS RD |
| | REXFORD, NY, US, 12148 |

| | |
|---|---|
| **PURCHASE ORDER NUMBER** | 46080 |
| **REFERENCE** | 213614.00001 |
| **SHIPPER REFERENCE** | 213614.00001 |
| **SHIP DATE** | Fri 12/29/2023 05:25 PM |
| **DELIVERED TO** | Residence |
| **PACKAGING TYPE** | FedEx Envelope |
| **ORIGIN** | Philadelphia, PA, US, 19103 |
| **DESTINATION** | REXFORD, NY, US, 12148 |
| **SPECIAL HANDLING** | Residential Delivery |
| **NUMBER OF PIECES** | 1 |
| **TOTAL SHIPMENT WEIGHT** | 0.50 LB |
| **SERVICE TYPE** | FedEx Priority Overnight |



## Notifications, from start to finish

Get push notifications when you pair FedEx Delivery Manager® with the FedEx® Mobile app. You can activate alerts in the app to track your package. Then listen for the virtual doorbell chime that lets you know your package was delivered.

**DOWNLOAD THE MOBILE APP**



**FOLLOW FEDEX**

     

✉ Please do not respond to this message. This email was sent from an unattended mailbox. This report was generated at approximately 8:45 AM CST 12/30/2023.

All weights are estimated.

To track the latest status of your shipment, click on the tracking number above.

Standard transit is the date and time the package is scheduled to be delivered by, based on the selected service, destination and ship date. Limitations and exceptions may apply. Please see the FedEx Service Guide for terms and conditions of service, including the FedEx Money-Back Guarantee, or contact your FedEx Customer Support representative.

© 2023 Federal Express Corporation. The content of this message is protected by copyright and trademark laws under U.S. and international law. Review our privacy policy. All rights reserved.

Thank you for your business.

# EXHIBIT K

# AMERICAN ARBITRATION ASSOCIATION®

**EMPLOYMENT ARBITRATION RULES**
**DEMAND FOR ARBITRATION**

To ensure your demand is processed promptly, please file online at **www.adr.org/support**. Complete this form, provide last known email addresses and include a copy of the Arbitration Agreement, Plan or Contract.

| Parties (Claimant) | | |
|---|---|---|
| Name of Claimant: | | |
| Address: | | |
| City: | State: | Zip Code: |
| Phone No.: | Email Address: | |
| Representative's Name (if known): | | |
| Firm (if applicable): | | |
| Representative's Address: | | |
| City: | State: | Zip Code: |
| Phone No.: | Email Address: | |

| Parties (Respondent) | | |
|---|---|---|
| Name of Respondent: | | |
| Address: | | |
| City: | State: | Zip Code: |
| Phone No.: | Email Address: | |
| Representative's Name (if known): | | |
| Firm (if applicable): | | |
| Representative's Address: | | |
| City: | State: | Zip Code: |
| Phone No.: | Email Address: | |

**Mediation:** If you would like the AAA to contact the other parties and attempt to arrange mediation, please check this box .

Claim: What was/is the employee/worker's annual wage range?    Less than $100,000    $100,000-$250,000    Over $250,000
*Note: This question is required by California law.*

Amount of Claim:

Claim involves:    Statutorily Protected Rights    Non-Statutorily Protected Rights

In detail, please describe the nature of each claim. You may attach additional pages if necessary:



**AMERICAN ARBITRATION ASSOCIATION**®

**EMPLOYMENT ARBITRATION RULES**
**DEMAND FOR ARBITRATION**

| | |
|---|---|
| Other Relief Sought:     Attorneys Fees     Interest     Arbitration Costs     Punitive/ Exemplary<br>    Other: | |

Please describe the qualifications for arbitrator(s) to hear this dispute:

| | | | |
|---|---|---|---|
| Hearing: Estimated time needed for hearings overall: | | hours   or | days |

Hearing Locale:

*(check one)*     Requested by Claimant     Locale provision included in the contract

Filing Fee requirement or $350 (max amount per AAA)

Filing by Company:     $2,450 single arbitrator     $3,050 three arbitrator panel

Notice: To begin proceedings, **please file online at www.adr.org/fileonline.** You will need to upload a copy of this Demand and the Arbitration Agreement, and pay the appropriate fee.

| | |
|---|---|
| Signature (may be signed by a representative): | Date: |

Pursuant to Section 1284.3 of the California Code of Civil Procedure, consumers with a gross monthly income of less than 300% of the federal poverty guidelines are entitled to a waiver of arbitration fees and costs, exclusive of arbitrator fees. This law applies to all consumer agreements subject to the California Arbitration Act, and to all consumer arbitrations conducted in California. Only those disputes arising out of employer plans are included in the consumer definition. If you believe that you meet these requirements, you must submit to the AAA a declaration under oath regarding your monthly income and the number of persons in your household. Please contact the AAA's Western Case Management Center at 1-800-778-7879. If you have any questions regarding the waiver of administrative fees, AAA Customer Service can be reached at 1-800-778-7879. Please visit our website at www.adr.org/support to file this case online.

**BEFORE**
**THE AMERICAN ARBITRATION ASSOCIATION**

WSP USA, Inc., )
)
              Claimant, )
)
v. )     C.A. No.
)
STEPHEN COON, )
)
              Respondent. )
)

---

## WSP USA, INC'S MOTION FOR EMERGENCY INTERIM RELIEF

---

Claimant WSP USA, Inc. ("WSP"), by and through undersigned counsel, hereby moves for interim relief in the form of the appointment of an emergency arbitrator, a temporary injunction, and expedited initial discovery, pursuant to the Optional Rules for Emergency Measures of Protection of the AAA's Employment Arbitration Rules and Mediation Procedures.

### <u>INTRODUCTION</u>

This action arises out of Stephen Coon's breach of the duty of loyalty and violations of restrictive covenants in his employment agreements with WSP. In 2020, WSP acquired kW Mission Critical Engineering ("kW MCE"), a data-center design and mission-critical engineering firm. As part of that acquisition, kW MCE's senior leadership, including Coon, signed employment agreements that prohibited them from competing with WSP or soliciting its employees or vendors until at least one year after their departure from kW MCE for any reason. Nonetheless, Coon resigned from WSP in October 2023 for the specific purpose of starting a competing business—a fact he openly admitted to colleagues. On his way out and since the time

of his resignation, it appears Coon also solicited several current WSP employees to work for him, two of which have now resigned (in violation of their own restrictive covenants) in close succession without revealing their new employer.  Having siphoned off this team of former WSP employees, Coon will imminently begin competing with WSP for the very same customers that Coon was entrusted with servicing using kW MCE's proprietary, confidential, and trade secret business information and strategies.  Coon also noted that he already has a buyer for his new business lined up, offering $25MM.

AAA should appoint an emergency arbitrator to enjoin Coon from improperly competing with WSP in clear violation of his employment agreement, and to prevent irreparable harm to WSP's business, impairment of its customer goodwill, and misappropriation of WSP's confidential and trade secret business information.  WSP paid Coon substantial amounts of consideration in exchange for the post-employment covenants he voluntarily agreed-to, and will be irreparably harmed, both through the loss of its competitive advantage and through the lost good will that it specifically acquired as part of its purchase of kW MCE.  The emergency arbitrator should also order limited expedited discovery to allow WSP to further support its requested relief.

## BACKGROUND

**I.      WSP Acquires kW Mission Critical Engineering.**

In December 2020, WSP acquired kW MCE, a small (then approximately 175 employee) engineering firm that focused primarily on designing data centers and other mission-critical projects.  (Decl. of Kenneth Clausen ¶ 4, attached hereto as Ex. A.)  The acquisition closed on December 30, 2020.  (*Id.* ¶ 5.)  As part of the acquisition, kW MCE's senior leadership team and key employees, including Coon, signed employment agreements and retention agreements containing restrictive covenants that prohibited them from competing with WSP, soliciting its

employees, customers, or vendors, or sharing its trade secrets or confidential information.  (Ex. B at 6–8.)

## II.        Coon Agreed to Be Bound by Restrictive Covenants.

Coon worked for kW MCE for approximately eight years before the acquisition and entered an Employment Agreement with WSP on December 30, 2020, as a Professional Electrical Engineer and Managing Principal of the Phoenix Office.  (Ex. A ¶¶ 6–7 .)  Coon was responsible for providing technical engineering expertise and developing successful relationships with design team partners—architects, engineers, and contractors.  (*Id.* ¶ 11.)  Coon gained substantial experience and insight into kW MCE's data center business, and had key responsibilities for leadership of key client accounts and projects associated with data center program design and build out.  (*Id.* ¶ 12.)  Coon also gained knowledge about all aspects of kW MCE's customers' programs, including schedule, budget, risk and desired engineering team.  (*Id.* ¶ 13.)

Mr. Coon's Employment Agreement provided for a $200,000 a year base salary, benefits, and potential performance bonuses.  (Ex. B at 2.)  In exchange for this compensation, Coon agreed "not directly or indirectly [to] own, manage, operate, control, be employed by, consult with or participate in the ownership, management operation or control of any business in a manner that would reasonably be expected to divert business from any of the Company's 'Clients' or 'Prospective Clients' with whom [he] had any involvement in developing, servicing, soliciting, or maintaining during the year prior to [his] termination."  (*Id.* at 7.)  The Employment Agreement also prohibits Coon from engaging in "the solicitation, hiring, or engagement of any person or entity who is, at the time, or was within the last 12 months of [his] employment with the Company, an employee, consultant, or independent contractor of the Company or any of its affiliates."  (*Id.* at 8.)  And the Employment Agreement provides that Coon "shall not . . . contact, call upon, solicit

3

or otherwise accept business from, render services to, market services or products to, divert business from, and/or interfere with the Company's relationship or business with any of the Company's existing Clients or Prospective Clients" that he learned of, did work for, or learned confidential information about through WSP. (*Id.*)

These restrictive covenants are essential to ensuring that WSP receives the benefit of the bargain from the kW MCE acquisition, including kW MCE's good will. The data-center design business is extremely competitive, with each company's ability to compete largely dependent on, *inter alia*, (1) its ability to understand and accommodate a client's needs, and (2) the quality and reputation of its specific engineers. (Ex. A ¶ 31.) Competition from former kW MCE/WSP employees—and especially high-level employees like Coon, who is equipped with recent knowledge of kW MCE and WSP customers' preferences for, *inter alia*, engineering team organization and operation patterns—would thus be devastating for WSP. (*Id.* ¶¶ 33–34.) Accordingly, the Employment Agreement provides that the restrictive covenants will remain in place not only during Coon's employment by WSP, but also for another twelve months after he leaves or is terminated by WSP. (*See* Ex. B at 6–8.) The only exception is if Coon does not renew the Employment Agreement after the first two-year Term—and thus "convert[s] to an at-will employee" at the end of the Term, (*id.* at 2)—and "remains employed with [WSP] one year after converting to an at-will employee," at which point the restrictive covenants would expire at the end of that one year period. (*Id.* at 10.) In further recognition of the importance of the restrictive covenants, the Employment Agreement also provides, and Coon agreed, that "[t]he Company is in a highly competitive business and expends considerable amounts of money in the development of business from new clients and customers and continued business from existing clients and customers. The business and clientele of the Company are national and worldwide in scope, and

therefore the territorial and time limitations set forth in th[e] Non-Compete clause are reasonable and necessary for the protection of the Company's interests." (*Id.* at 7.)

Additionally, many employees, including Coon, also signed retention bonus agreements ("RBA") that reaffirmed their restrictive covenants in exchange for substantial cash bonuses "to incentivize [them] to remain with [kW MCE] . . . in order to assist [kW MCE] with integration into WSP." (Ex. C at 1.) Specifically, Coon executed the RBA on December 29, 2020, the day before signing his Employment Agreement. WSP paid Coon $475,000 over the course of two years pursuant to his RBA, in addition to his compensation under the Employment Agreement. (*Id.* at 1–2.)

## III.        Coon Violates the Restrictive Covenants.

On November 2, 2022, Coon gave notice that he would not renew the Employment Agreement, making him an at-will employee as of December 30, 2022. (Ex. D.) Coon did not, however, remain with WSP for a year after that date, as required by the Employment Agreement to excuse him from the 12-month tail in the restrictive covenants. (Ex. A ¶¶ 15, 17.) Instead, he tendered his resignation on October 18, 2023, effective "sometime between two and four weeks from today." (Ex. E.) His actual last day was November 3, 2023. (Ex. A ¶ 19.) Accordingly, the non-compete and non-solicitation provisions of his Employment Agreement are still in effect until November 3, 2024.

Nonetheless, Coon has already begun forming a competing business in Arizona (where he lives) and upstate New York (where much of kW MCE was located), likely intending to take advantage of the exploding demand for data centers because of the growth of AI software and applications. Since his resignation (and likely earlier), Coon has solicited several former kW MCE/WSP employees—including at least Principal Mechanical Engineer Jason Leone and

Managing Principal of the Troy Office Gary Russinko, who are each subject to their own restrictive covenants with WSP, (Exs. F & G)—to join him. (Ex. A ¶¶ 24–30.)  Russinko resigned from WSP on October 30, 2023, with his last day being December 1. (*Id.*)  Leone followed close behind, resigning on December 5, 2023, with his last day being December 22.. (*Id.*)  Prior to his resignation, Coon openly admitted to a co-worker, Mr. Ken Clausen, that he was starting a competing business in Phoenix and upstate New York, near kW MCE's Troy, New York office, and had a lease ready to be executed in January of 2024. (*Id. ¶* 20.)  Coon also told Clausen he was "going to be taking anyone in Troy who had not signed a retention agreement," and acknowledged that he needed kW MCE's MEP engineers to deliver on competitive services to the very clients Coon was responsible for servicing at kW MCE. (*Id.* ¶ 21.)  By recruiting those experienced mechanical engineers, Coon openly touted he could start a business that could compete directly with WSP. (*Id. ¶* 22.)  He also bragged that a member of the C-suite of another company, Bowman Engineering, already planned to pay him $25 million to buy the new business. (*Id.* ¶ 23.)  Based on Coon's prior comments to Clausen, he is likely to target at least four other key kW MCE employees in early 2024, if he has not already done so. (*Id.* ¶ 34.)  Design partners have also suggested to Clausen that Coon is soliciting competitive work from kW MCE's existing customers. (*Id.* ¶ 35.)

Together, Coon and the employees he has recruited to compete against kW MCE have the potential to inflict substantial harm to WSP's business.  The key accounts that Coon was responsible for servicing have the potential to generate the tens of millions of dollars for FY 2024 and beyond. (*Id.* ¶ 32.)  Further, Coon has in-depth knowledge of customer preferences, pricing, desired team, project specifications, engineering specifications and kW MCE's existing and past work for those key customers. (*Id. ¶* 33.)

6

On October 25, 2023, WSP's counsel sent Coon a letter, reminding him of his obligations under the restrictive covenants and addressing questions Coon asked in his resignation letter regarding which items/information he could keep and what had to be returned to WSP. (Ex. H.) On December 29, 2023, WSP's counsel sent similar letters to Messrs. Leone and Russinko. (Exs. I & J.) Nonetheless, Coon seems undeterred, and neither Coon, Leone, or Russinko have divulged or disclosed where they intend to work after leaving WSP/kW MCE. Accordingly, on January 2, 2024, WSP filed its Demand for Arbitration against Coon pursuant to § 17(a) of the Employment Agreement, asserting claims for breach of fiduciary duty, breach of contract, and tortious interference with contract. WSP now moves for interim relief and expedited initial discovery.

## LEGAL STANDARDS[1]

The AAA's Emergency Rule O-4 provides that emergency interim relief is proper where "the party seeking the emergency relief has shown that immediate and irreparable loss or damage will result in the absence of emergency relief, and that such party is entitled to such relief." Similarly, New York law allows an employer to seek a preliminary injunction to enforce restrictive covenants where the claimant "show[s] a probability of success on the merits, the danger of irreparable injury in the absence of a preliminary injunction and a balancing of the equities in its favor." *Frank May Assocs. Inc. v. Boughton*, 281 A.D.2d 673, 674 (N.Y. S. Ct. App. Div. 2001).

---

[1]     Coon's Employment Agreement provides that "[a]ny dispute arising between any of the Company and [Coon] under this Agreement, or under any statute, regulation, or ordinance, or in connection with [Coon's] Employment with the Company, shall be submitted to binding arbitration before the American Arbitration Association ("AAA") for resolution." (Ex. B at 11.) It further provides that the arbitration proceedings will be governed by New York law and "conducted in accordance with AAA's Employment Arbitration Rules and Procedures." *Id.* And it provides "that in the event of a breach of any provision of this Agreement, money damages would be inadequate and neither [Mr.Coon] nor the Company would have an adequate remedy at law" and that injunctive relief is appropriate. *Id.*

"[T]he purpose of a preliminary injunction is to preserve the status quo until a decision is reached on the merits." *NYSARC, Inc. v. Syed*, 747 N.Y.S.2d 327, 329 (N.Y. S. Ct. 2002).

## ARGUMENT

Coon violated his duty of loyalty and his restrictive covenants by planning to start a competing business while still employed at WSP and soliciting WSP's other employees to join him. If he is permitted to begin competing with WSP, he will not only further violate his restrictive covenants, but WSP will also be irreparably harmed through the loss of its competitive position, the threatened and/or actual disclosure and misuse of its confidential information and trade secrets, and the impairment of kW MCE's business and customer good will for which WSP specifically bargained. Moreover, WSP requires expedited initial discovery on specific, targeted issues to determine the extent of the violations and Coon's plans for his competing business so that it can provide additional evidentiary support for continuing injunctive relief.

**I.       WSP Is Entitled to Emergency Interim Relief.**

**A.       WSP Is Likely to Succeed on the Merits of Its Breach-of-Contract Claims.**

To establish breach of contract, a claimant must show "the existence of a contract, the [claimant's] performance pursuant to the contract, the defendant's breach of his or her contractual obligations, and damages resulting from the breach." *Tri-Star Lighting Corp. v. Goldstein*, 151 A.D.3d 112, 1105 (N.Y. App. Div. 2017). Here, Coon breached his Employment Agreement by failing to abide by the restrictive covenants.

**i.       The Restrictive Covenants Are Enforceable.**

The Employment Agreement, including the restrictive covenants, is a valid and enforceable contract. "Generally, a covenant not to compete will be enforced . . . if it is reasonably limited temporarily and geographically and, without being harmful to the public or unduly burdensome,

serves the acceptable purpose of protecting the former employer from unfair competition."
*Bollengier v. Gulati*, 233 A.D.2d 721, 722 (N.Y. App. Div. 1996). Moreover, "[c]ourts will
enforce noncompetition clauses 'where necessary to protect, *inter alia*, an employer's confidential
customer information and the good will of . . . customer[s] generated and maintained at the
employer's expense.'" *Gundermann & Gundermann Ins. V. Brassill*, 46 A.D.3d 82, 83 (N.Y. App.
Div. 2007) (quoting *Milbrandt & Co., Inc. v. Griffin*, 1 A.D.3d 327, 328 (N.Y. App. Div. 2003)).

As an initial matter, in his Employment Agreement, Coon agreed that "the territorial and
time limitations set forth in th[e] Non-Compete clause are reasonable and necessary for the
protection of the Company's interests." (Ex. B at 7.) Accordingly, he has already conceded that
they are valid. *See* Arbitration Award, *Clopay Corp. v. Priest*, 2023 WL 5657724 (E.D. Ok. July
10, 2023) (holding that national scope of restrictive covenant was reasonable based on employee's
admission in contract).

Moreover, courts routinely hold that the Agreement's temporal scope—twelve months
after the employee leaves the company—is reasonable. *See, e.g.*, *Artech Info. Sys., L.L.C. v. Tee*,
280 A.D.2d 117, 124 (N.Y. App. Div. 2001); *Michael I. Weintraub, M.D., P.C. v. Schwartz*, 131
A.D.2d 663, 665 (N.Y. App. Div. 1987); *J.H. Goldberg Co., Inc. v. Stern*, 53 A.D.2d 246, 250
(N.Y. App. Div. 1976). The temporal scope is particularly reasonable here because the covenants
were connected to the acquisition of kW MCE. "New York courts have found three to five year
restrictions reasonable in the context of the sale of a business." *Uni-World Capital L.P. v.
Preferred Fragrance, Inc.*, 73 F. Supp. 3d 209, 235 (S.D.N.Y. 2014)). Although the restrictive
covenants were not part of the contract for the acquisition of kW MCE itself, the acquisition
contemplated that the restrictive covenants would be in place. Indeed, the Employment Agreement
specifically references the transition from kW MCE to WSP, (Ex. B at 1), and the RCA states that

the purpose of that agreement, including the similar restrictive covenants set forth therein, is "to incentivize [the employees] to remain with [kW MCE] . . . in order to assist [kW MCE] with integration into WSP." (Ex. C at 1.)

The Employment Agreement's lack of a specific geographic scope is also reasonable for two reasons. First, WSP works with clients and vendors around the world. *See Uni-World Capital L.P.*, 73 F. Supp. 3d at 235 (upholding non-compete that applied to "the United States of America, its territories and possessions, and any country outside of the United States of America to which products of the Business are sold"); *Integra Optics, Inc. v. Nash*, 2018 WL 224460, at *10 (N.D.N.Y. Apr. 10, 2018) (applying Colorado law and enforcing worldwide scope of restrictive covenant); *GE Betz Inc. v. Moffitt-Johnson*, 301 F. Supp. 3d 668, 685 (S.D. Tex. 2014); *Bio-Imaging Techs., Inc. v. Marchant*, 584 F. Supp. 2d 322, 328 (D. Mass. 2008) (upholding non-compete agreement that extends to "any state or country where [employer] does business); *Universal Engraving, Inc. v. Duarte*, 519 F. Supp. 2d 1140, 1153 (D. Kan. 2007). Second, the covenants are limited to conduct that is directed at WSP's existing and prospective clients—*e.g.*, soliciting them or engaging in conduct that "would reasonably be expected" to divert them away from WSP. *See Crest Hill Capital LLC v. Gonzalez¸* 2019 WL 1557512, at *6 (NY. S. Ct. Apr. 10, 2019) ("No geographic limitation is required for a non-solicitation clause that is client-based."); *W.R. Grace & Co., Dearborn Div. v. Mouyal*, 422 S.E.2d 529, 533 (Ga. 1992) ("Where . . . the former employee is prohibited from post-employment solicitation of employer customers which the employee contacted during his tenure with the employer, there is no need for a territorial restriction expressed in geographic terms." (footnote omitted)). Even if this were not the case (which it is), Coon intends to operate his business—and has solicited WSP employees to work on that business—in New York, where kW MCE was primarily located, and Arizona, where Coon

personally worked while employed at WSP. (*See* Ex. B at 1.) Accordingly, enforcing the restrictive covenants to prevent Coon from starting his competing business is reasonable and necessary to protect WSP's legitimate interests.

### ii. Coon Breached the Restrictive Covenants and Will Breach Them Again.

While WSP performed its obligations under the Employment Agreement by paying Coon a substantial salary, benefits, and bonuses, Coon violated his restrictive covenants and is planning to violate them again. The non-solicitation clause of the Employment Agreement provides that Coon shall not "engage in any activity which involves . . . the solicitation, hiring, or engagement of any person or entity who is, at the time, or was within the last 12 months of [his] employment with the Company, an employee . . . of the Company or any of its affiliates." (Ex. B at 8.) He has already done that by asking Messrs. Leone and Russinko to work for him at his competing business, causing them to resign.

Moreover, Coon's competing business itself will violate the non-competition and non-solicitation provisions. The non-competition clause provides that Coon "shall not directly or indirectly own, manage, operate, [or] control . . . any business in a manner that would reasonably be expected to divert business from any of the Company's 'Clients' or 'Prospective Clients' with whom [he] had any involvement in developing, servicing, soliciting, or maintaining during the year prior to [his] termination." (*Id.* at 7.) Yet, as noted above, that is exactly what Coon admits that he intends to do. Similarly, the non-solicitation clause provides that Coon "shall not . . . contact, call upon, solicit or otherwise accept business from, render services to, market services or products to, divert business from, and/or interfere with the Company's relationship or business with any of the Company's existing Clients or Prospective Clients" that he learned of, did work for, or learned confidential information about through WSP "during the year prior to [his]

11

termination." (*Id.*)  Coon has openly admitted he would go after the same client base given the team he is recruiting and his stated intention to start a competing business.  (Ex. A ¶¶ 20, 21, 35.)

### iii.    WSP Has Been Harmed.

WSP has already suffered damages and will suffer further damages without interim relief. Specifically, WSP has already been harmed by Coon's tortious interference with Messrs. Leone and Russinko's retention agreements in violation of his (and their) restrictive covenants—WSP lost two valuable employees.  Moreover, as explained below, WSP will suffer irreparable damage to its reputation, good will, and customer relationships if Coon is permitted to begin competing with it to solicit the same customers Coon worked with while at kW MCE/WSP.  (*See* Part I.B, *infra*.)

### B.    WSP Will Be Irreparably Harmed Without Interim Relief.

An injury is irreparable for the purpose of obtaining preliminary relief where the party would not have an adequate remedy at law.  *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 68 (2d Cir. 1999).  Here, WSP will suffer several irreparable injuries if the Arbitrator does not intervene.

As with the reasonableness of the restrictive covenants, Coon conceded that WSP will suffer irreparable harm if he is permitted to start a competing business before the covenants expire. Specifically, in the Employment Agreement, Coon agreed that "that in the event of a breach of any provision of this Agreement, money damages would be inadequate and neither [Mr.Coon] nor the Company would have an adequate remedy at law" and that injunctive relief is appropriate.  (Ex. B at 7); *see also Ticor Title Ins. Co.*, 173 F.3d at 69 (holding that contract provision that "in the event of Cohen's breach of the post-employment competition provision, Ticor shall be entitled to injunctive relief, because it would cause irreparable injury" is an admission that harm would be irreparable).

Even apart from this admission, Coon's competing business in fact will likely cause substantial irreparable harm to WSP. "It is well established that the loss of customer relationships stemming from the violation of nonsolicitation and non-competition clauses constitutes irreparable harm sufficient to support injunctive relief." *Crest Hill Capital LLC*, 2019 WL 1557512, at *6. "[T]he violation of a non-compete by the solicitation of employees also constitutes irreparable harm." *Global Switching Inc. v. Kasper*, 2006 WL 1800001, at *12 (E.D.N.Y. June 28, 2006); *EASi, LLC v. Gaffar*, 2020 WL 3868394, at *3 (C.D. Ill. July 9, 2020) (finding risk of irreparable harm because "[i]f Gaffar or L&T continue to solicit and hire EASi employees during the pendency of this lawsuit, EASi risks losing significant work from CAT, a large client, and may be competitively disadvantaged on future projects because the former EASi employees likely take with them the customer goodwill they helped to create for the employer"); *cf. Newmark Partners, L.P. v. Hunt*, 200 A.D.2d 557 (N.Y. App. Div. 2021) (granting preliminary injunction "to protect [plaintiff's] client relationships, reputation, and goodwill after losing all or almost all of their multifamily property group to their primary competitor").

As explained above, the data-center design industry is highly competitive, and a business' ability to compete depends in large part on the particular engineers working for it and its knowledge of a particular client's preferences about how the engineering team will operate. Coon knows WSP's clients' preferences and may be able to divert substantial business from it by siphoning off its valuable team of engineers. Coon also has knowledge of WSP/kW MCE's valuable trade secrets relating to customer projects/proposals, including design elements, proposal/fee schedules, and instruments of service like field construction documents. Any competition or solicitation by Coon and his former WSP colleagues will necessarily involve the actual or inevitable disclosure of WSP's confidential and trade secret business information.

Finally, these harms will be compounded by the fact Coon's restrictive covenants were integral to "the sale of an existing business with its goodwill." *Frank May Assoc.*, 281 A.D.2d at 674; *accord Lund v. Agmata Wash. Enterprises, Inc.*, 190 A.D.2d 577, 577 (N.Y. App. Div. 1993); *Hay Grp., Inc. v. Nadel*, 170 A.D.2d 398, 399 (N.Y. App. Div. 1991). WSP will irreparably lose part of the good will it purchased in the acquisition if Coon is permitted to compete with it and steal its employees during the term of the restrictive covenants.

In sum, WSP will be irreparably harmed if Coon is not enjoined from competing with it and continuing improperly to solicit its employees in violation of his restrictive covenants.

**C.      The Balance of Equities Favors WSP.**

The balance of the equities favors WSP. As explained above, WSP paid Coon substantial sums of money in exchange for his employment ***and*** his agreement to abide by the restrictive covenants, and WSP will suffer significant and irreparable harm to its business, reputation, good will, and customer relationships if Coon is not enjoined from violating those covenants.

Moreover, those covenants are reasonably limited to protect WSP's interests. They do not prohibit Coon from obtaining gainful employment. Rather, they prohibit him only from soliciting the specific employees, vendors, and clients that belong to WSP, and from doing work that "would reasonably be expected to divert business" away from WSP. *See Battenkill Veterinary Equine P.C. v. Cangelosi*, 1 A.D. 856, 859 (N.Y. App. Div. 2003) (holding that equities favored the plaintiff where "[d]efendant is not being deprived of her livelihood").

Accordingly, the equities favor WSP, and the Arbitrator should issue emergency interim relief to enjoin Coon from competing with WSP and soliciting its employees or vendors during the pendency of this arbitration.

II.      **WSP Is Entitled to Expedited Initial Discovery.**

An "arbitrator [has] the authority to order such discovery, by way of  deposition, interrogatory, document production, or otherwise, as the arbitrator considers necessary to a full and fair exploration of the issues in dispute,  consistent with the expedited nature of arbitration." AAA'S EMPLOY. ARB. R. & MEDIATION P. 9.  WSP requests that Coon be required to preserve all relevant documents, including personal communications like emails and text messages, and that WSP be permitted to serve up to fifteen document requests and ten interrogatories to understand more about the specifics of Coon's competition plans and the full extent of his breach of his post-employment covenants.  These requests and interrogatories should include, but not be limited to, the specific requests attached hereto as Exhibits K and L.

<div align="center">

**CONCLUSION**

</div>

For the forgoing reasons, the AAA should appoint an emergency arbitrator to this matter, order Coon not to compete with WSP or solicit its employees or vendors, and order Coon to preserve all relevant documents and to respond to expedited initial discovery.


Dated: January 2, 2024                    Respectfully submitted,


                                          */s/ Nipun J. Patel*
                                          **HOLLAND & KNIGHT LLP**
                                          Nipun J. Patel
                                          1650 Market Street, Suite 3300
                                          Philadelphia, PA 19104
                                          nipun.patel@hklaw.com
                                          Telephone:  215.252.9600
                                          Fax:  215.867.6070

                                          *Counsel for WSP USA, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I, Nipun J. Patel, do hereby certify that on January 2, 2024, a true and correct copy of

the foregoing was served via email and mail to:

Stephen Coon
5533 Evia Caballo Blanco
Cave Creek, AZ 85331

9273 E Western Saddle Way
Scottsdale, AZ 85255

Coon1986@gmail.com


*/s/ Nipun J. Patel*
Nipun J. Patel

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CG ENTERPRISES HOLDINGS, LLC, a California limited liability company; and STEPHEN M. COON, an individual<br><br>Plaintiffs,<br><br>vs.<br><br>WSP USA, INC., a New York corporation; WSP USA BUILDINGS, INC., a New York corporation; kW MISSION CRITICAL ENGINEERING, D.P.C., a New York design professional corporation; and DOES 1 through 20, inclusive,<br><br>Defendants. | Case No.:  3:24-CV-00292 CRB<br>Hon. Charles R. Breyer<br><br>**[PROPOSED] ORDER GRANTING MOTION TO DISMISS PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 12(B)(2), (3), AND (6) OR, IN THE ALTERNATIVE, TO STAY THIS ACTION PURSUANT TO 9 U.S.C. § 3, OR TRANSFER PURSUANT TO 28 U.S.C. § 1404(a)** |

**[PROPOSED] ORDER**

Currently before the Court is Defendants WSP USA, INC., WSP USA BUILDINGS, INC., and kW MISSION CRITICAL ENGINEERING, D.P.C. ("Defendants") Motion to Dismiss Pursuant to Federal Rules of Civil Procedure 12(b)(2), (3), and (6) or, in the Alternative, to Stay this Action Pursuant to 9 U.S.C. § 3, or Transfer Pursuant to 28 U.S.C. § 1404(a) ("Motion"). Having considered the moving, opposition, and reply papers, all materials on file in this Action, the argument of counsel at the hearing (if any), and all other matters this Court deems appropriate and proper, and good cause appearing therefrom,

**IT IS HEREBY ORDERED THAT**,

Defendants' Motion to Dismiss is GRANTED in its entirety, *with prejudice*;

*or in the alternative*

Defendants' Motion to Stay is GRANTED. This Action is stayed in its entirety pending the Parties' completion of arbitration with AAA;

*or in the alternative*

Defendants' Motion to Transfer is GRANTED. The Clerk is directed to transfer this Action to the Southern District of New York and close the file in this Court.

**IT IS SO ORDERED.**

Dated: March __, 2024

_____
Honorable Charles R. Breyer
UNITED STATES DISTRICT JUDGE

1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| WSP USA Buildings Inc., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:24-cv-00076-DNH-TWD |
| | ) | |
| STEPHEN COON, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

---

## PLAINTIFF WSP USA BUILDINGS INC'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR RECONSIDERATION

---

By:  Sean C. Sheely
HOLLAND & KNIGHT LLP
31 West 52nd Street
New York, NY 10019
212-513-3200
Sean.sheely@hklaw.com

Nipun J. Patel (*pro hac vice forthcoming*)
Justin M. Kadoura (*pro hac vice forthcoming*)
HOLLAND & KNIGHT LLP
1650 Market Street, Suite 3300
Philadelphia, PA 19103
215-252-9527
Nipun.patel@hklaw.com
Justin.kadoura@hklaw.com

## <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ...................................................................................................................1

ARGUMENT .......................................................................................................................3

   I.      THE SPECIAL CIRCUMSTANCES EXCEPTION APPLIES HERE. .........................3

         A.     Mr. Coon's California Action Was Motivated Solely by Forum Shopping. ......3

         B.     Mr. Coon's California Lawsuit is an Improper Anticipatory Action.................8

   II.     THE COURT'S VIEWS ON VENUE AND PERSONAL JURISDICTION
         SHOULD BE REVISITED AND THIS ACTION REINSTATED. ...............................9

         A.     Venue is Proper in this District. .............................................................9

         B.     This Court Has Personal Jurisdiction over Coon. .......................................11

CONCLUSION....................................................................................................................12

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Absolute Nevada, LLC v. Grand Majestic Riverboat Co., LLC*,
 646 F. Supp. 3d 426 (S.D.N.Y. 2022)......................................................................12

*Am. Integrated Sec. Grp., Inc. v. Terra Sound Tech. LLC*,
 No. 22CV2773AMDMMH, 2023 WL 6308014 (E.D.N.Y. Sept. 28, 2023)...........10

*Astor Holdings, Inc. v. Roski*,
 No. 01 CIV. 1905 (GEL), 2002 WL 72936 (S.D.N.Y. Jan. 17, 2002) ...................11

*Bartz v. Agway, Inc.*,
 849 F. Supp. 166 (N.D.N.Y. 1994)............................................................................1

*Bollengier v. Gulati*,
 233 A.D.2d 721 (3d Dep't 1996) ..............................................................................4

*Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*,
 511 F.3d 535 (6th Cir. 2007) ....................................................................................6

*CGI Solutions, LLC v. Sailtime Licensing Grp., LLC*,
 No. 05 CV 4120, 2005 WL 3097533 (S.D.N.Y. Nov. 17, 2005) ..............................8

*D.H. Blair & Co. v. Gottdiener*,
 462 F.3d 95 (2d Cir. 2006)......................................................................................11

*Daniel v. Am. Bd. of Emergency Med.*,
 428 F.3d 408 (2d Cir. 2005).....................................................................................10

*Dornuch Ltd. v. PBM Holdings, Inc.*,
 666 F. Supp. 2d 366 (S.D.N.Y. 2009).......................................................................6

*DraftKings Inc. v. Hermalyn*,
 Case No. 1:24-cv-10299-JEK (D. Mass. filed Feb. 5, 2024), ECF No. 4................7

*Eisemann v. Greene*,
 204 F.3d 393 (2d Cir. 2000)..................................................................................1, 3

*Employers Ins. of Wausau v. Fox Entertainment Grp. Inc.*,
 522 F.3d 271 (2d Cir. 2008).................................................................................2, 3

*Everest Cap. Ltd. v. Everest Funds Mgmt., LLC*,
 178 F. Supp. 2d 459 (S.D.N.Y. 2002).......................................................................7

*Factors Etc., Inc. v. Pro Arts, Inc.*,
　579 F.2d 215 (2d Cir. 1978)..................................................................................8

*Iragorri v. Un. Tech. Corp.*,
　274 F.2d 65 (2d Cir. 2001)....................................................................................4

*Kellen Co., Inc. v. Calphalon Corp.*,
　54 F. Supp. 2d 218 (S.D.N.Y. 1999).....................................................................6

*McCrory Corp. v. Cloth World, Inc.*,
　378 F. Supp. 322 (S.D.N.Y. 1974) ......................................................................12

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Lecopulos*,
　553 F.2d 842 (2d Cir. 1977)...........................................................................11, 12

*Ministers & Missionaries Benefit Bd. v. Snow*,
　26 N.Y.3d 466 (2015) ...........................................................................................4

*Motion Picture Laboratory Techs. Local 780, I.A.T.S.E. v. McGregor v. Werner, Inc.*,
　804 F.2d 16 (2d Cir. 1986)....................................................................................3

*New York Marine and Gen. Ins. Co. v. Lafarge N. Am., Inc.*,
　599 F.3d 102 (2d Cir. 2010)..................................................................................1

*Shrader v. CSX Transp., Inc.*,
　70 F.3d 255 (2d Cir. 1995)....................................................................................3

*Six Dimensions, Inc. v. Perficient, Inc.*,
　No. 15 CIV. 8309 (PGG), 2017 WL 10676897 (S.D.N.Y. Mar. 28, 2017)..........11

*Steuben Foods, Inc. v. Morris*,
　No. 01-CV-0521E(SC), 2002 WL 1628061 (W.D.N.Y. May 29, 2002)................12

*White & Case, LLP v. Suez, SA*,
　12 A.D.3d 267 (1st Dep't 2004) ...........................................................................9

*William Gluckin & Co. v. Int'l Playtex Corp.*,
　407 F.2d 177 (2d Cir. 1969)..................................................................................1

**Statutes**

28 U.S.C. § 1391(b)(2) ..............................................................................3, 9, 10

**Other Authorities**

C.P.L.R. § 302(a) ...........................................................................................12

Jimmy Vielkind, *New York Gov. Kathy Hochul Rejects Ban on Noncompete Agreements*, WALL ST. J., Dec. 23, 2023 ...................................................................4

Northern District of New York Local Rule 60.1 ...........................................................1

S. 3100A, 118th Cong. (2023) ........................................................................................4

## INTRODUCTION

Pursuant to Local Rule 60.1, Plaintiff WSP USA Buildings Inc. ("WSP") respectfully moves for reconsideration of the Court's January 25, 2024 Order and Decision (the "January 25 Decision") dismissing WSP's complaint without prejudice and denying as moot WSP's motion for preliminary injunction in aid of arbitration with temporary restraints (*see* ECF Nos. 9 and 10).

WSP acknowledges that reconsideration relief is limited to where material law or facts were overlooked or there is a need to correct a clear error or prevent manifest injustice. *Eisemann v. Greene*, 204 F.3d 393, 395 n. 2 (2d Cir. 2000); *see Bartz v. Agway, Inc.*, 849 F. Supp. 166, 167 (N.D.N.Y. 1994). Respectfully, that relief is warranted here because the Court's deference to Defendant Stephen Coon's ("Mr. Coon") earlier-filed California action overlooked facts showing the "special circumstances" for departure from the first-filed rule and reasons why this action should proceed in earnest. *New York Marine and Gen. Ins. Co. v. Lafarge N. Am., Inc.*, 599 F.3d 102, 112 (2d Cir. 2010) ("The [first-filed] rule is inapplicable when there are 'special circumstances'").

Mr. Coon's California action is quintessential forum shopping. *William Gluckin & Co. v. Int'l Playtex Corp.*, 407 F.2d 177, 178 (2d Cir. 1969) ("[w]here forum shopping alone motivate[s] the choice of the situs for the first suit . . . departure from the first-filed rule of priority [is warranted]."). Mr. Coon wants to immediately compete with WSP. To do so, he needs to invalidate his restrictive covenants with WSP. So, he identified California legislation that purports to void such restrictions and incorporated an "employer" there to avail himself of this favorable California law. He then waited until the statute went into effect on January 1, 2024 to commence his declaratory action in California the very next day. Mr. Coon intentionally undertook all these measures in derogation of the New York choice of law and forum selection clauses in his contracts

with WSP, and to thwart WSP's affirmative action against him for breach of his restrictive covenants.

Mr. Coon also improperly used an anticipatory lawsuit to secure priority status. *Employers Ins. of Wausau v. Fox Entertainment Grp. Inc.*, 522 F.3d 271, 275-76 (2d Cir. 2008) (special circumstances exist where "first-filed lawsuit is an improper anticipatory declaratory judgment action"). In the face of WSP's October 25 notice that it will pursue litigation and injunctive relief to hold Mr. Coon to his restrictive covenants, Mr. Coon filed his California action on the earliest possible date after enactment of the California statute, seeking to invalidate his covenants under that statute and thwart WSP's anticipated New York proceedings to hold him in breach of them. Mr. Coon readily admitted this improper purpose to the California court: "Defendants have threatened to sue Plaintiffs for doing precisely what they have a fundamental right to do under California law. This case seeks declaratory and injunctive relief preventing Defendants from doing so." Compl. (ECF No. 1) at Ex. K (referred to herein as "Coon CA Compl."), ¶ 4.

The January 25 Decision, while rooted in comity and judicial economy, regrettably rewards Mr. Coon's forum-motivated tactics while significantly prejudicing WSP. *Cf. Employers Ins.*, 522 F.3d at 275 (special circumstances exceptions are rooted in the notion that the "federal declaratory judgment is not a prize to the winner of a race to the courthouses.") (citations and quotations omitted). For WSP to have its injunctive request heard, it must appear in a distant forum selected by the nominal defendant where, as WSP contends in its pending motion to dismiss, personal jurisdiction is lacking. To the contrary, WSP and Mr. Coon mutually agreed to submit to jurisdiction in New York, not California. They agreed that the restrictive covenants would be decided according to New York's substantive law and public policy, not California's. And they agreed to litigate any dispute between them in New York, not California.

These facts also overcome the Court's venue and jurisdictional concerns embodied in the January 25 Decision. Mr. Coon expressly consented to this Court's exercise of personal jurisdiction over him in his contracts with WSP. And WSP laid venue in this Court under 28 U.S.C. § 1391(b)(2) because the gravamen of WSP's contractual and tort claims against Mr. Coon arise out his improper solicitation of *four* now-departed WSP senior employees in this District.

It is these indisputable facts, and their implications if the January 25 Decision stands, for which WSP respectfully requests that this Court have another look.

## ARGUMENT

Reconsideration relief is warranted where movant shows that "the Court overlooked controlling decisions or factual matters that were put before it on the underlying motion." *Eisemann*, 204 F.3d at 395 n. 2 (quotation and citation omitted); *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995) (reconsideration relief warranted where moving party "point[s] to controlling decisions and data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court."). Here, the factual record demonstrates the inapplicability of the first-filed rule under Second Circuit precedent and the propriety of venue in this District.

## I. THE SPECIAL CIRCUMSTANCES EXCEPTION APPLIES HERE.

### A. Mr. Coon's California Action Was Motivated Solely by Forum Shopping.

The Second Circuit directs that the first-filed rule will not apply where "the first-filing plaintiff [] engage[s] in some manipulative or deceptive behavior, or the ties between the litigation and the first forum [are] so tenuous or de minimis that a full 'balance of convenience' analysis would not be necessary to determine that the second forum is more appropriate than the first." *Employers Ins*, 522 F.3d at 276; *see Motion Picture Laboratory Techs. Local 780, I.A.T.S.E. v.*

*McGregor v. Werner, Inc.*, 804 F.2d 16, 19 (2d Cir. 1986) ("[T]he chief 'special circumstance' we have noted is our interest in discouraging forum shopping."). Both gamesmanship and insufficient ties are present here.

*First*, Mr. Coon manufactured a lawsuit in California for solely a tactical advantage. *Iragorri v. United Techs. Corp.*, 274 F.3d 65, 72 (2d Cir. 2001) (stating that one indication of forum shopping is "attempts to win a tactical advantage resulting from local laws that favor the plaintiff's case."). Mr. Coon readily admits that his restrictive covenants in his Employment and Bonus Retention Agreements with WSP are governed by New York law. Coon CA Compl. ¶ 19 ("By agreement of the contracting parties, New York law applies to the interpretation or enforcement of the contracts at issue in this lawsuit."); *see also* Compl., Ex. A § 17(b) ("the arbitrator will apply New York State law"); *id.* Ex. B § IV(E) ("This Retention Agreement shall be governed by and construed in accordance with the laws of the State of New York").

As the Court well knows, New York has a vested policy interest in having its laws applied where the parties so designate, as they did here. *See Ministers & Missionaries Benefit Bd. v. Snow*, 26 N.Y.3d 466, 472-476 (2015). Under New York law, Mr. Coon's contractual restrictive covenants will be enforced. *See Bollengier v. Gulati*, 233 A.D.2d 721, 722 (3d Dep't 1996). In fact, Governor Kathy Hochul recently vetoed a bill similar to the one relied upon by Mr. Coon in California, which "would broadly prohibit all non-compete agreements in New York," explaining that New York businesses "have legitimate interests [in non-competition agreements] that cannot be met with the Legislation's one-size-fits-all approach."[1]

---

[1] *See* S. 3100A, 118th Cong. (2023),
https://www.nysenate.gov/legislation/bills/2023/S3100/amendment/A; *see also* Jimmy Vielkind, *New York Gov. Kathy Hochul Rejects Ban on Noncompete Agreements*, WALL ST. J., Dec. 23, 2023, https://www.wsj.com/us-news/law/new-york-gov-kathy-hochul-to-reject-ban-on-noncompete-agreements-3f0eb7d4.

Mr. Coon also admits that he agreed to resolve disputes under his Bonus Retention and Employment Agreements in a New York court and a New York arbitration, respectively. Coon CA Compl. ¶ 35 ("[t]he Agreement requires the parties to resolve their disputes by arbitration with the America Arbitration Association . . . in New York"); *see* Compl., Ex. B § IV(E); Ex. A § 17 (a), (d).

Faced with these substantive and procedural hurdles, Mr. Coon identified California law as a gateway to invalidating his restrictive covenants so that he could immediately compete with WSP. According to Mr. Coon, California's statute enacted on January 1, 2024, Business and Professions Code Section 16600, voids restrictive covenants and noncompete provisions in employment contracts "even if the employee had signed the contractual restraint while living outside of California and working for a non-California employer." Coon CA Compl. ¶¶ 1-3(d).

But Mr. Coon, an Arizona domiciliary, needed a California, employment-based nexus to avail himself of the California law. *See id.* ¶ 3(e). So, he manufactured one. Following his departure from WSP on October 18, 2023, Mr. Coon formed CG Enterprises Holdings, LLC ("CG") in California on November 29, 2023. *See* Declaration of Sean C. Sheely ("Sheely Decl.") at Ex. 1; *see also* Declaration of Stephen M. Coon dated January 16, 2024 ("Coon Decl."), annexed as Ex. L to the Compl., at ¶ 8 (admitting same). Although Mr. Coon tries to cast CG as a "California employer" that "wishes to engage Steve as an employee," Mr. Coon readily admits that he solely founded and now "owns" the company. *Compare* Coon CA Compl. ¶¶ 33, 34 *with* ¶¶ 1, 8. Said differently, CG is not some established California-based competitor of WSP that courted Mr. Coon for his expertise but is now restrained from hiring him; rather, Mr. Coon himself created CG in California to compete with WSP and operates under his control.

5

Mr. Coon waited until the California statute went into effect on January 1 to file his California lawsuit on January 2, naming himself and CG as "plaintiffs." Coon CA Compl. ¶ 2 ("Those statutes became effective January 1, 2024"); Coon Decl. ¶ 37 ("On January 2, 2024, . . . I filed this suit."). He seeks declarations that his restrictive covenants with WSP are void and unlawful under the operative California statute and that WSP "can't enforce restrictive covenants against [him or] others." *See* Coon CA Compl. ¶¶ 38, 40, 47, 49.

Taken together, Mr. Coon undertook a series of intentional and manipulative acts to void his restrictive covenants using a California forum. He first identified favorable California legislation. He then formed an entity in California to avail himself of that forthcoming statute. Mr. Coon waited until the California statute went into effect. And when it did, he immediately filed his lawsuit for declaratory relief seeking an application of California law in violation of both the New York choice-of-law and forum selection clauses in his agreements, clauses that Mr. Coon admits are enforceable against him. These facts, without more, render Mr. Coon's California action undeserving of the first-filed priority. *See, e.g., Dornuch Ltd. v. PBM Holdings, Inc.*, 666 F. Supp. 2d 366, 371 (S.D.N.Y. 2009) (defendant not entitled to benefits of first-filed rule where it commenced action in Virginia, "notwithstanding the clear and mandatory agreement . . . to litigate in New York"); *Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535, 552 (6th Cir. 2007) ("By filing in [the first forum], Defendants were attempting to forum shop as well as preempt resolution of the parties' dispute by the proper forum" and therefore could not rely on the first-filed rule); *cf. Kellen Co., Inc. v. Calphalon Corp.*, 54 F. Supp. 2d 218, 223 (S.D.N.Y. 1999) (plaintiff's behavior "smacks of forum shopping" in initiating a secondary action in the hopes of securing "greater relief on the same claim" asserted in the primary case).

Mr. Coon is not the only party to attempt a stunt like this. Just recently, a senior executive from DraftKings Inc. resigned from his job, signed a contract with a California-based competitor, Fanatics, attempted to lay domicile in California, and then initiated a declaratory lawsuit in California seeking to invalidate his restrictive covenants under the same California statute relied upon by Mr. Coon. *See DraftKings Inc. v. Hermalyn*, Case No. 1:24-cv-10299-JEK (D. Mass. filed Feb. 5, 2024), ECF No. 4 at 1-4, 15-16 (arguing and citing case law for the proposition that employee cannot "escape the obligations of the[ir] contracts by, in essence, fleeing the jurisdiction"); *see also* ECF 26 at 4.[2] When DraftKings brought its own action in Massachusetts federal court, the executive sought a stay in favor of his California action under the first-filed rule. *Id.* at ECF No. 26. The Massachusetts court refused to give priority to the California action on the basis that (i) it could "better serve the interests involved" and (ii) the senior executive had executed noncompetition covenants with DraftKings expressly submitting to the jurisdiction of Massachusetts courts and agreeing that the provisions are governed by the laws of Massachusetts. *Id.* at ECF No. 29. This Court should do the same here: hold Mr. Coon to the New York substantive and procedural terms to which he agreed.

**Second**, even if Mr. Coon could point to a *bona fide* reason for his filing in California, any tie to that forum is still threadbare on its face. *See Everest Cap. Ltd. v. Everest Funds Mgmt., LLC*, 178 F. Supp. 2d 459, 470 (S.D.N.Y. 2002) (holding first-filed rule does not apply where plaintiff "select[ed] a forum with only a slight connection to the factual circumstances of his action."). The only nexus to California is the self-serving one created by Mr. Coon when he formed CG. Mr. Coon himself is not a California resident; he lives in Arizona. Defendants are not California

---

[2] For ease of reference, the operative *DraftKings* filings are annexed to the Sheely Decl. as Ex. 2.

entities; they are New York entities. *See* Coon Compl. ¶¶ 8, 11, 14 (admitting same). Mr. Coon's Employment and Bonus Retention Agreements say nothing of California; they are governed by New York choice of law and forum selection clauses. The pending arbitration between the parties is not seated in California; it is in New York. All four employees who have resigned since Mr. Coon's departure and are suspected of joining Mr. Coon previously worked in WSP's New York office and reside in New York. *See* Declaration of Kenneth Clausen dated February 1, 2024 (Sheely Decl. Ex. 3) ("Clausen Decl.") at ¶ 54. And, to the extent necessary, all the evidence regarding Mr. Coon's Employment Agreement and WSP's purchase of kW will be in New York.

**B.     Mr. Coon's California Lawsuit is an Improper Anticipatory Action.**

The first-filed rule also does not apply here because Mr. Coon admits he filed the California lawsuit in response to WSP's litigation threats and in anticipation of WSP's own lawsuit against him for breaching his restrictive covenants. *See Factors Etc., Inc. v. Pro Arts, Inc.*, 579 F.2d 215, 219 (2d Cir. 1978) (refusing to apply first-filed rule where defendant's "suit for declaratory judgment was filed in apparent anticipation of [plaintiff]'s New York suit.").

Shortly after Mr. Coon gave notice of his intent to leave, WSP notified Mr. Coon on October 25 of his continuing restrictive covenants and non-compete obligations, warning him that "WSP takes these restrictive covenants very seriously and expects you to honor the Agreement. If you were to breach one or more of these covenants, WSP would be forced to enforce the Agreement and seek all available remedies, including an injunction, damages, and attorneys' fees and costs." Compl., Ex. G; *see also CGI Solutions, LLC v. Sailtime Licensing Grp., LLC*, No. 05 CV 4120, 2005 WL 3097533, at *3–4 (S.D.N.Y. Nov. 17, 2005) (although notice letter "did not outright announce that it would be filing suit by a particular date," its statement that the party "may file a lawsuit seeking injunctive relief and civil damages . . . sufficiently notified Plaintiffs of its

8

resolve to sue").[3]  Not only was Mr. Coon's declaratory lawsuit filed close in time to this formal

letter, it was also filed on the *same day* WSP filed its Demand for Arbitration against him. Compl.

¶¶ 54-55; 58.

Mr. Coon concedes that he filed his California lawsuit in response to WSP's threats of

litigation and in anticipation of—and to preempt—WSP's inevitable lawsuit: "Defendants have

threatened to sue Plaintiffs for doing precisely what they have a fundamental right to do under

California law.  This case seeks declaratory and injunctive relief preventing Defendants from doing

so;" "Defendants threaten to, and unless restrained, will institute lawsuits upon Steve to prevent

Steve working for CG."  Coon CA Compl. ¶¶ 4, 44.

Mr. Coon also styled his complaint using the species of declaratory, defensive allegations

and claims indicative of an improper anticipatory action. That is, in the face of his threatened

breach of restrictive covenants by WSP, Mr. Coon turned his defenses of contractual non-

enforceability into affirmative declaratory claims that his restrictive covenants are void. *See White

& Case, LLP v. Suez, SA*, 12 A.D.3d 267, 268 (1st Dep't 2004) (action was properly dismissed,

finding that "use of a declaratory judgment action to determine the viability of a defense, or the

existence of merit, to a legal malpractice claim, or any tort claim, would be unusual, at the least").

## II.   THE COURT'S VIEWS ON VENUE AND PERSONAL JURISDICTION SHOULD BE REVISITED AND THIS ACTION REINSTATED.

### A.   Venue is Proper in this District.

WSP respectfully asks this Court to also revisit its view that "WSP appears to have mislaid

venue." January 25 Decision at 4.  Section 1391(b)(2) requires WSP only to point to facts showing

that a "substantial part of the events giving rise to the claim occurred [in this District]." 28 U.S.C.

---

[3]  On December 29, 2023, WSP also issued similar notices to two departing senior leaders suspected of joining Mr. Coon.  Compl. Exs. H, I.

§ 1391(b)(2); *see Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 432 (2d Cir. 2005) (plaintiff need not plead facts showing "the *most* substantial" events occurred in the operative venue; in fact, venue can be appropriate in more than one district as long as a substantial part of the underlying events took place in each of those districts) (emphasis added). So long as the subject events within this forum bear a close nexus to the claims asserted by WSP, they are properly deemed "significant" and, thus, "substantial" for purposes of venue under 28 U.S.C. § 1391(b)(2). *Daniel*, 428 F.3d at 433.

WSP filed for injunctive relief in aid of arbitration in this District because substantial events predicating its claims against Mr. Coon occurred here. WSP has shown that:

- Mr. Coon began competing with WSP in Troy, New York;

- Mr. Coon is leasing, or imminently plans to lease, office space in Troy, New York to strengthen his competitive profile;

- Mr. Coon conveyed to a WSP employee that he planned to take "anyone in Troy who had not signed a retention agreement" with WSP; and

- Mr. Coon already persuaded four senior WSP employees who work and reside in this District (Jason Leone, Gary Russinko, Andrew Stercho, and Jonathan Sterling) to join his competing company.

*See* Compl. ¶¶ 38-43; *see also* Clausen Decl. ¶¶ 24-25, 28, 31-38.

These claims are the centerpiece to WSP's breach of contract, breach of loyalty and tortious interference claims against Mr. Coon (*see, e.g.,* Compl. ¶¶ 68, 70-72, 76, 78-79, 83, 85-86), and venue is proper here on that basis.[4] *See Am. Integrated Sec. Grp., Inc. v. Terra Sound Tech. LLC*, No. 22CV2773AMDMMH, 2023 WL 6308014, at *8 (E.D.N.Y. Sept. 28, 2023) (finding venue

---

[4]     To the extent that WSP's *prima facie* showing does not wholly resolve the Court's concerns about venue to warrant reconsideration, WSP respectfully requests that the Court transfer the action to the U.S. District Court for the Southern District of New York in accordance with Mr. Coon's express consent to that venue in his Bonus Retention Agreement.

proper where the complaint alleged that defendants induced plaintiff's employee "to leave his New York employer, breach his New York contract, and steal significant New York business prospects from [plaintiff]" and thereby "a substantial part of the alleged interference and misappropriation happened in New York, which is the location of the confidential information that the defendants allegedly sought."); *Astor Holdings, Inc. v. Roski*, No. 01 CIV. 1905 (GEL), 2002 WL 72936, at *8 (S.D.N.Y. Jan. 17, 2002) (noting that "[v]enue will usually exist where an act outside the district causes physical injury or other tortious effect inside the district" and finding venue proper for tortious interference claim where "the complaint allege[d] that [defendant's] actions were directed at interfering with contracts that had substantial connections to New York"); *cf. Six Dimensions, Inc. v. Perficient, Inc.*, No. 15 CIV. 8309 (PGG), 2017 WL 10676897, at *7 (S.D.N.Y. Mar. 28, 2017) (finding venue improper because plaintiff "does not allege that any of its employees who were improperly solicited were employed in this District or solicited in this District").

## B. This Court Has Personal Jurisdiction over Coon.

The Court also had "doubt[s]" about whether it could exercise personal jurisdiction over Mr. Coon. January 25 Decision at 5, n. 4. Here again, WSP respectfully submits that the record should dispel any such doubt. Mr. Coon expressly consented to personal jurisdiction in New York for any dispute involving his Bonus Retention Agreement. *See* Compl., Ex. B at § IV(E). He likewise expressly consented—and now is actively participating—in an arbitration seated here in New York. Compl., Ex. A at § 17(A).

His dual consent is sufficient to confer jurisdiction over him to decide WSP's request for injunctive relief in this Court. *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 103 (2d Cir. 2006) ("Parties can consent to personal jurisdiction through forum-selection clauses in contractual agreements"); *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Lecopulos*, 553 F.2d 842, 844 (2d

11

Cir. 1977) (holding an "agreement to resolve disputes by arbitration in New York constitute[s] consent to personal jurisdiction in New York" without the need to engage in a CPLR § 302 analysis)[5]; *Absolute Nevada, LLC v. Grand Majestic Riverboat Co., LLC*, 646 F. Supp. 3d 426, 439 (S.D.N.Y. 2022) ("[B]y consenting to resolve his claim by arbitration in New York, [the party] consented to personal jurisdiction in New York.").

## **CONCLUSION**

WSP pursues reconsideration relief from this Court because of the significant prejudice it faces from this procedural morass created by Mr. Coon. If WSP is forced to proceed in California, it will be forced to proceed in a jurisdiction that it contends (a) is improper for all the reasons stated herein and (b) lacks jurisdiction for the reasons stated in WSP's pending motion to dismiss (*see* Sheely Decl. Ex. 3). Moreover, WSP is unable to await the outcome of its motion to dismiss because of the irreparable harm accruing each day and the practical reality that it could be many months until a decision is rendered.

For these and all the forgoing reasons, WSP respectfully requests that this Court (i) reconsider and reverse its January 25 Decision, (ii) vacate the Judgment (ECF 10) and reinstate

---

[5]     Even if this Court were to undertake further personal jurisdiction analysis, Mr. Coon's contractual breaches and tortious act in this State would confer jurisdiction over him under New York's long-arm statute, C.P.L.R. § 302(a). *See, e.g., Steuben Foods, Inc. v. Morris*, No. 01-CV-0521E(SC), 2002 WL 1628061, at *3 (W.D.N.Y. May 29, 2002) (finding personal jurisdiction under C.P.L.R. § 302(a)(3)(ii) over Georgia corporation that solicited New York-based employees of another company noting that plaintiff was injured in New York "where it felt the loss of its Solicited Employees" and defendant "should have reasonably expected that its recruitment of [plaintiff's] employees would have consequences in New York"); *McCrory Corp. v. Cloth World, Inc.*, 378 F. Supp. 322, 324–25 (S.D.N.Y. 1974) (finding personal jurisdiction over defendants under C.P.L.R. § 302(a)(3)(ii) where it was "undisputed that the defendants made certain phone calls to various of the employees in New York" in an attempt to lure away plaintiffs' employees and accordingly finding that injury to plaintiffs occurred in New York and defendants "certainly expected or should have expected their alleged acts to have consequences in New York.").

the action, (iii) permit Mr. Coon to be served and immediately joined to this lawsuit; and (iv) consider WSP's request for a temporary restraining order and preliminary injunction (ECF 3).

Dated: February 8, 2024              Respectfully submitted,

                            HOLLAND & KNIGHT LLP
                            *Attorneys for Plaintiff*

                            By:____*/s/ Sean C. Sheely*____
                                Sean C. Sheely

# Exhibit O

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

WSP USA BUILDINGS INC.,

                        Plaintiff,

              -v-                            1:24-CV-076

STEPHEN COON,

                         Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                    OF COUNSEL:

HOLLAND & KNIGHT LLP      SEAN C. SHEELY, ESQ.
Attorneys for Plaintiff
31 West 52 Street
New York, NY 10019

DAVID N. HURD
United States District Judge

## DECISION and ORDER

## I. INTRODUCTION

    On January 17, 2024, plaintiff WSP USA Buildings Inc. ("WSP" or "plaintiff") filed this action against a former employee, Stephen Coon ("Mr. Coon" or "defendant"). Dkt. No. 1. That same day, plaintiff filed an *ex parte* emergency motion for a temporary restraining order ("TRO") and preliminary injunction ("PI") to enforce the restrictive covenants contained in Mr. Coon's employment agreement (the "Agreement"). Dkt. No. 3.

On January 25, 2024, a Decision and Order (the "January Order") was issued dismissing WSP's case without prejudice. Dkt. No. 9. A judgment was entered accordingly. Dkt. No. 10. Plaintiff filed a motion for reconsideration of the January Order pursuant to Local Rule 60.1 on February 8, 2024. Dkt. No. 11.

Mr. Coon has yet to appear in this action. However, resolution of WSP's motion for reconsideration may proceed unopposed at this time. The motion will be considered on the basis of plaintiff's submission and without oral argument.

## II. BACKGROUND

In 2020, WSP acquired kW Mission Critical Engineering ("KW"). Compl. ¶¶ 2, 10, 14. As a member of senior leadership, Mr. Coon signed the Agreement with plaintiff that contained restrictive covenants prohibiting him from, *inter alia*, competing with plaintiff's business and soliciting plaintiff's employees. *Id.* ¶ 16.

On November 22, 2023, Mr. Coon tendered a letter of resignation notifying WSP of his intention to leave the company after over a decade of service. Compl. ¶ 35. On October 25, 2023, plaintiff mailed defendant a letter (the

"October Letter") reminding him that he remained bound by the Agreement for the next year. *Id.* ¶¶ 37, 51; Ex. G to Compl., Dkt. No. 1-1 at 38–39.[1]

Since then, the parties have disagreed as to the validity of the Agreement and have each initiated parallel litigation on opposite ends of the country. Compl. ¶ 58. On January 2, 2024, Mr. Coon filed an action in the California Supreme Court, Sonoma County against WSP contesting the validity of the Agreement. *Id.* Plaintiff later removed that case to the Northern District of California on January 17, 2024. *See CG Enters. Holdings, LLC v. WSP USA, Inc.*, No. 24-CV-0292 (VC). That same day, plaintiff filed this lawsuit in the Northern District of New York seeking both a TRO and PI that were denied. *See* January Order at 6.

On February 2, 2024, WSP moved to dismiss Mr. Coon's lawsuit in the Northern District of California pursuant to Federal Rule of Civil Procedure ("Rule") 12(b). Ex. 3 to Mot. for Reconsideration, Dkt. No. 11-3. As is especially relevant here, that motion remains pending before the Northern District of California.

## III. <u>LEGAL STANDARD</u>

Local Rule 60.1 provides that a party may file a motion for reconsideration within fourteen days from the date a judgment, order, or decree is entered. N.D.N.Y. L.R. 60.1. The standards governing motions for reconsideration are

---

[1] Pagination corresponds to CM/ECF.

necessarily strict to prevent litigants from rehashing the same issues that have already been carefully considered by the district court in the prior ruling. *Navigators Ins. Co. v. Goyard, Inc.*, 623 F. Supp. 3d 220, 222 (S.D.N.Y. 2022) (quoting *Analytical Survs. Inc. v. Tonga Partners L.P.*, 684 F.3d 36, 52 (2d Cir. 2012) ("[S]uch a motion 'is not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a second bite at the apple[.]'").

In this circuit, "[a] court may justifiably reconsider its previous ruling if: (1) there is an intervening change in the controlling law; (2) new evidence not previously available comes to light; or (3) it becomes necessary to remedy a clear error of law or to prevent manifest injustice." *DG N.Y. CS, LLC v. Norbut Solar Farm, LLC*, 2024 WL 476540, at *1 (N.D.N.Y. Feb. 7, 2024) (quoting *Delaney v. Selsky*, 899 F. Supp. 923, 925 (N.D.N.Y. 1995) (McAvoy, J.)).

## IV.  DISCUSSION

The motion for reconsideration standard is a high bar.  WSP has not presented new law or facts that require this Court to revisit the January

Order.[2]  As discussed in the January Order, dismissal of this case is proper for several reasons.  Among them are the so called first-to-file rule, lack of personal jurisdiction, and improper venue.

## A. **First-to-File Doctrine**

First, WSP fails to establish a clear error is dismissing this case under the so-called "first-to-file" rule.  Plaintiff argues that this case presents "special circumstances," precluding the application of the first-to-file rule.  Pl.'s Mem., Dkt. No. 11-5 at 3–10.  Plaintiff argues that defendant's decision to initiate a lawsuit in California was both improper forum shopping and improper anticipatory litigation.  Pl.'s Mem. at 3–9.  These arguments must be rejected.

As discussed in the January Order, judges in this Circuit enjoy wide discretion to dismiss, transfer, or stay an action where an earlier, identical lawsuit has been filed in another district court under the "first-to-file" rule. *Adam v. Jacobs*, 950 F.2d 89, 92 (2d Cir. 1991) (citing *Kerotest Mfg. Co. v. C-O-Two Fire Equip. Co.*, 342 U.S. 180, 138–84 (1952)).  Of course, exceptions to this rule exist.  Under the "special circumstances" exception, which encompasses both the forum shopping exception and the improper

---

[2] WSP has filed a motion to dismiss Mr. Coon's lawsuit in the Northern District of California that remains pending before the court. *See supra*.  While the Northern District of California may grant that motion, it may also deny it.  Therefore, simply appending its motion papers does not support the existence of new facts to require reconsideration of the January Order as to the applicability of the first-to-file rule.  Plaintiff has also appended the docket of a First Circuit case filed in the District of Massachusetts, *DraftKings, Inc. v. Hermalyn*, No. 24-CV-10299.  Ex. 2 to Decl. of Sean C. Sheely, Dkt. No. 11-2. However, that case is of no precedential value and does not demonstrate a "change in the law" sufficient to require reconsideration of the January Order.

anticipatory action exception, plaintiffs who are the first-to-file do not enjoy the priority conferred by the rule. *Fit & Fun Playscapes, LLC v. Sensory Path, Inc.*, 2022 WL 118257, at *7–8 (S.D.N.Y. Jan. 12, 2022).

To demonstrate that forum shopping constitutes a special circumstance, "the first-filing plaintiff must engage in some manipulative or deceptive behavior, or the ties between the litigation and the first forum must be so tenuous or de minimis that a full 'balance of convenience' analysis would not be necessary to determine that the second forum is more appropriate than the first." *Emps. Ins. of Wausau v. Fox Ent. Grp., Inc.*, 522 F.3d 271, 276 (2d Cir. 2008). A lawsuit is improper anticipatory litigation when it is filed in direct response to a demand letter that provides specific deadlines or notifies a party of "imminent" litigation in a different district. *Fit & Fun Playscapes, LLC*, 2022 WL 118257, at *8 (collecting cases).

Upon review, WSP has not demonstrated that the Court committed clear error when it concluded that Mr. Coon's pending lawsuit in the Northern District of California was not improper forum shopping nor improper anticipatory litigation. This dispute concerns defendants' alleged breach of the Agreement. Compl. ¶ 1. Mr. Coon has incorporated his competing business entity in California and maintains its principal place of business there. *See* Ex. 1 to Def.'s Mem, Dkt. No. 11-1 at 2. Therefore, the decision to

litigate there appears not only logical but efficient given the nature of the dispute.

Next, WSP's argument that Mr. Coon's California lawsuit is improper rests on a mischaracterization of the October Letter to defendant. The October Letter does not contain sufficient detail to be considered a demand letter in this context. *Fit & Fun Playscapes, LLC*, 2022 WL 118257, at *8 (collecting cases). The October Letter provides no deadlines or otherwise apprised defendant of plaintiff's intention to bring certain claims in this district or any other. Ex. G to Compl. at 39.

Therefore, WSP has not demonstrated that special circumstances exist to rebut the presumption that the first-to-file rule applies here. Dismissal is proper here to give priority to Mr. Coon's earlier lawsuit in the Northern District of California. Accordingly, plaintiff's argument that the January Order was made in clear error must be rejected.

## C. **Personal Jurisdiction**

Second, WSP urges that this Court has overlooked facts giving rise to personal jurisdiction over Mr. Coon. Plaintiff cites defendant's Bonus Retention Agreement in which the parties agree that disputes over *arbitration* awards should be litigated in the courts of New York, New York. Pl.'s Mem. at 11. However, the courts of New York County do not include the

Northern District of New York.  28 U.S.C. § 112(b).  Accordingly, plaintiff's argument must be rejected.

**B.  <u>Venue</u>**

Finally, WSP argues that the January Order overlooked key facts that properly lay venue in this district.  *See* 28 U.S.C. § 1391(b)(2).  Plaintiff urges once more that venue has been properly laid in the Northern District of New York because a "substantial part of the events giving rise to the claim occurred" here.  Pl.'s Mem. at 9; 28 U.S.C. § 1391(b)(2).

While WSP presents no new facts other than the ones carefully considered in the January Order, explanation of the federal venue statute appears necessary in this case.  The venue statue provides three possible district courts in which plaintiffs may initiate this litigation.  These include:

> (1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located; (2) a judicial district in which a substantial part of the acts or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or (3) if there is no district in which an action may otherwise be brough as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

28 U.S.C. § 1391.

Here, Mr. Coon resides in Arizona.  Compl. ¶ 11.  As such, venue would be proper in the District of Arizona in accordance with § 1391(b)(1).  Defendant

has incorporated a competing business entity in the state of California with a mailing address in Santa Rosa, California. Ex. 1 to Decl. of Sean C. Sheely, Dkt. No. 11-2 at 2. Therefore, the acts or omissions giving rise to this claim occurred in the Northern District of California—where defendant has already initiated a lawsuit.[3] 28. U.S.C. § 84(a). Finally, as a last resort, plaintiff could lay venue anywhere that defendant is subject to the court's personal jurisdiction. However, as discussed in the January Order, plaintiff has alleged merely speculative ties between defendant and this district. Pl.'s Mem. at 10; Compl. ¶¶ 42–43.

Therefore, WSP has incorrectly laid venue in the Northern District of New York. Accordingly, dismissal is proper under 28 U.S.C. § 1406(a).

## IV.  CONCLUSION

In sum, WSP fails to establish new law or facts that require revisiting the January Order. Plaintiff also fails to establish that the Court committed clear error in deciding the January Order. In reviewing plaintiff's motion, it is clear that it does not wish to litigate this dispute in the Northern District of California. Resolution of plaintiff's pending motion in that court may well prove meritorious. However, the question presented in *this* case is whether

---

[3] WSP also claims that Mr. Coon has solicited former employees from its Troy, New York office yet does not allege that defendant ever traveled to or conducted business anywhere in the state of New York. Pl.'s Mem. at 10.

plaintiff may file its case in the Northern District of New York. Once more, the answer to that question is no.

Therefore, it is

ORDERED that

1. Plaintiff's motion for reconsideration is DENIED; and

2. Plaintiff is directed to serve a copy of the complaint on defendant in a manner that conforms to the Federal Rules of Civil Procedure no later than April 16, 2024.

IT IS SO ORDERED.

David N. Hurd
U.S. District Judge

Dated:  February 14, 2024
        Utica, New York.